Michael J. Flynn, Mass. State Bar No.172780
P.O. Box 690, 6125 El Tordo
Rancho Santa Fe, CA 92067
Tel:  (858) 775-7624; Fax:  (858) 759-0711
*Admitted Pro Hac Vice*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| DENNIS MONTGOMERY, and the MONTGOMERY FAMILY TRUST,<br><br>Plaintiffs,<br><br>v.<br><br>ETREPPID TECHNOLOGIES, LLC, WARREN TREPP, and the UNITED STATES DEPARTMENT OF DEFENSE,<br><br>Defendants.<br><br>AND ALL RELATED MATTERS. | 3:06-CV-00056-PMP-VPC<br>**BASE FILE**<br><br>3:06-CV-00145-PMP-VPC<br><br>**DECLARATION OF PHILIP STILLMAN** |

## DECLARATION OF PHILIP H. STILLMAN

I, Philip Stillman, hereby declare:

1. I have been a member in good standing of the Board of Bar Overseers in the Commonwealth of Massachusetts since 1989 and the California State Bar since 1991, as well as all federal district courts in California, Massachusetts, the United States Court of Appeals for the Ninth Circuit and the First Circuit. I have personal knowledge of the facts stated herein, and if called as a witness, I could and would testify competently to them.

2. Beginning in 1987, I was first a law clerk, then a partner in the Massachusetts based law firm of Flynn, Sheridan, Tabb and Stillman. Mr. Flynn was the founding partner. I opened the California office of that firm in 1992. Although that partnership was ultimately dissolved, Mr. Flynn and I continued to practice as Flynn & Stillman, and Mr. Flynn maintained both a home and office in Boston and at my California office in Rancho Santa Fe, California. Between 1993 and the dissolution of the Flynn and Stillman partnership, I maintained an office in Cardiff, California. Mr. Flynn has never worked there, and to my knowledge, Mr. Flynn has never met or seen clients there. I do not believe that Mr. Flynn has been to the Cardiff office more than a few times.

3. I understand that Dennis Montgomery has claimed that he met Mr. Flynn in the Cardiff office. Neither Mr. Flynn nor I met Mr. Montgomery at the Cardiff office, although I was informed by him that he stopped by the office when I was not there on or about January 25-26, 2006. The only times that I met Mr. Montgomery in San Diego County was an agreed-upon meeting on or about January 25-26, 2006 at the restaurant at The Four Seasons Hotel in Carlsbad, California, where he, Mr. Flynn and I met for dinner, and then later at the office of another individual who is not an attorney. That meeting involved our representation of Montgomery in the Nevada cases..

4. According to Mr. Montgomery, he had recently arrived from Nevada, and this was the first time that either Mr. Flynn or I had met him in person in California. He had previously met with Mr. Flynn in Reno, Nevada several days before. Montgomery stated that he had "driven by" the office in Cardiff, but no one was there. Both Mr. Flynn and I explained to him that I was "the

1

California partner" also licensed in Massachusetts, that the firm originated as a Massachusetts firm, that Mr. Flynn was only licensed in Massachusetts (as is our custom and practice, also noted on Mr. Flynn's letterhead) and that to handle his case, Mr. Flynn and I would need to be admitted *pro hac vice* in Nevada. Montgomery acknowledged that in the previous meeting in Reno, Mr. Flynn had explained this to him, as well as Mr. Flynn's background as a litigator which we then discussed in terms of several cases that we had litigated.

5. There is absolutely no doubt in my mind that Montgomery fully understood that Mr. Flynn was and is not a California lawyer. Montgomery's claim that Mr. Flynn held himself out as being authorized to practice law in California is simply false.

6. First, it was explicitly discussed in our meeting at the Four Seasons Hotel. Second, on February 8, 2006, I drafted a written fee agreement with Mr. Flynn, Mr. Logar and Mr. Pulver in a conference room of Logar & Pulver in Reno, Nevada. That fee agreement, signed by me, was handed to Mr. Montgomery in the conference room by me, and read by him, and clearly discloses not only the terms of the fee agreement to which Mr. Montgomery had orally agreed, but explicitly states that Mr. Flynn is only licensed to practice in Massachusetts and that we would both need to be admitted *pro hac vice* in Nevada to be able to represent him. That fee agreement is attached as Exhibit 3 to Mr. Flynn's Motion for fees. It states in part: "Senior partners (Michael Flynn, only licensed in MA...." Mr. Logar and Mr. Pulver received copies of this proposed agreement on Feb. 8, 2007 in their conference room. Third, Mr. Flynn's status as a Massachusetts-licensed attorney was discussed in open court with Mr. Montgomery sitting next to Mr. Flynn and I on February 7, 2006 in the Second Judicial District Court for Washoe County, before the Hon. Robert Perry.

