1 | Mark H. Gunderson, Esq. (SBN: 2134)
  | Catherine A. Reichenberg, Esq. (SBN: 10362)
2 | GUNDERSON LAW FIRM
  | 5345 Kietzke Lane, Suite 200
3 | Reno, Nevada 89511
  | Telephone: (775) 829-1222
4 | Facsimile: (775) 829-1226

5 | Deborah A. Klar, Esq. (SBN: CA 124750)
  | Teri T. Pham, Esq. (SBN: CA 193383)
6 | Tuneen E. Chisolm, Esq. (SBN: CA 211741)
  | LINER YANKELEVITZ
7 | SUNSHINE & REGENSTREIF LLP
  | 1100 Glendon Avenue, 14th Floor
8 | Los Angeles, California 90024-3503
  | Telephone: (310) 500-3500
9 | Facsimile: (310) 500-3501
  | ADMITTED PRO HAC VICE

10

  | Attorneys for Plaintiffs
11 | DENNIS MONTGOMERY, and the MONTGOMERY
  | FAMILY TRUST

12

13 |                 **UNITED STATES DISTRICT COURT**

14 |                      **DISTRICT OF NEVADA**

15

16 | DENNIS MONTGOMERY and the            )   Case No. 3:06-CV-00056-PMP-VPC
   | MONTGOMERY FAMILY TRUST,             )   BASE FILE
17 |                                      )
   |            Plaintiffs,               )   (3:06-CV-00145-PMP-VPC)
18 |                                      )
   |      vs.                             )   **PLAINTIFFS' NOTICE OF MOTION**
19 |                                      )   **AND MOTION TO ENFORCE RIGHT**
   | ETREPPID TECHNOLOGIES, LLC, WARREN ) **TO INSPECTION OF RECORDS;**
20 | TREPP, and the UNITED STATES         )   **MEMORANDUM OF POINTS AND**
   | DEPARTMENT OF DEFENSE,               )   **AUTHORITIES; SUPPORTING**
21 |                                      )   **DECLARATIONS OF DENNIS**
   |            Defendants                )   **MONTGOMERY, MICHAEL S.**
22 |                                      )   **SPINDLER, AND GREG GILBERT**
   | _____)
23 |                                      )
   | AND RELATED CASES.                   )
24 | _____)

25

26

27

28

                              MOTION TO ENFORCE RIGHT TO INSPECTION OF COMPANY RECORDS

**NOTICE OF MOTION AND MOTION**

1

2    Plaintiffs Dennis Montgomery and the Montgomery Family Trust hereby move the Court

3  for an Order enforcing his inspection rights by requiring Defendant eTreppid Technologies, LLC

4  ("eTreppid" or the "Company"), to make available within three business days for inspection and

5  copying, in their native electronic format where applicable, all of the Company's financial and

6  organizational books and records, including but not limited to the Company's financial statements;

7  its tax returns; all contracts between eTreppid and any other person or entity; the Company's

8  organizational documents, including but not limited to all versions of its Operating Agreement, its

9  Articles of Organization, its Bylaws, all meeting minutes, any buy-sell agreements between and

10  among any members, and a list of its members and their addresses; the Company's accounts

11  payable records, purchase invoices, and receipts; all credit card bills and statements; accounts

12  receivable records, purchase orders, sales invoices, and receipts; bank statements and cancelled

13  checks; wire transfers and wire transfer authorizations; all fixed asset records; the Company's

14  accounting ledgers, including but not limited to its general ledger and any subsidiary ledgers such

15  as its daily transaction journals and records (including those recorded on the Zenith computer

16  system), cash receipts ledger, cash disbursements ledger, sales ledger, accounts receivable ledger,

17  or accounts payable ledger, and general journals containing all accounting entries; the Company's

18  leases; the Company's payroll records; all debt or loan agreements; any other transactions and

19  agreements, including those with insiders; all records of any capital distribution, guaranteed

20  payments, compensation, payment, or distribution of any kind to any officer or member of

21  eTreppid; its attorney bills; the Company's correspondence, including but not limited to e-mails,

22  letters, memoranda, faxes, reports, and notes; all other back-up material that supports the

23  Company's financial records; and all work product used to produce the Company's yearly financial

24  statements, including its ledgers and trial balances.

25    Good cause exists to grant this Motion. Montgomery is a member of eTreppid. Section 9.1

26  of eTreppid's Operating Agreement requires it to maintain its books and records in accordance with

27  GAAP. Section 9.3 of eTreppid's Operating Agreement grants "[i]nspection and [a]udit [r]ights"

28  to each of the members, permitting them to inspect and copy "any of the LLC books and records

1

0039641/001/ 368662v01

1  required to be maintained in accordance with Section 9.1 above." GAAP requires eTreppid to

2  maintain books and records documenting each of its transactions, and the accounting records

3  necessary to properly characterize and categorize them. Accordingly, Montgomery is entitled to

4  the requested inspection. Moreover, eTreppid's controlling members have used assertions

5  regarding eTreppid's financial condition to justify their efforts to dilute Montgomery's membership

6  interest. Montgomery is entitled to access to the Company's books and records to test the accuracy

7  of these representations.

