1  Mark H. Gunderson, Esq. (SBN: 2134)
   Catherine A. Reichenberg, Esq. (SBN: 10362)
2  GUNDERSON LAW FIRM
   5345 Kietzke Lane, Suite 200
3  Reno, Nevada 89511
   Telephone: (775) 829-1222
4  Facsimile: (775) 829-1226

5  Deborah A. Klar, Esq. (SBN: CA 124750)
   Tuneen E. Chisolm, Esq. (SBN: CA 211741)
6  LINER YANKELEVITZ
   SUNSHINE & REGENSTREIF LLP
7  1100 Glendon Avenue, 14th Floor
   Los Angeles, California 90024-3503
8  Telephone: (310) 500-3500
   Facsimile: (310) 500-3501
9  ADMITTED PRO HAC VICE

10 Attorneys for Plaintiffs
   DENNIS MONTGOMERY AND THE MONTGOMERY
11 FAMILY TRUST

12              **UNITED STATES DISTRICT COURT**

13                  **DISTRICT OF NEVADA**

14

15 DENNIS MONTGOMERY and the            )  Case No. 3:06-CV-00056-PMP-VPC
   MONTGOMERY FAMILY TRUST              )  BASE FILE
16                                      )
   Plaintiffs                          )  (Consolidated with Case No. 3:06-CV-
17                                      )  00145-PMP-VPC)
       vs.                             )
18                                      )  **MONTGOMERY PARTIES' RESPONSE**
   ETREPPID TECHNOLOGIES, LLC, WARREN )  **TO ETREPPID AND WARREN TREPP'S**
19 TREPP, and the UNITED STATES        )  **MOTION TO COMPEL PRODUCTION**
   DEPARTMENT OF DEFENSE               )  **OF SOURCE CODE; OBJECTIONS TO**
20                                      )  **DECLARATIONS OF JONATHAN**
       Defendants.                      )  **KARCHMER, WARREN TREPP, AND**
21                                      )  **DOUG FRYE (DOCKET #'S 463, 464 &**
                                        )  **465)**
22 _____  )
                                        )
23 AND RELATED CASES                     )
                                        )
24

25

26

27

28

**TABLE OF CONTENTS**

                                                                                      **Page**

I.    INTRODUCTION ............................................................................................. 1

II.   MONTGOMERY CANNOT BE COMPELLED TO DISCLOSE HIS
      TRADE SECRET SOURCE CODE, WITHOUT ETREPPID'S SHOWING
      OF RELEVANCE AND NECESSITY, AND ITS SPECIFIC DEFINITION
      OF ITS OWN TRADE SECRETS ...................................................................... 3

      A.   eTreppid Still Has Not Made The Requisite Showing of Relevance
           And Necessity .......................................................................................... 4

           1.   The Source Code Itself Is NOT The Most Probative Evidence
                As It Is Completely Irrelevant To The Core Issue Of
                Ownership ...................................................................................... 4

           2.   Prosecution And Defense Of Montgomery's Copyright
                Infringement Claim Does Not Require Any Analysis Of
                Montgomery's Source Code ............................................................ 6

                a.   Montgomery's Infringement Claim Does Not Assert
                     Copying Of Anything, Let Alone The Various Source
                     Codes eTreppid Seeks ............................................................ 6

                b.   Montgomery Is Not Required To Prove Copying For
                     His Claim ................................................................................ 6

                c.   eTreppid's Reliance On *Softel* And *Dynamic
                     Microprocessor* Is Misplaced .................................................. 7

                d.   Analysis Of Montgomery's Source Code Is
                     Completely Irrelevant And Unnecessary, And
                     Production Would Be Unduly Burdensome ............................... 10

           3.   Karchmer's Objectionable Declaration (Docket # 463) Does
                Not Satisfy eTreppid's Burden For Compelling Production Of
                Montgomery's Source Code ............................................................ 12

      B.   Even Assuming, *Arguendo,* That eTreppid Had Made The Requisite
           Showing of Relevance and Necessity, eTreppid's Ever Evolving,
           Vague Description Of Its Trade Secret Source Code And Technology
           Is Still Insufficient To Warrant Disclosure Of Montgomery's Trade
           Secrets At This Time ............................................................................... 14

      C.   The Testimony Of Trepp, Venables, and Zehang Sun Demonstrates
           That eTreppid's Purported Excuse For Failing Identify Any Trade
           Secrets It Claims Were Allegedly Misappropriated Is Completely
           False ........................................................................................................ 18

III.  ETREPPID OFFERS NO ARGUMENT FOR AN ORDER COMPELLING
      A RE-CREATION OF CD NO. 1, DESPITE ITS SUBMISSION OF
      OBJECTIONABLE DECLARATIONS RE: EFFORTS TO LOCATE CD
      NO. 1 ....................................................................................................... 19

i

1

## TABLE OF AUTHORITIES (cont.)

2

**Page(s)**

3

4

### FEDERAL STATUTES AND RULES

5

17 U.S.C. §101 .................................................................................................5

6

17 U.S.C. § 106(2) & (3) ....................................................................................7

7

17 U.S.C. § 204(a) .............................................................................................5

8

17 U.S.C. § 501(a) .............................................................................................7

9

Fed. R. Evid. 402 ..............................................................................................13

10

Fed. R. Evid. 602 ........................................................................................13, 19

11

Fed. R. Evid. 701 ..............................................................................................13

12

Fed. R. Evid. 702 ........................................................................................13, 19

13

Fed. R. Evid. 802 ..............................................................................................19

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iii

1 **I.    INTRODUCTION**

2    eTreppid seeks to compel the production of "any source code" created by Dennis

3 Montgomery ("Montgomery") or under his direction, at any point in time, "in the fields of data

4 compression, pattern recognition, object tracking, or anomaly detection."[1] This transparent attempt

5 at a fishing expedition should be denied for at least four reasons: (1) the source code sought

6 constitutes Montgomery's trade secrets; (2) the mere existence of a protective order that might

7 purportedly limit disclosure of the trade secret source code sought to eTreppid's attorneys and

8 selected experts does not replace eTreppid's burden to satisfy the governing legal standards before

9 *any* disclosure can be ordered; (3) eTreppid has not made the requisite showing of relevance and

10 necessity for the production of trade secret source code it seeks; and (4) more than two years after

11 commencing this misappropriation of trade secrets litigation, eTreppid still has not identified its

12 purported trade secrets and has offered no credible reason for its failure to do so.

