**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| DENNIS MONTGOMERY, et al., ) | 3:06-CV-0056-PMP (VPC) |
| Plaintiffs, ) | |
| vs. ) | **ORDER REGARDING** |
| ) | **SOURCE CODE DISCOVERY** |
| ETREPPID TECHNOLOGIES, LLC., et al., ) | |
| Defendants. ) | |

On February 21, 2008, this court held a discovery status conference and considered the motion of eTreppid Technologies, LLC and Warren Trepp ("eTreppid") to compel production of certain discovery (#s 431 & 433) and the opposition of Dennis Montgomery and the Montgomery Family Trust ("Montgomery parties") (#432). The court directed the parties to file supplemental points and authorities, and they did so (#s 461-463; # 467). The Montgomery parties also filed a request for judicial notice (#468) and a motion for permission to file under seal those documents referenced in the request for judicial notice (#469). The parties then filed replies (#s 498 & 500), and the court heard oral argument on April 2, 2008 and took the matter under submission.

**I.    Facts**

In 1998, Dennis Montgomery and Warren Trepp formed eTreppid, formerly known as Intrepid, a small, start-up technology company. Mr. Trepp contributed his business expertise, and Mr. Montgomery contributed his considerable experience as an inventor and software developer. In the fall of 2005, disagreements arose between Messrs. Trepp and Montgomery, and this litigation ensued.

**A.    The Contribution Agreement**

The Montgomery parties and eTreppid signed two agreements that are relevant to this discovery dispute. The first is a September 28, 1998 contribution agreement (#432, Ex. G). The contribution agreement states that the Montgomery parties were to contribute Mr. Montgomery's "know-how, trade secrets, patent rights, copyrights, trademarks, licenses and permits, . . . relating to or used in connection with, or otherwise describing or consisting of any part of, the software compression technology

contained on that certain Software Compression Engine Development Program contained on CD No. 1, . . ." *Id.* at Ex. G, section 1.2.1. The contribution agreement also contains a provision which expressly excludes "any other tangible or intangible assets of Contributor not specified herein." *Id.* at Ex. G, section 1.3.

All parties agree that the contents of CD No. 1 are essential to an understanding of the exact nature and extent of Mr. Montgomery's contribution; however, none of the parties has CD No. 1 or a copy. *See* Declarations of Warren Trepp, Doug Frye, and Dennis Montgomery, #s 464, 465 & 471.

### B.  The Operating Agreement

In addition to the contribution agreement, the parties also signed an operating agreement naming Mr. Montgomery as manager and Mr. Trepp as management committee chair of eTreppid (#467, Ex. A, sections 6.1.1 & 6.1.5.). As eTreppid's manager, Mr. Montgomery and his affiliates were prohibited from competing with eTreppid by:

> (i) developing, licensing or exploiting in any manner any software programs or other technology which is competitive with the Technology or the Business of the LLC, or providing any services or supplies which are encompassed within the definition of the "Business" of the LLC as set forth in this Agreement; (ii) purchasing or otherwise acquiring, owning, holding, operating, managing, investing in or otherwise disposing of a like business of the LLC's Business and interests therein of any kind or nature; or (iii) otherwise engaging in any or all aspects of a like business of the LLC's Business. The Manager's or his Affiliates' participation in any of the activities restricted by this paragraph shall be deemed a breach of the Manager's duties herein.

*Id.* at Ex. A, section 6.5.

### C.  Copyrights

Another set of documents relevant to this dispute are Mr. Montgomery's copyrights. Before joining eTreppid, Mr. Montgomery developed pattern recognition software, and the U.S. Copyright Office granted a series of copyrights, which the Montgomery Family Trust owns (#7, ¶ 8). The Montgomery parties allege that after the registration of these copyrights, Mr. Montgomery developed derivative works based on the pattern recognition technology originally copyrighted between 1982 and January 1987. *Id.* at ¶ 9. Mr. Montgomery alleges that these copyrights were not contributed to eTreppid pursuant to the contribution agreement.

2

### D.     eTreppid Operations

From January 1999 until January 2006, Mr. Montgomery served as eTreppid's chief technology officer.  As chief technology officer, Mr. Montgomery was responsible for day-to-day business operations, development of eTreppid's technology, making hiring decisions, and overseeing the programmers who worked for eTreppid. *See* #469, Ex. D, Transcript of February 7, 2006 preliminary injunction hearing before the Second Judicial District Court of the State of Nevada, Case No. CV06-0114 at page 245, lines 4-14; 250:2-6 ("Tr."). In contrast, Mr. Trepp had no technical knowledge and served as the investor with business experience, relying on Mr. Montgomery for the daily operations of eTreppid. Tr. at 245:4-14.

