1            UNITED STATES DISTRICT COURT
                DISTRICT OF NEVADA
2     BEFORE THE HONORABLE VALERIE P. COOKE, MAGISTRATE JUDGE
                   ---o0o---
3

4   Dennis Montgomery, et al.,   :  No. 3:06-cv-056-PMP-VPC
                                  :
5                Plaintiff,       :  August 19, 2008
                                  :
6          -vs-                   :  United States District Court
                                  :  400 S. Virginia Street
7   ETreppid Technologies,        :  Reno, Nevada  89501
    et al.,                       :
8                                 :    **VOLUME II**
                 Defendant.       :
9   _____:

10

11

12                        **TRANSCRIPT OF**
                  **CONTINUED SHOW CAUSE HEARING**

13

    A P P E A R A N C E S:
14

    FOR THE PLAINTIFF:          Randall Sunshine
15                              Ellyn Garofalo
                                Attorneys at Law
16

17  FOR DEFENDANT ETREPPID:     Stephen Peek
                                Jerry Snyder
18                              Attorneys at Law

19  FOR COUNTER-DEFENDANTS:     Bridgett Robb-Peck
                                Gregory Schwartz
20                              Attorneys at Law

21  FOR INTERESTED PARTY:       Carlotta Wells
                                U.S. Department of Defense
22

23

24  Proceedings recorded by mechanical stenography produced by
    computer-aided transcript
25

                    KATHRYN M. FRENCH, RPR, CCR
                        (775) 786-5584

1

2    Reported by:                    KATHRYN M. FRENCH, RPR, CCR
                                     NEVADA LICENSE NO. 392
3                                    CALIFORNIA LICENSE NO. 8536

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              Reno, Nevada, Tuesday, August 19, 2008, 9:00 a.m.

2                          ---OoO---

3

4              THE COURT:  Thank you.  Please be seated.

5              THE CLERK:  This is the date and time

6    set for continued Show Cause Hearing in case number

7    3:06-cv-056-PMP-VPC, Dennis Montgomery, and others, versus

8    eTreppid Technologies, and others.

9              Present on behalf of plaintiff, Ellyn Garofalo and

10   Randall Sunshine.

11             Present on behalf of defendant, Stephen Peek and

12   Jerry Snyder.

13             Present on behalf of counter-defendant,

14   Bridgett Robb-Peck.

15             Present on behalf of interested party,

16   Carlotta Wells.

17             THE COURT:  Good morning everybody.

18             Let the record reflect it is 9:08 a.m.  The Court

19   intends to start promptly nine o'clock a.m.  So I think

20   Mr. Peek may have been here early setting things up, but I

21   expect that we commence at nine o'clock sharp, just for

22   future reference.

23             Counsel.

24             MS. GAROFALO:  Good morning, Your Honor.  I

25   think the eight minutes late may have been well spent.

```
 1    Mr. Peek and I have been discussing what is one of the key
 2    issues here, which I think we have reached a resolution on.
 3              As the Court knows, there's been much talk about
 4    the Glogauer e-mails and PST files, the original PST files.
 5    The Glogauer PST files have now been received back from the
 6    Washington attorneys, Scatton lawyers, who were using that in
 7    the Grand Jury proceedings.  There is an issue with one, at
 8    least one, e-mail chain which, in response to a word search,
 9    does indicate that there may be some information subject to
10    the State Secret's Privilege on the Glogauer PST.
11              We've talked to Ms. Wells, who will be talking to
12    her client about the best way to handle it.  We've indicated
13    to Mr. Peek that we would prefer Mr. Montgomery remove those
14    files, necessarily open those files.  And we've come up with
15    several alternatives that, hopefully, by the end of the day,
16    we will be able to convey to the Court that we have resolved
17    the issue, and that those hard drives will be produced
18    forthwith to Mr. Peek.
19              THE COURT:  All right.  Very good.
20         Mr. Peek.
21              MR. PEEK:  I have nothing to say.  I appreciate
22    the proffer, Your Honor, and I've accepted.  And, certainly,
23    we're going to be speaking with Ms. Wells and see if we can't
24    find a way to expedite this.
25              THE COURT:  Thank you very much.
```

1        MS. GAROFALO:  Thank you.

2        THE COURT:  Thank you, counsel.

3     The other matter, counsel, we're just trying get

4  exhibits sorted out.  And I understand counsel can do that

5  later on today, toward the end of the afternoon.

6        Is that correct, counsel?

7        MR. SUNSHINE:  Yes, Your Honor.

8        THE COURT:  Okay.  Very good.

9     Correct, Mr. Peek?

10       MR. PEEK:  Yes, Your Honor.

11       THE COURT:  All right.  Mr. Peek, by my count,

12 you've got 4 hours and 17 minutes.

13       MR. PEEK:  That's about what I calculated, too,

14 Your Honor.

15       THE COURT:  All right.  So you may proceed, sir.

16       MR. PEEK:  Just need a witness, and we're ready

17 to go.

18       THE COURT:  All right.

19              **DIRECT EXAMINATION (resumed)**

20 BY MR. PEEK:

21  Q   Mr. Montgomery, I wanted to go back and clear up a few

22 things that I hadn't covered yesterday.  And I'm going to

23 start with, at least, the NBC and Wall Street Journal

24 communications.

25       One thing I have not seen in any production at

1    all, is any form of communications, whether it be cell phone

2    record or long distance phone call records of how NBC News was

3    contacted.

4            Did you contact NBC News?

5    A    No.

6    Q    Who did?

7    A    Tim Blixseth.

8    Q    Okay.  Did he do it -- do you know whether he did it by

9    telephone or by e-mail?

10   A    I believe phone.  I don't know for certain, but my

11   understanding was he was the one who had the contact with

12   them.

13   Q    And do you know at whose prompting Mr. Blixseth contacted

14   NBC News?

15   A    No.

16   Q    Was it at yours?

17   A    No.

18   Q    Did you tell Mr. Blixseth that you had certain e-mails

19   that would be of interest to NBC News?

20   A    I don't recall that I did or not.

21   Q    Well, why was it that he would contact NBC News, other

22   than to talk about the Jale Trepp and Glogauer e-mail?

23   A    You would have to ask him.

24   Q    Did you testify tell him about the Len Glogauer e-mail?

25   A    No.

1   Q   Did you give him a copy?

2   A   No.

3   Q   Did you tell him about the Jale Trepp e-mail?

4   A   I don't recall if I did or not.

5   Q   The Wall Street Journal, did you contact John Wilke, or

6   did somebody else contact John Wilke?

7   A   I didn't.

8   Q   Okay.  And who did?

9   A   I don't know if it was Tim or Edra.

10  Q   Okay.  One of those two?

11  A   I want to say Tim, but I'm -- I'm not certain.

12  Q   Okay.  And do you know when he did that?

13  A   No.

14  Q   Do you know whether he did it by phone or by e-mail?

15  A   I don't know.

16  Q   And do you know why he did it?

17  A   No.

18  Q   Did you tell him something that caused him to -- that you

19  believe caused him to contact the Wall Street Journal?

20  A   I did talk with him, I think, on one occasion.

21  Q   I mean, for example, did you tell him that you had a

22  Len Glogauer e-mail?

23  A   I don't recall if I said that exactly or not.

24  Q   Did you tell him what you believed about the Jale Trepp

25  e-mail?

1    A    I don't recall that one specific instance or not.

2    Q    Did you tell him that you had evidence that Mr. Trepp had

3    given casino chips and cash to Congressman Gibbons?

4    A    I told him I saw it.

5    Q    You told him you saw it.   Okay.

6              And did you tell him you saw it on one, or more than

7    one instance, or more than one instance?

8              MS. GAROFALO:   Your Honor, objection.   Relevance

9    based on the -- objection.   Relevance.

10             THE COURT:   Mr. Peek.

11             MR. PEEK:   Your Honor, what I'm trying to get at

12   is whether there are communications that Mr. Montgomery would

13   have that should have been produced.

14             MS. GAROFALO:   I'll withdraw the objection at

15   this time, Your Honor, but we are here to focus --

16             MR. PEEK:   And I'll do this quickly.   Sorry.

17             MS. GAROFALO:   -- to the core issues.   Not to

18   the underlying merits of the case.

19             THE COURT:   I agree.   Okay.

20             All right.   The Court does concur, to some extent,

21   with Mr. Montgomery's counsel about the focus.

22             So, go ahead, with that comment, Mr. Peek.

23   BY MR. PEEK:

24    Q    Did you provide any communications to Mr. Blixseth via

25   e-mail, for example?

1   A    I don't recall if I did or not.

2   Q    And if you did, those would be where, sir?

3   A    I mean, I don't have them.  If he has them -- maybe he

4   has them.  I don't know.

5   Q    When you say you don't have them, what efforts have you

6   made to look for them?

7   A    I've -- we went through this for four days.  I've looked

8   everywhere for everything you asked for, diligently.

9   Q    And you also told us yesterday that you believe if there

10  were any communications regarding your efforts to transfer,

11  sell, assign the data compression, anomaly detection, pattern

12  recognition, Object Tracking, Source Code, it would have been

13  on your computer, the computer that was seized by the FBI.

14          Do you remember that testimony from yesterday?

15  A    Yes, I -- yes.

16  Q    Okay.  And so that would be the only place that it would

17  be, or would it be other places?

18  A    I mean there could have been another copy of that drive,

19  or I mean --

20  Q    Well, you told us yesterday you thought there was another

21  copy of that drive because the video was on that.

22  A    Right.

23  Q    So was there another copy of that drive?

24  A    Not that I know of, but I've not looked through

25  everything.  There's still five drives left.  I've referred

1    to this before.

2    Q    Okay.  And so it would be somewhere on those five drives?

3    A    It could be.  I mean, I have a number of CDs, which it

4    could have been on those too.

5    Q    Now, after -- well, there are certainly some e-mails that

6    I think you have produced.  I don't know whether you produced

7    them or somebody else produced them, but there are e-mails of

8    communications with respect to the transfer, assignment of the

9    Source Code, correct?

10   A    Yes.

11   Q    You've seen those?

12   A    Yes.

13   Q    Okay.  Now, the other thing that we know is that the

14   FBI seized your material on or about March 1st of 2006,

15   correct?

16   A    Yes.

17   Q    And that we also know from Exhibit 9, which you've seen

18   before, I believe.  I -- let me just make sure I got the right

19   exhibit.

20         Actually, it's exhibit 8.

21         Let me just refer you to Exhibit 8.  That is your

22   response to requests for production that came from Miss Klar,

23   or from the Liner Law Firm to us, on or about May 26th.

24         Do you see that e-mail in the first page of that?

25   A    Yes.

 1   Q    And then attached to that are all the documents that are

 2   referenced in that e-mail.

 3            Do you see that?

 4   A    Yes.

 5   Q    Okay.  Do you recognize this production as something that

 6   you produced on or about May 26th, 2006 -- excuse me, 2008.

 7   A    No.  I mean, I -- I don't know that.

 8   Q    Okay.  Well, let me just then follow-up.

 9            Would you turn to a page that is marked MONT-184.

10   And these are in date numerical, ascending order.

11   A    Mine goes to 182 -- oh, no.  Then it starts with another

12   e-mail.

13            Oh, I see.  I got it.

14   Q    Okay.

15   A    Sorry.

16   Q    Do you see that e-mail there?

17   A    Yes.

18   Q    What's the address of Dennis Montgomery there?

19   A    Dennis@ncoder.net.

20   Q    Now, yesterday, you told us you didn't think you setup

21   that e-mail account in mid 2006.

22            Do you remember that testimony?

23   A    Yes.  Yes.

24   Q    You were wrong?

25   A    Yes.  Obviously.

1   Q   You were using the Montgomery@ncoder.net in March of
2   2006, were you not?
3   A   I didn't think so, but it may have been.
4   Q   Well, did you get this e-mail that was addressed to
5   Dennis@ncoder.net?
6   A   I'm believing you.  I see it.
7   Q   You don't have to believe me.
8   A   I'm saying I may -- maybe I set it up earlier.  I don't
9   recall.
10   Q   Okay.  But, anyway, this is an e-mail dated March 27th,
11   2006, is it not?
12   A   Yes.
13   Q   It's e-mail that wouldn't be on your home computer,
14   isn't it?
15   A   Correct.
16   Q   Because your e-mail, your e-mail was seized on or about
17   March 1st?
18   A   Yes.
19   Q   So, yesterday, when you told us all of those e-mail
20   communications that would be on your -- with respect to
21   transfer assignment of the Source Code would be on your home
22   computer that was seized by the FBI, that is now in hard drive
23   with the nine one one serial number ending -- do you remember
24   that from yesterday?
25   A   I didn't think I said exactly that.

1    Q   Well, that's what you told us yesterday.  If there were

2    any e-mails, they would be on that hard drive.  You've given

3    me everything.

4    A   I didn't say there wouldn't be any.  I said there would

5    be some.

6    Q   Oh, okay.  So there are some at Dennisencoder.net, are

7    there?

8    A   You keep asking me that.  There are none.

9    Q   There are none.  Well, here's one right here 184, is it

10   not?

11   A   I see that.

12   Q   It's on your e-mail.  It's on your e-mail, isn't it?

13   A   Yeah.  This could have shall be deleted a year ago.

14   Q   Okay.  So you deleted these e-mails?

15   A   No, I didn't.

16   Q   Well, they were deleted, correct?

17   A   I don't have that.  That's correct.

18   Q   Okay.  So these e-mails that you have that were produced,

19   didn't come from you, is that correct?  This e-mail, that

20   is --

21   A   I didn't --

22   Q   -- exhibit --

23   A   I don't -- I didn't have the agreements that I signed.

24   My attorney, Mike Flynn, did.  And he's never given them back

25   to me.  So, I couldn't have produced these signed documents

1   because Mr. Flynn is holding my documents -- like many other

2   things.

3   Q    Okay.  But you at least -- and you didn't have the

4   e-mails either that are produced here?  Somebody else did.

5   A    I don't know who produced this particular e-mail.  I

6   mean, I don't know if Mike Flynn produced it.  I don't know.

7   Q    Well, your -- you, through your lawyer, produced it.

8   That's all I know.

9   A    Okay.

10  Q    You don't know how they came into his possession, is that

11  your testimony?

12  A    I can't answer that without giving up attorney/client

13  privileged information.

14  Q    Well, did you provide e-mails to your attorneys that

15  covered the period of March 2006 through April 2006 that refer

16  to your transfer/assignment of the Source Code?

17  A    I didn't think -- the e-mails that I know of --

18  Q    Well --

19  A    Can I answer the question?

20  Q    It's a simple yes or no.

21       Did you or did you not provide --

22  A    I don't know specifically if that happened or not.

23  Q    Okay.  So you don't know whether you did provide these

24  e-mails that were produced by your counsel.

25       Is that your testimony?

1   A    That's correct.

2   Q    Okay.  And where would those e-mails be today?

3   A    I believe I gave e-mails between myself and Mike Flynn

4   that were privileged e-mails.

5   Q    That's not what I asked.

6        Where are the e-mails that are referenced here --

7   A    Oh.

8   Q    -- in Exhibit 8?

9   A    I don't know.  I don't know.

10  Q    Okay.  And there are actually, in Exhibit 8, a number of

11  them.  You can look at, you know, MONT-185.

12  A    Yeah, I see them.

13  Q    186.

14  A    Which they all refer to Mike Flynn.

15  Q    Okay.  Did they come from Mike Flynn?

16  A    God, knowing him, I don't know.  I don't know.

17  Q    You don't know the source of these, is that correct?

18  A    No, but I did give the e-mails that were -- I thought

19  I was supposed to give that were e-mails that were between

20  myself and Mike Flynn.

21  Q    Okay.  So you had some of those someplace then?

22  A    Yes, at some point.

23  Q    Where did you have those?

24  A    I think they were burned onto a CD.

25  Q    And so then would that be all of the e-mails you had

1   between yourself and Mike Flynn that you burned on the CD?

2    A   I believe so.

3    Q   Okay.  And then you must have retained copies of those

4   e-mails in order to burn them onto a CD, is that correct?

5    A   No.  I gave them -- what I had, I burned them onto a CD.

6    Q   Right before you burned them onto a CD, you took them off

7   some other form of electronic media, did you not, sir?

8    A   I think there -- I didn't know what the original source

9   was.  I don't know whether it was a CD or disk drive.

10   Q   Well, how did they -- what source --

11              THE COURT:  Okay.  Stop.  Stop.

12              MR. PEEK:  -- or hard drive --

13              THE COURT:  I just want to admonish both

14   counsel, and you, Mr. Montgomery, the court reporter cannot

15   report accurately if you talk over one another.  So please

16   take care to not do that.

17          Go ahead, sir.  Start again.

18   BY MR. PEEK:

19   Q   From what media source did you obtain the e-mails between

20   you and Mike Flynn that you burned onto either a CD or a hard

21   drive?

22   A   An Outlet file.

23   Q   And where was that outlet file?

24   A   On a hard drive.

25   Q   And on whose hard drive was that?

1    A    Mine.

2    Q    Did the hard drive only save e-mails between you and

3    Mr. Flynn, or did it save all e-mails?

4    A    Just those.

5    Q    So did you setup one program in your computer that it

6    would only save e-mails between you and Mr. Flynn?

7    A    I don't remember if it was setup that way specifically

8    or not.

9    Q    Okay.  But for some reason or another, you kept only the

10   e-mails in your Outlook file between you and Mr. Flynn, but

11   not others, is that correct?

12   A    Yes.  Because Mr. Flynn was very adversarial to me.

13   Q    In 2006 he was?

14   A    Yes.

15   Q    Okay.  And that would be in March of 2006, he was very

16   adversarial to you?

17   A    No.  Not at the beginning.

18   Q    Well, when did you start saving your e-mails between you

19   and Mr. Flynn?

20   A    Well, since I knew Mr. Flynn.

21   Q    Okay.  And those are the only e-mails that you saved, is

22   that correct?  Is that your testimony?

23   A    I -- there were e-mails on Opspring's computers that

24   Michael Sandoval retained.

25   Q    But this is before Mr. Sandoval, in this Exhibit A, is

1    it not?

2     A    Yeah, I know.  But, you're talking about a month before.

3    This is the month of March.

4     Q    I am talking about the month of March.

5     A    I don't recall that, whether I did or not.

6     Q    Okay.  And these were saved on your personal computer

7    where the address is Dennis@ncoder.net, is that your

8    testimony, the ones with Mr. Flynn?

9     A    Yes.

10    Q    And you saved no others than the ones between you and

11   Mr. Flynn, is that your testimony as well?

12    A    I don't recall the others, if I did or not.

13    Q    And where are those e-mails today that -- just the ones

14   that you saved between you and Mr. Flynn?

15    A    My attorneys'.

16    Q    Okay.  And where are the ones that you had between you

17   and others?

18    A    Well, between Opspring, they were on Opspring's

19   computers, of which Mr. Sandoval retained.

20    Q    Okay.  And so Mr. Sandoval would have those?

21    A    I would say that's a good source.

22    Q    Okay.  And what about the others that were not the

23   Opspring e-mails?

24    A    Well, I just told you I had Opspring and Dennis@ncoder --

25    Q    I'm talking about the others that would be at

1    Dennis@ncoder, where are they?

2    A   I haven't seen them.  I will look for them.

3    Q   Okay.  So you think they may exist?

4    A   I don't think so, but I will surely look.

5    Q   Okay.  Is this -- have you looked before today?

6    A   I've been looking for five months.

7    Q   Have you looked before today?

8    A   Yes, I have.

9    Q   Okay.  And in your search, did you find any e-mails that

10   would be responsive to any requests for production where you

11   had the e-mail address at Dennis@ncoder.net?

12   A   I had looked, but I don't think I found them originally.

13   I mean I haven't seen them.

14   Q   Okay.  You believe they exist?

15   A   There's a possibility.

16   Q   So it's just only a possibility that they may exist?

17   A   I've looked through a lot of information for five months.

18   Q   Okay.  Well the request went out to you in November

19   of '07.  Did you begin looking in November of '07, sir?

20   A   Yes.

21   Q   And?

22   A   And I believe I sent things to my original attorney,

23   Mr. Flynn.

24   Q   Mr. Flynn was not your attorney in November of '07, sir.

25   A   November of '07.

1    Q    That's correct, sir.

2    A    Okay.  I'm sorry.  I thought I had that wrong.

3    Q    Well, you did have it wrong.

4    A    Yeah, I got it wrong.  Yeah.

5         What was the question?

6    Q    The question was you've had it since November of '07,

7    when the request went out to you.  Did you begin looking in

8    November of '07 when the requests were sent to you?

9    A    Yes.  And I didn't find any at that time.

10   Q    So then you've been looking since November of '07, and

11   it's now August of '08.  So, that's approximately ten months.

12   Almost nine or ten -- eight, seven or eight months.

13   A    Is that a question?

14   Q    Yeah.  So you haven't found anything in this period of

15   time?

16   A    I have found stuff.

17   Q    November '07 --

18   A    I've produced four million files.  So, I can't say I

19   didn't find anything.  I have found something.

20   Q    Sir, my question was really related to the e-mails.

21   In November of '07, until today, August 19th, have you

22   found any e-mails, other than the ones that are between

23   you  and Mr. Flynn, that would be responsive to the requests

24   for production that would bear the e-mail address at

25   dennisncoder.net?

1   A    And excluding my current attorneys?

2   Q    Yes, sir.

3   A    No.  I haven't found any.

4   Q    Okay.  And the request also required you to produce them
5   in native format.

6   A    Correct.

7   Q    With PST.  So, you haven't done that either, have you?

8   A    Well, if I find them, and they're in that format, I will
9   produce them.

10                 MR. PEEK:  I would offer exhibit 8, Your Honor.

11                 THE COURT:  Any objection?

12                 MS. GAROFALO:  No, Your Honor.

13                 THE COURT:  All right.  Exhibit 8, defendant's
14   Exhibit 8, is submitted.

15             (Whereupon, exhibit 8 -- document, was received in
16   evidence.)

17   BY MR. PEEK:

18   Q    Now, we talked yesterday about Mr. Visconti.

19             Do you remember that testimony yesterday of
20   Mr. Visconti?

21   A    That was the Chris Shockey e-mail?

22   Q    Yes.  Do you recall attending a meeting with Mr. Shockey
23   in December of 2007, in Bellevue, with yourself, Mr. Shockey,
24   Mr. Rhodes, Mr. Crisman, Mr. Visconti, Mr. Wehnt and
25   Mr. King?

1    A    No.

2    Q    You don't have any recollection of that at all?

3    A    No, I don't recognize the guy's name.

4    Q    You do recognize the other names, Mr. Shockey and

5    Mr. Rhodes, and Mr. Crisman, do you not?

6    A    Yes.

7    Q    And you don't recognize the names Mr. Wehnt and Mr. King

8    then as well?

9    A    No.

10   Q    And did you, during -- well, did you ever make a

11   presentation to Mr. Visconti, Mr. Wehnt, and Mr. King, in

12   which you provided a demonstration of the technology showing

13   a CD quality movie, and what Dennis, what you described, as

14   a 19 to 1 video compression?

15   A    No.

16   Q    You don't ever recall doing that?

17   A    No.

18   Q    Do you have or did you have a demonstration of technology

19   showing the CD quality movie in a 19 to 1 video compression

20   while you were at Opspring?

21   A    No.

22   Q    You did not?

23   A    No.

24   Q    Okay.  Following along with some of those marketing

25   efforts, would you take a moment and look at Exhibit 20.

```
 1                    THE COURT:  What volume, sir?

 2                    MR. PEEK:  It's Volume 5, Your Honor.

 3                    THE WITNESS:  Okay.

 4  BY MR. PEEK:

 5   Q   Do you recognize that?

 6   A   Which number?  Exhibit 20?

 7           I don't know what this --

 8   Q   There's an entire exhibit.  Would you please take a

 9  moment and take a look at it.

10                    THE COURT:  There's a second page.

11  BY MR. PEEK:

12   Q   Do recognize this as the exhibit you submitted?

13   A   Yes, sir.

14   Q   And you signed it under penalty of perjury, didn't you,

15  sir.

16   A   Yes.

17   Q   Now, would you turn to paragraph 12 on page 6 of that

18  exhibit.

19   A   Okay.

20   Q   Declaration number 6.

21   A   Yes, I see it.

22           Which one is it?

23   Q   Paragraph 12.

24   A   Yes, I see it.

25   Q   And you say in your declaration:  "Throughout the summer
```

1    and fall of 2006, up to and including the present, I worked

2    with my current employers to improve my technology.  It is

3    significantly improved, and we have voluntarily used it in the

4    last 60 days to voluntarily provide intelligence information

5    to appropriate officials in, order to save American lives.

6    Even with its current limited use, it has specifically

7    diverted specific terrorist threats."

8            Was that your effort to market the technology to the

9    United States Government?

10   A    No.

11   Q    It was just a voluntary act on your part?

12   A    No.

13   Q    No effort to sell or market your --

14   A    Me?  No.

15   Q    Well, somebody at Opspring?

16   A    I didn't.  I wasn't involved.

17   Q    Did somebody at Opsprings do it, sir?

18   A    Well, you just asked me that question.

19   Q    Did somebody at Opsprings do it, sir; market the

20   technology to the United States Government?

21   A    I don't know if they did that specifically or not.

22   Q    Well, when you were providing these voluntary efforts to

23   the intelligence community of the United States Government,

24   were you doing so on behalf of Opsprings, or yourself, to

25   market the Source Code?

1    A    No.  I would like the ask the government a question

2    before I answer this.

3    Q    If you want to.  I mean, this has been redacted already

4    by the government.

5    A    So you want me just to answer the question, right?

6    Q    No.  Go ahead and ask the government.

7              MR. PEEK:  Your Honor, I don't want to --

8              THE WITNESS:  I'm not sure -- the question you

9    asked me again was what?

10   BY MR. PEEK:

11   Q    The question was when you provided this information

12   described in paragraph 12, was it an effort, by Opspring, to

13   market the technology to the United States Government?

14   A    I don't think so.

15   Q    Why was it done then?

16   A    Uh, we thought it would be helpful.

17   Q    Did you think it would also be helpful to provide them

18   this information in order to show the benefits of the Source

19   Code?

20   A    Well, we weren't giving them the Source Code.  We were

21   just giving the output.

22   Q    Well, sir, the benefits of the Source Code, which would

23   be the outputs, correct?

24   A    No.

25   Q    Right?

1    A    No.

2    Q    So this is not a marketing effort on your part?

3    A    No.

4    Q    Not a marketing effort on the part of Opspring, is that

5    your testimony?

6    A    Yes.

7    Q    Is --

8                    MR. PEEK:  Your Honor, do I need to offer

9    declarations, Your Honor, that are already part of the record?

10   I'll just refer to them in closing, but if I -- otherwise, I

11   would offer Exhibit 20.

12                   THE COURT:  All right.  Well, let's go ahead,

13   since they're exhibits.

14        Do you have any objection, counsel, just to having

15   it admitted?  It's part of the record as --

16                   MS. GAROFALO:  No, Your Honor.

17                   THE COURT:  All right.  20 is admitted.

18        (Whereupon, exhibit 20 -- a document, was received

19   in evidence.)

20                   MR. PEEK:  Thank you.

21   BY MR. PEEK:

22   Q    Now, we covered yesterday your affidavit, or your, excuse

23   me, your declaration that you gave where you said that did not

24   contain any classified information.

25        Do you remember that from yesterday?

1   A   Yes.

2   Q   Okay.  Now you've also made a representation to this

3   court in pleadings that at least 60 to 80 percent of the

4   technology data consists of files that are covered by the

5   U.S. Protective Order.

6           Do you remember that?

7   A   Yes.

8   Q   And is that still your testimony today?

9   A   I don't know if it -- if it's that high.  But, it's a

10  sizeable number.

11  Q   Okay.  And of that so-called 60 to 80 percent of

12  the technology data, have you provided any of it to the

13  government?

14  A   Yes.

15  Q   Okay.  And that's in the form, I think you said, of two

16  hard drives that you gave up recently?

17  A   Three.

18  Q   Three hard drives very recently.  Okay.

19          And how much data was on that?

20  A   I don't know specifically.  I would think a terabyte or

21  two.

22  Q   You would think.  Okay.  You don't know then?

23  A   Well, one of them was a terabyte.  I think the

24  other two, one was on a 500, and one was on a 750.  That's

25  two-and-a-quarter terabytes, and they weren't all full.  So,

1    I don't know.

2    Q    And how did you obtain this information, or this

3    information on these drives you gave to the government?

4    A    What do you mean how did I obtain it?

5    Q    Just exactly how did you obtain it?  Did you take it from

6    the eTreppid computers?

7    A    No.

8    Q    How did it come into your possession then, sir?

9    A    Government.

10    Q    Okay.  So the government gave you these hard drives,

11    first of all, and then you copied them from the government

12    onto something, some of your own media, is that correct, your

13    electronic --

14    A    I think so.  Yeah.

15    Q    You think so or you know, sir?

16    A    I -- I don't know specifically.  Are you talking about

17    the drives that I've given to the government?

18    Q    No, no, sir.  I'm not talking about --

19    A    Okay.

20    Q    --  I'm talking about the data on the hard drives.

21    A    Yeah.

22    Q    Did you obtain the data on the hard drives from eTreppid?

23    A    No.

24    Q    Okay.  You said you got it from the government.

25    A    Yes.

1    Q   Okay.  When did the government give it to you

2    specifically?

3                    MS. WELLS:  Your Honor, I would caution

4    Mr. Montgomery in providing that answer.  To take the terms

5    of the Protective Order into account.

6                    MR. PEEK:  It's just a when.

7                    MS. WELLS:  That could be a problem.

8                    MR. PEEK:  A when has problems.  Okay.

9    BY MR. PEEK:

10   Q   When did you get if from the government?

11   A   When did I what?

12   Q   When did you get it from the government?

13   A   You want -- you say the date?

14   Q   No.  You can't say the date --

15                   MS. WELLS:  No.

16   BY MR. PEEK:

17   Q   -- if it came from a source covered by the State Secrets

18   Privilege?

19   A   You already asked me --

20                   THE COURT:  Stop.

21                   MR. PEEK:  I'll let Ms. --

22                   THE COURT:  Stop.

23                   MS. GAROFALO:  Your Honor, I think we're in

24   direct jeopardy of trespassing on the U.S. Protective Order.

25                   MR. PEEK:  He can --

1              MS. GAROFALO:  If we are going to proceed,

2    I think we need to take a short break to confer with

3    Mr. Montgomery.

4              THE COURT:  All right.

5              MR. PEEK:  But can Mr. Montgomery confer with

6    the United States Government, Your Honor, before he answers

7    that question?

8              THE COURT:  Let me ask Ms. Wells.  She, as the

9    attorney for the government, if it is, she who will tell all

10   of us what is covered or not under the Protective Order.

11        So, Ms. Wells, you understand the nature of

12   Mr. Peek's questions.  What do you recommend we do.

13             MS. WELLS:  I would recommend that

14   Mr. Montgomery not answer that question, Your Honor.

15             THE COURT:  All right.  She -- counsel for

16   the United States has directed that, pursuant to the terms

17   of the U.S. Protective Order, Mr. Montgomery not answer that

18   question.

19             MR. PEEK:  Your Honor, may I confer with

20   Ms. Wells for a moment, because there are other agencies that

21   aren't covered by the States Secrets Privilege.

22             THE COURT:  All right.  Why don't you just take

23   a moment and speak privately.  We're not going to take a

24   recess.  Just the two of you can chat.

25             (Mr. Peek and Ms. Wells confer.)

```
 1              (Mr. Schwartz is now joined telephonically.)
 2                   THE CLERK:  Mr. Schwartz, are you there.
 3                   MR. SCHWARTZ:  I am.
 4                   THE COURT:  Thank you.
 5              Good morning, Mr. Schwartz.  This is Judge Cooke.
 6    We have commenced the Continued Order to Show Cause Hearing,
 7    and Mr. Peek is examining Mr. Montgomery.
 8                   Go ahead, Mr. Peek.
 9                   MR. SCHWARTZ:  Thank you.
10    BY MR. PEEK:
11     Q   You've had occasion to meet with the United States
12    Government, so you know which agencies are covered by the U.S.
13    Protective Order, is that correct?
14     A   That's correct.
15     Q   Okay.  Knowing that, and excluding that from the
16    question, did any data on the hard drives you provided to
17    the government come from an agency not covered by the United
18    States Protective Order?
19     A   I'm not certain.
20     Q   Okay.  So I guess if I ask the "when," knowing that
21    they're from an agency not covered by the Protective Order,
22    your answer is also that you're not certain?
23     A   That's correct.
24     Q   I wanted to at least get into the record, at least, where
25    you made the representation to the Court.  So, I'm going to
```

```
1    have you look at, if you would, Document 604, filed in this

2    proceeding, page 3.

3              May I approach, Your Honor?

4                   THE COURT:  You may.

5                   THE WITNESS:  Is this in this binder?

6                   MR. PEEK:  It's not in the binder, but it's part

7    of the court record.

8                   THE WITNESS:  Okay.

9    BY MR. PEEK:

10   Q   If you look at the paragraph and the representation you

11   made to this court --

12   A   The one that's highlighted?

13                  MS. GAROFALO:  I'm sorry, Your Honor.  But could

14   Mr. Peek please identify the document.

15                  THE COURT:  Could you, please.

16                  MR. PEEK:  Docket 604.

17   BY MR. PEEK:

18   Q   Could you read the title of it, since you have the title

19   of the document.

20   A   Emergency Request By Montgomery Parties For Status

21   Conference With the Montgomery Parties' Compliance With the

22   Court's Order May 7, 2008 Order.

23   Q   Okay.  And what representation did you make to the Court?

24   A   Do you want me to read it?

25   Q   Yes, sir.
```

1   A   "A substantial percentage, i.e. 60/80 of the technology

2   data consists of files the Montgomery parties reasonably

3   believe could fall within the provision of the U.S. Protective

4   Order, docket number 253, and the Non-Disclosure Agreements

5   executed by Dennis Montgomery, in connection with works

6   performed for the government of the protected data."

7   Q   Okay.  So of that 60, 80 percent -- you don't believe

8   it's that high today, is that correct?

9   A   It's probably not that high.

10  Q   Okay.  And have you submitted all of the 60 -- the amount

11  of data to the United States Government for their review?

12  A   No.

13  Q   And in May of 2007, you were telling the Court that

14  it existed.  Why have you not submitted that data to the

15  government in accordance with the procedures set forth in the

16  United States Protective Order?

17  A   Because for the last four months, I've been doing that.

18  Q   And all you found are just the three hard drives, is that

19  correct?

20  A   Yeah, with one million four hundred thousand files on it.

21  Q   Okay.  I understand what your testimony is.  All of

22  which you said was given to you personally by the United

23  States Government.

24  A   I said I believed that.

25  Q   Well, did it or did it not come to you directly from the

1   United States Government?  Or, did it come off of the

2   computers at eTreppid?

3    A    I can't remember right now everything that was on the

4   drive that was given to them, to be certain whether that's

5   correct or not.  I believe it is.  But, I'm not certain.

6    Q    Thank you.

7            Sir, when are you going to comply with the discovery

8   orders and the Protective Order, and deliver all of the data

9   that you believe is covered by the States Secrets Privilege to

10  the United States Government?

