**Michael J. Flynn, Esq.,** Mass. State Bar No.172780
P.O. Box 690, 6125 El Tordo
Rancho Santa Fe, CA 92067; *and*
One Center Plaza, Suite 240
Boston, MA 02129
Tel:    (858) 775-7624; Fax:(858) 759-0711
*Former Counsel, Admitted Pro Hac Vice*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| DENNIS MONTGOMERY, and the MONTGOMERY FAMILY TRUST,<br><br>     Plaintiffs,<br><br>v.<br><br>ETREPPID TECHNOLOGIES, LLC, WARREN TREPP, and the UNITED STATES DEPARTMENT OF DEFENSE,<br><br>     Defendants.<br><br>AND ALL RELATED MATTERS. | 3:06-CV-00056-PMP-VPC<br>**BASE FILE**<br><br>3:06-CV-00145-PMP-VPC<br><br>**DECLARATION OF ATTORNEY MICHAEL FLYNN IN SUPPORT OF MOTION TO CERTIFY JUDGMENT.** |

I, Michael J. Flynn, declare:

1. I am an attorney licensed to practice in the state of Massachusetts. I have appeared *pro hac vice* as counsel for Dennis Montgomery, individually and as Trustee of the Montgomery Family Trust, Brenda Montgomery, as Trustee of the Montgomery Family Trust, and the Montgomery Family Trust, (hereinafter "Montgomery"), in the above captioned related cases, 3:06-cv-0056 and 3:06-cv-00145, and 3:06-cv-0263. Most of the facts and averments made in this declaration are based upon information and belief; and some on personal knowledge of the facts stated herein, and if called as a witness, I could and would testify competently and truthfully to them, and/or my belief in their accuracy.

2. I make this declaration in support of the Motion to Certify a Judgment entered in my favor by the Court on December 16, 2008, (doc.#902), for the purpose of meeting the "good cause" standard of 28 U.S.C. 1963.

3. The Court should not wait for the expiration of the 30 day appeal period because Montgomery and his lawyers have demonstrated that he is hiding money and assets and engaged in a settlement charade with this Court. Montgomery, Blixseth and the Liner Firm have engaged in delaying and concealment strategies on virtually every front since the Liner Firm's appearance in these cases in August, 2007, delay in discovery, delay in complying with Court Orders, delay in the settlement process, delay in paying fees and costs, and likely concealment from the Court in the Trepp settlement process of Blixseth's and Ms. Klar's dealings with lending institutions on defaulted loans. Had the Court known of these defaulted loans, it likely would have already entered orders on the Trepp and Flynn sanctions motions and the Court's OSC's, and not countenanced further vexatious litigation strategies. These strategies and tactics support the conclusion that it is likely they will NOT appeal and post a bond from monies that have already been concealed.

4. On November 19, 2008 at the Court's status conference, I represented to the Court that Montgomery had received over $5 million dollars from Blixseth and her companies. Ms. Garafalo stood up and denied it, as part of the Liner Firm/Montgomery strategy to conceal assets and claim inability to satisfy the judgment. Ms. Garafalo misrepresented the facts. The truth is that the Blixseth companies books and records in Klar's possession prove that Montgomery received $3.8 million dollars between April, 2006 and June 30, 2007. Montgomery has been paid approximately $100,000 per month since April 2006. On June 10, 2008, he testified before this Court that he was still receiving $100,000 per month. (Transcript, Exhibit 1, attached ). Therefore, from July 1, 2007 until June 10, 2008 when he testified, he has received at least another $1.2 million.

5. Upon information and belief, the Liner Firm is in possession of Ms. Klar's computers after Stuart Liner fired her in July-August 2008 for her involvement with the frauds recited herein, and the frauds perpetrated on the Court involving the pending motions and OSCs. The Liner Firm sought to circumvent orders on said motions by firing Klar and seeking "court-monitored" settlement. It was more fraud and concealment. Liner knew Klar had a history and

|   |   |
|---|---|
|   | pattern of engaging in the same misconduct she perpetrated here, for which another Liner lawyer had filed a formal California State Bar complaint against her in 2006, which filing then caused Liner to fire the complaining lawyer - **not Klar** - even after the State Bar instructed the lawyer to notify Peter Garrell, the Liner Firm's "ethics counsel." (See Exh. 2 attached). |
| 6. | The Liner Firm's bad faith tactics in the settlement process, and concealment of the Blixseth/Montgomery financial deceits recited herein create exigent circumstances for this Court to find that Montgomery will conceal assets and impair satisfaction of the judgment. |
| 7. | The Trepp settlement conference was plainly designed to prevent the Court from entering orders on then pending motions involving both the Trepp and Flynn parties, which implicated the Liner Firm, Blixseth and Montgomery in incontrovertible discovery misconduct, and frauds on the Court. It arose in the context of attorney Sunshine's admission at the September 5, 2008 hearing that Montgomery essentially lied under oath in the FBI March 10, 2008 declaration filed by Klar about a stolen "device." This lie was designed by Klar to thwart discovery. The settlement request arose just two weeks after the August 21, 2008 hearing involving Montgomery's perjured September 10, 2007 Declaration, and the Court's extensive examination of Ms. Pham, attended by Mr. Sunshine and Ms. Garafalo. |
| 8. | Given facts recently uncovered recited below, it is apparent that the Liner Firm's conflicts, not only in representing dual, conflicted clients, but in its repeated filing of false and perjured declarations and pleadings; and in its pattern of actively, and by omission, deceiving this Court, the Liner Firm has vexatiously further multiplied these proceedings. The upcoming Flynn settlement conference appears to be another ploy if the Montgomery parties assert inability to pay the judgment. |
| 9. | At the time of Ms. Klar's pro hac vice application in this Court, the formal complaint had been filed against her at the California State Bar, by Jonathan Jenkins, *the Liner Firm lawyer,* involving the identical pattern of *past* unethical and illegal conduct, including the filing of overtly false pleadings, deceptive litigation strategies, and fraudulent client billing related to the fraudulent filings. (See Exhibit 2, attached). Upon information and belief, prior to the |

