1

2 **UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**
3

4 DENNIS MONTGOMERY, et al.,⁣)            3:06-CV-0056-PMP (VPC)
)
5                     Plaintiffs,⁣)
)            **ORDER RE: MOTION**
6          vs.⁣)            **FOR SANCTIONS (#545)**
)
7 ETREPPID TECHNOLOGIES, LLC, et al.,⁣)
)
8                     Defendants.⁣)
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯)
9

10          Before the court is Michael Flynn's ("Mr. Flynn") motion for sanctions against Dennis

Montgomery ("Mr. Montgomery"), the Montgomery Family Trust and Brenda Montgomery
11
("Montgomery parties"), their counsel of record, Deborah Klar, and her firm, Liner Yankelevitz
12
Sunshine Regenstreif, LLP ("Liner firm")[1] pursuant to 28 U.S.C. § 1927 and/or pursuant to the court's
13
inherent power (Case No. 06-56, #545).  The parties filed the following papers in regard to this motion:
14
Docket #s 545, 546, 547, 566, 567, 568, 571, 574, 589, 593, 595, 596, 597, 598, 599, 600, 601, 602, 603,
15
610, 613, 614, 620-25, 632, 633, 635-38, 649, 661, 664, 667, 674, 680, 683, 691, 698, 714, and 735.
16
         This motion concerns Mr. Flynn's withdrawal as counsel for the Montgomery parties in July
17
2007, two declarations Mr. Montgomery filed with this court, and the litigation conduct of Deborah Klar
18
("Ms. Klar") and Teri Pham ("Ms. Pham") of the Liner firm as it concerns events in this action in the
19
late summer and fall of 2007.  After extensive briefing, this court held a day-long evidentiary hearing
20
(Case No. 06-56, #826).  The court concludes that the conduct of the Liner firm and its attorneys, Ms.
21
Klar and Ms. Pham, was willfully reckless, intended to harass, done for an improper purpose, and was
22
suffused with bad faith.  The court also concludes that Ms. Klar and Ms. Pham unreasonably and
23
vexatiously multiplied these proceedings, which resulted in an increased cost to Mr. Flynn, and that their
24
conduct was in contempt of this court's orders.  Finally, the court concludes that Mr. Montgomery's
25
September 2007 declaration contained untrue statements, which he knew were untrue, and that this
26

27 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

28          [1]The Liner firm has since changed its name to Liner Grode Stein Yankelevitz Regenstreif &
Taylor LLP.

declaration was filed in bad faith and for the improper purposes of attempting to manipulate these proceedings, to gain a tactical advantage, to harass Mr. Flynn, his former counsel, and to subvert orders of this court.  Therefore, Mr. Flynn' motion for sanctions pursuant to 28 U.S.C. § 1927 and/or pursuant to the inherent power of the court (Case No. 06-56, #545) is **GRANTED**.

# I. <u>FINDINGS OF FACT</u>

*A.*      *The State District Court Proceeding – U.S. District Court Case No. 06-145*

1.      On January 19, 2006, eTreppid filed a complaint in the state district court against the Montgomery parties, alleging in part that Mr. Montgomery misappropriated eTreppid's trade secrets when he departed from the company in January 2006 (Case No. 06-145, #16).

2.      This case was removed to this court on March 20, 2006 (Case No. 06-145, #1).

3.      Prior to the removal, the state district court held a hearing on February 7, 2006 concerning eTreppid's motion for preliminary injunction.  *See* Ex.10, August 21, 2008 sealed evidentiary hearing in Case No. 06-56 ("sealed hearing").

4.      Appearing at the preliminary injunction hearing on behalf of the Montgomery parties were local counsel, Ronald Logar and Eric Pulver, as well as Michael J. Flynn and Philip Stillman.  *Id.*  Mr. Montgomery was also present and testified at the hearing. *Id.*

5.      At the beginning of that hearing, Mr. Logar advised the court as follows:

> Mr. Flynn is a member of the Massachusetts Bar. The application for *pro hac vice* has been made. The Massachusetts Bar has sent a certificate of good standing to the State Bar of Nevada. The State Bar of Nevada has issued its approval. It was over-nighted yesterday to my office. It should be received by Federal Express about 10:00 or 10:30 this morning, having complied with the Supreme Court rule as to admission, and we ask that Mr. Flynn be permitted to appear in this matter on behalf of the defendant.

> *Id.*

6.      Mr. Montgomery was seated at counsel table with his attorneys at this hearing.  Tr. 130:17-23, sealed hearing.

2

7.  The state district court allowed Mr. Flynn to appear based upon those representations. Ex. 10, sealed hearing. That same day, Mr. Logar filed the motion to associate counsel and provided Mr. Flynn's application, as well as his certificate of good standing with the State Bar of Massachusetts. Ex.11, sealed hearing.

8.  The day before the state court preliminary injunction hearing, Mr. Montgomery met with his local and out-of-state counsel, Mr. Flynn, Mr. Stillman, and Mr. Logar, at Mr. Logar's law offices in Reno. Tr. 130:23-25:131:1-4, sealed hearing. Mr. Montgomery testified that he did not recall the exact nature of the problem, but remembered there was "a problem about the *pro hac vice* application or the mechanism or whatever." Tr. 131:5-12, sealed hearing.

9.  The day after the preliminary injunction hearing, Mr. Montgomery's counsel provided him with a fee agreement, which Mr. Montgomery never signed. Tr. 118:5-25; Ex. 14, sealed hearing.

10. Messrs. Flynn, Logar, Stillman, and Pulver were present at the meeting, and Mr. Montgomery testified that it was Mr. Logar who actually gave him the agreement. Tr. 116:5-12, sealed hearing.

11. Page two of the fee agreement provides: "Senior partners (Michael Flynn, only licensed in MA, Ron Logar) $200/hour (reg. $400)." Ex. 14, sealed hearing.

12. The unsigned fee agreement also provides the following information:

    a)  a California address for Flynn & Stillman;
    b)  Flynn & Stillman are to be admitted *pro hac vice* in Nevada; and
    c)  any fee dispute is subject to jurisdiction of the State Bar of California.

    *Id.*

13. Mr. Montgomery testified at the sealed hearing that he did not understand what "licensed, " or "admitted" means in the context of the practice of law. Tr. 121:5-9; 148:4-5, sealed hearing.

14. On March 20, 2006, the United States Department of Defense removed this action to the United States District Court (Case No. 06-145, #1).

3

15.   Messrs. Flynn and Stillman applied for *pro hac vice* admission, which this court approved (Case No. 06-145, #s 9 and 14). Mr. Flynn stated in his application he is licensed to practice law in Massachusetts and resides in California (Case No. 06-145, #9).

16.   Pursuant to the District Court's order of March 15, 2007, Case No. 06-145 was consolidated with a companion case originally filed with this court, Case No. 06-56 (Case No. 06-56, #123).

**B.**   ***The U.S. District Court Trade Secrets Proceeding – Case No. 06-56***

17.   On January 31, 2006, the Montgomery parties filed a parallel action in this court alleging copyright infringement and related claims against eTreppid and Warren Trepp (Case No. 06-56, #1).

18.   Once again, Messrs. Flynn and Stillman filed applications for *pro hac vice* admission, which this court approved (Case No. 06-56, #s 9, 10, 20). As with Mr. Flynn's prior *pro hac vice* application in Case No. 06-145, he attested that he is licensed to practice law in Massachusetts and resides in California (Case No. 06-56, #9).

19.   Mr. Flynn served as lead counsel for the Montgomery parties in these consolidated actions and all other proceedings pending in this court for approximately nineteen months until September 4, 2007, when the District Court granted Mr. Flynn's motion to withdraw as counsel (Case No. 06-56, #256).

20.   Just as these civil actions were underway, the United States sought and obtained a search warrant to search Mr. Montgomery's home and storage units. The court now turns to that proceeding.

**C.**   ***The Search Warrant Proceeding - Case No. 06-263.***

21.   On February 28, 2006 and on March 3, 2006, this court issued search warrants for the search of Mr. Montgomery's home and storage units (Case No. 06-263, #s 2, 5, 7, 9, 11, and 12).

4

22.   On March 10, 2006, Mr. Flynn, as lead counsel for Mr. Montgomery, filed a motion to unseal search warrant affidavits, for the return of the property, and for the segregation and sealing of all attorney-client and trade secrets materials seized (Case No. 06-263, #21).

23.   From March 2006 until November 2006, this court presided over motions and evidentiary hearings concerning these disputes, and on November 28, 2006, the court issued its order granting in part and denying in part Mr. Montgomery's motion to unseal the search warrants (Case No. 06-263, #86).

24.   Throughout this period, Mr. Flynn served as lead counsel for Mr. Montgomery in the search warrant proceeding.

25.   The United States filed its objection to this court's November 28, 2006 order, and the District Court affirmed that order on March 19, 2007 (Case No. 06-263, #122).

26.   During this interim period, several events occurred which are relevant to the court's consideration of Mr. Flynn's motion for sanctions.

27.   On February 7, 2007, Mr. Flynn, on behalf of Mr. Montgomery, sent a letter to the following:  United States Attorney General, Alberto R. Gonzalez; Deputy Attorney General, Paul J. McNulty; Edward Nucci, Acting Chief of the Public Integrity Section, U.S. Department of Justice; and Daniel Bogden, Nevada United States Attorney. Ex. 30, sealed hearing. The letter concerned the status of the search warrant proceedings and matters concerning the United States Attorney's office. *Id.*

28.   On February 9, 2007, Mr. Flynn sent another letter to Messrs. Gonzalez, McNulty, and Nucci concerning the status of the search warrant proceedings, Mr. Montgomery's work on behalf of the United States, and related matters.  Ex. 28, sealed hearing.

29.   Both letters expressed concerns about the Nevada United States Attorney's handling of the search warrant proceeding.  Exs. 28 & 30, sealed hearing.

30.   Email communications among Mr. Flynn, his co-counsel, Carla DiMare, Mr. Montgomery, and Edra Blixseth ("Ms. Blixseth") indicate that these persons discussed

5

the drafting of these letters and that Mr. Flynn sent final copies of the letters to Mr. Montgomery via email. *Id.* The letterhead on these letters stated, "Michael J. Flynn, admitted only in Massachusetts." Exs. 28 & 30, sealed hearing.

31. On February 13, 2007, just days after the letters were sent, the United States filed a motion to strike pleadings filed by Mr. Flynn and to preclude his *pro hac vice* admission to this court in the search warrant proceeding. Ex. 6, sealed hearing; (Case No. 06-263, #110).

32. The United States challenged Mr. Flynn's representation of Mr. Montgomery in the search warrant proceeding because although Mr. Flynn had been admitted *pro hac vice* in the civil actions, he had not been admitted to appear in the search warrant proceeding. Ex. 6, sealed hearing. The United States also directly challenged Mr. Flynn's statements in his other *pro hac vice* applications that: (1) he regularly practices law in Massachusetts; (2) he has a law office in Boston; (3) he actually resides in California; (4) he has conflicting addresses for law offices in both California and Massachusetts; and (5) although his letterhead states, "admitted only in Massachusetts," it appeared that Mr. Flynn was practicing law in California. *Id.*

33. In response, Mr. Flynn filed an opposition memorandum (Case No. 06-263, #113), and both Mr. Flynn and Mr. Montgomery filed detailed declarations in support of the opposition (Case No. 06-263, #s 114 & 115); Exs. 3 & 4, sealed hearing.

34. In both the opposition memorandum and Mr. Flynn's declaration, Mr. Flynn recited that he is only licensed in Massachusetts, that he has appeared in jurisdictions throughout the United States, that he maintains a Boston office address and a personal residence in Massachusetts, and that he also has a residence in California. Ex. 4, sealed hearing. In addition, Mr. Flynn stated that he has litigated cases in Massachusetts since 1991. *Id.*

35. Mr. Flynn asserted in his opposition memorandum that the challenge to his representation of Mr. Montgomery was in retaliation for his success in the search warrant proceeding and for exposing alleged political corruption. *Id.*

6

36.   Mr. Montgomery's declaration, eight pages in length, recounted in great detail his work on national security matters, meetings with government officials at the highest levels, Mr. Negroponte's declaration in support of invocation on the military and state secrets privilege in the consolidated civil actions, and his concerns for the safety of United States military personnel.  Ex. 3, sealed hearing.

37.   Attached to his declaration were two exhibits: a March 1, 2006 letter to Secretary of Defense Donald Rumsfeld, Secretary of Homeland Security Michael Chertoff, and Attorney General Alberto Gonzales, as well as several pages of written questions directed to Mr. Negroponte.  *Id.*

38.   Mr. Montgomery testified that he recalled this letter, that it went through several drafts, but stated he did not recall seeing Mr. Flynn's letterhead, which states Mr. Flynn is only admitted in Massachusetts.   Tr. 56:5-25;  57:1, sealed hearing.   However, Mr. Montgomery then conceded that it was *not* his testimony that he never received Mr. Flynn's letterhead, but that he could not recall if he saw the final draft of this letter on Mr. Flynn's letterhead. Tr. 57:2-9, sealed hearing.  Mr. Montgomery then stated he could not recall whether he knew Mr. Flynn was only licensed in Massachusetts as of the March 1, 2006 date of the letter.  Tr. 57:10-12, sealed hearing.