7. In particular, the following is a true and correct excerpt of the court proceedings, at pp. 5:20 - 8:3:

> MR. LOGAR: Your Honor, if it please the Court, I'm Ronald Logar representing the Defendant, along with Mr. Eric Pulver in my office. I would like to introduce to you a Michael J. Flynn.
> MR. FLYNN: Good morning, your Honor.
> MR. LOGAR: Mr. Flynn is a member of the Massachusetts Bar. The application for admission to pro hac vice has been made. The Massachusetts Bar has sent a Certificate of Good Standing to the State Bar of Nevada. The State Bar of Nevada has issued its approval. It was over-nighted yesterday to my office. It should be received by Federal Express about 10:00 or 10:30 this morning, having complied with

2

1  the Supreme Court rule as to admission, and we ask that Mr. Flynn be permitted to appear in this
2  matter on behalf of the Defendant.

. . .

3      MR. LOGAR: And then I'd like to introduce Mr. Philip Stillman. Mr.
4  Stillman is a member in good standing of both the Massachusetts and the State Bar
   of California. He has made application to the State Bar of Nevada for admission and approval pro
5  hac vice. His Certificate of Good Standing was sent to the State Bar's office in Las Vegas
   yesterday by the State of California. It's expected that the State Bar of Massachusetts will send the
6  Certificate of Good Standing to the Las Vegas office today, and then the Las Vegas office will
   issue its approval and we expect that within the next two days. The delay on Mr. Stillman is due to
7  the fact that Mr. Stillman provided with his application to the State Bar recent admission before a
   Federal Court in the State of California; however, since it was beyond 30 days' time of issuance
8  from the date of application, the State Bar said they needed something more current, so that is the —

9      MR. PEEK: Your Honor, absent the approval by the State Bar, I would
   object to his admission until the State Bar has at least had its opportunity to vet and
10 receive, if you will, and then approve. I would object until that process has been
   approved.

11    8.    All of the work that I did for Montgomery, including negotiating, preparing,
12 reviewing and analyzing the Opsprings contracts *under Washington law* (not California law) in
13 March-April, 2006, was always directly related to the Nevada cases. In fact, as set forth in the
14 written fee agreement (but unsigned by Mr. Montgomery), it was explicitly contemplated that a
15 company would be separately formed to hold Mr. Montgomery's and the Montgomery Family
16 Trust's intellectual property rights and the attorneys would have shares in that entity as part of the
17 fee. Although Mr. Logar first incorporated a company called "nCoder" as part of that agreement,
18 we also worked on the Opsprings agreements specifically to facilitate both that portion of the fee
19 agreement relating to nCoder as well as the developing relationship with Edra Blixseth and
20 Opsprings. Mr. Montgomery, Mr. Logar and Mr. Pulver have copies of these Opsprings
21 agreements as part of our representation of Montgomery in the Nevada cases. Thus, Mr.
22 Montgomery's claim that matters other than the Nevada cases were involved in our representation
23 is to my knowledge, false. As far as I am aware, all legal work performed for Mr. Montgomery
24 was directly related to the Nevada actions now pending in this Court. Mr. Montgomery breached
25 his representations and promises regarding the proposed fee agreement.

26    9.    Although it is our custom and practice to get written fee agreements from new
27 clients before any work is performed, Mr. Montgomery's case was an exception. The reasons that
28 Mr. Flynn and I agreed to begin significant work on Mr. Montgomery's cases shortly before the

3

preliminary injunction hearing on Feb. 7, 2006, without a signed fee agreement which I was seeking from Mr. Montgomery at the time (Mr. Flynn left these details to me, and I am less trusting than he is) were twofold: (a) Mr. Montgomery promised to execute a fee agreement with the four attorneys, Logar, Pulver, Mr. Flynn and me, which I subsequently completed the day following the hearing on February 8, 2006; and (b) Mr. Flynn and I were convinced by Montgomery's demonstrations off his laptop computer that vital national security issues were at stake and that Warren Trepp was manipulating the judicial system to grab valuable technology belonging to Mr. Montgomery. In other words, we believed and trusted Montgomery. Because the case appeared very strong based on our interviews with Mr. Montgomery and because there were emergency applications for temporary restraining orders that had to be opposed immediately, and Mr. Flynn and I have had extensive experience in intellectual property litigation, we had to begin work immediately and on an emergency basis in order to protect Mr. Montgomery's rights. Accordingly, although we negotiated the fee agreement, we did not present it to him in final written form until after the the hearing on Trepp's application for a preliminary injunction against Mr. Montgomery on February 8, 2006. Mr. Montgomery read the fee agreement in our presence on Feb. 8, 2007 in Mr. Logar's conference room, and we discussed it, including the fact that Mr. Flynn's billing rate as the lead attorney was being discounted as part of the contingency arrangement as reflected right next to the clause that Mr. Flynn was only licensed in Massachusetts. I know that Mr. Montgomery read this clause because the discounting of Mr. Flynn's billing rate as party of the contingency was explained by Mr. Flynn to him.