8       This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and

9  Authorities and Declarations of Dennis Montgomery, Michael S. Spindler, and Greg Gilbert

10  attached hereto, all pleadings and papers on file in this action, all matters of which the Court may

11  take judicial notice, and such further evidence and argument as the Court may consider at the

12  hearing of this Motion.

13  Dated: November 5, 2007

LINER YANKELEVITZ SUNSHINE &
REGENSTREIF LLP

By: _____
Deborah A. Klar
Attorneys for Plaintiffs
Dennis Montgomery and the Montgomery
Family Trust

1

2

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

3      ETreppid's hide-the-ball tactics, which have gone on for years, must stop. Etreppid's

4  controlling members, Warren Trepp and Douglas Frye, contend that the Company's financial

5  condition permits them to dilute Montgomery's ownership interest. As a Member of eTreppid,

6  Montgomery has the right to inspect the Company's financial books and records, and he has

7  doggedly attempted to invoke those rights. Yet in the nine years since eTreppid was formed, Trepp

8  and Frye have <u>never</u> permitted Montgomery to inspect the Company's books and records. Instead,

9  as alleged in Montgomery's Counterclaim, they have obdurately refused to permit Montgomery to

10  independently verify their claims regarding the Company's financial condition, even while they

11  commence litigation against him.

12      Montgomery therefore requires the Court's assistance. Section 9.1 of eTreppid's Operating

13  Agreement requires the Company to maintain its books and records "in accordance with generally

14  accepted accounting principles [GAAP]." GAAP, of course, requires companies to maintain books

15  and records sufficient to verify all reported transactions. Section 9.3 of the Operating Agreement,

16  entitled "Inspection and Audit Rights," enables members to audit the Company (at their own

17  expense) by "inspect[ing] and copy[ing] . . . any of the LLC books and records required to be

18  maintained in accordance with Section 9.1 above." Accordingly, as a Member, Montgomery is

19  entitled to inspect and copy the Company's financial, tax, and accounting records, including the

20  backup necessary to verify them. Plaintiffs request that the Court order eTreppid to make these

21  records available within three business days for Montgomery's inspection and copying, and that all

22  electronic records be made available in their native electronic format.

23

24                                  ## FACTS

25      ETreppid was formed (originally under the name Intreppid Technologies, LLC) in 1998.

26  Montgomery Decl., ¶ 2. It was a classic division between sweat equity and money. Plaintiff

27  Dennis Montgomery, the sweat equity member, had invented valuable data compression

28  technology. To obtain his 50% stake in the Company, he agreed to contribute the portion of that

3

0039641/001/ 368662v01

1  technology that resided on a specific compact disc, which the parties called "CD-1." Warren Trepp
2  was the money member. His responsibility was to contribute $1,300,000 in cash to finance the
3  Company. Montgomery Decl., ¶ 3.

4        As the Court has undoubtedly seen on countless occasions, the classic division between
5  money and sweat equity carries with it a classic risk. In an all-too-frequent occurrence, the money
6  member uses his control of the company's books, records, and corporate machinery to engage in
7  financial chicanery with the intent of squeezing out the sweat equity member. The principal tool
8  available to the sweat equity member for self-defense is his right, upon reasonable demand, to
9  inspect the company's books and records to verify that all of the company's transactions are, in
10 fact, legitimate, and have occurred as the controlling member has described.

11       ETreppid has proved to be a typical example of this paradigm. Less than a year after the
12 Company was formed, Trepp informed Montgomery that the Company had run out of money and
13 needed to raise more capital. Montgomery Decl., ¶ 6. This proved to be the first of many
14 occasions on which Trepp or his business associate, Doug Frye, claimed that the Company had run
15 out of money. Montgomery Decl., ¶¶ 6, 9, 10, 12. The consistent effect of these claims was to
16 reduce Montgomery's interest, either indirectly, by adding more members or adding membership
17 interests to already-existing members, or directly, by compelling Montgomery to sell portions of
18 his membership interest, or simply to convey them in exchange for unasked-for services.
19 Montgomery Decl., ¶¶ 7-8, 10-11. At times, Montgomery did not even learn that he had been
20 diluted until he received the Company's K-1 forms, which identified capital calls and membership
21 interests that were previously unknown to him. Montgomery Decl., ¶ 9.

22       The transactions were consistently presented to Montgomery on a "my way or the highway"
23 basis. Typically, Trepp or one of his business associates would prepare a document and present it
24 to Montgomery without warning, or insist on a large cash payment for services previously
25 rendered. Montgomery Decl., ¶¶ 7-8, 10-11. On these occasions, Montgomery understood that he
26 had only two choices — (1) immediately make the payment or sign the document as is, without any
27 opportunity to review it at leisure or with the benefit of counsel, or (2) immediately lose the
28 payments he had been receiving from eTreppid. Montgomery Decl., ¶¶ 7-8, 10. These payments

4

0039641/001/ 368662v01

1  had become Montgomery's primary source of income, so this was a powerful threat. Montgomery
2  Decl., ¶ 7.