13    The uncontroverted evidence in the record demonstrates that the only technology

14 Montgomery contributed to eTreppid under the Contribution Agreement was the compression

15 technology described in that agreement, and that, more importantly, Montgomery has guarded his

16 source code as a trade secret and eTreppid has never had access to it   In fact, Warren Trepp

17 ("Trepp") has admitted as much under oath: Montgomery "kept the source code under his wing in

18 his private cubbyhole, not on a source server." [Docket # 468/469, Exh. E (P.I. Hearing Transcript

19 Vol. 2, p 98-99).]

20    The propriety of compelling production of the source code that eTreppid seeks is not merely

21 a matter of protecting the confidentiality of Montgomery's trade secrets in a general sense, as

22 eTreppid suggests can be done by producing the source code for "attorneys' eyes only." Were it

23 that simple, courts throughout the land could resolve every dispute regarding discovery of sensitive

24 information by simply rubber-stamping the production of every document, regardless of relevance,

25

26 [1] [See Docket # 432, Exh. C (RFP1, Request No. 18) & Exh. E (RFP2, Request No. 1).] eTreppid does not identify any specific discovery requests in its motion. Although the discovery requests as
27 to which further briefing was ordered encompass more than source code, eTreppid has singly styled its motion as one to compel production of source code and does not discuss any other materials.

28

1

1  under a stipulated confidentiality order. Such rubber-stamping is neither sanctioned by substantive
2  law nor procedural rule. eTreppid's argument that the existing protective order allows parties to
3  designate materials as "attorneys eyes only" begs the question, because disclosure under that order
4  assumes eTreppid has met the applicable legal standard for compelling disclosure in the first place.
5  eTreppid has not done so.

6       Contrary to eTreppid's overly simplistic assertions, there is a specific legal burden that
7  eTreppid must satisfy before production of trade secret documents can be ordered at all. The legal
8  standard for an order compelling disclosure of an adversary's trade secret in trade secret litigation
9  requires a showing that the disclosure is both relevant and necessary to the prosecution or defense
10 of the action, and, even then, the disclosure must be preceded by eTreppid's specific identification
11 of its own trade secrets claimed to have been misappropriated. As discussed and analyzed in the
12 Montgomery Parties' motion for protective order [Docket # 467] and further discussed herein,
13 eTreppid has not satisfied its burden here.

14      In a transparent attempt to skirt the issue, eTreppid argues that Montgomery must produce
15 the source code because he has asserted a copyright infringement claim in response to eTreppid's
16 trade secret action. eTreppid summarily and erroneously argues that "the most probative evidence
17 in this case will be an analysis of the subject source code itself." [Docket # 461, p. 2.] That
18 assertion could not possibly be further divorced from reality. In fact, as eTreppid itself has
19 repeatedly conceded in various pleadings in the record, the core issue in this action is ownership of
20 the software. As the Montgomery Parties have consistently argued, the ownership issue is readily
21 determined based solely upon an examination of the facts that relate to eTreppid's legal theories of
22 ownership premised upon its assertions that:  (1) Montgomery purportedly transferred all rights to
23 the software to eTreppid; (2) all of Montgomery's software work product generated during the
24 "scope of his 'employment'" purportedly belongs to eTreppid; and/or (3) Montgomery's work is
25 purportedly a work made for hire. As discussed more fully below, the determination of these issues
26 does not require an examination of any software at all, let alone Montgomery's proprietary trade
27 secret source code.

28

2

1    Moreover, contrary to eTreppid's makeshift argument, "analysis" of Montgomery's trade

2   secret source code "in the fields of data compression, pattern recognition, object tracking, or

3   anomaly detection" is neither relevant nor necessary for prosecution or defense of Montgomery's

4   copyright infringement claim. First, Montgomery has merely alleged that eTreppid exploited

5   works that Montgomery derived from his copyrighted pattern recognition technology. He has not

6   alleged infringement of data compression, object tracking, or anomaly detection software. Second,

7   Montgomery *has not asserted that eTreppid copied anything*. Rather, he has asserted only that

8   eTreppid's sublicensing of Montgomery's pattern recognition derivative works was done without

9   payment of royalties to Montgomery, and that eTreppid has continued to exploit Montgomery's

10   derivative works in that fashion even after Montgomery's revocation of any license that eTreppid

11   may have had. As a matter of law, a copyright protects both the source code and the object code

12   for a copyrighted software program. eTreppid does not dispute that Montgomery was the source of

13   the software licensed to the government. Moreover, eTreppid's own witness, Sloan Venables, has

14   testified that the deliverables on eTreppid's contracts with the government were executable files not

15   source code. Under these circumstances, Neither party has to resort to a line-by-line comparison of

16   source code, or any code comparison at all, to prove or disprove infringement. See, e.g., *Data

17   General Corp. v. Grumman Sys. Support Corp.*, 803 F. Supp. 487, 491 (D. Mass. 1992) (holding

18   that the plaintiff alleging copyright infringement of software "need not produce the [particular]

19   source code to prove its action for copyright infringement").

20   **II.    MONTGOMERY CANNOT BE COMPELLED TO DISCLOSE HIS TRADE**

21        **SECRET SOURCE CODE, WITHOUT ETREPPID'S SHOWING OF RELEVANCE**

22        **AND NECESSITY, AND ITS SPECIFIC DEFINITION OF ITS OWN TRADE**

23        **SECRETS**

24        As set forth in the Montgomery Parties' motion for protective order (Docket # 467),

25   "disclosure of trade secrets will be required only where such disclosure is relevant and necessary to

26   the prosecution or defense of a particular case." *Hartley Pen Co. v. United States District Court for

27   S.D. Cal.*, 287 F.2d 324, 330-31 (9th Cir. 1961). *"The burden rests upon the party seeking

28   disclosure* to establish that the trade secret sought is relevant and necessary to the prosecution or

3

1  defense of the case *before* a court is justified in ordering disclosure." *Id.* (emphasis added)

2  Similarly, section NRS 600A.070 of the Nevada Uniform Trade Secrets Act, entitled "Preservation

3  of secrecy," provides for the preservation of the secrecy of an alleged trade secret by reasonable

4  means, which may include, *inter alia*, without limitation, protective orders in connection with

5  discovery proceedings and ***determining the need for any proprietary information related to the***

6  ***trade secret before allowing discovery***. NRS 600A.070 (emphasis added).

7          Further, a "plaintiff seeking relief for misappropriation of trade secrets must identify the

8  trade secret and carry the burden of showing that they exist," *IMAX Corp. v. Cinema Technologies,*

9  *Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998), and discovery of an adversary's trade secrets is

10 routinely precluded until the plaintiff claiming trade secret misappropriation has adequately

11 identified its own trade secrets in the first instance. See, e.g., *Automed Techs., Inc. v. Eller.*, 160 F.

12 Supp. 2d 915, 926 (N.D. Ill. 2001); *Engelhard Corp. v. Savin Corp.*, 505 A.2d 30, 33 (Del. Ch.

13 1986); *Computer Economics, Inc. v. Gartner Group, Inc.*, 50 F. Supp.2d 980, 989 & 992 (S.D. Cal.