Mr. Montgomery was also responsible for backing up the eTreppid source code, which Sloan Venables, an eTreppid employee, defined as "the actual ... files that are used to be compiled into the software" eTreppid developed. Tr. 28, lines 7-10 & 23-24; 29:1-2.  The eTreppid source code consists of multiple source code files, which consist of more than one hundred different projects and thousands of files. Tr. at 54:21-24.  Mr. Montgomery was the sole individual at eTreppid responsible for backing up and maintaining the source code, which was a necessary precaution in the event computer hardware failed. Tr. at 29:21-24; 30:1-5 & 16-22.  The original copy of the eTreppid source code was located on the SRCSERVER, and Mr. Montgomery made copies of the hard drives of all of the programmers in the building, which he routinely copied on two work stations in eTreppid's warehouse. Tr. at 33:24; 34:1-12.  Prior to December 21, 2005, all of the source code was backed up. Tr. at 34:13-24; 35:1-7. After the Christmas holidays, eTreppid employees returned to work and discovered that nearly all of eTreppid's source code had been deleted. Tr. at 39:12-24; 40, 42, 43:1-19. On January 10, 2006, shortly after the discovery of the missing source code, Messrs. Trepp and Montgomery argued, and Mr. Montgomery left eTreppid and never returned. Tr. at 46:23-24; 47:1-18.

### II.     The Parties' Claims and Counterclaims

The operative pleadings in this action are the Montgomery parties' first amended complaint (#7) and eTreppid's answer to the first amended complaint and counterclaim (#393). The parties' claims and counterclaims are critical to the court's analysis of what information and documents are reasonably calculated to lead  to the discovery of admissible evidence pursuant to Fed.R.Civ.P. 26(b)(1).

### A.     The Montgomery parties' amended complaint (#7)

#### 1.     *Copyright infringement*

The Montgomery parties allege that the Montgomery Family Trust owns certain copyrights and derivative works, and that for approximately three years, eTreppid exploited the derivative works without any license or payment of royalties (#7, ¶¶ 21-23). The Montgomery parties allege that Mr. Trepp intentionally directed a willful infringement of the copyrights and derivative works, and they seek damages.[1]  *Id.* at ¶¶ 24-26.

#### 2.     *Copyright infringement - unlawful distribution of copyrighted work - injunction*

The Montgomery parties allege that they own the derivative works and that eTreppid violated the trust's right and interest to distribute copies of the derivative works to the public in violation of 17 U.S.C. § 106(3). *Id.* at ¶¶ 27-30. The Montgomery Parties seek to enjoin eTreppid from further infringement. *Id.*

#### 3.     *Declaratory relief*

The Montgomery parties seek a judicial declaration that they own the derivative works, and further, that any actual or implied oral nonexclusive license either never existed or was terminated. *Id.* at ¶¶ 31-33. The Montgomery parties also seek a declaration that the trust is entitled to 100 percent of the license fees obtained by the exploitation and sub-licensing of the derivative works. *Id.* at ¶¶ 34-35.

#### 4.     *Accounting*

The Montgomery parties seek an accounting of all profits derived from eTreppid's alleged exploitation of the copyrights and derivative works.[2]  *Id.* at ¶¶ 36-39.

///

---

[1] On July 30, 2007, the District Court dismissed the Montgomery Parties' copyright claims "only to the extent those claims are based on any allegations eTreppid and Trepp infringed the novel aspects of the Derivative works" (#217).

[2] On March 20, 2007, in the consolidated case, the District Court dismissed with prejudice the Montgomery Parties' counterclaim requesting an accounting based on the fact that the claim is pre-empted by federal copyright law. *See* Case No. 3:06-CV-00145-PMP-VPC, #91. This order was also filed in the base file, 3:06-CV-00056-PMP-VPC, at docket #131. To the extent that the order did not technically dismiss the Montgomery Parties' accounting claim in their first amended complaint file in case number 3:06-CV-00056-PMP-VPC, *see* #7, the court does so now.

### 5. Breach of fiduciary duty

The Montgomery parties allege that Mr. Trepp owed fiduciary duties to Mr. Montgomery and that Mr. Trepp violated those duties by improperly using his majority interests to reduce those of Mr. Montgomery by paying himself a high salary, improperly deducting business expenses, and taking distributions and misappropriating money from the company at Mr. Montgomery's expense. *Id.* at ¶¶ 40-44.