11   A    When it's all been segregated.

12   Q    When is that, sir?

13   A    Uh, by the end of the month.

14   Q    By the end of this month?

15   A    Yes.

16   Q    Correct?  Okay.

17           So you will deliver everything to the United States

18  Government, that you believe is covered by the States Secrets

19  Privilege, to the United States Government for their review,

20  on or before August 31st of 2008, is that correct?

21   A    Assuming I'm able to work on it, yes.

22   Q    Well --

23   A    Well, I've been in here.  I'm going to be here tomorrow.

24  I'm going to be here on Thursday.

25   Q    I just want to know the date certain.

1  A   I will surely try by the end of this month.

2  Q   Okay.  And if not by the end the month, what other date

3  would you give us?

4  A   I wouldn't think it would take more than a month to

5  complete everything that's left.

6  Q   Okay.  So that would be on or before September 19th would

7  be the latest date?

8  A   Yes.

9  Q   But you will begin doing it when?

10  A   Well, I've been doing it.

11  Q   When will you begin?

12  A   Can I speak?

13  Q   Okay.

14  A   I've been doing it for the last four months.

15  Q   I'll -- sorry.

16  A   But when I got hit with the second OSC hearing order

17  under the Source Code, I stopped doing that to work on that.

18  Q   Okay.  Let me ask my question again.

19        When will you begin doing the review to provide the

20  government the information that you believe is covered by the

21  States Secrets Privilege?

22  A   As soon as I return home.

23  Q   And when will that be?

24  A   Hopefully on Friday.

25  Q   Okay.  Now, there are also two articles the Wall Street

```
1    Journal -- another area I forgot -- one was in November '06

2    and one was in February of '07.

3              Do you remember that?

4    A    No.

5    Q    Okay.  Let me refresh your recollection then.

6              Let me hand the Court exhibits 31 and 32, which are

7    in Volume VI.

8              Do you recognize exhibit 31, sir?  It was an article

9    that appeared in or around --

10   A    Yes.

11   Q    And you recognize Exhibit 32 as an article that appeared

12   in the Wall Street Journal on or about February 15th 2007?

13   A    I don't remember this one, but it's obviously my picture,

14   so -- oh, the Wall Street Journal?

15   Q    Yes.

16   A    No.

17   Q    You don't remember this article as appearing --

18   A    You said the Wall Street Journal, I thought.

19   Q    That's what I'm talking about.  Exhibit 32 is an article

20   in the Wall Street Journal.  The date of it is --

21   A    I was looking at 33, so --

22   Q    Okay.

23   A    Um, no.

24   Q    You don't recall this article?

25   A    No.  I thought there was one.
```

1    Q    Okay.  And in the article that appears on Exhibit 31,

2    there is no mention of a Jale Trepp e-mail is there?

3    A    Do you want me to read the article?

4    Q    If you need to, sir.

5    A    (Witness reviews document.)

6            No.

7    Q    Okay.  And is there mention of the Glogauer e-mail --

8    A    I didn't --

9            THE COURT:  Let him finish his question, sir.

10   BY MR. PEEK:

11   Q    Is there a mention of the Glogauer e-mail in this article

12   November 1st, 2006?

13   A    I didn't think so.

14   Q    Okay.  Do you know whether there was a second delivery of

15   e-mails to Mr. Wilke regarding Mr. Glogauer and Ms. Trepp

16   after the November 1st, 2006 article appeared?

17   A    I don't think so.

18   Q    Did you have any follow-up communications with Mr. Wilke

19   after the November 1st article appeared?

20   A    I spoke to him.  I -- I spoke to him.

21   Q    After November 1st, 2006, sir?

22   A    Yes.

23   Q    Did you do it by telephone?

24   A    Yes.

25   Q    Okay.

1    A    Um, yes.

2    Q    Did you ever do it personally?

3    A    I think I only met him once.

4    Q    Okay.

5    A    You asked me this -- my nose is bleeding.  I really need

6    to stop for a minute.

7                    THE COURT:  All right.

8                    THE WITNESS:  I got a tissue.

9                    THE COURT:  Do you want to take a recess, sir?

10                   THE WITNESS:  Yeah.  Just for a few minutes.

11                   THE COURT:  All right.  We'll take about a

12   five-minute recess.  And we will reconvene promptly, and I

13   mean promptly.  So, five minutes.

14                   (Recess taken.)

15                   THE CLERK:  Court is again in session.

16                   THE COURT:  Please be seated.

17                   THE WITNESS:  Sorry.

18                   THE COURT:  You may proceed, Mr. Peek.

19   BY MR. PEEK:

20    Q    When you spoke to Mr. Wilke after November 1st, and

21   before February 5th, November 1st, 2006 and before November --

22   excuse me, after November 1st, 2006, and before February 15th,

23   2007, did you discuss the existence of e-mails with Mr. -- the

24   Glogauer e-mail and the Jale Trepp e-mail?

25    A    I don't think so.

1   Q   So it's your testimony that no other e-mails were

2   provided to Mr. Wilke after November 1st and before

3   February 15th?

4   A   I don't know the exact date that he got them, but that's

5   correct.

6   Q   Well, did he get them before November 1st --

7   A   No.

8   Q   -- 2006?

9   A   I think I answered that.  I don't know.

10   Q   Well --

11   A   I'm not certain of the exact date because I have said I

12   don't believe I'm the one that gave them to him.

13   Q   I know you say you don't believe that.  But, you don't

14   know for certain whether you did or did not, isn't that

15   correct, sir?

16   A   I don't know.  I guess.

17              MR. PEEK:  I'd offer 31 and 32, Your Honor.

18              THE COURT:  Any objection, counsel.

19              MS. GAROFALO:  Yes.  Hearsay.  They're not

20   authenticated.

21              MR. PEEK:  They're not being introduced for

22   the truth, Your Honor.  They're just being introduced to

23   show the articles and what was contained in them.  There are

24   e-mails that are referenced only in the February 15th and

25   not the November 1st.  And it shows, again, if you will, the

```
 1   credibility of this witness.  They're not being introduced for
 2   the truth.
 3               MS. GAROFALO:  I think, Your Honor, that is
 4   for the truth as to whether or not the e-mails were provided
 5   or included in the article.  I still -- we still object on
 6   hearsay grounds.
 7               THE COURT:  Well, the objection is overruled.
 8   I think for purposes of this hearing, these e-mails, I don't
 9   believe they're being offered for the truth of the matter
10   asserted in the e-mails.  I think it goes to trying to
11   ascertain, for purposes of this Order to Show Cause Hearing,
12   the extent to which documents, Mr. Montgomery and the
13   Montgomery parties have been ordered to produce have been
14   produced.  And it's really serving as a benchmark in the
15   chronology of the events that occurred in this litigation that
16   relate to the document production.
17               Go ahead, Mr. Peek.
18               MR. PEEK:  Thank you.
19   BY MR. PEEK:
20    Q   You still have, I think, Exhibit 20 there, which is in
21   Volume 5, do you not, sir?
22    A   No.  They took the binder.
23               MR. PEEK:  Okay.  She'll get it back for you.
24               Thank you Miss Clerk.
25               THE COURT:  Exhibit 20, Mr. Peek?
```

1           MR. PEEK:  Yes, Your Honor.

2           THE COURT:  Thank you.

3     BY MR. PEEK:

4     Q    Would you turn, sir, to page 3, paragraph 6.

5     A    Okay.

6     Q    And the sentence beginning on line 27.

7           Do you have that?

8     A    The one that says, "On that..."?

9     Q    Yes.

10    A    Yeah.

11    Q    And you wrote, at least in this declaration in February

12    of 2007, that:  "On that basis, and because of the failure of

13    our government to utilize my technology after my departure

14    from eTreppid, and because of Warren Trepp's attempts to steal

15    it with the raid on my home, my current employers engaged

16    in multiple meetings and conferences with high level Bush

17    administration officials beginning in May 2006, and continuing

18    to December 2006."

19          Is that correct?

20    A    Yes.

21    Q    And those were efforts to market the technology, were

22    they not?

23    A    No.

24    Q    Okay.  And then it says:  "In July 2006, they arranged a

25    meeting in Vice-President Cheney's office, which I attended

1    with several individuals for the purpose of educating and

2    explaining to the Vice-President that much of my work is so

3    highly compartmentalized within, that it was likely that some

4    high level official in the administration, even within the

5    intelligence community, including certain Air Force officials

6    aligned with Warren Trepp, potentially even the Director

7    of National Intelligence, John MacHunting (phonetic),

8    parentheses, whom certain distrusted, close parentheses,

9    did not know or understand the full scope of its utilization

10   on the war on terror, and/or competing financial interests

11   aligned with Trepp, given this event."

12           That was an effort to market as well, wasn't it?

13   A    No.

14   Q    It was not an effort to license the technology?

15   A    No.

16   Q    Okay.  Now there's an attachment to this exhibit, is

17   there not, which is a letter, Exhibit 1, from Mr. Flynn to

18   Mr. Rumsfeld, Cherchoff, and Alberto Gonzales, is there

19   not?

20   A    Yes.  Well, there was a fourth person but, obviously,

21   it's redacted.

22   Q    And then would you turn to page four of seven of that

23   letter.

24   A    Okay.

25   Q    The bottom of the page.

1   A   Yes.

2   Q   Do you see the sentence beginning, "Mr. Montgomery..."

3   the last sentence there.

4   A   Yes.

5   Q   "Mr. Montgomery desires to enter into an exclusive

6   license agreement with the U.S. government as soon as

7   possible."

8       That's marketing the technology, the Source Code, is

9   it not?

10  A   No.

11  Q   Okay.  The License agreement is not any effort by you to

12  license -- excuse me licensing the technology --

13  A   It's --

14  Q   -- is not an effort to market it?

15  A   This is the day they raided my home.

16  Q   I know that, sir.  I'm just asking --

17  A   Can I finish speaking?

18  Q   Sorry.

19  A   This is the day they raided my home.  And this letter was

20  originally -- Mr. Flynn had originally written the letter that

21  I had seen days, before that, that did not have some of this

22  in there.  He sent this letter the, the day that they were,

23  you know, when they were at my home raiding me.

24  Q   Okay.  I, I understand that.

25  A   So --

1    Q    But are --

2    A    Yeah.

3    Q    -- you telling this Court then that licensing of the

4    technology is not marketing the technology, the Source Code?

5    A    No.  I'm not saying that.  I don't remember -- I just

6    remember a lot was going on on that day.  And why this was

7    sent with those exact words, I can't explain.

8    Q    And there were a number of meetings after March 1st in

9    order to license the technology with the government.

10   A    With me?  No.

11              MS. GAROFALO:  Objection, Your Honor.

12   Relevance.  If this is going to documentation, Mr. Peek

13   should get there.  But it does not appear to be focused on

14   the discovery issue.

15              MR. PEEK:  Your Honor, the discovery issue is

16   any documents with respect to licensing the technology.  It

17   would appear to me that there would be additional documents

18   that would have been utilized by those individuals meeting

19   in that six-month period of time described by, described in

20   the affidavit, or in the declaration by Mr. Montgomery.  He

21   described it.  We don't have any of those so-called documents.

22              MS. GAROFALO:  I would ask the Court to then

23   direct Mr. Peek to focus his questions on what documents

24   exist; whether documents related to these meetings actually

25   exist, rather than explore the nature, the number of

1   participants and so forth at the meetings, which doesn't seem

2   to be relevant to this proceeding.

3                    MR. PEEK:  I have to establish a predicate,

4   Your Honor that it was for the purpose of marketing, in order

5   then to get the documents.

6                    THE COURT:  Right.

7                    The objection is overruled.  The Court, of course,

8   is keenly interested in moving things along, but recognizes

9   that part of the request for production that is part of this

10  Order to Show Cause hearing is this particular category of

11  documents.  So the Court, in trying to establish the basis

12  for Mr. Peek's inquiries is part of it, but please move on,

13  sir --

14                   MR. PEEK:  I will.

15                   THE COURT:  -- in your questions.

16  BY MR. PEEK:

17   Q   And then in the last page of the letter, page --

18  actually, second of last page, page 6 of 7 --

19   A   Okay.

20   Q   -- there's another statement there at the end of the

21  sentence where you want to license the software technology of

22  Mr. Montgomery.

23                   Do you see that sentence?

24   A   Where is it?

25                   Oh, yes, I see it.  I see that.

1    Q    And that's another effort to market, is it not?

2    A    Not really, no.  Why Michael put this in there when

3    they're raiding my home, I can't tell you.

4    Q    Okay.  Where are any of the documents relating to the

5    efforts to license the technology, first in March of 2006,

6    and then in that six-month period of time, or whatever period

7    of time it was in your declaration?  Where are those?

8    A    To my knowledge there are none, because no one did.

9    Q    Are you saying you didn't make any presentations --

10   A    I --

11   Q    -- then to the government from May 2006, and continued to

12   December 2006?

13   A    I went to one meeting, one time, in Washington.  That's

14   it.

15   Q    Okay.  And your current employer, that being Opspring,

16   also went on multiple times in May, between May of 2006 and

17   December 2006, did they not?

18   A    I think they only went one time initially.  And they were

19   with me on the one meeting I went to D.C.  To my knowledge,

20   there were no others.

21   Q    Okay.  Well, then when you signed this declaration under

22   penalty of perjury, were you lying?

23   A    Which declaration?

24   Q    The one that's Exhibit 20, where you said that your

25   employers engaged in multiple meetings and conferences with

```
 1    high level Bush administration officials, beginning May of
 2    2006, to December 2006?  Is that a lie?
 3     A    I just said -- no.  You just asked me multiple.  That's
 4    two.  You asked me and I said there were two that I knew of.
 5    Maybe they had others.  I can't tell you what Michael Sandoval
 6    did.  You can talk to him.
 7     Q    Okay.  Thank you.
 8           Going back to the computers that you backed up, from
 9    time to time.  You said that Mr. Trepp asked you to backup
10    computers as eTreppid, is that right?
11     A    Yes.
12     Q    Did he ask you to back up all the computers at eTreppid?
13     A    No.
14     Q    Or just the employees of eTreppid?
15     A    I don't know if he said all or both.  I don't recall
16    specifically.
17     Q    Well, one of the computers you backed up was
18    John Hughes, was it not?
19     A    Yes.
20     Q    Was John Hughes an employee of eTreppid?
21     A    I wouldn't know if he is or not.  I don't think he was.
22     Q    And why did you backup his computer?
23     A    Because it was failing, and he had to have another
24    laptop, so it had to be taken off his current laptop and put
25    on another laptop.
```

1    Q    And why did you retain the data on that?

2    A    I don't recall why I retained it.

3    Q    You recognize in the production that you made, you

4    provided, we have data related to Mr. Hughes, correct?

5    A    Yes.

6    Q    And that's not responsive to any request at all, is it?

7    A    Well, I wouldn't say that, because how did I know that he

8    didn't have something on his laptop that was responsive?

9    Q    Well, when you searched the data, did you look at

10   the John Hughes data to determine whether or not it was

11   responsive?

12   A    I don't recall if I did or not.

13   Q    Okay.  And then the e-mails, with respect to Jale Trepp,

14   that was on her computer, was it not?

15   A    I don't remember if it was or not, no.  I -- I'm not

16   certain.

17   Q    Well, we had e-mails that just appear to be only on Jale

18   Trepp's e-mail -- Jale Trepp's computer.  And we can go back

19   over that if you like in Exhibit 9.

20   A    Okay.  Go ahead.

21   Q    Okay.  Actually, it's Exhibit 8.  I apologize -- no.

22   It's Exhibit 9.

23           Do you know whether these e-mails that are set forth

24   in Exhibit 8, they're labeled at the top, Jale 1.  And then

25   there's some Jale 1-A, whether they came off of Jale Trepp's

1    e-mail account, on her computer, or off of somebody else's?

2    A    I don't know.  I'm sorry.  I don't recall.

3    Q    Okay.  Did you in fact backup Jale Trepp's e-mail?

4    A    Yes.

5    Q    From her computer?

6    A    I don't -- I don't remember -- the answer is yes.

7    Q    And was that her home computer?

8    A    Yes.

9    Q    Were you directed to do that?

10   A    Yes.

11   Q    By whom?

12   A    Warren.

13   Q    And when were you directed to do that?

14   A    Multiple, multiple times.

15   Q    Okay.  Did he give you reasons why he wanted to do that?

16   A    I don't recall if he did or not.

17   Q    And where did you go to back this up?

18   A    It was at her house.

19   Q    Now you've also testified in this proceeding, have you

20   not, that you did not have access to any of the financial

21   information of eTreppid?

22   A    That's correct.

23   Q    And we have found on, at least your production, that

24   there are QuickBooks on the hard drives that you have

25   produced, are there not?

```
 1    A    Yes.

 2    Q    And those are the financial records of eTreppid that you

 3  say you never had access to, aren't they?

 4    A    Um, there are QuickBooks records on there.  Whether those

 5  are those of eTreppid, I can't tell you.

 6    Q    Well, you testified that you never were given access to

 7  them, correct?

 8    A    Access to what?

 9    Q    To the financial information of eTreppid.

10    A    Yeah.  The paper, paper records.

11    Q    Well, were there -- so you were given the electronic form

12  of them off of Sue Perez's computer, or others in eTreppid's

13  offices that you backed up, correct?

14    A    I don't believe Sue Perez had QuickBooks.

15    Q    All right.  Did anybody have QuickBooks?

16    A    Monica, I believe, did.

17    Q    Okay.  So you backed up Monica?

18    A    Yes.

19    Q    And you had the access to that financial information that

20  was on Monica's computer, did you not?

21    A    I've seen it.  Yes.

22    Q    And it was QuickBooks, was it not?

23    A    I don't remember -- yes.

24    Q    And it contained a record of every receipt and

25  disbursement --
```

1    A    Absolutely.

2    Q    -- did it not?

3    A    No.

4    Q    So when you told the Court that you were never given

5    access to any of the financial records of eTreppid, that was

6    a lie, wasn't it?

7    A    Nope.  No it wasn't.

8    Q    But you had, at least, access to all these computers

9    where there was electronic information regarding financials

10   of the company, did you not?

11   A    No.

12   Q    You did not?

13   A    No.

14   Q    Well, you backed it up, didn't you?

15   A    Yeah, but it's password locked.

16   Q    Oh.  All the QuickBooks are password locked?

17   A    I don't remember if all of them were, but one -- the one

18   I tried was.

19   Q    Which one did you dry?

20   A    I don't recall which one it was.

21             MS. GAROFALO:  Objection, Your Honor.

22   Relevance.  This does not seem to be going to documents or

23   the production or the responsiveness of production.  It just

24   seems to be examining Mr. Montgomery on his knowledge of

25   financial information.

```
1                    MR. PEEK:  I'll move on, Your Honor.

2                    THE COURT:  All right.  The objection is

3    sustained.

4                    MR. PEEK:  This is Exhibit 46, Your Honor.  It's

5    tabbed so that folks can put it in their binder.

6                    THE CLERK:  Excuse me, Judge Cooke.  Yesterday,

7    Mr. Peek remarked defendant's 45 and defendant's 46.

8                    MR. PEEK:  I apologize.  Then this should be 47.

9                    THE CLERK:  Yes.

10                   MR. PEEK:  I apologize for that.

11                   THE COURT:  This is 47 then?

12                   MR. PEEK:  Yes, Your Honor.

13              (Whereupon, exhibit 47 -- a document, was marked for

14   identification only.)

15                   MR. PEEK:  Excuse me for the error.

16              Does the witness have it then?

17                   THE CLERK:  Yes.

18   BY MR. PEEK:

19    Q    Mr. Montgomery, this is a letter from your counsel at

20   Liner, the Liner firm.

21              Did you see that?

22    A    You mean Gunderson?

23    Q    Mr. Gunderson then.

24    A    Okay.  Yeah.

25    Q    I apologize.  I thought it was from the -- and in the --
```

1    this is produced in all those 21 hard drives, is it not?

2     A    I'll believe you.  I don't know.

3     Q    And in the second page of that letter, it says:

4            "I understand these drives contain electronic files

5    responsive to eTreppid's RFP One request, number 16."

6            Do you see that?

7     A    Yes.

8     Q    And that's what you believed when you produced them?

9     A    Yes.

10    Q    Let me show you what is request for production number 16.

11   That's in -- I think it's already a Court document, but I'm

12   going to go ahead and mark it as -- or it's Exhibit 34 in

13   Volume VI.

14           If we could have that for a moment.

15    A    Which number?

16               THE CLERK:  It should be up there.

17               MR. PEEK:  It's 34.  She's going to hand it to

18   you.

19               THE CLERK:  It should be there.

20               THE WITNESS:  No, I think I have it.

21               MR. PEEK:  It's in Volume VI.

22           Do you have it there?

23               THE WITNESS:  Yes.

24   \\\

25   \\\

1    BY MR. PEEK:

2     Q   Why don't you take a moment and look at page 7 of 10 in

3    that.

4     A   I don't -- which page?

5     Q   Page 7 of 10.  It's marked at the bottom.

6     A   That doesn't make sense to me.

7     Q   It's Exhibit 34, please.

8     A   Exhibit 34.  You didn't say which exhibit.

9             Okay.  Okay.  (Witness reviews document.)

10            Okay.  Go ahead.

11    Q   And the request to you is:  "All documents that relate

12   to eTreppid's technology, products and/or research and

13   development efforts, parentheses, including but not limited

14   to any and all marketing documents, business plans,

15   PowerPoint presentations, white papers, correspondence,

16   and/or notes of any customers or potential customers.

17            Do you see that?

18    A   Yes.

19    Q   And these 21 hard drives are only responsive to that

20   request, are they not?

21    A   You mean as a result of all of these?

22    Q   Well, that's what your letter -- that's what your

23   counsel's letter says to me; that they're only responsive to

24   that request number 16.

25    A   I don't know if they're more responsive -- I mean, I

1    would have to read every one of these.  I will, if you want.

2    Q    Well, it's only -- I'm just going by the letter.

3    A    Okay.

4    Q    The letter enclosed the hard drives and said they're

5    responsive to request number 16, does it not?

6    A    Yes.

7    Q    Okay.  And are there any documents on that, on those

8    21 hard drives that relate to the efforts by you -- you,

9    the defining term -- to market, or notes of meetings with

10   customers, or potential customers, after March of 2006?

11   A    I don't know if there are or not -- oh, after?  I'm

12   sorry.

13   Q    Yeah, after.

14   A    I don't know if there are or not.

15   Q    You represented that they were though, did you not, when

16   you gave them to us?

17   A    That there are not?

18   Q    No.  You represented that they were; that they did

19   contain marketing documents, business plans, PowerPoint

20   presentations, white papers, correspondence, and/or notes of

21   meetings with customers or potential customers.

22              MS. GAROFALO:  Objection, Your Honor, to the

23   extent that it misstates the document before Mr. Peek.  It's

24   from Mr. Gunderson, not from Mr. Montgomery.

25              MR. PEEK:  Excuse me.  You, as in your lawyer

1  represented that.

2   A   Is that what he wrote in the letter?  You want me to read

3  it?

4   Q   That's what he wrote in the letter.  Yeah.

5   A   Okay.

6   Q   He had to have that information from some source?

7             MS. GAROFALO:  Objection.

8             MR. PEEK:  In order to make that representation,

9  did he not?

10             MS. GAROFALO:  Objection, to the extent that

11  calls for attorney/client communications.

12             MR. PEEK:  If he represents that in a pleading,

13  Your Honor, or in a letter, then that's a waiver of the

14  privilege.

15             THE COURT:  Okay.  I don't think -- the

16  objection is overruled.  I don't think Mr. Peek is asking

17  for any inquiry about any attorney/client communication.

18  Logically, one requests production of documents from one's

19  client.  The client responds to document production requests

20  and hands over documents that the client believes are

21  responsive to a particular document production request.  And

22  the attorney, in turn, sends them off to opposing counsel,

23  after having reviewed them.

24             So that's, generally, how it works.  So the attorney

25  has to, one, have relied on the client to have reviewed the

1   request for production to ascertain what documents or media

2   might be responsive to the requests; and

3           Two, upon receipt, the Attorney, generally,

4   will review whatever is produced, and then pass it on to

5   counsel.

6           So --

7           MS. GAROFALO:  That's generally correct, Your

8   Honor.  But, in this case, it's a letter from Mr. Gunderson.

9   There's no foundation as to whether Mr. Montgomery saw this

10  letter.  It may very well be just a typographical error in

11  the letter.  Mr. Gunderson -- at least no basis has been laid

12  for knowledge on Mr. Montgomery's part as to how the documents

13  were characterized by Mr. Gunderson.

14          THE COURT:  Well, that's true.  I suppose you

15  can ask Mr. Montgomery some questions about.

16  MR. PEEK:

17   Q   Well, you provided the hard drives to your counsel, did

18  you not?

19   A   Not to Mr. Gunderson.

20   Q   You provided them to the Liner firm?

21   A   Yes.

22   Q   And when you provided them, you believed they were

23  responsive to request number 16, did you not?

24   A   Yes.

25   Q   Okay.  So Mr. Gunderson's representation came, I guess,

1    indirectly from you, correct?

2    A   I can't tell you.

3    Q   Well, you represented it to your counsel, the Liner

4    firm, who passed -- must have passed it on to Mr. Gunderson,

5    correct?

6    A   I can't say that.

7                MS. GAROFALO:  Objection, to the extent that

8    does implicate attorney --

9                MR. PEEK:  Your Honor, they can't have the

10   games.  They can't have it both ways.  They can't say that

11   they represented to me that it's responsive to request

12   number 16, and then now stand here today in this courtroom

13   and say it's not.  I mean, either it is or it isn't, because

14   there's nothing on the hard drives that refers to post-2006

15   marketing efforts.  There's just more garbage.

16               THE COURT:  The objection is overruled.

17   BY MR. PEEK:

18   Q   Are there any files, any data at all on those 21

19   hard drives that are responsive to request number 16?

20   A   Yes.

21   Q   Okay.  Is there any data on there that is responsive to

22   request number 16 post-March 2006?

23   A   No.

24   Q   Where is that data?

25   A   I wasn't -- I told you that when you asked me that

1    before.  I wasn't involved in marketing business plans.

2    Q    Okay.  So you gave us data that eTreppid already had?

3    A    Well, I was required to give that to you.

4    Q    And is everything on the 21 hard drives related to white

5    papers, correspondence, marketing documents, business plans to

6    customers or potential customers?

7    A    Post?

8    Q    No, pre.

9    A    I wouldn't say everything.  I would say there's a lot.

10    Q    Okay.  How much of that would you say there is?

11    A    I, I have no idea.

12    Q    I mean, one percent of it?

13    A    No.  But, I'm sure you have a number.  I don't know.

14    Q    Okay.

15            MR. PEEK:  I believe that's all, Your Honor.  If

16    I could have just a moment to consult with my client and my

17    colleague.

18            THE COURT:  You may.

19            MR. PEEK:  May I approach?

20            THE COURT:  You may approach.

21            MR. PEEK:  I want to actually talk to Ms. Wells

22    for a minute.

23            THE COURT:  Oh, all right.

24        (Mr. Peek and Ms. Wells confer.)

25    \\\

1   BY MR. PEEK:

2    Q    Before you produced the 21 hard drives, did you make any

3   effort to duplicate it?

4    A    There were two of them, or three of them that were bad

5   and that actually had problems in duplication.  So, the answer

6   is yes.

7    Q    And what efforts did you make to duplicate files there?

8    A    Well, the drive was bad.  Since the bad drive was copied,

9   I didn't want to get rid of the bad drives while these

10  hearings were going and someone accuse me of --

11   Q    Well, there was 21 hard drives.  Did you make an effort

12  with all 21 hard drives to deduplicate?

13   A    I believe they were all duplicated.

14   Q    No.  That's not what I asked, sir.

15   A    Oh.

16   Q    There are files that are on the drives themselves that

17  are multiple copies of the same thing.

18   A    That are duplicates, you mean?

19   Q    Yes.  Did you make any effort to deduplicate that?

20   A    To deduplicate that?

21   Q    Yes.

22   A    No.

23   Q    Okay.  Thank you.

24            MR. PEEK:  That's all I have, Your Honor.

25            THE COURT:  As I recall, at the commencement of

211

1    the Order to Show Cause hearing, Ms. Klar did have some brief

2    direct.  It was quite brief.

3            Do you wish to ask any questions on redirect?

4            MS. GAROFALO:  Uh, not at this time, Your Honor.

5    But, we do reserve the right to recall Mr. Montgomery.

6            THE COURT:  Okay.  Thank you.

7            Mr. Montgomery, you may step down, sir.

8            MR. PEEK:  And, Your Honor, I don't remember

9    exactly which exhibits were previously marked.  But since they

10   were identified previously, I would like to offer, if I could,

11   or get a list from the court.

12           THE CLERK:  Defendant's exhibits 1, 6, 9, 31,

13   45, 46, and 47 have all been marked.

14           MR. PEEK:  I would offer all of those,

15   Your Honor.

16           THE COURT:  Any objection?

17           MS. GAROFALO:  We have an objection to 45,

18   Your Honor.  It's hearsay, and has not been authenticated.

19   We object on those grounds.

20           Pending 45 admitted, we would ask the Court's

21   indulgence to address the other exhibits immediately after

22   lunch, or after the next break.

23           MR. PEEK:  Forty-five, I think, Your Honor, was

24   the e-mail.

25           THE CLERK:  Yes.

KATHRYN M. FRENCH, RPR, CCR
(775) 786-5584

```
1                    THE COURT:  Which binder is it in?

2                    MR. PEEK:  I don't know.  I didn't put it in a

3    binder.

4                    MS. GAROFALO:  It wasn't in the binder.  It was

5    a lone e-mail.

6                    MR. PEEK:  It's the e-mail from Chris Shockey or

7    Dennis@ncoder.net identified.

8                    MS. GAROFALO:  And I'm sorry, Your Honor, but

9    we also object to the e-mail as hearsay.  It has not been

10   authenticated.  We did not see the e-mail prior to yesterday,

11   so we would object on all of those bases.

12                   MR. PEEK:  It's not being offered for the truth,

13   Your Honor.  It's just being offered as another document that

14   he had the ability to produce and did not produce.

15        Dennis@ncoder.net was identified as his e-mail

16   address.  He identified Chris Shockey.  He identified all the

17   other recipients of that.

18                   MS. GAROFALO:  Your Honor, I believe he stated

19   he didn't know some of the parties involved.  He has not --

20   no recollection of seeing this e-mail.

21        I think we've all experienced e-mails that have been

22   directed to us that we have not received and, certainly, have

23   not reviewed.  The e-mail has not been authenticated and

24   should not be admitted.

25                   THE COURT:  Well, I'm going to go ahead and
```

1    admit Exhibit 45.  I think it goes to, as I've indicated,

2    the issues in this Order to Show Cause hearing concerning

3    compliance.  It's not for the truth of the matter asserted,

4    but compliance with the request for production of documents,

5    and the extent to which Mr. Montgomery may or may not have

6    done so.  So, it will be admitted notwithstanding the

7    objection.

8              (Whereupon, Exhibit 45 -- a document, was received

9    in evidence.)

10             THE COURT:  And I understand, Ms. Garofalo, you

11   wish to reserve to take a look at the balance of the items

12   Mr. -- the exhibits Mr. Peek has sought to admit until after

13   the noon hour, is that correct?

14             MS. GAROFALO:  We would appreciate that, Your

15   Honor.

16             THE COURT:  All right.  Very well.

17             MS. ROBB-PECK:  Your Honor, just as point of

18   clarification.  Yesterday, if I recall correctly, there was

19   an issue that, potentially, there were documents that were, or

20   exhibits that were renumbered in the binders that we have here

21   today.

22             MR. PEEK:  She is correct.  And I, I think 31

23   was the only one that was mis-numbered.

24             Which one is that one?

25             Okay.  It's now 38 instead of 31, Miss Clerk.

```
 1              MS. ROBB-PECK:  Thank you, Mr. Peek.  I just
 2   wanted to see if that --
 3              MR. PEEK:  Thank you.
 4              THE COURT:  All right.  Thank you for that
 5   clarification.  Why don't we take, before you continue, let's
 6   go ahead and take a ten-minute recess.  It is 10:30.  I expect
 7   everyone to be seated and ready to proceed promptly at 10:40.
 8         We are in recess.
 9         (Recess taken.)
10              THE CLERK:  Court is again in session.
11              THE COURT:  Thank you.  Please be seated.
12              MR. SNYDER:  Thank you, Your Honor.  ETreppid
13   calls Jonathan Karchmer, who is already on the stand.
14
                         JONATHAN KARCHMER,
15          called as a witness on behalf of the Defendant,
                    was sworn and testified as follows:
16
17              THE CLERK:  Please be seated.  Please state your
18   full name, spelling you last name for the record.
19              THE WITNESS:  Jonathan Karchmer,
20   K-a-r-c-h-m, like in Mike, e-r.
21              THE CLERK:  Thank you so much.
22              MR. SNYDER:  Thank you.
23                       DIRECT EXAMINATION
24   MR. SNYDER:
25    Q   Mr. Karchmer, could you explain to the Court what trade
```

1    or occupation you are in.

2    A    I'm a computer forensic examiner.

3    Q    And how long have you been a computer forensic examiner?

4    A    Almost eight years.

5    Q    Was that eight years?

6    A    Yes.  Almost eight.

7    Q    What special training did you have to become a forensic

8    examiner?

9    A    Uh, I've taken a number of training courses provided by

10   forensic software-makers and, actually, companies who are --

11   have no affiliation with software.  I've taken training from

12   Guidance Software.  I've also taken training provided by the

13   Sands Institute.

14   Q    And what is your -- what is your university education?

15   A    I have a Bachelor of Arts in Management Information

16   Systems.

17   Q    Okay.  And where did you receive that?

18   A    From the University of Arizona.

19   Q    When?

20   A    In December of 2000.

21   Q    All right.

22        Now, you explained that you had taken courses from

23   both software manufacturers and independent providers?

24   A    Correct.

25   Q    How extensive has that technical education been?

1   A    Um, I've taken at least one course a year since 2002, I

2   believe.

3   Q    Okay.  And do you have any certifications in the field of

4   forensic examination and electronic information?

5   A    I do.  I have an Encase Certified Examiner designation,

6   which is ENCE.  I also have a Certified Computer Examiner

7   designation.  That is CCE.  I also have a GCIH, or a -- that

8   stands for GIAC, Certified Incident Handler.  I also have a

9   GCFA or, which is also a GIAC Certified Forensic Analyst

10  designation.

11  Q    That's an awful lot of letters.  Tell me what an Encase

12  Certified Examiner is?

13  A    An Encase Certified Examiner, in order to get that,

14  you have to have, I believe, a minimum of, I think, 12 to

15  18 months of computer examination experience.  You also have

16  to have a base line level of forensic training and aptitude.

17  And you also must take a multiple choice exam.  I think it

18  was 180 questions or so.  And you must also complete a

19  practical examination of electronic media.

20  Q    What is Encase?

21  A    Encase is forensic software.  It's generally considered

22  to be the gold standard software used.  It's used by private

23  agencies, government agencies.

24  Q    Okay.  And the other certificates you mentioned, are

25  those provided by software makers, or are they, somehow,

1    independent certificates?

2    A   Right.  The others are independent.  They're not

3    affiliated with software makers.

4    Q   In late June, did you have an opportunity to -- sorry,

5    early June, did you have an opportunity to review certain

6    hard drives that my firm provided you which we told you had

7    been provided by Mr. Montgomery?