1    settlement conference, other partners at the Liner Firm knew of the State Bar Complaint and
2    should have informed the Court. The Liner Firm has concealed Klar's history and pattern of
3    unethical conduct, similar to that perpetrated here, and caused a far greater waste of judicial
4    resources than if the Court had just ruled on pending matters, which, of course, involved
5    potential sanctions against their Firm. The waste has been compounded not lessened by the
6    Montgomery parties, Blixseth and their lawyers settlement ruse.

7  10.  Upon information and belief, at the time of the Trepp settlement conference, Blixseth and
8    Blxware's assets and all of her other assets in various entities, were either legally
9    encumbered by recorded mortgages; or pledged to banks and lenders either by oral
10    misrepresentations or provisions in loan documents.[1] As recently discovered, any potential,
11    and very unlikely sale of any of her assets even at reasonably discounted prices, could not
12    possibly have fulfilled the Trepp settlement terms without violating existing lending
13    relationships. That is the essence of the fraud, initiated by Deborah Klar, and then
14    participated in, and perpetuated by the current partners of the Liner Firm. The Liner Firm's
15    settlement ploy could only have been designed to delay and avoid the pending rulings
16    *involving Klar's misconduct*—not to legitimately settle and pay the agreed upon settlement
17    amounts. Had this Court known of the fraudulent lending relationships described below at
18    the time of the Liner Firm's request for a settlement conference, it would likely have ruled
19    on pending motions in the Trepp case knowing that the settlement itself smacked of fraud,
20    both on this Court, on Mr. Flynn, and on numerous lenders.

21  11.  Here, the Court is aware of Ms. Klar's multiple false pleadings against Mr. Flynn filed in
22    four forums across the country. That is the subject of the pending sanctions motion, which
23    vexatiously increased litigation in this Court. Blixseth, Klar and the Liner Firm not only
24    concealed Klar's past history of such misconduct, it then actively participated in concealing
25    the true condition of Blixseth's financial lending relationships and actual financial condition
26    from various banks and lenders referenced in order to pay Klar and the Liner Firm for their
27    own misconduct - the identical pattern of conduct exposed by Mr. Jenkins. Upon
28

information and belief, they participated in this fraud on the Court while helping Blixseth repeatedly defraud multiple lenders of tens of millions of dollars.

12. Between June, 2007, while the Liner Firm was representing Blixseth, and August 14, 2008 - the day Blixseth gave a $35 million mortgage to Cross Harbor Capital on Porcupine Creek - upon information and belief, Blixseth, Montgomery and Klar engaged in a pattern of defrauding multiple banks and lenders. Deborah Klar and another Liner partner have actively participated in said fraud by making false statements to lenders and engaging in conduct contrary to the loan agreements.

13. In the spring of 2008, Bank X loaned Blixeth/Blxware $8 million dollars, secured only by the worthless assets of Blxware, namely Montgomery's purported software. Edra Blixseth executed financial statements, and loan documents which, upon information and belief, were prepared by Klar and/or Blixseth's bookkeeper. Upon information and belief, these are materially false, at least in connection with disclosures involving these pending cases. Upon information and belief, Blixseth, Klar and others in February-March, 2008, represented to Bank X that they had an "executed" "top-secret" contract with the government based on Montgomery's "fully developed" software. On that basis and Blixseth's financials, the loan was made. The loan was in default at the time of the settlement conference.