39.   Mr. Montgomery made the following important attestations in his declaration:

a)   that he had personal knowledge of the matters stated in his declaration, Ex. 3, sealed hearing;

b)   that he had read the motion to disqualify his attorney, as well as the letters Mr. Flynn sent to government officials on Mr. Montgomery's behalf concerning the search warrant proceeding, *Id.* at ¶ 4;

c)   that the "recent attempt to disqualify my attorney would gravely damage my constitutional protections. It is borne out of ignorance of the facts by the USAO, an agenda to attack me, and disregard for not only my rights, but the security of our Country" *Id.* at ¶ 13; and

d)   "Given [Mr. Flynn's] experience, integrity, and litigation expertise, he is my counsel of choice, I strongly believe he will stand up to the corrupting influences of Warren Trepp, vigorously protecting my rights, and achieve justice in this matter." *Id.* at ¶ 14.

40.   At the sealed hearing, Mr. Montgomery testified that his February 2007 declaration was truthful when he signed it.  Tr. at 24:8-10, sealed hearing.  However, when asked about

7

specific statements in his own declaration or the motion to disqualify, Mr. Montgomery repeatedly testified he could not recall whether he had read the entire motion, that Mr. Flynn may have read portions of the motion to him, and that he really didn't recall whether the government's motion concerned the question whether Mr. Flynn was licensed to practice law only in Massachusetts, and was practicing law in California.  Tr. 25:3-7; 27: 6-10; 31:4-22, sealed hearing.

41.     When asked specifically whether the contents of paragraph four of the declaration were true, Mr. Montgomery testified that those statements were true.  Tr. 53:13-25; 54:1-14, sealed hearing.

42.     When asked whether he knew at the time that Mr. Flynn was licensed to practice law only in Massachusetts, Mr. Montgomery testified, "What's that mean to me? That didn't mean to me that you couldn't practice in California."  Tr. 29:10-13; 42:8-13, sealed hearing.

43.     Mr. Montgomery also reviewed Mr. Flynn's declaration in opposition of the government's motion to disqualify, which states: "Both Mr. Stillman and [Mr. Flynn] are licensed attorneys in Massachusetts where the firm was originally based. Mr. Stillman is licensed to practice in California, Mr. Sherdian, and Tab (phonetic), my former partners through 2002, were only licensed in Massachusetts." Ex. 4, sealed hearing.  At the hearing, Mr. Flynn asked him, "Did you read that at the time the government was trying to throw your lawyer out and disqualify him in the middle of the search proceedings?" and Mr. Montgomery replied, "Probably."  Tr. 26:7-10, sealed hearing.

44.     The entire basis for Mr. Flynn's disqualification in the search warrant proceedings hinged on Mr. Flynn's bar licensure and the letters sent to high government officials just prior to the filing of the motion.  Mr. Montgomery either read these critical papers, or he did not.

8

D. **Resumption of the Civil Proceedings in March 2007 and the Liner Firm's Entry as Counsel for the Montgomery Parties in July 2007**

45.     In September 2006, this court issued its order staying proceedings in the two civil cases pending disposition of the search warrant proceedings (Case No. 06-56, #84).  It was not until March 2007, that the civil cases were consolidated and the case proceeded (Case No. 06-56, #123).

46.     On July 9, 2007, Mr. Flynn and his co-counsel, Ms. DiMare, moved to withdraw as counsel for the Montgomery parties based upon nonpayment of legal fees and the assertion that Mr. Montgomery had engaged in conduct that made continued representation unusually difficult (Case No. 06-56, #s 205 & 206).

47.     Since the United States had invoked the military and state secrets privilege, the withdrawal of counsel was not a routine motion, and it drew a response from the United States who sought to impose conditions on the withdrawal of former counsel concerning documents in the client file subject to the state secrets privilege (Case No. 06-56, #209).

48.     When the Liner firm stepped in to represent the Montgomery parties, Ms. Klar was designated as lead counsel, and she acted in that capacity until August 18, 2008, when Randall Sunshine and Ellyn Garofalo assumed the roles of lead counsel (Case No. 06-56, #815).

49.     Ms. Pham also initially represented the Montgomery parties, but only did so from July through November 2007, as she went on family leave (Case No. 06-56, #599). Thereafter, Ms. Pham made no appearances in the case, apart from the sanction proceedings.

50.      At the inception of their representation of the Montgomery parties, Ms. Klar and Ms. Pham knew that the United States had invoked the state secrets privilege and that it greatly affected the dissemination of documents relating to this proceeding, which might limit or prevent the Liner firm's access to Mr. Flynn's client files (Case No. 06-56, #213).  The Liner firm strenuously objected to the government's potential access to client

9

files, and they also asked that Mr. Flynn and Ms. DiMare be ordered to surrender the client files to new counsel upon entry of the order granting the motion to withdraw. *Id.* It was in this filing on July 26, 2007 that the Liner firm first raised a question about Mr. Flynn's residence in California and communications with the clients from California. *Id.*

51. On July 31, 2007, the District Court set a hearing on the motion to withdraw for August 17, 2007 (Case No. 06-56, #223).

52. Although neither this court nor the District Court had any reason to know of the escalating disputes among Mr. Montgomery, Mr. Flynn, and the Liner firm, the court now understands more fully what transpired.

53. Mr. Flynn wished to be paid past due attorney's fees and costs in excess of $635,000, and the Montgomery parties did not wish to pay him. As new counsel, the Liner firm wanted Mr. Flynn's client files, but on its terms and in a forum of its choosing.

54. The court now turns to the events that occurred in this action in Nevada, California and Massachusetts.

55. In July and August 2007, the Liner firm and Mr. Flynn communicated about transferring representation of the Montgomery parties to the Liner firm, a routine practice among counsel; however, they could not agree on surrender of the client files or the fee dispute (Case No. 06-56, #s 599 & 600).

56. On July 31, 2007, Mr. Flynn and Ms. Pham had a telephone conference concerning Mr. Flynn's withdrawal as counsel (Case No. 06-56, #240). Counsel discussed Mr. Flynn's claim to a retaining lien under Nevada law, as well as the government's position concerning the propriety of any transfer of client files until redaction issues were resolved. *Id.* Mr. Flynn attests that Ms. Pham would not acknowledge the effect of the retaining lien or the government's position concerning the client files *vis-a-vis* the state secrets privilege. *Id.* Based upon this communication, Ms. Pham and Ms. Klar had notice of the Nevada retaining lien.

10

57. Presumably, Ms. Klar and Ms. Pham immediately researched Nevada law and discovered that unlike many jurisdictions, including California, Nevada law allows attorneys to file a retaining lien over client files until the client either pays the outstanding fees or posts a bond to obtain the files.

**E.   *August 2007 – United States District Court and Los Angeles Superior Court***

58.   **August 1, 1007** – The Montgomery parties terminated Mr. Flynn as counsel. *Id.*

59.   **August 3, 2007** – **The Los Angeles County Superior Court Complaint:** Ms. Klar and Ms. Pham filed a complaint for preliminary and injunctive relief in Los Angeles Superior Court on behalf of the Montgomery parties. Ex. 16, sealed hearing. The complaint alleged in relevant part:

    a)   The plaintiffs met with Mr. Flynn on January 26, 2006, but do not state where the meeting occurred;

    b)   Mr. Flynn led the parties to believe that he was a California lawyer and that he had a law firm in California;

    c)   Mr. Flynn held himself out as a California lawyer "[t]hroughout the course of his representation," that invoices were sent from California, and that Mr. Flynn listed a California address on all pleadings filed with this court;

    d)   At no time did Mr. Flynn ever advise the plaintiffs he was *not* licensed to practice law in California (emphasis added);

    e)   Mr. Flynn never provided the plaintiffs with a written fee agreement.

60.   Plaintiffs alleged that notwithstanding their demand to turn over client files, Mr. Flynn refused to do so in violation of the California Rules of Professional Conduct. *Id.*

61.   However, when Ms. Klar and Ms. Pham filed this complaint, they knew the following: 1) that the turnover of the client files and matters concerning the state secrets privilege were pending before this court; 2) that the District Court had set Mr. Flynn's motion to withdraw for hearing on August 17, 2007, at which time the Court would consider the client file dispute in light of the state secrets privilege (Case No. 06-56, #223); and, 3) Mr. Flynn claimed a retaining lien under Nevada law (Case No. 06-56, #240).

62.   Mr. Montgomery testified that he reviewed this complaint before it was filed, but could not recall whether he conducted any investigation concerning the allegations in the complaint. Tr. 111:19-25; 112:1-12, sealed hearing.

11

63. However, Mr. Montgomery did acknowledge he knew before the complaint was filed that Mr. Flynn's letterhead stated, "admitted only in Massachusetts." Tr. 111:15-18, sealed hearing.

64. Mr. Montgomery also testified that Mr. Flynn was representing him in Nevada and that he knew of no legal proceedings in which Mr. Flynn represented him in California. Tr. 40:7-12, sealed hearing.

65. With regard to the allegation in the complaint that Mr. Flynn never informed Mr. Montgomery that he was not a licensed to practice law in California, Mr. Montgomery could not recall whether he ever actually asked Mr. Flynn whether he was a California lawyer. Tr. 113:15-25; 114:1-4, sealed hearing.

66. **August 8, 2007 – Mr. Flynn Files Notice of Lodgement:** Mr. Flynn removed the California Superior Court action to the United States District Court for the Central District of California, accompanied by a notice of lodgment of exhibits. Ex. 7, sealed hearing. This filing provided the Liner firm with extensive documentation about Mr. Flynn's admission to the State Bar of Massachusetts, and related papers concerning his relationship with Mr. Montgomery during their attorney-client relationship. *Id.*

67. Ms. Pham testified that she reviewed the materials Mr. Flynn provided. Tr. 217:7-13, sealed hearing.

68. **August 17, 2007 – District Court Hearing on Mr. Flynn and Ms. DiMare's Motion to Withdraw:**

The District Court heard Mr. Flynn's motion to withdraw and considered the government's concerns about the United States protective order. This hearing was the court's first real inkling of the dispute over fees and the client file (Case No. 06-56, #247). Ms. Klar of the Liner firm advised the court that she had filed suit against Mr. Flynn in California on behalf of the Montgomery parties, but neither the District Court nor this court had an understanding of exactly how that proceeding related to the events unfolding in this action. Given the complexity of the matters before the court, the

12

District Court was unclear whether it should become embroiled in this dispute, or whether the matter ought to be addressed by a California court (Case No. 06-56, Transcript of August 17, 2007 hearing, pages 25-28 (#267). The District Court took Mr. Flynn's motion to withdraw under submission. At the August 17th hearing, Mr. Flynn told the Court and counsel that he and Mr. Montgomery communicated very extensively via email correspondence over the nineteen months of his representation (Case No. 06-56, #267, Transcript of August 17, 2007 hearing, p. 20:19-25, p. 21-23). Mr. Flynn estimated that they exchanged in excess of one thousand emails and that apart from very few original documents, they transmitted all other documents in this fashion. *Id.* The Court asked Ms. Klar whether she had access to Mr. Montgomery's emails, and she replied that she did. *Id.* at 23:24-25; 24:1-3.

69.  **August 17, 2007 – Mr. Flynn and Ms. DiMare File Lien Notices:**

Mr. Flynn and Ms. DiMare filed "notices of lien and/or retaining lien pursuant to N.R.S. § 18.015 and cases over the papers and property of the Montgomery parties for unpaid fees and costs" (Case No. 06-56, #s 243, 245 & 246).

70.  **August 21, 2007** – **Mr. Flynn Files Motion for Attorney's Fees and Costs:**

Mr. Flynn filed a motion for attorney's fees (Case No. 06-56, #248), and it is Mr. Montgomery's declaration filed in opposition to this motion (Case No. 06-56, #261), which is, in part, the subject of Mr. Flynn's motion for sanctions.

71.  **August 29, 2007 – District Court Issues United States Protective Order:**

The District Court issued the United States protective order (Case No. 06-56, #252). The United States supported its motion under the military and state secrets privilege with the declaration of John Negroponte, formerly Director of National Intelligence, and a classified declaration, which the District Court reviewed *in camera* (#252). A companion order concerned protocols for information subject to disclosure or discovery in the action (Case No. 06-56, #253).

1

72.   **August 31, 2007 – Liner Firm Files Notice of Objection to Retaining Liens:**

2

Ms. Klar and Ms. Pham filed a notice of objection to the retaining lien (Case No. 06-56,

3

#254) and objected to the lien on the ground that the California Superior Court had

4

jurisdiction over the matter because they had already filed the complaint.

5   *F.*   *September 2007*

6

73.   **September 4, 2007 – District Court Grant's Mr. Flynn and Ms. DiMare's Motion to Withdraw:**

7

Having considered the arguments of the parties on August 17, 2007, the District Court

8

granted Mr. Flynn and Ms. DiMare's motion to withdraw and further ordered:

9

10

that to the extent the Montgomery Plaintiffs seek to condition the withdrawal of Flynn and DiMare on Flynn and DiMare surrendering their complete "client file" to new counsel of record for Plaintiffs (Doc. #213), said precondition is rejected by the Court. In this regard, the record before the Court does not support the finding that Flynn and DiMare have withdrawn "voluntary" as counsel for Montgomery Plaintiffs, In the Matter of Kaufman, 93 Nev. 452, 567 P.2d 857 (1977), nor does it appear on the record before the Court that Flynn and DiMare should be compelled to surrender their files to new counsel of record. Figliuzzi v. Fed. Dist. Court, 111 Nev. 338, 890 P.2d 798 (1995).

11

12

13

14

15

16

(Case No. 06-56, #256, p. 4:12-20).

17

74.   At the sealed hearing, Ms. Pham testified that she had not actually read *Kaufman* or

18

*Figliuzzi* at the time the District Court issued its order, but she agreed that these cases

19

20

stand for the proposition that where a lawyer has not withdrawn voluntarily, Nevada law

provides that the lawyer is not compelled to surrender the client file.  Tr. 195:24-25;

21

196:1-25; 197:1-19, sealed hearing.