10. However, Mr. Montgomery never signed the written fee agreement despite his promises and representations that he would do so, and I continued to perform work for Mr. Montgomery based on the belief in his claims and his representations that he would sign it.

11. At some time in late July or early August, 2007, I received a telephone call from Montgomery. Among other things, Mr. Montgomery claimed that Mr. Flynn may have entered into some sort of financial "side deal" with Trepp to damage Mr. Montgomery's case. I told him that based on my 20 years of knowing Mike Flynn personally and professionally, I simply could not believe that to be true. I thought that the idea of an alleged "side deal" with Trepp was absurd..

4

12. Some time thereafter I had two or three conversations with Teri Pham, Montgomery's new lawyer. Although our conversations were always cordial and not adversarial, Ms. Pham had a serious problem keeping our few conversations straight in her mind. It seemed as if from one time to the next, she would take whatever I said in the prior conversation and turn it around 180 degrees. I would then have to recount each step of the prior conversation to try to get her to understand that her version of events was seriously skewed. For example, on one occasion, she said that Mr. Montgomery wanted me to continue to represent him and asked if I would waive any claims to fees that Mr. Flynn was apparently seeking, in order to avoid a conflict of interest. I told her that I had no right to waive any fees on Mr. Flynn's behalf, but that I would potentially be willing to help mediate any dispute concerning fees, but only after I reviewed the bills and discussed them with Mr. Flynn. I also wanted to know all of the reasons for Mr. Flynn's withdrawal, because I had not discussed the cases with Mr. Flynn for many months. In a later telephone call, she told me that she had earlier said that Mr. Montgomery did not want me to be involved.

13. In one of our conversations, Ms. Pham also asked me about whether Mr. Flynn was holding himself out as a California lawyer. I told her in unequivocal terms that it never happened, recounting the above facts. Ultimately, Ms. Pham was not interested in having me act as a mediator or review any of the legal bills, saying that if I "wasn't going to help Mr. Montgomery, he wasn't going to help me." Although I tried to explain to Ms. Pham that it wasn't a question of helping or not helping Mr. Montgomery, but rather that I could not help resolve this dispute without any information, I told her that I understood her position and would just let things take their course. That was our last conversation, approximately on or about September 10.

14. I have litigated several software copyright cases and am well-versed in computer technology. Although I thought that some of Mr. Montgomery's claims sounded too good to be true, specifically relating to the claimed capabilities of his video and audio compression codecs that Mr. Montgomery discussed with me that in my opinion, if true, would revolutionize video/music over the internet and on cell phones, it is fair to say that Mr. Flynn and I continued to believe in Mr. Montgomery's claims about his technology, since those claims were certainly

plausible.

15. Mr. Flynn has enjoyed a remarkably successful career in numerous high profile cases for over three decades. I have had the privilege of trying lengthy jury cases with him as the second seat. His skills as a trial lawyer are beyond question. He has been a mentor and friend to me and in my 18 years of trial experience, Mr. Flynn is the best cross-examiner and trial strategist I have ever seen. I thought, at least from my personal observation, that we provided stellar representation to Mr. Montgomery, and I personally devoted hundreds of hours to the case, working late at night, on weekends, and when search warrants were executed on Mr. Montgomery, spending hours on an emergency basis to protect his interests.

16. I have read the "Attorney Search" record attached to the Montgomery Opposition to the Motion for Fees stating "Flynn and Stillman" with a Cardiff, California address. Some time ago, I had requested that this information be corrected to "Stillman & Associates." I recently had to submit a second request for this change after Mr. Flynn brought it to my attention that the change had not been made on the California State Bar website.

17. In addition, in my years of practice with Mr. Flynn, I cannot remember a case where we sued a client for fees, and indeed, I specifically recall one case where Mr. Flynn personally paid the costs out of his own pocket in excess of $100,000, when the client did not pay them as he had agreed, because we believed in the case and ultimately prevailed.

I declare under the penalties of perjury of the laws of the State of California and the United States that the foregoing is true and correct on September 24, 2007 at Cardiff, California.

By: _____
Phillip H. Stillman, Esq.

6