3       Montgomery's observations were not consistent with Trepp's claims that the Company
4  needed more and more infusions of capital. Montgomery was in a position to observe eTreppid's
5  expenditures for himself, and he could not reconcile what he saw with Trepp's claims. For
6  example, during the Company's first year, only two people were doing work, or should have been
7  drawing money from, the Company. Montgomery Decl., ¶ 6. Those payments, combined with
8  eTreppid's other expenses, should not have come close to exhausting the $1,300,000 that Trepp
9  was to have contributed. Id. Yet before the year was out, Trepp claimed that the Company was
10 broke. In another two-year period, Montgomery was personally responsible for more than $30
11 million in revenue to eTreppid. The Company's expenses during that period should not have been
12 more than $5 million, yet Trepp made still another capital call. Montgomery Decl., ¶ 12.
13 Montgomery did obtain access to a few of the Company's expense records at one point, and those
14 documents evidenced enormous expenditures on jet travel, much of it for private jets. Montgomery
15 Decl., ¶ 13. Montgomery also has observed that eTreppid's K-1s do not pass through the
16 Company's supposed losses to his personal tax returns. Montgomery Decl., ¶ 9. On at least one
17 occasion, this failure created a substantial tax liability for Montgomery, which led to a further
18 reduction of his interest. Montgomery Decl., ¶¶ 10-11.

19      For years Montgomery has been attempting to invoke his rights under Nevada law and the
20 Operating Agreement to review the Company's books and records, in order to test Trepp's
21 implausible claims of financial need. Montgomery Decl., ¶ 2. The current version of the Operating
22 Agreement has two relevant provisions. Section 9.1 of the Operating Agreement broadly requires
23 eTreppid to "cause books and records of the LLC to be maintained in accordance with generally
24 accepted accounting principles." Exh. 1, at 31. Section 9.3 of the Operating Agreement, entitled
25 "Inspection and Audit Rights," gives each Member "the right, upon reasonable request and for
26 purposes reasonably related to the Interest of that Member, to inspect and copy during normal
27 business hours any of the LLC books and records required to be maintained in accordance with
28 Section 9.1 above." Id.

1    Defendants have uniformly rebuffed Montgomery's requests, refusing to produce a single

2  document in response to his requests. Montgomery Decl., ¶ 2. Merely to recount Montgomery's

3  more recent efforts, on January 12, 2006, and again on July 24 and 28, 2006, Montgomery's

4  attorney sent letters invoking his right to inspect eTreppid's books and records. Exh. 2, at 1-2;

5  Exh. 3, at 2. But when Montgomery's accountant arrived at eTreppid's offices in order to conduct

6  that inspection, he was immediately escorted off the premises. Gilbert Decl., ¶ 6. Montgomery

7  himself sent a demand letter on October 9, 2007, and his present attorney followed up on October

8  16, 2007. Exh. 4, at 1; Exh. 5, at 1. Defendants' attorney rejected those requests as well. Exh. 6,

9  at 1; Exh. 7, at 1-2.

10

11                                           **ARGUMENT**

12    Under Nevada law, an LLC's Operating Agreement is routinely enforceable by its

13  members. NEV. REV. STAT. §§ 86.101 (defining an operating agreement as an agreement that

14  affects the affairs of a limited liability company), 86.286(2); see also 2007 Nev. Stat. 456, sec. 18

15  (confirming the enforceability of an operating agreement against an LLC when the Operating

16  Agreement is adopted after the LLC's formation). Indeed, where the issue is the inspection and

17  copying of the Company's books and records, the enforceability of the Operating Agreement is

18  particularly clear. Nevada law specifies the books and records that must be kept at an LLC's

19  principal place of business, but permits an operating agreement to vary that requirement. NEV.

20  REV. STAT. § 86.241(1). Those records, whether those specified in the statute or those set forth in

21  an effective operating agreement, "are subject to inspection and copying at the reasonable request,

22  and at the expense, of any member during ordinary business hours, unless otherwise provided in an

23  operating agreement." NEV. REV. STAT. § 86.241(2).

24    Here, Section 9.1 of the Operating Agreement requires eTreppid to "cause books and

25  records of the LLC to be maintained in accordance with generally accepted accounting principles."

26  Exh. 1, at 31. GAAP requires companies to record "as many events as possible that affect the

27  financial position of the enterprise." DONALD E. KIESO & JERRY J. WEYGANDT, INTERMEDIATE

28  ACCOUNTING 75 (9th ed. 1997). GAAP therefore requires companies to document all of their

6

0039641/001/368662v01

1   transactions. Those transactions are recorded in journals and posted in the general ledger. Id. at 76

2   ("The items entered in a general journal must be transferred to the general ledger.").