14 1999) (citing cases); *Magnox v. Turner*, 1991 Del. Ch. LEXIS 140 (Del. Ch. 1991). "[G]eneral,

15 conclusory assertions" are not sufficient to establish the need for or relevance of trade secrets.

16 *Pioneer Hi-Bred Int'l, Inc. v. Holden's Found. Seeds, Inc.*, 15 F.R.D. 76, 82-83 (N.D. Ind. 1985).

17          **A.      eTreppid Still Has Not Made The Requisite Showing of Relevance And**

18                   **Necessity**

19                   **1.      The Source Code Itself Is NOT The Most Probative Evidence As It Is**

20                            **Completely Irrelevant To The Core Issue Of Ownership**

21          Ownership of the software at issue is the dispositive issue in this action. Software programs

22 are literary works protected under the Copyright Act, regardless of whether they are expressed as

23 source code (human readable format) or object code (machine readable format). See *Apple*

24 *Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1249 (3d Cir. 1983); *Data General*

25 *Corp. v. Grumman Sys. Support Corp.*, 803 F. Supp. 487, 491 (D. Mass. 1992). Copyright

26 ownership provides a defense to a claim for misappropriation of trade secrets which cannot be

27 overcome by invoking patent-law shop rights, because a copyright owner cannot be liable for

28 misappropriating his own work. *Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 575 & n.16 (4th Cir. 1994)

4

1  (vacating judgment and holding if a company did not own the copyrights in the original version of

2  a software program, its employee could not have misappropriated it)   Thus, actual or putative

3  ownership of the copyrights in the allegedly misappropriated software is the core and dispositive

4  issue in this action   Examination of the actual source code (or object code) is not relevant to this

5  core issue

6          Montgomery claims ownership of his software by virtue of registered copyrights   In turn,

7  eTreppid alleges ownership of Montgomery's software on the basis that it was either: (i)

8  "transferred to eTreppid by Montgomery by agreement" or (ii) "created by Montgomery within the

9  scope of his employment while he was a member and/or office of eTreppid" or (iii) "is otherwise a

10 work made for hire." [Docket # 393 (Affirmative Defense ¶ 9 & Counterclaim ¶ 93).]

11         To prove ownership by agreement, eTreppid must demonstrate a written assignment of

12 Montgomery's works to eTreppid, signed by Montgomery.  See 17 U.S.C. § 204(a).  Discovery

13 relating to any such purported transfer does not require an examination of the actual software in

14 any form, since the written assignment must necessarily be clear on its face as to what is being

15 transferred.

16         eTreppid's second and third theories of ownership of the subject software are essentially the

17 same.  The two paths to a work-for-hire under the Copyright Act depends upon whether the work is

18 prepared by an employee or an independent contractor:

19         A "work made for hire" is –
               (1) a work **prepared by an employee within the scope of his**
20 **or her employment**; or

21               (2)  a work **specially ordered or commissioned** for use as a
      contribution to a collective work, as part of a motion picture or other
22 audiovisual work, as a translation, as a supplementary work, as a
      compilation as an instructional text, as a test, as answer material for a
23 test, or as an atlas, **if the parties expressly agree in a written
      instrument signed by them that the work shall be considered a work**
24 **made for hire.**

25 17 U.S.C. §101.  Software does not appear among the items identified in Section 101(2) that may

26 be specially commissioned from an independent contractor.  Thus, eTreppid's work-for-hire

27 ownership theory must rest on the employment prong, which, like eTreppid's second theory of

28 ownership, necessarily depends on whether Montgomery was an employee of eTreppid.  Clearly, a

                                              5

1   determination of Montgomery's "employee" status will not require an analysis of Montgomery's

2   source code, nor will any related "scope of employment" determination.  See, e.g., *Avtec Sys., Inc.*

3   *v. Peiffer*, 67 F.3d 293, 1995 WL 541610 *4 (4th Cir. 1995) (citing test for creation "within the

4   scope of employment")

5               **2.   Prosecution And Defense Of Montgomery's Copyright Infringement**

6                     **Claim Does Not Require Any Analysis Of Montgomery's Source Code**

7          eTreppid makes much ado about its "need" to exam the actual source code to evaluate

8   Montgomery's copyright infringement claim, stating that it must perform a source code comparison

9   to determine any similarities between Montgomery's 1982 programs and the digital compression

10  products that eTreppid claims as trade secrets.  [Docket #461, pp. 7-8.]  However, a plain reading

11  of the law governing Montgomery's copyright clearly exposes the clear error in eTreppid's strained

12  reasoning

13              **a.   Montgomery's Infringement Claim Does Not Assert Copying Of**

14                    **Anything, Let Alone The Various Source Codes eTreppid Seeks**

15         As a preliminary matter, it should be well noted that Montgomery's copyright infringement

16  claim is ***not a claim for unauthorized copying of copyrighted software***.  Montgomery does not

17  allege that eTreppid has copied anything.  Rather, Montgomery alleges that: (1) he developed

18  certain pattern recognition software, which is copyrighted [Docket # 7 (First Amended Complaint),

19  ¶ 8]; (2) he developed derivative works based on the copyrighted pattern recognition technology,

20  which he did not transfer to eTreppid under the Contribution Agreement [*Id.*, ¶¶ 9 & 14]; (3)

21  eTreppid licensed and then sublicensed Montgomery's pattern recognition derivative works

22  pursuant to a false promise to pay royalties for such use [*Id.*, ¶¶ 16-17]; and (4) although

23  Montgomery terminated any license that eTreppid may have had in January 2006, eTreppid

24  nevertheless continued to exploit Montgomery's derivative works.  [*Id.*, ¶¶ 18-19 & 22-24.]  On its

25  face, this claim has absolutely nothing to do with an analysis of any of Montgomery's source code.

26              **b.   Montgomery Is Not Required To Prove Copying For His Claim**

27         A copyright infringement plaintiff need not show copying by the infringer, but only that the

28  infringer violated at least one exclusive right afforded under the Copyright Act.  See *A&M*

6

1 │ *Records, Inc v. Napster, Inc.* 239 F 3d 1004, 1013 (9th Cir. 2001). The Copyright Act defines a
2 │ copyright infringer as "[a]nyone who violates any of the exclusive rights of the copyright owners as
3 │ provided in sections 106 through 122..." 17 U.S.C.§ 501(a)  As defined in section 106 of the
4 │ Copyright Act, the exclusive rights of a copyright owner include the right "to prepare derivative
5 │ works" and "to distribute copies" "by sale or other transfer of ownership, or by rental, lease, or
6 │ lending." 17 U.S.C § 106(2) & (3).