### 6. Fraud

The Montgomery parties allege that Mr. Trepp induced Mr. Montgomery to become a shareholder in eTreppid and to contribute his software technology by falsely representing that Mr. Montgomery would share equally with Mr. Trepp in the profits of the company. *Id.* at ¶¶ 45-48. It is further alleged that Mr. Trepp failed to share the profits equally, and that the Montgomery parties suffered damages as a result. *Id.* at ¶¶ 49-51.

### 7. Breach of contract

The Montgomery parties allege that pursuant to the contribution agreement, Mr. Montgomery contributed his software compression technology in return for a fifty percent ownership in eTreppid, but that Mr. Trepp breached the agreement by reducing the Montgomery parties' ownership interest in the company. *Id.* at ¶¶ 52-57.

### 8. Misappropriation of trade secrets

The Montgomery parties allege that the derivative works are trade secrets and that eTreppid has wrongfully attempted to misappropriate and convert those derivative works, causing the Montgomery Parties damage. *Id.* at 58-62.

### 9. Conversion

The Montgomery parties allege that they own the derivative works, which are currently in eTreppid's possession, but that eTreppid has converted this property for its own use and has refused to return it. *Id.* at ¶¶ 63-65. The Montgomery parties allege they have suffered damages as a result. *Id.* at ¶ 66.

///

### 10. Declaratory relief against the United States

Although the Montgomery parties stipulated to dismiss this claim against the United States (#295), the Montgomery parties make the following allegations in this claim for relief, which are relevant to this discovery dispute:

> a. [I]n order to defend Trepp's and eTreppid's claims of trade secret misappropriation and prosecute their own claims, Montgomery will be obligated to disclose the nature of the technology, the type of work that he has performed on government contracts using his technology versus that of eTreppid, and the capabilities of his technology versus that of eTreppid in performing work for certain government agencies.
>
> b. [T]hese disclosures go to the very core of Defendants' expected defense of this action, making it virtually, if not literally, impossible to defend without violating Montgomery's secrecy oath and compromising national security.
>
> c. Montgomery ... must make such disclosures in order to establish his ownership interests in the technology.

*Id.* at ¶¶ 71-72.[3]

### B.  eTreppid's Counterclaims (#393)

eTreppid names not only the Montgomery parties as counterdefendants, but also Edra Blixsth, Opspring LLC, Atigeo LLC, and Michael Sandoval as parties in its counterclaim.

#### 1.  *Misappropriation of trade secrets - N.R.S. § 600A.010 et seq.*

eTreppid alleges that the counterdefendants misappropriated its trade secret materials, which it defines as its "Source Code for digital compression products, including compression, pattern recognition, object tracking, anomaly detection technology, film colorization and other applications" (#393, ¶¶ 63-71).

#### 2.  *Breach of contract*

eTreppid alleges that in improperly taking eTreppid's trade secrets, Mr. Montgomery breached the contribution agreement. *Id.* at ¶¶ 72-75.

---

[3] The court notes that this claim for relief precipitated the United States Protective Order, which governs disclosures of this kind (#253). The clear understanding in drafting and issuing that protective order was that the parties would be discussing the nature and capabilities of the technology, and the type of work each party performed for the government. In addition, the court issued a protective order governing disclosure of trade secrets and other confidential information (#264).

### 3. *Conversion*

eTreppid alleges that the counterdefendants have converted eTreppid's confidential information and trade secrets for their own use. *Id.* at ¶¶ 76-78.

### 4. *Breach of fiduciary duty*

eTreppid alleges that based on the misappropriation of trade secrets, the Montgomery parties, as members of eTreppid and/or the management committee, breached their fiduciary duties to eTreppid. *Id.* at ¶¶ 79-84.

### 5. *Tortious and contractual bad faith*

eTreppid alleges that Mr. Montgomery breached the implied contractual covenant of good faith and fair dealing based upon the allegations outlined in the counterclaim. *Id.* at ¶¶ 85-90.

### 6. *Declaratory relief*

eTreppid seeks a judicial determination of the rights and duties of the parties pursuant to the parties' written agreements and state statutes. *Id.* at ¶¶ 91-93.

### 7. *Intentional interference with contract*

eTreppid alleges that all counterdefendants were aware of its contracts with third parties and that they intentionally interfered with those contracts. *Id.* at ¶¶ 94-99.

### 8. *Intentional interference with contract*

eTreppid alleges that counterdefendants Blixseth, Sandoval, Opspring, and Atigeo were aware of Mr. Montgomery's contracts with eTreppid, and intentionally interfered with those contracts. *Id.* at ¶¶ 100-105.