8    A   I did.

9    Q   And this was a one terabyte drive and 500 gigabyte drive?

10   A   That's right.

11   Q   Okay.  What software did you use to examine these drives?

12   A   Initially, I used Encase software to examine the data on

13   the drives.

14   Q   Okay.  So your Encase certification is what really is

15   relevant to your examination of these drives?

16   A   Uh, I, I guess you could say that.  Sure.

17   Q   In addition to all your other training and knowledge?

18   A   Sure.

19   Q   Okay.  Explain, in general, what you did to begin your

20   analysis of these drives.  What, what steps did you walk

21   through in looking at the 500 gigabyte drive and one terabyte

22   drive?

23   A   Once I received the hard drives, I connected them to what

24   we refer to as a hardware write blocker.  That prevents our

25   examiner machines from altering the hard drives in any way.

1              I then used Encase software to look at the file

2      system, and look at the files on each drive.

3      Q    Is there anything that struck you about the file

4      structure of the drives that were provided?

5      A    Yes.  The drives contained hundreds of thousands of files

6      but very few, if any, directories or folders which, generally,

7      would impede one's review of the documents on the drive.

8              In addition, the file names were something I've

9      never seen before.  They were extremely long, very cryptic.

10     Not what I would call a normal file name.

11     Q    I'll get back to that.

12             But, in general, in your line of work, are you

13     involved with the production of documents in the context of

14     litigation?

15     A    Yes.

16     Q    Okay.  How much of your time do you spend involved in

17     litigation support?

18     A    Uh, sometimes up to 50 percent.

19     Q    Okay.  Characterize how you would typically expect

20     electronic information to produce, to be produced in

21     litigation -- well, first, I guess, just explain how you

22     would typically expect electronic information to be produced

23     in litigation?

24     A    Well, typically, one would expect to see some

25     documentation and/or chain of custody indicating where the

1    data came from in the first place.  How it's been handled.

2    You would also expect to see the data organized in a manner

3    that communicates to the person receiving it, the original

4    disposition of the data.

5     Q   And what do you mean by the original disposition of the

6    data?

7     A   Where it came from, which custodians, if any, it came

8    from.  What data sources from that custodian could have been

9    a computer CD, other media.  Is it e-mail?  Does it come from

10   a user's home share on a network somewhere?  That kind of

11   thing.

12    Q   Was any of that information included with the one

13   terabyte and 500 gigabyte hard drive that you saw?

14    A   No.

15    Q   How would you expect the files to be organized on the, on

16   the hard drives if they were produced in litigation, or even

17   if they were, they were simply kept in the ordinary course of

18   business?

19    A   You would expect to see a folder structure that would

20   mirror the original disposition and location of the files.

21    Q   And can you explain what you mean by folder structure?

22    A   Sure.  In general, on a Windows file system, one's hard

23   drive would contain a folder path.  Something like documents

24   and settings, followed by, you know, your user name, followed

25   by a my documents folder.  One would expect to see paths such

1   as this, or something different if the data came from

2   another location such as a server.  And there was none of

3   this standard folder structure on the two hard drives.

4   Q   Okay.  Was there anything peculiar about the way the

5   files were actually named?

6   A   Yes.  As I mentioned, the file names were incredibly long

7   and cryptic and, apparently, non-sensical.  I've never seen

8   files named quite like they are on those two drives.

9   Q   So, all the files were in one single folder; do I have

10   that right?

11   A   I believe on one of the drives, all of the files were

12   in a single folder.  And I believe on the other drive that

13   contained over one million files, they were distributed across

14   three directories.

15   Q   Were the directories named in such a way as to make it

16   appear they had been categorized by any type of files or

17   anything like that?

18   A   I believe only on the larger drive.  The three folders

19   that were present indicated a year such as 2003, 2004,

20   et cetera.  No other folders were present.

21   Q   Okay.  Now why is the name of a file important, other

22   than the obvious reason of being able to say, oh, you know,

23   this file relates to eTreppid's business plans or something.

24         Is there anything else the name of the file actually

25   tells you?

1   A   Well, generally, from a review standpoint, the name of

2   the file can help you ascertain whether or not it's even a

3   document that can be reviewed or should be reviewed.   I

4   think, generally, it helps organize oneself with regard to

5   reviewing data.

6   Q   Does the name also typically contain a folder path?

7   A   No.   The full path would contain a file name.   The file

8   name itself is just the file's name.

9   Q   Okay.   With these documents that were provided, was the

10   original folder path preserved?

11   A   To my knowledge, no.   I couldn't tell.   I didn't see any

12   preservation of original folder structure.   And I had nothing

13   to indicate that any metadata was preserved either.

14   Q   Okay.   What do you mean by metadata?

15   A   Metadata simply means data about data.   Generally

16   speaking, it refers to date stamps and other information

17   about electronic files.

18   Q   So when you say you didn't see the metadata had been

19   preserved, what sort of metadata would you have been looking

20   for on the files contained on these hard drives?

21   A   Well, normally, you would expect to see the original

22   metadata.   You would have expected that to have been

23   preserved.   And by that, I mean you would expect to see the

24   original dates such as the file's creation date.   Its last

25   written date.   And you would expect to see a wide variety of

1    dates, depending on the date that that was being produced.

2    Q   Okay.  I'm going to have you look at an exhibit here.  I

3    think this is 47.

4                 MR. PEEK:  No.  We're now at 48.

5                 MR. SNYDER:  48.

6          (Whereupon, exhibit 48 -- a document, was marked for

7    identification only.)

8    BY MR. SNYDER:

9    Q   Could I have you take a look at the first page of

10   Exhibit 48 here.

11   A   Okay.

12   Q   Do recognize this document?

13   A   Yes.

14   Q   In fact, you've prepared this, right?

15   A   Yes.

16   Q   What I wanted you to focus on was the folder create date.

17   A   Yes.

18   Q   Tell us what that indicates.

19   A   The folder create date you're referring to is the date

20   and time at which the folder indicates that it was created;

21   meaning, first put on the hard drive.

22   Q   Okay.  And there's a hard drive in the far left-hand

23   column.  There's a hard drive date and time stamp.

24             Do you see that?

25   A   Yes.

1    Q    Tell me what that indicates?

2    A    With regard to this document, that is the format date

3    that these hard drives show.

4    Q    And where does that date come from?

5    A    Uh, in -- with regard to these two hard drives, that

6    information comes from file system metadata.

7    Q    Okay.  So you would look on the hard drives themselves to

8    find that date?

9    A    That's correct.

10   Q    It's electronically stored on the hard drive?

11   A    That's correct.

12   Q    And how does it get there?

13   A    It gets put there automatically when a hard drive is

14   formatted.

15   Q    So if I hookup a hard drive to my laptop and format it,

16   the date that is on the laptop will be placed on the hard

17   drive?

18   A    That's correct.

19   Q    If my laptop says today's date, and I format a hard

20   drive, the format date will be today's date?

21   A    That's correct.

22   Q    Okay.  Now on this one terabyte drive, this shows that it

23   was formatted on 11-18-2003?

24   A    At 4:58 a.m., yes.

25   Q    Okay.  Is there anything odd about that?

1   A   Yes.  One terabyte drives did not exist in 2003.  So when

2   I saw this, I immediately knew that whomever formatted the

3   hard drive did so using an inaccurate date on their system.

4   Q   So their computer had a date that had been changed?

5   A   Yes.

6   Q   Or wasn't the current date?

7   A   That is correct.

8   Q   Now, the folder create date.

9       Do you see that?

10  A   Yes.

11  Q   Obviously, that's very shortly after the hard drive

12  format date?

13  A   Immediately after.  Yes.

14  Q   What does that indicate to you?

15  A   It indicates to me that an individual formatted a drive

16  at some date and time and, immediately thereafter, created

17  two folders.  One being the backup folder seen here on this

18  document, and then a subfolder inside named 2003.

19  Q   Okay.  And then as you read over -- there's a start and

20  finish time and number of files copies and time elapsed.

21      Do you see that?

22  A   Yes.

23  Q   Can you explain to the Court what that means?

24  A   Those dates and times refer to the file creation times

25  of all of the files copied into the various subfolders seen

1    here.  What the file create date and time really is is just

2    the first date and time on which a file is saved to a hard

3    drive.

4              So, these dates and times indicate that immediately

5    after the hard drive was formatted, a folder was created and

6    documents were copied to that folder.

7    Q    So -- and even though these dates say 11-18-2003, we know

8    that that is really not possible because the one terabyte

9    drive was not available then?

10   A    That's correct.

11   Q    So, again, the computer that was used to make these had

12   the date stamp changed on it?

13   A    Yes.

14   Q    Okay?

15   A    The computer used to format the drive was the same

16   computer used to perform the copy, and stamped -- all the

17   files were stamped on this drive with the same date and time.

18   Q    Okay.  And the number of files copied, just briefly,

19   that's any one terabyte and a 500 gigabyte drive, a total of

20   about 1.8 -- or 1.38 million or so?

21   A    That's correct.

22   Q    Okay.  Now, does the manner in which all the files were

23   named have any impact on how the information is usable?

24              In other words, does it make it -- does it make it

25   easier to search, more difficult to search?  What does it do?

1    A    Oh, certainly.  A file name might contain a key word of

2    interest in any electronic discovery matter.  It might help a

3    key word search.  Yes.

4    Q    Okay.  Did you form any belief as to how the files

5    contained on these drives came to have such peculiar names?

6    A    All I can -- all I can say is that I know somebody went

7    above and beyond a normal copy operation to put the files on

8    these hard drives.  Meaning, if the original files were copied

9    from source hard drive to a destination hard drive, one would

10   expect the file names to remain in tact.  It appears, on these

11   drives, that somebody undertook an effort to manipulate and

12   change and lengthen file names.

13        Now, whether that was done during the copy or after

14   the copy, I'm not sure.  But somebody went above and beyond a

15   standard file copy operation to put the files on these hard

16   drives.

17   Q    And do you have the means to show the Court on the screen

18   some examples of these names?

19   A    Sure.  Bear with me just for one minute.

20        I can show you the contents of the 500 gigabyte hard

21   drive at this time.  I've been -- my software has been working

22   to open the other drives since the break.  It just needs a few

23   more minutes because it's a very large case.

24   Q    That's fine.  The 500 gigabyte is fine.  I just want to

25   show the Court an example of how they're named.

1          THE COURT:  There you go.  Your screen should be

2    up.

3          THE WITNESS:  So as you can see here, the 500

4    gigabyte drive really only contains a single directory that

5    was called "backup".

6          Now, I've highlighted the folder on the left side

7    of the screen.  And on the right side, you're seeing all the

8    contents of that folder, each file being on one line.

9    Q   Okay.  And tell me what is, what is odd about those

10   names?

11   A   Well, the names, generally speaking, are much longer.  As

12   I scroll through, you can see they are much longer than one

13   expects to see.

14   Q   Could you slow down just a little bit.

15   A   Sure.  It's highly duplicative.

16   Q   Okay.

17         Now, you mentioned that it was highly duplicative.

18   In the context of forensic examination, do you often run

19   across duplicate copies of files, especially dealing with

20   backup tapes like this?

21   A   Occasionally.  Yes.

22   Q   Okay.  Is there any process you use to eliminate

23   duplication?

24   A   Yes.  Generally speaking, with regard to E-discovery and

25   document review, there are a few methods of deduplication.

1    They generally involve doing what's called hashing a file, or

2    applying a mathematical algorithm to a file, an electronic

3    file, that results in a alphanumeric value.  That value we

4    call a hash value.  And two identical files that have the

5    same data content will have exactly the same hash value.  And

6    we will use that value as a key to deduplicate files.

7    Q    Okay.  So what does the hash value actually look like?

8    Is that actually just a string of numbers?

9    A    Yes.  I can show you.  It's, in this case, the hash

10   algorithm we used was the ND-5 algorithm.  And the hash value

11   is a 32 character alphanumeric string.

12            This column here shows you hash values for each

13   file.

14   Q    Okay.  And those values are unique to each file?  They're

15   like a fingerprint for each file?

16   A    They're sometimes referred to as a digital fingerprint.

17   That's correct.

18   Q    Just so we're clear.  If two files have the same hash

19   value, they are identical in every respect?

20   A    It just means they're identical with regard to data

21   content.  You can actually have files with different names.

22   But as long as they contain 100 percent of the same data,

23   they will have the same hash value.

24   Q    But if you change even one semicolon, it will have a

25   different hash value.

1    A    That's correct.

2    Q    Okay.  Now, how -- I imagine in Encase software, if I

3    wanted to go out and by a license, it's not terribly cheap.

4    Is there shareware or readily available software that would

5    generate a hash value?

6    A    Yes.  There are a number of tools that can generate hash

7    values for files, a number of free tools, a number of open

8    source tools.  That's correct.

9    Q    Okay.  And how, approximately -- I'm not asking for an

10   exact number -- but what sort of time frame would we be

11   looking at for someone to use one of these open source tools

12   to figure out, to determine hash values for the 1.3 million

13   files on these two drives.

14            Are we talking hours or days or weeks?

15   A    I would say several hours.  Possibly more than, I would

16   say, possibly 24 to 48 hours.

17   Q    Okay.  But basically, then, you'll have a list that shows

18   you all the documents that are duplicates, right?

19   A    That's correct.  Yes.

20   Q    And would you expect someone who is, say, a computer

21   scientist like Mr. Montgomery, would be able to, to go through

22   this exercise?

23   A    I'm not sure if he has specific knowledge of hashes,

24   per se.  I -- I've heard him say he's involved in

25   steganography, so I assume that he would.  Or if he didn't, he

1    could consult with somebody in the forensic rediscovery sector

2    to assist him in that regard.

3    Q    Okay.  You're aware that Mr. Montgomery has retained a

4    forensic expert in this case.  In fact, he had a forensic

5    expert who drafted a declaration in, in an issue you were

6    involved in earlier, right?

7    A    Right.

8    Q    Do you remember who that person was?

9    A    That was Scott Cooper.

10   Q    Okay.  And would you expect Scott Cooper to be able to

11   provide this kind of information to Mr. Montgomery if he had

12   asked?

13   A    Yes.

14   Q    Okay.  So when you work through this exercise and

15   generated the hash numbers, how -- what did you find in terms

16   of how much duplication there was?

17   A    Uh, well, if I can refer to the document.

18   Q    Yeah.  Go ahead and go to the second page of Exhibit 48.

19   A    With regard to the first two hard drives, the hash

20   analysis found that 92 percent of the date it was duplicative.

21   Q    Okay.  Meaning, that of the 1.3 million files, 92 percent

22   of them were duplicates of the other eight percent?

23   A    That's correct.

24   Q    So, only eight percent of that information was unique?

25   A    That's correct.

1          Let me clarify.  The eight percent may also include

2     documents that had no duplicates at all.

3     Q    Sure.  Sure.  Okay.

4          So how many total unique files were there out of

5     1.3 million?

6     A    There were 152,961 files that were unique.

7     Q    Okay.  Then once you would -- once you had determined

8     the number of unique files, what was the next step in your

9     analysis?

10    A    Uh, my next step was to generally try and ascertain how

11    many of those files were reviewable.  In other words, were

12    they text searchable, and would they lend themselves to being

13    key word searched and that kind of thing.

14    Q    Okay.  And if you skip ahead a couple of pages, there is

15    a list of different file types.

16    A    Yes.

17    Q    Are those the types of reviewable files you determined?

18    A    These are, very generally, some reviewable files that we

19    saw.  This list also includes QuickBooks and Quicken data

20    files.

21    Q    Okay.  It also has PDF and TIF files?

22    A    That's correct.

23    Q    And tell me what type of information is typically in PDF

24    or TIF files?

25    A    I would say that PDFs or TIFs are just two different

1    format of documents.  With PDFs and TIFs, specifically, they

2    might be scan documents.

3    Q    Okay.  Tell me, PPT is a PowerPoint file, is that right?

4    A    Yes.

5    Q    And D-O-C is typically a word file, am I right about

6    that?

7    A    That's right.

8    Q    Tell me what an MSG file is?

9    A    Uh, well, an MSG, typically speaking, is an outlook

10   e-mail message.  A single e-mail.  But, it can also be just a

11   normal text file that is included with installed applications

12   on one's computer.

13   Q    Okay.  Explain to the Court the difference between an

14   MSG file and a PST file?

15   A    An MSG, as I said, is an individual e-mail message.  The

16   PST is a store or a container.  It's like the e-mail box.

17   There's a single database file, and it contains all of the

18   e-mail messages and attachments.

19   Q    For purposes of forensic examination, is one of those

20   types of files more valuable than the other?

21   A    Yes.  For a forensic examination to be thorough and

22   complete, one would need a PST file, along with the original

23   media where the PST file originated.

24   Q    And why would you need the PST file to be complete?  What

25   information does that contain that, say, an MSG file would

1    not?

2     A    Well, when one extracts an MSG file from a PST, it will

3    contain some embedded information that relates to the date and

4    time it was extracted.

5            In addition, a PST file contains a number of

6    property tags and database properties that help to

7    authenticate the e-mails therein.

8     Q    Okay.  Now, skipping back a couple of pages, to the third

9    page in this group, you have unique reviewables by file size.

10   And you have three different categories here.

11           Now, do you have that page in front of you?

12    A    I do.

13    Q    Okay.  First of all, the total amount of reviewable or

14   the total amount of unique information on these two drives was

15   how much?

16    A    Of unique information?

17    Q    Yes, of unique information, in terms of memory used.

18    A    Approximately 80 gigabytes.

19    Q    Okay.  And if you look at the unique reviewable, you

20   have -- the biggest piece of the pie here is what you have as

21   all other non-reviewables?

22    A    Yes.

23    Q    Explain -- and that's 36.8 gigs.  What kind of

24   information is in all other non-reviewables; what sort

25   of files?

1    A    Uh, non-reviewables are identified as files that do not

2    typically have extractable text.  Meaning, they might be

3    system files or executable files.  And as opposed to being

4    something like one's work product, documents, and e-mail items

5    like that that can be text searched.

6    Q    Okay.  So a white paper or a PowerPoint presentation or a

7    business plan, or something like that would not be included in

8    what you've categorized as all other non-reviewables?

9    A    That's correct.

10   Q    Okay.  Then there's 22 percent or 22 gigs that you have

11   as non-reviewable images.  What do you mean by that?

12   A    Those were still image file types, pictures on the hard

13   drives that don't contain extractable text.

14   Q    Okay.  Did you have occasion to look at any of these

15   pictures?

16   A    Uh, briefly.  Yes.

17   Q    Okay.  What sort of -- what sort of pictures did you

18   find?

19   A    Uh, they appear to be personal photographs of parties,

20   family events, pictures of somebody's dog, pictures associated

21   with the installation of certain applications.

22   Q    Could you call up on your screen, say, the first few

23   pictures that appear on your list of unique files?

24   A    I may have -- actually, bear with me one second.

25   Q    I understand there's about 44,000 unique image files.

1   And, obviously, we don't want to go through all of those.

2   But, just to get some flavor, what kind of information is

3   there?

4    A    This may take just a minute.

5    Q    Can we continue to talk while you're doing that?

6    A    Certainly.

7    Q    Okay.  In the category of reviewable files, which --

8   okay.  So here's some of the types of photographs we have.

9   And these look like -- are these unique?

10   A    No, these are not.  These are just a list of the images

11  on the hard drive.

12   Q    Okay.  So, this is an example of both the type of the

13  picture and the extent of duplication that we had.

14   A    That's -- that's correct.

15   Q    Okay.  In the context of reviewable information, which

16  you state here is about 20 gigabytes of information on these

17  two hard drives --

18   A    I'm sorry?

19   Q    I'm looking -- I'm going back to your pie chart here.

20   A    Right.

21   Q    Where you show there's about 20.2 gigabytes that is

22  reviewable.

23   A    Right.

24   Q    And the first page shows by file size.  The second page

25  shows by file number.  And that's 23,300 files that are

1   reviewable?

2    A    That's right.

3    Q    Okay.  So if one were running a text search to find key

4   words of the information on this hard drive, if they were

5   looking at just the unique information on these two hard

6   drives, they would be looking at 28,373 files?

7    A    Generally, that's correct.  That total might expand a

8   little bit if there were container files that, incidentally,

9   contained other files.

10   Q    Okay.

11   A    But, yes.

12   Q    Okay.  So in -- when Mr. Montgomery -- you heard him

13  testify that he had to run searches on 1.3 million files.

14  It was really the searches were run on 28,000 unique

15  reviewable files.

16           Is that correct?

17   A    Well, I -- I'm not sure what Mr. Montgomery searched.

18   Q    Right.  Had he deduplicated and just looked at that, he

19  would have been looking at 28,000 files or so.

20   A    Well, the search I'm aware that Mr. Montgomery described,

21  was a Windows search performed against entire hard drives.

22   Q    Right.

23   A    And the effectiveness of a Windows search, and whether it

24  can perform a key word search, as well as a discovery tools or

25  forensic tools, I don't think they can compare.

1    Q    I certainly understand that.  The point I'm trying to get

2    at is had he gone through the deduplication process, the

3    number of files he would have been searching would have been

4    quite substantially smaller?

5    A    Well, that's absolutely right.

6    Q    Okay.  Now, on the next page, you have the list of file

7    types that you've included in the reviewable files.  We talked

8    about that, to some degree.  Tell me what an HTML file is.

9    A    HTM or HTML files are generally -- they're hypertexted

10   files that some are -- some could be -- they're generally

11   temporary internet files.  What that means is they are the

12   result of internet browsing, where these could be actual web

13   pages that have been cached or saved to the hard drive while

14   somebody was using an internet browser.

15   Q    Okay that's true for both the HTM or HTML files?

16   A    Yes, the two file types are basically interchangeable.

17   Q    And the total number of HTM and HTML files on these two

18   hard drives is in excess of 15,000 of the 28,000 reviewable

19   files?

20   A    Of unique files, yes.

21   Q    Okay.  And those are typically cached web pages, right?

22   A    Generally, yes.

23   Q    What is a TXT file?

24   A    A TXT file is a, just a text file.  It -- typically, you

25   will see them on the hard drive as being part of the hardware

1    installation.  They would include things like a "read me" file

2    or directions, a list of directions for the user.

3    Q    Okay.  Now, you also have QuickBooks files on here.

4         Did you see that?

5    A    Yes.

6    Q    Did you run a search for QuickBooks files on these

7    computers containing the terms "Drink Water Trust"?

8    A    Yes.

9    Q    And did you find a number of QuickBooks spreadsheets

10   relating to the Drink Water Trust?

11   A    I believe so.  Yes.

12   Q    Okay.  And how many total files were there that related

13   to the Drink Water Trust?

14   A    On the one terabyte drive, there were about 89 files that

15   can be Quicken or QuickBooks, that had the word Drink Water in

16   the file name.

17   Q    Okay.  And what about files related to an entity called

18   "Books Direct to You".  Did you look for those as well?

19   A    Yes.

20   Q    And what did you find there?

21   A    For Books Direct, there were about 174 files.

22   Q    That's just in Quicken or QuickBooks?

23   A    That's correct.

24   Q    Did you run a search through everything of how many

25   files, total, contained the word "Parasol"?

1    A    I did.

2    Q    Okay.  And how many were those?

3    A    On the one terabyte drive, there were 31,861.

4    Q    And just so we're clear, that's before you deduplicated?

5    A    That's right.

6    Q    Out of the 1.3 million, there is 30,000 that were related

7    to Parasol, that had the word Parasol in the name?

8    A    That's correct.  And that's just on the one terabyte

9    drive.  The 500 gigabyte drive may have others.

10   Q    Okay.  So of the 28,000 or so reviewable files, there's

11   approximately, if I'm reading this right, a total of about

12   16,000 that are either TXT, HTM, or HTML files.

13              Am I getting that right?

14   A    That's right.

15   Q    Are those type of files likely to have any user generated

16   information?

17   A    Uh, generally speaking, no.  But, they may.

18   Q    Okay.  Typically, they'll be something that just winds up

19   in your computer from surfing the web?

20   A    Generally, yes.

21   Q    Okay.  Now when -- of those 28,000 unique reviewable

22   files, 16,000 are in that category.  And of the 12,000

23   remaining, there's at least some number we looked at just

24   running two search terms that are related to entities other

25   than eTreppid, is that right?

1    A    That's correct.

2    Q    Okay.  Now did you -- we talked about the image files.

3    You said in your declaration there were 44,000 unique image

4    files -- I'm sorry did I say in your declaration?

5    A    I think you did.

6    Q    I meant on this exhibit, if you look at the fourth page.

7    A    Right.

8    Q    It shows 44,000, or 29 percent of the hard drives were

9    image files of one form or another.

10   A    That includes only the four image types listed here, yes.

11   Q    Okay.  What are those four image types?

12   A    Uh, well, going down the list, the first JPG, refer to

13   that as a J. Peg, that's an image format commonly seen for

14   images on web pages.  It's also a common format used by

15   digital cameras.  GIF or GIF, the following file type is just

16   a different format.  Those are commonly seen with graphics

17   from the internet pages as well.  The same goes for DMP or

18   Dmat.  PST is related to the use of photo shop, an image appli

19   -- an imaging application use on computers.

20   Q    Okay.  And in these -- in these images of the 44,000

21   images, do you have an estimate as to how many you looked at?

22   A    Um, I would estimate several hundred.

23   Q    And in those, did you see any white papers or PowerPoint

24   presentations or business plans related to Trepp eTreppid?

25   A    No.

1   Q    Okay.  Now, just in the last few days, did you have an

2   opportunity to look at any additional hard drives?

3   A    Yes.

4   Q    Tell me, tell me how many hard drives you looked at?

5   A    I looked at a total of eight hard drives.

6   Q    Okay.  Did someone from your office try to look at

7   additional hard drives?

8   A    Yes.

9   Q    Okay.  What -- who was that?

10  A    Uh, I believe that person was Bashal Oza (phonetic) from

11  our Los Angeles office.

12  Q    So Montgomery delivered 21 hard drives to us and Bashal

13  looked at a number of them.

14  A    That's right.

15  Q    Did he report to you as to what he found?

16  A    Yes.  He said that the hard drives were simply stacked

17  together, with no packing material, in a large box.  And

18  likely due to the fact, or due to how they were shipped, a

19  large number of the drives that were shipped were basically

20  dead on arrival.  They would not -- they would not spin out.

21  They would not work.

22  Q    Okay.  Do you, you work at LECG.  I'm not sure I actually

23  asked you that, but the entity you work for is actually?

24  A    That's right.

25  Q    At LECG do you have a procedure you follow when you ship

1   hard drives?

2    A   Yes.  Hard drives are very, very susceptible to shock.

3   So anytime we have to ship hard drives, we make sure that they

4   are packed extremely well.  We have our staff, literally,

5   shake the boxes they're in prior to sealing the boxes to make

6   sure that there's no movement in the box.

7           We have a saying in the lab:  We prefer drives to

8   be packed like fabriche eggs, because of how sensitive they

9   are.

10   Q   How, specifically, do you pack them?

11   A   We use a anti-static bubble bag that fits over the hard

12   drive itself.

13   Q   Is that one of these (indicating)?

14   A   That's correct.

15   Q   Okay.

16   A   In addition to that, to that small bag, we will add

17   enough packing material, foam, bubble wrap, et cetera, to

18   where the hard drives being shipped do not move in the box

19   they're in.

20   Q   Okay.  If you were shipping hard drives in a box like

21   this, and you packed them following your appropriate

22   procedures, how many would you expect you could pack in

23   that box?

24   A   I would estimate maybe, maybe three at the most.

25   Q   Okay.  I'll represent to you that we received 21 hard

1    drives contained in this box.  Does that strike you as an

2    appropriate way to pack hard drives for shipment?

3    A    Absolutely not.

4    Q    In fact, if you got a box with 21 hard drives like this,

5    what would you expect to find when you opened them up?

6    A    I would be surprised if any of the hard drives worked.

7    Q    Okay.  Now the eight hard drives that you said did work,

8    what -- have those -- are those working well?  Are they in

9    good shape?

10   A    I would say no.  In my experience, these are drives that

11   are, I would say, they're on the way out or will die soon.

12   And to clarify, I mean, these are drives that are making a lot

13   of noise.  They're clicking.  They're grinding now if you try

14   to power them up, which just means the performance is going to

15   degrade and they will eventually not work.

16   Q    Okay.  Now, you've heard Mr. Montgomery testify that

17   these hard drives, or the information on the one terabyte and

18   the 500 gigabyte hard drive that you looked at first, as well

19   as these additional hard drives was derived from backups he

20   made of eTreppid's computers, do you recall that?

21   A    Yes.

22   Q    Explain to me, in general, what's the purpose of backing

23   up information on a company's computer system?

24   A    Generally speaking, the purpose of backing up data is for

25   disaster recovery.  Backups are done so that, you know, if

1    something were to occur and computers were to, you know, be

2    destroyed or suddenly stopped working, the company could go

3    to its backups and, quickly, you would be on-line once again.

4     Q   Okay.  With that in your mind, what kind of information

5    do you try to backup when you're performing these backups?

6     A   Well, generally, the backup procedures vary, of course.

7    But, they tend to include vital information such as an

8    employee's e-mail, as well as their work product, documents,

9    et cetera.

10    Q   Okay.  Would you expect PST files to be included in a

11   backup?

12    A   Um, yes.  If the organization used Outlook and stored

13   mail on PSTs, definitely.

14    Q   Okay.  And do you have any knowledge as to whether or not

15   eTreppid used outlook?

16    A   Yes, I do.

17    Q   And did you find any PST files in the one terabyte or

18   500 gigabyte drives?

19    A   There were none.

20    Q   Did you find any PST files in any of the other eight

21   drives that you looked at?

22    A   No.  There were none.

23    Q   So, in these backups, no, no backup e-mail?

24    A   That's correct.

25    Q   Okay.  Now with the, with the new drives that we got, the

```
 1   additional eight drives you looked at, obviously, we got those

 2   recently, and you haven't had a chance to perform quite the

 3   degree of analysis.  But, were you able to determine how much

 4   duplicate information was on those drives?

 5    A   Yes.

 6    Q   Okay.  Go ahead and turn to the next page in this

 7   exhibit.

 8                   THE COURT:  Can you tell me which page, sir?  Is

 9   it --

10                   MR. SNYDER:  Yes.  I'll do my best.

11                   THE COURT:  Is it one of one?

12                   MR. SNYDER:  Yes.  It's labeled one of one.

13   It's actually the seventh page of the exhibit.  And just so

14   I can explain, the reason its labeled one of one is because

15   this was obviously generated after the previous one.

16                   THE COURT:  Right.  Does the top say file

17   account, hyphen, forensic software.

18                   MR. SNYDER:  That's it, Your Honor.

19                   THE COURT:  Thank you.

20                   MR. SNYDER:  Thank you.

21   BY MR. SNYDER:

22    Q   First of all, explain to me, with these eight additional

23   drives, when you, when you deduplicated it, what did you do

24   with that information?  In other words, is this -- did you

25   look at it independently, or did you put it in with the
```

 1   information on the previous drives?

 2    A    We combined it with the information from the previous

 3   two.

 4    Q    Okay.  So this sheet reflects the universe of hard drives

 5   that are the universe of information on the two hard drives we

 6   looked at previously, and on these eight hard drives?

 7    A    That's right.

 8    Q    Okay.  And how many total files were there on these total

 9   of ten hard drives?

10    A    There were over 2.8 million files on all eight drives

11   that we looked at so far.

12    Q    And, of those, how many were unique?

13    A    A little over 302,000.

14    Q    Okay.  So right around ten percent of the files on these

15   additional drives, or on the drives total were unique?

16    A    That's correct.

17    Q    Okay.  Now going to the next page -- I'm sorry.  I'm

18   skipping ahead two pages to the file types.

19            When, for instance, in the list of file types, where

20   it says on HTM files, there's 14,964 files on all ten drives

21   together.

22    A    Unique HTM files, yes.

23    Q    Thank you.  Unique HTM files.

24            On the two hard drives previously, there were

25   approximately 12,000 HTM files.

1    A    Right.

2    Q    So I take it from that, on the eight additional hard

3    drives, there's about forty-nine hundred total unique

4    additional HTM files -- I'm sorry twenty-nine hundred

5    additional unique HTM files.

6    A    I would say 2000.

7    Q    Okay.  And looking at PowerPoints, comparing those -- and

8    for the Court's reference, what I'm comparing here is the

9    fifth page, the list on the fifth page that says file type

10   account with the list on the last page.

11                THE COURT:  Thank you.

12   BY MR. SNYDER:

13   Q    In terms of PowerPoint documents in the two drives

14   initially produced, there's a total of 50 unique PowerPoint

15   documents.  And on the eight additional drives, there's only

16   32 additional unique PowerPoint documents.

17   A    That's right.

18   Q    And in terms of word documents on the initial drives, the

19   initial two, there were four thousand word documents.  And on

20   the eight additional hard drives, there's only about 500

21   additional word documents.

22   A    That's right.

23   Q    Okay.  So even though these eight drives contain another

24   1.5 million files total, the actual amount of unique

25   reviewable files is, is pretty marginal, is that fair to

1   say?

2    A    I would say so.  Yes.

3    Q    Okay.  Now were you able to, from looking at these

4   drives, were you able to tell, and I'm talking about the eight

5   additional drives, were you able to tell when the information

6   on those drives was put there?

7    A    Well, I can tell you that the hard drives, most of the

8   eight that we could see, appear to have been formatted in

9   December of 2002.  I can also tell you that they contained

10   data that was not created until 2003, 2004.

11          In addition to having been formatted with this

12   supposed 2002 date, again, the file creation date and times,

13   also, for most of the eight, I believe five of the eight

14   drives were also December of 2002, for all of the files.  Yet,

15   on more than one drive I identified, even though that a file

16   had a creation date of December of 2002, the file itself was

17   not created until later.

18    Q    Okay.

19    A    Which, of course, is not possible.

20    Q    So that provides more indication that someone was

21   creating files or formatting drives with a computer that

22   had a date that was set to a date that's inaccurate?

23    A    That's right.

24    Q    Okay.  Now, were you able to tell when the actual copies

25   that we received were burned?

1    A    I can tell you when the forensic images were created.

2    Q    Okay.

3    A    Yes.

4    Q    Okay.  And when were those created?

5    A    They were all created in June or July of this year.

6    Q    Is there some reason you have confidence in that date?

7    A    Um, well, I have more confidence in that date because the

8    images were created by an individual named Jared Schultz at a

9    company called Fulcrom in Los Angeles.  I've spoken with

10   Mr. Schultz briefly about other topics, but the software he

11   used to image the drives was Encase software.  And the dates

12   of June and July of this year, I thought, made more sense and

13   were probably accurate.

14   Q    Okay.  So there were -- do you recall how many were in

15   June and how many were in July?

16   A    Of the eight, I believe -- I'm going from memory, but I

17   believe six of the eight were imaged in June.  And I believe

18   two were imaged in July.

19             And I should point out, also, now that I'm thinking

20   about it, the two drives with a July image date were 100

21   percent identical to one another.

22   Q    Okay.

23             Now we were sent these drives on August 14, 2008,

24   but what you're telling me is they were all imaged much

25   earlier, in June and July of 2008?

1    A    Yes.

2    Q    Okay.  And they were imaged by Mr. Schultz?

3    A    I believe so.  Yes.

4    Q    So when he imaged them, he had access to that

5    information, could have looked at it, could have done,

6    done whatever he needed to do with it?