14. During the same period, while loan proceeds were being paid out, on April 14, 2008, Blxware's CEO, Steve Crisman testified under oath, while being represented by Klar, and unbeknownst to Bank X, that there were no contracts with anyone, and that there were no realistic prospects for any contracts within the next two years. During the same time frame, Blixseth testified under oath that Klar was the "negotiator" with the government *in an effort to obtain a government contract.* Thus, Klar and another Liner partner knew when they made their false statements that there were no government contracts, no "top secret" contracts, and no prospects for any contract - they were doing the negotiating to get a contract. Crisman had told Blixseth *and Klar* during the same time frame that Montgomery

was "a complete fraud" and that there was no technology as represented by Montgomery to support any contract with anyone. Crisman was then terminated by Blixseth for bad-mouthing Montgomery and the purported technology. (Blixseth was on notice of Montgomery's fraud *long* before Crisman told her - Sandoval's chief scientist told her in January, 2007 when Sandoval and Blixseth were partners.) Upon information and belief, Blxware has failed to make payroll *for the last month.*

14. **Upon information and belief, when the Liner Firm requested a settlement conference with Trepp, it knew the Bank X loan was in default and fraudulently procured by Klar and another partner. It knew that Klar had suborned Montgomery's perjury in multiple declarations including the September 10, 2007 declaration against Mr. Flynn, and the March 10, 2008 declaration against the FBI. It knew that Liner had fired Klar for the same pattern of conduct here that she had perpetrated in other cases, and that Liner had seized her computers containing this evidence. The Trepp settlement was just more fraud on the Court. This conduct supports a finding of "good cause."**

15. In July-August, 2008, Blixseth and Klar engaged in a series of transactions with Bank Y, which resulted in Bank Y issuing a $9.5 million loan to Blixseth. Said loan has been in default since it was made.

16. **When the Liner Firm requested the Trepp settlement conference, it knew the Bank Y loan was in default; and that Klar had participated in its fraudulent procurement. Upon information and belief, Stuart Liner has Klar's computers evidencing Klar's involvement in this loan. This conduct supports a finding of "good cause."**

17. In June, 2007, when Deborah Klar undertook the representation of Blixseth, Blixseth borrowed $13 million dollars from Western Capital Partners secured by property at the Yellowstone Club (YC). In June, 2008, while represented by Klar, Blixseth executed a modified loan agreement. Upon information and belief, that loan has been in default since August, 2008. That loan is believed to be under-collateralized resulting in a substantial shortfall. Blixseth has been sued in the District Court for the Western District of Colorado.

18. **When the Trepp settlement conference took place, upon information and belief, the Liner Firm knew the Western Capital loan was in default; and that Klar had participated in defrauding Western Capital by re-writing the loan in June, 2008 knowing that fraudulent loans had been procured from other lenders but not disclosed to Western Capital**. **These facts support a "good cause" finding**.

19. In 2007-2008, Blixseth borrowed $8 million dollars from Bank Z and secured it with assets in an LLC. Upon information and belief, that loan has been in default since August, 2008 and the Liner Firm knew it at the time of the Trepp settlement conference.

20. Upon information and belief, in 2007-2008, Blixseth borrowed $8 million from Bank SB Upon information and belief, that loan has been in default since August-September, 2008, and the Liner Firm knew it at that time.

21. At the time of the Trepp settlement, Blixseth, through Blixseth Group Inc. ("BGI"), the owner of Porcupine Creek, also owed Yellowstone Club Development Inc. (YDI) approximately $250 million dollars. This "insider" debt is now the subject of the Montana bankruptcy proceedings. The YC creditors include approximately $6.5 million dollars in unsecured debt to vendors, merchants etc, and a secured approximately $310 million dollar debt to Credit Suisse, which is in default. In the bankruptcy proceedings, these creditors are seeking the payment of the BGI debt to YDI, which may require the sale of Porcupine Creek. It is unknown whether the Trepp parties and the Court were aware of these additional encumbrances on Porcupine Creek or Blixseth's assets, during the prior settlement discussions. At the time of the settlement conference, the Liner Firm knew about this "insider debt."

22. At the time the Liner Firm requested the settlement conference, in addition to the foregoing, the Liner Firm knew that Blixseth also owed another $32.5 million dollars on notes to individuals due in November, 2008, now in default. At the time of the settlement, Blixseth could not possibly have paid these obligations, paid or provided collateral for the defaulted loans, and paid Trepp from any liquid assets, or assets available for sale. Blixseth knew that

bankruptcy of the YC and payment of the BGI debt alone might consume Porcupine Creek, the castle in France and her other assets. The Trepp settlement now appears to be a bad faith effort by the Liner Firm to thwart orders in the Trepp cases, and a fraud on other lenders. It appears to be no accident that the promised payment of $1.5 million dollars and collateralization of the Trepp settlement was put just outside the 90 day preference period. The current Montana bankruptcy proceedings appear to be planned by Klar in the spring of 2008 in order to obtain complete control of the Yellowstone Club for Edra Blixseth and her "partners."

23. Upon information and belief, when many of the foregoing loans were made to Blixseth, many of the lenders did not know about the loans to the other lenders; and the Liner Firm knew it at the time of the settlement.

24. All of the above evidence and facts support a "good cause" finding.

25. The bad faith inherent in the settlement ploy relating to the Flynn settlement conference is also supported by the fact that, to date, the Liner Firm has refused to comply with the Court's settlement Order, (doc.#892).

Signed under the pains and penalties of perjury this 18th day of December, 2008 under the laws of the United States and Nevada.

Michael J. Flynn