22

75.   Ms. Pham also agreed that at the August 17, 2007 hearing, the District Court was very

23

concerned about the disputed client files insofar as it concerned the United States

24

Protective Order.  Tr. 198:18-25; 199:1-3, sealed hearing.

25

26

27

28

14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

76.     **September 7, 2007 – Liner Firm Submits Application for Arbitration of Fee Dispute with San Diego County Bar Association:**

Ms. Klar and Ms. Pham submitted an application for arbitration of a fee dispute to the San Diego County Bar Association and stated the amount in dispute as $1,838,959.50 (Case No. 06-56, #597-6, Ex. 11).  Ms. Pham and Ms. Klar's statement of the facts allege that Mr. Flynn held himself out as a California lawyer, as set forth in their California Superior Court complaint, but they disclosed no information whatsoever concerning the pending proceedings in this court. *Id.*

77.     Mr. Montgomery knew Ms. Klar and Ms. Pham filed this application for arbitration of the fee dispute. Tr. 140:16-18, sealed hearing.

78.     Three months later, on December 3, 2007, the San Diego Bar Association responded that it had no jurisdiction and stated:

> Based on the Court Orders of the United States District Court, District of Nevada and the Superior Court of California for Los Angeles County, it is clear that the District of Nevada has taken control of the entire case filed by the applicants . . . including the issue of attorney fees and costs. The Superior Court for the County of Los Angeles has declined jurisdiction.
>
> In a matter where there is a court determination of attorney fees and costs between the application and his, her or its attorney, this committee has no jurisdiction to hear the matter. . . . In this matter, the US District Court for the District of Nevada has clearly indicated that it will make that determination. The matter is dismissed without prejudice.

(Case No. 06-56, #597-6, footnotes omitted).

79.     After submitting the September arbitration application, Ms. Pham did not notify the San Diego Bar Association of this court's October 12, 2007 order (Case No. 06-56, #296), nor did she notify them of the Los Angeles Superior Court's November 21, 2007 order (Case No. 06-56, #597-6), as she believed Mr. Flynn had done so.  Tr. 218:13-23; 220:3-12, sealed hearing. When asked why she did not withdraw the fee arbitration application after these orders were issued, Ms. Pham responded that she believed she had a

15

conversation with someone at the Bar Association, she was under the impression the application would be denied, and Mr. Flynn had already submitted the orders.   Tr. 219:18-25; 220:1-12, sealed hearing.

80.   **September 10, 2007 – Mr. Montgomery's September 10, 2007 Declaration**

The Liner firm filed an opposition to Mr. Flynn's motion for attorney's fees and attached Mr. Montgomery's declaration, which attested in relevant part as follows:

a)   In January 2006, I was introduced to attorney Michael J. Flynn by my local counsel, Ronald Logar;

b)   Mr. Flynn led me to believe at that time and throughout his representation that he was a California attorney, and I believed that I was engaging a California lawyer to represent me. Specifically, he told me that he had a law firm, Flynn & Stillman, in California, and I met with him at his offices in Cardiff, California;

c)   All of his invoices were sent from California, and all payments were remitted to California;

d)   All of the papers Mr. Flynn filed with the court listed a California address; and

e)   At no time did Mr. Flynn ever inform me that he was not and is not licensed to practice in the State of California *or that he is licensed to practice only in Massachusetts.* I only learned of this when I retained new counsel.

(Case No. 06-56, #261) (emphasis added).

81.   At the sealed hearing, Mr. Montgomery testified that although he initially met Mr. Flynn in Reno in January 2006, he believed Mr. Flynn was a California lawyer because he had offices in California.  Tr. 17:23-25; 18:1, sealed hearing.  Although he testified he went into a law office in Cardiff, California, Mr. Montgomery could not recall on what floor the office was located, whether the office had any desks, and he could not recall who else was in the office. Tr. 18:2-9 & 14-18, sealed hearing. When pressed about the details of this office visit, Mr. Montgomery stated, "I didn't say I met you *in* the office," but could not recall who was in the office Mr. Montgomery visited. Tr. 18:24-25; 19:1, sealed hearing (emphasis added).  When asked to explain additional details of this visit, Mr. Montgomery's responded six times that he could not remember or recall.  Tr. 19:9-20; 20:1-2, sealed hearing.  Later, Mr. Montgomery testified he recalled meeting Mr. Flynn in an office, but could not recall whether it was "inside" or "outside" the office. Tr. 21:7-14, sealed hearing.

16

82.  The court finds that paragraph seven of Mr. Montgomery's declaration is particularly important because he attested "[a]t no time did Mr. Flynn ever inform me that he was not licensed and is not licensed to practice in the State of California, *or* that he is licensed to practice only in Massachusetts." Ex. 1, sealed hearing (emphasis added).

83.  Mr. Flynn examined Mr. Montgomery extensively about paragraph seven of his declaration and offered several exhibits about their communications prior to his withdrawal as counsel. Exs. 5, 9, 15, 20, 21, 23, 28, 29, 30, 31, & 32, sealed hearing.

84.  These exhibits demonstrate a pattern in Mr. Flynn and Mr. Montgomery's attorney-client relationship of extremely frequent and detailed communications about every aspect of the actions pending in this court, and given the gravity of the letters sent to high ranking government officials and the papers filed with this court, it is difficult to imagine that Mr. Montgomery did not know that Mr. Flynn was "admitted only in Massachusetts," as his letterheads states.

85.  Prior to signing his September 10, 2007 declaration, Mr. Montgomery could not recall whether he reviewed or discussed the notice of lodgement sent to his new counsel, whether he reviewed the search warrant docket sheet provided to Ms. Pham and Ms. Klar, whether he reviewed letters Mr. Flynn provided to his new counsel stating he was admitted only in Massachusetts, whether he reviewed the transcript of the February 2006 preliminary injunction proceeding provided to his new counsel, or whether he did anything to confirm that Mr. Flynn was admitted to practice law only in Massachusetts. Tr. 106:18-25; 107:1; 107:20-25; 108:1-25; 109:1-5; 14-25; 110:1-23; 132:4-25, sealed hearing.  However, he conceded that he "must have seen" the title pages of papers filed with this court, which identify Mr. Flynn as having a Massachusetts bar number.  Tr. 128:20-25; 130:1-8, Ex. 9, sealed hearing.

86.   Mr. Montgomery's testimony about his understanding of the words "admitted" and "licensed" as they concern bar admission is inconsistent and not credible.  Mr. Montgomery testified that he did not know what the term "admitted" or "licensed"

meant, and that although he saw Mr. Flynn's letterhead which stated "only admitted in Massachusetts," Mr. Flynn never told him he was only licensed to practice in Massachusetts, and they never discussed what it meant. Tr. 148:4-23; 153:25; 154:1. However, Mr. Montgomery could not recall if he asked Mr. Flynn whether he was licensed in California.  Tr. 152:15-19, sealed hearing. He only learned after he retained new counsel that a lawyer admitted in one state had to be approved by another state to appear in a particular case.  Tr. 148:24-25; 149:1-7, sealed hearing.

87.   When pressed to recall the time frame in which Mr. Montgomery first understood the meaning of "admitted" and "licensed," he could not recall whether he learned this from Ms. Klar or Ms. Pham before or after he signed his September 10, 2007 declaration, and he then testified that he did not understand these words when he signed his declaration. Tr. 149:15-25; 150:1–19; 151:23-25; 152:1-14, sealed hearing.

88.   The court finds that there is a very simple reason that Mr. Flynn and Mr. Montgomery never discussed whether Mr. Flynn was licensed to practice law in California:  Mr. Montgomery hired Mr. Flynn to represent him in the search warrant proceedings and the trade secret litigation pending in the District of Nevada.  There was no reason to discuss Mr. Flynn's admission to practice law in California, Florida, New York, or any other state, as long as Mr. Flynn was properly admitted to practice law before this court, which he was.

89.   The court finds that as of September 10, 2007, Mr. Montgomery *knew* that Mr. Flynn had been admitted to practice in the District of Nevada because he was in the courtroom in February 2006 when Judge Perry allowed Mr. Flynn to proceed, and *knew,* or reasonably should have known, that Mr. Flynn was admitted to practice law in Massachusetts, because it was discussed in open court and appeared in letters and court filings.  Even if Mr. Montgomery may not have appreciated the importance of Mr. Flynn's admission to practice in the state court and his status as a Massachusetts lawyer at that time, he surely

18

understood the significance of this issue in February 2007, when the United States tried to disqualify Mr. Flynn as his counsel in the search warrant proceeding.

90. Ms. Pham also testified about Mr. Montgomery's September 10, 2007 declaration. She told the court that she drafted the declaration based on her discussions with Mr. Montgomery and believed that she had completed proper due diligence to draft it. Tr. 165:4-23, sealed hearing.

91. Although Ms. Pham acknowledged Mr. Flynn's Massachusetts bar number on papers routinely filed in all proceedings in this court, and his "admitted only in Massachusetts" letterhead, she concluded that Mr. Montgomery had not understood what it meant to be "admitted" or "licensed" in a state, nor had he understood that Mr. Flynn was not licensed to practice law in California. *Id.*

92. Based on her discussions with Mr. Montgomery, Ms. Pham believed that since Mr. Montgomery thought Mr. Flynn was a California lawyer, California law governed the attorney-client relationship. Tr. 166:2-20, sealed hearing.

93. In drafting paragraph seven of Mr. Montgomery's declaration, Ms. Pham believed it was truthful because Mr. Montgomery did not clearly understand what being licensed, admitted or authorized to practice law in a jurisdiction actually meant. Tr. 176:6-17, sealed hearing.

94. Although Ms. Pham saw Mr. Flynn's "admitted only in Massachusetts" letterhead, she believed that since it did not say "licensed only," and Mr. Flynn never affirmatively told Mr. Montgomery he was *not* licensed to practice law in California, this created confusion in the mind of a layperson like Mr. Montgomery. Tr. 167:19-25; 168:1-9, sealed hearing.

95. Ms. Pham testified that she believed paragraph seven to be accurate, notwithstanding that she reviewed Mr. Flynn's papers filed with the court and Mr. Flynn's "admitted only in Massachusetts" letterhead for more than a year and a half. Tr. 181:25; 182:1-24, sealed hearing.

19

96. **September 12, 2007– Liner Firm's *ex parte* Application for Writ of Possession**:

Two days after they filed the opposition to Mr. Flynn's motion for attorney's fees, Ms. Klar and Ms. Pham filed *an ex parte* application for writ of possession in the Los Angeles Superior Court proceedings (Case No. 06-56, #597-2, Ex. 1).   Mr. Montgomery's September 10, 2007 declaration was also attached to the application. *Id.*

97. The application states:

> Flynn's sole purpose in retaining those [client] files, is to extort money from the Montgomery parties, which he claims he is owed under some alleged fee agreement. California does not allow attorneys performing functions in this state to take such abusive positions, and this Court should enter an immediate routine order and Writ of Possession under these circumstances.

*Id.* at p. 2.

98. The application further states that good cause exists for an *ex parte* order or, alternatively, an order shortening time, because this court ordered parties to prepare a joint case management report in the trade secrets action, Case No. 06-56. *Id.* Ms. Pham noted that Mr. Flynn claimed a right to a retaining lien under Nevada law and alluded to the District Court's order granting a retaining lien over the files and the United States protective order in footnotes. *Id.* at p. 3, n. 1 & 2. Ms. Pham added, "Accordingly, it is now crucial that the Montgomery Parties obtain all of their client files immediately in order to comply with the Nevada District Court's Order." *Id.* at p. 4.   The majority of the application is devoted to a discussion of California law and the California Rules of Professional Conduct. *Id.*

99. Ms. Pham testified that since the Liner firm filed the California action in early August, and she believed nothing had occurred in District Court here in Nevada insofar as the client files were concerned, she filed the *ex parte* application for writ of possession, gave Mr. Flynn proper notice, and appeared the next morning before Commissioner Greenberg. Tr. 168:16-25; 169:1-7, sealed hearing.

20

100.     Ms. Pham had attached the District Court's September 4, 2007 order to her *ex parte* application, but she nevertheless believed that she had a right to seek a turnover of the files from a California court. Tr. 169:18-25; 170:1-1-2, sealed hearing.

101.     Ms. Pham sought the writ of possession on an *ex parte* basis because she was concerned that the Liner firm would not have the client files in time to meet case management deadlines in this action. Tr. 170:1-10, sealed hearing. Ms. Pham's testimony and the representations made in the *ex parte* application are inconsistent with Ms. Klar's admission to the District Court in Nevada on August 17, 2007, that she had access to Mr. Montgomery's files.

102.     Ms. Pham testified that *ex parte* applications for writs of possession are routinely held in chambers, and she outlined the basis for her application with Commissioner Greenberg who decided an emergency did not exist to warrant issuance of a writ of possession. Rather, he suggested Ms. Pham file the application as a fully noticed motion, which she did. Tr. 169:18-20; 170:10-20, sealed hearing.

103.     **September 18, 2007– Liner Firm's emergency *ex parte* application for clarification of order re motion to withdraw by Michael Flynn:**

    Ms. Klar and Ms. Pham sought clarification of the District Court's September 4, 2007 order, and made two important statements (Case No. 06-56, #274). First, they contended that no specific motion had been made to this court concerning the client files, and the issue had not been fully briefed. *Id.* Specifically, no argument or briefing was provided on the issue of choice of law and whether California, Nevada, or Massachusetts law applied. *Id.* Second, they asserted that if the court intended to adjudicate these issues, the Liner firm requested leave to file a brief and present oral argument. *Id.*

104.     The tenor of this motion was clear: to the extent the Liner firm sought clarification about these issues, it implicitly asked this court to consider the issue, not another forum. *Id.* In fact, they even asked to submit briefs on the choice of law issue to this court. *Id.*

105.    In response, the District Court issued its October 4, 2007 order and denied the motion for clarification. The Court found its prior order clear and unambiguous and further stated, "Montgomery has not moved *in this Court for a return of his client files under Nevada or any other applicable law.* The Court's denial of Montgomery's Motion . . . therefore is without prejudice to file a fully briefed motion for return of the file, including argument that law other than Nevada's applies to such an inquiry" (Case No. 06-56, #291) (emphasis added).