3       In the case of eTreppid, the list of documents required by GAAP, because they record

4   events that affect the Company's financial position, is extensive. These documents include all of

5   the Company's financial and organizational books and records, including but not limited to the

6   Company's financial statements; its tax returns; all contracts between eTreppid and any other

7   person or entity; the Company's organizational documents, including but not limited to all versions

8   of its Operating Agreement, its Articles of Organization, its Bylaws, all meeting minutes, any buy-

9   sell agreements between and among any members, and a list of its members and their addresses;

10  the Company's accounts payable records, purchase invoices, and receipts; all credit card bills and

11  statements; accounts receivable records, purchase orders, sales invoices, and receipts; bank

12  statements and cancelled checks; wire transfers and wire transfer authorizations; all fixed asset

13  records; the Company's accounting ledgers, including but not limited to its general ledger and any

14  subsidiary ledgers such as its daily transaction journals and records (including those recorded on

15  the Zenith computer system), cash receipts ledger, cash disbursements ledger, sales ledger,

16  accounts receivable ledger, or accounts payable ledger, and general journals containing all

17  accounting entries; the Company's leases; the Company's payroll records; all debt or loan

18  agreements; any other transactions and agreements, including those with insiders; all records of any

19  capital distribution, guaranteed payments, compensation, payment, or distribution of any kind to

20  any officer or member of eTreppid; its attorney bills; the Company's correspondence, including but

21  not limited to e-mails, letters, memoranda, faxes, reports, and notes; all other back-up material that

22  supports the Company's financial records; and all work product used to produce the Company's

23  yearly financial statements, including its ledgers and trial balances. Spindler Decl., ¶ 6. Section

24  9.1 of the Operating Agreement requires eTreppid to maintain all of these documents.

25      Section 9.3 of the Operating Agreement gives each of eTreppid's Members extensive

26  inspection rights: "**Inspection and Audit Rights.** Each Member, at its own expense, has the right,

27  upon reasonable request and for purposes reasonably related to the Interest of that Member, to

28  inspect and copy during normal business hours any of the LLC books and records required to be

1  maintained in accordance with Section 9.1 above." Exh. 1, at 50. Montgomery is a Member and
2  he is attempting to ascertain whether Trepp and Frye made false statements regarding eTreppid's
3  financial condition and regarding Trepp's contributions to the Company. He also is attempting to
4  learn whether anyone has wrongfully diverted Company funds to personal use. These purposes are
5  reasonably related to his Interest as a Member of eTreppid. Spindler Decl., ¶ 7. Accordingly, he is
6  entitled to inspect and copy all records that Section 9.1 requires the Company to maintain; namely,
7  all of its financial and accounting records.

8      In recent correspondence, eTreppid has cited three reasons for refusing to comply with
9  Montgomery's demands. First, eTreppid disputes Montgomery's status as a Member because there
10  are foreclosure proceedings pending against that interest. But even if that attempt to foreclose were
11  justified (and it is not), it is clear that no order of foreclosure has yet occurred. Thus, there is no
12  dispute that at present Montgomery is a Member of eTreppid.

13      Second, eTreppid claims that Montgomery has not sufficiently identified the documents he
14  wants. Nonsense. There is nothing vague about Montgomery's request. He wants every financial
15  and accounting document the Company has. This request is admittedly broad, but it is necessary
16  for Montgomery to vindicate the "[i]nspection and [a]udit [r]ights" he enjoys under the Operating
17  Agreement. Spindler Decl., ¶ 7. All of the documents requested by Montgomery fall within the
18  scope of Section 9.1, which requires GAAP compliance and therefore compels the Company to
19  maintain them.

20      Finally, eTreppid argues that Montgomery's request is not "reasonably related" to his
21  membership interest because it is relevant to issues in litigation. This argument is a non sequitur.
22  ETreppid is not entitled to strip Montgomery of his broad inspection rights under the Operating
23  Agreement by provoking litigation against Montgomery. In other words, an issue may be relevant
24  to issues in litigation and also reasonably related to Montgomery's membership interest, and where,
25  as here, that occurs, Montgomery is entitled to enforce both his discovery rights under the Federal
26  Rules of Civil Procedure and also his inspection rights under the Operating Agreement.

27      In their most recent correspondence during the meet-and-confer process, Defendants took a
28  still more outrageous position. Defendants now acknowledge that Montgomery "may have a

1  remedy for breach of the statute or a breach of contract" stemming from their refusal to honor

2  Montgomery's inspection demands  Exh. 7, at 1.  They claim, though, that the Court lacks power

3  to enforce those rights until and unless Montgomery obtains an order granting him summary

4  judgment. Nonsense  The statutory right to inspection is practically meaningless if a full-blown

5  action must be prosecuted to judgment merely to vindicate it.  The dispute between Montgomery

6  and eTreppid is clearly before the Court.  Paragraph 20 of Montgomery's Counterclaim squarely

7  alleges that Defendants have failed to honor Montgomery's inspection rights, and his Second Cause

8  of Action asserts a claim for breach of contract.  Moreover, eTreppid is getting a full and fair

9  opportunity to be heard. Nevada law clearly grants Montgomery the rights he is seeking, and this

10  Court has jurisdiction to enforce those rights.  The Court has power to grant Montgomery the

11  requested relief.