7 │ 　　　　"Under well-settled copyright law, [a licensor] would be able to claim copyright
8 │ infringement if [the licensee] exceeded the scope of the licensing agreement, breached a covenant
9 │ or condition, or breached the agreement in such a substantial and material way as to justify
10 │ rescission." *Rano v. Sipa Press, Inc*, 987 F 2d 580, 586 (9th Cir. 1993). "After the agreement is
11 │ terminated, any further distribution would constitute copyright infringement." *Id.* Accordingly,
12 │ Montgomery can prove his copyright infringement claim merely by showing that eTreppid
13 │ sublicensed his copyrighted works without a valid license to do so. Proof of copying is not
14 │ required.

15 │ 　　　　　　　　**c.**　　　**eTreppid's Reliance On *Softel* And *Dynamic Microprocessor* Is**
16 │ 　　　　　　　　　　　　　　**Misplaced**

17 │ 　　　　Given the basis of Montgomery's copyright infringement claim eTreppid's contentions that
18 │ "Montgomery must show that eTreppid copied some portion of his copyrighted software," [Docket
19 │ # 461, p. 8], is simply wrong. eTreppid's reliance on the two cases cited in support of this
20 │ erroneous assertion is misplaced.  See *Softel, Inc v. Dragon Medical and Scientific Comm, Inc.*,
21 │ 188 F.3d 995, 963 (2d Cir. 1997) (the Second Circuit applies an "'abstraction-filtration
22 │ comparison' method of analysis" for determining whether non-literal similarity of computer
23 │ program constitute infringement); *Dynamic Microprocessor Assoc v. EKD Computer Sales*, 919 F.
24 │ Supp 101, 103 (E.D.N.Y. 1996) (holding that the copyright infringement defendants were entitled
25 │ to discovery of the plaintiff's source code, where the issues involved whether a "wholly functional
26 │ computer program" was copyrightable in the first instance).

27 │ / / /

28 │

　　　　　　　　　　　　　　　　　　7

1  ***Softel***:

2       The "abstraction-filtration comparison" ("AFC") method used by the Second Circuit

3  involves a three-step process. First, the allegedly infringed program is broken down and examined

4  at varying levels of abstraction. *Softel*, 188 F.3d at 963. Second, the allegedly infringed program is

5  filtered at each level of abstraction through various copyright doctrines that deny protection to

6  certain types of materials, such as, for example, program elements dictated by mechanical

7  specification of the computer the program is intended to run on, or "widely accepted programming

8  practices within the computer industry." *Id.* "Third, the resulting protectible expression is

9  compared with the allegedly infringing program." *Id.*

10       Ironically, the plaintiff in *Softel* was hired by the defendant to write computer code, but

11  carefully kept the source code to himself. *Id.* at 959. When the plaintiff refused the defendant's

12  demands to hand over his code, the defendant gained access by "unerasing" code that the plaintiff

13  had put on the defendant's computers and then "seemingly erased." *Id.* Ultimately, the plaintiff

14  sued claiming, *inter alia*, "that its software combined certain computer programming design

15  elements in an expressive way and that [the defendant] had copied that expression." *Softel*, 188

16  F.3d at 963. Thus, the complex AFC analytical comparison of infringed software to infringing

17  software was done in *Softel*, to determine the extent of the copying of the plaintiff's copyrightable

18  elements, if any. Here, unlike the plaintiff in *Softel*, Montgomery's copyright infringement claim is

19  not based on allegations of copying and its resolution therefore does not require a comparison of

20  the infringed program with the infringing program.

21       ***Dynamic Microprocessor:***

22       *Dynamic Microprocessor* is similarly inapposite. eTreppid cites that case for the wholesale

23  assertion that without examining the source code, eTreppid cannot determine the validity of

24  Montgomery's defenses to eTreppid's trade secret misappropriation claim or whether there is "any

25  substance" to Montgomery's infringement claim. However, in so arguing, eTreppid fails to

26  identify any specific defense that may be relevant to this issue and it omits even a cursory analysis

27  of *Dynamic Microprocessor*. The reasons for those omissions are plain: *Dynamic Microprocessor*

28

8

1  is readily distinguished from the present case, and there is no comparable basis for an order

2  compelling production of Montgomery's source code.

3    In *Dynamic Microprocessor*, the plaintiff computer company sued the defendant computer

4  company alleging, among others, a claim for copyright infringement based on unauthorized

5  manufacture and sale of the plaintiff's software program, pcAnywhere III. *Dynamic*

6  *Microprocessor*, 919 F. Supp. at 102. Among other affirmative defenses, the defendant asserted

7  that "the alleged copyright is based on a 'wholly functional computer program in which there are

8  no copyrightable elements' and that the alleged copyright is void." *Id.* at 103. As a counterclaim,

9  the defendant also alleged that pcAnywhere III was "substantially the same program ...as

10  pcAnywhere IV and therefore within the purview of the licensing agreement which existed between

11  the parties." *Id.* The defendant sought production of the source codes for pcAnywhere III and IV,

12  and filed a motion to compel supported by the declaration of a computer software expert offering

13  an opinion on whether version III was "wholly functional" and whether version III and version IV

14  were substantially similar. *Id.* The court ultimately ordered the plaintiff's source code production,

15  subject to an "attorneys' eyes only" designation, based upon the defendant's expert's

16  uncontroverted detailed opinion showing why functionality and substantial similarity of the two

17  versions could not be determined merely by looking at the executable program, and as to why the

18  programs could remain functionally identical despite superficial changes, including the file size.

19  *Id.* at 103-106.

20    Unlike in *Dynamic Microprocessor*, Montgomery's copyright infringement claim and

21  eTreppid's asserted affirmative defenses in this action do not require a comparison of the infringed

22  program with the infringing program. [Docket # 393, pp. 6-8.] Thus, there is no basis for an order

23  compelling production of Montgomery's source code.

24  ///

25

26

27

28

9

1

           **d.**     **Analysis Of Montgomery's Source Code Is Completely Irrelevant**

2

                **And Unnecessary, And Production Would Be Unduly**

3

                **Burdensome**

4

      The complex AFC analysis and examination of source code is not applicable to copyright

5

infringement cases where the defendant admits to use of the plaintiff's software without

6

modification. See *Data General*, 803 F. Supp. at 490-491.

7

      In *Data General*, the plaintiff sued the defendant for copyright infringement of its computer

8

software product ADEX. *Id.* Employees of the defendant had admitted under oath that the

9

defendant had copied and used various versions of ADEX. *Id.* at 490. Like Montgomery, the

10

plaintiff had "filed only small portions of the ADEX source code (known as symbolic filing) with

11

the copyright office in accordance with applicable regulations." *Data General*, 803 F. Supp. at

12

489. During the course of discovery, the defendant first requested a copy of the ADEX source

13

code in 1988. *Id.* Like Montgomery, the plaintiff "objected to the request, in part, because it was

14

overly burdensome to produce the various source code versions of ADEX, each version containing

15

several million lines of computer code." *Id.* Years later, in 1992, when the defendant requested

16

production of "the source code for all versions of released ADEX programs," the plaintiff objected

17

as follows:

18

            Data General ***does not maintain complete copies*** (either hard or magnetic) ***of source code for the multiple revisions of its [ADEX]***

19

            ***programs in any comprehensive, cohesive form*** in the normal course of its business. Rather, the ***various files, subfiles and other***

20

            ***component parts of each program revision are stored or "dumped" on numerous storage tapes and assembled only at the time when a***

21

            ***specific revision is compiled.*** In order for Data General to produce the multiple source code listings that Grumman has requested, ***it***

22

            ***would be necessary for Data General personnel to spend months reviewing approximately four hundred 2,400 foot storage tapes***

23

            ***(assuming that the older tapes are even readable)*** for the purpose of piecing the various components of each program revision together.