### 9. *Claim and delivery*

eTreppid alleges that it owns certain computer hard drives and other electronic storage media and devices that may contain eTreppid's intellectual property, that Mr. Montgomery wrongfully took the property and, on information and belief, may have copied confidential information, converting it to Mr. Montgomery's own use or demanding payment of money for its return. *Id.* at ¶¶ 106-110.

///

///

///

### *10. Civil Conspiracy*

eTreppid alleges that the counterdefendants acted in concert to misappropriate eTreppid's technology and harm eTreppid's ability to fulfill prospective economic relationships, thereby violating the preliminary injunction. *Id.* at ¶¶ 111-115.

### *11. Intentional interference with prospective economic relations*

eTreppid alleges that it had prospective economic relationships with third parties, of which the counterdefendants were aware, and that they intentionally interfered with those potential relationships. *Id.* at ¶¶ 116-122.

### III. <u>The February 7, 2006 Preliminary Injunction Hearing</u>

Prior to the removal and consolidation of these actions, the state court held a preliminary injunction hearing to decide whether to enjoin the Montgomery parties from destroying, using, or assigning eTreppid's source code pending the outcome of this litigation. A copy of the transcript is attached as Exhibit D to the Montgomery parties' request for judicial notice (#469) ("Tr."). During that hearing, the state court heard testimony from Mr. Trepp, Mr. Montgomery, and eTreppid employees familiar with the computer operations at the company. Both Mr. Trepp and Mr. Montgomery testified that during Mr. Montgomery's tenure at eTreppid, the government contracted only with eTreppid, and not Mr. Montgomery in his individual capacity. Tr. at page 72, lines 20-24; pages 73-77; 229:24; 230-231, 232:1-12.

After twelve hours of testimony, the court issued a preliminary injunction and found:

1. Pursuant to the employment agreement between the parties, the subsequent undisputed conduct of the parties throughout the course of Montgomery's employment with ETreppid, and Montgomery's acquiescence to and active participation in contractual agreements entered into by ETreppid with third parties involving the Source Code and technology at issue, [ETreppid] is likely to prevail on the merits of its claims;

2. [Etreppid] has demonstrated a reasonable probability that [it] will suffer irreparable harm if a preliminary injunction does not issue [because] the record reflects that the Source Code is essential to ETreppid's operations;

3. The technology at issue includes data compression software, image detection software, and pattern recognition software, which necessarily relies upon the Source Code for it's operation, and is alleged to be valued in excess of $100,000,000;

    4.    Without the Source Code, ETreppid may be forced to forego entering into valuable contracts for the use or sale of said technology; and

    5.    [ETreppid] may suffer damages in excess of $10,000 per day if [it] remains without possession of the Source Code.

(#15, Ex. 7). Based upon these findings, the state court enjoined the Montgomery parties, and all persons in active concert or participation with them, "from destroying, hypothecating, transferring, modifying, and/or assigning the ETreppid Source Code, from discussing ETreppid technology, including anomaly detection and pattern recognition software, with any third-party, except experts and other persons and witnesses necessary to Defendant's case and counsel, provided, however, that such witnesses and counsel shall not disclose any information to others about ETreppid Source Code." *Id.*, Ex. 7 at 3.

**IV.   Legal Analysis and Discussion**

Federal Rule of Civil Procedure 26(b) provides that "Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense." Fed.R.Civ.P. 26(b)(1). Further, "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id*. Rule 26(c) allows the court to protect parties from undue burden and expense in discovery by "requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." Fed.R.Civ.P. 26(c)(1)(G). Trade secrets do not have "automatic and complete immunity from disclosure, but [courts] have in each case weighted their claim to privacy against the need for disclosure." Advisory Committee Notice to 1970 Amendments to Rule 26(c). The Ninth Circuit has held that "disclosure of trade secrets will be required only where such disclosure is relevant and necessary to the prosecution or defense of a particular case." *Hartley Pen Co. v. United States District Court for S.D. Cal.,* 287 F.2d 324, 330-31 (9th Cir. 1961). The party seeking disclosure must "establish that the trade secret sought is relevant and necessary to the prosecution or defense of the case before a court is justified in ordering disclosure." *Id.*

Although the parties have focused almost exclusively on their respective trade secret and copyright claims as those relate to the discovery eTreppid seeks, the court considers the discovery in the

broader context of *all* of the claims and counterclaims alleged.