7    A    Yes.

8    Q    Okay.  And now the other item I wanted to talk about

9    is a CD that I believe you examined that purported to contain

10   a Glogauer e-mail, an e-mail written by Len Glogauer in

11   September of 2003.

12           Do you recall that?

13   A    Yes.

14   Q    And did you, just to sum up, did you previously have

15   occasion to examine issues related to this e-mail?

16   A    Uh, I did.

17   Q    And, in fact, you submitted a declaration to the Court

18   about that, right?

19   A    That's right.

20   Q    Can you -- I don't want to -- this to be about your

21   previous examination in any kind of depth, but I do want you

22   to just summarize what you did in that previous examination

23   to explain to the Court why it was important that we have the

24   original native format PST file from Mr. Glogauer?

25   A    Uh, initially, I examined that e-mail message, an

1    instance of that e-mail message as it existed within

2    Mr. Trepp's mailbox -- I should say the mailbox on his

3    computer.  And instances of his mailbox that had been

4    backed up previously.

5             My analysis included examining the PST file

6    containing the message, and then identifying data base

7    and property tags associated with that message in order to

8    authenticate it, if I could.

9             What I found was that dates inside these property

10   tags indicated to me that the message instances I examined

11   were authentic.

12   Q    Okay.  So the -- and the instances you examined did

13   not contain the phrase, "We'll take care of him like we

14   discussed," or words to that effect?

15   A    Right.

16   Q    Now the -- so, given that, why was it important to

17   receive from Montgomery, then, the original native format

18   PST file with that e-mail?

19   A    Well, as I mentioned, in order to authenticate e-mail to

20   a reasonable degree of certainty, one needs, of course, the

21   original PST and, hopefully, the original media on which that

22   PST resided, so that dates between the two can be analyzed and

23   compared.

24   Q    When you say the original PST, you referred to the PST

25   earlier as kind of a container.

1    A    Right.

2    Q    What, what would be in that container in the original

3    PST?

4    A    Uh, an original PST would contain all of the folders one

5    would normally see when they used their e-mail program, as

6    well as all of the e-mail messages and attachments and other

7    things that might be stored there.

8    Q    Okay.  So the original PST would have, would have all

9    your e-mail?

10    A    Correct.  All the e-mail, you know, at that point in

11    time.

12    Q    Right.

13    A    Right.

14    Q    And why, why is it important to have all those additional

15    e-mails if you're just looking at one?

16    A    Well, for the purposes of authentication, one would

17    need to compare the universe of data, PST, all the PST in

18    order to conclude to any reasonable degree of certainty that

19    whether -- I should say an e-mail message was authenticated.

20    Q    Okay.

21                MR. SNYDER:  I'm going to have the clerk mark

22    Exhibit 49.

23                (Whereupon, exhibit 49 -- a document, was marked for

24    identification only.)

25                MR. SNYDER:  Before I forget, I move to admit

1   Exhibit 48.

2            THE COURT:  Ms. Garofalo, any -- Mr. Snyder has

3   moved to admit Exhibit 48.  Any objection?

4            MS. GAROFALO:  No, Your Honor.

5            THE COURT:  Exhibit 48 is admitted.

6         (Whereupon, exhibit 48 -- a document, was received

7   in evidence.)

8   BY MR. SNYDER:

9    Q   Mr. Karchmer, could I have you look at the exhibit that

10  we've marked as 49.

11   A   Yes.

12   Q   Can you explain to the Court what this portrays?

13   A   The first page of Exhibit 49 are a series of screen

14  captures that I created based on the CD you received that,

15  purportedly, contained the Glogauer e-mail message.

16   Q   Okay.

17   A   What these screen captures show, are the four files that

18  were on the CD.  Those four files were PST files.

19   Q   Okay.  So when you say there were four, on the CD

20  containing the Glogauer e-mail, there were four separate PST

21  files?

22   A   That's correct.

23   Q   Okay.  And what was in those PST files?

24   A   The PST files contained a single e-mail message.

25   Q   Okay.  And that single e-mail message was a Glogauer

1   e-mail?

2    A    Right.

3    Q    So they didn't have the universe of e-mail messages you

4   would need to really authenticate?

5    A    That's correct.  Based on that, and based on the

6   A-typical structure of PSTs, I could immediately tell that

7   the PSTs provided to eTreppid were not the original PSTs.

8    Q    What do you mean by the A-typical structure of the PSTs?

9    A    These PST files that were provided contained, I believe,

10   only two of the standard directories one would normally see

11   in an Outlook PST file.

12           In other words, there are standard folders that,

13   in fact, have to be present for the PST file to work in

14   conjunction with a company's e-mail server.  In this case,

15   eTreppid's Microsoft exchange server.

16           The folders that would have to be in the mail box

17   would include things like the inbox, sent items folder,

18   deleted items folder, a drafts folder.  However, on the CD

19   that was provided, only two directories in each PST were even

20   present.  And I believe they were the, I believe, the deleted

21   items folder and the sent items folder.

22           So, again, based on that, I knew that these were not

23   the original PSTs and, in fact, these were something that had

24   been created or engineered at some point in time.

25    Q    Okay.  If you were just going to create a PST, say,

1    open up and create a new PST file on a computer, and put one

2    message in it, how difficult would it be to have that message

3    be labeled with any date you wanted it to be labeled, or say

4    whatever you wanted it to say?

5    A    Well, it's -- as I've mentioned in my earlier

6    declaration, anybody can edit an e-mail message.  All one

7    would have to do is change the date on their computer if

8    they wanted the e-mail message to exhibit a certain date.

9    Afterwards, they could edit and save the e-mail message.

10   Q    And we've seen on these other hard drives you examined

11   that, in this case, dates on the computers have certainly been

12   changed?

13   A    That's right.

14   Q    Okay.  And so if you had the entire original PST file,

15   why would it make it more likely, or more, more readily

16   authenticated if you had that?

17   A    Well, if you have the original PST, as I said, you could

18   examine the entire PST in its entirety.  All of the property

19   tags associated with messages in the PST.  Ideally, you would

20   also need the original media or the hard drive where that PST

21   came into existence as well, so you can compare dates and

22   times and, generally, activity to authenticate the PST and any

23   e-mail messages inside.

24   Q    Okay.  Now, in going back to Exhibit 49, what does the

25   second page portray?

1   A   The second page was created by, I assume, whoever

2   provided you with a CD.

3   Q   Okay.  So just, if I can stop you, the first page was,

4   that was a screen capture that you took from the CD.  In other

5   words, you opened up these files and did a screen capture and

6   included that on this page?

7   A   That's right.

8   Q   Okay.  And the second page was a screen capture already

9   on the CD, is that right?

10  A   That's right.

11  Q   Okay.  And what does a screen capture appear to you to

12  show?

13  A   Well, it appears to show screen captures for PST files.

14  And because there are, or were four of them, I assume these

15  were supposed to, in some way, reflect the four PSTs that were

16  provided on the CD.  Of course the difference between them,

17  if you flip between the pages, are the file sizes are

18  remarkably different.

19        On the first page, the PST sizes are all 265-K,

20  which is the standard size for an MD-PST file or, like, very

21  little information.

22  Q   Like one e-mail?

23  A   That's correct.

24  Q   Okay.

25  A   The second page shows a string captures of PSTs that are

1    much, much larger; being 165 megabytes.  I don't know why

2    these were included on the CD.  I, again, I assumed that

3    these were supposed to reflect, in some way, the PSTs they

4    delivered.  But, they do not match.

5    Q    Would you expect the original PST file -- obviously, you

6    don't know how much is in it -- but the original native format

7    PST file to be more on the scale of 165 megabytes, than on the

8    scale of a couple hundred kilobytes?

9    A    Yes.

10   Q    Okay.  So 165 megabytes is in the realm of what an

11   original PST file would be?

12   A    Certainly.

13   Q    Okay.  But the files that were actually on the disk were

14   not the 165 megabytes PST files.  It was the 265 kilobyte PST

15   file?

16   A    Correct.  The files on the CD were the 265 kilobyte PSTs

17   that contained only one e-mail message, and it did not contain

18   all of the standard PST folders one would expect to see.

19   Q    Okay.  At any rate though, on this second page, where

20   it shows 165 megabyte, presumably, the person who created this

21   screen shot is trying to indicate that they had a PST file

22   that was created Tuesday, April 5th, 2005, that contained

23   165 megabytes worth of information they had at the time they

24   made the screen shot?

25   A    I would believe so.  Yes.

1    Q    Okay.  Do the differing dates on this screen shot

2    indicate anything to you?  In other words, the top two are

3    created April 5, 2005, and the bottom two were created in

4    November of 2003.

5    A    Well, it's hard to say, being as how these screen shots

6    refer to files that were not delivered.

7    Q    Okay.  Okay.

8                   MR. SNYDER:  Your Honor, if I may have just one

9    moment.

10                  THE COURT:  You may.

11   BY MR. SNYDER:

12   Q    Now, a couple of other questions on this Exhibit 49 --

13   I'd move to admit Exhibit 49.

14                  THE COURT:  Any objection?

15                  MS. GAROFALO:  To the extent that this was not

16   included in the materials provided to us before today.

17                  MR. SNYDER:  Your Honor, they produced this.

18                  MS. GAROFALO:  We will withdraw the objection,

19   Your Honor, but this was not part of the -- a part of the

20   documentation provided in connection with Mr. Karchmer's

21   testimony.

22                  THE COURT:  All right.  Thank you.

23        The objection is over -- it's withdrawn, so 49 is

24   admitted.

25                  (Whereupon, exhibit 49 -- a document, was received

1    in evidence.)

2    BY MR. SNYDER:

3     Q    Okay.  On this first page, do you see on the bottom the

4    dates, on the bottom two screen shots, there's the dates

5    accessed.  Do any of these dates, the created, modified, and

6    access dates indicate anything to you?

7     A    The access date on these particular screen shots could

8    actually be referring to when the PSTs were accessed by

9    our systems when we attempted to open them.  However, that

10   information, I should point out, would not be permanent with

11   regard to these PST files.

12            In other words, this could just be temporary

13   information, at least with regard to those dates of June 23,

14   2008.

15    Q    Okay.  Did you ultimately open up the e-mails contained

16   in this PST file?

17    A    Yes.

18    Q    Was there anything about that that was unusual?

19    A    Yes.  The e-mail on the CD that was present in each of

20   these four PST files was the Glogauer e-mail I had mentioned

21   earlier that I examined.  However, in this instance, it

22   appeared to have been taken from the sender, Mr. Glogauer.

23   And in addition, the e-mail did not contain the sentence, "We

24   need to take care of him."

25    Q    You mean on the one you first examined?

1    A    That's correct.  I misspoke.

2          The instances on this CD did contain the sentence,

3    "We need to take care of him."

4    Q    Were you able to tell whose, whose PST file, or whose

5    computer this was taken off of?

6    A    It appeared to have been taken from Mr. Glogauer's

7    computer.

8    Q    Okay.  Now based on your initial review, your initial

9    declaration in this -- in these matters relating to, to

10   authenticity of that e-mail, does -- and based upon your

11   examination of the PST file they provided, are you able to --

12   or what I'm asking is does the additional PST they provided

13   change any of the conclusions you arrived at in your initial

14   declaration?

15   A    No.  Absolutely not.  The PST that was provided, this PST

16   we're discussing was, as I've mentioned, something engineered

17   or created in order to only contain the single e-mail message,

18   as well as the folders that were present in the PST.

19          So, I have -- I have no, no way to authenticate that

20   e-mail message.

21   Q    Okay.  So, basically, this doesn't dispose of the issue

22   one way or another.

23   A    No.

24   Q    Okay.  But it doesn't give you any more confidence in the

25   e-mail he previously provided?

1    A    No.

2    Q    Okay.

3              MR. SNYDER:   I think that's it, Your Honor, but

4    let me confer here.

5    BY MR. SNYDER:

6    Q    Okay.  Now on the eight hard drives that you looked at --

7    I think you mentioned this earlier -- but you said there were

8    some files that were stored that indicated that they had been

9    created after the hard drive was formatted.

10             Could you explain that further?

11   A    I think you meant to say that the files I saw, files that

12   were created with a date in the future as compared to dates I

13   saw on the hard drive.

14   Q    Okay.  Explain that in more detail.

15   A    I, again, in my very cursory review of these hard drives,

16   I did see a couple of what I thought were anomalies with

17   regard to metadata, dates associated with the files.  One

18   example was an e-mail message that I believe had not been sent

19   until 2003.  I believe the date sent was somewhere in 2003.

20   However, the file representing this e-mail message had a file

21   creation date of 2002, consistent with when that hard drive

22   was formatted, as I mentioned.

23             So I, immediately, again, thought that dates had

24   been changed.

25   Q    Now, when you say an e-mail message, we talked about

1   there weren't any PST files.  What format was that e-mail

2   message in?

3   A   That particular e-mail message, I think, was HTM or HTML

4   file type.

5   Q   Does that indicate anything to you about how the e-mail

6   was sent?

7   A   No.  This was a special instance.  This e-mail was

8   created by software that -- I can go into more detail if you

9   like, but it was created by software that generated reports

10  for the user, and may have put e-mail into an HTML format for

11  the user.

12  Q   Okay.  So even though there was an e-mail message, that

13  doesn't indicate that it was -- there was no PST file.  There

14  was no, no, uh, no comprehensive e-mail storage?

15  A   That's, that's correct.

16  Q   And that's something I wanted to just be clear about.

17          On these hard drives, you did run into a few

18  instances of message files, a few hundred message files.  And

19  those, I believe you testified, could be e-mails or other text

20  files, is that correct?

21  A   Yes.  There were a few loose e-mail messages, yes.

22  Q   Okay.  How would a loose e-mail message windup in a

23  message file as opposed to a PST file?

24  A   Well, I mean, it really goes to the user activity, what

25  the user may have done to save the e-mail in that format.  One

1   can drag a message out of Outlook, for example, to another

2   location, another folder on their screen.  That would have the

3   effect of exporting a message as an MSG file.

4    Q   Okay.  And when one does that, you lose all the

5   metadata associated with the PST, at least with regard to

6   that message?

7    A   Yes.

8    Q   So to the extent there are e-mail messages, incidental

9   MSG files that contain e-mail messages on these drives, there

10  is not the PST metadata you would need to, to authenticate

11  them?

12   A   That's accurate.

13   Q   Okay.

14              MR. SNYDER:  I believe that is all I have at

15  this time, Your Honor.

16              THE COURT:  All right.  Thank you.

17          The time is 11:58, and so I think it would be a good

18  time to recess for lunch, and we'll return -- counsel, do

19  you -- I'm happy to come back at 1:15.  Or if you need the

20  full hour-and-a-half -- I mean, I'm happy to accommodate

21  counsel.

22              MS. GAROFALO:  We would like --

23              THE COURT:  I can either start sooner or later.

24              MS. GAROFALO:  We would like the full

25  hour-and-a-half, Your Honor.

1               THE COURT:  All right.  That's fine.  Then we'll

2    reconvene at 1:30.

3               MR. PEEK:  Your Honor, do you have my time per

4    chance?

5               THE COURT:  Well, no, but I'll have it --

6               MR. PEEK:  At 1:30.

7               THE COURT:  -- in the afternoon.

8               MR. PEEK:  Thank you, Your Honor.

9               THE COURT:  Thank you.

10          (Noon recess taken.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            Reno, Nevada, Tuesday, August 19, 2008, 1:30 p.m.

 2                            ---OoO---

 3

 4            THE COURT:  Thank you.  Please be seated.

 5            MR. SNYDER:  Your Honor, we would ask to reopen.

 6  I have just ten more minutes with Mr. Karchmer.  And opposing

 7  counsel indicated they would not object.

 8            THE COURT:  Okay.

 9       Is that correct, Ms. Garofalo?

10            MS. GAROFALO:  That is correct.

11            THE COURT:  Okay.  You may go ahead and take the

12  stand.  And as Mr. Karchmer is doing that, I just have a few

13  notations.

14            One, by my calculation, eTreppid has one hour and

15  48 minutes left for their examination.

16            And the other observation I would like to make is

17  that I noted, and I would like to note on the record, that at

18  the conclusion of Mr. Montgomery's testimony, he left the

19  courtroom.  He has not returned but for some time, a small

20  portion of time during Mr. Karchmer's testimony.  And my

21  concern about that is, I'm unclear why he's absent, and would

22  like to know why he's absent.

23            In addition to that, I'm also concerned that

24  there not be any claim later on in these proceedings that

25  Mr. Montgomery has waived -- I mean that he was not given
```

1   notice of the testimony that was taken, or claims some other

2   loss of due process as a consequence of his voluntary decision

3   not to appear in the proceedings.

4          So, I just wanted to put that on the record.

5          MS. GAROFALO:  Okay.  Your Honor, just for

6   the Court's information, Mr. Montgomery is here.  He has

7   been out in the hallway.  We will have Mr. Montgomery sit

8   in for the remainder.  I don't think it will be a problem

9   with Mr. Montgomery asserting due process rights.  It was his

10  decision not to be seated here in the courtroom.

11         THE COURT:  All right.  Thank you.

12         You may go ahead and commence the few questions you

13  had, sir.

14         MR. SNYDER:  Thank you.

15              **DIRECT EXAMINATION (resumed)**

16  BY MR. SNYDER:

17  Q   Now, Mr. Karchmer, when you took a look at the Len

18  Glogauer CD -- do have an image of that CD on your hard drive

19  there?

20  A   I do.

21  Q   Okay.  Was there anything else on that that indicated

22  that it had been examined with forensic software by

23  Montgomery, or by someone producing the CD?

24  A   Possibly.  And I'll show you in just a second.

25         This would be the forensic image of the CD that

1    was produced.

2    Q    Okay.

3    A    On the CD are four directories, each named, as you can

4    see here, PST, underscore, 1; PST, underscore, 2, 3, 4.  In

5    each one of these folders there is a PST file.  The PST files

6    we discussed.  And there are also these pictures or screen

7    captures for each PST.

8              Now, I provided on a piece of paper four screen

9    captures that look like this one.  This being the properties,

10   a dialogue for an individual PST file.  In addition to those

11   pictures are screen captures that come from Encase forensic

12   software.

13   Q    Okay.

14   A    And they appear to show the examination of a PST file.

15   I'm trying to open it up so it's a little bit bigger.  This

16   will just take a second.  This is a larger -- excuse me -- a

17   larger picture of that screen capture.

18   Q    Is there anything unusual about this screen capture?

19   A    Yes.  One thing that's unusual about it is that it's a

20   little hard to see, but there's a bar at the bottom of the

21   screen capture that is -- well, it's redacted.

22             What one would expect to see down here with Encase

23   forensic software is information about whatever is highlighted

24   or selected in the upper page.  That information, for whatever

25   reason, has been redacted from these screen shots.

1    Q    And what sort of information would that be?

2    A    It could include path information with regard to where

3    the PST is located logically in a folder structure.  It could

4    also contain information about the PST structure itself.

5    Q    Okay.  So the fact that that is -- is that something that

6    comes up automatically in Encase software?

7    A    That's correct.

8    Q    So someone, at some point, made a conscious choice to

9    redact that information from the Glogauer CD that was provided

10   to us?

11   A    That's correct.

12   Q    Okay.  Now one other thing I wanted to cover, just real

13   quickly.  I held up this box earlier.  Can we -- and I want

14   the record to reflect that it's approximately 5 inches on one

15   side, by 18 inches, by maybe 14 or 15 inches.

16              Can we mark this as an exhibit, Your Honor?

17                   THE COURT:  Yes.

18                   MR. SNYDER:  Okay.

19                   THE CLERK:  It will be D-50.

20              (Whereupon, exhibit 50 -- a box, was marked for

21   identification only.)

22                   MR. SNYDER:  I would also move to admit.

23                   THE COURT:  Any objection?

24                   MS. GAROFALO:  None, Your Honor.

25                   THE COURT:  50 is admitted.

1          (Whereupon, exhibit 50 -- a box, was received in

2     evidence.)

3     BY MR. SNYDER:

4      Q   Just one last question, Mr. Karchmer.

5          We talked about this Glogauer CD or the Glogauer

6     e-mail.  You spent a lot of time trying to authenticate it one

7     way or another.  What would you need to fully authenticate and

8     effectively authenticate this CD -- or I'm sorry, this e-mail?

9      A   Sure.  To effectively authenticate an e-mail, if you

10    know that e-mail to reside in a PST file, as I mentioned, you

11    would need the original media, the original hard drive that

12    contained that PST, and you would need the PST file itself.

13         So, in short, you would need the original hard

14    drive, or a forensic image of that hard drive.

15     Q   Okay.

16              MR. SNYDER:  Thank you, Your Honor.  Nothing

17    further.

18              THE COURT:  Ms. Garofalo --

19              MR. SNYDER:  Oh, just --

20              THE COURT:  Oh.

21              MR. SNYDER:  Okay.  Now one other question

22    on that.

23    BY MR. SNYDER:

24     Q   Based on what you heard in Mr. Montgomery's testimony

25    about the number of times that that has been copied, does that

1    have any impact on what you think would be essential to look

2    at to authenticate it as completely as is possible?

3     A   Well, based on what I've heard, I have real concerns

4    about any forensic examiner being able to authenticate e-mail

5    in this matter, given what I've heard about the disposition,

6    the location, transferring, and possession of data.  I've

7    heard nothing, for example, with regard to whether or not due

8    care was exhibited in keeping chain of custody, maintaining

9    metadata, maintaining data data integrity.

10            So, I would have real concerns, even if I were to

11   receive what purports to be an original hard drive, given

12   the date changing and so forth that I've seen, I'd have

13   real concerns about any forensic examiner being able to

14   authenticate an e-mail to a real degree of certainty.

15    Q   Okay.  Thank you.

16            THE COURT:  All right.

17            Ms. Garofalo.

18                      **CROSS-EXAMINATION**

19   BY MS. GAROFALO:

20    Q   Good afternoon, Mr. Karchmer.

21            If the Court does not object, I would like to

22   conduct cross-examination from counsel table?

23            THE COURT:  You may.

24            MS. GAROFALO:  Okay.

25   \\\

1  BY MS. GAROFALO:

2   Q   Good afternoon, Mr. Karchmer.  My name is a

3  Ellyn Garofalo.  As you may know, I represent

4  Dennis Montgomery.  I have a few discrete questions for

5  you on your testimony here this morning.

6   A   Okay.

7   Q   Preliminarily, can you tell me what your job title, so to

8  speak, is.

9   A   My job title is Managing Consultant.

10   Q   Okay.  Do you consider yourself a forensic consultant?

11   A   Correct.

12   Q   Is that the correct technical term?

13   A   Sure.

14   Q   Okay.  And what, exactly, does a forensic consultant do,

15  in somewhat general broad terms.

16   A   Generally, they are involved with the collection,

17  preservation, and analysis of data.

18   Q   Okay.  And you have a very impressive resume, so I am

19  accepting that you are well qualified to do just that.  And,

20  you also do litigation support as part of your job, is that

21  correct?

22   A   Can you be more specific.

23   Q   Well, I think you testified that about 40 to 50 percent

24  of your time is devoted to litigation support.

25   A   Well, at any one time, 50 percent of my time might be

1    devoted to what I would call electronic discovery processing

2    or production.  Sure.

3     Q    So you are thoroughly familiar with the procedures and

4    the protocols for the production of electronic discovery in

5    litigation, is that correct?

6     A    Sure.

7     Q    And you are generally familiar with the procedures

8    utilized by the federal courts, is that correct?

9     A    I'm not sure if federal courts have anything specifically

10   different.  I'm not sure.

11    Q    Okay.  But you are thoroughly familiar with the ways in

12   which electronic discovery should be organized in connection

13   with production in civil litigation, is that correct?

14    A    I would say so.  Yes.

15    Q    Now, do you have any experience, or have you had any

16   experience dealing with national security issues?

17    A    I don't think so.  No.

18    Q    Okay.  So is this the first matter you've worked on which

19   may, to some extent, implicate national security issues?

20    A    Possibly.  Yes.

21    Q    Okay.  Now, Mr. Montgomery is what we've been calling a

22   computer scientist.  Are you familiar with that term as it's

23   been applied to Mr. Montgomery?

24    A    I believe so.

25    Q    And do you have any understanding of what that means to

KATHRYN M. FRENCH, RPR, CCR
(775) 786-5584

1   be a computer scientist of the kind Mr. Montgomery is?

2    A    Generally, a computer scientist is responsible for

3   co-development and programing.

4    Q    Okay.  And that, I take it, would be a somewhat different

5   skill set than a forensic analyst or consultant, is that

6   correct?

7    A    Sure.  Uh-huh.

8    Q    Okay.  And would you expect a computer scientist, like

9   Mr. Montgomery, to have the same knowledge and expertise

10  relating to electronic discovery, for example?

11   A    Not necessarily.  No.

12   Q    Okay.  And would you expect an individual like

13  Mr. Montgomery to maintain files, including electronic

14  files, in the same manner you might expect, a business, such

15  as an IBM, to maintain those files?

16   A    Could you be more specific.

17   Q    Sure.  Mr. Montgomery is an individual, is he not?

18   A    Yes.

19   Q    Okay.  And you testified a little bit -- and we'll get

20  back to this in a little more detail in a few minutes -- but

21  you testified generally about the document, the electronic

22  documents produced by Mr. Montgomery, how they did not conform

23  with what you're used to seeing in a business setting, is that

24  correct?

25   A    That's correct.

1   Q    Okay.  But Mr. Montgomery, unlike a business setting, is

2   an individual, correct?

3   A    Yes.  He is an individual.  Yes.

4   Q    Okay.  And would you accept the same kind of organization

5   of documents and files from an individual, as you would from a

6   business that you were providing litigation services to?

7   A    Well, generally, I have to say that I would expect some

8   general organization in any electronic document production,

9   whether it's from an individual or a business.

10  Q    Okay.  Now with respect to Mr. Montgomery's forensic

11  skills, do you have any reason to believe that Mr. Montgomery

12  is as skilled or knowledgeable as you are, for instance,

13  Mr. Karchmer?

14  A    I have no idea.

15  Q    Have you seen any evidence in the documents that you've

16  reviewed, that were produced by Mr. Montgomery, that he does

17  have your skills in maintaining, copying, and producing

18  documents?

19  A    I have not.

20  Q    Quite the contrary, is that correct?

21  A    That's correct.

22  Q    And that would not be unusual because he's a computer

23  scientist, as opposed to a forensic consultant, is that

24  correct?

25  A    I don't know if I can make that distinction.

1   Q   Okay.  Now, have you read -- you may or may not have

2   heard discussion about the United States Protective Order in

3   this case, have you?

4   A   Have I heard discussion, or have I read it?

5   Q   Yes.  Have you heard discussion about it.

6   A   Yes.

7   Q   Have you read it?

8   A   No.

9   Q   Did you read -- then you did not read the Protective

10  Order prior to reviewing the electronic documents produced by

11  Mr. Montgomery, correct?

12  A   I don't believe so.  No.

13  Q   And you did not consider the provisions of the Protective

14  Order then, in determining how long it should have taken

15  Mr. Montgomery to review the files that were produced in this

16  case, correct?

17  A   Could you repeat that?  I'm sorry.

18  Q   You did not then consider the provisions of the

19  Protective Order in considering how long it would take

20  Mr. Montgomery to produce -- strike that -- to locate and

21  produce files in this matter, is that correct?

22  A   I hadn't considered them specifically with

23  Mr. Montgomery's ability to solely collect and produce

24  data.  No.

25  Q   Okay.  Now are you aware that the Protective Order

1   prohibited Mr. Montgomery from having a forensic analyst such

2   as yourself review the files?

3    A   I, I am aware of that.  Yes.  I have heard that.

4    Q   Okay.  And can we agree that it might take someone like

5   Mr. Montgomery, without your skills and experience, somewhat

6   longer to review files than it might take you, for example?

7    A   It may have been.  Yeah.

8    Q   Are you also aware that the Protective Order required

9   Mr. Montgomery to review, on his own, every file that he

10  was -- that was arguably subject to production in this case?

11   A   I believe I've been made aware of that.  Yes.

12   Q   Okay.  And did you take that into account in your

13  testimony today that Mr. Montgomery could have hashed, or by

14  hashing, eliminated duplicate files?

15   A   I don't think any provision in any Protective Order would

16  have prevented Mr. Montgomery from seeking outside assistance

17  to, perhaps, make his job a little faster.  And that would

18  include hashing.

19          And as I mentioned, had Mr. Montgomery, perhaps,

20  consulted with an outside party, not showing that outside

21  party any documents, mind you, but had he consulted with

22  anyone with regard to how to do this more quickly, or how

23  to do this more efficiently, I think, uh, anyone such as

24  Scott Cooper or anyone else, could have informed him about

25  tools, techniques, best practices he could have used.

1   Q   And as you sit here today, do you know whether

2   Mr. Montgomery conferred with anyone to find out if that

3   was an approach he should have taken in light of the U.S.

4   Protective Order?

5   A   I don't know.

6   Q   So you're just guessing that he -- strike that.

7         You also indicated that there were files that

8   Mr. Montgomery could have essentially breezed through, because

9   they contained such things as pictures, is that correct?

10   A   I'm not sure I follow the question.

11   Q   You indicated, through your testimony, that

12   Mr. Montgomery could have done the review of the documents

13   electronically, and produced much more quickly than he did,

14   correct?

15   A   I don't know if I indicated that specifically.

16   Q   Okay.  You talked about JPG files, for example.  Do you

17   recall that testimony?

18   A   Right.  Yes.

19   Q   And you indicated that JPG files were usually

20   photographs, is that correct?

21   A   Yes.

22   Q   Could there be anything else in a JPG file other than

23   photographs?

24   A   A JPG is a still image format.  It might be a photograph.

25   It might be a still image created electronically by some other

1   means.

2   Q    And do you know what Mr. Montgomery was required to look

3   for under the U.S. Protective Order?

4   A    Specifically, no.

5   Q    And do you understand, as you sit here today, that those

6   JPG files had to be reviewed prior to the production of this

7   material?

8   A    I believe I, I have been informed of that, yes.

9   Q    Okay.  So if we add the JPG files back into the number of

10  files which you identified as having original text, that would

11  increase the number of files that would have had to have been

12  reviewed prior to production, correct?

13  A    Well, a hash analysis, again, would have certainly helped

14  with the level of duplication, but -- I'm sorry.  Does that

15  answer your question?

16  Q    No.  I think we have two issues actually?

17  A    Okay.

18  Q    We have a hashing issue, which is about duplication,

19  correct?

20  A    Yes.

21  Q    And you felt that a lot of the files could have been

22  eliminated from the review by simply taking out the files that

23  were duplicative, correct?

24  A    I think I understand what you're saying.  Yes.

25  Q    Okay.  But you don't know whether Mr. Montgomery had the

1    skill or the expertise to know how to hash and remove

2    duplicate files, is that correct?

3     A    I don't know that.  No.

4     Q    And you also don't know whether Mr. Montgomery was

5    concerned about whether removing files, duplicate files,

6    would have caused the eTreppid parties to complain that the

7    hard drives had somehow been altered or corrupted, is that

8    correct?

9     A    Well, generally speaking, with an electronic discovery

10   production, when you have duplicates, you never remove them,

11   in the sense that, you know, you just get rid of them or

12   something like that.  Instead, you developed a log so that,

13   one, you're reviewing unique documents instead of duplicates;

14   and, two, you have a log available such that if a document

15   is considered to be important, you go back and find all the

16   duplicates of that document so that you can produce them if

17   you have to.

18    Q    Okay.  And it's your complaint here that Mr. Montgomery

19   did not do that, thereby, making your job much harder in this

20   case, is that correct?

21    A    I don't think I've made any such complaint.

22    Q    Okay.  Let's go to -- we've talked about JPG files.

23   Let's talk about TIF files.  Typically, what's contained in a

24   TIF file?

25    A    A TIF file is, again, generally, a still image format.

1   But TIFs can also be used with regards to document scanning

2   and text extraction.

3   Q   So it's possible to find text or text-related information

4   in a TIF file, correct?

5   A   Sometimes.  Yes.

6   Q   And in your opinion, would that have to be -- strike

7   that.

8          Is that material, to the best of your knowledge,

9   that would have to be reviewed in connection with the U.S.

10  Protective Order?

11  A   You're asking if information in TIF files would have to

12  be reviewed per the Protective Order?

13  Q   Correct.

14  A   Possibly.  I'm not sure.

15  Q   Okay.  So you don't know whether or not, as you sit here

16  today, because you haven't read the Protective Order, whether

17  Mr. Montgomery had to review that information, correct?

18  A   I believe he had to review all of the data he thought

19  could be responsive.

20  Q   And you don't know whether or not, in Mr. Montgomery's

21  mind, the data contained in TIF files may have been responsive

22  to the U.S. Protective Order.

23  A   I have no idea what Mr. Montgomery's thought or he

24  thinks.

25  Q   And if you add the number of TIF files back into the mix

 1   of the files that had to be reviewed, along with the JPG

 2   files, do you know how many files we would have been up to at

 3   that point?

 4    A   I do not.

 5    Q   But, considerably more files.  And you've identified at

 6   least 28,000 files as having text information or readable

 7   information, is that correct?

 8    A   It may have increased the number.  Again, but the

 9   information was highly duplicative.  And I think to try to

10   review each and every document, when you have millions of

11   documents, it simply can't be done, which is why duplication

12   is always used in electronic discovery.

13    Q   But, in this case, it was done by Mr. Montgomery.  Are

14   you aware of that?

15    A   I -- are you saying Mr. Montgomery reviewed over, looked

16   at over one million files?

17    Q   Let's assume, for a moment, that Mr. Montgomery did

18   indeed review over one million files.  Can you estimate how

19   long that review might take?

20    A   I have no idea.

21    Q   So you did not do an analysis of the number of files and

22   how long it would take an individual such as Mr. Montgomery,

23   without the assistance of a forensic analyst or consultant, to

24   review that number of files?

25    A   I did no analysis of how long a review might take if you

1   had to look at over one million files, a population of

2   duplicates, no.

3    Q    So, as you sit here today, you can't dispute

4   Mr. Montgomery's testimony as to the amount of time it

5   took him to review these files prior to production, is

6   that correct?

7    A    I'm not sure I can, I can opine on that.

8    Q    Let me ask you basically the same question about HDML

9   files.  What do those usually include, according to your prior

10  testimony?

11   A    They usually include temporary internet files and cached

12  web pages.

13   Q    And can the cached web page file include information

14  other than that that's publically available on the internet?

15   A    Sometimes that's true.

16   Q    And can you, in your opinion, and what you know about

17  the U.S. Protective Order, not having read the U.S.

18  Protective Order, would that information have to be reviewed

19  by Mr. Montgomery prior to its production?

20   A    I assume so.

21   Q    Okay.  And how many files, if you know, would

22  Mr. Montgomery have to had to review, if he included the

23  JPG files, TIF files, HTML files, along with the files that

24  had text or readable information?

25   A    I'm sorry.  Can you repeat.

1    Q   How long would it have taken Mr. Montgomery, in your

2    opinion, to review the files, if we included back in the HTML

3    files, the JPG files, the TIF files?

4    A   I -- as I said before, I have no idea.

5    Q   Would you consider that it would be a lengthy process?

6    A   I, I would consider it to be lengthy and difficult.

7    So, yes.

8    Q   Okay.  It would be a very difficult process, would it

9    not?

10   A   To look at thousands, hundreds of images and documents,

11   simply by opening each one, using those practices, yes.  That

12   would be extremely difficult.

13   Q   Okay.  And as you sit here today, could you tell us

14   whether or not there was a simpler way for Mr. Montgomery to

15   review each and every file that had to be reviewed under the

16   U.S. Protective Order before being produced in this case?

17   A   Well, as I mentioned, deduplication would have assisted.

18   Q   Okay.  Anything else?

19   A   With regard to?

20   Q   To simplify the process that Mr. Montgomery used.

21   A   Just off the top of my head, deduplication would have,

22   obviously, reduced his review time by 90 percent.

23   Q   By 90 percent.  How much duplication was there on the

24   files?

25   A   90 percent.

1   Q   90 percent duplication.  And that's without removing HTML

2   files, J. Peg files, and TIF files?

3   A   That's with removing every duplicate.  He would have only

4   had to review ten percent of the total data he delivered, had

5   he deduplicated data.

6   Q   And if he had deduplicated data, what would that have

7   done to the integrity of the hard drives?

8   A   Nothing.  I think you might -- we might be talking apples

9   and oranges.

10  Q   Explain to me why we would be talking apples and oranges.

11  A   First, I don't -- I'm not sure where these hard drives

12  came from, so the hard drive integrity, as you refer to it, I

13  don't have an opinion on at this time.

14          Now, were deduplication to occur, and a deduplicated

15  set of data to be delivered, along with a log showing all

16  duplicates and their locations on the original media from

17  which they resided, one would have a more, at least somewhat

18  more defensible means of communicating to parties how much

19  data they have, where it is and the volume.

20  Q   Okay.  Now, you're familiar with false negatives and

21  false positives?

22  A   Sure.

23  Q   And a false negative is where you run a search, it

24  comes up -- you run a word search and it comes up negative,

25  correct?

1   A    Correct.

2   Q    Now, if Mr. Montgomery just searched using word searches,

3   it was possible that he would come up with false negatives, is

4   that correct?

5   A    Could you describe word searches?

6   Q    Montgomery runs a search saying, "Plan to blowup the

7   World Trade Center."  Okay?  Searches World Trade Center, for

8   example.  It comes up negative.

9   A    Can you be more specific about what tools were used to

10  run the search, and how the search was run?

11  Q    Just a Windows search, like Mr. Montgomery conducted in

12  this case.

13  A    You're asking whether a Windows' search could yield false

14  negatives?

15  Q    Correct.

16  A    I suppose that's true.

17  Q    Okay.  So in a case like this, where there is a

18  Protective Order and there is sensitive information, it

19  would be -- the possibility of a false negative could cause

20  Mr. Montgomery to overlook information that was protected by

21  the U.S. Protective Order, correct?

22  A    Uh, it may have.

23  Q    Okay.  So --

24  A    Yeah.

25  Q    By the way, can Encase yield false negatives?

1    A    Well, it depends on how the search is run.  It would need

2    to be run by somebody who understands the software.

3    Q    Okay.  So my question is, in this case, just a word

4    search could yield false negatives that would result in the

5    disclosure of State Secret information, is that correct?

6    A    I would say maybe that's possible.

7    Q    Okay.  And a word search would have been a quicker way

8    to review the information produced in this case than going

9    through each e-mail, e-mail by e-mail, or document by

10   document, correct?

11   A    You're comparing a word search to opening a document at a

12   time, is that accurate?

13   Q    Correct.

14   A    Then, generally, yes.  A word search would be faster.

15   Q    But in a case like this, where there is privileged

16   information, highly privileged information involved, a word

17   search would not exactly be the most secure way to conduct

18   the search, is that correct?

19   A    I'm not sure.  Probably not.

20   Q    But as you sit here today, you can't -- other than

21   eliminating the duplicates, you can't tell us about any

22   process or approach that Mr. Montgomery could have taken to

23   make his search of these documents quicker?

24   A    Well, actually, another comes to mind, and that is

25   indexing.  The Windows search tool is not what I would call an

 1   efficient means to search the volume of data that we've been

 2   discussing in this case.  And I believe I read a declaration

 3   from Mr. Montgomery indicating that he had problems with a

 4   Windows search, crashes and so forth.

 5            Were the data to be deduplicated and indexed,

 6   that would have made searching, using another tool, a more

 7   efficient tool used with indexes.  His searches would have

 8   been instantaneous, basically.

 9   Q    And someone with your skills would know how to do the

10   indexing that you've just described, correct?

11   A    That's correct.

12   Q    But, Mr. Montgomery didn't have the possibility of using

13   an expert such as yourself to conduct this review, isn't that

14   correct?

15   A    I don't know if that's correct.

16   Q    Okay.  Well, under the U.S. Protective Order,

17   Mr. Montgomery had to conduct the search on his own.  He

18   could not use forensic experts.

19            Are you aware of that, Mr. Karchmer?

20   A    Oh, I understand he had to do it alone.  Yes.

21   Q    Okay.  Let me just talk to you a minute about the

22   shipping of the 21 hard drives, 13 of which, apparently, were

23   unreadable.

24            You recall your testimony in that regard?

25   A    Yes.

1   Q    And I believe you said that it is, at your company at

2   least, the saying is that they should be treated, packed like

3   fabriche eggs, correct?

4   A    Yes.

5   Q    Would a non -- your company specializes in such things,

6   does it not?

7   A    Well, only a very small practice within my company

8   specializes.

9   Q    Do you think it's common knowledge to layperson, so to

10  speak, that these hard drives have to be packed or treated

11  like fabriche eggs?

12  A    Could you be more specific about lay people.

13  Q    Yes.  If somebody who wasn't a computer specialist,

14  forensic consultant, were to ship hard drives, is it possible

15  they would not know that extra precaution had to be taken in

16  order to keep the hard drives from being damaged?

17  A    I would say that the knowledge that hard drives are

18  sensitive expands beyond the fields of people you just

19  mentioned; being, computer forensic examiners and data

20  discovery specialists.  I think, generally, people know that

21  hard drives are fragile.

22  Q    You base that understanding on what information?

23  A    Uh, well, when you purchase the hard drive, there's --

24  the instructions are to -- there's an instruction to plug it

25  in correctly.  And then the second thing it always says is

1    drop.  Hard drives are susceptible to shock.

2    Q    And that's the basis for your opinion that persons other

3    than professionals might know that, is that correct?

4    A    They might.

5    Q    Okay.  Do you know who packed and shipped these hard

6    drives?

7    A    I have no idea.

8    Q    And do you know if the person -- strike that.

9         Do you know whether Mr. Montgomery did it?

10   A    I have -- as I said, I have no idea.

11   Q    And do you know if the person who did it had any

12   experience whatsoever in shipping the hard drives?

13   A    No.

14   Q    Okay.  Is it possible it was just a mistake?

15   A    Yes.

16   Q    Okay.  So you don't read anything particularly evil

17   into the fact that the hard drives were not packaged like

18   fabriche eggs?

19   A    I wouldn't say evil.  No.

20   Q    If the hard drives were replaced within 24, 48 hours in

21   readable form, I take it, it would not in any way impede your

22   ability to do the analysis required in this case?

23   A    Probably not.

24   Q    I'd like to go back to the testimony that you began with,

25   Mr. Karchmer, which was about the one terabyte drive.

1         Do you recall that?

2    A    Yes.

3    Q    And I believe you questioned the authenticity of the date

4    based on the fact that it preceded the availability of one

5    terabyte hard drives, is that correct?

6    A    That's correct.

7    Q    Is there any circumstance which you can think of, as you

8    sit here today, under which that kind of anomaly might have

9    been created without an intentional effort to manipulate the

10   data?

11   A    Well, you can copy or clone file system metadata from

12   drive to drive.  But, I'm led to believe that a cloning did

13   not occur, at least for a couple of reasons:

14         One, all of the copying on many of these drives was

15   done in a manner -- or excuse me, was done immediately after

16   the format date.  So if a hard drive, if a source drive was

17   cloned to a destination drive, that would mean that your

18   source drive has the same anomaly;

19         Secondly, the terabyte drive, as I've discussed,

20   wasn't available in 2003.  So, a terabyte worth of information

21   couldn't have been cloned to another terabyte drive.

22   Q    It could not have been cloned -- or strike that.

23         An older -- information on an older drive could not

24   have been cloned or overlaid onto a newer one terabyte drive?

25         Is that your testimony?

1    A    The manner in which files were copied to the one terabyte

2    drive indicates that they were copied in rapid succession,

3    consecutively.  That is not consistent with   drive cloning.

4    Q    How is that inconsistent with drive cloning?

5    A    Well, a drive cloning, you would see the original -- you

6    might see the original file system's dates and times.  A

7    transfer from your original drive to your destination drive,

8    depending on how the cloning was done, software, hardware

9    used, et cetera.  In this case, with the terabyte drive, it's

10   a terabyte worth of information that, where all of the files

11   are copied within the span of a couple three hours.  So to

12   clone, as I think you might be suggesting, from a source drive

13   to a destination one terabyte drive, would suggest that you

14   had a source drive of one terabyte to begin with, with dates

15   of 2003, or whatever it was, to begin with.

16   Q    And when you say the information might be transferred, it

17   also might not be transferred, correct?

18   A    You're asking whether file system metadata is always

19   transferred during a cloning?

20   Q    Correct.

21   A    Again, it goes to the manner and methods used in the

22   cloning.

23   Q    Okay.  But as you sit here today, you really don't know

24   whether information was cloned onto that one terabyte drive,

25   do you Mr. Karchmer?

1    A    I don't think it was, no.

2    Q    Okay.  Do you know whether it was, Mr. Karchmer?

3    A    No.  As I said, I don't know that it was.  But, I have

4    reason to believe that it was not.

5    Q    Okay.  In other words then, what you've just described,

6    do you have any other reason to believe that the information

7    on the one terabyte drive was not cloned from an earlier

8    smaller drive?

9    A    As I sit here, not readily.  But, I could look into the

10   files and dates more, if given more time.  But, up to now,

11   that's my opinion.

12   Q    And I may have understood you, but one of your first

13   comments was, "I understand that, in this case, the

14   information was not cloned."  Other than what you've just

15   described, did somebody provide you with information

16   indicating that the one terabyte drive did not contain  cloned

17   information?

18   A    Have I been provided information that the one terabyte

19   drive has not been cloned?

20   Q    Strike that.  I'll make that a lot simpler.

21           Anybody tell you that it was not cloned?

22   A    No.

23   Q    So this is just based on your analysis, the analysis that

24   you just discussed?

25   A    It's based on the data I have available on the one

1   terabyte drive.

2   Q   Okay.  How do you know, by the way, that all the files

3   were copied in rapid succession?

4   A   That goes to the file create date.  Again, all of the

5   files were created or saved to that drive in rapid succession,

6   immediately following the date and time in which the hard

7   drive was formatted.

8   Q   Okay.  And why is that inconsistent with cloning?

9   A   Well, cloning, again, suggests that you're copying the

10  file system itself from one drive to another.  That is, if

11  you have formatted a drive with a 2003 date, and you clone it

12  to this one terabyte drive, that's certainly possible.

13           The fact here is, though, that almost a terabyte of

14  information wound up on that drive.  So -- I'm not sure if

15  that answers your question.

16  Q   And what does rapid succession mean?

17  A   Uh, the file creation dates and times, again, are

18  milliseconds or seconds apart; meaning, generally speaking,

19  a forensic examiner can tell that files were copied to the

20  drive in mass.

21  Q   Okay.  And would it make any -- would it make any

22  difference to your analysis if a tool, such as Partition Magic

23  had been used in cloning the information?

24  A   I'm not sure it would.

25  Q   Okay.  Are you familiar --

1    A    Sure.

2    Q    -- with such tools?

3           And that would not, in any way, affect your

4    analysis?

5    A    My analysis?  Can you be more specific?  I'm not sure

6    what your --

7    Q    That it's unlikely that cloning was done here because of

8    the rapid succession of the information transferred?

9    A    I'm not sure it would.

10   Q    But you're not sure if it wouldn't?

11   A    I'm not sure.

12   Q    And is it your testimony that all of the files were

13   created within seconds of one another?

14   A    No, not --

15   Q    Milliseconds.  I'm sorry.  Milliseconds, I believe is the

16   word you used.

17   A    No.  I don't have the exhibit right in front of me, but

18   the exhibit that was passed out earlier has the dates and

19   times.

20   Q    And that's Exhibit 48?

21   A    I believe it was.  But, again, I don't have a copy in

22   front of me.

23   Q    Okay.  And what would we see on Exhibit 48 that

24   would tell us -- do you have Exhibit 48 before you now,

25   Mr. Karchmer?

1   A    I do.

2   Q    And can you tell me where in Exhibit 48 I would see that

3   information?

4   A    The start and finish and dates and times alluded to the

5   earliest and latest file created dates within each folder.

6   Q    I may be reading these incorrectly, Mr. Karchmer -- and

7   I'm sure that you will correct me -- but it seems that there

8   were -- that we're not talking about milliseconds, but hours,

9   on the start to finish times.

10          Can you take a look at those columns, the fifth and

11  sixth column on the chart.

12  A    Yes, I see those.

13  Q    Okay.  And would that reflect milliseconds to you?

14  A    Well, milliseconds aren't seen on this exhibit, but I --

15  I will represent that the file creation times might be

16  milliseconds, or one second apart from one another for all 1.3

17  million files.

18  Q    Did you make that analysis --

19  A    Or, excuse me, 1 million files on a one terabyte drive.

20  Q    Did you make that analysis?

21  A    Did I make that analysis?  I'm not sure I understand the

22  question.

23  Q    Okay.  Sitting here today, can you know whether or

24  not files were transferred within milliseconds, all of the

25  files?

1    A    No.  It took 14 hours to copy all the files to the one

2    terabyte drive.

3    Q    So you've just divided,  essentially, the number of files

4    by the time it took?

5    A    No.  As I recall, when looking at the hard drive, the

6    file creation dates and times were very close to one another

7    with regard to consecutive list of files.

8    Q    Okay.  Were they different from the times we see

9    reflected here in Exhibit 48?

10    A    No.  These were the create times.

11    Q    So you're not looking at anything different than

12    what we're looking at from the start and finish times on

13    Exhibit 48, is that correct?

14    A    Well, that is correct.  But, if you do want to see

15    milliseconds, I do have an image of the hard drive I

16    can show.

17    Q    And where does it show on the image of the hard drive?

18    A    In the file create date and time.

19    Q    Okay.  And was that information produced to your counsel

20    in connection with your testimony here today?

21    A    I'm not sure I follow you.

22    Q    Did you provide any information reflecting the

23    milliseconds that it took to transfer these files to your

24    counsel, to the eTreppid lawyers, in connection with your

25    appearance here today?

1    A    I'm -- I think you -- I might -- you might be

2  misunderstanding my use of the milliseconds.  What I meant

3  was, and what I thought was clear, and I apologize if  it

4  wasn't, but when a file, generally speaking, is copied to  a

5  hard drive, that file, when it hits the destination drive, is

6  assigned a creation time by the file system on that hard

7  drive.  Okay?  That is going to be a date and time value.

8          If I copy ten files from one hard drive to a

9  separate hard drive, the destination drive is going to

10  contain, or going to record ten file create dates and times

11  for the ten files I'm copying.

12          Now, when files are copied in mass, or transferred

13  in mass, they are assigned closely sequential file creation

14  dates and times.  So, that's what I meant by milliseconds.  I

15  did not mean that it took milliseconds to copy one terabyte of

16  data from one drive to another.

17    Q    Okay.  So the time it took to copy is reflected on

18  Exhibit 48, to the best of your knowledge, is the correct

19  amount of time, from start to finish, is that correct?

20    A    From what I can tell, yes.

21    Q    Okay.  And you say that as though you're not able to

22  tell with any certainty.  Is there any information you're

23  missing that prevented you from being able to testify with

24  certainty that that is in fact the time it took to copy

25  the files?

1    A    Well, without a clearer understanding of how the data

2  came to be in the first place, where it originated -- and none

3  of that is actually clear to me -- no.

4    Q    And you don't know, as you sit here today, where it came

5  from, correct?

6    A    I am informed and believe it came from eTreppid in the

7  form of backups.

8    Q    Going back to Mr. Montgomery's review of the files to

9  glean out information protected under the U.S. Protective

10  Order, do you know how many files were provided to the

11  government for its review?

12    A    No.

13    Q    Okay.  So do you know how much material was actually

14  extracted from the drives that you reviewed?

15    A    No.

16    Q    Okay.  Do you have any information at all concerning the

17  type of information that Mr. Montgomery was searching for

18  under the U.S. Protective Order?

19    A    I'm not sure.  No.

20    Q    Do you think any of that information might have been

21  relevant to your analysis of how long it should have taken

22  Mr. Montgomery to complete his review?

23    A    I think you may have asked that question a different way

24  earlier.  I think you're asking me whether or not items in the

25  Protective Order, or restrictions in the Protective Order