106.    Notwithstanding the District Court's invitation to file a motion *in this court* concerning the choice of law issue, the Liner firm never did so.

107.    Ms. Pham testified that the District Court's October 4, 2007 order denying the motion for clarification made it clear that even though the District Court had earlier stated that Nevada law (*Kaufman* and *Figliuzzi)* did not require former counsel to surrender the client files to new counsel, the Liner firm could actually take possession of the client files pursuant to this most recent order. Tr. 199:16-25; 200:1-15, sealed hearing.

108.    In addition, Ms. Pham testified that the October 4, 2007 order indicated that no determination had been made as to what law applied, so she construed this to mean that any law could apply to the matter of the client files, including Nevada, California, or Massachusetts. Tr. 200:16-25; 201:1-25; 202:1-4, sealed hearing.

109.    The District Court's September 4, 2007 order granted Mr. Flynn and Ms. DiMare a retaining lien on the client files under Nevada law, and the District Court made its conclusion abundantly clear by its citation to *Kaufman* and *Figliuzzi.* As a result, Mr. Flynn retained possession of the files until such time as the Montgomery parties either paid the attorney's fees or posted a bond. Ms. Klar and Ms. Pham did neither.

110.    The October 4, 2007 order did not alter the *status quo;* rather, the District Court stated that if the Montgomery parties wished to contest what state's law applied to the client files, they could file a motion *in this court.* Ms. Klar and Ms. Pham never did so.

22

111. The court finds that Ms. Pham and Ms. Klar did not do so because they already knew that Mr. Flynn had a retaining lien under Nevada law, and they did not want to litigate the choice of law issue in a forum that might rule against their cause, namely, to get the client files without posting a bond or paying Mr. Flynn.  Ms. Pham and Ms. Klar also apparently did not wish to be hampered by the United States protective order and the District Court's imposition of conditions for the turnover of the client files, so they continued to pursue their litigation strategy for the client files in California.

112. **September 25, 2007 - Request for Investigation to Office of Bar Counsel for the Commonwealth of Massachussetts (Case No. 06-56, #597-6, Ex. 13):**

In addition to the proceedings now pending in this court, Los Angeles County Superior Court, and the San Diego Count Bar Association, Ms. Pham next submitted a request for investigation of Mr. Flynn with the Massachusetts Bar Counsel.  *Id.*  Most telling about this request is what Ms.Pham *failed* to include in this request.  The statement of facts summarizes Mr. Flynn's failure to surrender client files, the allegation that Mr. Flynn improperly held himself out as a California lawyer, and attached are the Montgomery parties' termination letter to former counsel and the Los Angeles County Superior Court complaint.  *Id.* However, there is no disclosure whatsoever concerning any orders that this court issued. *Id.*

113. Although Mr. Montgomery authorized the Liner firm to file this bar complaint, he could not recall the basis for the complaint, nor did he know whether Bar Counsel was notified of this court's orders concerning the client files. Tr. 139:20-25; 140:4-9, sealed hearing.

114. Ms. Pham testified that the timing of the submission of the bar complaint in Massachusetts had nothing to do with this court's orders concerning the client files at about the same time; rather, it was simply a function of the time it took to obtain the form and submit the complaint.  Tr. 172:13-25; 173:1-11, sealed hearing.

115. Mr. Flynn was admitted *pro hac vice* to practice before this court, and the client files and fee dispute concerned cases pending in this court; however, Ms. Pham never filed any complaint with the Nevada State Bar because she believed that the only tribunal that could discipline Mr. Flynn was Massachusetts. Tr. 215:14-25; 216:1-25; 217:1-6, sealed hearing.

116. The court finds that Ms. Klar and Ms. Pham did not avail themselves of procedures afforded attorneys admitted *pro hac vice* in this court because it was inconsistent with their litigation strategy to remove the issues concerning possession of client files and attorney's fees from this court's jurisdiction.

117. On October 31, 2007, the Assistant Massachusetts Bar Counsel responded to the bar complaint (Case No. 06-56, #597-5, Ex. 14). It states,

> You did not mention in your complaint that the United States District Court, District of Nevada, entered detailed and comprehensive orders with respect to the transmission of the files. Attorney Flynn was admitted *pro hac vice* in the Nevada Court and as such, in connection with that proceeding, is subject to the standards of professional conduct as adopted by the Nevada Supreme Court.

*Id.*

118. The Assistant Bar Counsel also noted that he had learned the file may contain military or states secrets, making this court the proper forum "to determine procedures and restrictions with respect to transfer of the files in these circumstances, and *it appears they have maintained jurisdiction over that precise issue." Id.* (emphasis added).

119. The letter concludes by stating that the only connection Massachusetts had to the matter is that Mr. Flynn is licensed in that state; however, it was for other courts to sort out, especially in light of national security issues, and Assistant Bar Counsel declined to interfere in pending litigation. *Id.* As for claims that Mr. Flynn held himself out as a

24

California lawyer, the proper forum to address such concerns was the California State Bar. *Id.*[2]  The filed was closed. *Id.*

120.   Ms. Pham testified that upon receipt of this court's October 12, 2007 order (Case No. 06-56, #296), the Liner firm "commenced" no further actions, but did not notify Massachusetts Bar Counsel of this court's order, as she believed Mr. Flynn had done so. Tr. 222:10-25; 223:1.

121.   When asked why Ms. Pham did all of this, she offered this explanation:

   a)   Because the client files were located in California, she thought it was proper to file the August 2007 complaint in California;
   b)   Three weeks later, Mr. Flynn filed a motion for attorney's fees in this court, and Ms. Pham believed that notwithstanding the District Court's orders, she could proceed in California; and
   c)   It was not until this court's October 12, 2007 order that Ms. Pham understood that the District Court in Nevada had jurisdiction over these issues, and she "commenced" no further proceedings.

   Tr. 223:2-20, sealed hearing.

122.   **October 12, 2007– Order on Motion by Mr. Flynn for Attorney's Fees and Costs:** Having in mind the District Court's August 29, 2007 orders granting the United States' motion for protective order governing military and state secrets (Case No. 06-56, #s 252 & 253), its September 4, 2007 order granting Mr. Flynn's motion to withdraw, and its October 4, 2007 order denying the Montgomery parties' motion for clarification (Case No. 06-56, #s 252, 253, 256 & 291), this court issued an order concerning Mr. Flynn's motion for attorney's fees and costs (Case No. 06-56, #296).

123.   By this time, this court was keenly aware of the Liner firm's litigation strategy, which included the California Superior Court action, an application for fee arbitration with the San Diego County Bar Association, and the Massachusetts State Bar complaint.  In fact, this court noted in its order:

---

[2]There is nothing in the record indicating that Ms. Pham and Ms. Klar referred this matter to the California State Bar; they only sought arbitration of the fee dispute with the San Diego County Bar Association.

25

> The court observes that in the face of the District Court's September 4, 2007 order that Flynn and DiMare would not be compelled to surrender their files to new counsel of record, *see* #256, Montgomery has continued to pursue another forum to adjudicate the fee dispute, namely California. In his California Superior Court action, Montgomery seeks relief that is contrary to the District Court's order.

*Id.* at p. 3, n. 3.

124.   This court took jurisdiction of the fee dispute and observed that because the fee dispute implicated Mr. Flynn's conduct as the Montgomery parties' counsel as a lawyer admitted *pro hac vice*, this court was "the obvious and proper forum" for resolution of this fee dispute. *Id.* at p. 5.   Furthermore, the court reiterated that the District Court had earlier concluded that Mr. Flynn's withdrawal was not voluntary and did not revisit that issue. *Id.* at 3, n. 4.   This court noted – just in case the Liner firm still did not understand – that this court took jurisdiction of both the attorney's fee dispute and the client file dispute. *Id.* at 5, n. 5.

125.   Because the Liner firm had initiated this flurry of proceedings concerning the client files and the fee dispute, the court went to great lengths to discuss Nevada law insofar as charging liens and retaining liens are concerned, and it discussed in detail the two Nevada cases cited in the District Court's September 4, 2007 order: *Figliuzzi v. Eighth Judicial District Court,* 111 Nev. 338 (1995) and *In re Kaufman,* 93 Nev. 452 (1977). *Id.*   These are the two pivotal cases that Ms. Pham later testified she had not read at the time.

126.   This court did so for the simple reason that despite several orders of this court, Ms. Klar and Ms. Pham either did not appear to understand the import of these orders, or they elected to ignore them and shop for a friendlier forum.

127.   The court suspected the latter was true, and it knew that the writ of possession was scheduled for hearing on October 18, 2007.   Therefore, it took the unusual step of ordering the Liner firm to deliver of copy of its order to the presiding judge in the

26

California Superior Court action. *Id.* Unfazed and undaunted, Mr. Klar and Ms. Pham pressed on with the October 18, 2007 hearing.

128. **October 18, 2007 Hearing on Writ of Possession in Los Angeles County Superior Court (Case No. 06-56, #597-5, Ex. 8):**

On October 18, 2007, Ms. Pham and Ms. Klar appeared before Commissioner Victor Greenberg, Ms. DiMare appeared on behalf of Mr. Flynn and herself, and Ms. Wells appeared on behalf of the United States. *Id.* The court recounts Ms. Pham and Ms. Klar's statements *verbatim* because their own words most aptly demonstrate why their conduct warrants sanctions.

129. Commissioner Greenberg stated at the outset of the hearing that it was his inclination to deny the writ of possession based upon his understanding that the District Court for the District of Nevada had already determined that Mr. Flynn was not required to turn over his file, and that it had also entered protective orders relating to the client files. *Id.* at p. 2:17-28.

130. Ms. Pham told the court:

> I understand that your Honor's ruling is probably based on this late order that was just issued last Friday by the magistrate judge in Nevada, and with all due respect to the magistrate judge in Nevada, the issue of whether or not the files should get turned over to the client, the Montgomery party was not addressed to that Nevada court and the Nevada magistrate did acknowledge in her order, that no motion has been made in the Nevada court.
>
> And both the Nevada magistrate judge and the actual presiding judge there, Judge Pro, indicated that no request has been made and no determination has been made as to which state's law should apply. That's squarely before this court and this is the only court with jurisdiction to decide whether or not the files should get turned over because the files are located here in California. And the court in Nevada has not determined which law should apply. That has not been address[ed] today here and that motion has not been made in Nevada.

*Id.* at p. 3:1-19.

27

131.   In response, the Commissioner remarked that the Nevada court *did* discuss that under

Nevada law Mr. Flynn was entitled to keep the client files subject to being paid, and Ms.

Pham replied:

> If Nevada law were to apply that would be correct, but there has been no determination as to whether or not Nevada law applies or not and that was made clear by Judge Pro's recent order with respect to our request for clarification. Judge Pro indicated that no motion has been made and no determination has been made and had indicated that we were denied without prejudice to making that motion as well as arguments as to which state's law should apply. And the proper court to make that determination would be this court where the files are located. Only this court could order the files to get turned over because the files are located here in California.
>
> Mr. Flynn, under both the law – the jurisdiction where Mr. Flynn is licensed and where he practices and maintains his office and resides and where the files are located are in California, and Massachusetts law requires the files to be turned over, the Nevada law cannot apply. These arguments have never been addressed to the Nevada court so Judge Cook's (sic) – the magistrate judge's order was not a determination of which law should apply it was simply a statement that if Nevada law were to apply then in fact he would have a retaining lien because the only other issue before the magistrate judge at this time is a fee dispute as to how much would be owed to Mr. Flynn under the party's (sic) attorney-client relationship and fee arrangement. And in that event the fees are determined and Nevada law were to apply then Mr. Flynn would have a retaining lien but no determination has been made and to what law should apply at this point. That issue is only before your Honor.

*Id.* at p. 3:25-28; 4:1-27.

132.   Ms. DiMare argued that the Commissioner's understanding of this court's prior orders

was correct: under Nevada law, Mr. Flynn could retain the file, and that if the

Montgomery parties wished to challenge that order based on a choice of law argument,

they had leave to do so.  Otherwise, the order stood.  She also noted that the Nevada

federal court required Ms. Pham and Ms. Klar to deliver the October 12, 2007 order to

the California court because the Nevada court knew that they were attempting to

circumvent orders issued by the Nevada federal courts.  *Id.* at 5:2-26.

28

133.   In reply, Ms. Pham quoted the conclusion of the District Court's October 4, 2007 order, and then stated:

> At the time this [District Court order] was filed this action in California had already been filed. This motion was already pending before the court. Judge Pro was aware of that. Judge Pro specifically did not order that we must file in Nevada. He simply said that if we would *like* to file in Nevada he will address and he will determine the issue of which law should apply. He consistently refrained from making any order with respect to the turnover of the files because he knew there was an action pending in California.
>
> *         *         *         *         *
>
> What the magistrate judge did was simply – based on, I have to say misrepresentation[s] about what these proceeding today entail, I believe the magistrate judge was under the [mis]apprehension of what exactly was taking place before the court based on some statement made by Mr. Flynn which we were not allowed to respond to. Those statements seem to suggest that we were somehow circumventing the jurisdiction or going around the court in terms of the motion or attorney's fees or protective order that are already in place in the Nevada court.