12

13                                    **CONCLUSION**

14         For all of the foregoing reasons, Plantiffs respectfully request that the Court Order eTreppid

15  to make available to Plaintiffs for inspection and copying within three business days all of its

16  financial, tax, corporate and accounting records, with all electronic records produced in their native

17  electronic format

18  Dated:  November 5, 2007             LINER YANKELEVITZ SUNSHINE &
                                         REGENSTREIF LLP
19

20                                       By:
21                                          Deborah A. Klar
                                            Attorneys for Plaintiffs
22                                          Dennis Montgomery and the Montgomery
                                            Family Trust
23

24

25

26

27

28

                                        9

0039641/001/ 368662v01

## DECLARATION OF DENNIS MONTGOMERY

I, Dennis Montgomery, declare as follows:

1.      I am a plaintiff in this action and, along with my wife, a co-trustee of the Montgomery Family Trust, the other plaintiff in this action  I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would testify competently thereto.

2.      I have been a member of eTreppid Technologies, LLC ("eTreppid" or the "Company"), since its formation (under the name Intreppid Technologies, LLC) in 1998. In all of that time, I have never been permitted to inspect the Company's books and records, though I have been asking to do so for years  I would like to do so for reasons that are directly related to my Membership Interest in eTreppid.

3.      I was originally introduced to Warren Trepp by Steve Sands, one of his close business associates, in 1998. Trepp saw my data compression technology and agreed with me that it could form the basis for a profitable commercial venture.  Our original agreement was that Trepp and I would be the only two members of the Company, and we would share ownership 50-50. Trepp was to contribute $1,300,000 in cash, and I was to contribute the technology contained on a particular compact disc that we referred to as CD-1  However, even though the Company was formed in September 1998, I have never seen confirmation that Trepp followed through on his commitment to contribute any cash, much less $1,300,000

4.      Shortly after we created the Company, Trepp left for six months  Trepp told me that in his absence, Doug Frye would run the Company.

5.      Frye provided me with the Company's original Operating Agreement in or about November 1999  I understood that he had drafted it, and when he presented it to me, he insisted that I sign it on the spot  I was not represented by counsel, and I understood from Frye that if I did not sign the document then and there, he would terminate the Company's payments to me  The same pattern repeated itself over the years — Frye would present me with a document with no warning and even though I was not represented by counsel, he would insist that I sign it on the spot, with the implicit or explicit threat that my payments from the Company would be cut off if I

DECLARATION OF DENNIS MONTGOMERY

0039641/001/ 368662v01

1    did not do so  This was a powerful threat because the payments I was receiving from the Company
2    had become my primary source of income.

3         6.      Trepp returned to the Company in approximately July 1999. For the first of what
4    proved to be many occasions, Trepp told me that the Company had run out of money and needed
5    additional funds. I was astonished by this claim, because through my work with the Company, I
6    had been in a position to observe its expenditures. Frye and I had been the only people doing work
7    on the Company's behalf. The Company, which had been created less than a year earlier, should
8    have had plenty of money remaining from the $1,300,000 Trepp was to have contributed. I have
9    never seen documentation evidencing the Company's expenditures during this period

10        7.      Frye assured me that the Company would obtain additional capital without diluting
11   my 50% interest in the Company. Frye and Trepp left town again in approximately August 1999  I
12   understood that they arranged to obtain additional capital from Steve Sands, who had introduced
13   me to Trepp the previous year, and I presumed that in exchange for the additional capital, Trepp
14   had agreed to transfer some of his interest in the Company. However, Sands told me, in effect, "I
15   need ten percent of your stock," and claimed that if I refused to sign the document effectuating the
16   transfer, my affiliation with (and pay from) the Company would be terminated immediately. This
17   pay had become my primary source of income  I knew that Sands was a close business associate of
18   Trepp, so this was a credible threat, and I signed the document as required, thinking that I could
19   clear matters up when Trepp returned.

20        8.      When Trepp returned to town, he initially agreed with Sands — in other words, he
21   claimed he had bargained away 10% of <u>my</u> interest in the Company. However, approximately a
22   month later, Trepp and Sands had a falling out. In the wake of that dispute, Trepp assured me that
23   he would retrieve my shares from Sands. Subsequently, Frye created a new Operating Agreement
24   that I understood had the effect of retrieving from Sands the membership interest Sands had forced
25   me to transfer to him, and removing Sands as a member of the Company. After he prepared the
26   document and had it executed, Frye insisted that I transfer 2% of my interest to him in
27   compensation for his work in drafting the document. Once again, the threat, if I balked, was the
28   termination of my association with the Company.

DECLARATION OF DENNIS MONTGOMERY

9.    I received a K-1 from the Company in 2000.  Two aspects of the K-1 surprised me greatly.  First, I learned for the first time that I had been diluted.  When I asked about this, Trepp told me that there had been one or two other capital calls that I had not been aware of.  I did not understand why this was necessary or appropriate, because I was in a position to observe the Company's expenditures and revenues, and additional capital should not have been necessary.  Second, if capital calls were necessary, then my K-1 should have reflected the Company's loss and passed the loss through to me.  It did not do so.