24

            This data, if transferred to PC-DOS 3 1/2 inch or 5 1/4 inch floppy disks as you have requested, ***would consume almost 33,000 such***

25

            ***disks.***

26

*Id.* (emphasis added). Montgomery has similar "burden" issues in this action. [Docket # 467

27

(Montgomery Declaration), ¶¶ 21-22.); Docket # 432, Exhs. C & E.]

28

1     In response to the above-quoted discovery response, the defendant in *Data General* filed a
2  motion to dismiss on the ground that the plaintiff's inability and failure to produce the original
3  ADEX source code precluded the plaintiff from proving its infringement and misappropriation of
4  trade secrets claims  The district court denied the motion to dismiss, finding that it had no legal
5  foundation. *Data General*, 803 F. Supp. at 490. The rationale for the district court's finding was
6  two-fold  First, the court found that because object code and source code were both tangible
7  representations of the same protected ADEX copyright, the plaintiff could "show infringement of
8  the ADEX expression through with the source code or the object code representation," and the
9  parties had already agree to exchange object code  *Id.* at 490-491.

10     Second, and more importantly, the district court held that the ***plaintiff "need not prove a***
11  ***line-by-line correspondence between the object code and the source code, particularly where the***
12  ***defendant so clearly infringed the copyright."*** *Data General*, 803 F. Supp. at 490.  In so ruling,
13  the district court specifically rejected the defendant's argument that a recent Second Circuit case –
14  *Computer Assoc. Int'l, Inc. v. Atlai, Inc.* 23 U.S.P.Q.2D (BNA) 1241 (2d Cir. 1992) (addressing a
15  copyright infringement claim based on substantial similarity without direct copying) – required
16  analysis of the source code using the AFC method of analysis. *Data General*, 803 F. Supp. at 491.
17  Rather, the district court held, and the First Circuit affirmed, that "[s]ince [the defendant] has
18  directly copied ADEX, there is no need to confront the more difficult issue of evaluating 'non-
19  literal' elements of a program." *Id.* at 491, aff'd 36 F. 3d 1147 (1st Cir. 1994).

20     The same is equally true in this instance.  eTreppid cites to Montgomery's prior declarations
21  to demonstrate that Montgomery developed and currently possesses the pattern recognition source
22  code (as well as technologies outside of the infringement claim), which eTreppid used "on a
23  number of United States Government Contracts." [Docket # 461, p. 6.]  However, whether
24  Montgomery has the source code or not is irrelevant.  What is relevant is that eTreppid
25  demonstrates that ***there is no dispute that Montgomery was the source of the software that***
26  ***eTreppid licensed to the government***.  In fact, eTreppid's own witness (Sloan Venables) testified at
27  the preliminary injunction hearing that while he was never given access to any of the lines of
28

11

1  source code created by Montgomery in connection with the government projects," he did "know

2  what executables were delivered."[2]  [Docket # 468/469, Exh. E, 67:16-22.]

3       Under these circumstances, eTreppid's sublicensing of Montgomery's software without a

4  valid license is tantamount to direct copying and analysis of the underlying source code is therefore

5  completely irrelevant and unnecessary.

6         **3.**     **Karchmer's Objectionable Declaration (Docket # 463) Does Not Satisfy**

7                **eTreppid's Burden For Compelling Production Of Montgomery's**

8                **Source Code**

9       In stark contrast to the detailed expert opinion declaration relied upon in *Dynamic*

10  *Microprocessor* which demonstrated why examination of actual source code was required, the

11  Karchmer declaration submitted by eTreppid in support of its motion to compel does not even

12  come close to establishing the relevance and necessity of Montgomery's source code.

13       The Karchmer declaration is objectionable and thus deficient, on a number of different

14  grounds. At paragraph 1 of his declaration, Karchmer states that the purpose of his declaration is

15  "to describe the type of information that eTreppid could obtain by analyzing the source code for

16  Montgomery's original copyrighted material and the source code of the software at issue in this

17  case." Yet, nowhere in his declaration does Karchmer ever state the basis for any knowledge of

18  what the "source code at issue in this case" is. That omission is not surprising because, as

19  discussed *infra*, eTreppid has yet to define what its allegedly misappropriated trade secrets are.

20  Thus, the entire declaration should be stricken for lack of foundation and improper opinion. Fed.

21  R. Evid. 702.

22       At Paragraph 2, Karchmer states that:

23            Through an analysis of the source code, eTreppid will be able to
          compare the source code used at eTreppid with the text of

24            Montgomery's originally copyrighted material and the digital
          compression products that eTreppid claims as trade secrets. eTreppid

25            will further be able to examine the evolution of Montgomery's

---

26  [2] Venables' testimony also suggests that the delivered executables are readily identified by and

27  available from the government. Thus, to the extent eTreppid seeks discovery of the delivered
executable code – which is not the subject of this motion to compel – it should seek it from the

28  government.

1
2
3

> technology in order to test Montgomery's claims that he developed
> the subject technology prior to the formation of eTreppid. Without
> examining the actual source code, there is simply no way for
> eTreppid to evaluate Montgomery's claim that the eTreppid source
> code infringes on Montgomery's copyrights.

4
5
6
7
8
9
10
11
12

Karchmer's conclusory statement that there is "no way" to evaluate Montgomery's copyright claim is completely misplaced because, as discussed *supra*, there is no legal issue in this action that requires a source code comparison or analysis. Further, Karchmer fails to demonstrate that he is qualified as an expert to render the stated opinion. Moreover, Karchmer fails to explain how it is that the term "digital compression products" encompasses the source code "in the fields of data compression, pattern recognition, object tracking, and anomaly detection" that eTreppid seeks. Thus, paragraph 2 should be stricken for lack of foundation and improper opinion, as well as on grounds of irrelevance. Fed. R. Evid. 402, 701 & 702.

13
14
15
16
17
18
19

At paragraph 3, Karcher speculates that "eTreppid will be able to examine the source code for the technology used in order to view any 'comments' or notes and instructions written in the source code to advise any future programmers of the functionality of a particular section of the source code, etc." There is no factual foundation for the assertion that Montgomery included any such comments, notes or instructions in source code that he created, nor, as discussed *supra*, is "functionality" even an issue in this case. Thus, paragraph 3 should be stricken as irrelevant, as well as for lack of foundation and improper opinion. Fed. R. Evid. 402, 602 & 702.