### A. Etreppid's request for production-1: No. 22 and request for production-2: No. 4 – CD No 1

The discovery requests at issue are:

1. **Request No. 22 (RFP-1):**

   All documents that relate to the software that [Mr. Montgomery] transferred to eTreppid under the terms of the September 28, 1998 Contribution Agreement (including, but not limited to: all source code – whether in printed or electronic form – executable files, shop notes, laboratory notes, and any other memoranda).[4]

2. **Request No. 4 (RFP-2)**

   All documents that relate to the software that [Mr. Montgomery] transferred to eTreppid under the terms of the September 28, 1998 Contribution Agreement (including, but not limited to, all source code – whether in printed or electronic form – executable files, shop notes, laboratory notes, and any other memoranda).

After this discovery dispute arose, the court ordered the parties to file declarations with the court concerning possession of CD No. 1. Mr. Trepp states in his declaration that he instructed eTreppid employees "to examine every hard drive, CD, or other storage device they could find in order to locate this 'CD 1,'" but "these efforts have not resulted in the location of this item" (#464). Mr. Trepp also states that during his tenure at eTreppid, Mr. Montgomery provided Mr. Trepp with CDs, DVDs and/or hard drives "that allegedly contained the then-current version of the eTreppid Source Code, which [Mr. Trepp] would then store at an off-site location. These storage media should have contained the source code contributed on 'CD1,' as well as other source code developed by eTreppid." *Id.* However, Mr. Trepp attests that having directed the review of these media, they "do not and have never contained a completed version of the eTreppid Source Code for any period of time." Further, "while these backups did contain a portion of an early, 2001 version of one of eTreppid's compression products, this was all that was located on the backup media." *Id.*

Doug Frye, a member of eTreppid and its counsel, also filed a declaration concerning the whereabouts of CD No. 1 (#465). Mr. Frye states that he searched his files, both at his office and at

---

[4] The court also addresses this request for production below as it relates to source code and other technology Montgomery claims as a trade secret.

10

home, and did locate a CD that Mr. Montgomery had given to him. *Id.* Mr. Frye does not recall the circumstances or the date that Mr. Montgomery gave him the CD, but recalls that Mr. Montgomery told him at the time that it contained a backup copy of eTreppid's technology. *Id.* Mr. Frye gave the CD to Mr. Trepp, and upon examination by eTreppid employees, Mr. Frye attests that it does not contain source code or other useful information. *Id.*

Mr. Montgomery also filed his declaration concerning CD No. 1 and attests that he is unable to locate the original or a copy of CD No. 1, nor does he believe it existed in printed form (#466). Mr. Montgomery states that CD No. 1 contained software programs for software compression technology and included executable files and related source code and a "software compression engine development program." *Id.* Mr. Montgomery further attests that while he was careful to maintain his work product in an organized fashion to insure he could reconstruct his work, the FBI destroyed that organization during the seizure at his home and storage facility. *Id.* Moreover, he contends that there are discrepancies between the FBI seizure list and the FBI return lists, which have not been resolved, and this makes it impossible for him to determine whether or if the work product can be reconstructed at all. *Id.* Mr. Montgomery goes on to state that even if he had all of the software compression files he had as of September 1998 when he signed the contribution agreement, he could not reconstruct CD No. 1 without actually reviewing the files, which is not technically feasible, given the alleged destruction and failure to return all of his property. *Id.* Although Mr. Montgomery's declaration is silent concerning whether he ever delivered CD No. 1 to Mr. Trepp or someone at eTreppid, Mr. Montgomery testified at the preliminary injunction hearing that he gave it to Mr. Frye (#469, Ex. E, Tr. at page 143, lines 10-24; 135:1-10).

It is undisputed that what is on CD No. 1 is pivotal to the parties' claims and counterclaims in this proceeding. Remarkably, this key piece of evidence apparently no longer exists. Messrs. Frye and Trepp state under penalty of perjury that they have searched every piece of media located at eTreppid and in other locations where it might be found, but that the media that Mr. Montgomery provided during his tenure at eTreppid – whether CD No. 1 or otherwise – contain nothing relevant to the claims alleged in this action, including "data compression software." Mr. Montgomery likewise states under penalty of perjury that he gave CD No. 1 to Mr. Frye back in September 1998, and that to the extent he might

have had possession of CD No.1, the FBI search of his home and storage units resulted in loss or destruction of certain of his work product. Mr. Montgomery states that it is virtually impossible to re-create CD No.1 based on technical lack of feasibility, accessibility of files, time and expense.

At this point in the litigation, the court will not order Mr. Montgomery to recreate CD No. 1, but it reserves this issue for future consideration after more thoroughly testing Mr. Montgomery's allegations that the FBI lost or destroyed property such that it prevents him from being able to re-create CD No. 1. In the interim, the court draws two conclusions. First, these document production requests are broader than simply seeking production of CD No. 1. Second, the court agrees with eTreppid that Mr. Montgomery's declaration is silent as to whether he has in his possession any documents or information that was contained on CD No. 1, other than to state that CD No. 1 itself did not exist in printed form.