```
 1   affected Mr. Montgomery's, what we're calling review.

 2            Is that --

 3   Q   I'm asking you whether or not you considered, in

 4   formulating your opinion as to how Mr. Montgomery might

 5   have expedited his search, the number of files that had to

 6   be reviewed and extracted from the materials?

 7   A   Well, I mean I certainly considered it with regard to

 8   there were, as you can see, hundreds of thousands of files

 9   produced.

10            Now, anyone, generally speaking, would look for

11   ways to try to expedite that.  So I don't know what the

12   Protective Order said was allowed and was not allowed -- I

13   understand Mr. Montgomery had to go it alone -- but I did

14   consider the fact that he had trouble with the Windows search

15   crashing, different things not working for him.  I have

16   considered that.

17   Q   Okay.  And the fact that the Windows searches caused the

18   systems to crash would have delayed his ability to complete

19   his review of the documents, is that not correct?

20   A   It may have.  Certainly.

21   Q   And do you think that Mr. Montgomery, in some way, caused

22   the crashes deliberately to impede the search?

23   A   Oh, no.  I hope I didn't make you think that that's what

24   my opinion is.

25   Q   Okay.  So Mr. Montgomery had over a million files to
```

1   review, correct?

2    A   That's correct.

3    Q   Had to review them pursuant to the terms of the

4   U.S. Protective Order, which you have not read, is that

5   correct?

6    A   I guess that's correct.

7    Q   Had to -- had to review each document individually, the

8   material that was subject to the United States Protective

9   Order, correct?

10   A   Uh, he may have.  That's correct.

11   Q   Okay.  But you don't know, do you?

12   A   I don't know.

13   Q   And you don't know how much material had to be reviewed

14   and screen out of the materials ultimately produced, do you?

15   A   No.

16   Q   Okay.  So you really don't know how long it could have

17   taken -- or strike that.

18           You really don't know how long it should have

19   taken Mr. Montgomery to complete the search and produce the

20   documents called for in this litigation, do you?

21   A   I'm sorry.  Can you repeat that?

22   Q   You really don't know how long it should have taken

23   Mr. Montgomery to complete the search and produce the

24   documents responsive to the requests in this case.

25   A   I wouldn't say that I know how long it should have taken

1    him.  No.

2     Q    So you don't know whether it took him longer than it

3    should have taken, do you?

4     A    Well, I believe that it most likely did take longer than

5    it should have.

6     Q    Just based on the duplicative files, is that correct?

7     A    Mainly the duplicates and, also, the methods by which

8    files were sought out and reviewed.

9     Q    I'd like to move to what we've been calling the

10   Glogauer e-mail.

11          You're familiar with that term, I take it,

12   Mr. Karchmer?

13    A    Sure.

14    Q    Okay.  Where did you find PST files at eTreppid that you

15   reviewed?

16    A    Uh, there was one PST file on Mr. Trepp's computer in

17   which the hard drive was imaged.  There were, I believe, a

18   couple of other instances of a PST that eTreppid had archived

19   or backed up.

20    Q    Where did you find those archived or backed up files?

21    A    I think they were on a server.

22    Q    Okay.  Who pointed you to that server?

23    A    I don't remember.  I don't remember specifically.  It

24   was -- it could have been, I'm not sure, somebody at eTreppid.

25    Q    Okay.  Just going back for a minute to the PST file that

```
1   you found on Mr. Trepp's computer.

2    A    Correct.

3    Q    Was that a dead file, or was that still a live file?

4    A    Could you be more specific?  I'm not sure I understand --

5    Q    Do you know the difference?

6    A    -- dead or live.

7    Q    Do you know the difference -- do you know what a dead

8   file is, PST file?

9    A    As you're using  the term dead file, no.  That's why I'm

10  asking.

11   Q    Was it still interacted?  Was it still being used?

12   A    Uh, I believe it was, yes.

13   Q    Okay.  And it was on, when you say it was on Mr. Trepp's

14  computer --

15   A    Right.

16   Q    Was it a laptop, was it a computer hooked up to a server?

17  What kind of --

18   A    I think it was a desktop computer.

19   Q    Was it hooked up to the eTreppid server?

20   A    I'm pretty sure it was.

21   Q    You're not sure?

22   A    Well, in order for him to receive e-mail, I believe it

23  was.

24   Q    Okay.  Now, let's go back to the other.  I think you said

25  there were hard drives that you were given with PST files?
```

1  A   Hard drives that I was given that contained the Glogauer

2  e-mail.

3  Q   Where else did you find the Glogauer e-mail, other than

4  Mr. Trepp's computer?

5  A   There was instances of the Glogauer e-mail and archived

6  off-line PSTs.

7  Q   How were they stored?

8  A   I believe they were stored on a server as loose PSTs.

9  Q   Okay.  Did you look at anything on those servers, on this

10 archived documents, other than the Glen Glogauer -- Len

11 Glogauer e-mails?

12 A   Do you mean -- are you asking whether I looked at

13 anything on the server besides the PST file or --

14 Q   Yes.

15 A   -- are you -- I'm sorry.  That was the question?

16 Q   Yes.  That was the question.

17 A   Could you be more specific?

18 Q   Do you know if there was anything else on the server

19 other than the Glogauer PST file?

20 A   Oh, I'm sure there was.

21 Q   Did you look at it?

22 A   Did I review -- are you asking if I reviewed all the

23 contents of the server?

24 Q   I'm asking you if you know what else was on the server?

25 A   Just generally, I know that there were other files and

1   folders.

2   Q   Okay.  Do you know the time period for the Glogauer PST

3   file that you found on those archived servers?

4   A   I, I need you to be a little bit more specific.  I'm not

5   sure I understand what you mean by "time period".

6   Q   Fair enough.

7        You found -- you had the PST file from Mr. Trepp's

8   computer, correct?

9   A   Yes.

10  Q   And you had Glogauer PST files that had been archived,

11  correct?

12  A   I may have misspoke.  I apologize.

13       The instances of PST files that I found that contain

14  what we're calling the Glogauer e-mail, were all on the

15  recipient side or Mr. Trepp's PSTs.  I believe you may have

16  said Glogauer PSTs.  I just want to be clear that all the

17  instances I found preserved and analyzed were instances of

18  Mr. Trepp's mailbox.

19  Q   Okay.  So it was all on Mr. Trepp's computer, right?

20  A   No.  That's not what I said.  Mr. Trepp has a PST on his

21  desktop.  His desktop computer hard drive was forensically

22  imaged.  That's one source.  The other PST sources were

23  archives, off-line PSTs that were on a server.

24  Q   Okay.  And you don't know, as you sit here today, what

25  else was stored on that server, correct?

1    A    As I said, generally, there was some other files stored

2    on the server.

3    Q    Okay.  But the files that you reviewed were Mr. Trepp's

4    PST files, correct?

5    A    Yes.

6    Q    Okay.  So you didn't -- you did not review anything that

7    was the Glogauer PST file, is that correct?

8    A    Oh, no.  That's incorrect.  We did look at the Glogauer's

9    PST file.

10   Q    Okay.  Where did you find Glogauer's PST file?

11   A    On Mr. Glogauer's computer, I believe.  Excuse me.

12   Q    Okay.  So you looked at Mr. Glogauer's computer --

13   A    Yes.

14   Q    -- for his PST file; Mr. Trepp's computer for his PST

15   file; and then at some archived documents that included

16   Mr. Trepp's PST?

17   A    Yes.  I think that's right.

18   Q    Okay.  You're not sure what was on the archived server?

19   A    Um, I'm not sure I follow the question.

20   Q    Okay.  The documents that were archived on the separate

21   server --

22   A    Right.

23   Q    -- what was on that server that you reviewed?

24   A    The PST files I've been talking about.  Off-line

25   PST files.

1    Q    Whose PST files?

2    A    Mr. Trepp's.

3    Q    Just Mr. Trepp's?

4    A    I believe so.  Yes.

5    Q    Okay.  Mr. Glogauer's were not on that server?

6    A    Uh, I don't think so.  No.

7    Q    Okay.  And on that separate server that held the archive

8    backup files, again, do you know if there was anything else on

9    that server?

10   A    I, I'm trying to be clear.  Yes, there, there were files

11   and folders on that server.

12   Q    And do you know anything -- strike that.

13              Can you identify any of the other files or folders

14   on the server that had the archived materials?

15   A    I'm -- I'm trying to follow you.  I need you to maybe

16   restate that.

17   Q    What else was on that separate server, other than

18   Mr. Trepp's PST file that had been archived?

19   A    I apologize if I'm not -- I'm trying to answer your

20   question.  As I said, I saw other files and folders stored

21   on that server.  It was a file server of some kind.

22   Q    Okay.  Do you recall, as you sit here today, the names of

23   any of the other files or folders?

24   A    No.

25   Q    And do you have any idea what general subject matter they

1    may have covered?

2     A    No.

3              MR. SNYDER:  Your Honor, I'm going to object

4    as to relevance.  We're running pretty far afield of what

5    Montgomery's obligations to produce for this Show Cause

6    Hearing are.

7              MS. GAROFALO:  Your Honor, we're trying to

8    determine the basis for Mr. Karchmer's testimony on the

9    Glogauer e-mail; how he analyzed that e-mail; and how he

10   reached the conclusions he's testified to.  It's tied

11   directly to the direct examination of Mr. Karchmer.

12             THE COURT:  All right.  I'll overrule the

13   objection.  But I'll just say my understanding on the

14   archived server, the server that had archives, he just looked

15   at the Warren Trepp PST file.  And probably knew there were,

16   or recognized in his examination of that, of that server, that

17   there were other files on it.

18             So, anyway, that's what I understand.  Perhaps I'm

19   incorrect.

20             MS. GAROFALO:  All right.

21             THE COURT:  But, go ahead, please.

22   BY MS. GAROFALO:

23    Q    How do you know it was Mr. Trepp's PST on the server that

24   held the archived files?

25    A    I believe I was directed to it.  And I believe the file

1    name indicated that it belonged to Mr. Trepp.

2    Q    Okay.  And did you take any steps to authenticate the PST

3    file on the server that held the archived documents?

4    A    Yes.  The PST that was archived, if I understand you

5    correctly, we authenticated e-mails in that PST against

6    e-mails that came from the PST on Mr. Trepp's desktop.

7    Q    Now did you search any place else for Glogauer e-mail?

8    A    No.  And the reason our search was performed in the

9    manner it was, was that the eTreppid e-mail server, at least

10   at the time, was configured to physically pop e-mail from the

11   server to client desktops and laptops; meaning, e-mail was

12   never physically stored on a live exchange server.

13          After that point, users could, of course, perform

14   backups or archive the PSTs if they wanted to.

15   Q    Okay.  Now, did you make any effort to determine the

16   chain of custody on the server that held the archive

17   documents?

18   A    I'm -- I'm not sure I follow you.

19   Q    What period of time did documents, the archive documents

20   on the separate server cover?

21   A    Uh, as I sit here, I'm not sure.

22   Q    Do you have any recollection of the period of time?

23   A    I mean some of the years past two or three, I'm really

24   not sure.

25   Q    Do you know how long the server had been out of use?

1    A    Out of use?  It was in use.

2    Q    Right.  Separate server.  As I understood you, there was

3    a separate server that was no longer being used on which you

4    found Mr. Trepp's PST files.

5              Is that correct?

6    A    I don't know if I ever said it wasn't being used.  I

7    referred to the PST files as having been off-line.  I think

8    that's what you might mean.  And to be more to the point, all

9    I was trying to say was that those PST were archived; meaning,

10   they did not receive e-mail on a regular basis from the live

11   exchange server -- if that's helpful.

12   Q    By the way, did anybody ask you to review the e-mails

13   in any of the PST files to see if they were subject to the

14   U.S. Protective Order?

15             MR. SNYDER:  Objection, Your Honor.  That's --

16   the U.S. Protective Order was not entered at the time this

17   analysis was conducted.

18   BY MS. GAROFALO:

19   Q    When did you conduct this analysis?

20   A    I believe there -- bear with me.  We initially collected

21   data at eTreppid, I think, in February of '07 or -- I can't

22   actually remember.  I'm sorry.  If it was -- I apologize.  I

23   can't remember if it was February '06 or '07 that we first

24   went.  I think it was '07.

25             MR. PEEK:  Your Honor, I'll represent to the

 1   Court that his opinion which was proffered to this court was

 2   in July of 2007.  The U.S. Protective Order wasn't entered

 3   until August or September of 2007.  I think if we go back and

 4   look at the docket, you'll see his opinion and declaration,

 5   which is dated in July 2007.

 6                    MR. SNYDER:  June.

 7                    MR. PEEK:  June of 2007.  Excuse me.

 8                    THE COURT:  Thank you.

 9   BY MS. GAROFALO:

10    Q   Other than the archive documents, Mr. Trepp's PST file

11   that had been archived, Mr. Trepp's PST file on Mr. Trepp's

12   computer at eTreppid, did you find any other copies or

13   information relating to the Glogauer e-mail in any other

14   location?

15    A   No.  We, we examined -- we may have collected more

16   e-mail, other than Mr. Trepp's and Mr. Glogauer's computer,

17   and maybe a couple of the archive PSTs we've been discussing.

18   I don't, as I sit here, I don't have a complete inventory in

19   front of me, but we did not find what we're calling the

20   Glogauer e-mail anywhere, except for on Mr. Trepp's computer,

21   on his PST file, and in the archived PSTs that were saved on

22   the server sharer that belonged to Mr. Trepp.

23    Q   Okay.  And you, as you sit here today, do you recall any

24   other PSTs that you saw in any of those locations that you did

25   not look at, any other PST files?

1    A    No.  I'm -- well, we certainly looked at Mr. Glogauer's

2    as well.  But in case I wasn't clear, the e-mail was not found

3    in Glogauer's e-mail box as well.  We looked at all the e-mail

4    we collected for that message.

5    Q    How was it possible the e-mail wasn't on Mr. Glogauer's

6    PST file?

7    A    It may have been deleted between the time that it was

8    sent, and the time we came on-site to collect data.

9    Q    Did you make any effort to find out who deleted that

10   e-mail?

11   A    I, I don't know how the message would not be there, if it

12   was deleted or removed by some other means.  So, I'm not sure

13   I can answer that specific question.

14   Q    Okay.  I just want to make sure that I understand you.

15            On the Glogauer PST, what we've been terming the

16   Glogauer e-mail is missing?

17   A    That's correct; that the e-mail message was not found in

18   Mr. Glogauer's mailbox.

19   Q    Did you make any effort to determine why that message was

20   no longer in Mr. Glogauer's mailbox?

21   A    Well, I think we just thought it could have been deleted.

22   Q    Did you ask anyone?

23   A    I'm trying to remember.

24            I'm not even sure -- I'm not even sure if I met

25   Mr. Glogauer when I was out there at first.  I think our --

1   I think it was a general understanding that it probably was

2   deleted.

3   Q   How did you obtain the general understanding that it was

4   probably deleted?

5   A   Well, one would either expect to see an e-mail in a

6   sender's mailbox, if they knew that sender had sent an e-mail.

7   If it's not there, the other logical conclusion was that it

8   could have been deleted.

9   Q   Well, aren't you concerned that an important e-mail such

10  as the one we're describing as the Glogauer e-mail was missing

11  from Mr. Glogauer's mailbox?

12  A   I had no idea about, or no opinion of the message's

13  relevance, if any.  So, no, I don't think that would be

14  accurate.

15  Q   The only place that you found the Glogauer e-mail, if I'm

16  correct, is on Mr. Trepp's computer, correct?

17  A   No.  We also found it on -- inside PST files that had

18  been archived.

19  Q   Mr. Trepp's PST files, correct?

20  A   Correct.

21  Q   Can PST files -- strike that.

22          Can documents in PST files be altered?

23  A   Sure.  Absolutely.

24  Q   Not a problem, right?

25  A   No.

1   Q   And what steps did you take to authenticate the document

2   as it was found on Mr. Trepp's computer and in the archived

3   documents?

4   A   Well, the archived documents matched perfectly with the

5   e-mail we found on Mr. Trepp's computer.

6   Q   And that's it?  You took no other steps to determine

7   whether or not it was possible that the e-mail, the Glogauer

8   e-mail, as found on Mr. Trepp's computers, had been doctored

9   or altered, is that correct?

10  A   Well, I'm of the opinion that that's less likely, given

11  that one would need to understand that modifying an Outlook

12  item requires you to understand the manner in which the date

13  and time for an Outlook item is stored.  You have to know what

14  it is.  And you would have to, you know, set your clock -- you

15  would have to make the change, would you have to save it, you

16  would have to hope the change would be reflected with the date

17  and time you wished to put in there.

18          And I don't know that given that these PST files

19  were archived whenever they were to a server, I didn't think

20  that eTreppid would have manipulated that one message and

21  necessarily saved copies of it -- if that answer your

22  question.

23  Q   So it's missing from Mr. Glogauer's mailbox, and you find

24  it only in Mr. Trepp's computer.  And it is possible, in fact,

25  to alter the e-mail, but you don't think it happened because

1   you just don't think so?

2    A    Well, no, that's not what I said.

3                MR. SNYDER:  Your Honor, again, we've spent

4   45 minutes on a declaration that's not relevant to these

5   proceedings directly.

6           The question here is the extent to which

7   Mr. Montgomery has produced the Glogauer e-mail.  It is

8   not -- the question is not the facts underlying Mr. Karchmer's

9   June 2007 declaration.  So, I think that this line of

10  questioning has gone on quite some time, and it is not

11  relevant to what's at issue in these proceedings.

12               MS. GAROFALO:  Your Honor, we've made relevance

13  objections on this line of questioning all throughout these

14  proceedings, and those objections have been overruled.  And

15  there has been significant evidence suggesting, purportedly

16  evidencing, the fact that Mr. Montgomery somehow altered or

17  tampered with these e-mails.

18          It is now directly relevant, and it's been made

19  so by the eTreppid parties.  And we ought to be allowed to

20  continue to examine their own witness who's testified as to

21  potential alterations to this e-mail on the subject raised by

22  the eTreppid parties.

23               THE COURT:  The objection is overruled.

24          Proceed.

25  BY MS. GAROFALO:

1    Q   Okay.  Now, did you match the archive PST of Mr. Trepp's

2    archived PST with the PST that you found on Mr. Trepp's

3    computer?

4    A   Yes.  I believe they were pretty duplicative of one

5    another.

6    Q   Okay.  When you say "pretty duplicative," were there any

7    differences?

8    A   Well, I'm sure his current mailbox had newer messages as

9    compared to the archive that was saved on the server sometime

10   earlier.

11   Q   Okay.  Other than the fact that the server, the

12   information input into that server was cutoff at a particular

13   point in time, were there any other differences between

14   the information PST file found on the server with the archived

15   information, and the one that Mr. Trepp was using, I presume,

16   at the time you obtained a PST file from it?

17   A   I'm not sure.  There could have been a difference, as I

18   said, in message content between the two, and that we noted.

19   But, that was all.

20   Q   Okay.  By message content, you mean messages, later

21   dated messages on the computer Mr. Trepp was using, or are

22   you talking about a difference in text where you have the same

23   e-mail on both?

24   A   No.  No differences of text.  If there were any

25   differences, it would be that there was some overlap between

1    the two PSTs.  And, of course, each PST would have unique

2    messages unto themselves as well.

3    Q    Okay.  And other than the fact that the server was not

4    actively in use, if I may use that term, the one that had the

5    archived information, other than the fact that it had fewer

6    e-mails, it didn't have the more recent e-mails, were there

7    any differences between the e-mails that you found on the

8    server with the archived e-mails, and the e-mails that you

9    found on Mr. Trepp's computer?

10   A    Other than message content, as I've said, no, I don't

11   think so.

12   Q    So did you -- was there an analysis done -- strike that.

13          Was there a perfect match between all e-mails you

14   found on the server, with those e-mails that corresponded on

15   Mr. Trepp's computer?

16   A    I, I don't know how else to say it.  There was probably a

17   difference in message content; e-mails that were in one PST

18   and not the other.  Apart from that, I don't recall any

19   differences.

20   Q    Okay.  But there was, to your recollection, a difference

21   in some of the message, some of the content, correct?

22   A    I believe so, yes.

23   Q    Okay.  And with respect to the Glogauer e-mail, was there

24   any difference between the one you found on the server with

25   the archived material, and the one that you found on

1   Mr. Trepp's computer?

2    A   No.  Every version of the Glogauer message, e-mail

3   message we found, was identical.

4    Q   And how about the metadata?

5    A   That's, uh -- yes.  That would mean that the messages

6   were identical.

7    Q   Okay.  Now, your February, your February declaration

8   filed in this case mentions three hard drives, I believe,

9   found in a cabinet.

10          Do you recall that?

11   A   It may.  I don't have the declaration in front of me.

12   Q   Oh, do you recall having three hard drives that were

13   located in a cabinet?

14   A   I believe so.  Yes.

15   Q   And did you search those hard drives?

16   A   I believe so.  Yes.

17   Q   And who, uh -- were you the one who found the hard drives

18   in the cabinet?

19   A   I believe somebody at eTreppid had found them sometime

20   after our first visit to eTreppid, and then they called

21   counsel, who called us.

22   Q   Okay.  Now did you review those three hard drives?

23   A   I don't know if we reviewed them in detail.  If I recall

24   correctly, we would have looked on those drives for the e-mail

25   message we're discussing.  And I believe we didn't find any.

1   Q   Okay.  Are you certain you didn't find it on any of those

2   three drives?

3   A   Uh, I'm reasonably sure we didn't.  I believe the only

4   sources that we had of the Glogauer e-mail, if I recall

5   correctly, were Mr. Trepp's computer and the archive -- some

6   archived PSTs.

7   Q   And if you know, where are those three drives now?

8   A   I believe we were asked to ship our copies of that data

9   to a vendor being used by the eTreppid parties.

10  Q   And who is that vendor?

11  A   I don't remember their name off the top of my head.

12  Q   Okay.  Actually, you referenced, in paragraph 7 of your

13  declaration, which is --

14           MR. PEEK:  Might we have the declaration?

15           MS. GAROFALO:  -- Document 199.

16           MR. PEEK:  Could we have the declaration if

17  we're going to refer to it?

18           THE WITNESS:  I don't have it in front of me.

19           MS. GAROFALO:  I don't think it's necessary.

20  BY MS. GAROFALO:

21  Q   You reference four hard drives.  Do you recall now that

22  it was three, or it was indeed four hard drives?

23  A   I don't recall.  I would have to take a look.  But if you

24  say that it says three, then I certainly believe you.  It's

25  three.

1    Q    And did you draft your declaration?

2    A    Uh, I may have.  I believe so.

3    Q    Did you read the declaration before it was submitted?

4    A    Yes.

5    Q    And would you not have signed the declaration unless all

6    of the information contained in the declaration was accurate,

7    is that correct?

8    A    That's correct.

9    Q    Okay.  Going to Exhibit 49, which I believe is the last

10   exhibit marked by the eTreppid parties, if I could just ask

11   you to look at the second page of Exhibit 49.

12   A    Uh-huh.

13   Q    And you testified on this exhibit.  I just want to ask

14   you a couple of very quick questions.

15        If you would just look at the first, the first box

16   up in the left, in the left upper side.

17   A    All right.

18   Q    Where it says, "accessed" -- hold on one second.

19        Okay.  It says, "accessed April 5, 2005,"  do you

20   see that?

21   A    Yes.

22   Q    And what does that mean?

23   A    This -- I have no idea.  I don't know what these

24   screen shots represent.

25   Q    Okay.  But, generally, what does it mean if there is a

1   date and time next to the word "accessed"?

2    A    Uh, it means that a file was accessed by a process or

3   user, generally.

4    Q    Okay.  Generally, the last time somebody looked at that

5   file, is that correct?

6    A    Generally, yes.

7    Q    Okay.  If I could ask you to look at the first page.

8   Look at the same box up in the upper left-hand corner.

9            Do you see that, Mr. Karchmer?

10   A    Yes.

11   Q    Okay.  And it says "accessed".

12            Do you see that?

13   A    Yes.

14   Q    And the date on that?

15   A    Yes.

16   Q    What is the date?

17   A    June 23rd of 2008.

18   Q    Okay.  And do you know who accessed this document on

19   June 23rd, 2008?

20   A    Oh, yeah.  I testified about that.  I did it.

21   Q    Okay.  So that's the date that you accessed the document?

22   A    That's correct.

23   Q    And it changes the screen to show the date that it was

24   last accessed?

25   A    Yes.  It may change these property pictures you're

1    referring to.  But as I pointed out in my testimony, I

2    accessed these files from a CD.  And I thought it was clear,

3    and I apologize if I wasn't, but my accessing the file

4    would not change any of the data that was provided to us.

5    Q    That was actually my next question.

6         So nothing else changed, except the date that's

7    reflected for the document having been accessed, correct?

8    A    I think you're asking me if my viewing the PSTs, and

9    then producing the screen shots you see on Exhibit 49, would

10   change anything but the access date on Exhibit 49.  No.

11   Q    Okay.  So the access date isn't necessarily something you

12   would consider in determining the authenticity of an e-mail in

13   a PST file, is that correct?

14   A    Well, it may be.  The purpose, if this is helpful,

15   behind Exhibit 49 was just to contrast the data that we had

16   been shipped, along with the screen shots provided with the

17   data that, I assumed, were supposed to match up to the PST

18   files we were sent.

19   Q    Okay.  But if I understand you correctly, for your

20   analysis of a particular e-mail or a particular document on

21   a PST file, you don't really need to see when that document

22   was last accessed, isn't that correct?

23   A    I would say all the dates are helpful certainly.

24        Again, with regard to authenticating an e-mail

25   message, which is an intimated database file, where a file