*Id.* at p. 7:5-15.  Ms. Pham went on to say that the only issue before the Nevada District Court was the issue of attorney's fees, and there had been no decision in this court concerning turnover of the client files.  *Id.* at 7:20-28.

134.   After hearing from Ms. Pham and Ms. DiMare, the Commissioner noted that counsel for the United States, Ms. Carlotta Wells, was also present, and he inquired whether he ought to hear from her.  Ms. Klar then stated:

> Your Honor, on behalf of the Montgomery parties we do object. Our position is there is a protective order that has been issued by the court in Nevada. Of course in connection with any order that this court would issue mandating transfer of the files, we would comply with that order. We believe that the government is here to take yet another bite at the apple and to try to circumvent that court's order. That order, we believe, is clear in terms of what we are required to do in connection with the transfer of the files, and I think . . . I think they are here to muddy the waters and to somewhat intimidate your Honor to refrain in giving us the relief that we believe Mr.

29

Montgomery and Mrs. Montgomery and the Montgomery
Trust is (sic) entitled to.

*Id.* at 8:3-22. Ms. Wells responded that the United States took no position on the merits of the application for writ of possession; rather, the government's interest "is that the information that's contained in those files that's subject to the military and state secrets, present and intact, be protected." *Id.* at 8:28; 10:1-7.

135.  The Commissioner denied the writ of possession. *Id.* at 13:17-24.

136.  The court finds that at least by October 12, 2007, Ms. Klar and Ms. Pham knew or reasonably should have known that this court not only reaffirmed its jurisdiction over the client files, but also formally retained jurisdiction over the fee dispute.

137.  Ms. Pham made several intentional misrepresentations to the Commissioner at the October 18, 2007 hearing. She told the court that the California Superior Court was the only court that had jurisdiction to decide whether the files should be turned over to the Liner firm. This is not true. She told the court that the Montgomery parties had not had an opportunity to argue which state's law should apply as it concerns the client files. This is not true. *See, e.g.,* Case No. 06-56, #s 254, 261. Ms. Pham told the Commissioner that this Court had not taken jurisdiction over the matter of the client files. This is not true. *See* Case No. 06-56, court order #s 256, 291, & 296, n. 5 ("By this order, this court only takes jurisdiction over the attorney's fees and client file dispute."). Ms. Pham told the Commissioner that this court misapprehended the nature of the writ of possession proceedings before the Commissioner. This is not true. The court most assuredly knew exactly what Ms. Pham and Ms. Klar were up to, which is why this court *ordered* the Liner firm to deliver its October 12, 2007 order to the California court. This court finds that Ms. Klar and Ms. Pham intentionally failed to file their choice of law motion in this court because they knew they might lose, and instead attempted to argue – albeit improperly and unsuccessfully – in California, that since they declined this District Court's invitation to file such a motion, they could do so in California.

30

138.   Ms. Klar's statements to the Commissioner that counsel for the United States was present at the hearing to "take another bite at the apple," to "circumvent that court's order," "muddy the waters," and to "intimidate your Honor" are misrepresentations of what Ms. Klar knew had transpired in this court.

139.   Both Ms. Pham and Ms. Klar knew that the United States had a compelling interest in insuring that documents in the client files that were subject to the state secrets privilege be protected, yet by their conduct, attempted to undermine the effect of the United States protective order.

140.   Ms. Pham later testified that once this court issued its October 12, 2007 order by which it took jurisdiction over the client files and attorney's fees, she did not "commence" any further proceedings.  Tr. p. 223:17-20, sealed hearing.  The court finds that testimony disingenuous.  In the face of no less than three orders of this court, Ms. Klar and Ms. Pham continued to engage in a litigation strategy in violation of those orders and made misrepresentations to the Commissioner on October 18, 2007. Had Ms. Klar and Ms. Pham intended to act in good faith, they would have terminated the writ of possession proceedings as soon as they received this court's October 12, 2007 order, at the very least.

141.   **November 21, 2007 – Los Angeles County Superior Court's Order of Dismissal on the Basis of Forum Non Conveniens:**

Undaunted by this court's orders, the writ commissioner's order denying a writ of possession, and the Massachusetts Bar Counsel's dismissal of the bar complaint, the Liner firm pressed on with its California Superior Court complaint to obtain the client files and obtain injunctive relief against Mr. Flynn. On November 21, 2007, the Superior Court heard oral argument on Mr. Flynn's motion to quash service of summons and motion to dismiss/stay (Case No. 06-56, #548, Ex. 1; #597-9, Ex. 8).

142.   At the hearing, another lawyer from the Liner firm, continued to make the identical arguments the Liner firm had made before this court, the writ commissioner, the San

1   Diego Bar Association, and the Massachusetts Bar Counsel. *See* transcript of November

2   21, 2007 hearing, p. 9:20-28; 10: 1-28; 11:1-23, (Case No. 06-56, # 597-5, Ex. 10).

3   143.   The court granted Mr. Flynn's motion to dismiss on the basis of *forum non conveniens*

4   and stated:

5   California is only involved in this matter due to an
    unsubstantiated allegation by plaintiff that defendant
6   misrepresented to him that defendant was licensed in
    California. *The case is before a California court for the*
7   *transparent purpose of having this court countermand the*
    *orders of the Nevada District Court. California has no*
8   *interest in doing so.*
      Nevada, on the other hand, has a great public interest in
9   adjudicating this dispute. Defendant Flynn is a
    Massachusetts licensed lawyer, who appeared pro hac
10  vice in Nevada on behalf of plaintiffs, solely in Nevada
    cases, before Nevada courts, applying Nevada law. The
11  Nevada District Court has already made substantial orders
    concerning the subject matter of this action by giving
12  defendant a 'retaining lien' over the 'client files' that
    plaintiff seeks, by this action, to have returned to him.
13  The Nevada District court case concerns allegations of
    wrongdoing against the current Nevada Governor and
14  allegations that the plaintiffs in this case made
    misrepresentations in Nevada.

15  Case No. 06-56, #548, Ex. 1 (emphasis added).

16
17  ## II. <u>LEGAL DISCUSSION</u>

    **A.    Sanctions Pursuant to the Court's Inherent Authority**
18
19      A federal court has inherent power to levy sanctions, including attorney's fees, for "willful

20  disobedience of a court order . . . or when the losing party has acted in bad faith, vexatiosuly, wantonly,

    or for oppressive reasons. . . ." *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 766 (1980) (internal
21
    quotations and citations omitted).  A court "certainly may assess [sanctions] against counsel who
22
23  willfully abuse judicial processes." *Id.*  In *Chambers v. NASCO, Inc.,* 501 U.S. 32 (1980), the Court

    reaffirmed the *Roadway* principles and "left no question that a court may levy fee-based sanctions when
24
25  a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, delaying or disrupting

    litigation, or has taken actions in the litigation for an improper purpose." *Fink v. Gomez,* 239 F.3d 989,
26
    992 (9th Cir. 2001) (citing *Chambers,* 501 U.S. at 45-46, n. 10).  In *Fink,* the Ninth Circuit made clear
27

28                                          32

that imposition of sanctions under the court's inherent power requires a specific finding of bad faith or "conduct tantamount to bad faith:"

> Sanctions are available for a variety of types of willful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose . . . An attorney's reckless misstatements of law and fact, when coupled with an improper purpose, such as an attempt to influence or manipulate proceedings in one case in order to gain tactical advantage in another case, are sanctionable under the court's inherent power.

*Id.* at 994.

In *In re Itel Securities Litigation,* 791 F.2d 672 (9th Cir. 1986), the court examined the court's inherent authority to impose sanctions for bad faith where the attorney filed objections in one case to obtain fee concessions in an action pending before another court.  Although the court found the objections were not frivolous or meritless, the attorney's goal was to gain an advantage in another case, which the court concluded was sufficient to support a finding of bad faith.  *Id.* at 675.  "For purposes of imposing sanctions under the inherent power of the court, a finding of bad faith 'does not require that the legal and factual basis for the action prove totally frivolous; where a litigant is substantially motivated by vindictiveness, obduracy, or *mala fides*, the assertion of a colorable claim will not bar assessment of attorney's fees.'"  *Id.* (quoting *Lipsig v. Nat'l Student Mktg. Corp.,* 663 F.2d 178, 182 (D.C. Cir. 1980).  In *Fink,* the court cited *Itel* for the proposition that "sanctions are justified when a party acts *for an improper purpose* – even if that act consists of making a truthful statement or a non-frivolous argument or objection."  *Fink,* 239 F.3d at 992 (emphasis in original).

The burden of proof is clear and convincing evidence (*Roadway Express,* 447 U.S. at 764); however, a finding of bad faith may not be required when an "attorney acts recklessly . . . [with] an improper purpose."  *Fink*, 239 F.3d at 993.

**B.**    **Sanctions Pursuant to 28 U.S.C. § 1927**

28 U.S.C. § 1927 states:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

33

1    Although Section 1927 has a clear compensatory purpose because it permits an award of

2    attorney's fees and costs, "it is in reality a penal statute designed to discourage unnecessary delay in

3    litigation by requiring attorneys 'or other persons' to compensate personally other litigants who incur

4    excess costs due to their misconduct." GEORGENE M. VAIRO, RULE 11 SANCTIONS 765 (3d ed. 2003),

5    citing *Roadway Express,* 447 U.S. at 759-62 (noting the importance of Section 1927 sanctions in that

6    "lawyers who multiply legal proceedings [are] taxed with the extra 'costs' they generate.")

7        To warrant sanctions pursuant to Section 1927, a court must find the attorney acted with

8    recklessness or subjective bad faith. *New Alaska Dev. Corp. v. Guetschow,* 869 F.2d 1298, 1306 (9th Cir.

9    1989), *Estate of Blas ex re. Chargualaf v. Winkler,* 792 F.2d 858, 860 (9th Cir. 1986); *United States v.*

10   *Blodgett,* 709 F.2d 608, 610 (9th Cir. 1983).  "Bad faith is present when an attorney knowingly or

11   recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an

12   opponent." *W. Coast Theater Corp. v. City of Portland*, 897 F.2d 1519, 1528 (9th Cir. 1990). Section

13   1927 sanctions may only be imposed on attorneys and *pro se* litigants.  *Wages v. Internal Revenue Serv.,*

14   915 F.2d 1230, 1235-36 (9th Cir. 1990).  However, Section 1927 "cannot reach conduct of a party who

15   is not involved in an action before the sanctioning court at the time of the conduct." *Grid Systems Corp.*

16   *v. John Fluke Mfg. Co., Inc.,* 41 F.3d 1318, 1319 (9th Cir. 1994). Because imposition of Sections 1927

17   sanctions is penal in nature, it requires the court to make specific findings of fact. *Trulis v. Barton,* 107

18   F.3d 685, 692 (9th Cir. 1995). "'Prior to sanctioning an attorney, a court must provide the party to be

19   sanctioned with notice and some reasonable opportunity to respond to the charges' in order to satisfy

20   the requirements of due process." *In re Deville*, 361 F.3d 539, 548 (9th Cir. 2004), quoting *Jones v.*

21   *Pittsburgh Nat'l Corp.*, 899 F.2d 1350, 1357 (3d Cir. 1990).

22       **C.    Local Rule IA 10-7(a)**

23       Local Rule ("LR") IA 10-7(a) of the Local Rules of Practice for this court provides that an

24   attorney admitted to practice before this court is subject to the standards of conduct prescribed by the

25   Model Rules of Professional Conduct as adopted by the Nevada Supreme Court. LR IA 10-7 further

26   states, "Any attorney who violates these standards may be disbarred, suspended from practice before this

27

28                                                     34

court for a definite time, reprimanded or subjected to such other discipline as the court deems proper. This subsection does not restrict the court's contempt power."

### D.    Nevada Rules of Professional Conduct

#### 1.    Rule 8.4

Nevada Rule of Professional Conduct 8.4 reads: "It is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;...(c) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

#### 2.    Rule 3.1

Nevada Rule of Professional Conduct 3.1 reads: "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not frivolous...."

#### 3.    Rule 3.3

Nevada Rule of Professional Conduct 3.3 reads:

> (a) A lawyer shall not knowingly:
> (1) Make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;
> (2) Fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or
> (3) Offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence and the lawyer comes to know of the its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal. A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal matter, that the lawyer reasonably believes is false.
> (b) A lawyer who represents a client in an adjudicative proceeding and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal...

#### 4.     Rules 5.1 and 5.2

Nevada Rule of Professional Conduct 5.1 reads:

> ...(b) A lawyer having direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the other lawyer conforms to the Rules of Professional Conduct.
> (c) A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if:
>> (1) The lawyer orders, or with knowledge of the specific conduct, ratifies the conduct involved; or
>> (2) The lawyer is a partner or has comparable managerial authority in the law firm in which the other lawyer practices, or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

Nevada Rule of Professional Conduct 5.2 reads:

> (a) A lawyer is bound by the Rules of Professional Conduct notwithstanding that the lawyer acted at the direction of another person.
> (b) A subordinate lawyer does not violate the Rules of Professional Conduct if the lawyer acts in accordance with a supervisory lawyer's reasonable resolution of an arguable question of professional duty.