10.    Trepp informed me in 2000 that yet another capital call would be necessary.  To meet it, I wrote a check for $365,000.  I had obtained that money by borrowing it from Friendly Capital, an entity controlled by Trepp.  To avoid leaving me in debt, Trepp offered to allow me to sell 2% of my membership interest for $1,500,000.  However, within days of completing this sale, Trepp told me that I needed to pay him $998,000 to repay him for undoing the earlier transactions that had diluted my interest.  Again, I understood that if I declined, Trepp would immediately terminate my association with the Company.

11.    This sale led to additional problems, because it generated a large capital gain on which I needed to pay taxes.  After making various payments — principally a repayment of the loan from Friendly Capital and the $998,000 payment Trepp insisted on — I did not have the cash necessary to pay those taxes.  Trepp therefore allowed me to sell another 1% of my membership interest for $750,000.  Shortly after that sale, Trepp informed me that I was being diluted yet again.

12.    This process continued for years.  One example is particularly egregious.  In approximately 2004, Trepp informed me of yet another capital call.  I was personally responsible for obtaining contracts that paid more than $30 million in revenue to ETreppid in the course of only two years.  Based on my observations, ETreppid's expenses during that period should have been no more than $5 million.  The only reason I can conceive for needing still more funds is that someone was stealing money from the Company.

13.    The few records I have been able to obtain bolster these fears.  By way of example, I have seen records indicating that ETreppid has spent enormous amounts of money on jet travel, much of it on private jets.  I simply do not believe that all, or even most, of that expense is justified

12

0039641/001/368662v01

1   by ETreppid's business needs.  Rather, I strongly suspect that Trepp has been using the Company

2   to fund his personal travel expenses.

3        14.    For all of these reasons, I would like to have my accountants perform a forensic

4   audit of the Company's books and records.  However, the Company has consistently refused to

5   show me the documents necessary toward that end.  Accordingly, I am asking for the Court's

6   assistance.

7        15.    Attached hereto as Exhibit 1 is a true and correct copy of an Amended and Restated

8   Operating Agreement for eTreppid Technologies, LLC, dated November 1, 2001.  I believe this to

9   be eTreppid's most recent Operating Agreement.

10       16.    Attached hereto as Exhibit 2 is a true and correct copy of a letter sent on my behalf

11   by my attorney, Eric Pulver, on or about January 12, 2006, to Douglas Frye in his capacity as

12   eTreppid's general counsel.

13       17.    Attached hereto as Exhibit 3 is a true and correct copy of a letter sent by my then-

14   attorney, Michael Flynn, to the law office of Hale & Lane on or about July 28, 2006.  Mr. Flynn

15   also sent letters to that office asserting my right to assert eTreppid's books and records on or about

16   January 12 and July 24, 2006.

17       18.    Attached hereto as Exhibit 4 is a true and correct copy of a letter that I sent to

18   Trepp's attention at eTreppid on October 9, 2007.

19       19.    Attached hereto as Exhibit 5 is a true and correct copy of a letter sent on my behalf

20   by my attorney, Deborah Klar, to Stephen Peek on or about October 16, 2007.

21       20.    Attached hereto as Exhibit 6 is a true and correct copy of a letter that I received on

22   or about October 19, 2007.

23       21.    Attached hereto as Exhibit 7 is a true and correct copy of a letter that I received on

24   or about October 29, 2997.

25       I declare under penalty of perjury under the laws of the United States of America that the

26   foregoing is true and correct.  Executed on November 2, 2007.

27

28                                 _____

                                      Dennis Montgomery

DECLARATION OF DENNIS MONTGOMERY

1

## DECLARATION OF MICHAEL S. SPINDLER

2    I, Michael S. Spindler, declare as follows:

3    1.    I am a Partner of Deloitte Financial Advisory Services LLP   I am a Certified Public
4    Accountant in the State of Nevada   I am a Certified Fraud Examiner with extensive experience
5    conducting forensic accounting engagements   I have performed financial statement audits for both
6    publicly traded and private companies   Attached hereto as Exhibit 8 is a true and correct copy of
7    my curriculum vitae, which accurately recounts my professional experience and qualifications   I
8    have been asked to express an opinion on behalf of Plaintiffs in this matter in connection with their
9    dispute concerning eTreppid Technologies, LLC ("eTreppid" or the "Company")   The opinions I
10   express herein are based on my personal knowledge and on information of the type reasonably
11   relied upon by experts in my field.

12   2.    In forming the opinions expressed herein, I have read and considered the following
13   material: Amended and Restated Operating Agreement of eTreppid Technologies LLC (the
14   "Agreement"), *Kohler's Dictionary for Accountants, Sixth Edition*[1] (*"Kohler's"*), and *Barron's*
15   *Business Guides Dictionary of Business Terms, Second Edition*[2] (*"Barron's"*).