20
21
22
23
24
25
26
27

At paragraph 4, Karchmer states that "eTreppid will be able to determine which programming language was used for the subject source code," and then eTreppid can "propound discovery to determine whether Montgomery owns licenses to the necessary programming software and/or compilers." Again, there is no stated basis for Karchmer's purported expertise on this or any other subject. Moreover, whether or not Montgomery has licenses for programming software used as far back as the 1980's (when Montgomery's works were copyrighted) is not relevant to any issue in this action. Thus, paragraph 4 should be stricken as irrelevant, as well as for improper opinion. Fed. R. Evid. 402 & 702.

28

At paragraph 5, Karchmer states that "if provided the hard drive media containing the source code, eTreppid will be able to examine any metadata associated with the source code files to

13

1   determine when the files were created and modified." However, as eTreppid is seeking source

2   code created, developed or modified by Montgomery, such metadata is irrelevant to any issue in

3   this action, including whether eTreppid can prove ownership by written assignment or by virtue of

4   Montgomery having requisite status as an eTreppid employee. Thus, paragraph 4 should also be

5   stricken as irrelevant. Fed. R. Evid. 402.

6        For the reasons and grounds asserted, Karchmer's declaration should be stricken in its

7   entirety, and it does not suffice to establish the relevance and necessity of Montgomery's source

8   code.

9   **B.**   **Even Assuming, *Arguendo,* That eTreppid Had Made The Requisite Showing of**

10       **Relevance and Necessity, eTreppid's Ever Evolving, Vague Description Of Its**

11       **Trade Secret Source Code And Technology Is Still Insufficient To Warrant**

12       **Disclosure Of Montgomery's Trade Secrets At This Time**

13       Faced with unconverted evidence that compression technology is the only thing that

14  Montgomery contributed under the Contribution Agreement, eTreppid now asserts in its motion

15  that pattern recognition, object tracking, and anomaly detection are merely "digital compression

16  products." This eleventh-hour assertion is both unfounded and unsupported by evidence.[3] eTreppid

17  only recently (albeit improperly) began using the term "digital compression products" in its

18  pleadings, when eTreppid belatedly perceived it to be in its interest to do so.

19       In its state court pleadings and supporting declarations filed January 19, 2006, eTreppid

20  began this action claiming that the company "develops software for such applications as data

21  compression and pattern recognition." [Docket # 414, Exh. 1 (Complaint), ¶ 4; Docket # 468, Exh.

22  B (Ex Parte Application for TRO), p.3; Case No. 3:06-CV-00145, Docket #78 (Trepp Declaration),

23

---

24  [3] Montgomery has over three decades of experience in computer programming and has developed
    thousands of programs for various applications, including programs in the fields of data
25  compression, pattern recognition, object tracking, and anomaly detection. [Docket # 467
    (Montgomery Decl.), ¶ 3.] As Montgomery testified at the preliminary injunction hearing, pattern
26  recognition, anomaly detection, and data compression are distinctly different technologies:
    "Anomaly detection is looking for anything out of the normal," while "pattern recognition is
27  specifically looking for patterns in things." [Docket # 468, Exh. E (P.I., Hearing Transcript, Vol. 2,
    126:13-19.] Whereas "video compression is looking to shrink a file and trying to keep it intact,"
28  "[p]attern recognition is looking through the file and trying to find things." [*Id.*, 130:11-23.]

1    ¶ 1 ]  Consistent with that claimed scope of the company's business, eTreppid alleged in January

2    2006 that the "eTreppid Confidential Information is comprised of trade secret materials, including,

3    but not limited to, source code regarding eTreppid compression and pattern recognition

4    technology." [Docket # 414, Exh. 1 (Complaint), ¶ 35.]  eTreppid's original complaint used the

5    term "eTreppid Source Code," but did not define it.  [*Id., passim.*]

6           By February 1, 2006, when eTreppid filed its First Amended Complaint, eTreppid was still

7    alleging that its business was "developing software for such application as data compression and

8    pattern recognition," but the "eTreppid Source Code" was "the source code used to implement the

9    various function performed by eTreppid software, which functions include[d] compression, pattern

10   recognition *and anomaly detection*."  [Docket # 34, Exh. 2 (First Amended Complaint, filed Feb 1,

11   2006), ¶¶ 7 & 20 (emphasis added).]  Without explanation, eTreppid's First Amended Complaint

12   expanded the definition of "eTreppid Confidential Information" such that it was then "comprised of

13   trade secret materials, including, but not limited to, source code regarding eTreppid compression,

14   pattern recognition *and anomaly detection technology*."  [*Id.*, ¶ 48 (emphasis added) ]

15          By the time eTreppid filed its Second Amended Complaint in June 2007, eighteen months

16   after the action had commenced, eTreppid was alleging that its business was "developing software

17   for such application as data compression, pattern recognition and others." [Docket # 186 (Second

18   Amended Complaint), ¶ 7 ]  eTreppid then defined the "eTreppid Source Code as "a complete

19   and/or nearly complete current version of certain computer source code, which is included in the

20   eTreppid Confidential Information." [Id., ¶ 3 ]  However, the definition of "eTreppid Source

21   Code" had expanded, again without explanation, such that it was purportedly "the source code used

22   to implement the various functions performed by the eTreppid Software, including data

23   compression, pattern recognition, *object tracking* and anomaly detection *and other functions*."

24   [*Id.*, ¶ 20 (emphasis added).]  In turn, eTreppid defined "eTreppid Confidential Information" as

25   "eTreppid's proprietary information, including eTreppid technology, Source Code, confidential

26   information, and trade secrets related to eTreppid products." [Id., ¶ 2].  In its claim for

27   misappropriation of trade secrets, eTreppid further alleged that:

28                    The eTreppid Confidential Information is comprised of trade secret
                     materials, including, but not limited to, eTreppid's Source Code for

                                                15

1     compression, pattern recognition, *object tracking*, anomaly detection
2     technology *and other applications*. . . the information destroyed,
      deleted and/or taken by Montgomery constitutes eTreppid's "trade
      secrets" under Nevada Revised Statutes section 600A.030(5).
3  [*Id.*, ¶ 49.]