The court concludes that documents pertaining to CD No. 1 are likely to lead to the discovery of admissible evidence, and the Montgomery parties are ordered to produce all documents, including but not limited to those in electronic form, which are responsive to RFP-1, No. 22, and RFP-2, No 4.

  **B.  Etreppid's request for production-1, Nos. 3, 4, 6, 8, 9, 16, 18, 19, 20 & 22 and request for production-2, Nos. 1, 2, & 3 and any others to the extent they seek source code and other technology Montgomery claims as a trade secret**

eTreppid's first request for production of documents includes the following items in dispute:

1. **Request No. 3:**  All documents that contain some or all of the full text of each of the copyrights.

2. **Request No. 4:**  All documents that contain some or all of any material, included in and/or protected by the copyrights, that you contend defendants have, either collectively or individually, infringed.

3. **Request No. 6:**  All documents that contain some or all of the full text of each work that you contend is a "derivative work" of the copyrights.

4. **Request No. 8:**  All documents that relate to your contention that defendants, either collectively or individually, have infringed upon any of the copyrights.

5. **Request No. 9:**  All documents that relate to your contention that defendants, either collectively or individually, have infringed upon any work that you contend is a 'derivative work' of the copyrights.

6. **Request No. 16:**  All documents that relate to eTreppid's technology, products, and/or research and development efforts (including but not limited to: any and all marketing documents, business plans, PowerPoint presentations, white papers, correspondence, and/or notes of meetings with customers or potential customers).

|   |   |   |   |
|---|---|---|---|
| 7. | **Request No. 18:** | | All documents that contain any source code, written by you or under your direction, that relate to the fields of data compression, pattern recognition, object tracking or anomaly detection (including but not limited to: all of any part of a software program or algorithm). |
| 8. | **Request No. 19:** | | All documents that relate to any research and development efforts made, by you or by anyone working under your direction, in the fields of data compression, object tracking, pattern recognition, or anomaly detection (including, but not limited to: any and all notes, diagrams, laboratory materials, or source code). |
| 9. | **Request No. 20:** | | Executable versions of any and all software, developed by you or by anyone working under your direction, which relates to the fields of data compression, object tracking, pattern recognition, or anomaly detection. |
| 10. | **Request No. 22:** | | All documents that relate to the software that you transferred to eTreppid under the terms of the September 28, 1998 Contribution Agreement (including but not limited to: all source code – whether in printed or electronic form – executable files, shop notes, laboratory notes, and any other memoranda). |

eTreppid's second request for production of documents includes these items in dispute:

1. **Request No. 1:** Please produce all documents that contain any source code, writen by you or under your direction, that relate to the fields of data compression, pattern recognition, object tracking or anomaly detection (including, but not limited to: all or any part of a software program or algorithm).

2. **Request No. 2:** Please produce all documents that relate to any research and development efforts made, by you or by anyone working under your direction, in the fields of data compression, object tracking, pattern recognition, or anomaly detection (including, but not limited to: any and all notes, diagrams, laboratory materials, or source code).

3. **Request No. 3:** Please produce all executable versions of any and all software developed by you or by anyone working under your direction, which relates to the fields of data compression, object tracking, pattern recognition, or anomaly detection.[5]

This dispute also concerns Request Nos. 30 and 31 in the first request for production of documents, and Request Nos. 6, 7, and 24 through 28, of the second request for production of documents to the extent that responses may also implicate the dispute over disclosure of documents related to this issue.

---

[5] RFP-1 Nos. 18, 19 & 20 are identical to RFP-2 Nos. 1, 2, & 3.

As earlier noted, the debate among the parties concerning these document production requests centers on the trade secret and copyright claims; however, the parties' numerous other claims and counterclaims include a wide range of tort and equitable claims, and the court must consider these requests in that broader context. The court has reviewed the parties pleadings, the transcript of the preliminary injunction hearing, the order that followed, as well as the legal arguments and evidence concerning this dispute.