```
1   resides on a hard drive, you would want dates from all of

2   those things, the hard drive, the files, the applications.

3   You generally need to not look at the e-mail itself, but

4   everything surrounding it to be able to authenticate it to

5   any degree of certainty.

6    Q   But to do your analysis here, that access date, the fact

7   that that access date reflected June 23rd, 2008, didn't in any

8   way affect your analysis, correct?

9    A   No, of course not.

10   Q   Okay.

11            MS. GAROFALO:  All right.  I think I have no

12  further questions.

13            THE COURT:  All right.

14        Anything on redirect?

15            MR. SNYDER:  Just a few questions, Your Honor.

16                    REDIRECT-EXAMINATION

17  BY MR. SNYDER:

18   Q   Mr. Karchmer, you talked about the duplication of files

19  and Mr. Montgomery's review.  If Mr. Montgomery had, as you

20  had suggested, consulted with an expert in forensics and

21  deduplicated these files -- and I reference you to Exhibit 48.

22   A   Okay.

23   Q   Do you have that in front of you?

24   A   I do.

25   Q   Okay.  How many total image files would he have had to
```

1   review?

2    A    I believe he would have reduced the population to

3   something around forty-five or forty-six thousand unique

4   still images.

5    Q    Okay.  And in terms of the other category of reviewable

6   documents, how many of those would there have been to review?

7    A    As I'm looking at the list, maybe nineteen or -- nineteen

8   thousand?

9    Q    I'd refer you to --

10   A    Oh, I'm sorry.

11   Q    -- to the fourth page of the exhibit.  It's a pie chart

12   with the numbers.

13   A    Yes.  You're asking about reviewable files specifically?

14   Q    Right.

15   A    The unique population was 28,373.

16   Q    So we have 28,373 reviewables, and 44,000 image files?

17   A    Ah, yes.

18   Q    If he had deduplicated, he would have had that number to

19   review?

20   A    That's correct.

21   Q    Approximately 75,000 files rather than 1.3 million files.

22        Is that correct?

23   A    That's correct.

24   Q    And that would have taken substantially less time than

25   reviewing 1.3 million files?

1    A    I believe so.  Yes.

2    Q    Okay.  Now, if he in fact reviewed every photograph on

3    these drives, he would have come across a lot of photos of

4    people's dogs and Parasol images, and those things we talked

5    about, right?

6    A    Sure.

7    Q    But those were produced anyways, is that right?

8    A    That's correct.

9    Q    Okay.  We talked about packing the hard drives.  I

10   believe you had testified that there was some indicia on the

11   hard drives that a forensic image had been made of those

12   eight hard drives by -- or they had been duplicated by a

13   fellow named Schultz, is that correct?

14   A    I believe so.  That indicia was not, if I remember

15   correctly, it wasn't on a hard drive itself.  There was a

16   label on a hard drive indicating that it was a copy.  But the,

17   I guess the originator, or the person responsible for imaging

18   it, that information was actually found on, in data on the

19   hard drive.

20   Q    Okay.  And who was that person again?

21   A    I believe it was Gerald Shultz.

22   Q    Is that someone who you know?

23   A    I don't know him.  No.

24   Q    Did you have any indicia on the hard drive of what entity

25   he is connected with or --

1    A    I know he's connected with a company called Fulcrom.  And

2    I know that because I was -- I believe we had a conversation

3    about providing data to him in this matter.

4    Q    Okay.  And what, what business is Fulcrom in?

5    A    I believe they are a consulting firm with a forensic

6    practice.

7    Q    And would you expect Fulcrom to understand how to pack a

8    hard drive?

9    A    Yes.

10   Q    And would you expect a computer scientist to know how to

11   pack a hard drive?

12   A    Yes, I would.

13   Q    Okay.  So, now, these hard drives, I think, you said

14   indicated that Schultz had done what he did to them in June,

15   had duplicated them in June and July?

16   A    That's correct.

17   Q    All right.

18   A    The images were made in June and July.

19   Q    Mr. Schultz would have known how to deduplicate the

20   images on a hard drive, wouldn't he?

21   A    I would assume.

22   Q    That's his business?

23   A    I would assume.  Yes.

24   Q    So even by the time he got them, presumably,

25   Mr. Montgomery had had -- determined that there were no

1    states secrets, potentially, documents on those, to give to

2    Mr. Schultz.  At that point, Mr. Schultz could have

3    deduplicated prior to production to eTreppid, right?

4     A   That's my understanding.  Yes.

5     Q   Okay.  But, apparently, that wasn't done because there's

6    still 90 percent duplicated images on these files, right?

7     A   Correct.

8              MR. SNYDER:  Okay.  Thank you.

9              THE COURT:  Any recross?

10             MS. GAROFALO:  Very briefly, Your Honor.

11                   **RECROSS-EXAMINATION**

12   BY MS. GAROFALO:

13    Q   If Mr. Schultz had de-duped the hard drives, would it

14   have had, in any way, reduced the amount of time it took

15   Mr. Montgomery to review those hard drives to extract the

16   information subject to the U.S. Protective Order?

17    A   You mean if Mr. Montgomery performed the review he

18   performed, and then gave the data to Mr. Schultz?

19    Q   Correct; for copying.

20    A   Then, no.

21    Q   Okay.  So it would have not made any difference how long

22   it took Mr. Montgomery to review the files, correct?

23    A   Correct.

24    Q   Have you reviewed the document requests in this case?

25    A   I've looked at some of them.

1  Q    Okay.  Are you familiar with the full scope of the

2  document requests?

3   A    I'm not aware of all the details in each document

4  request.

5                MR. SNYDER:  Objection Your Honor.  This is

6  beyond the scope --

7                MS. GAROFALO:  I'm going to --

8                MR. SNYDER:  -- of redirect.

9                MS. GAROFALO:  I'm finished, Your Honor.  Thank

10  you.

11                THE COURT:  All right.

12                MS. GAROFALO:  Thank you, Mr. Karchmer.

13                THE COURT:  Thank you.  You may step down, sir.

14                MR. PEEK:  Your Honor, my next witness would be

15  Mr. Glogauer.

16                THE COURT:  All right.

17                MR. PEEK:  Give Mr. Karchmer a moment to take

18  his laptop, Your Honor.

19                THE COURT:  All right.

20                            **LEONARD GLOGAUER**,
21          called as a witness on behalf of the Defendant,
                  was sworn and testified as follows:
22

23                THE CLERK:  Please be seated.

24          Please state your full name for the record.

25                THE WITNESS:  It's Leonard Glogauer.

```
 1              THE CLERK:   Spelling the last name.

 2              THE WITNESS:  G-l-o-g-a-u-e-r.

 3              THE CLERK:   Thank you.  Please be seated.

 4                      DIRECT EXAMINATION

 5   BY MR. PEEK:

 6   Q    Mr. Glogauer, where do you reside?

 7   A    In Genoa, Nevada.

 8   Q    During the period -- well, have you had a relationship

 9   with eTreppid?

10   A    Yes.

11   Q    And what is that?

12   A    Uh, I was the Vice-President of Business Development and

13   Industry Relations.

14   Q    During what period of time?

15   A    2000, summer of 2002 up until current.  However, today,

16   I'm working as a contractor rather than a full-time employee.

17   Q    Do you know Dennis Montgomery?

18   A    I do.

19   Q    When and where did you first meet Mr. Montgomery?

20   A    When I first hired on to eTreppid.

21   Q    That's, I think you said mid 2002?

22   A    Yes.

23   Q    Okay.  And when you met Mr. Montgomery, how was he

24   introduced to you?  I mean, what -- how was he described

25   to you?
```

1    A   He was a key player in the organization, and the inventor

2    of the technology that was described.

3    Q   Did, from time to time, did Mr. Montgomery backup your

4    computer?

5    A   Yes, he did.

6    Q   And do you know -- do you recall how often that would

7    happen during the period of 2002 until he left in 2005?

8    A   Sometimes it was on a weekly basis.  Sometimes maybe

9    every other week.  Certainly more than twice a month.

10   Q   And at the times that he would backup your computer,

11   would you tell me the procedures that he would use.

12   A   Typically, he would do it when I was out to lunch, so he

13   wouldn't interrupt my work.  Frequently, I would come back

14   from lunch and there would be a DOS screen on my computer that

15   was streaming file names through, as the information on the

16   hard drive was being moved to wherever he was storing it on

17   the server.

18   Q   Could you tell, during the time this process was

19   occurring, whether or not any applications were open?

20   A   None were open at that time.

21   Q   And then were there times when you were present when

22   Mr. Montgomery asked you if he would backup your computer?

23   A   Yes.

24   Q   And would you tell me what happened in those occasions?

25   A   Basically the same process.  I would either stand across

1   the room or go do something else.

2   Q    And what would happen, if anything, to the applications?

3   A    They would all close down.

4   Q    And who would close them down?

5   A    Either I would close them out before, or Dennis would

6   close them.

7   Q    Did you observe him closing out the applications?

8   A    A number of times.

9   Q    And during the time that you would close them out, did he

10  instruct you to close out the applications?

11  A    Certainly.

12  Q    And were you present during any other times when he took

13  backups of other employees at eTreppid?

14  A    Yes.

15  Q    And do you know what process was employed by

16  Mr. Montgomery during those times?

17  A    Basically, the same process.  There were times when I

18  shared an office with Patty Gray.  And he would do the same

19  thing with her computer.  And there were times when I was back

20  in the, back in the back room on the second floor where the

21  programmers were, where the word would go out, everybody get

22  off your computer.  Shut off your operations.  We're going to

23  do a backup.

24  Q    So would you hear Mr. Montgomery give instructions to the

25  employees that they were to close out their computers prior to

331

1    backup?

2    A   Yes.

3    Q   Did you also hear him give instruction to Ms. Gray as

4    well, to close out her computer?

5    A   Yes.

6    Q   And close out the applications?

7    A   Yes.

8    Q   And were you also present when he gave instructions to

9    others, besides -- other employees, besides the programmers

10   you described?

11   A   Not all of them, but the ones -- and I know for sure the

12   ones up in the back room there.

13   Q   Okay.  And the ones up front, that would just be

14   yourself and Ms. Gray which, when you observed him perform

15   backups and --

16   A   Uh-huh.

17   Q   -- telling people to close out applications?

18   A   Yes.

19   Q   Was there any time he did not tell you to?

20   A   Not that I know of.  But there were times that I was

21   gone to lunch and I would come back, and I could see that the

22   Windows applications had been shutdown, or a DOS screen was

23   left there, and I would have to restart my applications.

24   Q   Was there ever a time when you observed that your backup

25   was performed on your computer when there were no -- when

1   there were applications that were open?

2    A   I would have no way to tell at that point.

3    Q   But every time you observed it, whether it was coming

4   back from lunch, applications were closed?

5    A   Yes.

6    Q   And every time he told you he was going to perform a

7   backup, he would?

8    A   Absolutely.

9    Q   And with respect to, I think there is a Glogauer e-mail

10   that's been at issue in this one here?

11    A   I've heard that.

12    Q   You've heard of that.  And you see how it's been reported

13   in the press, as to how it has been represented that you made

14   a statement, "We need to take care of Jim"?

15    A   Yes.

16    Q   Did you ever write that?

17    A   No, I didn't.

18    Q   And are you aware of whether or not that e-mail is or is

19   not on your computer?

20    A   I know for sure it's not on my computer because, when

21   I first was aware of it, it was from a phone call from a

22   Wall Street Journal reporter who read it to me over the phone.

23   And I recalled the first sentence of the e-mail, and was

24   shocked at the second, because I knew I didn't write that.

25    Q   And then --

1    A    And -- I'm sorry to answer your question --

2    Q    Did you then try to find the e-mail?

3    A    I immediately tried to find the e-mail.  And it wasn't on

4    the computer.

5    Q    And did you -- so somebody had deleted it?

6    A    Obviously.

7    Q    Did you delete it?

8    A    No, I didn't.

9    Q    Do you have any idea who did delete it?

10   A    Somebody who had access to my computer.

11   Q    And whom would that be?

12   A    It could be anybody, but --

13   Q    But, uh --

14   A    I have no way of knowing for sure who it was.

15   Q    From time to time, did Mr. Montgomery delete data on your

16   computer?

17   A    I have -- I don't know.

18   Q    Okay.

19              MR. PEEK:  That's all I have.  Thank you.

20              THE COURT:  All right.

21                      **CROSS-EXAMINATION**

22   BY MS. GAROFALO:

23   Q    Good morning, Mr. Glogauer.  I'm Ellyn Garofalo.

24   Mr. Montgomery's lawyer.  I just have very few questions

25   for you.

1          How long have you been employed by eTreppid?

2    A    Uh, since, like I said, since the late summer of 2002.

3    Q    Okay.  And you're still employed by eTreppid, correct?

4    A    As a contractor.

5    Q    Okay.  And did you know Mr. Trepp prior to your

6    employment with eTreppid?

7    A    I did.

8    Q    How long did you know Mr. Trepp prior to 2002 when you

9    became employed by eTreppid?

10   A    I first met him in 1996.

11   Q    Okay.  Did you work for him prior to 2002?

12   A    No, I didn't.

13   Q    Do you work for -- do you provide services to anyone else

14   other than eTreppid or Mr. Trepp at this point in time?

15   A    Yes, I do.

16   Q    Okay.  How much of your income is eTreppid responsible

17   for?

18   A    Currently, 100 percent.

19   Q    Excuse me?

20   A    Currently, 100 percent.

21   Q    One hundred percent?

22   A    The other projects I was working on have been completed.

23   Q    Okay.  Thank you, Mr. Glogauer.

24          You mentioned that Mr. Montgomery would backup your

25   computer files approximately once a week.

335

```
 1          Is that correct?
 2    A   I believe I said frequently.  Sometimes it was once a
 3  week.  Sometimes it was once every two weeks.
 4    Q   Okay.
 5    A   Generally, more than at least twice a month.
 6    Q   And as you sit here today, can you recall the period in
 7  which Mr. Montgomery worked at eTreppid?
 8    A   Yes.
 9    Q   And what -- what was the date range that Mr. Montgomery
10  was employed at eTreppid?
11    A   I'm not sure when he started, but I know that he left
12  in -- prior to January of 2006.
13    Q   Uh --
14    A   I think it was December of '05.
15    Q   Okay.  Would it be fair to say that Montgomery worked for
16  eTreppid for approximately five to six years?
17    A   I have no way of knowing.
18    Q   Does that sound right to you, as you sit here?
19    A   I have no way of knowing.
20    Q   More than one year?
21    A   More than one year, certainly.
22    Q   More than two years?
23    A   Since I was there.  I know he was there the time I was
24  there, between late 2002 and when he departed.
25    Q   Okay.  And can you approximate the number of times during
```

1    his employment that he backed up your computer?

2     A    Well, I could do the math.

3          I would assume if we're talking about a five-year

4    period, and he did it approximately twice a month, then we're

5    looking at -- what would that be, 60 times?

6     Q    Okay.  And did you -- did he have permission to backup

7    your computer?

8     A    Certainly.

9     Q    Do you know who gave him the authority to do that?

10    A    I don't know.  I'm assuming his boss.

11    Q    Okay.  Do you know how you came by your understanding

12    that he had permission to backup your computer files?

13    A    It was a given.  He was a senior person.  He was the, uh,

14    computer scientist, and did a lot of the I.T. work at the

15    place, and as I.T., I.T. was his job to do that, as far as I

16    was -- as far as I understood.  I didn't argue.

17    Q    Okay.  So at no time did you hear anybody at eTreppid

18    say that Mr. Montgomery did not have the authority to backup

19    computers such as yours?

20    A    That's correct.

21    Q    And you assumed, in fact, that he did have such

22    authority?

23    A    I assumed that.  Yes.

24    Q    Okay.  Now, assuming -- assuming, just for purposes of

25    this question, that Mr. Montgomery backed up your files

1   60 times during the duration of his stint at eTreppid --

2   A   That's an estimate.

3   Q   I understand that, Mr. Glogauer.  Do you recall, on each

4   and every occasion, that all applications were closed at the

5   time of the backup?

6   A   I recall that was the procedure that we were to follow.

7   I can't attest to whether it was followed every single time.

8   Q   Okay.

9   A   But it was the established procedure.

10  Q   So, generally, that's the way it was done?

11  A   Yes.

12  Q   But you cannot state the date, the day that it was done

13  in every instance, is that correct?

14  A   I can state that it was done in most instances.

15  Q   Okay.  Now, going to what's become infamously known as

16  the Glogauer e-mail --

17  A   Unfortunately.

18  Q   -- you testified a few moments ago that the second

19  sentence in the e-mail you testified that you did not write

20  that sentence?

21  A   I did not write that sentence.

22  Q   And is it correct that you did write the first sentence?

23  A   Yes, it is.

24  Q   And do you actually remember drafting the e-mail which

25  contained the first sentence?

338

1    A    I do.

2    Q    Okay.  Do you remember deleting that e-mail from your

3    file?

4    A    I distinctly remember not deleting it.

5    Q    Okay.  Do you have -- strike that.

6             Other than Mr. Montgomery, who had access to your

7    computer?

8    A    I think anybody that was in the building that would

9    wander into my office, when I was away from my computer and

10   hadn't shut it down.

11   Q    And your computer was hooked up to the company server,

12   is right?

13   A    Yes, it was.

14   Q    And who had access to that server, do you know?

15   A    Primarily Sloan Venables.  And I'm sure that Dennis

16   Montgomery had access to it.

17   Q    And after Mr. Montgomery's departure, do you know who had

18   access in addition to Mr. Venables?

19   A    To the server?

20   Q    Correct.

21   A    I don't believe anybody, other than Mr. Venables had

22   access to it.

23   Q    Do you have any knowledge of the time at which the

24   Glogauer e-mail was deleted from your file?

25   A    I can tell you when I first noticed that it wasn't there.

1   And that was when I first heard that it had been -- or was

2   going to be published in the Wall Street Journal.

3    Q    Okay.  But you don't know at what time prior to that

4   call from --

5    A    I have no way of knowing.  I, I have lots of e-mails in

6   my file that I keep in a structured file format, and I -- by

7   category, by folder.  But there, there's such a number of them

8   there, I don't check how many, or which ones are there from

9   one time to another.

10   Q    Does your office have -- strike that.

11          At the time the Glogauer e-mail was created, did

12   your office have a lock on the door?

13   A    Yes, it did.

14   Q    And do you generally -- is it your general practice to

15   lock your office --

16   A    No.

17   Q    -- when you leave the office?

18   A    No.

19   Q    Do you leave your office unlocked at night?

20   A    Yes.

21   Q    And always did?

22   A    Yes.

23   Q    And the company server, do you know where it's

24   maintained?

25   A    I do.  Yes.

1    Q    Where is it maintained?

2    A    It's maintained in a room off of Sloan Venables office.

3    Q    And is the room in which the server is maintained locked?

4    A    Yes, it is.

5    Q    Okay.  Who has key to that room, if you know?

6    A    I have no idea.  I assume Sloan does.

7    Q    Now, I believe you testified that your recollection is

8    Mr. Montgomery left sometime in December '06, January --

9    December '05 or January '06, is that correct?

10   A    I believe that's correct.  Yeah.

11   Q    Okay.  And I take it it's your recollection that

12   Mr. Montgomery's parting was not amicable?

13   A    Well, that was the impression that I was under.

14   Q    Shortly after Mr. Montgomery's departure, is it not true

15   that certain employees of eTreppid were given significant

16   bonuses?

17   A    Well, that would be news to me.  I mean, we haven't seen

18   a bonus there for quite a while.

19   Q    Did you receive a distribution, or any kind of payment in

20   or about December of '05, or January of '06, at the time that

21   Mr. Montgomery left eTreppid?

22   A    I don't believe so.

23   Q    Okay.

24              MS. GAROFALO:  All right.  I have no further

25   questions.

1           MR. PEEK:  No redirect, Your Honor.

2           THE COURT:  All right.

3           MR. PEEK:  My next witness is Sloan Venables.

4           MS. GAROFALO:  Your Honor, we object to this

5    witness, to the extent this witness was not identified on the

6    witness list in this matter.

7           MR. PEEK:  Your Honor, the significance of

8    Mr. Venables only came up recently in terms of the e-mail

9    addresses of Mr. Montgomery.

10           THE COURT:  All right.  Well, I think that that

11    issue is relevant to the inquiry, based on Mr. Montgomery's

12    testimony.  And I'll go ahead and allow it.

13                          **SLOAN VENABLES**,
14           called as a witness on behalf of the Defendant,
                 was sworn and testified as follows:
15

16           THE CLERK:  Please be seated.

17           Please state your full name and spell it for the

18    record.

19           THE WITNESS:  Sloan S. Venables,

20    V-e-n-a-b-l-e-s.

21           THE CLERK:  Thank you.  Please be seated.

22

23                      <u>**DIRECT EXAMINATION**</u>

24    BY MR. PEEK:

25     Q   Mr. Venables, you work for eTreppid?

1    A    That's correct.

2    Q    And for how long have you worked for eTreppid?

3    A    Since December of 1999.

4    Q    And what has been your position at eTreppid during the

5    period of time that you've worked there?

6    A    Title-wise, it's shifted over time but, currently,

7    director of it.

8    Q    And had you been asked to look at e-mail addresses that

9    Mr. Montgomery used on his computer at eTreppid?

10   A    Yes, I was.

11   Q    And what have -- and have you found certain e-mail

12   addresses on that computer?

13   A    I found several.  I provided a list to you guys earlier.

14   I think there was probably six -- five or six.

15   Q    Do you need that list in order to refresh your

16   recollection what they are?

17   A    Uh, probably.

18          MR. PEEK:  May I approach, Your Honor?

19          I don't have a copy, counsel.  I apologize.

20   BY MR. PEEK:

21   Q    Is that the list that you typed up and brought with you

22   today?

23   A    Yes, it is.

24   Q    And what are the varying e-mail addresses that you found

25   that Mr. Montgomery was using while at eTreppid, at least?

1    A    At the time he was at eTreppid, uh, they of course used

2    the Dennis@eTreppid.com.  He also used the Ncoder@earthlink.

3    net; Ncoder@hotmail.com; Ncoder@ mindstring.com; and, also,

4    an Smartin666@hotmail.com, which was used as an alias under

5    David Martin.

6    Q    Okay.  And did you also find another e-mail address that

7    was registered, or used by Mr. Montgomery, other than those

8    you just described to us?

9    A    Since -- after leaving eTreppid, I had found that he had

10   been using Dennis@ncoder.net.

11   Q    Did you find anything unusual about the

12   Dennis@ncoder.net?

13   A    I found that it's currently an inactive domain.  But,

14   originally, the domain was registered in Australia, under

15   a company called Moniker.  And that it was registered

16   anonymously, so that the original registrant wasn't made

17   known to the public.

18   Q    Do you know whether that is an active --

19   A    I had checked it today and it's currently inactive.

20   There are no mail records, no mail servers, or DNS domain name

21   servers responding to that domain.

22   Q    And did you find that unusual that it was an Australian

23   company?

24                MS. GAROFALO:  Objection.  Lacks foundation.

25                MR. PEEK:  I can go into, you know, his I.T.

1   background, Your Honor, if I need to.

2             THE COURT:  Well, I think it's not necessary.

3   The objection is overruled.

4        Go ahead.

5             THE WITNESS:  Well, domains are generally

6   registered in a handful of different places since they've

7   been allowed to be registered outside the initial I-can who

8   controls all domain handlers.  The registering them in

9   Australia is usually done by somebody in Australia, not by

10  somebody that's in the United States.

11  BY MR. PEEK:

12   Q   Would that be a way to hide it?

13   A   Possibly.

14             MR. PEEK:  That's all I have.  Thank you.

15             THE COURT:  Thank you.

16        Anything on cross-examination?

17             MS. GAROFALO:  Yes, Your Honor.  Again, very

18  briefly.

19                    **CROSS-EXAMINATION**

20  BY MS. GAROFALO:

21   Q   Mr. Venables, where did you search to come up with the

22  list of e-mail addresses purportedly used by Mr. Montgomery?

23   A   I found them within the PST files that were left behind

24  by Mr. Montgomery.

25   Q   Okay.  Do you have Mr. Montgomery's PST file from the

1    time he was at eTreppid?

2     A    Do you want me to describe where I found the PSTs, or do

3    I currently have them?

4     Q    Where did you find the PSTs?

5     A    On one of Dennis' machines that had been deleted.  We

6    used recovery software and recovered six PSTs that had been

7    deleted.

8     Q    Okay.  And when you talk about a machine, was it a

9    desktop or laptop?

10    A    It was desktop station than was in the warehouse that

11   Dennis used.

12    Q    And when did you discover that desktop?

13    A    It had been there for at least two years in use by

14   Dennis.

15    Q    When -- I'm sorry, Mr. Venables.  Maybe I wasn't clear.

16          When did you discover the existence of that desktop?

17    A    I had seen him use that desktop for at least two years

18   prior to him leaving.

19    Q    So you always knew where that desktop was, is that

20   correct?

21    A    That's right.

22    Q    So the desktop was never lost, misplaced, out of sight,

23   is that correct?

24    A    Only time it was out of sight was when the -- I believe

25   it was the Office of Special Investigations came and took it,

1   after I had recovered these PSTs.  And then they've since

2   returned it to us this -- I would say earlier this year.

3   Q    The PSTs had been copied onto hard drives outside of the

4   desktop?

5   A    They were imaged by the LACG people.  So, they have a

6   copy.

7   Q    Anybody else have a copy?

8   A    I believe our lawyers have copies.  There's probably

9   several copies.

10  Q    Okay.  And do you -- strike that.

11        I think you mentioned that the, that deleted files

12  had been reconstructed, is that correct?

13  A    They were recovered using a software called Emergency

14  Undelete, which recovers files that have been deleted on the

15  hard drive.

16  Q    And when was that process undertaken, if you know?

17  A    That was done, uh, about a week, or no more than two

18  weeks after Dennis left, in the early 2006.

19             MS. GAROFALO:  Thank you.  I have no further

20  questions.

21             THE COURT:  Thank you.

22        Anything further, Mr. Peek?

23             MR. PEEK:  Just some follow-up.  And I

24  apologize, Your Honor.  This really goes to Mr. Glogauer.

25             **REDIRECT EXAMINATION**

1   BY MR. PEEK:

2   Q   Who had access to the servers in the building at eTreppid

3   besides yourself?

4   A   During what time?

5   Q   During the period of 1999 through 2000, 2005?

6   A   Uh, just Dennis and I.

7   Q   Okay.  And were the computers that were used by the

8   individuals, password protected?

9   A   You mean all the computers?

10   Q   Yes.

11   A   For all the users in the company?

12   Q   Yes.

13   A   They all had passwords on them.

14   Q   And who had those passwords besides the user?

15   A   Dennis.

16          MR. PEEK:  Thank you.  That's all I have.

17          THE COURT:  Anything else?

18          MS. GAROFALO:  I have no further questions,

19   Your Honor.

20          THE COURT:  Thank you.

21          MR. PEEK:  Your Honor, I'd next call

22   Warren Trepp.

23          THE COURT:  All right.  Let's go ahead, it's

24   3:25.  Let's go ahead and take about a ten-minute break.

25   We'll return at 3:35.

1                    (Recess taken.)

2              THE CLERK:  Court is again in session.

3              THE COURT:  Thank you.  Please be seated.

4         All right.  Mr. Peek, you may proceed.

5              MR. PEEK:  Thank you, Your Honor.  My next

6    witness is Mr. Trepp.

7                        **WARREN TREPP**,
8         called as a witness on behalf of the Defendant,
              was sworn and testified as follows:
9

10             THE CLERK:  Please be seated.

11        Please state your name for the record.

12             THE WITNESS:  Warren Trepp.

13             THE CLERK:  Thank you.  Please be seated.

14                   <u>**DIRECT EXAMINATION**</u>

15   BY MR. PEEK:

16   Q   Mr. Trepp, do you know Dennis Montgomery?

17   A   I do.

18   Q   And how long have you known Dennis Montgomery?

19   A   Since, uh, I believe 1997 or 1998.

20   Q   Did there come a time when you and Mr. Montgomery worked

21   together in a company called eTreppid?

22   A   Yes.

23   Q   And for what period of time was that?

24   A   Starting the end of '98 through two thousand -- January

25   of 2006.

1    Q    And during that period of time, he had the title of Chief

2    Technology Officer, did he not?

3    A    That's correct.

4    Q    Did you ever ask Mr. Montgomery to perform any backups

5    of the individual computers used by other employees at

6    eTreppid?

7    A    No.

8    Q    Did you ever ask him to backup your wife's computer?

9    A    Abso --

10   Q    At your residence?

11   A    Absolutely not.

12   Q    Did you ever ask him to backup non-employees of eTreppid

13   such as Mr. Hughes?

14   A    Absolutely not.

15   Q    Did you ever give Mr. Montgomery hard drives to perform a

16   backup?

17   A    Absolutely not.

18   Q    Did you ever know that Mr. Montgomery was performing

19   backups of the individual computer stations at eTreppid?

20   A    No.

21   Q    When did you first learn that?

22   A    During this hearing.

23   Q    That would have been starting on or about June 10th?

24   A    I believe that's correct.

25   Q    Did you have a secure storage where you would keep

1    backups, or some -- you know, that type of important data?

2    A    I have a number of safe deposit boxes where I would keep

3    important documents for my wife and myself.

4    Q    And did you also use that for anything related to

5    eTreppid?

6    A    I did.  I asked Mr. Montgomery, over the years, to give

7    me copies of what he purported to be our proprietary Source

8    Code, which I kept in those safe deposit boxes.

9    Q    And he would give that to you from time to time?

10   A    That is correct.

11   Q    And did you maintain those -- were they hard drives?

12   A    Uh, they were first CDs, then DVDs, then hard drives.

13   Q    And have you had a chance to look at any of that

14   material?

15   A    Yes.  I had an analysis done on it all.

16   Q    And did you find that there were any backups of

17   individual computers of the other employees?

18   A    Zero.

19   Q    Zero?

20   A    Zero.

21   Q    Uh-huh.

22          Now, with respect to Len Glogauer's e-mail.  You

23   remember receiving it?

24   A    Yes.

25   Q    And we heard from Mr. Karchmer about how it was analyzed

1    on your computer.

2    A    That is correct.

3    Q    And analyzed on another storage of, I believe a server?

4    A    An archived version.  Yes, I did.

5    Q    An archive.  Did you ever alter that e-mail?

6    A    Absolutely not.

7    Q    Did you ever delete that e-mail off of Mr. Glogauer's

8    computer?

9    A    Absolutely not.

10   Q    Did you ever instruct anybody to delete the e-mail

11   purporting to contain the language, "We need to take care of

12   Jim," off of Mr. Glogauer's?

13   A    Absolutely not.

14               MR. PEEK:  That's all I have.

15               THE COURT:  Thank you.

16         Anything on cross?

17               MS. GAROFALO:  Good morning, Mr. Trepp -- good

18   afternoon, Mr. Trepp.  It's been a long-day.

19               THE WITNESS:  Good afternoon.

20                    **CROSS-EXAMINATION**

21   BY MS. GAROFALO:

22   Q    Mr. Montgomery ever backup your computer?

23   A    Not that I can recall.

24   Q    You don't recall Mr. Montgomery backing up your computer?

25   A    No.

1    Q    Okay.  How, during Mr. Montgomery's tenure at eTreppid,

2    about how much of your time during the work week did you spend

3    in the office?

4    A    The bulk of it.

5    Q    How big are the offices?

6    A    I'm not sure I understand the question.

7    Q    Five floors?  Two floors?  One floor?  Three offices?

8    A    Oh, there were two floors, with approximately 10 or 12

9    offices.

10   Q    Okay.  Was Mr. Montgomery's office on your floor?

11   A    For some period of time, Mr. Montgomery had an office

12   next to mine.  For a substantial amount of time, he did a lot

13   of work out of the warehouse, which was not in the office

14   area.

15   Q    Okay.  And Mr. Glogauer, was his office on the same floor

16   as yours?

17   A    Yes.

18   Q    And Ms. Perez?

19   A    Uh, Ms. Perez's office was on the first floor.

20   Q    Okay.  And during the six or so years that Mr. Montgomery

21   was at eTreppid, you did not know that he was backing up

22   the computers on a regular basis of you and other eTreppid

23   employees?

24   A    No, I did not.

25   Q    And you didn't know that until you came to these hearings

1    this week, is that your testimony?

2    A   Yes.

3    Q   Okay.  And --

4    A   Well, excuse me.  There was testimony about the backups,

5    either June 10th or -- but it was during this hearing when I

6    first heard about him saying he was doing these backups.

7    Q   And no other employee at eTreppid was -- Mr. Glogauer, or

8    nobody ever informed you that Mr. Montgomery was backing up

9    their computers?

10   A   Not that I remember.

11   Q   Okay.  And I believe your -- you just testified that

12   Mr. Montgomery backed up your wife's computer without

13   authority, is that correct?

14   A   No.  I believe the question was did I give authority to

15   Mr. Montgomery to backup my wife's computer.  And the answer

16   to that question was no.

17   Q   Okay.  Do you know whether Mr. Montgomery backed up your

18   wife's computer?

19   A   I don't, but I heard him testify that he did.

20   Q   Okay.  And your wife maintained her computer at home, at

21   your home?

22   A   That's correct.

23   Q   Did Mr. Montgomery have access to your home?

24   A   Whenever I would allow him in there.

25   Q   Okay.  Did Mr. Montgomery have access to your home when

1   you were not present?

2   A    No.

3   Q    Did he have a key to your house?

4   A    No.

5   Q    Do you have any explanation as to how he could have

6   backed up Mrs. Montgomery's (sic.) computer without your

7   knowing about it?

8   A    You mean my wife's?

9   Q    Your wife's.  Excuse me.  Mrs. Trepp.

10  A    Thank you.  He could have easily done it on one of the

11  occasions where I asked him to come to my house to either fix

12  a problem with her printer, or a problem we were having with

13  her machine.  It could have been any number of reasons.

14  Q    Okay.  So you did, on occasion, invite him to the house

15  to address computer issues --

16  A    Correct.

17  Q    -- that you or your wife were having, correct?

18  A    Correct.

19  Q    Okay.  You just mentioned safe deposit boxes, correct,

20  where you kept important information?

21  A    That's correct.

22  Q    Okay.  And you mentioned, I believe, that certain Source

23  Code information was maintained in those safety deposit boxes,

24  is that correct?

25  A    Purported Source Code.

1    Q    Okay.  And you're still in possession of that Source Code

2    that you believe to be purported Source Code?

3    A    It's not in my safety deposit boxes anymore, but I have

4    access to it.

5    Q    Do you know whether or not that information has been

6    produced in this litigation?

7    A    I don't know.

8    Q    Okay.  Did you give that material to your lawyers?

9    A    Uh, I believe I did.  I believe I did.

10   Q    Are you certain that you did?

11   A    No.

12   Q    Okay.  Where else could that information be?

13   A    In eTreppid's offices.

14   Q    Okay.  And how, how is that information stored -- strike

15   that.

16             On what kind of media is that information stored?

17   A    I've already testified it started on CDs, went to DVDs,

18   was then put onto hard drives.

19   Q    Okay.  Who actually transferred the information from the

20   DVDs to hard drive?

21   A    I never said it was transferred from DVD to a hard drive.

22   Q    Okay.  How did it get from a DVD to a hard drive?

23   A    I think you asked the same question twice, and I've

24   answered it twice.

25   Q    I'm sorry.  I did misunderstand your question.  Let me

1   then ask you a different series of questions.

2           Do you still have the DVDs?

3    A   I believe I have all of the purported Source Code that

4   Montgomery gave me to store in my safe deposit boxes.   I

5   believe they're currently in eTreppid's offices.

6    Q   Okay.  So that would be CDs, correct?

7    A   Originally CDs.

8    Q   Do you know how many CDs?

9    A   I don't know exactly.

10   Q   Okay.  And DVDs?

11   A   I don't know -- the number is what you're asking for?

12   Q   You have DVDs, right?

13   A   Yes.

14   Q   Do you know how many?

15   A   No.

16   Q   Okay.  And the same with respect to hard drives.  How

17  many?

18   A   I don't know the exact number.

19   Q   Okay.  Do you know approximately how many CDs?

20   A   Uh, three or four.

21   Q   And how many DVDs?

22   A   Approximately three or four.

23   Q   Okay.  Same question for hard drives.

24   A   Three to five.

25   Q   Okay.  Has anybody else, other than you, had access to

1    the hard drives?

2    A    Yes.

3    Q    Who were they?

4    A    Excuse me.  The hard drives or all of the media?

5    Q    Right now I'm asking about the hard drives?

6    A    Has anybody else had access; what do you mean by access?

7    Q    Has anybody else had the ability to view the material on

8    the hard drives?

9    A    Yes.

10   Q    Who?

11   A    Sloan Venables.

12   Q    Anybody else?

13   A    You would have to ask Sloan who else helped him do the

14   review of the data.

15   Q    I'm just asking you if you know.

16   A    I don't know.

17   Q    Okay.  Same question for DVDs; do you know who had access

18   other than you?

19   A    Same answer.

20   Q    And I assume the same answer for the CDs?

21   A    Correct.

22   Q    Any of the CDs, the CD we've been talking about as

23   CD-1?

24   A    I have never received CD-1.

25   Q    Okay.  Thank you.

1    A    I do not believe CD-1 ever existed.

2    Q    Thank you.

3              MS. GAROFALO:  I have no further questions.

4              THE COURT:  Okay.

5          Any further redirect, sir?

6                    **REDIRECT EXAMINATION**

7    BY MR. PEEK:

8    Q    Was any so-called Source Code found on any of the CDs,

9    DVDs, or hard drives?

10   A    There was a portion of Source Code that was worthless,

11   that was found on one of the medium.  Everything else was

12   total garbage.

13   Q    What do you mean total garbage?

14   A    Had no relationship to Source Code of anything.

15   Q    Nothing related to data compression?

16   A    Zero.

17   Q    Nothing related to anomaly detection?

18   A    Zero.

19   Q    Nothing related to object tracking.

20   A    Zero.

21   Q    Nothing related to pattern recognition?

22   A    Absolutely not.

23              MR. PEEK:  Thank you.  That's all I have.

24              THE COURT:  Anything on recross?

25              MS. GAROFALO:  No, Your Honor.

1          THE COURT:  Thank you.

2          Thank you, sir.  You may step down.

3          THE WITNESS:  Thank you, Your Honor.

4          MR. PEEK:  Your Honor, that concludes the

5   testimonial side of my presentation.  I do have a number of

6   exhibits, most of which are either court pleadings or document

7   productions or a declaration regarding document productions

8   that I would offer.  I can do that now, or -- because I know

9   that counsel wants to look at some of those, I can do it

10  later.  But, I don't want to close my presentation until I

11  have the opportunity to make the offer of admission of the

12  various exhibits.

13          THE COURT:  Any -- Ms. Garofalo?  How would you

14  like to proceed?

15          MS. GAROFALO:  I think, Your Honor, that perhaps

16  the most expedient way to proceed -- at this point in time,

17  we only anticipate calling one witness.  I don't expect the

18  testimony to be terribly long.  Perhaps we can finish, and

19  then we can address the issues relating to the exhibits.

20          THE COURT:  All right.  And Mr. Peek has made

21  his record, so I think that's fine.

22          All right.

23          MS. GAROFALO:  We would like to call to the

24  stand Scott Cooper.

25  \\\

1

2                          **SCOTT COOPER**,
          called as a witness on behalf of the Plaintiff,
3                was sworn and testified as follows:

4

5              THE CLERK:  Please be seated.

6          Please state your full name for the record.

7              THE WITNESS:  Scott Cooper.

8              THE CLERK:  Please be seated.

9                      <u>**DIRECT EXAMINATION**</u>

10   MS. GAROFALO:

11    Q   Good afternoon, Mr. Cooper.

12          Mr. Cooper, can you tell us your occupation?

13    A   I am an expert in computer forensics and computer

14   systems.

15    Q   Okay.  And when did you start working with computers,

16   Mr. -- when did you start working with computers?

17    A   1972.  So, that would be 36 years ago.

18    Q   Okay.  And did you have any undergraduate education

19   relating to computers?

20    A   Yes.  And graduate.

21    Q   Okay.  Let's start with the undergraduate.  Where did you

22   attend undergraduate school?

23    A   I started at the University of San Francisco, and I was

24   taking business classes.  I then went to the University of

25   California, Berkeley, for engineering, physics and calculus