#### 5.     Imposition of Sanctions for a Violation of a Rule of Professional Conduct

The ABA has adopted standards that courts should consider for the imposition of sanctions. AMERICAN BAR ASS'N, JOINT COMMITTEE ON PROFESSIONAL SANCTIONS, STANDARDS FOR IMPOSING LAWYER SANCTIONS (1992). Under the ABA standards, the court may consider four factors:

1. Whether the duty violated was to a client, the public, the legal system, or the profession;

2. Whether the lawyer acted intentionally, knowingly, or negligently;

3. Whether the lawyer's misconduct caused a serious or potentially serious injury;

4. Whether there are aggravating and/or mitigating circumstances.

### III.  SANCTIONS ANALYSIS

#### A.     Ms. Klar and Ms. Pham

##### 1.     The Litigation Strategy

Trial counsel owe an undivided allegiance to their clients, but they also owe important duties of candor and honesty to opposing counsel and to any court or tribunal before whom they appear. If a lawyer disagrees with an order of the court, that lawyer does not have leave to violate, disregard, or

36

1   subvert that order; his or her recourse is to take appropriate steps to test the validity of that ruling

2   pursuant to the Federal Rules of Civil Procedure, and observing at all times the Rules of Professional

3   Conduct.

4          Based upon the chronology of events described at length herein, the court finds there is clear and

5   convincing evidence that Ms. Klar and Ms. Pham acted in bad faith or conduct tantamount to bad faith

6   with the intention to undermine this court's orders for the improper purpose of obtaining a more

7   favorable forum for resolution of the fee dispute and the turnover of the client files.  Ms. Klar and Ms.

8   Pham willfully abused the judicial processes in this court and elsewhere, and they did so to delay or

9   disrupt this litigation to gain a tactical advantage. *Fink,* 239 F.3d at 993.  As a result of their conduct,

10  Ms. Klar and Ms. Pham multiplied these proceedings, and they did so unreasonably and vexatiously,

11  resulting in an increase in the cost of the proceedings to Mr. Flynn and a tremendous burden on the court

12  to sort through this byzantine web of misconduct.  28 U.S.C. § 1927. Even if Ms. Klar and Ms. Pham's

13  conduct was not totally frivolous, the court finds they were motivated by vindictiveness and bad faith.

14  There is clear and convincing evidence that Ms. Klar and Ms. Pham acted recklessly and with an

15  improper intent. *Fink,* 239 F.3d at 993; 28 U.S.C. § 1927.

16         The court also finds that Ms. Klar's conduct constitutes violations of Rules 8.4, 3.1, 3.3, and 5.1

17  of the Nevada Rules of Professional Conduct.  As the senior attorney and lead counsel in this case, Ms.

18  Klar abdicated her duties to the court and the attorneys she supervised by engaging in a consistent pattern

19  of gamesmanship, misrepresentations, and outright contempt of this court and its orders.  She was

20  unrelenting in her campaign to achieve her desired end –  to wrest jurisdiction from this court over the

21  fee dispute and client files –  and she was willing to do so at any cost to her client, to her junior partner,

22  to the Liner firm, to Mr. Flynn, and to the court.

23         The court finds that Ms. Pham's conduct violates Rules 8.4, 3.1, 3.3, and 5.2 of the Nevada Rules

24  of Professional Conduct.  "Following orders" does not excuse her own, independent ethical duties to her

25  client and the court.

26         From the inception of the Liner firm's representation of the Montgomery parties in August 2007

27  until she was replaced one year later, Ms. Klar acted as lead counsel.  Ms. Klar directed the litigation

28

37

1   strategy for her clients, and it was evident from the outset of her appearance that although subordinate

2   attorneys from the Liner firm performed legal services in this case, it was Ms. Klar who directed those

3   attorneys and the management of this case. Ms. Klar was ordered to appear at the sealed hearing on the

4   motion for sanctions, and although she was present, she did not testify.

5       Ms. Pham's representation of the Montgomery parties was generally limited to the events giving

6   rise to Mr. Flynn's motion for sanctions, as she was on leave from October 22, 2007 until February 25,

7   2008 (Case No. 06-56, #599). At the time Ms. Klar and Ms. Pham became the Montgomery parties'

8   counsel of record, both were partners with the Liner firm; Ms. Klar was admitted to the California Bar

9   in 1986, and Ms. Pham was admitted to the California Bar in 1997 (Case No. 06-56, #s 233 & 234).

10      It was Ms. Pham whom the Liner firm called to testify at the sealed hearing in this matter. Based

11  upon Ms. Pham's testimony and the court's understanding of this case, the court concludes that although

12  Ms. Pham is most certainly responsible for her conduct in this action, Ms. Klar was the ultimate

13  decision-maker and chief strategist.  However, a lawyer is not excused from her ethical duties because

14  she is practicing under the direction of a senior attorney. The Nevada Rules of Professional Conduct

15  require that a lawyer abide by the Rules of Professional Conduct "notwithstanding that the lawyer act[s]

16  at the direction of another person." NEV. RULES OF PROF'L CONDUCT R. 5.2(a); *see also In re Hector*

17  *Martinez*, 393 B.R. 27, 40-41 (Bankr. D. Nev. 2008).

18      When Ms. Klar and Ms. Pham undertook representation of the Montgomery parties, they did not

19  have Mr. Flynn's client files.  However, they did have access to Mr. Montgomery's files, and Ms. Klar

20  so advised the District Court at the August 17, 2007 hearing (Case No. 06-56, #247 (minutes), #267, p.

21  23-24 (transcript)). Ms. Klar's admission confirms Mr. Flynn's contention that the Liner firm had access

22  to virtually all communications between Mr. Montgomery and Mr. Flynn.  Mr. Flynn and Mr.

23  Montgomery communicated very extensively via email, and this included discussions of draft

24  documents, letters, court papers, and Mr. Montgomery's February 28, 2007 declaration (Case No. 06-

25  263, #115).  Therefore, even though Ms. Klar made representations to this court and the California

26  Superior Court that she needed Mr. Flynn's client files to properly represent her clients, she had access

27

28
                                              38

1    to the thousands of emails and attached documents in Mr. Montgomery's possession, as well as access

2    to court filings via PACER.

3           Ms. Klar and Ms. Pham knew that Mr. Flynn did not represent the Montgomery parties in any

4    matters pending in California and that he was properly admitted to practice before this court *pro hac*

5    *vice.* Ms. Klar and Ms. Pham also knew that Mr. Flynn and Mr. Montgomery were embroiled in a fee

6    dispute over unpaid attorney's fees in excess of $600,000.  As early as July 31, 2007, they knew that Mr.

7    Flynn intended to claim a retaining lien over the client files under Nevada law.  Ms. Klar and Ms. Pham

8    knew, or upon reasonable inquiry should have known, that the retaining lien would allow Mr. Flynn to

9    keep the client files until the lien was adjudicated.  Faced with the prospect of a Nevada retaining lien

10   that prevented them from obtaining the client files and also required their clients either to pay the

11   disputed fees or post a bond, Ms. Klar devised a different strategy.  She sought a new forum where she

12   and her clients would not be so encumbered.

13          Ms. Klar and Ms. Pham knew, or upon reasonable inquiry should have known, that during Mr.

14   Flynn's representation of Mr. Montgomery and the Montgomery parties, there was no reason whatsoever

15   for Mr. Montgomery to concern himself with the state in which Mr. Flynn was admitted to practice law.

16   Mr. Flynn and Ms. DiMare were both duly admitted *pro hac vice* to represent the Montgomery parties

17   in *these* cases before *this* court.[3] As Ms. Klar and Ms. Pham well know, this is a routine practice for

18   lawyers who appear in federal courts throughout the country.  Lawyers are typically admitted to the bar

19   in one or two states, but they are excused from state bar admission requirements by the *pro hac vice*

20   application. This issue was a red herring and only became an issue when those in opposition to Mr.

21   Flynn – first the United States, and then Ms. Klar – seized upon it as a means to disqualify or discredit

22   Mr. Flynn for different motives.  The papers filed by the United States to disqualify Mr. Flynn in the

23   search warrant proceeding in February 2007, and the papers filed by Ms. Klar and Ms. Pham six months

24   _____

25          [3]Since all of these lawyers were admitted *pro hac vice* before this court in these proceedings,
     including Ms. Klar and Ms. Pham, it is curious that Ms. Klar and Ms. Pham filed no complaint against
26   Mr. Flynn with the Nevada State Bar.  LR IA 10-7(a) specifically authorized them to do so.  However,
     this would have been inconsistent with their strategy to avoid Nevada insofar as these matters were
27   concerned.

28                                                          39

1    later in California and Massachusetts allege strikingly similar facts concerning Mr. Flynn's bar

2    admission, the location of his law offices, his residence, and so on.

3         When Ms. Klar and Ms. Pham filed their complaint in California Superior Court in early August

4    2007, they may arguably have had a reasonable, good faith belief based on the law and facts that they

5    were entitled to seek a turn over of the client files in California. Mr. Flynn's California address appeared

6    on all papers filed in this court, he sent invoices to the Montgomery parties from California, Mr. Flynn's

7    client files were in California, he has a California residence, and he identified himself as a member of

8    Flynn & Stillman, which had a California address. Ms. Klar and Ms. Pham may have also arguably had

9    a reasonable, good faith belief that they were entitled to seek arbitration of the fee dispute before a

10   California bar entity based on this same information. The District Court here had not ruled on Mr.

11   Flynn's motion to withdraw or the United States' motion for protective order. Mr. Flynn and Ms.

12   DiMare had not yet filed their notices of retaining lien or their motion for attorney's fees.

13        However, the chronology of events that occurred, as well as Mr. Montgomery's inconsistent

14   declarations and his lawyers' complicity in drafting the untruthful September 10, 2007 declaration,

15   convince the court that Ms. Klar and Ms. Pham's actions were part of a litigation strategy designed to

16   remove both the client file and fee dispute from this court's jurisdiction, deny Mr. Flynn the disputed

17   attorney's fees, and force him to expend significant attorney's fees defending his interests in three other

18   forums. Even more disturbing, as events unfolded and this court issued orders that were contrary to Ms.

19   Klar's litigation strategy, she and Ms. Pham engaged in a continuous pattern of contempt of this court.

20        Ms. Pham drafted Mr. Montgomery's September 2007 declaration, the California Superior Court

21   complaint, the *ex parte* application for writ of possession, and it was she who met with the writ

22   commissioner in chambers on September 12, 2007. Ms. Pham also made the principal argument at the

23   October 18, 2007 hearing on the writ of possession. Ms. Klar  appeared as counsel of record on the

24   California Superior Court complaint, the *ex parte* application for writ of possession, the papers filed in

25   support of the writ of possession, and she attended the October 18, 2007 hearing and made arguments

26   concerning the Justice Department's presence at that hearing.

27

28                                                    40

1        Both Ms. Klar and Ms. Pham submitted the application for fee arbitration to the San Diego

2   County Bar Association on September 7, 2007, and three days later, filed their opposition to Mr. Flynn's

3   motion for attorney's fees, attaching Mr. Montgomery's September 10, 2007 declaration.  Two days

4   later, September 12, 2007, they filed their *ex parte* application for writ of possession and once again,

5   attached Mr. Montgomery's September 10, 2007 declaration.

6        Assuming *arguendo* that Ms. Klar and Ms. Pham were ignorant of Mr. Montgomery's February

7   28, 2007 declaration in opposition to the United States' motion to disqualify Mr. Flynn and had a good

8   faith belief that they were justified in seeking disposition of the client files and fee dispute in California,

9   Mr. Flynn's notice of lodgement dated August 6, 2007, gave notice to Ms. Klar and Ms. Pham that they

10  should reconsider their strategy.  They did not.

11       Even though the District Court recognized Mr. Flynn's retaining lien under Nevada law on

12  September 4, 2007,  Ms. Klar and Ms. Pham were undaunted and filed their *ex parte* writ of possession

13  of the client files in the California Superior Court, claiming Mr. Flynn was attempting to "extort money"

14  from the Montgomery parties.  They also made the odd assertion that Mr. Flynn "claimed" a retaining

15  lien even though "he was never licensed to practice in Nevada . . ." (Case No. 06-56, #597-2, Ex. 2).

16  Mr. Flynn never made such a claim. Then, on September 25, 2007, Ms. Pham filed a bar complaint in

17  Massachusetts, adding a third forum where Mr. Flynn was required to defend himself, this time for

18  misconduct.

19       As Ms. Klar and Ms. Pham pursued their strategy to remove the client file and fee disputes from

20  this court's jurisdiction to avoid the retaining lien, this court began to understand what was afoot.  The

21  District Court issued a second order on October 4, 2007, and declined to clarify its prior order, but

22  suggested that if Ms. Klar and Ms. Pham wished to adjudicate a choice of law question on these issues

23  *to this court,* they could do so.  They never did.  This court hastened to issue its October 12, 2007 order

24  to state, once and for all, that the District of Nevada had retained jurisdiction over the client files and

25  the fee dispute.  It even took the unusual step of requiring Ms. Klar and Ms. Pham to deliver its order

26  to the California Superior Court. The court hoped its message to Ms. Klar and Ms. Pham was clear: Stop

27  forum shopping.  They did not.

28

1    Ms. Klar and Ms. Pham did not voluntarily dismiss the California action, nor did they withdraw

2    their clients' application for arbitration of the fee dispute with the San Diego Bar Association.  Instead,

3    they proceeded with the October 18, 2007 hearing before the writ commissioner and engaged in stunning

4    misrepresentations of this court's orders. The court has earlier quoted these misrepresentations *verbatim*

5    and will not repeat them.   The court notes that in her zeal to advance her clients' cause, Ms. Pham

6    engaged in a tortured analysis of this court's three orders to support her claims that somehow, California

7    had jurisdiction over the client files.  She further suggested that this court misapprehended "exactly what

8    was taking place."  To the contrary, this court understood very well what Ms. Klar and Ms. Pham were

9    attempting to do, which is why it unequivocally stated that the District of Nevada had jurisdiction of

10   these issues and ordered them to provide its October 12, 2007 order to the California court.