16   3.    Section 9 3 of the Agreement provides the Inspection and Audit Rights for each
17   Member   It also references Section 9 1   The relevant portions of each are below:

18      9 3   **Inspection and Audit Rights**   Each Member, at its own expense, has the right, upon
19            reasonable request and for purposes reasonably related to the Interest of that Member,
20            to inspect and copy during normal business hours any of the LLC books and records
21            required to be maintained in accordance with Section 9.1 above   Such rights may be
22            exercised by the Member or that Member's agent or attorney.

23      9.1   **Maintenance of Books and Records**   The LLC shall cause books and records of the
24            LLC to be maintained in accordance with generally accepted accounting principles

25

26   _____

27   1.    Edited by W.W. Cooper and Yuji Ijiri, 1983

28   2.    Jack P. Friedman, 1994

14

0039641/001/368662v01

1      4.      Although "books and records" is not specifically defined in the Agreement, the

2   words are terms of art in business. Almost any business-related dictionary provides the definitions

3   for these words. I read the relevant definitions contained within two commonly used business

4   dictionaries and have attached the relevant pages as Exhibit 9. The following is a summary of the

5   definitions contained in each dictionary:

6          "Books"

7          *Kohler's*: 1. Any journal, register, or ledger which forms a part of a system of accounts. 2

8          *pl.* All the books of original entry and books of final entry, and the invoices, vouchers,

9          contracts, correspondence, and the like that result from the occurrence of transactions and

10         the operation of a system of accounts; often shortened to *books* [3]

11         *Barron's*: 4. Collectively, books are the journals, ledgers, and other accounting records of

12         a business.

13

14         "Records"

15         *Kohler's*: 1. A book or document containing or evidencing some or all of the activities of

16         an enterprise or containing or supporting a transaction, entry, or account. Examples: a

17         book of account; subsidiary ledger; invoice; voucher; contract; correspondence; internal

18         report; minute book. 2. The expression "books and records," though redundant, is in

19         common use.

20         *Barron's*: All documents and books used in the preparation of financial statements,

21         including general ledger, subsidiary ledgers, sales slips, invoices, and so on [4]

22     5.      It is normal for members of an LLC to have inspection rights under their Operating

23   Agreement. I have performed many engagements working on behalf of limited partners or

24

25

---

26   3.     The definition of "book" states the noun is a "book of account." The definition presented is
           under "book of account."

27

28   4.     The definition "records" states "see *accounting records*." The definition presented is under
           "accounting records."

---

15

0039641/001/368662v01

1  members in a partnership or LLC to inspect the books and records of the subject business. In my

2  experience, the term "books and records" includes the following types of documents:

3  • Financial statements

4  • Tax returns

5  • General ledger

6  • Subsidiary ledgers, including cash receipts ledger, cash disbursements ledger,

7  sales ledger, accounts receivable ledger, and accounts payable ledger

8  • General journals containing all accounting entries

9  • Bank statements, wire transfer documentation and cancelled checks

10  • Company credit card statements

11  • Sales invoices

12  • Purchase invoices and receipts

13  • Purchase orders

14  • Correspondence, including e-mails, letters, memorandums, faxes, reports and

15  notes

16  • All LLC records including Articles of Incorporation, Bylaws, Meeting Minutes,

17  and Buy Sell Agreements

18  • Payroll records

19  • Electronic accounting system

20  • All contracts between eTreppid and related or third parties

21  • Lease agreements

22  • Fixed asset records

23  • All loan agreements

24  6   In my opinion, for eTreppid to prepare financial statements in accordance with

25  GAAP, the Company would need to have a complete set of books of accounting and supporting

26  records including the items listed in paragraph 5 above. Without the records noted in paragraph 5, it

27  would be nearly impossible for eTreppid to prepare financial statements in accordance with GAAP.

28

DECLARATION OF MICHAEL S. SPINDLER

0039641/001/368662v01

1      7.      Based upon my reading of the Agreement and my years of experience as an auditor
2  and forensic accountant, I believe the records identified in paragraph 5 above would be the types of
3  records needed in order to perform a forensic accounting engagement on behalf of an LLC
4  member, a purpose that is reasonably related to the interest of that member.

5      I declare under penalty of perjury under the laws of the United States of America that the
6  foregoing is true and correct. Executed on November 2, 2007.

7
8                                                                Michael S. Spindler
9                                                                Michael S. Spindler
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

                                    17
0039641/001/368662v01

## DECLARATION OF GREG GILBERT

I, Greg Gilbert, hereby declare:

1.    I am a certified public accountant and over 18 years of age. I have personal knowledge of the facts stated herein, and if called as a witness, I could and would testify competently to them.

2.    I am a certified public accountant and the principal of Greg Gilbert Associates, a firm that does tax consulting, accounting, business valuation and provides litigation support services. I was retained by Dennis Montgomery to review the books and records of eTreppid Technologies, LLC, pursuant to notice given on January 12, 2006 and again on July 24, 2006.

3.    This declaration summarizes the unsuccessful attempt made this morning to retrieve document copies of the books and records of eTreppid Technologies, LLC, at 755 Trademark Drive, Reno, Nevada pursuant to the absolute right of a member of a Nevada LLC to inspect the books and records of the LLC of which he is a member.