4        Almost two years after the commencement of this action, eTreppid amended its complaint

5  yet again and made still further changes to the definitions of its business, the "eTreppid

6  Confidential Information" and the "eTreppid Source Code," all with no explanation for those

7  changes whatsoever.[4]  For example, in describing what was allegedly transferred from the

8  Montgomery Parties in 1998 pursuant to the Contribution Agreement, where eTreppid previously

9  alleged that it was "certain software technology that is incorporated in whole or in part in the

10 eTreppid Source Code," the Counterclaim now alleges that it was "certain *digital compression*

11 *products* that are incorporated in whole or in part in the eTreppid Source Code." [Compare SAC, ¶

12 9 with Counterclaim (Docket # 393), ¶ 18 (emphasis added).] The "eTreppid Source Code" is now

13 "the source code used to implement the various functions performed by the eTreppid Software,

14 including *digital [not data] compression products*, pattern recognition, object tracking and

15 anomaly detection and other functions." Further, "[t]he software at issue in this matter is [now] *in*

16 *the fields of digital compression products* for applications including data compression, pattern

17 recognition, object tracking and anomaly detection and other functions." [Counterclaim, ¶ 2

18 (emphasis added).]

19       In its claim for misappropriation of trade secrets, eTreppid further alleges that:

20     The eTreppid Confidential Information is comprised of trade secret
       materials, including, but not limited to, eTreppid's Source Code for
21     *digital compression products*, pattern recognition, object tracking,
       anomaly detection technology, *film colorization* and other
22     applications. . . . *the information destroyed, deleted and/or taken by*
       *Montgomery constitutes eTreppid's "trade secrets"* under Nevada
23     Revised Statutes section 600A.030(5).

24 [*Id.*, ¶ 64 (emphasis added).]

25

26 _____

27 [4] These changes were not disclosed to the Court until the Montgomery Parties challenged them in
   their opposition to eTreppid's motion for leave to amend; but even then eTreppid offered no
28 explanation for the changes.

16

1    Despite four iterations of its complaint, eTreppid has yet to define its allegedly

2  misappropriated trade secrets with any degree of specificity that would enable the Montgomery

3  Parties or the Court to distinguish what eTreppid claims, as opposed to what Montgomery

4  maintains are his trade secrets. The ongoing and ever-evolving vague and ambiguous assertion that

5  eTreppid's trade secret is simply everything that was allegedly misappropriated begs the issue.

6    During the course of discovery in this action, Montgomery propounded interrogatories

7  seeking clarification about what eTreppid claims as its misappropriated trade secret source code, its

8  constitutive elements, capability, technical specifications, computer language (as applicable), date

9  of creation, and the names of the individual creators. eTreppid's response to date remains woefully

10  inadequate. [Docket # 432, Exh. I (eTreppid Response to Second Set of Interrogatories, Amended

11  Interrogatory No. 1).] Thus, there is no indication of what, if anything, of the generally referenced

12  technology was purportedly transferred to eTreppid.

13    Trepp has submitted a declaration stating that "the digital compression technology that

14  Dennis Montgomery provided to eTreppid was, pursuant to the terms of the Contribution

15  Agreement, stored on a CD entitled CD1." [Docket # 464, ¶ 2.] However, in stark contrast, the

16  Contribution Agreement defines the contributed "Technology" as "software compression

17  technology" (not the subsequently coined "digital compression technology"), and it fails to mention

18  anything about such technology including pattern recognition, anomaly detection, object tracking,

19  film colorization, or anything else that eTreppid now selectively claims. [Docket # 432, Exh. G

20  (Contribution Agreement), Sections 1.2.1 and 1.3.] Similarly, there is absolutely no explanation

21  given by eTreppid of technology capabilities, creation dates, computer languages, or even an

22  identification of the creators or specific contracts for which the alleged software products were

23  used. [Docket 3 432, Exh. I (Response to Amended Interrogatory No. 1).]

24    Given eTreppid's failure to identify its purported trade secrets with the required level of

25  specificity, eTreppid should not be permitted to conduct a fishing expedition into Montgomery's

26  proprietary code, particularly without any showing of relevance and necessity.

27

28

17

1
2
3

C.     **The Testimony Of Trepp, Venables, and Zehang Sun Demonstrates That**
       **eTreppid's Purported Excuse For Failing Identify Any Trade Secrets It Claims**
       **Were Allegedly Misappropriated Is Completely False**

4       eTreppid's purported excuse for failing to properly identify any of its allegedly

5 misappropriated trade secrets is patently false. eTreppid has consistently alleged that all source

6 code was allegedly deleted or destroyed by Montgomery. Seeking to avoid identifying any

7 purported trade secret, eTreppid has also consistently asserted that it cannot properly identify any

8 allegedly misappropriated source code because eTreppid does not have it and Montgomery is the

9 only person who did or does.

10      However, in contradiction of its purported claim of ignorance, Trepp now admits that

11 eTreppid does in fact have in its possession "one program developed in 2002," and that it has

12 backups that "contain a portion of an early 2001 version one of eTreppid's compression products."

13 [Docket # 464, ¶ 3 ] Moreover, Sloan Venables testified at the state court preliminary injunction

14 hearing that: (i) during the first two years, "data compression-type work" 'was the "majority of

15 what we (i.e., eTreppid) were doing"; (ii) he personally saw data compression programs on which

16 an eTreppid employee named Venkata worked during the first two years; and (iii) he was sure there

17 were other employees who worked on it  [Docket # 468, Exh. D (P.I. Hearing Transcript, Vol. 1)

18 77:1-5 & 76:15-24.] Thus, to the extent eTreppid is claiming that trade secret compression

19 software was misappropriated, Venkata and the other employees referenced by Venables should be

20 able to identify those trade secrets. eTreppid has never provided any explanation for its failure to

21 identify such trade secrets.

22      Moreover, during his testimony at the preliminary injunction hearing, eTreppid's Vice

23 President of Engineering, Zehang Sun, claimed that he wrote pattern recognition, object tracking,

24 and anomaly detection software for eTreppid independent of Montgomery, and that at least four

25 other engineers reporting to him – Navin, Saurabh, Krishna, and Yong Mian – worked on projects

26 relating to pattern recognition source code. [Docket # 468, Exh. D (P.I. Hearing Transcript, Vol.

27 1), pp. 185-188 & 192-195.] eTreppid failed to identify any of these employees as creators of the

28 allegedly misappropriated source code, despite Sun's testimony (albeit hearsay) that the source

1   code created by those four engineers was "gone." [*Id.*, p. 198.] Significantly, Sun himself testified

2   that he did not know whether eTreppid still had the source code that he had created. [*Id.*, pp. 197-

3   198.]

4       Thus, eTreppid's professed ignorance of what it claims to be its trade secrets in this action

5   lacks credibility and is in fact demonstrably false.

6   **III.**    **ETREPPID OFFERS NO ARGUMENT FOR AN ORDER COMPELLING A RE-**

7           **CREATION OF CD NO. 1, DESPITE ITS SUBMISSION OF OBJECTIONABLE**

8           **DECLARATIONS RE: EFFORTS TO LOCATE CD NO. 1**

9       The Minute Order of February 21, 2008, specifically directed the parties to submit by

10  March 10, 2008 any further briefing desired in connection with eTreppid's RFP-1 Request No. 22

11  and RFP-2 Request No. 4, as well as declarations regarding the parties' respective attempts to

12  locate CD No. 1. While eTreppid did submit declarations, it's motion to compel (Docket # 461) is

13  completely devoid of any argument as to why Montgomery's objections to RFP-1 Request No. 22

14  and RFP-2 Request No. 4 should be overruled. Accordingly, Montgomery's objections should be

15  sustained.