The court also noted earlier that the Montgomery parties originally named the United States Department of Defense as a defendant in their amended complaint, and those allegations are quite contrary to the position the Montgomery parties' new counsel now takes concerning disclosure of Mr. Montgomery's technology (#7, ¶¶ 68-74). While it is true that the United States has since been dismissed, as has the tenth claim for relief, the allegations are telling. Plaintiffs allege that "in order to defend Trepp's and eTreppid's claims of trade secret misappropriation and prosecute their own claims, Montgomery will be obligated to disclose the nature of the technology, the type of work that he has performed on the government contracts using his technology versus that of eTreppid, and the capabilities of his technology versus that of eTreppid in performing work for certain government agencies." *Id.* at ¶ 71. The Montgomery parties further allege that, "these disclosures go to the very core of [eTreppid's] expected defense of this action, making it virtually, if not literally, impossible to defend. . . ." *Id.* at ¶ 72. This makes sense, and is the very reason that the parties subsequently executed not only a standard protective order governing disclosure of trade secrets, but also the United States' protective order governing the military and state secrets privilege. With these safeguards in place, it was presumed that the parties could proceed to discover information relating to their respective claims and defenses.

The court also finds instructive both the preliminary injunction transcript and state court's preliminary injunction order. Having heard the testimony of Mr. Trepp, Mr. Montgomery, and eTreppid employees intimately familiar with eTreppid's operations, the state court issued a preliminary injunction and concluded that Mr. Montgomery took technology of value when he left eTreppid. The state court order does not specifically define eTreppid's source code, but includes in that term "data compression software, image detection software, pattern recognition software, which necessarily relies upon the Source Code for its operation," and the court later includes a reference in the order to "anomaly detection

14

and pattern recognition software," all of which the court clearly understood to be at the heart of this case (#15, Ex. 7). The final sentence of this order is instructive: "The Court issues this injunction to maintain the status quo and to avert any irreparable harm that ETreppid may suffer and based on the risk that Mr. Montgomery could delete and/or transfer the last version of the ETreppid Source Code that remains intact." *Id.*

The Montgomery parties contend eTreppid cannot take discovery on its trade secret claim because it must first specifically identify the trade secret, and a protective order is proper until a plaintiff claiming trade secret misappropriation has adequately identified its own trade secret. *IMAX Corp. v. Cinema Technologies, Inc.,* 152 F.3d 1161 (9th Cir. 1998). The pivotal difference between this action and *Imax* is the facts.

*Imax* concerned the patents that Imax acquired to the "rolling loop projector," making it the world's largest supplier of such projectors. *Imax,* 152 F.3d at 1163. To protect the secrecy of the undisclosed technology, Imax included a confidentiality provision in each sales or lease agreement, which forbade customers from disclosing confidential information about the system. *Id.* Three individuals, who were never employed by Imax, formed a company with the goal of developing their own large format projector that would compete with Imax. *Id.* They obtained a copy of an Imax manual that was not marked confidential, and they then observed, disassembled, measured, photographed, traced, and sketched the Imax projector. *Id.* Eventually, the company unveiled it's own "rolling loop" projector at a trade show, and Imax sued, alleging misappropriation of trade secrets and unfair competition. *Id.* at 1163-64. However, Imax was unable to identify the dimensions and tolerances of its projector design that were its claimed trade secrets, and the court granted summary judgment against Imax on that claim. *Id.* at 1170.

The fact that Imax held the patents to the projector, developed and sold the projector, yet was unable to identify the allegedly misappropriated trade secret dictated the court's conclusion in *Imax.* In other words, since Imax, or an employee of Imax whom Imax could consult, created the projector, and therefore the trade secret, it ought to be able to identify it. In contrast, Mr. Montgomery came to eTreppid with CD No.1 and his years of computer training and expertise. He agreed to devote all of his technical know-how solely for the benefit of eTreppid during his tenure there. He oversaw the

company's software development programs, and he alone was the custodian of eTreppid's source code and was entrusted with insuring its security. Neither Mr. Trepp, Mr. Frye, or any of the eTreppid software engineers had Mr. Montgomery's level of access to eTreppid's source code, so when he left eTreppid and allegedly took eTreppid's "source code" with him, eTreppid could not possibly identify its alleged trade secret because the one person who could identify it was gone. To further complicate matters, no one has a copy of CD No. 1, the technology Mr. Montgomery initially contributed to eTreppid.

What the source code is, or is not, is a central issue in this action. This court agrees with the Montgomery parties that the preliminary injunction order does not give eTreppid a monopoly in the development of software and technology in the fields of anomaly detection and pattern recognition, and that the injunction is limited to the "source code at issue." However, the order expressly enjoins Mr. Montgomery from using that source code pending disposition of this action. Mr. Montgomery admits he is in possession of the source code eTreppid used in fulfilling its contractual obligations and that he continues to work to improve that technology with the financial assistance of his new employer; however, he contends this does not violate the preliminary injunction order because the technology he is using belongs to him (Dec. of Mr. Montgomery, #462, Ex. B; *see also* #115, Case No. 3:06-CV-0263-PMP (VPC)). Because Mr. Montgomery took or deleted the source code from eTreppid's computer – a finding Judge Perry made in February 2006 – eTreppid cannot define the source code without its requested discovery, and it is clear that it will be impossible to adequately prosecute or defend the myriad of claims and counterclaims without defining the source code.