```
 1    type stuff.  I then went to the University of Colorado, where
 2    I finished my undergraduate degree in the College of Business.
 3    The major was computer-based information systems, which is
 4    basically computers from a business perspective.
 5              I then went on and did graduate work at University
 6    of Colorado, College of Engineering, Department of Computer
 7    Science.  So then it's computers from the engineering
 8    perspective.
 9    Q    Okay.  Since leaving graduate school, have you had any
10    further training in computer science or forensics?
11    A    Regularly.  I attend conferences and seminars.  I also
12    give seminars and conferences, both paid conferences, uh
13    membership organizations, monthly meetings, quarterly
14    meetings, annual meetings, in country, out of country.
15    Q    And do you have any certifications relating to your work
16    in computers?
17    A    I have a -- I am a Certified Management Consultant from
18    the Institute of Management Consultants.  So although it's
19    not specifically a forensic certification, it's a consulting
20    certification.
21    Q    Any other professional organizations to which you belong?
22    A    Many.
23    Q    Can you name a few?
24    A    There is a well-known national organization called the
25    High Tech Crime Investigation Association.  It is -- excuse
```

1    me, it's an international organization that is about -- that

2    is, uh, about half law enforcement, half private sector,

3    for the purpose of learning and sharing information about

4    examining and understanding high tech data and high tech

5    crimes.

6           I was the most recent past president of the

7    Los Angeles Chapter of the HDCIA.  And I think the Los Angeles

8    Chapter was one of the largest in the world.  I am also a

9    member of the American Society For Industrial Security, ASIS;

10   the Forensic Expert Witness Association, FEWA.  There is an

11   organization called, it's a Secret Service based organization,

12   dealing with high tech crime.  There's an FBI organization

13   that requires FBI credentials, that deals with the FBI and

14   private sector people, certain people being able to share

15   information about Homeland Security in the high tech crime

16   focus.

17          Those are many.  But, I don't think it's all.

18   Q   And where are you currently employed Mr. Cooper?

19   A   I am employed at FTI Consulting.

20   Q   And what are your responsibilities at FTI Consulting?

21   A   First, let me put into perspective of what FTI does.  And

22   then I'll identify my responsibilities.

23          FTI is a large company, traded on the New York Stock

24   Exchange.  We have offices in, I think, 25 countries around

25   the world.  Approximately 5000 employees.  The company is an

1   event-driven consulting firm.  We react to events.  We help

2   companies deal with events, whether it's financial analysis,

3   economic damage.  And in virtually all of those situations,

4   there is some component of electronic data that is often

5   relevant to a matter.

6           We have an electronic evidence consulting practice,

7   that is a global practice.  I am the Senior Managing Director

8   of the Electronic Evidence Consulting, EEC practice.  And I am

9   the senior-most person, across the globe, for that practice.

10  Q   And how long have you been in that role at FTI?

11  A   I joined FTI last year.  I had been running a company

12  prior to that for 24 years.  That was an I.T. consulting firm

13  that had two specialization areas.  One was what we called

14  our automation practice, which dealt with the computers,

15  computer systems, networks, applications, and helping

16  companies implement those.

17          The second practice area was what we called our

18  forensics practice, which was the focus on electronic

19  discovery and computer forensics.  And after 24 years there,

20  we were basically brought into the -- our company, the

21  forensics practice was brought into the FTI corporate

22  structure.

23  Q   Prior to Insync (phonetic), where were you employed?

24  A   Prior to InSync, uh, the most immediate position before

25  that was the Director of Information Systems at I.T. service

1    bureau.  Prior to that, I was at KPMG, Pete Morrick

2    (phonetic), in their Consulting Department, in the information

3    systems services group dealing with I.T. and computer systems

4    for large companies.

5     Q   And have you ever provided services to a court in

6    connection with litigation?

7     A   Many times.

8     Q   What kind of services have you provided at the request of

9    the court?

10    A   I have been a Special Master.  I've been a court

11    appointed referee, also granted with quasi-judicial immunity

12    on occasion, helping courts, judges, federal and state, and

13    other Special Masters understand technology as it's being

14    utilized for cases, and electronic discovery matters, systems,

15    et cetera.

16    Q   I would like to mark two exhibits at this time.  But,

17    first -- I believe we're up to Exhibit 50, is the Minutes of

18    Proceeding in this case, dated May 21st, 2008.  It's docket

19    number 628; and

20            Number 51 is the U.S. Protective Order, which is

21    docket number 253.

22            May I approach Your Honor?

23                THE COURT:  You may.

24                MR. PEEK:  I think this is 51 and 52.

25                MS. GAROFALO:  51 and 52.

1          THE CLERK:  We're at defendant 50.  So if these

2   are your first exhibits, it will be plaintiff's 1 and 2.

3          MS. GAROFALO:  Correction.  They'll be marked as

4   plaintiff's 1 and 2.

5          (Whereupon, exhibits 1 and 2 -- documents, were

6   marked for identification only.)

7   BY MS. GAROFALO:

8   Q   Mr. Cooper, I would like to have you look at the document

9   we've marked as plaintiff's exhibit 1, which is captioned,

10  Minutes of Proceedings.

11          Do you see that --

12  A   I do.

13  Q   -- document?

14          Have you seen this document before today?

15  A   (Witness reviews document.)

16          I have.

17  Q   Okay.  And have you had the chance to review this

18  document prior to your testimony here today?

19  A   I have.

20  Q   Okay.  And I would like to draw your attention to page 2

21  of 3, bottom of the document, paragraph 4.

22          Do you see that?

23  A   I do.

24  Q   Okay.  And have you seen that paragraph before today?

25  A   I have.

1    Q    And what does that paragraph say to you?

2                    MR. PEEK:  Your Honor, is the question just --

3    is he going to read it, or is he going to interpret it?

4                    THE WITNESS:  I understood it to be the

5    interpretation of the paragraph.

6                    MS. GAROFALO:  That's correct.

7                    MR. PEEK:  Then I object, Your Honor.  His

8    interpretation is improper here.  I mean the Court's words

9    are the Court's words, and the Court's order is the Court's

10   order.  Somebody else's interpretation is meaningless here.

11                   MS. GAROFALO:  Your Honor, he's providing expert

12   testimony.  He's going to provide expert testimony on the

13   subject of PST versus native files.  And I'm simply asking

14   whether he understands that that's what the Court ordered him

15   to -- that that's what the Court ordered to be produced in

16   this case.

17                   MR. PEEK:  Your Honor, this is another way, by

18   the plaintiffs, to rewrite the Court's orders.  And this is

19   just their effort to rewrite a court order.

20        What this gentleman's interpretation of this is, is

21   meaningless.  It's what, at least Ms. Klar, who heard this,

22   and what Mr. Montgomery, who heard this, what they understood

23   that they were required to do, and what the discovery required

24   them to do.

25                   THE COURT:  All right.  Well, I'm going to --

1    as I understand the question, first of all, it shouldn't be

2    Glen Glogauer.  It should be Len, which was the Court's error

3    in item four of docket 628, which has been marked as

4    plaintiff's exhibit 1.

5            So, I mean, if you're just asking, Ms. Garofalo,

6    if he's read this order, has he read item four on page 2,

7    go ahead and ask him that.  And he can tell us what he was

8    directed to do as a consequence of reading, or having reviewed

9    that, as someone, I presume, retained by the Montgomery

10   parties to respond to that discovery request.

11           I take it that's where you're going.

12   BY MS. GAROFALO:

13    Q   Have you read, Mr. Cooper, paragraph 4 of Plaintiff's

14   Exhibit 1?

15    A   I have.

16    Q   Okay.  And do you believe you understood paragraph 4 of

17   plaintiff's number 1?

18    A   I do.

19    Q   Okay.  I would like you to look, for a moment, to

20   plaintiff's number 2, which is the United States Protective

21   Order in this case.

22           Do you see that document?

23    A   I do.

24    Q   And have you seen this document before today?

25    A   I have.

1    Q    And did you review this document before coming here to

2    testify today?

3    A    I did.

4    Q    Okay.  You've heard testimony -- strike that.

5          You were present for Mr. Karchmer's testimony, is

6    that correct?

7    A    Yes.

8    Q    In which Mr. Karchmer discussed, to some extent, the

9    length of time needed to review documents to be produced

10   today.

11         Do you recall that testimony?

12   A    Yes.

13   Q    Okay.  And you -- have you reviewed the Protective Order

14   in connection with forming an opinion as to the length of time

15   it would take Mr. Montgomery to review the documents that have

16   been produced in this case?

17   A    Yes.

18   Q    And have you come to any conclusions about the difficulty

19   in reviewing documents, in light of the U.S. Protective Order?

20   A    Yes.

21   Q    And what is that opinion?

22   A    That --

23              MR. PEEK:  Your Honor, I'm going to object.

24   He's not qualified in time and motion studies.  He's

25   qualified, certainly, in forensic analysis.  But, I don't

1    believe the gentleman is qualified in terms of time, motion,

2    and human elements.  And that's what this opinion is asking.

3                MS. GAROFALO:  Mr. Karchmer testified as to the

4    time it should have taken, what he believes Mr. Montgomery

5    should have done, whether it would have been reasonable to

6    delete certain items, duplicate items in order to shorten that

7    time, on the suggestion that it took far too long given the

8    task at hand.

9                If the Court would like me to breakdown the

10   questions, we can go through it question by question and

11   approach the issue that way.  The issue is certainly relevant.

12   And this witness is certainly competent to testify what a

13   review of these materials would entail.

14               MR. PEEK:  I'm happy to hear questions about

15   deduplicating and what it would take to deduplicate.  I'm

16   happy to hear questions that would relate to 1.3 million

17   files, and 92 percent of which are duplicates of eight

18   percent, whether he has an opinion about that.  But, those

19   are the kinds of things you do.  The other rest of it is just

20   human elements, and time and motion studies.

21               THE WITNESS:  We --

22               THE COURT:  Well, I --

23               THE WITNESS:  May I make a comment?

24               MR. PEEK:  Your Honor, the witness is not --

25               THE COURT:  No.

1            MR. PEEK:  -- does not have any question in

2    front of him.

3            THE COURT:  Actually it might be helpful, but

4    no.

5            What I'm going to do is this:  I mean if he wants

6    to proffer an opinion at this time, that's fine.  I'm going

7    to allow him to do that.  Obviously, the Court has listened

8    to Mr. Karchmer's testimony and his cross-examination, and

9    is aware of the issues raised, and would expect, as a

10   consequence, that not only would this witness, Mr. Cooper, can

11   give an opinion, but that he will substantiate that opinion.

12           MS. GAROFALO:  Thank you, Your Honor.

13           THE COURT:  So, please proceed.

14           MS. GAROFALO:  Okay.

15   BY MS. GAROFALO:

16    Q   Mr. Cooper, you understand that the United States

17   Protective Order required Mr. Montgomery to review files

18   that were required to be produced in this case prior to

19   production.

20    A   Yes.

21    Q   Okay.  And do you have an understanding, based on your

22   expertise, as to how that review was to be conducted?

23    A   Yes.

24    Q   And what is your understanding of what was entailed in

25   the review of materials to be produced in this case, as made

371

1    necessary by the U.S. Protective Order?

2     A    There are several parts to my understanding to that

3    process.  The first is that the U.S. Protective Order asked

4    Mr. Montgomery to review documents himself, and not get

5    assistance in the review; as well as to look for specific

6    documents that would contain what I'll, generically, call

7    confidential information or privileged information.  I believe

8    the term that was used was State's Secrets.  I understand

9    that his work related to national security issues, so he was

10   instructed to produce those things that were not confidential.

11            In order to do that, it required Mr. Montgomery to

12   review, I believe, every single file that existed, whether it

13   was duplicated or not.

14    Q    Why would Mr. Montgomery have to produce -- or have to

15   review files that were merely duplicates of other files?

16    A    We first have to understand the environment that he

17   was working in.  In listening to Mr. Karchmer's testimony, it

18   was clear to me that the scenarios that Mr. Karchmer was

19   addressing dealt with the scenario of if this was being done

20   by a forensically knowledgeable, or forensically skilled

21   person.

22            The forensic process -- I would like to describe

23   the forensic process before I describe the process that

24   Mr. Montgomery went through, because they are different.

25            The forensic process, typically, would have someone

(775) 786-5584

1    take all the hard drives and all the pieces of media that

2    Mr. Montgomery had, make forensic images of each and every

3    one of them, assimilate all of those forensic images into one

4    great big image, then apply search criteria through a forensic

5    program, to filter and find certain file extensions, certain

6    words, certain file types, and extract that out.

7              That process would take weeks, or a month or so, to

8    do forensically, with forensic skills or tools.

9              It's my understanding that -- it's my understanding

10   that Mr. Montgomery did not have forensic tools, did not have

11   forensic skills, did not have forensic knowledge.  He took a

12   commonsensical approach, a computer scientist approach, a CTO

13   approach to working with the media that he had.  To do that, I

14   understand that he took each hard drive and looked through it

15   using the Windows search tool.  That Windows search tool is

16   woefully inadequate to search the scope and magnitude of the

17   data that he had, for the things that he's looking for.

18             There's an additional underlying problem in all of

19   this, an additional time consuming problem in all of this.

20   And that's the topic of false positives and false negatives.

21             When doing a search, irrespective of method,

22   whether it's a forensic method or non-forensic method, a false

23   negative means searching and not finding what you're looking

24   for, but it being there.  It means you missed it.  No search

25   mechanism I've ever seen, that I've ever been aware of, will

1    guarantee no false negatives.  The mechanism Mr. Montgomery

2    used was prone to having false negatives.

3              In cases that I've been involved with, and I've been

4    involved with many cases, sometimes a false negative isn't a

5    big deal.  You miss it.  Well, if you got it all, it's pretty

6    good.  If you accidently turn something over to the opposing

7    party that you shouldn't have, maybe it's not too damning and

8    maybe you can get it back.

9              But in this particular case, this a national

10   security.  And I believe some of the language in the U.S.

11   Protective Order talked about grave consequences to the

12   security of the United States.  Having a false negative

13   means that if Mr. Montgomery allowed a false negative to

14   occur, he would have then been turning over potentially

15   gravely serious data to the public.  My understanding is

16   that he desired to be rigorous and careful in this process,

17   and eliminate false negatives.

18             Additionally, false positives are also a problem.

19   If you are looking for a term that might be important, it's,

20   virtually, a hundred percent of the time, that false positives

21   also occur, which means you wind up hitting and finding more

22   things than are completely relevant.  But when you get a false

23   positive, you then need to look at it and say is it relevant

24   or not.

25             Then we get into the dilemma of how does one

1    determine relevance?  I know that there is the legal

2    interpretation of relevance of is it responsive, is it in

3    scope?  But, here, we've got an issue of, in addition to

4    the legal side, the U.S. Protective interests.  And it just

5    complicates the process to have to go through, deal with

6    false negatives, false positives, manual steps, non-forensic

7    methods, an non-forensic skills.

8     Q   If I may summarize, by a very simplistic way, the only

9    way to really be sure that all of the material covered by the

10   U.S. Protective Order was screened out, was to look at each

11   and every item on the hard drives.

12             Isn't that correct, Mr. Cooper?

13    A   Yes.

14    Q   Okay.

15    A   Can I elaborate a little bit?

16    Q   You may.

17    A   There's been a lot of conversation about file extensions.

18   And Mr. Karchmer created a 42-page document that listed

19   file he extensions, and there was conversation about the

20   unnecessary need to look at certain extensions like JPGs and

21   TXTs and EXEs.  In a normal forensic -- using normal forensic

22   tools, you can skip over those.  But, in this case, you

23   cannot.

24             And Mr. Karchmer also, under cross-examination,

25   agreed, that an HTML file, for instance, normally is a web

1  page.  But it can also be a word document.  And it can also

2  be something completely different.  He even commented that he

3  found some e-mail messages that were tagged at HTML, which

4  means that he even found instances where the extension is not

5  what it normally is.

6           There is a mechanism, in the forensic community, to

7  do signature hash analysis, which is different than the

8  already MD-5 hash analysis that's been discussed.  But, again,

9  that's a sophisticated forensic mechanism to go through.

10          So, absent having those forensic tools and methods,

11  I really don't see any other way for Mr. Montgomery to have

12  complied, other than to manually look at each and every file.

13  Q    Now, given the tools that Mr. Montgomery was using, in

14  your opinion, is the testimony that there were frequent

15  crashes of the computer plausible?

16  A    Quite.

17  Q    Okay.  What and why would that be?

18  A    As I understand it, Mr. Montgomery was looking through

19  millions and millions of files.  The tool that he used was

20  Windows Search.  It is not intended to be applied to such a

21  large corpus.  He's limited to then -- he was then limited to

22  using a regular PC computer, not a forensic computer, looking

23  through a forensic quantity of data, using a tool that was not

24  intended for such a large problem.  Having it crash, or take

25  hours and hours to run, is highly probable, and highly likely.

1           Would it have caused crashes every time?  No.  Is it

2     likely to have crashed frequently?  Yes.

3     Q   And, again, in my very simple way, the question is those

4     crashes would also slow-up the process, would they not?

5     A   Most certainly.

6     Q   You have not, by the way, reviewed the material that

7     Mr. Montgomery produced, have you, Mr. Cooper?

8     A   You're correct.

9     Q   And you have not -- including the Glogauer e-mail, is

10    that correct, Mr. Cooper?

11    A   Also correct.

12    Q   Okay.  I would like to ask you just a couple of simple

13    questions relating to PST files.

14           There has been some testimony by Mr. Karchmer

15    relative to what you can discern, what you can't discern

16    from PST files.

17           You were here for that testimony, correct?

18    A   Yes.

19    Q   Okay.  The first thing I would like to ask you is there

20    has been some mention of MSG versus PST files.  Is -- what

21    information would you -- strike that.

22           If an MSG version of an e-mail were produced,

23    as opposed to a PST version of the e-mail, is there any

24    information that would be missing from the MSG version that

25    would be found in the PST version?

1  A    The e-mail message itself is the same, whether it's in

2  an MSG form or the PST form.  However, there are additional

3  information beyond the e-mail itself, that is 99 percent

4  present on an MSG.

5           So, I'll state it differently.  Comparing an MSG

6  to a PST, the MSG e-mail information is identical.  Then

7  secondarily to that, is the peripheral information that

8  related it to the e-mail.  And in that case, 99 percent of

9  it is present on the MSG.  There is only one small piece of

10  the peripheral secondary information that's not in the MSG

11  that could be found in the PST.

12  Q    And what piece of information is that, Mr. Cooper?

13  A    That is the third piece of date and time information that

14  was on the print screens of Exhibit 58 or 48?

15  Q    49, I believe.

16  A    49.  That listed the access date, where Mr. Karchmer, I

17  believe mentioned on cross-examination that it wasn't

18  necessary for him to look at that piece of information to

19  draw his conclusions.

20  Q    And that would be the only difference between the MSG

21  version of an e-mail and the PST version of the e-mail, is

22  that what you're telling us, Mr. Cooper?

23  A    Yes.  That's assuming that the MSG was a Microsoft e-mail

24  MSG, as opposed to the other types of MSGs that could exist

25  that are not e-mail messages from Microsoft.

378

1    Q    Okay.  Are you telling us, then, that Mr. Karchmer was

2    wrong when he said the MSG version of the e-mail would lack

3    any metadata?

4    A    He was.

5    Q    And can you be more specific in how Mr. Karchmer was

6    incorrect?

7    A    So a mechanism that Mr. Karchmer described in his

8    testimony was to look at the PST file, and realizing that the

9    PST file contains lots of e-mail messages.  He described that

10   you can drag an e-mail message out of the PST and make an MSG

11   out of it.  And that is a proper mechanism.

12          By doing so, which is a proper mechanism, the

13   metadata of the e-mail message itself stays with the e-mail

14   message.  And I would like to elaborate just a little bit.

15          An e-mail message has three parts:  One is the body

16   of the e-mail.  The body of the e-mail are the words:  Dear

17   Fred, let's have lunch.  Signed Wilma;

18          The second part of an e-mail message is the, what

19   I call header information.  And it's also referred to as the

20   message header.  It's the to and from and CC and subject and

21   date;

22          The third part of an e-mail message is what I call

23   the routing information.  That's also referred to as the

24   internet headers.  The internet headers are pure metadata.

25   And there are two types of metadata.  There was traditional

1   metadata, and what I call extended metadata, or the pure

2   metadata.  This pure metadata is not affected by users'

3   activities.  Pure metadata in an e-mail message contains when

4   the e-mail was sent, and if it left your computer and went to

5   your server, a time stamp.  And if it then left your e-mail

6   server to go out to the AOL server, there's another time stamp

7   and piece of metadata added into the internet header section.

8   That internet header section accumulates information during

9   the life of the e-mail.

10          When you drag an e-mail message out of a PST into

11  an MSG, all three of those pieces carryover.  So, in that

12  respect, when he said there was no metadata carried over, he

13  was incorrect.

14  Q   Okay.  So when you're working in Outlook and you drag, as

15  Mr. Karchmer described, an e-mail, a PST file over into a --

16  drag it over and it becomes an MSG file, you basically take

17  all the meta -- strike that -- most of the metadata with you.

18          Is that correct?

19  A   You take 100 percent of the metadata that's in the e-mail

20  message, and you take most of the metadata that's peripheral

21  to it.

22  Q   Now in terms of -- in terms of a one e-mail PST, in your

23  opinion, would the production of a one e-mail PST be compliant

24  with the order which we've marked as Exhibit 51, paragraph

25  four, which directs Mr. Montgomery to produce the material in

 1    PST or native format?

 2                    MR. PEEK:  Objection, Your Honor.

 3                    THE WITNESS:  Your question --

 4                    MR. PEEK:  Excuse me.  I have an objection to

 5    this, Mr. Cooper.  You're familiar with the procedures.

 6          I'm going to object, Your Honor.  This is not within

 7    the province of this witness to interpret, again, the Court's

 8    order and determine to give a legal opinion whether this is or

 9    is not in compliance with the Court's order.

10                    MS. GAROFALO:  I can rephrase the question,

11    Your Honor.

12                    THE COURT:  All right.

13                    MS. GAROFALO:  Okay.

14    BY MS GAROFALO:

15     Q    Is there something in a one e-mail PST, that's missing

16    from the e-mail as it's viewed in the entire PST file?

17     A    I don't think so.  But a one e-mail PST is not the same

18    as having the entire PST that had the e-mail in it.

19          However, it's my understanding, and it would be my

20    interpretation of the instructions that Mr. Montgomery was

21    given, he was not allowed to provide the entire PST.  So,

22    he did the thing that he was instructed to provide, in my

23    understanding of what's here.

24     Q    Okay.  An MSG, a copy of an e-mail in MSG format can be

25    manipulated, is that correct?

1    A    Yes.

2    Q    Okay.  And Mr. Karchmer testified that it was also

3  possible to manipulate an e-mail that's in PST format.

4              Was Mr. Karchmer correct?

5    A    No.

6    Q    And why not?

7    A    Assuming that you are a normal user, and are using the

8  application in a normal fashion; i.e., you're not a forensic

9  person using forensic tools, it is my understanding that it

10  is not possible to edit an e-mail inside a PST.  You can drag

11  it out, edit it, and drag it back.  You can manipulate it

12  forensically, but you cannot just change it while it's sitting

13  inside a PST.

14    Q    The fact that an e-mail is found in a PST file is not

15  necessarily conclusive that the e-mail has not been somehow

16  altered, is that correct?

17    A    Correct.

18    Q    Okay.  And, obviously, the same with an MSG.  Wherever

19  that e-mail is found, it's possible it was altered.

20              Is that correct?

21    A    Correct.

22    Q    So there's really no format which is absolutely

23  foolproof, correct?

24    A    Correct.

25    Q    I just want to talk a little bit about the issue that

1    Mr. Karchmer discussed early in his testimony, about this one

2    terabyte drive.

3            Do you recall hearing that testimony?

4    A    Yes.

5    Q    Okay.  And Mr. Karchmer testified that there was

6    something wrong with the dates on the drive because it

7    appeared that the hard drive was created before one terabyte

8    drives were available for purchase.

9            Is that correct?

10   A    Correct.  I believe his language was the dates were -- I

11   forget his exact words.  I believe they were manipulated was

12   his words.

13   Q    Okay.  Do you have any understanding in this case how the

14   date on the one terabyte, on the one terabyte drive came to

15   precede the actual availability of a one terabyte drive?

16   A    Yes.

17   Q    And what is your understanding of the process?

18   A    My understanding of the process is that Mr. Montgomery

19   used cloning software.  Using the term that Mr. Karchmer used,

20   he used cloning software to clone a small drive, an old, or

21   older small drive, onto a newer large drive.  And when you

22   clone an entire drive, you carry with it all of its metadata.

23           The scenario -- which means that if you have an old

24   hard drive that's from 2002, and you have a new hard drive

25   from 2007, if you clone the '02 drive onto the '07 drive, and

1    you then look at the '07 drive, it will look like the '07

2    drive was formatted in '02, the data was from '02 or '03, as

3    the case may be.

4              The scenario that Mr. Karchmer didn't consider in

5    his talking about the cloning process, is he made mention that

6    since the target-cloned drive -- and the word target means

7    where you copy onto.  So there's the source drive, which is

8    the original and the target where you copy to -- Mr. Karchmer

9    said that since there was no terabyte drive in '02, he

10   couldn't understand how a terabyte drive would have been

11   filled up through a clone.

12             He's correct.  That if you were to clone an entire

13   terabyte drive, since it didn't exist.  However, he was also

14   wrong.  He failed to consider the scenario where -- and this

15   is what I understood that Mr. Montgomery did -- Mr. Montgomery

16   had a small old hard drive, and he created a partition that

17   matched the size of the old drive on the new large drive.  He

18   cloned -- I forget the exact size -- he cloned 300 gigabytes

19   from an old drive, into a 300 gigabyte partition on the new

20   drive.  He then expanded that partition afterwards, which then

21   makes it look like I have cloned onto a one terabyte drive,

22   and it was dated from '02 or '03.

23             MS. GAROFALO:  Thank you.  I have no further

24   questions.

25             THE COURT:  All right.  Mr. Peek.

1          MR. PEEK:  Thank you, Your Honor.

2                    **CROSS-EXAMINATION**

3    BY MR. PEEK:

4    Q    Let me just start with the cloning process, because it's

5    easier for me to go that way.

6              I think you said that you learned from

7    Mr. Montgomery that he used cloning software?

8    A    Yes.

9    Q    What is the name of that cloning software?

10   A    I recall that he told me he used Partition Magic.

11   Q    Partition Magic?

12   A    I'm not sure if that's the only piece of software that

13   he used.

14   Q    When did he tell you he used Partition Magic?

15   A    Within the last week.

16   Q    Okay.  And so within the last week -- and was that in an

17   interview you had with him?

18   A    A conversation.

19   Q    A conversation.  You were asking him questions about how

20   he went through the process?

21   A    I don't recall if I was asking him if he went -- how he

22   went through the process, or he was telling me.

23   Q    Okay.

24   A    But it was in a conversation he and I were having.

25   Q    Who else was present?

1    A    I don't recall if that conversation was over the phone or

2    in person.

3    Q    Okay.

4    A    During the last week, there have been several

5    conversations with him.  During most of them, Peter Branston

6    was either on the phone or in our presence.

7    Q    Okay.  So he told you that he used a cloning software

8    called Partition Magic?

9    A    Not exactly.  He said that he used cloning software.  And

10   he also discussed Partition Magic.  I don't remember if there

11   was another piece of software.  Only --

12   Q    So you just concluded that that may have been one of the

13   softwares that he used?

14   A    Well, I know that I -- I am clear that he said he used

15   Partition Magic to expand the partition.  He, from my

16   recollection, he would have used Partition Magic to create

17   the partition.  I don't recall if he used Partition Magic to

18   clone.

19   Q    Well, wouldn't it be important to you, to your

20   understanding of what he did, to know what the software was?

21   A    No.

22   Q    It wasn't important to you to know what that software was

23   in order to know exactly whether or not that software he was

24   using would perform as he described?

25   A    I accepted his statement.

1   Q   You accepted his statement.  Okay.

2   A   Well, I accepted his statement that he used cloning

3   software.

4   Q   But without finding out what that cloning software was --

5   A   I believe he told me.  I just don't recall.

6   Q   Okay.  And that was just in the last week, and you don't

7   recall that?

8   A   Correct.

9   Q   And you've been testifying as an expert for a lot of

10  years.

11  A   You bet.

12  Q   And it's requiring you to remember what your client tells

13  you, and what information you have in order to formulate your

14  opinion, isn't it?

15  A   Yes.

16  Q   And you don't remember this one key element of what

17  software he used?

18  A   Wasn't so key for me.

19  Q   It wasn't important to you?

20  A   I didn't say it wasn't important.  You asked me if it was

21  key.

22  Q   Was it important to you to know what cloning software he

23  used?

24  A   No.

25  Q   Okay.  Have you asked?

1    A    I'm sorry.  I just don't remember.

2    Q    Ahh, okay.

3    A    That's what I've been saying.

4    Q    But, again, that's part of the your job as an expert to

5    remember facts like that, isn't it?

6    A    It's not -- to me, it's not such an important fact in

7    this process.

8    Q    You certainly were present in the proceedings in June on

9    this matter, were you?

10   A    I'm sorry?

11   Q    You weren't present during any of the proceedings?

12   A    You're correct.

13   Q    Have you read any of the transcripts of those

14   proceedings?

15   A    I don't think so.

16   Q    Do you know what his testimony was when asked about

17   the dates and how they came to be on the terabyte drive of

18   November 2003, and I think the other one was 2002?

19   A    I don't believe I know that.

20   Q    You don't know that.  So you're not aware that when

21   asked about how those dates got there, he never told this

22   court that he used cloning software, and that's the reason for

23   the dates?

24   A    I'm unaware of that.

25   Q    Would that be important to you to know whether he did or

1   did not use cloning software, as to what he testified under

2   oath in this proceeding as to how he would explain the dates?

3    A   All I know is what he told me.

4    Q   Now, are you aware that Mr. Karchmer was here during

5   Mr. Montgomery's entire testimony?

6    A   Not aware of that.

7    Q   And he heard what Mr. Montgomery said about how the dates

8   got onto the terabyte drive and the 500 gigabyte drive.  He

9   was here for that --

10   A   So to help me understand --

11   Q   -- sworn testimony.

12   A   So to help me understand that, can you tell me what

13   Mr. Montgomery said?

14   Q   He had no explanation, whatsoever, as to how those dates

15   got there, other than it was imprinted off of the computer

16   from which it was gotten.

17   A   It's correct answer.

18   Q   But he would have had to give a full explanation to say

19   he used cloning software in order to provide -- to say the

20   date would have matched it, wouldn't he, to be completely

21   truthful and honest?

22   A   If he was asked what was the mechanism, I suppose --

23   Q   I asked him that question many, many times what the

24   mechanism was.  He never told us he used cloning software,

25   sir, under oath.

1    A    Okay.

2    Q    And when you were examining him, he wasn't under oath,

3    was he?

4    A    No.

5    Q    So he told you something different, not under oath, than

6    he told this court, correct?

7    A    If you say that's what he said, and your statements are

8    correct, then yes.

9    Q    Now when you put a hard drive into your computer to

10   format it, do you type the word "format"?

11   A    It's one mechanism you can use.

12   Q    And what other mechanisms do you use?

13   A    When you type in your premise, you said if you type the

14   word "format", that presumes that you are using the DOS

15   operating system, and using the DOS command format.  There

16   are other DOS commands that you can use besides format.

17   There's quick format.  There are other DOS tools that allow

18   you to format.  And then there's the Windows environment.

19            Assuming we're talking about Windows, you would --

20   you can click an icon to format.  You can issue command line

21   instructions.  There's a lot of ways --

22   Q    But you have to give a command of some type to format the

23   hard drive, do you not?  In other words, you don't just plug

24   and play.

25   A    Well, to some degree, I believe that when some -- there's

1    a possibility that the computer can come up and say, do you

2    want to format?  And all you have to do is hit, click on yes.

3    I don't know if you want to call that issuing a command.  You

4    are issuing some sort of instruction.

5    Q    Right.

6    A    I'm unaware of any computer that will format by itself.

7    Q    Okay.  And is it your testimony that when you use the

8    cloning software, that the command format, however it's given,

9    gives the date off of the clone, or does it give the date that

10   it actually occurred?

11   A    The word "date" is a little vague.  But if I understand

12   your question, I believe that depending on the cloning

13   software that you used, and the switches or the choices or

14   options that you invoke, it will either keep old dates, or not

15   keep old dates, but I believe the default for the cloning

16   process is to keep old dates.

17   Q    Okay.  But you don't know what software he used to be

18   able to tell us if that was in fact what happened in this

19   instance?

20   A    You're correct.

21   Q    And are all cloning softwares the same?

22   A    No.

23   Q    And some would just use the date that you've actually put

24   the hard drive in to be copied?

25   A    I didn't say that.  And I don't know that that exists.  I

1    believe it's a choice, but I believe the default, if you don't

2    do anything to change the default, you wind up with an old

3    date.

4    Q    Which software would you know that has that default,

5    which cloning software?

6    A    There are -- there's a drive copy utility --

7    Q    Is that what it's called, Drive Copy Utility?

8    A    Well, utility is an adjective, so I believe that it was

9    called Drive Copy.

10   Q    Okay.

11   A    And it's a utility.

12   Q    And it's used for cloning software?

13   A    It's used to copy a drive.  It's an old DOS -- Encase has

14   a component; I believe FTK has a component.  It's a common,

15   fairly common activity.

16   Q    Okay.  And each of those, as far as you know, the default

17   is you give the format, provide the format date as the date

18   from which the drive being copied has?

19   A    I believe so.  I have not used drive cloning in many

20   years.

21   Q    And why would you use cloning software in a document

22   production?  Or, did Mr. Montgomery tell you why he used a

23   cloning software in order to maintain these dates?

24   A    It wasn't a conversation that I was having about trying

25   to maintain dates or not.  This was -- the maintaining of

1    dates was a conversation that occurred today.

2    Q   Oh, okay.  That was just today then?

3    A   Yes.

4    Q   Okay.

5    A   The issue about the dates, and the changing of the dates,

6    my recollection, was today.  Maybe yesterday also.

7    Q   Okay.  So it was just during the course of this testimony

8    yesterday and today, from Mr. Montgomery, that he told you

9    about using cloning software?

10   A   No.

11   Q   Okay.

12   A   That wasn't -- that wasn't my answer.  He told me about

13   using cloning software within the last week.  Your question,

14   that I understood it, was about how cloning software affected

15   dates.

16   Q   Ahh, I apologize.  My fault.  My mistake, Mr. Cooper.

17           Have you ever used cloning software for purposes of

18   document productions?

19               MS. GAROFALO:  Objection.  Lacks foundation.

20               MR. PEEK:  Well, I can make foundation as to

21   whether he's been involved in document production.  But I

22   thought given his vast experience over the 36 years, that he

23   would have had some involvement.  I can go over his list.

24   But, I can make a foundation if she wants me to.

25               THE COURT:  I believe that through Mr. Cooper's

1    testimony about his experience, he can go ahead and answer the

2    question.

3                The objection is overruled.

4                    THE WITNESS:  Yes.

5    BY MR. PEEK:

6    Q    And do you use it often?

7    A    Yes.

8    Q    And why?

9    A    When we produce data in a, in a litigation matter,

10   because data these days has gotten to be large and will no

11   longer fit on floppies, CDs, or DVDs, we produce it often on

12   a hard drive.  We keep a clone of that hard drive to keep in

13   our files to keep track of what we produced.

14   Q    I'm talking about what you actually produced, not what

15   you keep.

16   A    That's a different question.

17   Q    Well, I'm talking about what you produce.  I said -- I

18   understand you keep a copy of what you produce.

19   A    Sure.  We clone frequently, also.

20   Q    And provide the hard drives as cloned copies, showing an

21   earlier date than when the files were created?

22   A    Most definitely.

23   Q    Okay.  Now, would you expect in using the cloned software

24   that all of the dates of each of the files would remain the

25   same, or just the dates that they were actually imported or

1   exported onto the new hard drive?

2    A   I think I understand your question.

3    Q   I'm not sure I do.  But, go ahead.

4    A   My expectation is that when we clone a drive, exactly

5   what was on drive one, is exactly what winds up on drive two;

6   all dates, all files.  It's meant to be an exact clone, using

7   the metaphor of the dahli clone of -- down to the DNA level.

8    Q   Okay.  So in this case, we have the date on, I think it's

9   the 500 gigabyte drive -- I need my exhibit.

10          The 500 gigabyte drive, the format date was on

11   four -- 11-18-2003 at 4:58.  And it ran until 15:34 on

12   11-18-2003.

13   A   Can you repeat that for me a little more slowly.

14   Q   The format date was 11-18-2003 at 4:58 a.m.  And the

15   completion date of all of the transfer was at 11-18-2003 at

16   15:34 or 3:34 in the afternoon.

17          Now --

18    A   Excuse me.

19              THE COURT:  Excuse me.  Would you just give him

20   the exhibit --

21              MR. PEEK:  Does he have the exhibit?

22              THE COURT:  -- 48, please.

23          Thank you.

24              MR. PEEK:  That way -- I apologize.  I'm not

25   trying to make this a test of memory.

1         THE COURT:  It's on that first page, is it not,

2    Mr. Peek.

3    BY MR. PEEK:

4     Q   Yes, it is.  First one is the one terabyte drive that I

5    just read?

6     A   Mr. Peek, these times that you're giving me, are they

7    local times or GMT times?

8     Q   I don't know.

9     A   Okay.  Go ahead.

10    Q   Because -- I don't know because it's a clone software, so

11   it's taking the date off of the clone.  So I don't know what

12   the date is on the clone.

13        That's what you told me.  These dates come off the

14   clone.  I would assume you would know that from talking to

15   Mr. Montgomery.

16    A   Uh, I understand this exhibit to have been created by

17   your expert.

18    Q   Correct.  These are the dates and times that showed on

19   the terabyte.  As to the first one, is the date that the

20   one terabyte drive was formatted.  That's 11-18-2003 at 4:58.

21   And then the copying, or the exporting of the data began on

22   11-18-2003, moments later, at 4:58.

23    A   To help me understand your question, when your expert

24   created this document for you, did your expert convey that the

25   times that they put on here, were they using GMT times or

1   local times?

2   Q    I don't know that because I only know what you've told

3   me, that the clone software would give the date and time.

4   A    That actually wasn't my question.

5   Q    I know that.

6   A    Okay.

7   Q    But I know what GMT time is.  Greenwich Mean Time.  I

8   know that.  It's about nine hours ahead of where we are in

9   Reno here today.  So, it doesn't matter in terms of whether

10  it was GMT or not for your, for purposes of this interrogation

11  -- or does it?

12  A    To me, it does.

13  Q    Okay.  Why does it matter if it's GMT or not?

14  A    So whether it's GMT or local, the elapse time is the

15  same.  But, if I know that a process starts at four in the

16  morning or three in the morning, versus three in the

17  afternoon, it tells me about the likelihood of somebody

18  monitoring it, or going to sleep after something starts.

19           It's a process I've gone through many times.

20  Q    Well, didn't you find that information from

21  Mr. Montgomery, as to whether he started it at a five in the

22  morning, or five in the afternoon --

23  A    No.

24  Q    -- the previous day?

25  A    No.

1   Q    Okay.  But if it's GMT time, it would be in the evening,

2   would it not, nine hours earlier?

3   A    Correct.

4   Q    And --

5   A    Approximately.  It's either nine or eight.

6   Q    I don't know if it's nine or eight, but it could be

7   seven.  We're on Daylight Savings Time?

8   A    For the conversation purposes, we'll call it eight.

9   Probably closer.

10  Q    Okay.  So if we're at eight, so he would have started

11  instead of 5:00 a.m. in the morning -- I'm just rounding it

12  off -- it would have started at about nine o'clock the

13  previous night?

14  A    Yes.

15  Q    So does that matter which one?  Whether he stayed up

16  and monitored it all night, or he got up early and monitored

17  it all day, for purposes of my question, is that important?

18  A    I haven't heard the rest of the question yet.

19  Q    You're the one that said GMT was important to you, so I'm

20  just trying to find out.

21  A    I'm just trying to understand the premise of the

22  question.

23  Q    Okay.  My question, really is, sir, does the GMT -- or

24  does the time here, you're telling me it comes off of the

25  clone, does it not?  That's what you told me.