11   Ms. Klar's remarks to the writ commissioner about the presence of Department of Justice counsel

12   at the writ hearing were a complete distortion.   Ms. Klar accused Justice Department counsel of

13   attempting to "muddy the waters," to "take yet another bite at the apple to try to circumvent [the District

14   Court's] order," and to intimidate the court when Ms. Klar knew very well that Justice Department

15   counsel was present to protect the interests of the United States concerning the protective order. The writ

16   commissioner denied the writ.  (Case No. 06-56, #597-5, Ex. 8).

17   Despite these events, Ms. Klar and Ms. Pham did not voluntarily dismiss the California Superior

18   Court action, nor did they dismiss the fee arbitration.   Ms. Pham testified that the Liner firm

19   "commenced" no further actions upon receipt of the October 12, 2007 order, and she believed Mr. Flynn

20   had notified both the San Diego and Massachusetts Bar of what had occurred; therefore, presumably

21   neither she nor Ms. Klar had an affirmative duty to do anything more.  Their view appears to be that they

22   were entitled to create havoc for Mr. Flynn in three different forums, and if they did not succeed, it was

23   for Mr. Flynn and this court to clean up the mess.  Their disdain for the legal process and for their duties

24   as officers of the court is disheartening and sanctionable.

25   At the sealed hearing, Ms. Pham was unwavering in her belief that she, and presumably Ms. Klar,

26   at all times acted ethically, in good faith, and in no way misconstrued this court's orders.  Having heard

27   Ms. Pham's testimony, the court concludes that Ms. Pham was so focused on her assigned tasks – to

28

remove the fee dispute and turnover of client files from this court's jurisdiction – that she suspended her own independent judgment and failed to critically consider any legal, factual, or ethical impediments to her assignments.  What Ms. Pham did was, in essence, only half of her task as a lawyer and officer of the court.  She uncovered every piece of information and advanced every legal argument she could muster to advance her position; however, she failed to consider any defects or weaknesses in her analysis. As a result, Ms. Pham, under the supervision of Ms. Klar, engaged in a consistent pattern of material misrepresentations and the omissions of material facts from her court papers, oral arguments, and bar complaints.  Conveying half truths and only part of the record in matters is a misrepresentation and a breach of her ethical duties as a lawyer. In addition, when presented with this court's orders that were contrary to her assigned goals, she engaged in tortured analyses of the plain meaning of those orders to justify her conduct and to press on, undeterred. Even after this court's definitive October 12, 2007 order, Ms. Pham went into California Superior Court and intentionally misrepresented the import of this court's orders.

Every single court or bar entity that ultimately considered Ms. Klar and Ms. Pham's campaign to divest this court of jurisdiction over these matters and to force Mr. Flynn to defend his interests concluded they were wrong. The California Superior Court Writ Commissioner stated, "Evidently the Federal District Court in Nevada has already determined that based upon the Nevada laws Mr. Flynn is not required to turn over the file at this time. And the District Court in Nevada has also made protective orders regarding the information in the materials and that court could deal with any issues arising from any further requests for possession from the [Montgomery parties]" (Case No. 06-56, #597-5, Ex. 8). In dismissing the complaint against Ms. Flynn in Massachusetts, Bar Counsel noted, "You did not mention in your complaint that the United States District Court, District of Nevada, entered detailed and comprehensive orders with respect to the transmission of the [client] file. Attorney Flynn was admitted *pro hac vice* in the Nevada court and as such, in connection with that proceeding, is subject to the standards of professional conduct as adopted by the Nevada Supreme Court"(Case No. 06-56, #597-5, Ex. 14).  The San Diego Bar Association also dismissed the petition and said,  "[I]t is clear that the District of Nevada has taken control of this entire case filed by the applicants . . . including the issue of

1   attorney fees and costs" (Case No. 06-56, #597-6, Ex. 12)   Most telling is the California Superior

2   Court's order dismissing that case: "The case is before this court for the transparent purpose of having

3   this court countermand the orders of the Nevada District Court.  California has no interest in doing so"

4   (Case No. 06-56, #548, Ex. 1).

5          Ms. Klar did not testify at the sealed hearing, but the misconduct discussed herein did not occur

6   in a vacuum; instead, it was a part of a vexing pattern of conduct throughout her tenure as lead counsel

7   until she was replaced in July 2008.  In its March 2008 order granting in part Mr. Flynn's and Ms.

8   DiMare's motion for attorneys' fees, this court noted:

9                          [T]he initial strategy of the Montgomery parties and the
                           Liner firm was to challenge former counsels' fee dispute
10                         in every forum but this one and to compel former counsel
                           to expend substantial time and attorneys' fees in
11                         defending themselves, even in the face of clear orders
                           issued by the District Court and this court to the contrary.
12                         This conduct resulted in the expenditure of many
                           thousands of dollars in attorneys' fees for all concerned,
13                         but also in even greater delays in the disposition of the
                           instant motion. The Montgomery parties have repeatedly
14                         complained to this court that they have been prejudiced
                           because they do not have former counsels' client files.
15                         Had they not pursued these protracted attempts to wrest
                           jurisdiction from this court, . . . the court would have been
16                         in a far better position to decide this motion sooner rather
                           than later.
17
     (Case No. 06-56, #502, page 17).[4]
18
           As the case progressed, Ms. Klar continued to invite sanctions against her clients and herself.
19
     The court issued a May 7, 2008 order that stated: "[T]he court's patience for abusive, bad faith discovery
20
     gamesmanship is ended. The court finds that the Montgomery parties have deliberately violated this
21
     court's February 21, 2008 order by failing to produce the documents as ordered, and sanctions for this
22
     misconduct are warranted. . ." (Case No. 06-56, #582).  On May 21, 2008, this court issued this minute
23
     order: "Ms. Klar is admonished that attorneys appearing in his Court shall not unilaterally set hearings
24
     and that this Court will manage its docket. Ms. Klar is further admonished that she shall abide by the
25

26   ─────────────────

27          [4] The court did not award Mr. Flynn and Ms. DiMare any attorneys' fees in connection with this
     motion for sanctions. *Id.*

28                                                      44

local rules of practice for this Court, as well as related court orders, and that future violations will not be tolerated" (Case No. 06-56, #628).  On May 29, 2008, this court issued an order to show cause why the Montgomery parties should not be held in contempt of court for their failure to abide by this court's May 21, 2008 order (Case No. 06-56, #646).  On July 24, 2008, this court issued another order to show cause why the Montgomery parties *and* Ms. Klar should not be held in contempt of this court for failure to comply with a prior order concerning discovery (Case No. 06-56, #769).  On August 18, 2008, the District Court imposed a monetary sanction against Mr. Montgomery in the amount of $2,500.00 per day until he complied with a prior discovery order (Case No. 06-56, #815), and this court convened a two-day hearing on its order to show cause issued against Ms. Klar and Mr. Montgomery (Case No. 06-56, #s 816 & 817).  It was only after repeated sanction orders and orders to show cause that the Liner firm substituted in new lead counsel for the Montgomery parties.  Thereafter, the court presided over a settlement conference in September 2008, and matters between the Montgomery parties and eTreppid were settled (Case No. 06-56, #s 854, 855, & 856).

Ms. Klar needlessly multiplied and manipulated these proceedings for the tactical advantages described herein, and increased the cost and complexity of this action exponentially. Apart from the litigation misconduct and contempt of this court described above, there is another very disturbing subtext about what occurred. It is evident that when Mr. Flynn and Mr. Montgomery parted company in July 2007, there was tremendous animosity between the two.  The court knows that Ms. Blixseth – although not yet a party to the action at that time – was intimately involved behind the scenes in these cases, as the evidence presented in support of this motion for sanctions so plainly reveals.[5]  When Mr. Flynn fell out of accord with Mr. Montgomery, he also fell out of accord with Ms. Blixseth.  The court concludes that the animosity Mr. Montgomery and Ms. Blixseth harbored for Mr. Flynn was a catalyst for the litigation strategy to insure  – through any means possible – that Mr. Flynn would never be paid and to crush him into submission in the process.  By her conduct as lead counsel in these proceedings, Ms. Klar allowed  her clients to involve the Liner firm, Ms. Pham and herself in a scheme to exploit legitimate

---

[5]The court also notes that Ms. Klar was not unacquainted with Ms. Blixseth in 2007.  She represented Ms. Blixseth in an unrelated matter (Case No. 06-56, #600).

1  legal proceedings to harass and punish Mr. Flynn.  Ms. Klar crossed over the line as a zealous advocate

2  for her clients' interests and abdicated her ethical and professional duties to the court in advancing this

3  strategy.  "'Following orders' of a client or a superior or employer is no defense to filing a pleading in

4  bad faith or for an improper purpose."  In re *Aston-Nevada Ltd. P'ship*, 391 B.R. 84, 106 (Bankr. D.

5  Nev. 2006) (citations omitted).  *See also In re TCI Ltd.*, 769 F.2d 441, 446 (7th Cir. 1985) (rejecting

6  argument that sanctions could not be imposed because attorney acted at the insistence of the client);

7  *Steinle v. Warren*, 765 F.2d 95, 101 (7th Cir. 1985) (imposing sanctions on attorney, even though acted

8  at client's insistence); *Blair v. Shenandoah Women's Ctr., Inc.*, 757 F.2d 1435, 1438 (4th Cir. 1985)

9  (attorney does not escape sanctions "just because his client's behavior was even worse" than attorney's

10  behavior).

11             2.    Mr. Montgomery's September 10, 2007 Declaration

12       Mr. Montgomery's February 28, 2007 declaration in the search warrant proceeding directly

13  conflicts with his September 10, 2007 declaration. The attestation in the September 10, 2007 declaration,

14  filed both in this court and in the California court, was an essential piece of evidence in support of Ms.

15  Klar and Ms. Pham's assertion that there was a factual basis to file the California Superior Court action,

16  the San Diego fee arbitration, and the Massachusetts Bar complaint.

17       On August 1, 2007, Mr. Montgomery's local counsel filed notice of termination of Mr. Flynn

18  and Ms. DiMare, and Ms. Klar subsequently signed the stipulation to dismiss the action (Case No. 06-

19  263, #s130 & 134); therefore, Ms. Klar knew, or upon reasonable inquiry, should have known, the

20  details of that proceeding, which most particularly included the United States' unsuccessful attempt to

21  disqualify Mr. Flynn only five months earlier.  Although the court's file in the search warrant proceeding

22  was not unsealed until September 17, 2007 (Case No. 06-263, #131), Mr. Montgomery would have had

23  a copy of his February 2007 declaration in his own files.  Ms. Klar told the District Court on August 17,

24  2007 that she had access to these files.

25       Through apparent inadvertence, Mr. Montgomery's declaration was not unsealed pursuant to the

26  District Court's September 17, 2007 order (Case No. 06-56, #270).  It is curious that when the United

27  States requested that the declaration be unsealed, it drew Ms. Klar's objection (Case No. 06-56, #331).

28                                          46

1    This is odd because the United States, as holder of the state secrets privilege, was the only party who

2    could assert the privilege, and Justice Department counsel presumably determined the declaration should

3    be unsealed, or they would not have made the request.

4           On November 9, 2007, the court held a brief hearing and noted Ms. Klar's objection; however,

5    she did not appear (Case No. 06-56, #331).  Instead, local counsel appeared, and he was understandably

6    unable to articulate a basis for keeping this declaration sealed. The court unsealed Mr. Montgomery's

7    declaration, and it has become a centerpiece of this sanction litigation.  The court reasonably infers that

8    Ms. Klar objected to the unsealing of Mr. Montgomery's February 28, 2007 declaration because it so

9    clearly contradicted the September 10, 2007 declaration, which was drafted for the purposes outlined

10   herein.

11          Ms. Klar and Ms. Pham knew, or upon reasonable inquiry, should have known that in February

12   2007, Mr. Montgomery attested under penalty of perjury that he had read court filings, which disclosed

13   (1) that Mr. Flynn is only licensed to practice law in Massachusetts, (2) that he maintains a Boston law

14   office address, (3) that he has residences in Massachusetts and California, (4) that Mr. Flynn and Mr.

15   Stillman were partners, and Mr. Stillman opened a West Coast office of the firm in 1992, and (5) that

16   Mr. Flynn regularly practices law in Massachusetts, but also maintains a multi-state practice.  Ms. Klar

17   and Ms. Pham knew, or upon reasonable inquiry, should have known that in his own declaration, Mr.

18   Montgomery attested that the "recent attempt to disqualify my attorney would gravely damage my

19   constitutional protections.  It is borne out of ignorance of the facts by the USAO, an agenda to attack me,

20   and disregard for not only my rights, but the security of our Country."

21          Mr. Montgomery's September 10, 2007 declaration is directly contrary to these attestations, and

22   the court concludes that the September 10, 2007 declaration is perjured. It is the most damaging

23   document because without it, Ms. Klar would have had no basis to remove the client file and fee disputes

24   from the District of Nevada. Mr. Montgomery either lied to his lawyers to assist in effectuating Ms.

25   Klar's  litigation plan, or Ms. Pham, the declaration's author, orchestrated the subornation of perjury.

26   Having heard the testimony of both Mr. Montgomery and Ms. Pham and considered their credibility, the

27   court does not believe Ms. Pham intentionally suborned perjury; rather, it finds that Mr. Montgomery

28                                              47

1    voluntarily tailored this latest declaration to achieve his lawyers' goals and may well have done so at the

2    direction of Ms. Klar.

3        The conduct of Ms. Klar and Ms. Pham epitomizes the scorched earth litigation tactics that

4    undermine citizens' confidence in our courts and our system of justice.  The court cannot allow attorneys

5    who practice before it to operate as hired bounty hunters who – armed with extensive resources – take

6    it upon themselves to manipulate the legal system with impunity.  Ms. Klar and Ms. Pham are sanctioned

7    as more fully set forth below.