4.    We (my assistant and I) arrived at 755 Trademark Drive at about 9:20 a.m. The front entry door was locked, but a young man from inside opened the door and gave us entry. He asked who we were. I said who we were and that we were here to see Su Perez, who I understood to be the person with possession of the books and records. He stated she was not here, was on an errand, and would be back shortly. We could wait in the lobby. He asked again who we were with, and in response I presented my business card.

5.    After approximately 10 minutes, two gentlemen came in with their security cards through the front door, and said hello. The second of the two appeared to be a bodyguard. The receptionist offered that we were there to see Su Perez. The two gentlemen went upstairs, followed shortly by the receptionist.

6.    The two gentlemen returned. The first gentleman asked, "Are you here regarding the

18

Montgomery issue?" I replied, "Yes." The gentleman then said, "You should leave." I said, "We have an appointment to see Su Perez. Aren't we allowed to wait to see her?" Gesticulating, he said, "No. Get out!" I asked, "Who are you?" The gentleman responded, "I'm the owner." I responded, "So we won't be able to see Su Perez?" The bodyguard said, "Come on, leave!" The bodyguard closely escorted us to the door.

7. Accordingly, we left.

I hereby declare under the penalties of perjury under the laws of the state of Nevada that the foregoing is true and correct, this 27th day of July, 2006.

Greg Gilbert, CPA, CVA

19

DECLARATION OF GREG GILBERT

1

2 **CERTIFICATE OF SERVICE**

3       Pursuant to NRCP 5(b), I certify that I am an employee of the LAW OFFICES OF LINER
YANKELEVITZ SUNSHINE & REGENSTREIF LLP, and that on the **5th day of November,**
4 **2007,** I caused to be served the within document described as **PLAINTIFFS' NOTICE OF
MOTION AND MOTION TO ENFORCE RIGHT TO INSPECTION OF RECORDS;**
5 **MEMORANDUM OF POINTS AND AUTHORITIES; SUPPORTING DECLARATIONS
OF DENNIS MONTGOMERY, MICHAEL S. SPINDLER, AND GREG GILBERT** on the
6 interested parties in this action as stated below:

7 J. Stephen Peek, Esq.
Jerry M. Snyder, Esq
8 Hale Lane Peek Dennison and Howard                     Ralph O. Gomez, Esq., Sr. Trial Counsel
5441 Kietzke Lane                                       U.S. Dept. of Justice, Fed. Programs Branch
9 SecondFloor                                            Civil Division, Room 6144
Reno, Nevada 89511                                      20 Massachusetts Avenue, NW
10 (775) 327-3000; 786-6179 - FAX                        Post Office Box 883
speek@halelane.com; jsnyder@halelane.com                Washington, D.C. 20044
11 Attorneys for Etreppid and Warren Trepp               (202) 514-1318; 616-8470 - FAX
E-mail: raphael.gomez@usdoj.gov
12 Reid H. Weingarten, Esq.                              Attorneys for Department of Defense
Brian M. Heberlig, Esq.
13 Robert A. Ayers, Esq,                                 Greg Addington, AUSA
Steptoe & Johnson, LLP                                  U.S. DEPARTMENT OF JUSTICE
14 1330 Connecticut Avenue, N.W.                         100 W. Liberty Street. Suite 600
Washington, D.C. 20036-1795                             Reno, Nevada 89501
15 (202) 429-3000; (202) 429-3902 - FAX                  E-mail: Greg.addington@usdoj.gov
rweingarten@steptoe.com;                                (775) 784-5181 - FAX
16 bhaberlig@steptoe.com; rayers@steptoe.com             Attorneys for Department of Defense
Attorneys for eTreppid and Warren Trepp
17                                                       Mark H. Gunderson, Esq.
Carlotta P. Wells, Sr. Trial Counsel                    Catherine A. Reichenberg, Esq.
18 U.S. Dept. of Justice                                 GUNDERSON LAW FIRM
Fed. Programs Branch                                    5345 Kietzke Lane, Suite 200
19 Civil Division                                        Reno, Nevada 89511
Room 7150                                               (775) 829-1222; 829-1226 - FAX
20 20 Massachusetts Avenue, NW                           mgunderson@gundersonlaw.com;
Post Office Box 883                                     creichenberg@gundersonlaw.com;
21 Washington, D.C. 20044                                poneill@gundersonlaw.com
(202) 514-4522; 616-8470 - FAX
22 E-mail: Carlotta.wells@usdoj.gov
Attorneys for Department of Defense
23

24

25
/ / /
26
/ / /
27
/ / /
28

PROOF OF SERVICE

1   ☒    **[ELECTRONIC]** By filing the document(s) electronically with the U.S. District Court and therefore the court's computer system has electronically delivered a copy of the foregoing

2       document(s) to the persons listed above at their respective email address.

3       I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed on 11/5/2007, at Los Angeles,

4   California.

5

6    NANCY TORRECILLAS

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE

0039641/001/ 359652v01