16       At paragraph 4 of Trepp's declaration (Docket # 464), Trepp states that "Venables advised

17  me that this CD did not contain any useful source code, or, indeed, anything relating to

18  compression technology." As such, Trepp is clearly offering the Venables' statement for the truth

19  of the matter asserted regarding the contents of the referenced CD, and the statement is

20  inadmissible hearsay. In addition, Trepp fails to establish that Venables is qualified to render an

21  opinion regarding the contents of the CD, or whether the facts and methods Venables used to reach

22  his conclusion are reliable, or whether the methods he used were reliably applied. Thus, paragraph

23  4 of Trepp's declaration should be stricken as inadmissible hearsay and improper opinion

24  testimony. Fed. R. Evid. 702 & 802.

25       Similarly, paragraph 3 of Doug Frye's declaration (Docket # 465) should be stricken as

26  inadmissible hearsay and improper opinion testimony, where Frye states, without personal

27  knowledge or foundation, that "I understand that eTreppid employees have inspected the CD and

28

1   concluded that it does not contain any source code or other useful information." Fed. R. Evid. 602,

2   702 & 802.

3      Moreover, while throughout this litigation eTreppid has attempted to cast doubt regarding

4   whether Montgomery ever delivered CD No. 1, eTreppid's own evidence belies that position.

5   Trepp and Doug Frye both confirm that the technology that Montgomery contributed to the

6   company was contained on CD No. 1. [Docket # 464, ¶ 2; Docket # 465, ¶ 2.] Frye also confirms

7   that Montgomery did indeed deliver the CD to him. [Docket # 465, ¶ 3.] Significantly, Venables

8   testified at the preliminary injunction hearing that he knew for a fact that other eTreppid employees

9   were working on data compression software within the first two years of the company, which is

10  consistent with Montgomery's delivery of the compression technology as agreed. [Docket #

11  468/469, Exh. D (P.I. Hearing Transcript, Vol. 1) 77:1-5 & 76:15-24.] Further, Trepp now admits

12  that eTreppid does in fact have backups that "contain a portion of an early 2001 version of one of

13  eTreppid's compression products." [Docket # 464, ¶ 3.] Thus, the only reasonable conclusion is

14  that Montgomery delivered the contributed "Technology" due under the Contribution Agreement,

15  and that contribution was limited to data compression technology just as the Contribution

16  Agreement describes.

17     As eTreppid did not submit further briefing with respect to RFP-1 Request No. 22 and RFP-

18  2 Request No. 4, the Montgomery Parties' objections to those requests should be sustained without

19  further consideration of eTreppid's response thereto.

20

21  Dated: March 21, 2008                    Respectfully submitted,

22                                           LINER YANKELEVITZ
                                             SUNSHINE & REGENSTREIF LLP
23

24                                           By: _____

25                                               Deborah A. Klar
                                                 Tuneen E. Chisolm
26                                               Attorneys for DENNIS MONTGOMERY
                                                 AND THE MONTGOMERY FAMILY
27

28

                                    20

1

**CERTIFICATE OF SERVICE**

2

    Pursuant to NRCP 5(b), I certify that I am an employee of the LAW OFFICES OF LINER YANKELEVITZ SUNSHINE & REGENSTREIF LLP, and that on

3

**March 21, 2008**, I caused to be served the within document described as **MONTGOMERY PARTIES' RESPONSE TO ETREPPID AND WARREN TREPP'S**

4

**MOTION TO COMPEL PRODUCTION OF SOURCE CODE; OBJECTIONS TO DECLARATIONS OF JONATHAN KARCHMER, WARREN TREPP, AND DOUG FRYE**

5

**(DOCKET #'S 463, 464 & 465)** on the interested parties in this action as stated below:

| | |
|---|---|
| 6  J. Stephen Peek, Esq.<br>Jerry M. Snyder, Esq.<br>7  Hale Lane Peek Dennison and Howard<br>5441 Kietzke Lane<br>8  Second Floor<br>Reno, Nevada 89511<br>9  (775) 327-3000; 786-6179 - FAX<br>speek@halelane.com; jsnyder@halelane.com<br>10  Attorneys for eTreppid and Warren Trepp<br><br>11 | Carlotta P. Wells, Sr. Trial Counsel<br>U.S. Dept. of Justice<br>Fed. Programs Branch<br>Civil Division<br>Room 7150<br>20 Massachusetts Avenue, NW<br>Post Office Box 883<br>Washington, D.C. 20044<br>(202) 514-4522; 616-8470 - FAX<br>E-mail: Carlotta.wells@usdoj.gov<br>Attorneys for Department of Defense |
| 12  Reid H. Weingarten, Esq.<br>Brian M. Heberlig, Esq.<br>13  Robert A. Ayers, Esq.<br>Steptoe & Johnson, LLP<br>14  1330 Connecticut Avenue, N.W.<br>Washington, D.C. 20036-1795<br>15  (202) 429-3000; (202) 429-3902 - FAX<br>rweingarten@steptoe.com;<br>16  bhaberlig@steptoe.com; rayers@steptoe.com<br>Attorneys for eTreppid and Warren Trepp<br>17 | Raphael O. Gomez, Esq., Sr. Trial Counsel<br>U.S. Dept. of Justice, Fed. Programs Branch<br>Civil Division, Room 6144<br>20 Massachusetts Avenue, NW<br>Post Office Box 883<br>Washington, D.C. 20044<br>(202) 514-1318; 616-8470 - FAX<br>E-mail: raphael.gomez@usdoj.gov<br>Attorneys for Department of Defense |
| 18  Greg Addington, AUSA<br>U.S. DEPARTMENT OF JUSTICE<br>100 W. Liberty Street. Suite 600<br>19  Reno, Nevada 89501<br>E-mail: Greg.addington@usdoj.gov<br>20  (775) 784-5181 - FAX<br>Attorneys for Department of Defense<br>21 | |

22

23    ☒    **[ELECTRONIC]** By filing the document(s) electronically with the U.S. District Court and

24           therefore the court's computer system has electronically delivered a copy of the foregoing document(s) to the persons listed above at their respective email address.

25

26    ☒    [Federal]    I declare that I am employed in the offices of a member of the State Bar of this Court at whose direction the service was made. I declare

27           under penalty of perjury under the laws of the United States of America that the above is true and correct.

28        I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

21

1 | Executed on March 17, 2008, at Los Angeles, California

2

3 |     Criss A. Draper                                                 
    (Type or print name)                                  (Signature)

22