This case also revolves around the technology developed at eTreppid for use in contracts with government entities. It was eTreppid, not Mr. Montgomery, who entered into these contracts. However, Mr. Montgomery claims that the technology used in these contracts is derived from his copyrights, which he never assigned to eTreppid. eTreppid contends that some or all of the technology used in these contracts is derived from CD No.1 and that Mr. Montgomery agreed to devote all of his know-how for the exclusive benefit of eTreppid. In response, Mr. Montgomery essentially asks eTreppid and this court to "take his word for it" that all that eTreppid is entitled to is that which was contributed on the now vanished CD No. 1, and that any technology he now possesses is solely derived from his unassigned

copyrights. In other words, the valuable trade secret in this case is his because he says so. This is not enough.

Disclosure of trade secrets will be required where such disclosure is relevant and necessary to the prosecution and defense of the parties claims. *See Hartley Pen Co.,* 287 F.2d, 324, 330-31. Discoverable information need only appear "reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). Because the protective order regarding trade secrets is in place, the court believes that the Montgomery Parties are protected from the technology's misuse in the event that this court determines that the Montgomery parties are the rightful owners of the disputed technology. Fed.R.Civ.P. 26(c)(1)(G). To sort out what rightfully belongs to the Montgomery parties and eTreppid, it makes sense to take discovery on this technology, particularly in light of the fact that CD No.1 no longer exists. The questions to be answered are what technology eTreppid began with in September 1998 and what technology was developed at eTreppid in the ensuing seven years. Only after sorting through this tangle can the parties reasonably argue ownership and develop their claims and defenses accordingly. Simply put, there is no conceivable way eTreppid can describe its trade secret, because Mr. Montgomery has made that impossible based upon the events that occurred in December 2005 and January 2006.

The court is convinced that neither eTreppid nor the Montgomery parties will be able to conclusively prove ownership of the technology without analysis of the source code; thus, the court concludes that documents related to the source code and other technology Montgomery claims as a trade secret are "reasonably calculated to lead to the discovery of admissible evidence." The Montgomery parties are ordered to produce all documents, including but not limited to those in electronic form, which are responsive to RFP-1, Nos. 3, 4, 6, 8, 9, 16, 18, 19, 20 & 22 , and RFP-2, Nos. 1, 2 & 3 as limited by the court below.

### V.     Conclusion

Based upon the foregoing, and for good cause appearing, **IT IS HEREBY ORDERED:**

1. eTreppid's motion to compel (#431) is **GRANTED IN PART AND DENIED IN PART** as more fully set forth in this order and as follows:

    a.    Produce all documents responsive to RFP-1, Nos. 4, 6, 8, 16 & 22 and RFP-2, No. 4;

    b.    Produce documents responsive to RFP-1, No. 3 as limited to the "full text of each of the copyrights." eTreppid shall have leave to request documents which contain a reference to some or all of the text of the copyrights if good cause is shown that such further discovery is reasonably calculated to lead to the discovery of admissible evidence;

    c.    Produce documents responsive to RFP-1, No. 9 as limited to 1998 to the present; and

    d.    Produce documents responsive to RFP-1, Nos. 18, 19 & 20 and RFP-2, Nos. 1, 2 & 3 as limited to 1997 to the present. eTreppid shall have leave to request documents pre-dating 1997 if good cause is shown that such further discovery is reasonably calculated to lead to the discovery of admissible evidence.

2.    The Montgomery parties' motion for protective order (#467) is **GRANTED IN PART AND DENIED IN PART** as more fully set forth in this order;

3.    The Montgomery parties' request for judicial notice (#468) is **GRANTED**;

4.    The Montgomery parties' motion to file document under seal (#469) is **DENIED AS MOOT,** as this court has ordered unsealed all of the papers filed in the state district court proceeding (#644); and

5.    The Montgomery parties shall file a discovery status report with this court no later than **Monday, June 30, 2008,** outlining its proposed timeline for compliance with this order, notwithstanding that any party may file an objection to this order pursuant to LR IB 3-2.

**IT IS SO ORDERED.**

Dated: May 29, 2008

                                        */s/ Valerie P. Cooke*
                                        UNITED STATES MAGISTRATE JUDGE