```
 1   A   I'm not able to tell you where this document gets its

 2   time from.  I don't know how this document was populated

 3   with --

 4   Q   It came off of the terabyte drive.

 5   A   Okay.  So are you telling me that the data that's in this

 6   spreadsheet was manually entered by someone, or was it an

 7   electronic dump from some tool's analysis of the cloned drive?

 8   Q   Well, I guess, I guess, you don't know one way or the

 9   other, because you haven't looked at the terabyte drive, have

10   you?

11   A   I have not.

12   Q   So you wouldn't be able to even know what these times

13   are, when this began, when it ended, can you?

14   A   Correct.

15   Q   Because you never looked at it --

16   A   Correct.

17   Q   -- for purposes of this examination here today?

18   A   Correct.

19   Q   And wouldn't it be important for you to know this

20   information, as opposed to asking me questions?

21           I mean you heard Mr. Karchmer's testimony.  Did you

22   not understand what he said when he said when it started and

23   when it ended?

24   A   When he talked about it today?

25   Q   Yes.  Did you not understand what he said?
```

1   A    I understood what he said.

2   Q    Okay.  And was what he said not understandable by you or

3   not complete?

4   A    I sort of feel like you're arguing with me.

5   Q    I'm not trying to, sir.  I'm trying to understand what

6   you did and the conclusions that you've reached, and the fact

7   that you're telling me that cloning software was used, and

8   your lack of information from the previous testimony, and

9   I'm just trying to understand how these dates get on there

10   with cloning software?

11   A    Okay.  So how dates get on with cloning software is not

12   related to how dates got on this document.  That's what I'm --

13   Q    Oh, okay.  I'm sorry.  Then these dates -- because we

14   were trying to find out the reason that Mr. Karchmer testified

15   about these dates, is he said these are the dates that came

16   off of the hard drive, as the date on which the transport of

17   information, or the export of information off of one media

18   went onto the one terabyte drive.  And he found that to be

19   unusual, because he said they didn't have terabyte drives

20   in 2003.

21        That was his purpose of giving that testimony and

22   why he was showing us these dates and times.

23   A    Correct.

24   Q    And he took those dates and times off of the terabyte

25   hard drive as to the date it first was formatted, and the

1    dates on which the data was exported from one media to the

2    one terabyte hard drive.

3     A    Correct.  And when I heard him say that this is unusual

4    because the dates of format on the terabyte drive preceded the

5    existence of terabyte drive --

6     Q    Right.

7     A    -- I thought it was unusual.  And my comment to myself

8    when I heard that for the first time today, was this is

9    consistent with someone using Partition Magic to create a

10   partition, cloning into the partition, and stretching the

11   partition.  And I believe that if Mr. Karchmer thought about

12   that scenario, he might not conclude this is so odd.

13    Q    I understand then.  That's really what your conclusion

14   is, is that you believe that Mr. Montgomery, based upon what

15   he told you, used both cloning software and Partition Magic.

16   And that's the explanation as to the dates, as opposed to

17   manipulation of dates?

18    A    Yes.

19    Q    Okay.  But you don't -- but you also know that Mr. -- you

20   don't know what Mr. Montgomery testified to June 10th and

21   June 24th?

22    A    Also correct.

23    Q    Okay.  And you didn't hear the testimony of

24   Mr. Montgomery about the process that he used to export

25   information onto the one terabyte and the 500 gigabyte drive,

1   did you?

2   A   His testimony prior to yesterday?

3   Q   Correct?

4   A   I did not hear that.

5   Q   And you didn't hear any explanation yesterday of it

6   either, did you?

7   A   I don't remember.

8   Q   Okay.  I take it that you also haven't looked at the 500

9   gigabyte drive either, have you?

10   A   Correct.

11   Q   And you've been a consultant to Mr. Montgomery since

12   June of 2007, have you not -- or to the Liner firm.  Excuse

13   me.

14   A   I don't believe that's correct.

15   Q   Well, you gave an affidavit in this proceeding, did you

16   not?

17   A   I wrote a declaration.

18   Q   You wrote a declaration.

19   A   My recollection is that declaration was from much earlier

20   this year, but I don't believe it's a whole year ago.

21   Q   Maybe I'm mistaken.  I know Mr. Karchmer's declaration

22   was in June of 2007.  That's why I thought yours would have

23   been following on maybe July or August, when they had to file

24   an opposition.

25   A   Could somebody just show me the declaration?

1              MR. SNYDER:  It's January '08.

2              MR. PEEK:  Oh, it's here.  It is January '08.

3         So, you've been a consultant since January '08?

4              THE WITNESS:  Yes.

5    BY MR. PEEK:

6     Q   Did you first come on board January '08, or did you come

7    on board in December of '07?

8     A   If you'll tell me the date of the declaration --

9     Q   I will.  And I'll actually give it to you.

10    A   I can answer your question a little differently.  I think

11   I was engaged maybe a week or two, or three, before that

12   declaration.

13    Q   Okay.  Let --

14    A   So if it's the end of January, it would be the beginning

15   of January.  Or if it's at the beginning January, it would be

16   the end of December.

17              MR. PEEK:  May I approach, Your Honor?

18              THE COURT:  You may.

19              MR. PEEK:  Let me just hand this to you.  This

20   is docket 397, Mr. Cooper.  I'm just trying to get to your

21   signature.

22         Yeah, it was January 11th you executed it.  There it

23   is.

24              THE WITNESS:  Thank you.

25

1   BY MR. PEEK:

2    Q    So about a week before January 11th of 2008, was when you

3   were retained by Mr. Montgomery?

4    A    No.  I said two -- one or two or three weeks.

5    Q    Okay.  So somewhere between the end of December-ish, to

6   the first of December-ish.  Okay?

7    A    I can't -- you're trying to pin me down to specific

8   dates.  It was within two to three weeks prior to.

9    Q    At least seven-and-a-half months?

10   A    Yeah.

11   Q    Because we're in the eighth month, in the middle of the

12  month.

13          Seven-and-a-half months?

14   A    Yes.

15   Q    Okay.

16   A    For conversational purposes, if you want to say that I

17  was engaged on January 2nd, it's probably as good a date as

18  any.

19   Q    I -- that's fine with me.  I'm sure your time records

20  would show.

21   A    Absolutely.

22   Q    And did you meet Mr. Montgomery in January of 2008?

23   A    No.

24   Q    When was the first time you met him?

25   A    Yesterday.

1   Q    Okay.  And when was the first time you spoke to him?

2   A    I think Friday of last week.

3   Q    So that would be the 15th of August?

4   A    Give or take a day.

5   Q    And we're now on the 20th.  So, five days ago?

6   A    Yes.

7   Q    And was it then on this Friday that you talked to him

8   about the cloning software?

9   A    I don't recall if it was Thursday or Friday, if you're

10  trying to pick the day.  But, towards the end of last week.

11  Q    Okay.  On the first day --

12  A    Yes.

13  Q    So it would be Thursday or Friday.  Was that the day in

14  which you talked to him about the cloning software?

15  A    I think so.  But I wasn't talking to him about the

16  cloning software.  It wasn't an interview.  It was -- it

17  was more of a conversation and cloning came up in the

18  conversation.  I did not have a list of questions.

19  Q    And then you confirmed the use of cloning software

20  with respect to the terabyte drive sometime today with

21  Mr. Montgomery?

22  A    I know that we discussed it.  I believe we discussed it

23  today.  Maybe yesterday.

24       This has been a compressed time frame over the last

25  four or five days, so I'm having a hard time recalling which

```
1    conversation on which day.  If it matters the exact day, we

2    can talk about it more.  But if it's okay with you to just say

3    within the last five days, it makes my answers a lot faster.

4    Q   Okay.  That's fine.

5             The U.S. Protective Order, when did you first see

6    that?

7    A   Again, within the last week.

8    Q   Last five days?

9    A   In the last five days.

10   Q   Okay.

11   A   Approximately.

12   Q   Okay.  But you don't know whether it was prior to the

13   weekend or after the weekend?

14   A   Maybe on the weekend.

15   Q   Well, most of the experts with whom I work keep, maintain

16   logs of when they receive documents on which they're going to

17   opine.

18             Do you do that as well?

19   A   I don't keep a log per se, but I have e-mails.

20             So if it was e-mailed to me, my e-mail would show

21   me.  I do keep time records.  And if I put in the time record,

22   "discussed Protective Order", it would be in there.  It's

23   possible it was sent to me and said go look at this.  And I

24   looked at it after.

25             But, again, if you can accept the 5-day window, I
```

1   can answer your questions quickly.  And I'll assume that if

2   you ask me something more precise, you're trying to drill down

3   the exact day or hour and I'll --

4   Q   I am trying to drill down to the exact day.

5   A   On the Protective Order?  Did.

6   Q   Yes, sir.  Do you have e-mails on your computer here

7   today?

8   A   I do.  I would have to connect up.  It's not connected

9   right now, but I can do that.

10  Q   That's all right.  I don't want to take that extra time,

11  unless it doesn't take very long to do it.

12  A   So it would take a few minutes.  But we've also been

13  experiencing some internet problems in the courtroom.

14  Q   Okay.  We won't worry about it.

15          So sometimes in the last 5 days you got it, and

16  sometime in the last 5 days you got the Minutes of the

17  proceedings?

18  A   Yes.

19  Q   When you were hired, what were you directed -- what was

20  your direction from counsel or from Mr. Montgomery?  What were

21  you asked to do?

22  A   For my work back in January or the work --

23  Q   The work currently, sir.

24  A   Now?

25  Q   Yes, sir.  For this testimony here today.

1    A    It was to participate in these proceedings, to provide my

2    knowledge, and listen to  responses to the topics that were

3    going to be discussed and addressed.

4    Q    Okay.  When did you first become aware that there were

5    1.3 million files on the one terabyte hard drive?

6    A    You -- I think yesterday.

7    Q    Okay.  And when did you become aware that there were,

8    similarly, I think, fewer files on the 500, but I think there

9    were -- I think it's 285 -- 1.3 million files total on both

10   of them.  The first time you became aware of that was

11   yesterday?

12   A    I recall that number being discussed yesterday.

13   Q    Okay.

14   A    I'm not sure if it was over the weekend, but I think it

15   was yesterday.

16   Q    And when were you first retained for this court

17   proceeding?

18   A    Well, we weren't retained, and I wasn't retained for this

19   proceeding.  We were retained back in January.

20   Q    When were you retained to come here?  When did you first

21   know that you were going to be a witness?

22   A    I think Friday.

23   Q    Friday?

24   A    Yes.

25   Q    Are you aware that you were disclosed about a month

1   earlier?

2   A   I'm not.

3   Q   Okay.  So the first time you became aware of the

4   assignment was last Friday?

5   A   No.  It might have been on Thursday.

6   Q   Thursday or Friday?

7   A   In the last week.

8   Q   Okay.  And so we talked a little bit about the document

9   review of Mr. Montgomery --

10  A   I need to clarify that last answer.

11  Q   Okay.

12  A   I recall someone in my office mentioning to me that,

13  about a month ago, there was some conversation about an

14  upcoming proceeding.  But when did I know that I would coming

15  here?  I didn't know until Thursday or Friday.

16  Q   Okay.  So somebody at FTK may have known -- or FTI may

17  have known you were going to come here, but nobody every told

18  you about it until last Thursday or Friday?

19  A   It wasn't confirmed until Thursday or Friday night.

20  Q   So wouldn't have done anything in preparation until you

21  were notified until last Thursday or Friday?

22  A   I didn't know I was coming, so I didn't do anything --

23  Q   Right.

24  A   -- prior to knowing I was coming.

25  Q   And with respect to the U.S. Protective Order and the

1    review of documents, you've opined about what one would have

2    to do, which is look at every one of the documents, correct?

3     A    Yes.

4     Q    Okay.  And do you know whether or not there is a

5    requirement under the U.S. Protective Order that there be a

6    good faith belief as to whether or not there are or are not

7    documents on, electronically stored documents that are

8    potentially being produced?  There has to be a good faith

9    basis that there are documents that are covered by the

10   U.S. Protective Order?  Are you aware of that?

11    A    I'm not following your question.  I don't recall wording

12   in the Protective Order that used the words good faith belief

13   of something.  It may have been there.  I don't recall those

14   words.

15    Q    Okay.  And because you haven't been involved in these

16   proceedings, you're not aware of all of the many times that

17   folks have stood up and said there has to be a good faith

18   belief, both by from the government and others?

19    A    Correct.

20    Q    And are you aware of whether or not Mr. Montgomery,

21   during the course of the review of the 1.3 million files, he

22   found any files whatsoever which he delivered to the United

23   States Government?

24    A    I'm sorry.  Can you repeat the question.

25    Q    Are you -- you said that Mr. Montgomery was going to look

1   at the 1.3 million files, had to look at, one by one, every

2   one of them.  And if he found something, he would have to turn

3   it over to the government, correct?

4    A   My understanding is that 1.3 million files were turned

5   over to the government.

6    Q   No.  They were turned over to me.

7    A   Okay.  So my understanding is that there were far more

8   files that exist that he has been looking through.  So, the

9   sum total of the files that were turned over to you --

10   Q   Uh-huh.

11   A   -- plus the number of files that were turned over to the

12   government that weren't turned over to you --

13   Q   Uh-huh.

14   A   -- would be the total number of files that he's turned

15   over.

16   Q   Do you know whether or not, from his review of any of the

17   data that he transferred into the terabyte, he produced any of

18   that to the government?

19   A   I don't know.

20   Q   You haven't found that information out, uh?

21   A   I don't know.

22   Q   And because you're not aware of what's on the terabyte

23   drive, you would, I guess, would be unaware of all of the

24   duplicates, correct, other than what Mr. Karchmer has

25   testified to?

1    A    So --

2    Q    You're not aware, because you haven't reviewed it, that

3    92 percent of what's on there is a duplicate of the other

4    eight percent?

5    A    So I'm glad that you asked me about that.

6    Q    Go ahead.  I always like to get good grades on asking

7    good questions.

8    A    Mr. Karchmer testified that his calculation of duplicates

9    was based on the MD-5 hash calculation of the files.  And his

10   description is that the MD-5 hash calculation tells you if the

11   content is the same.  And he said that if the file name or the

12   file location was different, you could still get a hash match.

13          As a forensic expert, I almost always, if not

14   always, want to see all of the data possible.  Knowing where a

15   file is, even if it's a duplicate, can be often important.

16          So although the content may have hash matched, the

17   location, and presence, and number of instances can and does

18   have forensic value.  So even though there may have been some

19   high percentage number of content matches, it's not the full

20   story.

21   Q    Okay.  But you don't know what the full story is, because

22   you haven't done it.

23   A    Correct.

24   Q    You don't have any reason to believe, do you, as an

25   expert, that Mr. Karchmer is not correct in his statement that

```
1    92 percent of the data is a duplicate of the other eight
2    percent?
3     A   Well, I'm confident that if he did a hash calc and
4    determined that 92 percent are hash matched, that he's -- that
5    he is saying that the file content is hash matched, but not
6    the file location, not the file name.  And all of that
7    knowledge becomes relevant.
8              For instance, if an e-mail exists as an MSG and it
9    exists in five places, but the content hash matches and you
10   throw out four of them, you've lost the knowledge that the
11   other four people knew about it, and had done something with
12   it, and had seen it.
13             So, there's an example where discarding the hash
14   match, hash matches, would lose a lot of forensic knowledge.
15   And we'll call it data, because it's the analysis and
16   understanding of what that data environment is telling you.
17             THE COURT:  Mr. Peek, I'm sorry to interrupt
18   you.  It is five minutes after five o'clock, and I think that
19   we need to conclude for today.
20             So you can undertake continued cross-examination
21   of Mr. Cooper tomorrow morning, based upon whatever time
22   allocation you have remaining.
23             MR. PEEK:  What is my time?
24             THE CLERK:  Forty-two minutes.
25             THE COURT:  She has 42 minutes.
```

1            MR. PEEK:  Thank you.

2            THE COURT:  All right.  What I'm going to advise

3  counsel, we still have a matter of exhibits to attend to.  I

4  expect you to be here tomorrow morning by 8:30 a.m. to meet

5  and confer and work with the clerk of court to figure out

6  what exhibits are admitted or not.  We will begin promptly at

7  nine o'clock a.m.

8            Thank you.  We're in recess.

9            MR. PEEK:  Thank you, Your Honor.

10           (Court Adjourned.)

11

12

13                         -o0o-

14

15       I certify that the foregoing is a correct
         transcript from the record of proceedings
16       in the above-entitled matter.

17  \s\ Kathryn M. French                 August 29, 2008

18  _____         _____

19  KATHRYN M. FRENCH, RPR, CCR                DATE
    Official Reporter

20

21

22

23

24

25

1                          **I N D E X**

2

3   **DEFENSE'S WITNESSES:**                              **PAGE:**

4

    1)   **DENNIS MONTGOMERY (cont')**
5
             Direct Examination By Mr. Peek            155
6
    2)   **JONATHAN KARCHMER**
7
             Direct Examination By Mr. Snyder          214
8            Cross-examination By Ms. Garofalo         270
             Redirect Examination By Mr. Snyder        322
9            Recross-examination By Ms. Garofalo       326

10   3)   **LEONARD GLOGAUER**

11           Direct Examination By Mr. Peek            328
             Cross-examination By Ms. Garofalo         333
12
    4)   **SLOAN VENABLES**
13
             Direct Examination By Mr. Peek            341
14           Cross-examination By Ms. Garofalo         344
             Redirect Examination By Mr. Peek          347
15
    5)   **WARREN TREPP**
16
             Direct Examination By Mr. Peek            348
17           No Cross-examination

18   **PLAINTIFF'S WITNESSES:**

19   1)   **SCOTT COOPER**

20           Direct Examination By Ms. Garofalo        360
             Cross-examination By Mr. Peek             384

21

22

23

24

25

1                    **I N D E X   O F   E X H I B I T S**

2

3    **EXHIBIT NUMBER**:                    **MARKED**        **RECEIVED**

4    Exhibit 8 -- document                                      171

5    Exhibit 20  -- document                                    176

6    Exhibit 47  -- document                 202

7    Exhibit 45  -- document                                    213

8    Exhibit 48  -- document                 222               253

9    Exhibit 49  -- document                                    259

10   Exhibit 50  -- box                      268

11

12

13   **PLAINTIFF'S EXHIBITS**:

14   Exhibits 1 and 2  -- documents          365

15

16

17

18

19

20

21

22

23

24

25