8        ### B.    The Liner Firm

9        The Liner firm also bears  responsibility for what occurred in this proceeding.  Ms. Klar utilized

10   the Liner firm's substantial resources to engage in the litigation misconduct described herein, and she

11   was not the only attorney who signed misleading pleadings and ignored repeated orders of this court.

12   Ms. Klar certainly utilized Ms. Pham to carry out her strategy, but also assigned tasks to other junior

13   attorneys in the firm.[6]  Ms. Klar was allowed to operate in the Liner firm unchecked and unquestioned,

14   and this conclusion is supported by her pattern of sanctionable conduct that ensued long after the fall

15   of 2007.  It was not until matters came to a head in the summer of 2008 that senior partners finally

16   stepped in to this case. The court finds that the Liner firm acquiesced to or willingly carried out Ms.

17   Klar's litigation strategy; therefore, sanctions against the Liner firm are warranted pursuant to 28 U.S.C.

18   § 1927.  *See, e.g., Moser v. Bret Harte Union High School District,* 366 F. Supp. 2d 944 (E.D. Cal.

19   2005); *Avirgan v.Hull,* 125 F.R.D. 189 (S.D. Fla. 1989).

20       ### C.    Mr. Montgomery

21        Mr. Montgomery's role in this matter revolves around his two declarations.  The court considers

22   Mr. Montgomery's conduct and credibility in light of his testimony at the sealed hearing and at other

23   hearings in this action. Mr. Montgomery was no bystander to these events; he had a pivotal role in both

24   the search warrant proceeding and the trade secrets litigation. The evidence is clear that Mr. Flynn and

25   Mr. Montgomery were in constant contact concerning every aspect of these proceedings, and it is

27   [6]The court does not identify these attorneys in this order because it concludes their participation in the misconduct was minimal.

28                                48

obvious that Mr. Montgomery's participation was essential to his effective representation. The characterization of Mr. Montgomery as an unsophisticated client who could not appreciate the importance of these two declarations is not in the least credible.

Mr. Montgomery knew in January 2005 that Mr. Flynn was a Massachusetts lawyer, but his concern at the time was whether Mr. Flynn could appear before courts in Nevada. Mr. Flynn was admitted *pro hac vice* in state court and in this court, and this was the extent of Mr. Montgomery's interest in the matter. Mr. Montgomery's alleged confusion over nineteen months later about what it meant to be "admitted," a "member," or "licensed" in a particular jurisdiction is a chimera. Mr. Montgomery knew very well that Mr. Flynn's admission to a state bar meant nothing to him until he either wanted Mr. Flynn as his counsel (February 28, 2007 declaration), or he did not (September 10, 2007 declaration). The court finds there is clear and convincing evidence that Mr. Montgomery committed perjury when he signed the September 10, 2007 declaration, and that he signed the declaration in bad faith, vexatiously, wantonly, and for oppressive reasons. Ms. Klar and Ms. Pham filed this perjured declaration in the court and in California Superior Court. They also used the allegations contained therein in the San Diego fee arbitration petition and the Massachusetts Bar complaint. This not only resulted in the delay and disruption of this proceeding; it was motivated by vindictiveness and bad faith and demonstrates contempt of this court.

## IV.  SANCTIONS

This court has considered the American Bar Association's standards, *supra* at p. 36, for the imposition of sanctions against Ms. Klar, Ms. Pham, and the Liner firm.

Ms. Klar:  Ms. Klar violated her duties to the public, the legal system and the legal profession by her conduct. She acted intentionally and knowingly. The aggravating circumstances of her misconduct are set forth herein, and the court will only note that Ms. Klar is a seasoned trial lawyer who has practiced in state and federal courts. Ms. Klar did not testify at the sealed hearing in this matter, and there are no factors in mitigation of sanctions.

Ms. Pham:  Ms. Pham is a junior partner in a large metropolitan law firm, and she had been admitted to practice law for ten years at the time of these events. In the fall of 2007, Ms. Pham was

1    preparing for family leave, which may have caused her to follow the path of least resistance and accede

2    to Ms. Klar's directions. It may have been part of the "large firm" culture at the Liner firm that junior

3    partners were unaccustomed to challenging senior litigators about matters of strategy, and she may also

4    not have had Ms. Klar's level of understanding about the complexity of these proceedings.  During her

5    tenure as lead counsel, this court observed Ms. Klar's demeanor toward the court and opposing counsel,

6    which was frequently uncivil and lacking in collegiality.  The court imagines that those junior to Ms.

7    Klar might well suffer intimidation and trepidation if compelled to challenge her legal strategy. Ms.

8    Pham may have been no exception.  These factors weigh in mitigation of sanctions.

9         However, Ms. Pham *did* testify at the sealed hearing and was quite adamant that the course of

10   conduct outlined herein was proper, not done in bad faith, and she insisted that she had a proper legal

11   basis for her actions throughout all of the proceedings.  This factor weighs in favor of sanctions.

12        The Liner Firm:   As noted above, the Liner firm is a large Los Angeles law firm and employs

13   many attorneys. The Liner firm failed their clients, the legal system, and the legal profession by allowing

14   Ms. Klar to engage unchecked in scorched earth litigation tactics.  Even senior partners must be held

15   accountable for their conduct, and it is the law firm's responsibility to insure this occurs.  Ms. Pham and

16   other lawyers junior to Ms. Klar should have been able to rely on the firm's senior management to

17   intercede when the firm knew, or reasonably should have known, that Ms. Klar was following such a

18   course.  It is also the law firm's responsibility to insure that its junior lawyers are trained to consider

19   their assignments from both ethical and legal perspectives.  It appears to the court that the Liner firm did

20   not meet these obligations and this failure contributed to what occurred here.  These factors weigh in

21   favor of sanctions.

22        In July 2008, senior partners in the Liner firm finally stepped into this case, but this was only

23   after several sanction orders had been issued, and both Ms. Klar and Mr. Montgomery were facing very

24   serious allegations unrelated to the issues currently before this court.  It was also many months after Ms.

25   Klar's unsuccessful campaign to divest this court of jurisdiction and to defeat Mr. Flynn at any cost.

26   This factor weighs in mitigation of sanctions, since it ultimately resulted in settlement of the underlying

27   cases between the Montgomery parties and eTreppid.

28
                                                  50

1    <u>Mr. Montgomery</u>: The American Bar Association factors in mitigation of sanctions set forth

2    herein do not apply to parties, but the court observes that during his testimony at the sealed hearing, as

3    well as other hearings in this action, Mr. Montgomery demonstrated a consistent inability to recall

4    pivotal facts, and the court did not find his testimony credible.  Mr. Montgomery was also sanctioned

5    for his failure to comply with other court orders in this action.  *See, supra* at ¶¶ 44-45.  These factors

6    weigh in favor of sanctions.

7    Based upon the foregoing, the court finds that pursuant to its inherent powers and 28 U.S.C. §

8    1927, the following sanctions shall issue:

9    **A.    Monetary Sanctions**

10   Pursuant to LR 54-16, Mr. Flynn submitted a declaration, a summary description of his work

11   associated with the motion for sanctions, and an itemized statement of his and Ms. DiMare's legal

12   services (Case No. 06-56, #s 547 & 552, Exs. 11-A &11-B).  Mr. Flynn and Ms. DiMare seek a total of

13   $361,275.00 in attorney's fees and $3,303.00 in costs.

14   The court has reviewed all of these papers and has made certain adjustments.  First, Mr. Flynn

15   and Ms. DiMare's request the court adopt respective hourly rates of $450 and $350; however, their

16   hourly rates for their prior fee application were $400 and $300, respectively. The court believes these

17   hourly rates are proper for this fee application as well.  Second, the court has not only reviewed the task

18   summaries, but it has reviewed, line-by-line, each of the time entries.  The court will not award

19   attorney's fees for work performed on the fee application that resulted in an award of attorney's fees and

20   costs in March 2008.  *See* Case No. 06-56, #502.  Nor will the court awards attorney's fees for the

21   motion to withdraw as counsel, the filing of the retaining lien, and similar matters.  The court has also

22   reduced some of the time allocated to preparation of Mr. Flynn's declaration, the time line, and entries

23   that may be, in part, attributable to Mr. Flynn's Rule 3.3 motion.  Finally, the court has deducted time

24   for entries that are vague and duplicative.  The court awards Mr. Flynn attorney's fees in the amount of

25   $159,840 and Mr. DiMare the sum of $42,150, for a total of $201,990.00.

26

27

28
                                                                    51

Mr. Flynn and Ms. DiMare itemize costs in the amount of $3,303.00.  The court excludes the monthly cost of LEXIS for September 2007 to April 2008 ($882.00), as this is an attorney's normal cost of doing business.  The court awards costs in the amount of $2,421.00.

Based upon the foregoing, the monetary sanctions imposed upon Ms. Klar, Ms. Pham, the Liner firm, and Mr. Montgomery total $204,411.00. Mr. Montgomery is sanctioned pursuant to the court's inherent power, and Ms. Klar, Ms. Pham, and the Liner firm are sanctioned pursuant to the court's inherent power and 28 U.S.C. § 1927 as follows:

|   |   |   |   |
|---|---|---|---|
| 1. | Ms. Klar | $102,205.50 | 50% |
| 2. | Mr. Montgomery | $ 61,323.30 | 30% |
| 3. | Ms. Pham | $ 20,441.10 | 10% |
| 4. | The Liner Firm | $ 20,441.10 | 10% |

Those sanctioned are jointly and severally liable for these sanctions.

**B.    Bar Discipline – Ms. Klar and Ms. Pham**

The court believes that Mr. Klar and Ms. Pham violated the Rules of Professional Conduct and refers this matter to the Nevada State Bar and California State Bar.  The Clerk of Court is directed to send this order to Bar Counsel for both Nevada and California.

**C.    *Pro Hac Vice* Appearances in the United States District Court, District of Nevada**

Local Rule IA 10-2 authorizes attorneys who are not members of this court to apply for admission to practice in a particular case at the court's discretion.  In light of their misconduct in this proceeding, Ms. Klar and Ms. Pham shall be prohibited from applying for *pro hac vice* admission to this court for a period of five years. At the expiration of five years, they may apply for admission pursuant to Local Rules, but shall attach a copy of the court's order, and they shall provide a declaration identifying all courses they have completed on legal ethics during the interim period.  The court shall retain its discretion whether they shall be admitted *pro hac vice.*

**D.    Publication of this Opinion**

The court believes the maximum deterrence will result from publication of this order, which will constitute a public reprimand of Ms. Klar, Ms. Pham, and the Liner firm in the form of an opinion in

1  West's Federal Supplement. *See* William W. Schwartzer, *Sanctions Under the New Federal Rule 11-*
2  *A Closer Look,* 104 F.R.D. 181, 201 (1985).

3  **E.     Community Legal Service**

4  The court has already imposed substantial monetary sanctions in this matter; however, the court
5  believes that additional sanctions against Ms. Klar and Ms. Pham are warranted for their pattern of
6  contempt for this court's orders and the legal system in which they are privileged to serve as officers of
7  the court.  This type of professional misconduct not only damages the legal system and requires courts
8  to divert substantial resources to discipline attorneys and parties; it undermines citizens' confidence in
9  attorneys who are given a public trust to conduct themselves ethically and preserve the rule of law. To
10  remediate this violation, the court fashions a sanction that it believes will restore to Ms. Klar and Ms.
11  Pham a sense of their responsibilities as officers of the court in our system of justice.  Ms. Klar and Ms.
12  Pham shall perform *pro bono* legal services, of 200 hours and 100 hours, respectively, to benefit those
13  who are indigent and otherwise unable to afford legal services.

14  Within ten days of entry of the final order in this matter, Ms. Klar and Ms. Pham shall submit
15  to this court for its approval their proposed plans for completion of *pro bono* legal services, which shall
16  be completed within two years of the date of entry of the final order. On the first anniversary of the final
17  order, Ms. Klar and Ms. Pham shall submit declarations to this court attesting to the number of hours
18  of *pro bono* service completed, and a description of those services.  On the second anniversary of the
19  final order, Ms. Klar and Ms. Pham shall submit a final declaration containing the same information.

20  **F.     Mr. Montgomery**

21  A copy of this order shall be sent to the Office of the United States Attorney.

22  **V.  <u>CONCLUSION</u>**

23  Apart from depriving a citizen of his or her life, liberty or property, there is no more difficult task
24  for a judge than sanctioning an attorney for misconduct.  The court has devoted many, many hours of
25  time in reviewing the papers filed, reading transcripts of relevant hearings, listening to recordings of
26  hearings, and considering carefully the facts and law before it.  It is this court's sincere hope that those
27  subject to the sanctions issued herein will never repeat this misconduct and that they will renew their

28

1   professional commitment to abide by the highest ideals of the legal profession and the rule of law.

2        **IT IS ORDERED** that Mr. Flynn' motion for sanctions pursuant to 28 U.S.C. § 1927 and/or

3   pursuant to the inherent power of the court (Case No. 06-56, #545) is **GRANTED**.  Pursuant to LR IB

4   3-1(a), a party may file an objection to the District Court of this order within ten days of service of this

5   order.  Therefore, this order is **STAYED** until Friday, April 10, 2009.  If objections are filed, this stay

6   shall remain in effect until the District Court issues its final order. If no objections are filed, the effective

7   date of this order shall be **April 10, 2009.**

8        **IT IS SO ORDERED.**

9        DATED:   March 31, 2009.

10       _____

11       UNITED STATES MAGISTRATE JUDGE

54