# EXHIBIT "B"

**DECLARATION OF DENNIS L. MONTGOMERY**

I, Dennis L. Montgomery, state the following as my declaration pursuant to 28 U.S.C. § 1746:

1. I am a citizen of the United States and resident of the State of Florida.

2. Over the 45 years as a computer scientist, developed software programs, computer hardware, and medical devices.

3. For more than 45 years, I have been engaged in software development and written software focused on developing Data Compression (DC), Anomaly Detection (AD), Pattern Recognition (PR), Object Detection, Identification, and Tracking Technology, and Biometrics in analyzing massive volumes of electronic data.

4. In companies I started, we have developed and then licensed various technologies to the U.S. government intelligence agencies including (CIA), Department of Defense (DOD), SOCOM, Homeland Security (HS), Department of Advanced Naval Research (NAVY), and Air Force (AF).

5. I was issued a TS/SCI security clearance 2004 with case-determined access to SAP programs. I was required to sign a Classified Information Nondisclosure Agreement in connection with my work at eTreppid for the federal government. A true and accurate copy of the nondisclosure agreement that I signed, dated September 16, 2003, is attached

    a. Attached as **Exhibit-01** is a true and correct copy of Dennis Montgomery Security Clearance.

6. I built a myriad of medical technologies. Many are still in use today. I licensed various medical technologies to American Hospital, Baxter Healthcare, Dupont, Corning, Perkin Elmer, the Henley Group, Fisher Scientific, Instrumentation Labs, Kaiser, Siemens, Kodak, among others. I successfully filed multiple medical device registrations with the FDA. I took 3Net Systems Inc. medical company public on Nasdaq August 11, 1992.

7. In addition to these medical technologies, I designed and built programs for GE, Intel, Technicolor, MGM, Hewlett Packard, Novell, IBM, and many others

8. In 1998, I formed eTreppid Technologies, LLC (eTreppid) together with a business partner, Warren Trepp. I was the member of the company who contributed the principal software development capability for the purpose of obtaining contracts with federal government agencies and performing software development services under those contracts.

9. In 2002, eTreppid was approached by representatives of the United States Department of Defense (DOD) and Central Intelligence Agency (CIA), who expressed an interest in various surveillance technologies eTreppid had been developing. These federal government representatives conducted independent tests of eTreppid's technology and then advised us that they had decided to integrate eTreppid's DC, AD, and PR technologies into various programs in the federal government's intelligence community.

    a. Attached as **Exhibit-02** is a true and correct copy of US GOV contract announcement with contract (limited).

1

10. Following the terrorist attacks of September 11, 2001, eTreppid was awarded contracts with the DoD, U.S. Air Force, CIA, the United State Department of Homeland Security, and other U.S. federal entities to develop and deliver surveillance software technologies. eTreppid fulfilled its obligations under these contracts and delivered intercepted data that enabled the location of foreign terrorists and activities abroad that posed threats to the United States. The work began at our facility in Reno NV. All data collected in our Reno facility was passed on to the intelligence community members in our building and transmitted to the FBI via secure encrypted communication lines at the end of the day. The data was also burned on CDs and couriered weekly by the intelligence officials in our building to their secure facilities in DC.

11. eTreppid Technologies was supplied millions of dollars of hardware by the FBI to begun our surveillance work. Or surveillance work was running on supplied computers by the FBI during my work in Reno NV.

   a. **Attached as Exhibit-03** is a true and correct copy of US GOV supplied surveillance computers.

12. eTreppid Technologies was awarded a surveillance contract by the CIA, DOD, Air Force, and Department of Homeland Security, starting in 2004.

   a. **Attached as Exhibit-04** is a true and correct copy of US GOV contracts (limited pages)

13. Beginning in 2005, I became aware that the CIA and the National Security Agency (NSA) had started using the eTreppid technology that I had developed for locating terrorists abroad to conduct surveillance of citizens of the United States, including members of the Supreme Court of the United States and thousands of other federal and state jurists, members of Congress, state officeholders, numerous public figures and religious leaders in the U.S., and other Americans.

14. On Jan 6, 2006, I separated from Warren Trepp and eTreppid Technologies, which was the very company I started. The separation was related to various business disagreements.

15. In Feb/March 2006, the FBI applied for searched warrants against my home and later storage units. The warrants claimed they were looking for classified documents and various intellectual properties owned by eTreppid. The FBI failed to mention to Magistrate Cooke, who approved the warrants, that I, not eTreppid, owned the intellectual property. It didn't take long for Magistrate Cooke, who issued the search warrant, to figure out how she was duped by the FBI. She realized Agent West took sides in a civil dispute and was there looking for something other than what he listed on the search warrants.

   a. **Attached as Exhibit-05** Copy of FBI Agent West Search warrant affidavit that was handed to me at my house.

16. Eight members of FBI, IRS, and DEA raided Montgomery home and storage units looking for all evidence of FBI/CIA/NSA involvement in operating surveillance programs, foreign and domestic in Nevada that target foreign and domestic individuals, businesses, and elections. The US GOV would only supply the name of SA FBI Agent West. The US GOV refuses to produce the names of the other agents.

2

17. After three months of testimony, Judge Cooke concluded that Montgomery did nothing wrong and that the FBI filed false affidavits, tampered with evidence they collected, made up false information against Montgomery, and that the FBI violated Dennis Montgomery constitutional rights. When Judge Sandoval (later Governor Sandoval) was confronted with illegal FBI/CIA/NSA domestic surveillance programs operating in NV, he recused himself.

   a. **Attached as Exhibit-06** Judge Cooke probable cause ruling.

18. Judge Cooke issues ruling against the FBI concluding FBI violated Dennis Montgomery constitutional rights. Ordered everything returned to Montgomery family despite objections from DOJ. The FBI shredded the documents that they did not want others to see that reflected US GOV bad actors involved in these illegal surveillance programs, including interfering in foreign elections operating off the grid and away from congressional oversight. After this ruling came out, I was forced to hire 24-hour private security for me and my family given the number of death threats we received. For our safety concerns we were forced to leave our home In Reno, NV and move to Seattle. In WA we continued private 24-hour security for 4 years costing us considerable dollars. The US GOV never appealed the Judge Cooke's ruling.

19. On September 8, 2008, after lengthy legal battles, I settled my differences with my partner, Warren Trepp, and began work at Opspring, later called Blxware. Blxware met with members of the White House and Senate Intel Committee members and eventually went under contract for licensing various technologies to the intelligence community similar to eTreppid products.

20. On Jan 13, 2009, Blxware contracted with the us intelligence community to continue our prior work at eTreppid to be conducted at a new facility Fort Washington, Maryland, which was under the direction of James Clapper.

   a. **Attached as Exhibit-7** is a true and correct copy of US GOV contracts (limited pages)

21. When I learned of CIA and NSA's domestic surveillance using the technology I had developed, I filed whistleblower complaints with the Inspectors General of the CIA, Department of Defense (DOD), Department of Justice (DOJ), Air Force, Director of National Intelligence (DNI), Defense Intelligence Agency (DIA), and others. In those complaints, I objected to the misuse of this surveillance technology to monitor the private communications, bank records, attorney client communications, voting information and other private activities of American citizens.

22. During the eTreppid Litigation, the Director of National Intelligence filed a motion asserting on behalf of the United States a state secrets privilege. In response, on August 29, 2007, the court entered a Protective Order that prohibited certain discovery in the eTreppid Litigation.

   a. Attached as **Exhibit-08** is a true and correct copy of the US Protective Order.

23. On June 6, 2008, I was ordered by a federal district judge in Reno, Nevada to go to the DOJ building in Washington DC and meet separately with two groups in a SCIF. DOJ attorneys Carlotta Wells and Raphael Gomez, who were involved in FBI/CIA/NSA domestic surveillance programs I have worked since the beginning were not allowed in the meeting. I was not allowed to have any attorney present. I was not allowed to have any mobile devices; nothing could be brought into the room or taken out.  In the first meeting, I met with DOD, AF, DIA attorneys and personnel. They claimed all my prior work had been validated and wanted to move forward in contract. In the second meeting, only one woman with the CIA was present and she

wanted to know (a) where all the technology and collected data was kept regarding the CIA surveillance work, foreign and domestic including election monitoring and interference and (b) how I got a copy of 35 CIA enhanced interrogation tapes and where the originals were kept. I made it clear that all work was authorized and supervised by George Tenet, Ed Charbonneau, Donald Kerr, and John Brennan and suggested she talk to them. It was not a pleasant experience and I didn't appreciate the threats she directed at me and my family if their surveillance work ever appeared in the public space. I passed on the CIA threats to the court.

   a. Attached as **Exhibit-9 is** an email confirmation I must appear as ordered by the court at the DOJ building in Washington DC.

24. On September 9, 2008, the eTreppid Litigation was terminated by dismissal of all claims and counterclaims pursuant to a stipulation of the parties. At the time of settlement, the federal district court in Reno retained control of all matters regarding compliance with the US Protective Order and the State Secrets Privilege. The Department of Justice has continued to claim that I am still prohibited by the Protective Order from disclosing information related to the FBI/CIA/NSA domestic surveillance contracts in which I played a part.

   a. Attached as **Exhibit-10** is an email confirmation that the Reno Federal court retains compliance matters over the PO and SSP in place.

   b. Attached as **Exhibit-11** is a true and correct copy of October 26, 2020 email correspondence between my attorney and DOJ attorney Greg Addington, in which Mr. Addington states that the Protective Order "**remains in place** to preclude disclosure of the categories of information and related materials described in the order, based on the circumstances giving rise to the protective order."

25. On March 4, 2010, the DOJ and FBI raided the law offices of my attorneys, Liner Law Firm, without a search warrant or any probable cause and seized millions of pages of attorney-client documents, us gov communications, election data collected in FBI/CIA/NSA domestic surveillance programs I worked in, including proof of us gov election surveillance and tampering. Seized documents and electronic media reflected voting machines manufactures vulnerabilities to hacking. Voting machine manufactures communications and intellectual property we hijacked by us gov numerous times over the years I worked in FBI/CIA/NSA surveillance programs, foreign and domestic.

26. The IP that I designed for these surveillance programs was also seized and never been returned to me despite 12 years of requests by me and my attorneys, costing me tens of millions of dollars.

   a. Attached as **Exhibit-12** is an email confirmation of the illegal raid on my attorneys I was not allowed to be present at.

27. On November 18, 2010, the US GOV sent Senior DOJ Attorney Carlotta Wells to my deposition in a bankruptcy proceeding. She was accompanied by two armed agents. During the deposition, Ms. Wells asserted the right to bar me from testifying on matters covered by a protective order entered by the Nevada federal district judge enforcing the state secrets privilege.

   a. Attached as **Exhibit-13** is a relevant portion of my 2010 deposition.

28. In September 2013 after failed neurosurgery in July 2013, I decided to give FoxNews an interview regarding FBI/CIA/NSA domestic surveillance programs I worked in including election surveillance and interference. Carl Cameron, FOXNEWS reporter interviewed me in my home in Seattle and filmed my computers running domestic surveillance programs I licensed to the us gov involved in domestic surveillance programs I worked which involved domestic election monitoring and interference. Carl Cameron filmed computers hacking into voting machines manufactures and their equipment with ease. I only agreed to the interview under the agreement that I would be provided a copy of the interview; to date I never received my copy of the interview despite my many requests. A second film crew returned to my home October 2013 to film domestic voting interference and voting machines vulnerabilities. The film crew recorded election network vulnerabilities in various Secretary of State election networks, specifically in Florida, Georgia, Arizona, and others. The filming was done by Robert Shaffer, Foxnews field producer, Seattle, WA.

    a. Attached as **Exhibit-14** are email exchanges between me an FOXNEWS reporter Carl Cameron regarding his interview and filming at my home in Seattle Sept/Oct 2013.

29. On November 15, 2013, the Maricopa County Sheriff's Office approached me for identity theft information regarding Maricopa County residents. I provided under Arizona State immunity agreement information collected in FBI/CIA/NSA domestic surveillance programs I worked in, including surveillance of Maricopa residents, businesses, and the state election networks. During a court proceeding related to that matter, Raphael Gomez, a senior DOJ attorney, took possession of approximately 50 hard drives that I had provided to the Maricopa Sheriff under an assertion of a state secrets privilege. Those hard drives have not been returned to me.

    a. Attached **Exhibit-15** Article (limited) detailing actions during the court hearing.

30. On August 3, 2014, I met with Federal Judge Royce Lamberth in his office in the Federal Court House in DC with others present and discussed FBI/CIA/NSA domestic surveillance programs I worked in including election tampering and the abuses of high-ranking US GOV officials who directed and supervised this illegal domestic surveillance programs I worked in, first in Reno NV and then at Ft. Washington, MD. I presented information to him to support the claims I was making in my previous whistleblower complaints. I was seeking immunity to allow me to present my evidence of these super-secret surveillance programs I worked in. He reached out first to Senator Grassley and then to FBI general counsel James Baker. I provided Judge Lamberth proof of election interference both foreign and domestic. FBI General counsel James Baker later denied any knowledge of such FBI/CIA/NSA domestic surveillance programs I worked in, but had to walk back those comments in his testimony before a house committee on us gov surveillance matters.

    a. Attached as **Exhibit-16** FBI general counsel James Baker testimony before congress where he had to acknowledge my us gov surveillance work.

31. On September 8, 2014, I had discussions with Senate Select Committee on Intelligence (SSCI) staffers John Dickas and James Wolfe regarding targeting congressional members in FBI/CIA/NSA domestic surveillance programs I worked in.

    a. Attached as **Exhibit-17** email to John Dickas regarding the use of surveillance technology I built foreign surveillance used to target Americans and their businesses.

5

32. On February 23, 2015, I notified Judge Holmes in my US Tax Court hearing that the IRS had retaliated against me because they were upset over Judge Cooke's ruling against the agents of the FBI, IRS, and DEA who raided my home on an illegal search warrant in 2006. In my court hearing, Judge Holmes took notice of the IRS retaliation against me. Also took notice many bad actors in us gov surveillance programs I worked in that abused the surveillance technology.

    a. Attached as **Exhibit-18** is a true and correct copy of pages from my tax case a search hearing (limited pages).

33. In July 2015, I was contacted by the Department of Justice and asked to cooperate in their investigation of US GOV officials who directed and supervised FBI/CIA/NSA domestic surveillance programs I worked in. I was granted immunity for my cooperation and document production. The DOJ was interested in the use of the "eTreppid/Blxware" technology that could surveil and interfere in elections, foreign and domestic leaving no trace. I provided the data to the FBI and DOJ from 2003-2015 showing the technology (source code), collected data, previous tampered data in election surveillance programs operated in FBI/CIA/NSA domestic surveillance programs I worked in.

    a. Attached as **Exhibit-19** is a true and correct copy of my immunity agreement with the DOJ.

34. August 19, 2015, I met with the FBI at their Miramar, Florida office to turn over the data the DOJ requested as part of my immunity agreement. I produced 47 hard drives, 90TB of data, and software (source code) that I developed and licensed to the US GOV to show the methods and sources of this vast data collection, developed and intended for foreign surveillance but used by some bad actors in the US GOV for domestic surveillance running on computers owned by me and the US GOV. This data was personal data about millions of Americans and businesses. It related to contracts between 2003-2013. The drives also contained proof of us gov involvement in both foreign and domestic elections.

35. On December 3, 2015, only after the US GOV reviewed the data that I had submitted to the FBI on the 47 hard drives, I was interrogated by a senior DOJ lawyer Deborah Curtis, FBI SA Walter Giardina, and FBI SA William Barnett in the FBI's field office in the District of Columbia did the DOJ decide to move forward. As a result of this interview, DOJ granted me immunity, as shown in **Exhibit-20,** to present information about the illegal domestic surveillance program to appropriate authorities. During the 3.5-hour deposition, under oath and videotaped at FBI headquarters in DC, I discussed matters regarding the contents of the data on the drives including the programs I developed for the us gov that involved election surveillance and interference with data going back to 2004. I answered all questions and never took the fifth. I also produced additional data at the time of this interrogation. This December 3rd 2015 I had with FBI was confirmed later by FBI General Counsel James Baker during his congressional testimony October 18, 2018 regarding FBI/CIA/NSA domestic surveillance programs I worked in.

    a. Attached as **Exhibit-20** is a true and correct copy of the DOJ request for my testimony and additional document production I was required to produce at the interview which I did.

36. I have never received the 48 hard drives back from DOJ or the FBI. I have tried to recover possession of them, but DOJ and the FBI refuse to return them. The drives were to be returned to me after they removed any sensitive data from them.

37.  From 2006-2022, the us gov has seized or failed to return 1,213 electronic media devices (disk drives, flash drives, DVD, CD, etc. containing proof of FBI/CIA/NSA domestic surveillance I worked in and built technology for. These drives contain personal information on over 25 million Americans and their businesses collected in these illegal surveillance programs I worked in.

38. The 47 hard drives, 90TB, hundreds of millions of pages of documents I provided the FBI and the us gov is holding outlined in this declaration will prove US voting machine manufactures and their employees were hacked several times; collecting documents, electronic communications, and intellectual property in illegal FBI/NSA/CIA surveillance programs I worked in. I provided proof to us law enforcement 2005, 2008, 2010, 2012, and 2015. The data was also provided to the FBI Director James Comey's general counsel James Bakers office on 08/19/2015 and 12/03/2015. The voting machine companies included Election Systems & Software, Inc (ES&S), Clear Ballot Group, Inc., Dominion Voting Systems Corp, Hart InterCivic, Inc., MicroVote General Corp., Smartmatic USA Corporation, VotingWorks, and Unisys Voting Solutions.

39.  In 2021, I agreed to convey certain assets that I acquired and developed for eTreppid and Blxware to Mike Lindell Management.

40. In the recent 2020 elections, terabytes of data ("Election Data") comprising internet transmissions sent during 2020 election were collected by the same technology I developed and previously licensed by the us gov. US GOV or their agents continued to use the "election technology" I licensed to them previously. The US GOV has refused to pay license fees associated with technology as they continue to use the technology and have paid for in the past.

41. Because DOJ has asserted that the eTreppid Litigation Protective Order "remains in place" to "preclude disclosure of the categories of information and related materials described in the order," I believed when I owned eTreppid and Blxware, and continue to believe today, that DOJ asserts that the Protective Order applies to the FBI/CIA/NSA domestic surveillance data including Election Data, and that public disclosure of the Election Data would violate the Protective Order and the state secrets privilege.

I certify under penalty of perjury that the foregoing is true and correct.


Executed this 19 day of August, 2022 in ___NAPLES___, Florida.


_____
Dennis L. Montgomery

# EXHIBIT "1"

7757867544                         Logar & Pulver Law                    03:48:57 p.m.    10-04-2006      275

# CLASSIFIED INFORMATION NONDISCLOSURE AGREEMENT

AN AGREEMENT BETWEEN **_Dennis   Montgomery_**         AND THE UNITED STATES
                         *(Name of Individual — Printed or typed)*

1. Intending to be legally bound, I hereby accept the obligations contained in this Agreement in consideration of my being granted access to classified information. As used in this Agreement, classified information is marked or unmarked classified information, including oral communications, that is classified under the standards of Executive Order 12958, or under any other Executive order or statute that prohibits the unauthorized disclosure of information in the interest of national security; and unclassified information that meets the standards for classification and is in the process of a classification determination as provided in Sections 1.1, 1.2, 1.3 and 1.4(e) of Executive Order 12958, or under any other Executive order or statute that requires protection for such information in the interest of national security. I understand and accept that by being granted access to classified information, special confidence and trust shall be placed in me by the United States Government.

2. I hereby acknowledge that I have received a security indoctrination concerning the nature and protection of classified information, including the procedures to be followed in ascertaining whether other persons to whom I contemplate disclosing this information have been approved for access to it, and that I understand these procedures.

3. I have been advised that the unauthorized disclosure, unauthorized retention, or negligent handling of classified information by me could cause damage or irreparable injury to the United States or could be used to advantage by a foreign nation. I hereby agree that I will never divulge classified information to anyone unless: (a) I have officially verified that the recipient has been properly authorized by the United States Government to receive it; or (b) I have been given prior written notice of authorization from the United States Government Department or Agency (hereinafter Department or Agency) responsible for the classification of information or last granting me a security clearance that such disclosure is permitted. I understand that if I am uncertain about the classification status of information, I am required to confirm from an authorized official that the information is unclassified before I may disclose it, except to a person as provided in (a) or (b), above. I further understand that I am obligated to comply with laws and regulations that prohibit the unauthorized disclosure of classified information.

4. I have been advised that any breach of this Agreement may result in the termination of any security clearances I hold; removal from any position of special confidence and trust requiring such clearances; or termination of my employment or other relationships with the Departments or Agencies that granted my security clearance or clearances. In addition, I have been advised that any unauthorized disclosure of classified information by me may constitute a violation, or violations, of United States criminal laws, including the provisions of Sections 641, 793, 794, 798, *952 and 1924, Title 18, United States Code. *the provisions of Section 783(b), Title 50, United States Code, and the provisions of the Intelligence Identities Protection Act of 1982. I recognize that nothing in this Agreement constitutes a waiver by the United States of the right to prosecute me for any statutory violation.

5. I hereby assign to the United States Government all royalties, remunerations, and emoluments that have resulted, will result or may result from any disclosure, publication or revelation of classified information not consistent with the terms of this Agreement.

6. I understand that the United States Government may seek any remedy available to it to enforce this Agreement including, but not limited to, application for a court order prohibiting disclosure of information in breach of this Agreement.

7. I understand that all classified information to which I have access or may obtain access by signing this Agreement is now and will remain the property of, or under the control of the United States Government unless and until otherwise determined by an authorized official or final ruling of a court of law. I agree that I shall return all classified materials which have, or may come into my possession or for which I am responsible because of such access: (a) upon demand by an authorized representative of the United States Government; (b) upon the conclusion of my employment or other relationship with the Department or Agency that last granted me a security clearance or that provided me access to classified information; or (c) upon the conclusion of my employment or other relationship that requires access to classified information. If I do not return such materials upon request, I understand that this may be a violation of Sections 793 and/or 1924, Title 18, United States Code, a United States criminal law.

8. Unless and until I am released in writing by an authorized representative of the United States Government, I understand that all conditions and obligations imposed upon me by this Agreement apply during the time I am granted access to classified information, and at all times thereafter.

9. Each provision of this Agreement is severable. If a court should find any provision of this Agreement to be unenforceable, all other provisions of this Agreement shall remain in full force and effect.

*(Continue on reverse.)*

7757867544          Logar & Pulver Law                    03:49:28 p.m.    10-04-2006        3/5

10. These restrictions are consistent with and do not supersede, conflict with or otherwise alter the employee obligations, rights or liabilities created by Executive Order 12958, Section 7211 of Title 5, United States Code (governing disclosures to Congress); Section 1034 of Title 10, United States Code, as amended by the Military Whistleblower Protection Act (governing disclosure to Congress by members of the military); Section 2302(b) (8) of Title 5, United States Code, as amended by the Whistleblower Protection Act (governing disclosures of illegality, waste, fraud, abuse or public health or safety threats); the Intelligence Identities Protection Act of 1982 (50 U.S.C. 421 et seq.) (governing disclosures that expose confidential Government agents), and the statutes which protect against disclosure that may compromise the national security, including Sections 641, 793, 794, 798, 952 and 1924 of Title 18, United States Code, and Section 4(b) of the Subversive Activities Act of 1950 (50 U.S.C. Section 783(b)). The definitions, requirements, obligations, rights, sanctions and liabilities created by said Executive Order and listed statutes are incorporated into this Agreement and are controlling.

11. I have read this Agreement carefully and my questions, if any, have been answered. I acknowledge that the briefing officer has made available to me the Executive Order and statutes referenced in this agreement and its implementing regulation (32 CFR Section 2003.20) so that I may read them at this time, if I so choose.

| SIGNATURE | DATE | SOCIAL SECURITY NUMBER (See Notice below) |
|---|---|---|
|  | 9/16/03 | 568-92- |

ORGANIZATION (IF CONTRACTOR, LICENSEE, GRANTEE OR AGENT, PROVIDE: NAME, ADDRESS, AND, IF APPLICABLE, FEDERAL SUPPLY CODE NUMBER)
(Type or print)

eTREPPID TECHNOLOGIES. LLC          3C5X0
755 TRADEMARK DR.
RENO, NV 89521

| WITNESS | ACCEPTANCE |
|---|---|
| THE EXECUTION OF THIS AGREEMENT WAS WITNESSED BY THE UNDERSIGNED. | THE UNDERSIGNED ACCEPTED THIS AGREEMENT ON BEHALF OF THE UNITED STATES GOVERNMENT. |

| SIGNATURE | DATE | SIGNATURE | DATE |
|---|---|---|---|
|  | 16 Sept 03 |  | 16 Sept 03 |

NAME AND ADDRESS (Type or print)

Defense Security Svc. (541 PY)
4349 Duffer Drive
Nellis AFB NV 89191

NAME AND ADDRESS (Type or print)

SAME

## SECURITY DEBRIEFING ACKNOWLEDGEMENT

I reaffirm that the provisions of the espionage laws, other federal criminal laws and executive orders applicable to the safeguarding of classified information have been made available to me; that I have returned all classified information in my custody; that I will not communicate or transmit classified information to any unauthorized person or organization; that I will promptly report to the Federal Bureau of Investigation any attempt by an unauthorized person to solicit classified information; and that I (have) (have not) (strike out inappropriate word or words) received a security debriefing.

| SIGNATURE OF EMPLOYEE | DATE |
|---|---|
|  |  |

| NAME OF WITNESS (Type or print) | SIGNATURE OF WITNESS |
|---|---|
|  |  |

NOTICE: The Privacy Act, 5 U.S.C. 552a, requires that federal agencies inform individuals, at the time information is solicited from them, whether the disclosure is mandatory or voluntary, by what authority such information is solicited, and what uses will be made of the information. You are hereby advised that authority for soliciting your Social Security Account Number (SSN) is Executive Order 9397. Your SSN will be used to identify you precisely when it is necessary to 1) certify that you have access to the information indicated above or 2) determine that your access to the information indicated has terminated. Although disclosure of your SSN is not mandatory, your failure to do so may impede the processing of such certifications or determinations, or possibly result in the denial of your being granted access to classified information.

*NOT APPLICABLE TO NON-GOVERNMENT PERSONNEL SIGNING THIS AGREEMENT.

STANDARD FORM 312 BACK (Rev. 1-00)

# 🖼 **Person Summary**

## MONTGOMERY, DENNIS LEE

| | | | |
|---|---|---|---|
| **SSN:** 568-92-▓ | | **Date of Birth:** 1953 07 11 |
| **Eligibility:** <mark>Top Secret, 2004 02 21, DISCO</mark> | | **Place of Birth:** Arkansas |
| **Investigation:** SSBI, 2004 02 13, DSS | | **Citizenship:** U.S. Citizen |
| **Open Investigation:** NLC, 2003 04 04, DSS | | **NdA Signed:** No |
| **Date EPSQ Sent:** N/A | | **NdS Signed:** No |
| **Incident Report:** N/A | | **Attestation Date:** N/A |
| **Polygraph:** N/A | | |
| **Foreign Relation:** N/A | | |

---

## Person Category

Industry (KMP) 3C5X0-I 🖼

| | |
|---|---|
| **Category Classification:** KMP | |
| **Organization:** 3C5X0-I, ETREPPID TECHNOLOGIES LLC, 755 Trade Mark Drive, Reno, NV, 89521 | |

| | |
|---|---|
| **Occupation Code:** N/A | **Office Symbol:** N/A |
| **SA:** N/A | **Grade:** N/A |
| **Arrival Date:** N/A | **PS:** N/A |
| **Office Phone Comm:** N/A | **Office Phone DSN:** N/A |
| **Separation Date:** N/A | **RNLTD:** N/A |
| **Separation Status:** N/A | **TAFMSD:** N/A |
| **Interim:** N/A | **Proj. Departure Date:** N/A |
| **PSP:** No | **Proj. UIC/RUC/PASCODE:** N/A |
| **SCI SMO:** N/A | |
| **Non-SCI SMO:** N/A | |
| **Servicing SMO:** No | |

**Report Incident**                    **In/Out Process**

---

| Non-SCI Access | | SCI Access |
|---|---|---|
| **US:** N/A   **NATO:** N/A | | **SPA:** N/A |
| **CNWDI:** N/A   **SIOP:** N/A | | **Access:** No |
| **PRP:** N/A   **Restricted Data:** N/A | | |
| **SIGMA 16:** N/A | | |
| **IT:** N/A   **Public Trust:** N/A   **Child Care:** N/A | | |

---

## Investigation Summary

SSBI from DSS, Opened: 2003 04 04 Closed 2004 02 13
NAC from DSS, Opened: Closed 2003 04 29

---

## Adjudication Summary

PSI Adjudication of SSBI DSS, Opened 2003 04 04, Closed 2004 02 13, determined Eligibility of Top Secret on 2004 02 21 DISCO

PSI Adjudication of NAC DSS, Opened , Closed 2003 04 29, determined Eligibility of Interim Top Secret on 2003 12 29 DISCO



# eTreppid Technologies, LLC

755 Trademark Drive
Reno, NV 89521

www.eTreppid.com

Tel: (775) 337-6771
Fax: (775) 337-1877

To Whom It May Concern:

Name: Dennis Lee Montgomery
SSN: 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
Date of Birth: 11 July 1953
Place of Birth: Mena, Arkansas
Citizenship: US

The above listed person, **Dennis Lee Montgomery, has been granted Top Secret** by DISCO effective February 14, 2004 and is therefore authorized to be a courier for material that is classified up to the level of clearance eligibility that he has been granted.

Clearance data and other information furnished is certified to be true and correct and this request is made in the national interest.

**Verified and Approved by:** _____ **Date: 1 June 2005**
**Facility Security Officer:** Sloan S. Venables

"bringing digital to life"



# eTreppid Technologies, LLC

www.eTreppid.com

755 Trademark Drive
Reno, NV 89521

Tel: (775) 337-6771
Fax: (775) 337-1877

To Whom It May Concern:

Name: Dennis Lee Montgomery
SSN: 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
Date of Birth: 11 July 1953
Place of Birth: Mena, Arkansas
Citizenship: US

The above listed person, **Dennis Lee Montgomery**, has been granted **SCI - DCID 6/4** by
**AFCAF** effective **06 October 2005**, and is therefore authorized to be a courier for material that
is classified up to the level of clearance eligibility that he has been granted.

Clearance data and other information furnished is certified to be true and correct and this request
is made in the national interest.

Verified and Approved by: _____   Date: 10 October 2005

**Facility Security Officer:** Sloan S. Venables

---

*"bringing digital to life"*



**eTreppid Technologies, LLC**

755 Trademark Drive
Reno, NV 89521

www.eTreppid.com

Tel: (775) 337-6771
Fax: (775) 337-1877

January 12, 2004

To whom it may concern,

For about four months eTreppid Technologies, LLC (the "Company") has been providing assistance and information (including that related to the Company's technology, know-how, business and processes) pursuant to an agreement with the CIA (the "Government"). As part of the consideration for providing such assistance and information, the Government agreed that eTreppid Technologies' identity as a contractor and source of the assistance and information as well as the information supplied by the Company would be kept confidential, would only be disclosed to individuals within the government on a need to know basis only, and would not be revealed to the public under the Freedom of Information Act or otherwise. The purpose of this letter agreement is to confirm in writing the understanding between the parties.

It is our current intent to continue to work with the Government with regard to this matter. This will confirm that the U.S. Government agrees not to make any attempt to unilaterally use or otherwise take technology, intellectual property or other property or assets owned by eTreppid Technologies. In addition, the Government agrees that it will negotiate in good faith an agreement that sets forth future services (including technology and intellectual property) to be provided by the Company and the compensation to be paid for such future services as well as services already rendered.

eTreppid Technologies, LLC

By: Warren Trepp, CEO

US Government

By:

Edward B. Charbonneau
Associate DDS&T for Technical Operations

Central Intelligence Agency
Washington, DC 20505

(703) 482-4848
Fax: (703) 482-6350

*"bringing digital to life"*

# EXHIBIT "2"

## eTreppid Awarded IDIQ Contract for Compression, ATR, and Biometric Technology

Reno, Nevada—(BUSINESS WIRE)—Feb. 18, 2004—

eTreppid Technologies, LLC has been awarded a five-year indefinite delivery, indefinite quantity (IDIQ) contract with the United States Government to supply software compression, Automatic Target Recognition (ATR), and biometric products. With a contract ceiling of $30 million, this contract provides a vehicle for the procurement of eTreppid's breakthrough technology by all services and agencies in the U. S. Government.

eTreppid Technologies provides a family of compression products based on its proprietary lossless and "lossy" data compression technology. These products include data, audio, still imagery, and video compression systems that enable transmission of time-critical information over limited bandwidth equipment. Because of the unique qualities of eTreppid's compression approach, the identification of objects within the data while the data is in its compressed state is possible.

"eTreppid compression is, in a word, impressive," stated Mr. Pete Wiedemann, an expert in real-time motion imagery and communications who provides applied solutions to the United States Air Force (USAF) as a consultant. "Just the single-pass, lossy compression by itself yields high quality at very tight ratios, making it a valuable tool for communications and storage of a wide variety of data. Its ability to add lossless iterative re-compression magnifies that capability, achieving even tighter compression. Additional compression factors of 2 to 3 are thus easily achievable in near real time for live transmission and even higher re-compression factors are obtainable for media storage, where the additional processing time on the order of a minute or two is easily tolerated. Remarkably, such re-compression does not increase decompression time. Lastly, valuable additional capabilities such as Automatic Target Cueing/Recognition, directly from the compressed data without first needing to decompress, are like icing on the cake. The combination of these capabilities makes using this technology all but irresistible. Not only can these capabilities make significant contributions to expand use and lower the cost in traditional compression environments, but should open many new communications and storage areas and markets heretofore inaccessible to the delivery of bandwidth/storage consumptive products." Mr. Wiedemann rendered these

observations upon completion of an independent "hands-on" evaluation of the compression system, using a variety of actual and purposely selected aerial video clips.

"eTreppid's compression technology enables video to be transmitted over satellite radios using the same bandwidth that audio or still images had required in the past," stated Warren Trepp, eTreppid's Chief Executive Officer. "Whether it is satellite imagery or email, our compression technology can reduce the storage and transmission needs for the Government."

"eTreppid's ATR technology can be used in many ways in markets such as surveillance and security," stated Patty Gray, eTreppid's VP of Product Development. "Whether for the protection of our interests at home or elsewhere in the world, ATR can provide the additional information needed to address today's tough security problems."

eTreppid Technologies, LLC is a privately held innovative company specializing in compression and data processing technology.

CONTACT INFORMATION:
Patricia Gray
eTreppid Technologies
 http://www.etreppid.com

EXHIBIT "3"

# eTreppid Technologies Computer Facility

## <u>05/12/2004</u>

**<u>FBI/CIA Supplied Surveillance Computers</u>**



**<u>DOD Supplied Surveillance Computers</u>**



# EXHIBIT "4"

# ORDER FOR SUPPLIES OR SERVICES

(Contractor must submit four copies of invoice.)

| | Form Approved OMB No. 0704-0187 Expires June 30, 1997 | PAGE | 1 | OF | 2 |

Public reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0187), Washington, DC 20503.

PLEASE DO NOT RETURN YOUR FORM TO EITHER OF THESE ADDRESSES.
SEND YOUR COMPLETED FORM TO THE PROCUREMENT OFFICIAL IDENTIFIED IN ITEM 6.

| 1. CONTRACT/PURCH ORDER NO. H92222-04-D-0006 | 2. DELIVERY ORDER NO. 0001 | 3. DATE OF ORDER 16-FEB-2004 | 4. REQUISITION/PURCH REQUEST NO. 1SP50040420100 | 5. PRIORITY DO-C9 |

| 6. ISSUED BY | CODE H92222 | 7. ADMINISTERED BY (if other than 6) S0507A | 8. DELIVERY FOB |
|---|---|---|---|
| HQ US Special Operations Command ATTN: SOAL-KB (Holland) 7701 Tampa Point Blvd Macdill AFB, FL 33621 | | DCMA San Francisco Lathrop Office 700 E. Roth Rd French Camp, CA 95231 | X DEST ☐ OTHER (See Schedule if other) |

| 9. CONTRACTOR | CODE 3C5X0 | FACILITY CODE | | 10. DELIVER TO FOB POINT BY (Date) (YYMMDD) SEE SCHEDULE | 11. MARK IF BUSINESS IS ☐ SMALL ☐ SMALL DISADVANTAGED ☐ WOMEN OWNED |
| NAME AND ADDRESS eTreppid Technologies, LLC 755 Trademark Dr Reno, NV 89521 | | TEL: FAX: | | 12. DISCOUNT TERMS | |
| | | | | 13. MAIL INVOICES TO See Section G | |

| 14. SHIP TO | CODE H92222 | 15. PAYMENT WILL BE MADE BY HQ0339 | |
|---|---|---|---|
| UQ USSOCOM/SOAL-SP (Mohr) 7701 Tampa Point Blvd MacDill AFB, FL 33621 ATTENTION: SOAL-SP (Brad Mohr) | | DFAS-Columbus - West Entitlement Operations PO Box 182381 Columbus, OH 43218 | MARK ALL PACKAGES AND PAPERS WITH CONTRACT OR ORDER NUMBER |

| 16. TYPE OF ORDER | DELIVERY X | This delivery order is issued on another Government agency or in accordance with and subject to terms and conditions of above numbered contract. | |
| | Reference your | | furnish the following on terms specified herein |
| | PURCHASE | ACCEPTANCE. THE CONTRACTOR HEREBY ACCEPTS THE OFFER REPRESENTED BY THE NUMBERED PURCHASE ORDER AS IT MAY PREVIOUSLY HAVE BEEN OR IS NOW MODIFIED, SUBJECT TO ALL OF THE TERMS AND CONDITIONS SET FORTH, AND AGREES TO PERFORM THE SAME. | |

ETREPPID TECHNOLOGIES, LLC
NAME OF CONTRACTOR / SIGNATURE
WARREN TREPP CEO
TYPED NAME AND TITLE
040216
DATE SIGNED (YYMMDD)

☐ If this box is marked, supplier must sign Acceptance and return the following number of copies.

17. ACCOUNTING AND APPROPRIATION DATA/LOCAL USE
ACRN AA: 974/60300 56SF SD4 52SP 54X000 SP10 525700 F25700   $325,125.00

| 18. ITEM NO. | 19. SCHEDULE OF SUPPLIES/SERVICES | 20. QUANTITY ORDERED/ ACCEPTED* | 21. UNIT | 22. UNIT PRICE | 23. AMOUNT |
|---|---|---|---|---|---|
| | SEE CONTINUATION SHEET | | | | |

| *If quantity accepted by the Government is same as quantity ordered, indicate by X. If different, enter actual quantity accepted below quantity Ordered and encircle. | 24. UNITED STATES OF AMERICA BY SUSAN M GRIFFIN (signature) CONTRACTING/ORDERING OFFICER | 25. TOTAL | $325,125.00 |
| | | 29. DIFFERENCES | |

| 26. QUANTITY IN COLUMN 20 HAS BEEN ☐ INSPECTED ☐ RECEIVED ☐ ACCEPTED, AND CONFORMS TO THE CONTRACT EXCEPT AS NOTED | 27. SHIP NO. | 28. D.O. VOUCHER NO. | 30. INITIALS |
| | ☐ PARTIAL ☐ FINAL | 32. PAID BY | 33. AMOUNT VERIFIED CORRECT FOR |
| DATE SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE | 31. PAYMENT ☐ COMPLETE | | 34. CHECK NUMBER |
| 36. I certify this account is correct and proper for payment | ☐ PARTIAL ☐ FINAL | | 35. BILL OF LADING NO. |
| DATE SIGNATURE AND TITLE OF CERTIFYING OFFICER | | | |
| 37. RECEIVED AT | 38. RECEIVED BY (Print) | 39. DATE RECEIVED (YYMMDD) | 40. TOTAL CONTAINERS | 41. S/R ACCOUNT NUMBER | 42. S/R VOUCHER NO. |

DD FORM 1155, JUN 94     PREVIOUS EDITION MAY BE USED

H92222-04-D-0006
Task Order 0001
Page 2 of 2

Continuation Sheet

1. **CONTRACT LINE ITEMS**:

| ITEM NO | SUPPLIES/SERVICES | MAX QUANTITY | UNIT | UNIT PRICE | MAX AMOUNT |
|---|---|---|---|---|---|
| 0001AA | Falconview (PFPS) Maps - Compression<br>FFP<br>1 Each = 1 CPU that this software is installed on.<br><br>FOB:  Destination | 1 | Each | $25,000.00 | $25,000.00 |
| 0001AB | Falconview (PFPS) Maps - Plug-in Decoder<br>FFP<br>1 Each = 1 CPU that this software is installed on.<br><br>FOB:  Destination | 1 | Each | $40.00 | $40.00 |
| 0001AC | Still Image Compression<br>FFP<br>1 Each = 1 CPU that this software is installed on.<br><br>FOB:  Destination | 1 | Each | $25,000.00 | $25,000.00 |
| 0001AD | Still Image Decoder<br>FFP<br>1 Each = 1 CPU that this software is installed on.<br><br>FOB:  Destination | 1 | Each | $10.00 | $10.00 |
| 0001AE | Video Imagery w/ Audio - Compression<br>FFP<br>1 Each = 1 CPU that this software is installed on.<br><br>FOB:  Destination | 1 | Each | $50,000.00 | $50,000.00 |
| 0001AF | Video Imagery w/ Audio - Decoder<br>FFP<br>1 Each = 1 CPU that this software is installed on.<br><br>FOB:  Destination | 1 | Each | $25.00 | $25.00 |
| 0001AN | Generic Data Compression<br>FFP<br>1 Each = 1 CPU that this software is installed on.<br><br>FOB:  Destination | 1 | Each | $125,000.00 | $125,000.00 |

| 0001AP | | 1 | Each | $50.00 | $50.00 |
|---|---|---|---|---|---|
| | Generic Data Decompressor | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | FOB:  Destination | | | | |

| 0001AQ | | 1 | Each | $100,000.00 | $100,000.00 |
|---|---|---|---|---|---|
| | Detection of Human and Non-Human Objects | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | FOB:  Destination | | | | |

2. **GOVERNMENT FURNISHED PROPERTY**.

a) The Government will furnish one laptop computer to:
   eTreppid Technologies
   755 Trademark Dr
   Reno NV  89521.

b) Upon receipt of the Government-furnished laptop, the Contractor shall load the software ordered on the task order and return the laptop to:
   HQ USSOCOM
   ATTN: SOAL-SP (Brad Mohr)
   7701 Tampa Point Blvd
   MacDill AFB, FL  33621.

3. **DELIVERY TIMEFRAME**.  The contract shall have 14 days from the receipt of the Government-furnished laptop to load the software and return the laptop to the Government.  If the 14th day falls on a weekend or federal holiday, the due date shall automatically extend to the next business day.

//nothing follows//

# ORDER FOR SUPPLIES OR SERVICES

(Contractor must submit four copies of invoice.)

Form Approved
OMB No. 0704-0187
Expires June 30, 1997

PAGE | OF
3

Public reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0187), Washington, DC 20503.

PLEASE DO NOT RETURN YOUR FORM TO EITHER OF THESE ADDRESSES.
SEND YOUR COMPLETED FORM TO THE PROCUREMENT OFFICIAL IDENTIFIED IN ITEM 6.

| 1. CONTRACT/PURCH ORDER NO. | 2. DELIVERY ORDER NO. | 3. DATE OF ORDER | 4. REQUISITION/PURCH REQUEST NO. | 5. PRIORITY |
|---|---|---|---|---|
| H92222-04-D-0006 | 0004 | 01 MAR 2004 | ISP50050070100 | DO-C9 |

| 6. ISSUED BY | CODE | H92222 | 7. ADMINISTERED BY (if other than 6) | S0507A | 8. DELIVERY FOB |
|---|---|---|---|---|---|

6. ISSUED BY — CODE H92222

HQ US Special Operations Command
ATTN: SOAL-KB (Lopez)
7701 Tampa Point Blvd
Macdill AFB, FL 33621

7. ADMINISTERED BY (if other than 6) — S0507A

DCMA San Francisco Lathrop Office
700 E. Roth Rd
French Camp, CA 95231

8. DELIVERY FOB
X DEST
☐ OTHER
(See Schedule if other)

| 9. CONTRACTOR | CODE | 3C5X0 | FACILITY CODE | | 10. DELIVER TO FOB POINT BY (Date) (YYMMDD) | 11. MARK IF BUSINESS IS |
|---|---|---|---|---|---|---|

NAME AND ADDRESS
eTreppid Technologies, LLC
755 Trademark Dr
Reno, NV 89521

TEL:
FAX:

10. DELIVER TO FOB POINT BY (Date) (YYMMDD)
SEE SCHEDULE

12. DISCOUNT TERMS

13. MAIL INVOICES TO See Section G

11. MARK IF BUSINESS IS
☐ SMALL
☐ SMALL DISAD-VANTAGED
☐ WOMEN OWNED

| 14. SHIP TO | CODE | | 15. PAYMENT WILL BE MADE BY | HQ0339 | MARK ALL PACKAGES AND PAPERS WITH CONTRACT OR ORDER NUMBER |
|---|---|---|---|---|---|

SEE SCHEDULE

ATTENTION:

15. PAYMENT WILL BE MADE BY — HQ0339
DFAS COLUMBUS WEST ENTITLEMENT OPERATIONS
PO BOX 182381
COLUMBUS OH 43218-2381

| 16. TYPE OF ORDER | DELIVERY | X | This delivery order is issued on another Government agency or in accordance with and subject to terms and conditions of above numbered contract. |
|---|---|---|---|
| | PURCHASE | | Reference your _____ furnish the following on terms specified herein |

ACCEPTANCE. THE CONTRACTOR HEREBY ACCEPTS THE OFFER REPRESENTED BY THE NUMBERED PURCHASE ORDER AS IT MAY PREVIOUSLY HAVE BEEN OR IS NOW MODIFIED, SUBJECT TO ALL OF THE TERMS AND CONDITIONS SET FORTH, AND AGREES TO PERFORM THE SAME.

| ETreppid Technologies, LLC | | Warren Trepp, CEO & President | 18 Mar 05 |
|---|---|---|---|
| NAME OF CONTRACTOR | SIGNATURE | TYPED NAME AND TITLE | DATE SIGNED (YYMMDD) |

☐ If this box is marked, supplier must sign Acceptance and return the following number of copies. _____

17. ACCOUNTING AND APPROPRIATION DATA/LOCAL USE
ACRN AA: 9740100.12SF SG4 52SP SPCP00 01 592 012140 525700 F25700

| 18. ITEM NO. | 19. SCHEDULE OF SUPPLIES/SERVICES | 20. QUANTITY ORDERED/ ACCEPTED* | 21. UNIT | 22. UNIT PRICE | 23. AMOUNT |
|---|---|---|---|---|---|
| | SEE CONTINUATION SHEET | | | | |

| *If quantity accepted by the Government is same as quantity ordered, indicate by X. If different, enter actual quantity accepted below quantity Ordered and encircle. | 24. UNITED STATES OF AMERICA BY SUSAN M. GRIFFIN 24 Mar 05 CONTRACTING/ORDERING OFFICER | 25. TOTAL $184,147.98 |
|---|---|---|
| | | 29. DIFFERENCES |

| 26. QUANTITY IN COLUMN 20 HAS BEEN ☐ INSPECTED ☐ RECEIVED ☐ ACCEPTED, AND CONFORMS TO THE CONTRACT EXCEPT AS NOTED | | 27. SHIP NO. ☐ PARTIAL ☐ FINAL | 28. D.O. VOUCHER NO. | 30. INITIALS |
|---|---|---|---|---|
| | | 31. PAYMENT ☐ COMPLETE ☐ PARTIAL ☐ FINAL | 32. PAID BY | 33. AMOUNT VERIFIED CORRECT FOR |
| DATE | SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE | | | 34. CHECK NUMBER |
| 36. I certify this account is correct and proper for payment | | | | 35. BILL OF LADING NO. |
| DATE | SIGNATURE AND TITLE OF CERTIFYING OFFICER | | | |
| 37. RECEIVED AT | 38. RECEIVED BY (Print) | 39. DATE RECEIVED (YYMMDD) | 40. TOTAL CONTAINERS | 41. S/R ACCOUNT NUMBER | 42. S/R VOUCHER NO. |

DD FORM 1155, JUN 94                    PREVIOUS EDITION MAY BE USED

H92222-04-D-0006
Task Order 0003
Page 2 of 3

Continuation Sheet

Line Items

| ITEM NO | SUPPLIES/SERVICES | QTY | UNIT | UNIT PRICE | TOTAL AMOUNT |
|---------|-------------------|-----|------|------------|--------------|
| 0001 | SOFTWARE APPLICATIONS – CONTRACTOR FUNDED  (FFP)<br>The Contractor shall furnish the COTS software (license and media)<br>FOB: Destination<br>USSOCOM Form 9 Number:  ISP50050070100 | 1 | LOT | NSP | NSP |
| 0001AE | VIDEO IMAGERY w/AUDIO – COMPRESSION (FFP)<br>1 Each =  to be install on 1 CPU furnished as GFP | 4 | EACH | $30,000 | $120,000.00 |
| 0001AF | VIDEO IMAGERY w/Audio - Decoder(FFP)<br>50 Each =  to be installed on 1 CPU furnished as GFP | 50 | EACH | $15.00 | $750.00 |
| 0004 | FFP - Fixed Price Task Order<br>The contractor shall furnish all materials, equipment, personnel and travel required to perform the requirements of the Statement of Work entitled " Evaluation and Integration of Digital Compression "<br>FOB: Destination<br>USSOCOM Form 9 Number:  ISP50050070100 | 1 | LOT | | $63,397.98 |
| 0007 | Data<br>FFP<br>The contractor shall furnish data as required in individual task orders.<br><br>FOB:  Destination<br>USSOCOM Form 9 Number:  ISP50050070100 | 1 | LOT | $0.00 NSP | $0.00 NSP |

**TOTAL AMOUNT TASK ORDER 0004    $184,147.98**

Attachment 2                                                                page 3 of  3

development, Mr. Montgomery approached Warren Trepp, eTreppid's Chief Executive Officer, and they formed eTreppid Technologies, LLC.

During the first few years, eTreppid remained largely in a Research and Development stage, continuing to refine the technology. The algorithm achieves its remarkable compression ratios by applying multiple passes at the data until a gain in compression is too small to warrant an additional pass. The decompression process, however, is always just one pass. In addition, a compression pass does not have to be completed on the entire data set before a user can have access to that file. It has also been used to compress previously compressed files where its compression strength is apparent.

Due to a large demand for compression of multimedia data, eTreppid worked on developing an initial compression pass that would alter a user-defined amount of the data in an effort to increase compression. The resulting "lossy" compression pass is then followed by multiple "lossless" passes to achieve a typical compression ratio of 400-600 : 1 on video data.

Another benefit of compressing data with eTreppid's technology is that objects within the data can be located and operated on while the data is compressed. This greatly increases the speed of database searches and operations on the objects. For example, objects within a video stream can be accurately identified at rates up to 1000 objects per second at greater than 98% accuracy with virtually no false-positive reports. If desired, the detected object can then have an effect applied such as blurring or color changes without the need to decompress the video frame first. This ability is not restricted to video objects. 3D models, text, audio, numerical data, are all examples of objects that can be operated on.

Today, eTreppid's compression technology has been evaluated or applied in many different industries including real time video surveillance, seismic data analysis, medical imaging, broadcast audio and video, facial and fingerprint identification, mapping applications, and still imaging.

**Deliverables**

### Government Furnished Equipment
USSOCOM will provide eTreppid with the following equipment, information, or access in order for eTreppid to complete its tasks:
- Access to the PSYOP media production center and equipment
  - to gather information required to correctly integrate eTreppid's compression technology into the existing system
  - to gather information required to provide architecture recommendations for integrating eTreppid's compression technology "in-line" or in replacement of existing equipment
- A listing of software formats that are of interest to the US Government
  - to enable eTreppid to enable support for the formats
  - to enable eTreppid to provide estimates on the development of software support for currently unsupported formats
- Technical information on the network interface
  - to enable eTreppid to understand network certification and configuration management requirements for transmission through network firewalls and Microsoft operating system networks
- Computing hardware per eTreppid's specifications
  - to be used inline with existing equipment during Phase 2

### Other Government Furnished Resources
USSOCOM shall provide the following resources to support this effort:
- Program manager (PM) who shall act as a single point of contact

### eTreppid Deliverables
eTreppid shall deliver the following items in support of this contract:
- An estimate for the development of software support for any currently unsupported formats
- An architecture diagram providing eTreppid's recommendations on integrating its compression software either "in-line" or in replacement of existing equipment
- Software and/or systems for any procured licenses along with installation assistance, training, technical support and maintenance as described in this document.

### Other eTreppid Resources
eTreppid shall provide the following resources in support of this contract:
- eTreppid shall provide a Program Manager (PM) who shall act as the single point of contact that is provided at a rate of 10% of the total resource hours for each phase.
  - Program Manager: Patty Gray, eTreppid Technologies, LLC, 755 Trademark Drive, Reno, Nevada 89521, 775-337-6771 (office), 602-421-1453 (mobile), patty@etreppid.com

*The eTreppid compression and object identification technology will at all times remain the sole property of eTreppid Technologies, LLC and all licenses will be granted pursuant to Contract No. H92222-04-D-0006, CLIN 0001, Attachment 2. No data or other rights of any nature in eTreppid's technology will accrue to USSOCOM by virtue of eTreppid performing under this ROM.*



**eTreppid Technologies, LLC**

755 Trademark Drive
Reno, NV 89521

www.eTreppid.com

Tel: (775) 337-6771
Fax: (775) 337-1877

January 12, 2004

To whom it may concern,

For about four months eTreppid Technologies, LLC (the "Company") has been providing assistance and information (including that related to the Company's technology, know-how, business and processes) pursuant to an agreement with the CIA (the "Government"). As part of the consideration for providing such assistance and information, the Government agreed that eTreppid Technologies' identity as a contractor and source of the assistance and information as well as the information supplied by the Company would be kept confidential, would only be disclosed to individuals within the government on a need to know basis only, and would not be revealed to the public under the Freedom of Information Act or otherwise. The purpose of this letter agreement is to confirm in writing the understanding between the parties.

It is our current intent to continue to work with the Government with regard to this matter. This will confirm that the U.S. Government agrees not to make any attempt to unilaterally use or otherwise take technology, intellectual property or other property or assets owned by eTreppid Technologies. In addition, the Government agrees that it will negotiate in good faith an agreement that sets forth future services (including technology and intellectual property) to be provided by the Company and the compensation to be paid for such future services as well as services already rendered.

eTreppid Technologies, LLC

By:  Warren Trepp, CEO

US Government

By:

**Edward B. Charbonneau**
Associate DDS&T for Technical Operations

Central Intelligence Agency
Washington, DC 20505

(703) 482-4848
Fax: (703) 482-6350

*"bringing digital to life"*

OMB Approval 2700-0042

| AWARD/CONTRACT | 1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 350) ▶ | RATING | PAGE 1 | OF | PAGES 26 |
|---|---|---|---|---|---|

| 2. CONTRACT (Proc. Inst. Ident.) NO. 2004*I111530*000 | 3. EFFECTIVE DATE 1 April 2004 | 4. REQUISITION/PURCHASE REQUEST/PROJECT NO. |
|---|---|---|

| 5. ISSUED BY                                     CODE | 6. ADMINISTERED BY (If other than Item 5)     CODE |
|---|---|
| Calvin A. Boone<br>P.O. Box 40931<br>Arlington, VA  22204 | Susan B.  (703) 790-9442 |

7. NAME AND ADDRESS OF CONTRACTOR (No. street, county, state and ZIP Code)

eTreppid Technologies, LLC
755 Trademark Drive
Reno, NV  89521

| 8. DELIVERY |
|---|
| ☐ FOB ORIGIN   ☐ OTHER (See below) |
| 9. DISCOUNT FOR PROMPT PAYMENT |
| N/A |
| 10. SUBMIT INVOICES (4 copies unless other-wise specified)  TO THE ADDRESS SHOWN IN: ▶  ITEM G-2. |

| CODE | FACILITY CODE |
|---|---|

| 11. SHIP TO/MARK FOR          CODE | 12. PAYMENT WILL BE MADE BY          CODE |
|---|---|
|  | G-2. |

| 13. AUTHORITY FOR USING OTHER FULL AND OPEN COMPETITION: | 14. ACCOUNTING AND APPROPRIATION DATA |
|---|---|
| ☐ 10 U.S.C. 2304(c)(  )   ☐ 41 U.S.C. 253(c)(  ) |  |

| 15A. ITEM NO. | 15B. SUPPLIES/SERVICES | 15C. QUANTITY | 15D. UNIT | 15E. UNIT PRICE | 15F. AMOUNT |
|---|---|---|---|---|---|
|  | See Page 2<br><br>CL BY: 2025200<br>CL RSN: 1.5(c)<br>DECL ON: X1<br>DRV FRM: CON 1-82 |  |  |  |  |
|  | **15G.  TOTAL AMOUNT OF CONTRACT** ▶ |  |  |  | $ 0 |

16. TABLE OF CONTENTS

| (✓) | SEC. | DESCRIPTION | PAGE(S) | (✓) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
|  |  | PART I - THE SCHEDULE |  |  |  | PART II - CONTRACT CLAUSES |  |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 20 |
| X | B | SUPPLIES OR SERVICES AND PRICE/COST | 3 |  |  | PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH. |  |
| X | C | DESCRIPTION/SPECS./WORK STATEMENT | 4 | X | J | LIST OF ATTACHMENTS | 26 |
| X | D | PACKAGING AND MARKING | 5 |  |  | PART IV - REPRESENTATIONS AND INSTRUCTIONS |  |
| X | E | INSPECTION AND ACCEPTANCE | 7 |  | K | REPRESENTATIONS, CERTIFICATIONS |  |
| X | F | DELIVERIES OR PERFORMANCE | 8 |  |  | AND OTHER STATEMENTS OF OFFERORS |  |
| X | G | CONTRACT ADMINISTRATION DATA | 9 |  | L | INSTRS., CONDS., AND NOTICES TO OFFERORS |  |
| X | H | SPECIAL CONTRACT REQUIREMENTS | 12 |  | M | EVALUATION FACTORS FOR AWARD |  |

*CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE*

| 17. ☒ CONTRACTOR'S NEGOTIATED AGREEMENT (Contractor is required to sign this document and return __1__ copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein.  The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.) | 18. ☐ AWARD (Contractor is not required to sign this document.) Your offer on Solicitation Number _____, including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets.  This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract.  No further contractual document is necessary. |
|---|---|

| 19A. NAME AND TITLE OF SIGNER (Type or print)<br><br>WARREN TREPP | 20A. NAME OF CONTRACTING OFFICER<br><br>John S. Tarah |
|---|---|
| 19B. NAME OF CONTRACTOR<br><br>*(Signature of person authorized to sign)* | 19C. DATE SIGNED<br><br>4/21/04 | 20B. UNITED STATES OF AMERICA<br><br>BY *(Signature of Contracting Officer)* | 20C. DATE SIGNED<br><br>20 Apr 2004 |

| NSN 7540-01-152-8069 | 26-107 | STANDARD FORM 26 (REV. 4-85) |
|---|---|---|
| PREVIOUS EDITION UNUSABLE | Computer Generated | Prescribed by GSA |

# EXHIBIT "5"

AO106 (Rev. 12/03)   Affidavit for Search Warrant

**FILED**

# UNITED STATES DISTRICT COURT

_____   DISTRICT OF   NEVADA                    FEB 28 2006

_____ MAGISTRATE JUDGE
_____ ~~OT~~ OF NEVADA
_____DEPU~~TY~~

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

12720 Buckthorn Lane, Reno, Nevada

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

Case Number:   **3:06-MJ-0023-VPC**

I,   MICHAEL WEST _____   being duly sworn depose and say:

I am a(n)   SPECIAL AGENT, FEDERAL BUREAU OF INVESTIGATION _____   and have reason to believe

Official Title

that   ☐ on the person of or   ☑ on the property or premises known as (name, description and/or location)

12720 Buckthorn Lane, Reno, Nevada, further described in Attachment A, fully incorporated by reference and attached
hereto

in the   _____   District of   NEVADA _____
there is now concealed a certain person or property, namely (describe the person or property to be seized)

SEE ATTACHMENT B

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

property that constitutes evidence of the commission of a criminal offense; the fruits of a crime, and/or property designed or
intended for use which is or has been used as a means of committing a criminal offense

concerning a violation of Title   18 _____   United States code, Section(s)   793(e) _____
The facts to support a finding of probable cause are as follows:

SEE ATTACHED AFFIDAVIT OF SPECIAL AGENT MICHAEL WEST

Continued on the attached sheet and made a part hereof:     ☑ Yes   ☐ No

_____
Signature of Affiant

Sworn to before me and subscribed in my presence,

_February 28, 2006_                    at   RENO _____   NEVADA
Date                                         City                                         State

VALERIE P. COOKE        US MAGISTRATE            _____
Name of Judge            Title of Judge              Signature of Judge

<u>AFFIDAVIT</u>

1   I, Michael A. West, Special Agent (SA), United States Federal Bureau of
2
3   Investigation, being duly sworn, state the following:

4          I have been employed as a Special Agent with the Federal Bureau of Investigation
5   for approximately ten years.  As part of my regularly assigned duties, I investigate violations of
6   federal statutes to include theft of trade secrets and the unlawful retention of information relating
7   to the national defense which occur in Northern Nevada.

8          Your affiant makes this affidavit in support of the accompanying application for a
9   search warrant for the premises located at 12720 Buckthorn Lane, Reno, Nevada (further described
10  in "Attachment A").

11         Your affiant has investigated or been advised by other Special Agents of the U.S.
12  Government and confirmed the following:

13         Your affiant became involved in investigating DENNIS LEE MONTGOMERY
14  based on a complaint made by Management Committee Chairman Warren Trepp of eTreppid
15  Technologies, LLC, a Nevada Limited Liability Corporation, located at 755 Trademark Drive,
16  Reno, Nevada.  Trepp alleged that Chief Technical Officer (CTO) DENNIS LEE
17  MONTGOMERY removed eTreppid computer equipment and storage media containing Source
18  Code files derived from eTreppid's development efforts relating to data compression and pattern
19  recognition software, removed hard disk drives containing Secret information provided by the
20  Department of Defense (DOD), and systematically deleted all Source Code files from the
21  remaining eTreppid data servers, all in violation of Title 18, United States Code, Section 1832,
22  Theft of Trade Secrets, and Title 18, United States Code, Section 793(e), Unlawful Retention of
23  National Defense Information.

24         eTreppid Technologies, LLC, (eTreppid), a Nevada Limited Liability Company,
25  was originally formed in 1998 as "Intrepid" by founders Warren Trepp (Trepp) and DENNIS LEE
26  MONTGOMERY (MONTGOMERY) to develop software that relates to data compression and
    pattern recognition, among other products.  Since that time and to the present, Trepp has held the

1 | position of Management Committee  Chairman and MONTGOMERY held the title of Chief

2 | Technical Officer (CTO).

3 |         MONTGOMERY signed a Contribution Agreement, dated September 28, 1998,

4 | in which MONTGOMERY effectively assigned all rights to his "Contributed Assets" to eTreppid

5 | in exchange for a fifty percent (50%) interest Management Interest in eTreppid.  The "Contributed

6 | Assets" meant all of MONTGOMERY's know-how; trade secrets; patent rights, copyrights,

7 | trademarks, licenses and permits, registered or unregistered, pending or approved; software

8 | programs and all programming and Source Codes used in connection therewith or otherwise

9 | required to operate any component thereof; and all programming documentation, designs,

10 | materials and other information, all in whatever form and wherever located, relating to or used in

11 | connection with, or otherwise describing or consisting of any part of, the software compression

12 | technology.

13 |         MONTGOMERY also signed the "Amended And Restated Operating Agreement

14 | of eTreppid Technologies, LLC, A Nevada Limited Liability Company, Dated and Adopted

15 | Effective As Of November 1, 2002", which in paragraph 6.5, "Time Devoted to Management",

16 | MONTGOMERY agreed to "devote substantially all of his full time and attention and efforts to

17 | the Business and affairs of the LLC"; in paragraph 6.6, "Restriction on Independent Activities;

18 | Agreement Not to Compete", MONTGOMERY agreed that he "and his Affiliates, during the term

19 | of this Agreement, none of them shall compete with the LLC, whether for their own account

20 | and/or for the account of others, individually, jointly with others, or as a part of any other limited

21 | liability company, limited partnership, general partnership, joint venture, corporation or other

22 | entity, by: (i) developing, licensing, or exploiting in any manner any software programs or other

23 | technology which is competitive with the Technology or the Business of the LLC, or providing any

24 | services or supplies which are encompassed within the definition of the "Business" of the LLC set

25 | forth in this Agreement."

26 |

1    MONTGOMERY, as the Chief Technical Officer, was responsible for leading the

2    software development efforts of eTreppid, including those related to data compression, pattern

3    recognition, change and anomaly detection, and other inventions, from 1998 until he was

4    terminated on January 18, 2006.

5    MONTGOMERY filed ten Patent Assignment applications with the United States

6    Patent and Trademark Office during the period of November 2000 to November 2001 for patents

7    pertaining to various technologies developed by MONTGOMERY while an employee at eTreppid

8    and on each patent MONTGOMERY assigned full and exclusive rights, title, and interest of these

9    technologies to eTreppid.

10    Trepp considers eTreppid's trade secrets to be various software programs relating

11    to data compression, pattern recognition, change and anomaly detection, among other things,

12    which derive independent economic value, actual or potential, from not being generally known to,

13    and not being readily ascertainable through proper means by the public.  eTreppid has earned in

14    excess of ten million dollars in revenues since 1998 from various government and commercial

15    contracts.   Trepp anticipates that eTreppid's development efforts will result in other multi-million

16    dollar contracts.

17    eTreppid has taken reasonable steps to keep its information and development

18    efforts secret by requiring Programmers or Software Developers to use unique user names and

19    passwords to log onto eTreppid computers with limited access to prevent unauthorized

20    duplication, modification, or deletion of Source Codes.  Software Developers store their work or

21    Source Code on a hard drive installed in their workstation and on a Source Code Server, a high

22    capacity data storage device, which uses Redundant Array of Inexpensive Disks (RAID) storage to

23    maintain and ensure reliable accessibility to the Source Code files produced by all Software

24    Developers.  The Source Code Server is backed up by the Internet Security Accelerator (ISA)

25    Server which also uses RAID storage to maintain and ensure reliable accessibility to the Source

26    Code files.  Only two eTreppid employees,  MONTGOMERY and Director of Research and

1   Development Sloan Venables, had the access rights to duplicate, modify, or delete Source Code

2   files maintained on the Source Code and ISA Servers.

3           MONTGOMERY was responsible for and regularly maintained a separate backup

4   copy of the Source Code Server data on an eTreppid black Lianli Central Processing Unit (CPU)

5   connected to an Ultra Storage eight hard drive RAID storage unit, Model 2081, serial number

6   6564737, located in a work area occupied by MONTGOMERY in the eTreppid warehouse.

7           As an additional security measure, Trepp required MONTGOMERY to provide

8   him with periodic copies of eTreppid's current Source Code files on compact disks or hard drives

9   over the past seven years which Trepp stored in a secure off-site location.

10           eTreppid's facility is physically secured by door locks, access control devices, and

11   a monitored alarm system. eTreppid also maintains a video surveillance system that records

12   sixteen surveillance cameras covering internal and external views of eTreppid's facility.

13           On March 12, 2003, eTreppid was awarded a contract from the U.S. Special

14   Operations Command (SOCOM), Fort Bragg, North Carolina, to develop Automatic Target

15   Recognition software which required eTreppid to have access to ▮▮▮▮ material at other contractor

16   and government locations. On August 1, 2005, SOCOM amended the Department of Defense

17   (DOD) contract Security Classification Specification, DD Form 254, permitting eTreppid to store

18   Secret material at the facility.

19           On or about August 25, 2003, MONTGOMERY received and signed a Security

20   Briefing from Michael S. Allen, Department of the Army, U.S. Army Security Operations Training

21   Facility (SOTF), Fort Bragg, North Carolina, regarding MONTGOMERY's obligation to protect

22   either sensitive or classified material which concern the security of the United States of America

23   due to MONTGOMERY's assignment, employment, or association with SOTF.

24           On or about September 16, 2003, MONTGOMERY received another Security

25   Briefing from the Defense Security Service, Nellis Air Force Base (AFB), Las Vegas, Nevada, and

26   signed a Standard Form 312, "Classified Information Nondisclosure Agreement", in which

1    MONTGOMERY was made aware of his obligation to protect from unauthorized disclosure,

2    unauthorized retention, or negligent handling of classified information, marked or unmarked,

3    which could cause damage or irreparable injury the United States or could be used to advantage by

4    a foreign nation.

5            During the period of November 9, 2005 to November 18, 2005, ██████████████

6    ███████████████████, traveled to ████████████████████ located on the

7    Nellis AFB, and recorded ████████████ video images onto nine eTreppid hard drives for

8    use in the development of the Automatic Target Recognition software. ████marked the nine hard

9    drives with red standard U.S. Government ████labels as instructed by contractor personnel at

10   Nellis AFB and placed a hand written descriptor label on each of the nine hard drives. ██████

11   subsequently mailed the nine ████hard drives to eTreppid in Reno, Nevada, and these██████

12   hard drives were stored in a GSA approved safe as required by the DOD. ██████ Trepp, and

13   MONTGOMERY were the only eTreppid employees with the combination to the safe.

14           On or about December 6, 2005, ████discovered that the nine ████hard drives

15   were not in the GSA approved safe and notified Trepp who told MONTGOMERY to store the

16   ████hard drives correctly in the GSA approved safe.  On or about December 7, 2005,

17   MONTGOMERY told████ all the ████hard drives were stored in a file cabinet in the

18   warehouse. ████informed MONTGOMERY that this was not the correct location to store the

19   ████hard drives and notified  Trepp.  On December 8, 2005, all nine████hard drives were

20   returned to a GSA approved safe which was accessible by ████, Trepp, and MONTGOMERY.

21           On or about December 13, 2005, ████was completing work on copying selected

22   data from the ████hard drives to four Mini DV cassette tapes at the request of Trepp. ████

23   found the nine ████hard drives missing from the GSA approved safe and notified Trepp.

24   MONTGOMERY returned all nine ████hard drives to the GSA approved safe.  Later on

25   December 13, 2005,████handed MONTGOMERY two Mini DV cassette tapes labeled ████

26   ████placed the two other████Mini DV cassette tapes in the top drawer of the GSA approved

1  safe and changed the combination so she was the only one with the combination.

2  MONTGOMERY told ████ he was condensing the nine original ████ hard drives as some were

3  only partially full.  MONTGOMERY eventually provided ████ with the nine original ████ hard

4  drives and six additional hard drives labeled ████ by MONTGOMERY.  Gray secured the nine

5  original ████ hard drives and the six ████ hard drives containing copies of the nine original

6  ████ hard drives in the bottom drawer of the GSA approved safe.  The bottom drawer of the

7  GSA approved safe was only accessible by ████ Trepp, and MONTGOMERY.

8              On or about December 15, 2005, ████ again found all nine original ████ hard

9  drives missing from the GSA approved safe.  MONTGOMERY told ████ that he wanted to store

10  the hard drives in the file cabinet in the warehouse.  ████ informed MONTGOMERY this was not

11  the appropriate way to secure classified content and he was risking losing his security clearance.

12  MONTGOMERY stated "I don't care about my clearance.  They'll always give me my clearance

13  because they want me to do the work".  ████ notified Trepp and Trepp agreed that access to the

14  classified material needed to be restricted and instructed ████ to place all classified material in the

15  top drawer of the GSA approved safe.  ████ changed the combination to the top drawer and was

16  the only eTreppid employee with the combination.  ████ secured all classified material in the top

17  drawer of the GSA approved safe, to include the nine original ████ hard drives.

18              On or about Sunday, December 18, 2005, MONTGOMERY attempted to contact

19  ████ by text message to get access to the classified material.  Eventually, Trepp contacted ████ by

20  telephone and instructed ████ to give MONTGOMERY the combination to the top drawer of the

21  GSA approved safe so MONTGOMERY could work and all classified material would be re-

22  secured on Monday.

23              On or about December 19, 2005 or December 20, 2005, ████ a Software

24  Developer at eTreppid, observed MONTGOMERY delete eTreppid Source Code files from the

25  hard drive installed in ████ computer workstation which ████ had not recently used.

26  MONTGOMERY stated he deleted the files for security reasons and copies of these files were

accessible on the Source Code Server.  At that time, ▇▇ observed that more recent Source Code

files ▇▇ used in ▇▇ development efforts remained on ▇▇ hard drive installed in ▇▇ computer

workstation.

On or about December 21, 2005, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ and

▇▇▇▇▇▇▇ discovered that the Central Processing Unit and RAID storage unit used by

MONTGOMERY to backup the Source Code Server was missing.  ▇▇▇▇ asked

MONTGOMERY what happened to the Central Processing Unit and RAID storage unit and

MONTGOMERY stated he took them home.  ▇▇▇▇▇ described the missing equipment as a

black Lianli Central Processing Unit (CPU) connected to an Ultra Storage eight hard drive RAID

storage unit, Model 2081, serial number 6564737.  ▇▇▇▇ stated this equipment is large and

heavy.  ▇▇▇▇ has never known MONTGOMERY to remove this equipment from the eTreppid

facility as MONTGOMERY used the equipment on a daily basis.

Also on December 21, 2005, ▇▇▇▇▇ installed and activated the Internet Security

Accelerator (ISA) Server designed to back up all of eTreppid's server's data, including the Source

Code Server.  Prior to leaving eTreppid on December 21, 2005, ▇▇▇▇▇ verified that the ISA

Server was operating properly and noted data was being successfully completed from eTreppid

servers.

On or about December 22, 2005 ▇▇▇▇▇▇▇ departed Reno, Nevada,

for the Christmas holiday and did not return to Reno, Nevada, until January 3, 2006.

In December 2005, right before the Christmas holiday, ▇▇▇▇▇▇▇ a

Software Developer at eTreppid, noticed the collection of eTreppid Source Code files that ▇▇ had

stored on the hard drive installed in ▇▇ computer workstation had been deleted.  ▇▇▇ asked

MONTGOMERY about these files and MONTGOMERY explained that he was backing up

eTreppid Source Code and would provide ▇▇▇▇ the portion eTreppid Source Code necessary for

▇▇ to work.  Between December 25, 2005, and January 1, 2006, ▇▇▇▇ would request eTreppid

Source Code file from MONTGOMERY and MONTGOMERY would place the request Source

7

1    Code file on a shared drive where ███████ retrieved the Source Code file.  Upon completing his

2    work on that Source Code file, ███████ would copy the file back to the shared drive and inform

3    MONTGOMERY who was responsible for copying that file to the Source Code Server.

4              On or about December 23, 2005, ███████████, an employee at eTreppid, moved

5    six closed boxes from MONTGOMERY's office to the back door of the warehouse at

6    MONTGOMERY's request.  ███████ was not aware of the contents of these boxes.  ███████

7    observed MONTGOMERY load at least two of these boxes into MONTGOMERY's truck.

8    ███████ has never known MONTGOMERY to remove anything from the facility in the past.

9              On or about January 3, 2006, ███████████ returned from vacation and noticed the

10   Source Code Server cabinet and keyboard were in disarray.  ███████ entered the Server Room

11   and found the Source Code Server screen active and could see a process running on the screen.

12   Shortly thereafter, MONTGOMERY entered the Server Room and ███████ asked

13   MONTGOMERY what he was doing.  MONTGOMERY stated he was "cleaning stuff up."

14   ███████ went to the warehouse to further discuss what MONTGOMERY was doing on the

15   Source Code Server and MONTGOMERY stated he was just "cleaning stuff up" and deleting old

16   files.  While in the warehouse, ███████ noticed the Central Processing Unit and RAID storage

17   unit used by MONTGOMERY to backup the Source Code Server was still missing.  On or about

18   January 3, 2006, ███████ asked MONTGOMERY where was the equipment and

19   MONTGOMERY stated "I'll bring it back, I don't need it anymore."

20             ███████ looked at the Source Code Server and found that the majority of the

21   Source Code files contained in specific folders used by the Software Developers had been

22   systematically deleted.  ███████ attempted to access the ISA Server which ███ found inoperable

23   and unable to access.

24             On or about January 9, 2005, Trepp became aware that the Source Code was

25   missing when his employees complained that they were unable to operate their computer systems.

26   Trepp asked ███████ about the problem and was told by ███████ that all eTreppid's Source

8

1    Code had been deleted from the Source Code Server, the ISA Server, and all of eTreppid's

2    Software Developer's workstations.  Trepp confronted MONTGOMERY who said that the Source

3    Code could be located on the 753 removable hard drives located at the company.   Trepp instructed

4    eTreppid employees to conduct an analysis of each of the company's 753 hard drives in an effort

5    to locate the Source Code.  The two day analysis failed to locate the Source Code.

6         While looking for the Source Code on eTreppid hard drives, ▓▓▓ located seven

7    hard drives containing copies of the nine original ▓▓▓ hard drives recorded at Nellis AFB in

8    MONTGOMERY's file cabinet. ▓▓▓ checked the drawer in the GSA approved safe where all

9    ▓▓▓ material was to be maintained and found seven more hard drives containing copies of the

10   nine original ▓▓▓ hard drives recorded at Nellis AFB.  A complete search of the eTreppid

11   facility failed to locate the nine original ▓▓▓ hard drives recorded or two ▓▓▓ Mini DV

12   cassette tapes containing copied segments of the original ▓▓▓ hard drives. ▓▓▓ stated that ▓▓▓

13   and MONTGOMERY were the only eTreppid employees with access to the top drawer of the

14   GSA approved safe.

15        On or about January 10, 2006, Trepp instructed ▓▓▓ to review eTreppid's

16   video surveillance system. ▓▓▓ found that each of the sixteen computer systems were no

17   longer recording video from eTreppid's sixteen cameras. ▓▓▓ also found that all video

18   footage stored on the sixteen  computer systems had been deleted.

19        MONTGOMERY returned to eTreppid on morning of January 10, 2006, when

20   ▓▓▓ asked MONTGOMERY where was eTreppid's Source Code.  MONTGOMERY stated it

21   was on 320 gigabyte hard drives in the building.  No such hard drives were located.

22   MONTGOMERY again returned to eTreppid later on January 10, 2006, and ▓▓▓ again asked

23   MONTGOMERY where a certain part of the Source Code to which MONTGOMERY stated "he

24   (Trepp) needs to give me big money if he wants it."

25        Trepp retrieved the annual or periodic copies provided to him by

26   MONTGOMERY over the last seven years from the secure off-site location. ▓▓▓ conducted

9

1   a review of the compact disks and hard drives provided by MONTGOMERY and found that these

2   compact disks and hard drives contained no data relevant to eTreppid's development efforts or

3   Source Code except for one program developed in 2002 which is currently not being used.

4            Trepp advised the MONTGOMERY devoted eight years of his life to developing

5   various software products at eTreppid, including to data compression, pattern recognition, change

6   and anomaly detection.  MONTGOMERY worked on these products every day during normal

7   business hours and would often return at night and on weekends to continue his efforts.

8   MONTGOMERY considered some of these capabilities to be of paramount  importance to him

9   (MONTGOMERY) that he (MONTGOMERY) would never delegate the project to someone else.

10   Trepp further advised if MONTGOMERY intended to continue work on eTreppid's Source Code,

11   MONTGOMERY would need substantial computing power, similar to the workstation and RAID

12   unit removed from the warehouse,  and access to video images contained on the nine Secret hard

13   drives.

14            MONTGOMERY did not return to eTreppid after January 10, 2006, and has not

15   returned any eTreppid property.  MONTGOMERY was terminated as an employee of eTreppid on

16   January 18, 2006.



1    Based on the conversation MONTGOMERY had with ▇▇▇▇ and possibly

2 other unknown individuals, it appears that MONTGOMERY may have provided information

3 relating to the Source Code to others and is looking for investors for the Source Code.



## Instrumentalities and Evidence of the Crime

As set forth above, there is probable cause to believe that the premises located at 12720 Buckthorn Lane, Reno, Nevada, contains evidence of the offense of Theft of Trade Secrets and Unlawful Retention of National Defense Information.  Therefore, the computer hardware, software, computer documentation, passwords, and data security devices further described in Attachment B constitute means of committing criminal offenses.  Additionally, there is probable cause to believe that MONTGOMERY has used his computers and related electronic storage devices to collect, store, maintain, retrieve, conceal, transmit, and use electronic data relating to these offenses in the form of electronic records, documents, and materials, including those used to facilitate communications, each of which constitutes evidence of the offense.

## Seizure of Equipment and Data

Based on my knowledge, training, and experience, and my conversations with other FBI Special Agents and computer trained personnel, I know that in order to completely and accurately retrieve data maintained in computer hardware or on computer software, to ensure accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that some computer equipment, peripherals, related instructions in the form of manuals and notes, as well as the software utilized to operate

12

1   such a computer, be seized and subsequently processed by a certified Computer Forensic Examiner

2   in a laboratory setting.  This is true because of the following:

3           a.  <u>The volume of evidence</u>.  Computer storage devices (such as hard disks,

4   DVDs, compact disks, diskettes, tapes, laser disks, and other storage devices.) can store the

5   equivalent of thousands of pages of information.  Additionally, a user may seek to conceal

6   criminal evidence by storing it in random order with deceptive file names.  Searching authorities

7   are required to examine all the stored data to determine which particular files are evidence or

8   instrumentalities of criminal activity.  This sorting process can take weeks or months, depending

9   on the volume of data stored, and it would be impractical to attempt this kind of data analysis on-

10  site.

11          b.  <u>Technical requirements</u>.  Analyzing computer systems for criminal

12  evidence is a highly technical process requiring expert skill and a properly controlled environment.

13  The vast array of computer hardware and software available requires even computer experts to

14  specialize in some systems and applications.  Thus it is difficult to know prior to the search which

15  expert possesses sufficient specialized skill to best analyze the system and its data.  No matter

16  which system is used, however, data analysis protocols are exacting scientific procedures, designed

17  to protect the integrity of the evidence and to recover even "hidden", erased, compressed,

18  password-protected, or encrypted files.  Since computer evidence is extremely vulnerable to

19  tampering or destruction (both from external sources or from destructive code imbedded in the

20  system as a "booby trap"), a controlled environment is essential to its complete and accurate

21  analysis.

22          Due to the volume of the data at issue and the technical requirements set forth

23  above, it may be necessary that the above reference equipment, software, data, and related

24  instruction be seized and subsequently processed by a certified Computer Forensic Examiner in a

25  laboratory setting.  Under appropriate circumstance, some types of computer equipment can be

26  more readily analyzed and pertinent data seized on-site, thus eliminating the need for its removal

1    from the premises.  One factor used in determining whether to analyze a computer on-site or to

2    remove it from the premises is whether the computer constitutes an instrumentality of an offense

3    and is thus subject to immediate seizure as such--or whether it serves as a mere repository for

4    evidence of a criminal offense.  Another determining factor is whether, as a repository for

5    evidence, a particular device can be more readily, quickly, and thus less intrusively, analyzed off

6    site, with due considerations given to preserving the integrity of the evidence.  This, in turn, is

7    often dependent upon the amount of data and number if discrete files or file areas that must be

8    analyzed, and this is frequently dependent upon the particular type of computer hardware involved.

9    As a result, it is ordinarily impossible to appropriately analyze such material without removing it

10   from the location where it is seized.

11                                Analysis of Electronic Data

12                The analysis of electronically stored data, whether performed on-site or in a

13   laboratory or other controlled environment, may entail any or all of several different techniques.

14   Such techniques may include, but shall not be limited to, surveying various file "directories" and

15   the individual files they contain (analogous to looking at the outside of a file cabinet for the

16   markings it contains and opening a drawer capable of containing pertinent files, in order to locate

17   the evidence and instrumentalities authorized for seizure by the warrant); "opening" or reading the

18   first few "pages" of such files in order to determine their precise contents; "scanning" storage areas

19   to discover and possibly recover recently deleted data; scanning storage areas for deliberately

20   hidden files; and performing electronic "key-word" searches through all electronic storage areas to

21   determine whether occurrences of language contained in such storage areas exist that are

22   intimately related to the subject matter of the investigation.

23

24                Based on the investigation ███████████████ made to

25   MONTGOMERY, MONTGOMERY appears to have removed the necessary computer equipment

26   and data from eTreppid to continue his development efforts and more likely than not maintains

                                          14

1  this computer equipment and data at his residence located at 12720 Buckthorn Lane, Reno,

2  Nevada.

3         Based on the forgoing, your affiant believes there is reasonable grounds and

4  probable cause to believe that DENNIS LEE MONTGOMERY did steal trade secrets, a violation

5  of Title 18, United States Code, Section 1832, Theft of Trade Secrets, and unlawful retained

6  National Defense Information, a violation of Title 18, United States Code, Section 793(e),

7  Unlawful Retention of National Defense Information.

8         Wherefore, your affiant requests a search warrant for the premises located at 12720

9  Buckthorn Lane, Reno, Nevada (further described in "Attachment A") for the purpose of locating

10  and seizing items listed in Attachment B.

11

12                                    MICHAEL A. WEST, Special Agent

13                                    Federal Bureau of Investigation

14

       Sworn to before me and subscribed in my presence this 28th day of February 2006.

15

16

17                                    VALERIE P. COOKE

18                                    United States Magistrate Judge

19

20

21

22

23

24

25

26

1

## ATTACHMENT A

2          12720 Buckthorn Lane, Reno, Nevada, is a single family residence located on the

3   westside of Buckthorn Lane.  The  residence is a single level home having an off-white stucco

4   exterior and an attached three car garage with white garage doors facing Buckthorn Lane.  The

5   numbers "12720" are affixed to the southern corner of the garage structure and two planters with

6   small green trees are located on either side of the entryway arch.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

<u>ATTACHMENT B</u>

<u>LIST OF ITEMS TO BE SEIZED</u>

1.   Any Black Lianli Central Processing Unit (CPU)

2.   Any Ultra Storage eight hard drive RAID storage unit, Model 2081, serial number 6564737.

3    Any address and/or telephone books and papers reflecting names, addresses, telephone numbers, electronic mail addresses, and/or Internet Web site addresses which might identify associates which may relate to potential investors of the Source Code.

4.   Any telephone bills and records, and/or calling cards numbers which may relate to potential investors of the Source Code.

5.   Any corporate documents, corporate charters, articles of incorporation, list of corporate officers, and/or registered agent applications which may relate to potential investors of the Source Code.

6.   Any bank statements, deposit or withdrawal slips, bank checks, money orders, cashier's checks, passbooks, wire transfers, and any other items evidencing the movement of money which may relate to payments made and/or received from potential investors of the Source Code.

7.   Any personal or business correspondence, both written forms and electronically stored, to include envelopes and packaging materials which indicate indica of occupancy.

8.   Any computer files protected by copyright, including software and movie files, log files, user names and passwords to Internet, mIRC, ftp, or other sites, programs or software used for communication between individuals relating to Dennis Lee Montgomery and other unknown individuals.

9.   Any computer hardware, meaning any and all computer equipment including any electronic devices which are capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic, optical, or similar computer impulses or data.  Included within the definition of computer hardware is any data processing hardware (such as central processing units and self-contained laptop or notebook computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical and compact disk storage devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); related communications devices (such as modems, cables and connections, recording equipment, RAM and ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone generating devices); and any devices, mechanisms, or parts that can be used to restrict access to such hardware (such as physical keys and locks).

10.  Any computer software, meaning any and all information, instructions, programs, or program codes, stored in the form of electronic, magnetic, optical, or other media, which is capable of being interpreted by a computer or its related components.  Computer software may also include data, data fragments, or control characters integral to the

operation of computer software, such as operating systems software, applications software, utility programs, compilers, interpreters, communications software, and other programming used or intended to be used to communicate with computer components.

11.     Any computer-related documentation, meaning any written, recorded, printed, or electronically-stored material which explains or illustrates the configuration or use of any seized computer hardware, software, or related items.

12.     Any computer passwords and data security devices, meaning any devices, programs, or data -- whether themselves in the nature of hardware or software -- that can be used or are designed to be used to restrict access to, or to facilitate concealment of, any computer hardware, computer software, computer-related documentation, or electronic data records. Such items include, but are not limited to, data security hardware (such as encryption devices, chips, and circuit boards); passwords; data security software or information (such as test keys and encryption codes); and similar information that is required to access computer programs or data or to otherwise render programs or data into usable form.

13.     Any computer or electronic records, documents, and materials, including those used to facilitate interstate communications, in whatever form and by whatever means such records, documents, or materials, their drafts or their modifications, may have been created or stored, including, but not limited to, any hand-made form (such as writing or marking with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negative, video tapes, motion pictures or photocopies); any mechanical form (such as photographic records, printing or typing); any electrical, electronic, or magnetic form (such as tape recordings, cassettes, compact disks); or any information on an electronic or magnetic storage device (such as floppy diskettes, hard disks, CD-ROMs, optical disks, printer buffers, sort cards, memory calculators, electronic dialers, or electronic notebooks), as well as printouts or readouts from any magnetic storage device.

14.     Any electronic information or data, stored in any form, which has been used or prepared for use either for periodic or random backup (whether deliberate, inadvertent, or automatically or manually initiated), of any computer or computer system.  The form such information might take includes, but is not limited to, floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, CD-ROM disks, video cassettes, and other media capable of storing magnetic or optical coding.

15.     Any electronic storage device capable of collecting, storing, maintaining, retrieving, concealing, transmitting, and using electronic data, in the form of electronic records, documents, and materials, including those used to facilitate interstate communications. Included within this paragraph is any information stored in the form of electronic, magnetic, optical, or other coding on computer media or on media capable of being read by a computer or computer-related equipment, such as fixed disks, external hard disks, removable hard disk cartridges, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, laser disks, or other memory storage devices.

# EXHIBIT "6"



# United States District Court

### District of Nevada

Bruce R. Thompson U.S. Courthouse and Federal Building
400 South Virginia Street, Room 404
Reno, Nevada 89501

Chambers of Valerie P. Cooke
United States Magistrate Judge

Telephone:  (775) 686-5855
Facsimile:  (775) 686-5864

## *FAX  TRANSMITTAL*

DATE:      November 28, 2006

THE FOLLOWING PAGES ARE BEING FAXED TO:

NAME:      Michael J. Flynn, Esq.  (#1-888-235-4279)
           Phillip Stillman, Esq. (#1-888-235-4279)
           Ronald Logar, Esq.  (#786-7544)
           Eric A. Pulver, Esq. (#786-7544)
           Paul Pugliese, Esq. (#784-5181)

RE:        In the Matter of the search of 12720 Buckthorn Lane

NUMBER OF PAGES INCLUDING COVER SHEET:  34

FROM:      The Honorable Valerie P. Cooke
           United States Magistrate Judge

PHONE:     (775) 686-5855

FAX NO.:   (775) 686-5864

If you do not receive all the pages indicated above or the message is poorly received, please contact our office as soon as possible at the phone number above.  If the reader of this message is not the intended recipient, please contact our office as soon as possible at the phone number listed above.

ADDITIONAL COMMENTS:

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | | |
|---|---|---|
| In the matter of the search of: | ) | 3:06-CV-0263-LRH (VPC) |
| 12720 BUCKTHORN LANE, | ) | 3:06-MJ-0023-VPC |
| RENO, NEVADA, | ) | |
| and | ) | |
| 888 MAESTRO DRIVE, RENO, | ) | **ORDER** |
| NEVADA, STORAGE UNITS | ) | |
| 136, 140, 141, 142, and 143, | ) | |

Before the court is a motion by Dennis Montgomery, Brenda Montgomery and the Montgomery Family Trust ("Montgomery") (1) to unseal search warrant affidavits; (2) for the return of property pursuant to Fed. R. Crim. P. 41(g); and (3) for the segregation and sealing of all attorney client and trade secret material seized (#21, 50). The Government opposed (#s 23, 24, & 25) and Montgomery replied (#26). The parties engaged in additional briefing (#s 45, 46, 47, 48, 49, 50, & 51), and the court held an evidentiary hearing on June 29, July 31, and August 17, 2006. Thereafter, the parties submitted post-hearing briefs (#s 74, 76, & 77).

The court has thoroughly reviewed the record and the papers submitted herein, and Montgomery's motion is granted as follows: 1) the search warrant affidavits shall be unsealed, and 2) Montgomery's property shall be returned.[1]

## I. HISTORY & PROCEDURAL BACKGROUND

### A. Basis for Probable Cause for Search Warrant Applications and Affidavits

Dennis and Brenda Montgomery ("Montgomery") own a home located at 12720 Buckthorne Lane, Reno, Nevada and lease storage space located at 888 Maestro Drive, Reno, Nevada, storage unit numbers 136, 140, 141, 142, and 143 (#21). The Federal Bureau of Investigation ("FBI") searched both

---

[1] Since the court is ordering the return of Montgomery's property, the request to segregate and seal all attorney-client and trade secret material is denied as moot.

the residence and storage units pursuant to search warrants executed on March 1 and March 3, 2006. *Id.* This court granted the Government's motions to seal the affidavits in support of the warrants (#3, 14). A copy of the warrant and receipt for items seized was left with counsel for Montgomery (#15). On March 8, 2006, returns on the search warrants were executed, and the requisite inventories of items seized were provided to this court. (#15-20).

The Government set forth the original basis for probable cause in the affidavits accompanying the applications for the search warrants (#s 1, 4, 6, 8, 10, & 12).[2] With respect to the search of the Montgomery residence at 12720 Buckthorne Lane, Reno, Nevada, Michael West, Special Agent, Federal Bureau of Investigation ("SA West"), states that he first became involved in the investigation of Dennis Montgomery based on a complaint made by Warren Trepp ("Trepp"), management committee chair of eTreppid Technologies, LLC, of Reno, Nevada (#1). Trepp alleged that Dennis Montgomery, eTreppid's chief technical officer, removed eTreppid computer equipment and storage media containing "source code" files derived from eTreppid's development of certain data compression and pattern recognition software, removed hard disk drives containing "Secret" information provided to the Department of Defense ("DOD"), and systematically deleted source code files from the remaining eTreppid data servers, all in violation of 18 U.S.C. § 1832, Theft of Trade Secrets, and 18 U.S.C. § 793(e), Unlawful Retention of National Defense Information. *Id.*

The basis for probable cause is described in detail below; in sum, the majority of information was provided by Trepp or eTreppid employees. The only other information appears to have come from Neil Azzinaro, a businessperson with whom Montgomery allegedly had a conversation about seeking investors for the source code and/or a new business venture of Montgomery's, and Air Force Special Agent Haraldsen ("SA Haraldsen") with whom Montgomery had conversations about continuing to perform work for the government, independent of eTreppid. To better understand the chronology of events and the complex factual issues giving rise to these searches, the court has divided its discussion of the affidavit into six segments.

---

[2] For the ease of reference, this order will refer to docket #1 as the search warrant affidavit.

2

1          **1.      The Documents Offered in Support of the Affidavit**

2          To establish probable cause for the search warrant SA West relied on three categories of

3    eTreppid documents: 1) a contribution agreement between Montgomery and eTreppid ("contribution

4    agreement"); 2) the eTreppid amended and restated operating agreement ("operating agreement"); and

5    3) ten patent assignments from Montgomery to eTreppid.

6          **a.      The Contribution Agreement - page 2, lines 3-12[3]**

7          SA West attested that Montgomery signed a contribution agreement in which he assigned his

8    rights to "contributed assets" to eTreppid in exchange for fifty percent management interest in eTreppid.

9    According to the affidavit, "contributed assets" included trade secrets, patent rights, copyrights, licenses

10   and permits, software programs and source codes, etc. (#1, 2:3-12).  The court drew the inference from

11   this summary of the contribution agreement that Montgomery assigned *all* intellectual property and

12   related property he owned to eTreppid because that is what the plain meaning of the excerpt of the

13   contribution agreement states.

14         **b.      The eTreppid Amended and Restated Operating Agreement -
                     2:13-25; 3:1-4**

15

16         Montgomery also signed an amended and restated operating agreement of eTreppid

17   Technologies, and SA West quoted a provision of that agreement which states that Montgomery agreed

18   to devote substantially all of his time and efforts to the business and affairs of eTreppid and also

19   restricted Montgomery's independent activities; in other words, it is a non-compete agreement.

20   According to the affidavit, Trepp considered eTreppid's trade secrets to be various software programs

21   relating to data compression pattern recognition, change and anomaly detection, among other things.

22   *Id.* at 3:10-13.

23         **c.      Ten Patent Assignments from Montgomery to eTreppid - 3:5-16**

24         Finally, SA West identified ten patents that Montgomery, as an eTreppid employee, assigned to

25   eTreppid in 2000-2001.  *Id.* at 3:5-9. The affidavit states that through these patent assignments,

26         [3]The references that follow are to the page and line numbers in SA West's affidavit in support
27   of the search warrant (#1).

28                                                    3

1   Montgomery assigned full and exclusive use of the technologies described in the patents to eTreppid.

2   The next paragraph of the affidavit describes "trade secrets," which the court inferred were the patented

3   technologies Montgomery assigned to eTreppid in 2000-2001: software programs relating to data

4   compression, pattern recognition, and change and anomaly detection. *Id.* at 10-16.

5               **2.     The Source Code and eTreppid Security - 3:17-26; 4:1-12**

6           The next section of the affidavit is devoted to a description of the protocols eTreppid established

7   to insure the security for the source code files, which contained data compression and pattern recognition

8   software. *Id.* at 3:17-26. The affidavit states that only two eTreppid employees, Montgomery and Sloan

9   Venables ("Venables"), had access rights to duplicate, modify or delete source code. The affidavit

10  describes Montgomery's responsibility to maintain a back-up copy of the source code server data on

11  specifically described hardware units, and that Trepp required Montogomery to provide him with current

12  source code files, which Trepp stored at a secure off-site location. *Id.* at 4:7-9. The affidavit then

13  summarizes eTreppid's locks, alarm system and video surveillance system. *Id.* at 4:10-12.

14              **3.     The SOCOM Contract and Montgomery's Security Clearance -
                         4:13-26; 5:1-4**

15          Having established ownership of the technology in eTreppid, Montgomery's role in the work of

16  eTreppid, and the sophisticated security system in place at eTreppid, the affidavit turns to a March 2003

17  agreement between eTreppid and U.S. Special Operations Command ("SOCOM"), which required

18  eTreppid to have access to secret material. *Id.* at 4:13-18. The affidavit states that eTreppid was

19  permitted to store secret material onsite pursuant to DD Form 254. *Id.* at 4:16-18.

20          The affidavit then states that Montgomery received and signed two security briefings in August

21  and September of 2003, which outlined his obligation to protect classified material of concern to the

22  United States, to protect unauthorized disclosures, and to prevent negligent handling of marked or

23  unmarked classified information, which could irreparably damage the United States and be used to

24  advantage by a foreign nation. *Id.* at 4:19-26; 5:1-4.

25

26

27

28                                                  4

1
2

        **4.**       **November 2005 Visit to Nellis Air Force Base and the Nine Secret Hard Drives - 5:5-13**

3
4
5

      In the next section of the affidavit, SA West develops the chronology of events concerning the "nine eTreppid hard drives," which are then characterized as the "nine Secret hard drives," and ultimately transformed into "classified material." In November 2005, Patty Gray ("Gray") of eTreppid

6
7
8

visited the Predator Drone Operations Center at Nellis Air Force Base where she recorded "Secret Predator Drone video images" onto nine eTreppid hard drives for use in developing "Automatic Target Recognition" software. *Id.* at 5:5-8. The affidavit states that pursuant to instructions from "contractor

9
10
11

personnel at Nellis AFB," Gray marked these nine hard drives with "red standard U.S. Government Secret labels" and mailed them to eTreppid's facility in Reno. *Id.* at 5:8-11. The nine secret hard drives were stored in a GSA-approved safe as required by the DOD. Gray, Trepp and Montgomery were the

12
13
14

only persons with access to the safe. *Id.* at 5:11-13.

        **5.**       **December 2005: Montgomery's Breaches of Protocol, Deletion of Classified Material and Trade Secrets, and Removal of Classified Material and Trade Secrets from eTreppid - 5:14-26; pages 6, 7, 8, 9, and 10**

15
16
17
18

      This portion of the affidavit recounts the events which led to the allegations of theft of trade secrets and unlawful retention of national defense information. According to SA West's affidavit, during December 2005, Gray and other eTreppid employees noticed that Montgomery was not following the standard protocols for use and storage of the nine secret hard drives. Gray discovered on two

19
20
21
22
23

occasions that Montgomery was not properly securing them in the safe, and they were returned after Montgomery was questioned. *Id.* at 5:14-26;6:1-7. Despite these incidents, Gray continued to find the nine secret hard drives missing from the safe, and Trepp intervened to insure that all "classified material" be kept in the top drawer of the safe. *Id.* at 6:13-17. Gray changed the combination to the top drawer of the safe, and she was the only eTreppid employee who had it. *Id.* at 6:15-17.

24
25
26
27

      Montgomery requested access to the classified material, and Trepp not only gave Montgomery authorization; he also instructed Gray to give Montgomery the combination to the top drawer of the safe, which she did. *Id.* at 6:18-22. From December 18th until December 21st, other eTreppid employees reported that Montgomery was deleting eTreppid source code files and that certain computer hardware

28

5

1    was missing. *Id.* at 6:23-26;7:1-6. When asked about the missing equipment, Montgomery responded

2    that he had taken the equipment home, although the eTreppid employee who reported the missing

3    equipment had never known Montgomery to take this equipment home. *Id.* at 7:6-12.

4            Prior to leaving for the holidays, Venables installed software to back up all of eTreppid's server

5    data, including the source code server, and he verified that it was operating properly before his departure.

6    *Id.* at 7:13-17. Two key eTreppid employees, Gray and Venables, departed for the holidays on

7    December 22, 2005, and did not return until January 3, 2006. *Id.* at 7:18-19. During their absence, one

8    eTreppid employee discovered portions of the eTreppid source code he was working on had been

9    deleted, and when he asked Montgomery about this, Montgomery advised he would provide the

10   employee with the source code he needed to do his work. *Id.* at 7:20-26;8:1-3. Montgomery also asked

11   another eTreppid employee to load some boxes into Montgomery's truck, which had never happened

12   before. *Id.* at 8:4-8. After Venables returned from the holidays in January, he noticed that the source

13   code server cabinet and keyboard were in disarray and the screen was active. *Id.* at 8:9-10. When he

14   asked Montgomery about this, Montgomery responded that he was "cleaning up stuff," but when

15   Venables went into the warehouse, he also noticed that the units Montgomery used to back up the source

16   code server were still missing. *Id.* at 8:13-17. Montgomery told Venables he would bring back the

17   equipment, as he no longer needed it. *Id.* at 8:17-19. When he looked at the source code server,

18   Venables discovered that most of the folders used by the eTreppid software developers had been deleted,

19   and he could not access the ISA server either. *Id.* at 8:20-23.

20           Shortly thereafter, Trepp became aware source code was missing when employees complained

21   that they could not operate their computer systems, and Venables reported that all source code had been

22   deleted from the source code server, the ISA server, and all of the software developers' work stations.

23   *Id.* at 8:24-26;9:1-2. Although Montgomery then told Trepp that the source code could be located on

24   removable hard drives, a two-day analysis failed to locate the source code. *Id.* at 9:3-5. It was also at

25   this time that Gray found seven hard drives containing copies of the nine original secret hard drives from

26   Nellis AFB in Montgomery's file cabinet, and she found seven additional hard drives also containing

27   copies of the nine original hard drives in the safe. *Id.* at 9:6-10. A search of the eTreppid facility failed

28                                                        6

1    to locate the nine original secret hard drives, and Gray and Montgomery were the only employees with

2    access to the top drawer of the safe. *Id.* at 9:10-14. At Trepp's request, Venables reviewed all of the

3    video surveillance cameras and found that none was recording video, and he also discovered that all

4    stored video had been deleted. *Id.* at 9:15-18.

5         Despite Montgomery's assurances that the source code was stored on hard drives in the building,

6    the hard drives were never located, and on his last day at eTreppid, Montgomery was reported to have

7    said that if Trepp wanted the source code, "he [Trepp] needs to give me big money if he wants it." *Id.*

8    at 9:19-24. Montgomery never returned to eTreppid and he was terminated on January 18, 2006. *Id.*

9    at 10:14-16. Warren Trepp told SA West that Montgomery had devoted eight years of his life to

10   developing software products at eTreppid, that Montgomery worked on these products every day and

11   on weekends, that Montgomery would never delegate these projects to anyone else, and that in order to

12   continue this work, Montgomery would require substantial computing power, similar to the workstation

13   and RAID unit removed from the warehouse, and have access to the nine secret hard drive video images.

14   *Id.* at 10:4-13.

15        **6.    Montgomery's Conversations with Neil Azzinaro and Special Agent
             Paul Haraldsen ("SA Haraldsen") – p. 10:17-24; 11:1-26; 12:1-7**

16

17        Apart from the information provided SA West from Trepp and eTreppid employees, SA West

18   also relied on two other individuals who had conversations with Montgomery during this same time

19   period. The first is Neil Azzinaro, a casino host and Montgomery's friend. In a January 2006

20   conversation, Montgomery recounted the business dealings of Trepp, Montgomery's unhappiness that

21   he had not received a raise, and Montgomery's interest in looking for individuals who would invest

22   several million dollars. *Id.* at 10:17-23. Montgomery specified the investor would have to be an

23   individual with United States citizenship. *Id.* at 10:23-24. SA West stated that based on this

24   conversation with Azzinaro, and possibly others, it appeared that Montgomery may have provided source

25   code to others and was looking for investors for the source code. *Id.* at 11:1-3.

26        In mid-February 2006, SA West was contacted by SA Haraldsen, Air Force Office of Special

27   Investigations, Pentagon. During this period SA Haraldsen placed consensual, recorded telephone calls

28                                                        7

1    with Montgomery. During these calls, Montgomery made several representations to SA Haraldsen: 1)

2    that Trepp did not have the capability to continue the work; 2) that Montgomery had made certain that

3    the assets of the U.S. Government were protected; 3) that if the work is to continue, it must be through

4    Montgomery; and, 4) that the capability to do the work continued to exist. *Id.* at 11:4-10. SA Haraldsen

5    and Montgomery had two additional telephone calls on February 24, 2006, during which Montgomery

6    indicated he might just give the technology to the government, and when SA Haraldsen asked for proof

7    that the technology still exists, Montgomery became agitated. *Id.* at 11:11-17. Later that same day,

8    Montgomery purchased computer disks, and business card stock. *Id.* at 11:18-21.

9           Finally, on February 26, 2006, Montgomery telephoned SA Haraldsen again and expressed

10   concerns about supplying SA Haraldsen with information about anomaly detection and pattern

11   recognition technical capabilities, as to do so might violate a temporary restraining order filed against

12   him by eTreppid. *Id.* at 12:1-7.

13          Based upon SA West's affidavit, the court found probable cause existed that Montogmery may

14   have unlawfully retained classified material and stolen trade secrets, and it issued the search warrant.

15   The court also granted the Government's motion to seal the affidavit (#3).

16          **B.    The Search Warrants for the Storage Units**

17          With respect to the search of the storage units, SA West's affidavit sets forth the following basis

18   for probable cause: the CPU and RAID storage unit used by Montgomery and the nine original secret

19   hard drives were not located during the search of the residence of Buckthorne Lane (#4, 6, 8, 10, 12).

20   Montgomery rented five storage units at Double R Storage in Reno, Nevada. *Id.* The storage units were

21   accessed a total of ninety-two times between November 1, 2005 and March 3, 2006. *Id.* Double R

22   Storage's video surveillance showed that a truck registered to Brenda Montgomery entered the facility

23   on March 3, 2006, an individual walked between the storage unit and the truck, but no observable items

24   were taken from or transported to the truck. *Id.* SA West stated that this constituted probable cause to

25   believe that the storage units contained the evidence of theft of trade secrets and unlawful retention of

26   national defense information. *Id.* Based upon SA West's affidavit, the court found probable cause

27

28                                                    8

1    existed for issuance of these search warrants, and the court also ordered these search warrant affidavits

2    sealed (#14).

3         The court granted the Government's motion to seal the search warrants and affidavits because

4    the Government argued that the information contained therein related to proprietary intellectual property

5    and national security classified materials (#3, 14).

6    **C. Search Warrant Returns**

7         The following items were seized from the Montgomery residence:

8    HP Pavilion laptop
     6 SanDisk compact flash cards
9    letter on white paper and yellow pages of ripped up paper
     rolodex
10   15 computer CDs
     white shredded paper
11   miscellaneous post-it notes
     Network Solutions account paperwork 4 pages
12   check stubs -- Montgomery Family Trust
     Western Digital hard drive serial number WEAL 71844911
13   Grante digital devserver labled 12/17/2005 serial number F05090650042-A
     silver CPV (tower) labeled ATI 3
14   16 computer CDs
     3 pieces of paper containing phone numbers
15   Grante digital server labeled DEO 1/2/06 PROG
     8 containers of medicine, each with 40-168 tablets
16   (#15).

17        The following items were seized from storage unit 140:

18   1 yellow/gray case containing eTreppid disks
     7 compact disks
19   9 mini DV cassettes
     1 Sony Hi8 video cassette
20   1 USB (black 2.0 flashback)
     1 256MB SanDisk compact flash card
21   1 IBM travel star hard drive serial number V29CH7080N5
     11 sealed Western Digital hard drives
22   1 TDK mini DV video cassette
     10 various manufacturer hard drives
23   1 box containing 78 compact disks
     bank statements 12/2005 through 1/2006
24   financial documents and phone bills
     1 removable hard drive labeled "Dennis Eyes Only" and 1 compact disk labeled
25   eTreppid
     (#17).

26
          No items were seized from the other four storage units searched (#16, 18, 19, 20).
27

28                                        9

### D. Chronology of Motions

On March 10, 2006, Montgomery filed a motion to unseal the search warrants and affidavits and for the return of property pursuant to Fed. R. Crim. P. 41(g) and for the segregation and sealing of all attorney-client privileged materials seized (#21). Montgomery argued that he has a Fourth Amendment right to view the search warrant affidavits and that the Government cannot show a compelling governmental interest that cannot be served by a less restrictive means than withholding the entire affidavits. *Id.* Next, he contended that the warrants are facially invalid because they lack specificity and are overbroad. *Id.* Therefore, Montgomery asserted that he is entitled to the return of his property. *Id.* Finally, Montgomery also sought to have attorney-client privileged information segregated prior to any inspection by the Government. *Id.* Montgomery's overarching argument is that the entire investigation stems from Trepp having convinced the United States Attorney to use the power of the federal government to achieve what Trepp could not accomplish through a civil action – a search of Montgomery's property in an effort to obtain certain technology. *Id.*

The Government filed three separate responses (#23, 24, 25). In its response to the Rule 41(g) motion, the Government first argued that because the balance of the equities favored the Government, the court should decline to consider the merits of this pre-indictment Rule 41(g) motion (#23). The Government further asserted that it would produce evidence at an evidentiary hearing to demonstrate that probable cause for the searches existed, that the warrants were valid, and to refute Montgomery's assertions regarding how the searches were executed. *Id.* In its response to the motion to unseal the search warrant affidavits, the Government contended that Montgomery failed to support his position that he has a constitutional right for pre-indictment review of the affidavits (#24). The Government also asserted that its interests in maintaining the secrecy of the information in the affidavits including: (1) the premature identification of possible witnesses; (2) the possibility that such witnesses could be compromised or influenced; (3) the possibility that potential subjects could alter, remove, or destroy information sought by the Government; and, (4) that the affidavits identify specific, sensitive information. *Id.* Finally, the Government opposed the motion to seal and segregate all attorney-client privileged information and trade secrets prior to the DOD conducting an analysis of the seized electronic

10

1    storage media and documents for classified information and information relating to the national defense

2    (#25). Montgomery replied to the government's oppositions (#26).

3            The court set a sealed evidentiary hearing for May 3, 2006, on the motion to unseal the affidavits,

4    return the property pursuant to Rule 41(g) and segregate attorney-client privileged information and trade

5    secrets (#27).    On April 19, 2006, the court further ordered that the parties file simultaneous

6    supplemental briefs concerning certain specific issues identified by the court (#28). On April 28, 2006,

7    the Government filed a partial compliance with court order of April 19, 2006 (#31). The Government

8    explained that it had provided redacted affidavits to Montgomery and did not oppose supplemental

9    filings by Montgomery subsequent to his review of the affidavits. *Id.* The Government argued that the

10   redacted information could (1) expose witnesses; (2) identify investigative techniques prior to

11   completion of the investigation; (3) interfere with the identification of other suspects; and (4) interfere

12   with the recovery of equipment that may contain evidence of criminal violations. *Id.* Also on April 28,

13   2006, the court vacated the hearing set for May 3, 2006 and vacated the order for supplemental briefing

14   (#32). The court stated that there appeared to be serious concerns about the search warrants issued by

15   the court as they relate to certain classified information. *Id.*

16           On May 8, 2006, the Government moved for a protective order prohibiting disclosure of

17   classified information (#34). Montgomery opposed (#36, 39), and the Government replied (#38). The

18   court held a hearing and denied the motion (#42).    At the hearing, the Government provided

19   Montgomery with redacted versions of the applications and affidavits for the search warrants,[4] which

20   were supplemented on June 1, 2006 (#40, 41, 43, 44). The only portions of the affidavits that remain

21   redacted, after the supplements, are the conversation between Montgomery and a business friend about

22   finding investors for the source code, and Montgomery's telephone conversations with SA Haraldsen.

23   *Id.*; *compare* #40 at 10-12 to #1 at 10-12.

24

25

---

26           [4]It is unclear whether this is the second redacted version of affidavits provided by the
     Government, or the same version referred to in Government's partial compliance with court order of
27   April 19, 2006 (#31).

28                                          11

1    On June 2, 2006, Montgomery filed a supplemental memorandum in support of his motion to

2  unseal the affidavits, return the property, and seal attorney-client communications (#45). Montgomery

3  again stated that the court need not hold an evidentiary hearing on the Rule 41(g) issues. *Id.* The

4  Government filed a response to issues identified in court minute order of April 19, 2006 (#46). The

5  Government noted in parentheses that recent information provided by the DOD indicated that the

6  information was not classified. *Id.* at 2. The Government argued that the search warrants set forth

7  probable cause and described the items sought as specifically as possible. *Id.* The Government did not

8  explain whether the determination that the information was improperly classified affects whether

9  probable cause for the search existed, and thus apparently took the position that probable cause existed

10  independent of the belief that classified information was sought. *Id.* The Government provided a

11  declaration by SA West which describes the execution of the searches in detail (#47). The Government

12  still sought to establish a protocol to screen attorney-client privileged material and suggested two

13  alternatives (#46).

14    Upon receipt of the redacted affidavits and the supplements, Montgomery filed a second

15  supplemental memorandum in support of its motion to unseal the search warrant affidavits, for the return

16  of property pursuant to Rule 41(g), and to segregate privileged material (#48, 49, 50). Montgomery then

17  requested an evidentiary hearing, arguing that a hearing is the only way to pin down the Government's

18  shifting positions (#50). He asserted: "The Government has essentially admitted that it did not raid Mr.

19  Montgomery's property to retrieve 'classified information being in a place it shouldn't be;' but rather

20  to do the bidding of wealthy Warren Trepp and thrust itself into a private, civil dispute between the two

21  owners and founders of eTreppid Technologies. The search for 'classified information' was obviously

22  only the cover story seeking to justify the search." *Id.* Montgomery also stated that Assistant United

23  States Attorney Pugliese informed Montgomery's counsel that the "classified information thought to be

24  in Mr. Montgomery's possession had been found." *Id.* at 3. Montgomery's counsel included his

25  declaration that he had conversations with AUSA Pugliese and SA West, during which they discussed

26  approximately ten compact discs, which were the only materials marked "classified" and the only

27

28    12

1   material sought in the search (#49). Montgomery questioned why the Government did not list that

2   information or the storage media containing it in the search warrants (#50).

3       The court held an evidentiary hearing over the course of three days, which concluded on August

4   17, 2006. At the conclusion of the final day of the hearing, the court directed the parties to file post-

5   hearing briefs (#67). The Government filed three separate post-hearing briefs addressing Montgomery's

6   motion to unseal search warrant affidavits (#74), the motion to seal and segregate all attorney-client and

7   trade secret information (#76), and the motion for return of the seized property (#77). Montgomery filed

8   a consolidated brief regarding all three issues (#80).

9                         **II.   DISCUSSION AND ANALYSIS**

10      **A.   Equitable Jurisdiction over Rule 41(g) Motion to Return Property**

11      Federal Rule of Criminal Procedure 41(g) generally is used to seek the return of property after

12  an indictment is issued; however, "district courts have the power to entertain motions to return property

13  seized by the government when there are no criminal proceedings pending against the movant."

14  *Ramsden v. United States,* 2 F.3d 322, 324 (9th Cir. 1993). "These motions are treated as civil equitable

15  proceedings, and, therefore, a district court must exercise 'caution and restraint' before assuming

16  jurisdiction." *Id.*

17      Before the court can reach the merits of a pre-indictment motion pursuant to Rule 41(g), the court

18  must consider whether: (1) "the Government displayed callous disregard for the constitutional rights of

19  the movant; (2) the movant has an individual interest in and need for the property he wants returned; (3)

20  the movant would be irreparably injured by denying return of the property; and (4) the movant has no

21  adequate remedy at law for the redress of his grievance." *U.S. v. Kama,* 394 F.3d 1236, 1238 (9th Cir.

22  2005) (internal citations omitted). If the balance of equities favors reaching the merits, the court should

23  exercise its equitable jurisdiction to entertain the Rule 41(g) motion. *Ramsden,* 2 F.3d at 326.

24      **1.   Callous Disregard**

25      Here, the Government has conceded that *none* of the seized material is classified; therefore, there

26  is a question whether the Government displayed callous disregard for Montgomery's constitutional

27  rights. SA West testified that the central focus of the search was classified information: ". . . [The search

28                              13

1  warrant] was based on the possession of classified information. Obviously there's a lot of things going
2  on at eTreppid, but nothing was more influential than the information that [Montgomery] may have been
3  in possession of secret information." Tr. II, 144:17-19.[5] As will be more fully discussed herein, the
4  court concludes that the Government acted in callous disregard of Montgomery's rights.

5          **2.    Individual's Interest in and Need for the Property**

6          Montgomery has established that the seized property includes items covering many years of his
7  work as a computer programmer, an inventor, as well as items of personal family property (#21, 26; Tr.
8  Ex. 38). Many of the items seized are also integral to the two civil actions pending between Montgomery
9  and Trepp/eTreppid. *Id. See In re Singh,* 892, F.Supp. 1, 3 (D.D.C. 1995).

10         **3.    Irreparable Harm**

11         In addition to the concerns identified above regarding Montgomery's interest in and need for
12 the property, he contends that some of the seized information includes attorney-client privileged
13 information, which will be compromised if a third party reviews it. *See id.* at 3-4.

14         **4.    No Adequate Remedy at Law**

15         The Government has denied Montgomery is a target, and there has never been any indication that
16 either Ms. Montgomery or the Montgomery Family Trust is a search warrant target. Nine months have
17 passed since the Government executed the search warrants, and it appears there are no current plans to
18 prosecute any of the movants. *See Ramsden,* 2 F.3d at 326 (movant does not have the opportunity to
19 challenge the seizure of the documents and request their return at a later date, without a current plan to
20 prosecute). Mindful that Montgomery has not been indicted, the balance of equities favors reaching the
21 merits of his 41(g) motion. *Id.* at 4.

22         The court now considers Montgomery's requested relief: (1) the unsealing of the redacted
23 portions of the search warrants affidavits, and (2) the return of the seized property.

24         **B.    Right to View Affidavits**

25

26         [5]Transcript I is the transcript of the June 29, 2006 evidentiary hearing.
           Transcript II is the transcript of the July 31, 2006 continued evidentiary hearing.
27         Transcript III is the transcript of the August 17, 2006 continued evidentiary hearing.

28                                          14

1          Some courts have held that no right to inspect sealed affidavits for search warrants exists under

2    the Constitution or the Federal Rules of Criminal Procedure prior to the initiation of a criminal

3    proceeding against the movant. *See Matter of Eyecare Physicians of America*, 100 F.3d 514, 517 (7th

4    Cir. 1996); *Matter of the Search of S & S Custom Cycle Shop*, 372 F.Supp.2d. 1048, 1051-52 (S.D. Ohio

5    2003).[6]  The court in *Eyecare Physicians* applied a "right of access committed to the sound discretion

6    of the court." *Eyecare Physicians*, 100 F.3d at 517.

7          Other courts have held that a search target has a pre-indictment Fourth Amendment right to

8    examine the search warrant affidavit. *In re Search Warrants Issued on April 26, 2004*, 353 F.Supp. 2d

9    584, 585 (D. Md. 2004), *see also United States v. Oliver*, 208 F.3d 211, 2000 WL 263954 (4th Cir.

10   2000) (unpublished opinion); *In re Search Warrants Issued Aug. 29, 1994*, 889 F.Supp. 296, 299 (S.D.

11   Ohio 1995); *In re the Search of Up North Plastics, Inc.*, 940 F.Supp. 229, 232 (D. Minn. 1996).  The

12   right is not unqualified; the Government bears the burden to "demonstrate compelling government

13   interests in keeping the affidavit under seal and . . . that no less restrictive means, such as redaction, is

14   available to prevent disclosure." *In re Search Warrants Issued on Apr. 26, 2004*, 353 F.Supp. 2d at 587.

15   The United States District Court for the District of Maryland emphasized that the plain words of the

16   Fourth Amendment protect the public from unreasonable intrusions and specifically require that

17   probable cause support search warrants. *Id.* at 588.  The Court reasoned that "implicit in that language

18   is the public's right to challenge both the reasonableness of the search and the degree to which the

19   warrant was supported by probable cause." *Id.*  The Court invoked Justice Harlan's statement that

20   "constitutional provisions for the security of person and property should be liberally construed" and

21   concluded that without a right to access the affidavit upon which a search warrant is based, a search

22   target could never challenge the warrant for probable cause. *Id.* "More than a conclusory allegation

23

24

25          [6]In *Search of S&S Custom Cycle Shop*, the court stated that "Absent the existence of a criminal

26   action, an individual simply has no basis for bringing a motion to unseal an affidavit under the Criminal
     Rules. If it is a constitutional right, such as the Fourth Amendment right to be free from unreasonable

27   search and seizures, that has been violated by federal authorities, vindication is civil in nature and can
     be achieved through a *Bivens* action." 372 F. Supp. 2d at 1051.

28                                                          15

1    about the need to protect a continuing investigation is necessary to meet the Government's burden of

2    showing compelling need" to keep the affidavits sealed. *Up North Plastics*, 940 F.Supp. at 232.

3           Apart from the arguments it advanced initially to seal the entire affidavit – generalized concerns

4    that unsealing will reveal witnesses, investigative techniques, or compromise on ongoing criminal

5    investigation – the Government has not explained why remaining portions of the affidavit should still

6    remain redacted (#74). The Government contends the standard in the Ninth Circuit for unsealing such

7    information is the balancing test established in *United States v. Napier*, 436 F.3d 1133, 1137 (9th Cir.

8    2006). However, *Napier* had nothing to do with a search target's pre-indictment Fourth Amendment

9    right to review a search warrant affidavit; rather, it concerned a post-indictment challenge to a search

10   warrant that the defendant sought to unseal in order to make the "substantial preliminary showing"

11   required by *Franks v. Delaware,* 438 U.S. 154, 155-56 (1978). In that instance, the court rejected the

12   view that *Franks* creates an unlimited right to all information possibly needed to meet the preliminary

13   showing requirement and held that the court must balance the defendant's interests against those of the

14   government. *Napier* at 1133.

15          The court has considered the authorities addressing a search target's pre-indictment Fourth

16   Amendment right to review the search warrant and concurs with those courts that have required the

17   Government to "demonstrate compelling government interests in keeping the affidavit under seal and

18   . . . that no less restrictive means, such as redaction, is available to prevent disclosure." *In re Search*

19   *Warrants Issued Apr. 26, 2004,* 353 F.Supp. 2d at 587.

20          Turning to the evidence in this proceeding, the redactions involve direct and recent contacts

21   Montgomery had with other individuals, and it is difficult to imagine that the Government is concerned

22   about revealing identities of witnesses or protecting an ongoing investigation. In fact, Montgomery has

23   already surmised that part of the redaction relates to seeking investors for the source code (#50).

24   Moreover, at the June 29, 2006 evidentiary hearing, SA West revealed the identity and involvement of

25   SA Haraldsen during his testimony. Tr. I, 15. Accordingly, the court finds that the Government has not

26   met its burden to establish a compelling government interest in keeping the remaining portions of the

27   affidavits sealed, and it further finds that Montgomery has a right to view the affidavits in their entirety.

28                                                        16

1

2    **C.    Return of Montgomery's Seized Property Based Upon Lack of
             Probable Cause**

3

4        The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause,

5   supported by Oath or affirmation, and particularly describing the place to be searched, and the persons

6   or things to be seized." U.S. Const. Amend. IV. "A search warrant . . . is issued upon a showing of

7   probable cause to believe that the legitimate object of a search is located in a particular place, and

8   therefore safeguards an individual's interest in the privacy of his home and possessions against the

9   unjustified intrusion of the police." *U.S. v. Adjani*, 452 F.3d 1140, 1145 (9th Cir. 2006) quoting

10  *Steagald v. United States*, 451 U.S. 204, 213 (1981). The United States Supreme Court has

11          reaffirm[ed] the totality-of-the-circumstances analysis that traditionally
            has informed probable-cause determinations. The task of the issuing
12          magistrate is simply to make a practical, common-sense decision
            whether, given all the circumstances set forth in the affidavit before him,
13          . . . there is a fair probability that contraband or evidence of a crime will
            be found in a particular place. And the duty of a reviewing court is
14          simply to ensure that the magistrate had a substantial basis for
            conclu[ding] that probable cause existed.

15  *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). The Supreme Court also explained that the "probable

16  cause standard . . . is a practical, nontechnical conception." *Id.* at 231. Further, "probable cause is a

17  fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or

18  even usefully, reduced to a neat set of legal rules. *Id.* at 232. "[A]n affidavit may be based on hearsay

19  information and need not reflect the direct personal observations of the affiant, so long as the magistrate

20  is informed of some of the underlying circumstances supporting the affiant's conclusions . . . ." *United*

21  *States v. Ventresca*, 380 U.S. 102, 108 (1965).

22        "In assessing whether a warrant passes constitutional muster, a court is therefore obliged to make

23  two inquiries: first, whether the scope of the search authorized by the warrant was justified by probable

24  cause and, second, whether the warrant was sufficiently particular to limit the discretion of the officers."

25  *In re Grand Jury Investigation Concerning Solid State Devices, Inc.*, 130 F.3d 853, 856 (9th Cir. 1997).

26  If the court finds that a search warrant lacked probable cause and, thus, that movant was aggrieved by

27  the unlawful search and seizure of his property, Rule 41(g) dictates the remedy: "the court must return

28                                                  17

1    property to the movant, but may impose reasonable conditions to protect access to the property and its

2    use in later proceedings." Since this court finds that the Government lacked probable cause, as more

3    fully explained below, the court does not reach the particularity analysis.

4          Montgomery argues that no probable cause supports SA West's affidavits in support of the

5    search warrants (#21). The Government responds that SA West properly investigated Trepp's

6    allegations, including interviewing Trepp and other employees and compiling information SA Haraldsen

7    provided (#23). It is now clear that no probable cause existed to believe that Montgomery had removed

8    classified information from eTreppid and improperly stored it at his home because after the warrants

9    issued, it was determined that the material was, in fact, not classified (#46; Tr. Ex. 4). As noted earlier,

10   SA West testified that the central focus of the search was classified information: ". . . [the search

11   warrant] was based on the possession of classified information. Obviously there's a lot of things going

12   on at eTreppid, but none was more influential than the information that [Montgomery] may have been

13   in possession of secret information." Tr. II, 144. Three months after the search was executed, the

14   Government determined that the information sought was not classified. Tr. I, 123.

15         In light of this very critical fact, the court now examines SA West's affidavit and testimony at

16   the evidentiary hearing to determine whether probable cause exists to support the search warrants.[7]

17              **1.     Documents Offered in Support of the Affidavit**

18         SA West relied on three documents discussed below to support a finding that there was probable

19   cause to believe Montgomery had stolen eTreppid's trade secrets.

20              **a.     The Contribution Agreement**

21         As noted earlier, SA West referred to the 1998 contribution agreement, and he quoted an excerpt

22   from the agreement which stated that Montgomery contributed *all* of his intellectual property, software

23   programs, and source codes to eTreppid; therefore, this court inferred that eTreppid owned *all* of the

24   assets described in the balance of SA West's affidavit. This inference was incorrect. At the evidentiary

25

26         [7]For ease of reference, the court considers SA West's affidavit in the same order set forth in the
     section of this order entitled "procedural history," *supra*, at pages 3-8.

27

28                                          18

hearing, the entire contribution agreement was admitted into evidence, and the relevant portions state as follows:

> 1.2 <u>Contributed Assets</u>.    As used in this Agreement, the term "Contributed Assets" shall mean and include, collectively, all the following assets, together with all of Contributor's rights, title and interest therein, tangible and intangible, present or future, including, but not limited to, all development, distribution and exploitation rights, or to any proceeds derived therefrom:

> 1.2.1   All of Contributor's know-how; trade secrets; patent rights, copyrights, trademarks, licenses and permits, registered or unregistered, pending or approved; software programs and all programming and source codes used in connection therewith or otherwise required to operate any component thereof; and all programming documentation, designs, materials and other information, all in whatever form and wherever located, relating to or used in connection with, or otherwise describing or consisting of any part of, the software compression technology *contained on that certain Software Compression Engine Development Program contained on CD No. 1, all of which is being contributed by Contributor hereunder (collectively, the "Technology").*

> 1.2.2   Certain of Contributor's tangible personal property used in connection [sic] the Technology as more particularly described on SCHEDULE 1.2.2 attached hereto and made part of this Agreement.

> 1.2.3  All of Contributor's books and records relating to the Contributed Assets.

> *1.3   Excluded Assets and Liabilities.   Notwithstanding any of the foregoing, Contributor is specifically not contributing, transferring or conveying to INTREPID under this Agreement or by any other means, nor is INTREPID acquiring from Contributor, any other tangible or intangible assets of Contributor not specified herein, and expressly is not assuming any claims, liabilities or obligations of Contributor of any kind or nature, whether existing as of the Closing Date or arising thereafter, on account of Contributor's ownership, development, exploitation or operation of the Contributed Assets at any time prior to the Closing Date.*

Tr. Ex. 7 (emphasis supplied).[8]

Had this court been provided the entire contribution agreement, it would have concluded that whatever is on CD No. 1 – nothing more and nothing less – belonged to eTreppid. The court would have expected the Government to demonstrate there was probable cause to believe that CD No. 1 contained the disputed trade secrets. However, SA West testified that he does not know what CD 1 contains, and

---

[8]INTREPID was the predecessor of eTreppid.

19

1    he never inquired as to how long Montgomery has been creating software technologies. Tr. I, 51, 53,

2    60. SA West did not investigate whether Montgomery had created software that was not contributed

3    under the contribution agreement or ask what assets Montgomery had not contributed. Tr. I, 60. SA

4    West stated that the fact that his affidavit does not refer to CD No.1 was not intended to mislead the

5    court. Tr. II 124. His impression was that any work that Montgomery performed while at eTreppid was

6    also part of what eTreppid owned; he did not believe that it was limited to CD No. 1. Tr. II, 124.

7    Montgomery's counsel and SA West had the following exchange:

8                    Counsel: . . . as I understand your testimony today you're saying that
                     notwithstanding paragraph 1.3 [of the Contribution Agreement],
9                    excluding everything if it's not specified, you thought that [Montgomery]
                     conveyed everything, patents, trademarks, copyrights, didn't limit it to
10                   CD No. 1.

11                   SA West: No, I think what the − my thought at the time was that that
                     agreement was in 1998 and that the CD and the particular CD 1 was
12                   conveyed. We're in 2005. He has worked there for eight years working
                     on various projects for eTreppid, one as the chief technology officer.
13                   They've employed ten other programmers to do the programming, and
                     what he took wasn't just his.
14

15   Tr. II, 124. This interchange conveys SA West's fundamental misunderstanding of the operating

16   agreement and the business relationship between Montgomery and eTreppid.

17         On the final day of the evidentiary hearing SA West was once again asked about CD No. 1 and

18   the discrepancy between the entire contribution agreement and the excerpt quoted in his affidavit. SA

19   West testified that he received an incomplete copy of the contribution agreement from SA Haraldsen,

20   who had sent it to him in a different "landscape format;" therefore, the crucial reference to CD No. 1 was

21   cut off. See Tr. Ex. 31; Tr. III, 47-54. SA West testified that he did not realize the tops of each page

22   were missing until Government's counsel pointed it out to him. Tr. III, 52:17-53:6. The court finds SA

23   West's explanation difficult to comprehend, since one has only to read Exhibit 31 to realize that it is

24   quite obviously an incomplete document with missing sentences and paragraphs. Yet, it is this fatally

25   incomplete document that SA West relied on to obtain the warrants to search Montgomery's home and

26   the storage units for stolen trade secrets.

27

28                                                      20

1          **b.     The eTreppid Operating Agreement**

2          SA West quoted an excerpt from the operating agreement in his affidavit, which led this court

3    to conclude that Montgomery was contractually bound by a non-compete agreement; therefore,

4    Montgomery was prohibited from developing or purchasing any software programs or technology

5    competitive with eTreppid, or in engaging in any similar business to that of eTreppid.  However, at the

6    evidentiary hearing the entire operating agreement was admitted, and it, too, revealed that SA West

7    omitted a critical phrase from the sentence he quoted in his affidavit:

8              6.6.   **Restriction on Independent Activities; Agreement not to**
              **Compete.**  *So long as MONTGOMERY is appointed a Committee*
9              *Member and/or as Chief Technology Officer pursuant to this Agreement,*
              MONTGOMERY and his Affiliates agree that, during the terms of this
10             Agreement, non of them shall compete with the LLC, whether for their
              own account and/or for the account of others, individually, jointly with
11             others, or as a part of any other limited liability company, limited
              partnership, general partnership, joint venture, corporation, or other
12             entity, by: (i) developing, licensing or exploiting in any manner any
              software programs or other technology which is competitive with the
13             Technology or the Business of the LLC, or providing any services or
              supplies which are encompassed within the definition of the "Business"
14             of the LLC as set forth in this Agreement; (ii) purchasing or otherwise
              acquiring, owning, holding, operating, managing, investing in or
15             otherwise disposing of a like business of the LLC's Business and interests
              therein of any kind or nature; or (iii) otherwise engaging in any or all
16             aspects of a like business of the LLC's Business. MONTGOMERY's or
              his Affiliates' participation in any of the activities restricted by this
17             paragraph shall be deemed a breach of his duties and obligations as a
              Committee Member hereunder.

18
     Tr. Ex. 30 (emphasis in italics supplied).  SA West omitted the beginning phrase of paragraph 6.6, which
19
     expressly limits the non-compete to Montgomery's tenure as a committee member or chief technology
20
     officer.  Based on SA West's omission, this court drew the incorrect inference that in addition to giving
21
     all of his intellectual property to eTreppid, Montgomery had also agreed not to compete with eTreppid.
22
     This is not true.
23
          SA West testified that he had in his possession the entire operating agreement prior to preparing
24
     his affidavit.  Tr. III, 34-35 and stated:
25
              No. It was not an intentional - - as I said before, I tried to capture the
26             pertinent parts out of these voluminous documents like you've done,
              giving me three pages of probably a fifty-page document, and to try to
27             capture those parts that were relevant to the investigation.

28                                          21

1    Tr. I, 173. SA West admitted that he included this excerpt of the operating agreement in his affidavit

2    to demonstrate that Montgomery had a covenant not to compete, and he also testified that the evidence

3    of Montgomery's efforts to sell to potential investors in violation of the operating agreement concerned

4    the redacted portion of his affidavit, which was the single conversation Montgomery had with Azzinaro

5    in late December or early January. Tr. I, 174-175. The affidavit states that Montgomery talked with

6    Azzinaro about his problems at eTreppid and inquired whether Azzinaro might know of anyone willing

7    "to invest" – nothing more (#1 at 10:17-24). Based upon the incomplete provision of the operating

8    agreement, followed by the conversation between Montgomery and Azzinaro, the court concluded that

9    in violation of the operating agreement, Montgomery solicited Azzinaro for new investors and intended

10   to use stolen trade secrets as a new competitor of eTreppid. This is not true.

11                    **c.    The Ten Patent Assignments**

12       SA West identified ten patent assignments provided by SA Haraldsen, which he also referred to

13   in his affidavit. Tr. III, 5. SA West testified that he referred to these patent assignments to "illustrate that

14   Dennis Montgomery is employed by eTreppid and has done work at eTreppid, that he is assigned to

15   eTreppid." Tr. III, 6. SA West believed that these documents also confirmed that Montgomery was not

16   only an assignor of the patents, but also an "employee" of eTreppid, Tr. III, 7, and this is what SA West

17   stated in his affidavit (#1 at 3:5-9). However, Montgomery was not an employee of eTreppid when he

18   made these assignments; he was an independent contractor as evidenced by Montgomery's form K-1s

19   for the period 1999-2001. Tr. Ex. 29. SA West testified that he was unaware that Montgomery had

20   received 1099 independent contractor forms from eTreppid during the period November 2000 to

21   November 2001. Tr. II, 174.

22       The patent assignments concern various items, ranging from "method and apparatus for

23   streaming data using rotating cryptographic keys," to "system and method for generating alert conditions

24   in a surveillance system," to "method and apparatus for encoding information using multiple passes and

25   decoding in a single pass." Tr. Ex. 26. SA West did not ask Trepp whether Montgomery had assigned

26   patents to eTreppid for the source code that SA West sought. Tr. II, 174-175.

27

28                                        22

1    Although SA West referred to the patent assignments to illustrate Montgomery's employment

2    relationship with eTreppid, this is what the reference conveyed to this court: that since Montgomery had

3    conveyed all of his technological know-how to eTreppid, the ten patents bore an integral relationship

4    to the trade secrets that Montgomery allegedly stole. One has only to review SA West's affidavit to see

5    how the juxtaposition of his reference to the ten patent assignments to eTreppid's trade secrets –

6    software programs relating to "data compression, pattern recognition, change and anomaly detection"

7    – led the court to draw this conclusion. (#1 at 3:5-16). It is now evident that these patents had nothing

8    to do with the trade secrets alleged to have been stolen.

9             **2.    The SOCOM Contract and eTreppid's Security Clearance**

10    SA West's affidavit states that a government contract from SOCOM in March 2003 required

11    eTreppid to have access to secret material; therefore, eTreppid received government authorization to

12    store secret material at its facility (#1 at 4:13-18). The court inferred from this portion of SA West's

13    affidavit that eTreppid was engaged in work for the United States involving secret materials, and that

14    eTreppid had the proper facility clearance to conduct this work. It appears eTreppid never had a facility

15    clearance.

16    SA West first stated that his understanding is that eTreppid had not received approval to store

17    certain classified material at eTreppid facilities. Tr. I, 145. Subsequently, SA West testified that, as

18    stated in his affidavit, eTreppid was permitted to store secret material at least since August 2005. Tr.

19    II, 156-62. To the query, "And to your knowledge despite the three years of government contracts,

20    Trepp's facility never got a facility clearance?" SA West responded, "I don't know what the reasoning

21    was. It could have been Montgomery that held it up." Tr. II, 186.

22    However, SA West testified later that SA Haraldsen told him that eTreppid had a facility

23    clearance to store secret material, which is based upon a DOD form DD 254. Tr. III, 141-142; Tr. Ex.

24    34. SA West relied on this information in preparing his affidavit, but he never saw the form. Instead,

25    he relied on SA Haraldsen's statements to him. Tr. III at 141-143. SA West included this information

26    in his affidavit "[t]o show that eTreppid had access, had permission by the U.S. Government or the

27    author of that form to possess secret information." Tr. III, 142. SA West only saw a copy of the actual

28                                            23

1  DD 254 form just days prior to the final August 17, 2006 evidentiary hearing when Venables faxed it

2  to him. Tr. III, 103-104. Although a signature line is provided on form DD 254, presumably to signify

3  certification for a facility clearance, there is no signature. Tr. Ex. 34. Therefore, the court now

4  concludes that although SA Haraldsen and Venables represented to SA West that eTreppid possessed

5  a facility clearance to store secret material, eTreppid did not have one.

6         **3.    Montgomery's Security Clearance**

7         SA West attested that Montgomery received and signed two security briefings in 2003, which

8  outlined his duty to protect classified material and to protect it from unauthorized disclosure (#1 at 4:19-

9  26;5:1-4). Later in the affidavit, SA West recounted a conversation between Montgomery and Gray

10  during which Gray warned Montgomery that his improper storage of classified material could result in

11  the loss of Montgomery's security clearance. *Id.* at 6:8-17. Montgomery allegedly replied, "I don't care

12  about my clearance. They'll always give me my clearance because they want me to do the work." *Id.*

13  at 6:12-13. The affidavit then recites continued problems with Montgomery's storage and handling of

14  classified material and, ultimately, the allegation that he removed it from eTreppid. *Id.* at 6:13-26-7:10.

15  The court concluded there was probable cause to believe that Montgomery breached his security

16  clearance and took classified materials in violation of the law. Although SA West's affidavit never

17  specifically states the level of Montgomery's security clearance, the inference was that it was tied to his

18  work at eTreppid and that he lost it. However, SA West's testimony conflicts as to whether he knew

19  what, if any, security clearance Montgomery possessed at the time of the search. SA West testified that

20  he knew Montgomery had a top secret clearance in the fall of 2005. Tr. I, 115. SA West stated that he

21  did not look into who at eTreppid had what level security clearance prior to November 2005. Tr. I, 114

22  at 9-13. SA West initially stated that he did not remember whether he contacted Defense Security

23  Services ("DSS"), the determining agency, regarding Montgomery's security clearance before or after

24  the search. Tr. I, 112-113. SA West subsequently testified that Jay Dixon of DSS and Venables both

25  told him that Montgomery's security clearance was suspended, and SA West said that he believed that

26  he learned that information prior to the search. Tr. I, 116-117. SA West later testified that Dixon told

27  him Montgomery's clearance was suspended, but only after the search. Tr. III, 92. In any event, SA

28                                                      24

1  West made no reference to Dixon in his affidavit, and the court finds that SA West did not rely on

2  Dixon.

3        SA West testified that, as he understood it, Montgomery's clearance was contingent on his

4  employment with eTreppid. Tr. II, 113. SA West stated that he is unfamiliar with Jpass, the electronic

5  system that governs security clearance, but that Venables provided him with a computer printout

6  indicating that Montgomery's clearance had been suspended. Tr. II, 129-132. To the question "[s]o this

7  was an issue to you before you raided his home whether he still had his security clearance?" SA West

8  responded: *"Yes. I mean it would be significant if he had legitimate access to classified information*

9  *or not. "* Tr. II, 132 at 6-9 (emphasis supplied).

10        SA West stated that he did not know whether Montgomery had notice that his security clearance

11  had been suspended. Tr. II, 156-157. He testified that eTreppid tried to provide Montgomery with

12  termination documents and that he did not know if those documents informed Montgomery that his

13  security clearance had been suspended. Tr. II, 156. Montgomery's counsel questioned SA West about

14  DOD directives, which movant's counsel represented governed the revocation or suspension of security

15  clearance. Tr. II, 155-156. The DOD directive outlines steps that must be taken, including providing

16  notice and an opportunity to be heard to the applicant, before an "unfavorable clearance decision" is

17  made. Tr. II, 159-160. SA West had no knowledge of the directive or whether the procedures were

18  followed prior to suspending Montgomery's security clearance. Tr. II, 160. SA West testified that the

19  basis for searching Montgomery's home was the unlawful retention of national security information and

20  that Montgomery did not have permission to store it at home. Tr. II, 160-161. Contrary to SA West's

21  understanding, Montgomery attests that the Government has never revoked his security clearance. Tr.

22  Ex. 38, para. 21.

23       **4.**    **The November 2005 Visit to Nellis Air Force Base and Nine Secret**
              **Hard Drives**

24

25        The evidentiary centerpiece of SA West's affidavit insofar as it concerns unlawful retention of

26  classified material are the "nine Secret hard drives," which Gray recorded at Nellis Air Force Base and

27  "marked with red standard U.S. Government Secret labels as instructed by contractor personnel" and

28                                           25

1    Based upon this section of SA West's affidavit, the court concluded that probable cause existed

2    that the nine eTreppid hard drives were classified as secret by the appropriate government agency, that

3    they contained information of importance of the United States government, and that the Department of

4    Defense had provided instructions concerning their classification, access, and storage. It is now

5    abundantly clear that this conclusion was incorrect because there was no classified material.

6         **5.   December 2005: Montgomery's Breaches of Protocol, Deletion of
              Classified Material, and Removal of Classified Material and Trade**
7             **Secrets from eTreppid**

8    Since it is now evident that there was no classified material, the court will only note that the

9    chronology of events in December 2005, which SA West described in his affidavit, led the court to

10   conclude that there was probable cause to believe that in breach of his security clearance, Montgomery

11   had unlawfully removed classified information from eTreppid. The court now turns to the theft of trade

12   secrets.

13        As a preliminary observation, the court notes that SA West never disclosed in his affidavit that

14   Trepp and Montgomery were engaged in civil litigation concerning ownership of the trade secrets, which

15   are intertwined with the allegation in the affidavit that Montgomery engaged in the criminal theft of trade

16   secrets.[10] Over the course of SA West's meetings with Trepp prior to the search warrant applications,

17   he knew that Trepp was engaged in trade secret litigation against Montgomery and that Trepp was

18   attempting to obtain a temporary restraining order against Montgomery. Tr. I. 20-22, 47. Trepp and

19   SA Haraldsen also provided SA West with declarations of eTreppid employees and other court

20

21        [10]In fact, two civil cases are pending in federal court: *Montgomery v. eTreppid Technologies,
     LLC, et al.*, 3:06-CV-0056-LRH (VPC); *eTreppid Technologies, LLC v. Montgomery, et al.*, 3:06-CV-
22   0145-LRH (VPC). In Case No. 3:06-CV-00056 LRH (VPC), the complaint was filed on January 31,
     2006 (#1), and as of the dates this court issued the search warrants, February 28 and March 3, 2006,
23   there were no matters under submission to this court; therefore, the court was unaware of this pending
     action. On January 25, 2006, Montgomery filed a petition to remove the state court proceeding initiated
24   by eTreppid against Montgomery to the United States District Court in Case No. 3:06-CV-00041-HDM
     (RAM); however, that matter was remanded to the state district court on January 31, 2006 (#14).
25   Thereafter, the United States Department of Defense filed its notice of removal to the United States
     District Court on March 20, 2006, in Case No. 3:06-CV-00145-LRH (VPC). Thus, this second civil
26   action between Montgomery and eTreppid was not pending in this court at the time the search warrants
     were issued.

27

28                                              27

1 | documents. Tr. I, 22-23, 74-75; Vol. II, 199-200; Tr. Ex. 10. SA West was aware that the trade secrets

2 | at issue are valued in millions of dollars, but he did nothing during his pre-search warrant investigation

3 | to determine the extent of Montgomery's claim to ownership. Tr. I, 60-62,141; Tr. II, 176, #1 at 3:10-16.

4 | Had this court had even the slightest inkling that Trepp and Montgomery were engaged in civil litigation,

5 | it is an understatement to say that the court would have scrutinized the theft of trade secrets allegation

6 | very, very carefully.

7 |      As discussed earlier, SA West omitted critical portions of the contribution agreement and the

8 | operating agreement, which stated that whatever Montgomery contributed to eTreppid could be found

9 | on CD No. 1. However, SA West testified that he did not know what CD No. 1 contained. Tr. I, 51-53.

10 | He never inquired as to how long Montgomery had been creating software technologies, Tr. I, 60. SA

11 | West did not investigate whether Montgomery had created software that was not included under the

12 | contribution agreement or ask anyone what assets Montgomery had not contributed. Tr. I, 62; Tr. II, 123,

13 | 128, 214. SA West testified that his impression was that any work Montgomery performed while at

14 | eTreppid was also part of what eTreppid owned; he did not believe that it was limited to CD No. 1.

15 |      Putting aside the questions concerning SA West's investigation, the court understood that the

16 | trade secret Montgomery had allegedly stolen was "source code" (#1 at 1:16-23). However, to this day,

17 | it is unclear to the court exactly how "source code" is a trade secret that Montgomery allegedly stole.

18 | SA West was unable to describe the allegedly stolen trade secret because no one at eTreppid was

19 | adequately able to identify it. Tr. I, 84-85, 87, 131-132, 136, 152; Tr. II., 78-79, 192. SA West never

20 | checked eTreppid's computers for the missing source code, and it appears that Trepp referred SA West

21 | to Venables for source code questions. Tr. I, 84-87. However, Venables admitted that he did not know

22 | what source code was "ever there" at eTreppid; therefore, Venables had no way of knowing what to look

23 | for to confirm missing source code (Tr.I, 136; 152-154; Tr. Ex. 33, Vol. 1:11-120). Venables's

24 | testimony at the preliminary injunction hearing appears to contradict the assertions SA West made in

25 | his affidavit that the source codes at issue were located on the "source code server," using the "RAID

26 | Unit" and "back-up ISA" on the premises at eTreppid, and that Venables had access to them (#1 at 3:17-

27 | 26; 18:1-2).

28 |

1    Montgomery asserts that the term "source code" is meaningless and that the Montgomery Family

2    Trust owned the software pursuant to copyrights filed years before Montgomery's involvement with

3    Trepp (#21). Montgomery also states:

> The sou rce codes used on military contracts are derived from my copyrighted source codes on file in the Copyright Office. None of those source codes are on CD No. 1 or in the patents I assigned to eTreppid. They were all created by me with no other input from anyone and none of them were created as part of my work at eTreppid. Approximately 90% of the codes were developed before September 28, 1998, and 99% were developed prior to November 2002, when even eTreppid treated me as an independent contractor.

Tr. Ex. 38, ¶ 16.

Had the court been apprised of the civil litigation between Trepp and Montgomery and the disputed facts summarized herein, it would have concluded – as the court does now – that there was no probable cause to issue a search warrant based upon the allegation of theft of trade secrets.[11]

### 6.    Callous Disregard of Montgomery's Constitutional Rights

The court has reviewed the record in this proceeding in great detail, since the power of the Government to safeguard a citizen's privacy in his or her home and possessions against unjustified intrusions by government officials is a "basic purpose" of the Fourth Amendment. *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 528 (1967). In this proceeding, SA West was charged with the investigation of two very serious and two potentially very complex criminal violations. After examination of his affidavit, his testimony concerning his investigation, and the protocols the Department of Justice has implemented for these crimes, this court can only conclude that SA West acted with callous disregard of Montgomery's fundamental Fourth Amendment rights. The over-arching concern in this proceeding is that SA West became an unwitting pawn in a civil dispute, and as a result of his inexperience and lack of training, he prepared search warrant affidavits that are riddled with incorrect statements, edited documents, and uncorroborated conclusions, which caused this court to

---

[11]Because the court has concluded that there is no probable cause as to the trade secret allegation, the court notes that the conversations Montgomery had with Azzinaro and SA Harraldsen do not change the court's finding of lack of probable cause, and they need not be addressed.

29

1   exercise its formidable power to authorize the government to search Montgomery's home and storage

2   units.

3           In 2000, the Department of Justice's Computer Crime and Intellectual Property Section

4   ("CCIPS") published the *Prosecuting Intellectual Property Crimes Manual.* Tr. Ex. 12. With respect

5   to theft of commercial trade secrets, it states:

> The EEA [Economic Espionage Act of 1996] is violated only where
> someone acts knowingly without authorization. Under certain
> circumstances, however, two individuals or companies may have a
> legitimate dispute over ownership rights in a trade secret. This type of
> dispute is likely to arise where the two potential owners previously
> worked together to develop the disputed technology and where the
> contractual arrangements governing each party's respective ownership
> interests are unclear or entirely absent. In these circumstances, unilateral
> action with regard to the trade secret by one of the owners may precipitate
> an EEA referral. *Such cases are rarely appropriate for criminal
> prosecution, especially where the party taking unilateral action has
> obtained advice of counsel.* Notwithstanding the passage of the EEA,
> many disputes regarding ownership of intellectual property, including
> trade secrets, continue to be best resolved in a civil forum.

*Id.* at 17, section VIII.B.6.e (emphasis supplied). Prior to this case, SA West had never investigated a

trade secrets case, he was unfamiliar with Department of Justice manuals relating to intellectual property

crimes, and he did not consult with anyone within the Department of Justice for guidance, such as the

Department of Justice's Computer Hacking and Intellectual Property Unit ("CHIPS Unit"). Tr. I, 14,

18, 23-24; Tr. II, 187-188; 216-218; Tr. Ex. 12, 14, 21, 25. Like SA West, SA Haraldsen had no training

in investigating intellectual property crimes, and  his role was to act as a liason between eTreppid and

the U.S. Air Force and Department of Defense on contracts eTreppid had with these government

agencies. Tr. I, 17-18.   SA West was aware that Trepp and Montgomery were engaged in civil trade

secret litigation, and he relied on one side of that dispute – Trepp's – for critical evidence concerning

potential criminal prosecution for theft of trade secrets against the adverse party, Montgomery. SA West

relied on Trepp's representation that court records were sealed, but he never confirmed this

representation. Tr. I, 74-76; 136-138. In fact, although certain portions of eTreppid's lawsuit were

sealed, the parallel lawsuit filed by Montgomery was not. SA West blindly relied on the documents,

sworn statements, and evidence supplied by eTreppid, and he never appeared to question whether he had

30

1  become an agent, not for the Government, but for private interests engaged in litigation valued in

2  millions of dollars. The litigation that has ensued based upon the seizure of Montgomery's property is

3  a cautionary tale to heed the admonition that trade secrets litigation is best left to the civil forum.

4        The court has similar concerns about SA West's investigation of unlawful retention of national

5  defense information. SA West took SA Haraldsen, Trepp, Venables, and Gray at their word and never

6  confirmed basic facts they alleged. Upon learning of these serious allegations, one would presume that

7  an FBI agent with no experience in this area would consult with Department of Justice officials or his

8  own supervisors regarding the investigation. However, SA West never confirmed with the proper

9  government agency whether eTreppid had a facility clearance to store classified materials; he simply

10  relied on statements of Haraldsen and Venables. SA West did not even see the actual DD Form 254

11  until a few days before the final day of the evidentiary hearing – six months after the search warrants

12  were issued. SA West never confirmed the status of Montgomery's security clearance with the

13  appropriate government agency, and once again relied on Venables's statement. Moreover, SA West

14  had no knowledge of government procedures for suspension or revocation of an individual's security

15  clearance. When Gray supplied SA West with a list of so-called classified materials, he never confirmed

16  with anyone at Nellis Air Force Base that they were, in fact, classified. He continued to rely on

17  Venables, Gray and Haraldsen's representations concerning classification, and he never verified himself

18  whether the allegedly classified materials were actually missing.

19        The evidence before this court compels the conclusion that SA West acted with callous disregard

20  of Montgomery's constitutional rights, which resulted in the improper search of Montgomery's home

21  and storage units, and the improper seizure of his property.

22        **7.    Conclusion**

23        Once the Government conceded that "nine Secret hard drives" were not, in fact, classified and

24  that the material "was not properly classified by an Original Classification Authority within the U.S. Air

25  Force," (Tr. Ex. 4), the obvious question is whether the search warrant can stand based on probable

26  cause that Montgomery violated 18 U.S.C. § 793(e), unlawful retention of national defense information.

27  Throughout the three days of the evidentiary hearing and in its post-hearing brief, the Government made

28                                                    31

1  no showing whatsoever that probable cause still exists to justify keeping the seized material based on

2  this criminal violation, notwithstanding this court's invitation that the Government do so. Tr. III, 211-

3  212.  Likewise, the Government has also failed to demonstrate that probable cause exists to justify the

4  issuance of the search warrants in this case based on a violation of 18 U.S.C. § 1832, theft of trade

5  secrets. The Government's post-hearing brief is devoid of any legal or factual argument in opposition

6  to Montgomery's motion for a return of the seized property, other than a defense of SA West's

7  investigation prior to the issuance of the search warrants.  Having considered the evidence adduced at

8  the hearing, and all of the papers submitted in this proceeding, the court grants Montgomery's motion

9  for a return of the seized property (#21).[12]

10                                                **III.  ORDER**

11          Based upon the foregoing,

12          **IT IS ORDERED** that Montgomery's motion to unseal the search warrant affidavits (#21) is

13  **GRANTED,** and Montgomery's motion for the return of property pursuant to Fed.R.Crim.P. 41(g) (#21)

14  is **GRANTED**.  Montgomery's motion for the segregation and sealing of all attorney-client and trade

15  secret material (#21) is **DENIED AS MOOT,** since the court has ordered the return of all seized

16  property.

17          Pursuant to LR IB 3-1, any party wishing to object to this order shall, on or before **Tuesday,**

18  **December 12, 2006,** file and serve specific a written objection to the ruling together with points and

19  authorities in support thereof.  The opposing party shall within ten days thereafter file points and

20  authorities opposing the objection. Points and authorities filed in support of or in opposition to the order

21  are subject to the page limits set forth in LR 7-4. This proceeding shall remain sealed until the deadline

22  for filing a written objection has expired.  If no objection to this order is filed by **Tuesday, December**

23  **12, 2006**, this order shall stand as the final order, and all papers filed in this proceeding shall be

24  **UNSEALED** without further order of this court.

25

26  _____

27          [12]Since this court concludes that the Government lacked probable cause, it does not reach the
    particularity analysis.

28                                                    32

**IT IS FURTHER ORDERED** that in the event an objection is filed, this proceeding shall remain **SEALED** until such time as the District Court issues its final order. The parties shall file any written objection to this order or opposition to the objection under seal by delivering any documents to be filed in a sealed envelope addressed to Jake Herb or Lia Griffin or the U.S. District Court, District of Nevada, Reno Office.

**IT IS SO ORDERED.**

Dated this 28th day of November, 2006.

_____
UNITED STATES MAGISTRATE JUDGE

33

# EXHIBIT "7"

**SOLICITATION/CONTRACT/ORDER FOR COMMERCIAL ITEMS**

*OFFEROR TO COMPLETE BLOCKS 12, 17, 23, 24, & 30*

J

| 1. REQUISITION NUMBER FX20270901S001 | | Page 1 |
|---|---|---|

| 2. CONTRACT NO. FA8240-09-C-3203 | 3. AWARD/EFFECTIVE DATE | 4. ORDER NUMBER | 5. SOLICITATION NUMBER | 6. SOLICITATION ISSUE DATE |
|---|---|---|---|---|

| 7. FOR SOLICITATION INFORMATION CALL | a. NAME Phillip D. Judd | b. TELEPHONE NUMBER (No collect calls) (801 ) 777 -3192 ext. | 8. OFFER DUE DATE/LOCAL TIME |
|---|---|---|---|

| 9. ISSUED BY                  CODE  FA8240 | 10. THIS ACQUISITION IS | 11. DELIVERY FOR FOB DEST. UNLESS BLOCK IS MARKED | 12.   DISCOUNT TERMS |
|---|---|---|---|

9. ISSUED BY   CODE **FA8240**
519 CBSS/PK
6082 FIR AVE, Bldg 1232
HILL AFB UT  84056-5820
BUYER: Phillip D. Judd/519CBSS/PK
phil.judd@hill.af.mil
Phone: (801) 777- 3192 Fax:  (801) 777-5688 No Collect Calls

10. THIS ACQUISITION IS
☒ UNRESTRICTED
☐ SET ASIDE: % FOR
☐ SMALL BUSINESS
☐ HUBZONE SMALL BUS
☒ Oth Than Full & Open
NAICS CODE: 541519
SIZE STD: $25.0

11. DELIVERY FOR FOB DEST. UNLESS BLOCK IS MARKED
☐ **SEE SCHEDULE**
☒ 13a. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700)
13b. RATING
DO: C9  52.211-14, 52.211-15
14. METHOD OF SOLICITATION
☐ RFQ    ☐ IFB    ☒ RFP

12.   DISCOUNT TERMS
**NET 30 DAYS**

| 15. DELIVER TO                    CODE | 16.  ADMINISTERED BY                    CODE **1232JM** |
|---|---|

## SEE LINE ITEM SCHEDULE

16.  ADMINISTERED BY
519 CBSS/PK
Attn: Phillip Judd
6082 Fir Ave
Bldg 1232
Hill AFB UT  84056-5820
United States
SCD:C

| 17a. CONTRACTOR/ OFFEROR   CODE **59NF3**   FACILITY CODE | 18a. PAYMENT WILL BE MADE BY                    CODE **1QLPK** |
|---|---|

17a. CONTRACTOR/OFFEROR  CODE **59NF3**  FACILITY CODE
**BLXWARE LLC**
600  106th Ave NE Ste 210
Bellevue WA  98004-5043
United States
(760)  862-6400
Attn: Nickolas Rhodes

18a. PAYMENT WILL BE MADE BY  CODE **1QLPK**
519 CBSS/FM
6082 FIR AVE BLDG 1232
HILL AFB UT  84056-5820

EFT:T

| ☐ 17b. CHECK IF REMITTANCE IS DIFFERENT AND PUT SUCH ADDRESS IN OFFER | 18b. SUBMIT INVOICES TO ADDRESS SHOWN IN BLOCK 18a UNLESS BLOCK BELOW IS ☒ CHECKED. SEE ELECTRONIC SUBMISSION OF PAYMENT REQUESTS, CLAUSE 252.232-7003. |
|---|---|

| 19. ITEM NO. | 20. SCHEDULE OF SUPPLIES/SERVICES | 21. QUANTITY | 22. UNIT | 23. UNIT PRICE | 24. AMOUNT |
|---|---|---|---|---|---|

Routine

The following PR is applicable to this award:

**FX2027-09-013S001**

**All Invoices must be submitted manually to the payment office identified in block 18a as Wide Area Work Flow procedures will not be used. (See Section G)**

SEE LINE ITEM SCHEDULE
(Attach Additional Sheets as Necessary)

| 25. ACCOUNTING AND APPROPRIATION DATA   **SEE FUNDS SCHEDULE** | Total | 26. AWARD AMOUNT (For Gov't use only) $   3,000,000.00 |
|---|---|---|

| ☐ 27a. SOLICITATION INCORPORATES BY REFERENCE FAR 52.212-1, 52.212-4. FAR 52.212-3 AND 52.212-5 ARE ATTACHED. ADDENDA ☐ ARE ☐ ARE NOT ATTACHED |
|---|
| ☒ 27b. CONTRACT/PURCHASE ORDER INCORPORATES BY REFERENCE FAR 52.212-4. FAR 52.212-5 IS ATTACHED. ADDENDA ☐ ARE ☒ ARE NOT ATTACHED |

| 28. ☒ CONTRACTOR IS REQUIRED TO SIGN THIS DOCUMENT AND RETURN  1  COPIES TO ISSUING OFFICE. CONTRACTOR AGREES TO FURNISH AND DELIVER ALL ITEMS SET FORTH OR OTHERWISE IDENTIFIED ABOVE AND ON ANY ADDITIONAL SHEETS SUBJECT TO THE TERMS AND CONDITIONS SPECIFIED HEREIN. | 29. AWARD OF CONTRACT: REF.   OFFER  DATED  13 -JAN -2009 .  YOUR OFFER ON SOLICITATION (BLOCK 5), INCLUDING ANY ADDITIONS OR CHANGES WHICH ARE SET FORTH HEREIN, IS ACCEPTED AS TO ITEMS: |
|---|---|

| 30a. SIGNATURE OF OFFEROR/CONTRACTOR | 31a. UNITED STATES OF AMERICA *(SIGNATURE OF CONTRACTING OFFICER)* |
|---|---|

| 30b. NAME AND TITLE OF SIGNER (Type or print) Edra Blixseth   Owner | 30c. DATE SIGNED 1/19/09 | 31b. NAME OF CONTRACTING OFFICER (Type or print) Phillip D. Judd phil.judd@hill.af.mil | 31c. DATE SIGNED 13 -JAN -2009 |
|---|---|---|---|

AUTHORIZED FOR LOCAL REPRODUCTION
PREVIOUS EDITION IS NOT USABLE

STANDARD FORM 1449 (REV. 4/2002)
Prescribed by GSA - FAR (48 CFR) 53.212

# EXHIBIT "8"

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

DENNIS MONTGOMERY and the            )
MONTGOMERY FAMILY TRUST              )          3:06-CV-00056-PMP-VPC
                                     )          BASE FILE
          Plaintiffs,                )
                                     )          3:06-CV-00145-PMP-VPC
     vs.                             )
                                     )          **ORDER RE PROTECTIVE ORDER**
ETREPPID TECHNOLOGIES, LLC;          )
WARREN TREPP; and the UNITED         )
STATES DEPARTMENT OF DEFENSE,        )
                                     )
          Defendants.                )
—————————————————————————————)
                                     )
AND ALL RELATED MATTERS.             )
—————————————————————————————)

          Prior to consolidation of these two related cases, Defendant United States

Department of Defense filed Motions for Protective Order (3:06-CV-00056-PMP-VPC,

Doc. #83, and 3:06-CV-00145-PMP-VPC, Doc. #51) to prevent disclosure of information

that could harm the national security interests of the United States.  Specifically, the United

States' seeks a protective order pursuant to Federal Rule of Civil Procedure 26(c) to prevent

the disclosure of information relating to (1) the existence or non-existence of any actual or

proposed relationship, agreement, connection, contract, transaction, communication or

meeting of any kind between an intelligence agency as defined in 50 U.S.C. § 401(a)(4),

which includes intelligence elements of the military services; and (2) any actual or proposed

interest in, application, or use by any intelligence agency, or any current or former official,

employee, or representative thereof, of any technology, software, or source code owned or

claimed by any individuals or entities associated with these lawsuits.

/ / /

1    The United States' supports its application for protective order under the military

2    and States Secret privilege by the Declaration of John D. Negroponte, formally Director of

3    National Intelligence, and a Classified Declaration which has been reviewed by the Court in

4    camera and ex parte, which demonstrate that disclosure of information at issue in this

5    litigation subject to the proposed protective order could be expected to cause serious, and

6    some cases exceptionally grave damage to national security.

7    Issues relating to whether information subject to a claim of military and states

8    secrets privilege were contained in pleadings, motions, declarations and other materials

9    filed in these consolidated cases as well as in the related in the Search Warrant case (3:06-

10   CV-0263-PMP-VPC), have required considerable attention by the parties and the Court.  In

11   this regard, counsel for Defendant United States' and those authorized to assert the military and

12   states secrets privilege on behalf of Defendant United States' have met with counsel in these

13   related actions as well as with counsel in the related Search Warrant case, and have reviewed

14   copies of all pleadings, motions, documents and exhibits filed in the above referenced cases

15   for the purpose of identifying and redacting those portions subject to a claim of military and

16   state secrets privilege on behalf of Defendant United States.  The Court has reviewed all

17   such papers in camera and ex parte with counsel for Defendant United States' and those

18   authorized to assert the military and states secret privilege on behalf of Defendant United

19   States, and has approved the redaction of material subject to the privilege claim.

20   Defendant United States' Department of Defense Motion for Protective Order

21   has now been fully briefed and on June 12, 2007, the Court conducted a hearing regarding

22   the United States' Motion for Protective Order and other pending motions.

23   On June 21, 2007, Defendant United States' filed a Revised Proposed Protective

24   Order (3:06-CV-00056-PMP-VPC (Doc. #196).  The Court finds that said Protective Order

25   is warranted as to form and content and hereby approves the same.

26   / / /

1    IT IS THEREFORE ORDERED that Defendant United States Department of

2  Defense Motions for Protective Order (3:06-CV-00056-PMP-VPC, Doc. #83, and 3:06-CV-

3  00145-PMP-VPC, Doc. #51) is GRANTED.

4

5  DATED: August 29, 2007.

6

7  _____

8  PHILIP M. PRO
   United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1  PETER D. KEISLER
   Assistant Attorney General
2  STEVEN W. MYHRE
   Acting United States Attorney
3  District of Nevada
   GREG ADDINGTON
4  Assistant United States Attorney
   Nevada Bar 6875
5  100 West Liberty, Suite 600
   Reno, Nevada 89501
6  VINCENT M. GARVEY
   Deputy Branch Director
7  CARLOTTA P. WELLS
   Senior Trial Counsel
8  Federal Programs Branch
   Civil Division - Room 7150
9  U.S. Department of Justice
   20 Massachusetts Ave., NW/P.O. Box 883
10 Washington, D.C. 20044
   Telephone: (202)514-4522
11 Facsimile: (202) 616-8470

12              **UNITED STATES DISTRICT COURT**
                  **DISTRICT OF NEVADA**
13

14 ————————————————————————
   DENNIS MONTGOMERY, et al.,               )
15                                          )
            Plaintiffs,                     )
16                                          )      3:06-CV-00056-PMP-VPC
   v.                                       )      **BASE FILE**
17                                          )
   ETREPPID TECHNOLOGIES, INC.,             )      3:06-CV-00145-PMP-VPC
18 et al.,                                  )
                                            )
19          Defendants.                     )
   ————————————————————————

20              UNITED STATES   **PROTECTIVE ORDER**

21       Pursuant to Federal Rule of Civil Procedure 26, in order to protect the classification,

22 confidentiality and the rights to information and documents developed and disclosed in

23 connection with this litigation, and to facilitate discovery by and among the parties to this

24 action and from third parties, the United States hereby proposes entry of the following

25 protective order.

26

27

28

IT IS HEREBY ORDERED as follows:

1.      Certain information that may or may not be relevant to the claims and/or defenses of eTreppid Technologies, LLC and its current or former officers or employees (hereinafter collectively referred to as "eTreppid"), Warren Trepp, Dennis Montgomery, the Montgomery Family Trust and/or Dennis Montgomery and Brenda Montgomery as trustees of the Montgomery Family Trust (hereinafter collectively referred to as "the Parties"), as delineated in paragraphs 2 and 3 below, is subject to the state secrets privilege, the disclosure of which reasonably could be expected to cause serious, and in some cases exceptionally grave, damage to the national security of the United States.  Such information shall not be subject to discovery or disclosure by any of the Parties during all proceedings in these actions, and shall be excluded from evidence at trial.

2.      The Parties shall not serve or take any discovery relating to or questioning the existence or non-existence of any actual or proposed relationship, agreement, connection, contract, transaction, communication or meeting of any kind between any entity in the intelligence community as defined by the National Security Act of 1947, 50 U.S.C. § 401(a)(4), which includes intelligence elements of the military services, or any current or former official, employee or representative thereof (hereinafter collectively referred to as "intelligence agency") and the Parties.

3.      The Parties shall not serve or take any discovery relating to or questioning any actual or proposed intelligence agency interest in, application of or use of any technology, software or source code owned or claimed by the Parties.

4.      This Order does not preclude the Parties from serving or taking any discovery from other Parties or third parties relating to, or questioning, the following:

a.      The existence and nature of the "Big Safari" contract (hereinafter referred to as "the Big Safari Contract") between eTreppid and the Unites States Air Force, including but not limited to the fact that the Big Safari Contract required eTreppid to perform data analysis and the fact that the data analysis eTreppid performed under the Big Safari Contract involved image identification technology;

b.      The fact that the Big Safari Contract required employees and/or officers of eTreppid to sign secrecy agreements with the Department of Defense;

c.      The computer source code, software, programs, or technical specifications relating to any technology owned or claimed by any of the Parties ("the Technology");

d.      Any contract, relationship, agreement, connection, transaction, communication or meeting of any kind relating to the Technology, unless covered by paragraphs 2 or 3 above;

e.      Any actual or potential commercial or government applications of the Technology, unless covered by paragraphs 2 or 3 above;

f.      Facts relating to the issue of ownership by the Parties of any right or interest in the Technology, unless covered by paragraphs 2 or 3 above;

g.      The revenue, income, expenses, profits and losses of the Parties, unless disclosure of such information would be covered by paragraphs 2 or 3 above; and

h.      Any consideration received by any of the Parties relating to the Technology, unless covered by paragraphs 2 or 3 above.

5.      The Parties shall not discuss, mention, question or introduce as evidence, either at trial, in any pleading or motion, or in any case-related correspondence, any actual or proposed relationship, agreement, connection, contract, transaction, communication or meeting of any kind between any intelligence agency and any of the Parties.

6.      The Parties shall not discuss, mention, question or introduce as evidence, either at trial, in any pleading or motion, or in any case-related correspondence, any actual or proposed intelligence agency interest in, application of or use of the Technology.

7.      No question and no document request in discovery or at trial shall require a response that would include any information covered by paragraphs 2, 3, 5 or 6 above, but if the responding party believes that a full and complete response could disclose information within the scope of the state secrets privilege, the responding party shall provide timely notice of such belief and the full and complete response to the United States prior to responding, and shall respond only with information that the United States has determined is not subject to the state secrets privilege.

8.      The military and state secrets privilege, the claim that any discovery is covered by paragraphs 2 or 3 above, and the claim that any evidence is covered by paragraphs 2 or 3 above, can only be invoked by the United States. These claims cannot be asserted by a private individual or entity.

9.      All Parties shall serve the attorneys for the United States with (a) a copy of all notices of depositions, (b) a copy of all requests for discovery and responses thereto, and (c) a copy of all pleadings and motions filed together with supporting memoranda (hereinafter collectively referred to as the "documents"), unless such documents request or relate to information covered by paragraphs 2 or 3 above. If the documents request or relate to information covered by paragraphs 2 or 3 above, the Parties shall submit the documents to the United States for privilege review prior to service or filing. All documents filed or sought to be used as evidence by the Parties in this case shall be unclassified. This requirement applies to all motions, pleadings, briefs, and any other document, including exhibits, correspondence, or anything appended thereto or filed therewith. If the United States determines that a document or discovery response includes

-4-

information covered by paragraphs 2 or 3 above, the United States shall redact the information and provide the parties and Court with a redacted copy of the document or discovery response.

10.    The Clerk of the Court shall send attorneys for the United States a copy of all future decisions and notices for hearings in these cases.

11.    As the United States deems necessary, attorneys for the United States may attend all depositions and proceedings in this case and may make objections as necessary to protect national security information.  If attorneys for the United States assert an objection based on the need to protect national security information with respect to either witness testimony or documents introduced or otherwise relied upon during a deposition, then the witness shall be precluded from testifying with respect to the line of inquiry that engendered the objection, and the document shall be withdrawn from the record pending an order of the Court with respect to the scope of the government's national security objection.

12.    To protect the United States' interests, attorneys for the United States may participate in any proceeding in these cases, including but not limited to motions hearings, all pre-trial proceedings, or trial by making and opposing motions, submitting briefs, and participating in arguments.

13.    The United States shall be excepted from all party discovery during the pendency of its motions to dismiss the claims against the Department of Defense.

It is so ordered.


Dated:  ___August 29, 2007_____


_____
PHILIP M. PRO
United States District Judge

-5-

**UNITED STATES' MOTION FOR
PROTECTIVE ORDER**


**EXHIBIT 1**

SEP. 18 2006 05:49AM
Case 3:06-cv-00056-MMD-CSD  Document 1216-2  Filed 08/20/22  Page 96 of 194
Case 3:06-cv-00056-PMP-VPC  Document 83-2  Filed 09/29/06  Page 2 of 11   *Tab-1*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

ETREPPID TECHNOLOGIES, LLC, a )
California Corporation,       )     CV-N-06-00415(BES)(VPC)
                             )
        Plaintiff            )
    v.                       )
                             )
DENNIS MONTGOMERY, et. al.,  )
                             )
        Defendants.          )
_____)

DENNIS MONTGOMERY, et. al.,  )
                             )
        Plaintiffs           )
                             )     CV-N-06-00056(BES)(VPC)
    v.                       )
                             )
ETREPPID TECHNOLOGIES, INC., )
et. al.                      )
                             )
        Defendants.          )
_____)

**DECLARATION AND FORMAL CLAIM OF
STATE SECRETS AND STATUTORY PRIVILEGES
BY JOHN D. NEGROPONTE,
DIRECTOR OF NATIONAL INTELLIGENCE**

I, JOHN D. NEGROPONTE, hereby declare as follows:

1.  I am the Director of National Intelligence (DNI) of the United States.  I have held this position since April 21, 2005.  From June 28, 2004, until my appointment as DNI, I served as the United States Ambassador to Iraq.

From September 18, 2001, until my appointment in Iraq, I
served as the United States Permanent Representative to the
United Nations. I have also served as Ambassador to
Honduras (1981-1985), Mexico (1989-1993), and the
Philippines (1993-1996), and as Deputy Assistant to the
President for National Security Affairs (1987-1989).

2. The statements made herein are based on my
personal knowledge, as well as on information provided to
me in my official capacity as DNI, and on my personal
evaluation of that information. In personally considering
this matter, I have read the information contained in the
separate classified declaration filed *in camera* and *ex
parte* in this case.

3. The purpose of this ==declaration is to assert
formally==, in my capacity as DNI and head of the United
States Intelligence Community, ==the state secrets privilege
to protect intelligence information== ("state secrets
privilege"), as well as a ==statutory privilege under the
National Security Act==, 50 U.S.C. § 403-1(i)(1), to ==protect
intelligence sources== and ==methods from unauthorized
disclosure.== Unauthorized disclosure of information covered
by the state secrets and statutory privileges reasonably
could be expected to cause serious, and in some cases
==exceptionally grave damage to the national security of the==

United States, and such information should therefore be excluded from any use in this litigation.

I.   STATUTORY AND EXECUTIVE ORDER AUTHORITIES

4.   The position of Director of National Intelligence was created by the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, §§ 1011(a), 1097, 118 Stat. 3638, 3643-63, 3698-99 (2004) (amending sections 102 through 104 of Title I of the National Security Act of 1947).  Subject to the authority, direction, and control of the President of the United States, the DNI serves as the head of the United States Intelligence Community and as the principal advisor to the President, the National Security Council, and the Homeland Security Council for matters related to intelligence and national security.  *See*, 50 U.S.C. § 403 (b)(1),(2).

5.   The "United States Intelligence Community" includes the Office of the Director of National Intelligence; the Central Intelligence Agency; the National Security Agency; the Defense Intelligence Agency; the National Geospatial-Intelligence Agency; the National Reconnaissance Office; other offices within the Department of Defense for the collection of specialized national intelligence through reconnaissance programs; the intelligence elements of the military services, the Federal

3

Bureau of Investigation, and the Department of Energy; the Office of Intelligence and Analysis of the Department of the Treasury; the Drug Enforcement Administration's Intelligence Division; the Bureau of Intelligence and Research of the Department of State; elements of the Department of Homeland Security concerned with the analysis of intelligence information (including the Office of Intelligence of the Coast Guard); and such other elements of any other department or agency as the President may designate, or as may be jointly designated by the DNI and the head of the department or agency concerned, as an element of the United States Intelligence Community. *See*, 50 U.S.C. § 401(a)(4).

6. The responsibilities and authorities of the DNI, enumerated in the National Security Act, as amended, at 50 U.S.C. § 403-1, include ensuring that national intelligence is provided to the President, the heads of the departments and agencies of the Executive Branch, the Chairman of the Joint Chiefs of Staff and senior military commanders, and the Senate and House of Representatives and committees thereof. 50 U.S.C. § 403-1(a)(1). The DNI is also charged with establishing the objectives of, determining the requirements and priorities for, and managing and directing the tasking, collection, analysis, production, and

4

dissemination of national intelligence by elements of the
United States Intelligence Community. 50 U.S.C. § 403-
1(f)(1)(A)(i), (ii). The DNI is responsible for developing
and determining, based on proposals submitted by heads of
agencies and departments within the United States
Intelligence Community, an annual consolidated budget for
the National Intelligence Program for presentation to the
President, and for ensuring the effective execution of the
annual budget for intelligence and intelligence-related
activities, including managing and allotting appropriations
for the National Intelligence Program. *Id.* § 403-1(c)(1)-
(5).

7. In addition, the National Security Act of 1947, as
amended, provides that "The Director of National
Intelligence shall ==protect intelligence sources and methods==
==from unauthorized disclosure.==" 50 U.S.C. § 403-1(i)(1).
Consistent with this responsibility, the DNI establishes
and implements the guidelines of the United States
Intelligence Community for the classification of
information under applicable law, Executive Orders, or
other Presidential directives, and access and dissemination
of intelligence. *Id.* § 403-1(i)(2)(A), (b). In particular,
the DNI is responsible for the establishment of uniform
standards and procedures for ==granting access to Sensitive==

Compartmented Information to any officer or employee of any
agency or department of the United States and for ensuring
consistent implementation of those standards throughout
such departments and agencies. *Id.* § 403-1(j)(1),(2).

8. By virtue of my position as the DNI, and unless
otherwise directed by the President, I have access to all
intelligence related to national security that is collected
by any department, agency, or other entity of the United
States. Pursuant to Executive Order 12958, as amended,[1] the
President has authorized me to exercise original TOP SECRET
classification authority. After personal consideration of
the matter, I have determined that the classified *ex parte*,
*in camera* declaration which accompanies this assertion of
the state secrets privilege and the statutory privilege to
protect intelligence sources and methods is properly
classified under § 1.3 of E.O. 12958, because the
unauthorized public disclosure of information contained in
that declaration reasonably could be expected to cause
serious, and in some cases exceptionally grave damage to
the foreign policy and national security of the United
States.

---

[1] Executive Order 12958 was amended by Executive Order 13292. *See* Exec.
Order No. 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003). All citations to
Exec. Order No. 12958 are to the Order as amended by Exec. Order No.
13292. *See* Exec. Order No. 12,958, 60 Fed. Reg. 19825 (1995),
*reprinted as amended in* 50 U.S.C.A. § 435 note at 180 (West Supp.
2006).

## II.   ASSERTION OF THE STATE SECRETS
##       AND STATUTORY PRIVILEGES

9.   After careful and actual personal consideration of
the matter, I have determined that the unauthorized
disclosure of certain information that may be implicated by
the parties' claims in this matter, as set forth here and
described in more detail in the classified *ex parte, in
camera* declaration which accompanies this declaration,
reasonably could be expected to cause serious, and in some
cases exceptionally grave damage to the national security
of the United States, and thus must be protected from
disclosure and excluded from this case.   Therefore, I
formally invoke and assert the ==state secrets privilege to
prevent the disclosure of that information.==

10.   Through this declaration, I also invoke and
assert a statutory privilege held by the DNI under the
National Security Act, as amended, to ==protect the
intelligence sources and methods implicated by this case.==
*See*, 50 U.S.C. § 403-1(i)(1).   My assertion of this
statutory privilege for ==intelligence sources and methods is
coextensive with my state secrets privilege assertion==.

11.   With my assertion of the state secrets privilege
and the statutory privilege to protect intelligence sources
and methods, I respectfully ask the Court to prevent any

7

party from testifying, eliciting testimony, producing, disclosing, entering into evidence or making any other use in discovery, at trial, or in any other way in connection with this case, information concerning: (a) the existence or non-existence of, any actual or proposed relationship, agreement, connection, contract, transaction, communication, or meeting of any kind between any entity in the United States Intelligence Community, or any current or former official, employee, or representative thereof, and any individuals or entities associated with this lawsuit, on any current or former officer or employee thereof; and (b) any actual or proposed interest in, application, or use by any entity in the United States Intelligence Agency, or any current or former official, employee, or representative thereof, of any technology, software, or source code owned or claimed by any individuals or entities associated with this lawsuit.

12.   I have determined that any unauthorized disclosure of the information described in Paragraph 11 reasonably could be expected to cause serious, and in some case exceptionally grave damage to national security since the United States can neither confirm nor deny such information without compromising the effectiveness of intelligence sources and methods.  Public disclosure of

8

SEP. 14. 2006 10:40 NO. 3220 P. 194
Case 3:06-cv-00056-MMD-CSD Document 1216-2 Filed 08/20/22 Page 104 of 194
Case 3:06-cv-00056-PMP-VPC Document 63-2 Filed 09/25/06 Page 10 of 11

information that confirms the use of particular
intelligence sources and methods compromises the
effectiveness of those sources and methods by alerting
likely targets to their use, while public denial of the use
of particular intelligence sources and methods reveals to
adversaries that some practices are secure. Any truthful
response to confirm or deny allegations related to
intelligence sources or methods informs hostile foreign
intelligence agencies about the manner in which the United
States collects intelligence information, and could result
in a loss of valuable intelligence when our adversaries are
able to take countermeasures. Similarly, if the United
States government was required to admit or deny allegations
made in litigation concerning its classified contracting
process, then classified contract relationships could be
exposed, which would cause harm to the national security.
The precise nature of the harm that would ensue from the
disclosure of the information protected by the state
secrets privilege and statutory privilege to protect
intelligence sources and methods is set forth in detail in
the *in camera, ex parte* declaration.

**CONCLUSION**

13.  I respectfully request that the Court grant the
Department of Defense's motion for a protective order.


I hereby declare under penalty of perjury that the
foregoing is true and correct.

Executed this *19*th day of September 2006.


JOHN D. NEGROPONTE
DIRECTOR OF NATIONAL INTELLIGENCE

EXHIBIT "9"

**From:**     Ncoder <dennis@ncoder.net>
**Sent:**     Wednesday, June 4, 2008 8:00 PM
**To:**       'Deborah A. Klar'
**Subject:**  RE: Meeting

I will attend.

-----Original Message-----
From: Deborah A. Klar [mailto:dklar@linerlaw.com]
Sent: Wednesday, June 04, 2008 4:12 PM
To: Wells, Carlotta (CIV)
Subject: RE: Meeting

Counsel: If I did not acknowledge previously in writing, this email will confirm that Mr. Montgomery
will attend the meetings in D.C. on June 6,
2008.  Best regards, D.A.K.

-----Original Message-----
From: Wells, Carlotta (CIV) [mailto:Carlotta.Wells@usdoj.gov]
Sent: Tuesday, June 03, 2008 12:01 PM
To: Deborah A. Klar; Tuneen E. Chisolm
Cc: Gomez, Raphael (CIV)
Subject: Meeting

Deborah--

As I stated in my voice mail message, we are confirming that Mr.
Montgomery will meet with security personnel on Friday, June 6.  The meeting will commence at 10
am EDT at 20 Massachusetts Avenue, NW, Washington, DC.  Please acknowledge that Mr.
Montgomery will attend the meeting as soon as possible.

Thanks.
Carlie Wells
Senior Trial Counsel
Civil Division/Federal Programs Branch
P.O. Box 883 (zip 20044)
20 Massachusetts Ave, NW  Room 7150
Washington, DC  20530
(202) 514-4522
(202) 616-8470 (fax)

**From:**        Ncoder <dennis@ncoder.net>
**Sent:**        Friday, June 6, 2008 1:24 AM
**To:**          'Christian Cordero'
**Subject:**     Leaving for DC

I will be in DC at 7am EST.  I will email you when I can.  Don't try to call.  I am not allowed to carry phone into the building.

Night

**dennismontgomery45@gmail.com**

| | |
|---|---|
| **From:** | Ncoder <dennis@ncoder.net> |
| **Sent:** | Tuesday, June 3, 2008 5:46 PM |
| **To:** | 'Deborah A. Klar' |
| **Subject:** | RE: Meeting with Gov't |

You have no credibility with the court!  Like they would believe you?

---

**From:** Deborah A. Klar [mailto:dklar@linerlaw.com]
**Sent:** Tuesday, June 03, 2008 1:39 PM
**To:** Ncoder
**Cc:** Ellyn S. Garofalo; Peter Bransten; Mark H. Gunderson
**Subject:** Meeting with Gov't

**Dennis, The meeting has been confirmed for June 6.  I spoke with Saul about him accompanying you.  But, he did not think that was wise.  We think it wise that you have counsel present.  Although government counsel will not be in the room, they will be outside.
For the same reason we insisted that government counsel not be present in the room, we think it best for you to have counsel present outside the room.  Gov't counsel has been directed to report to the Court re the meeting.  If your counsel is not present, the gov't lawyers will be free to put their spin on what happened before Cooke.  We will not be in a position to challenge any negative assertions they may feel free to make, knowing that your counsel was not present and cannot contradict what they say.**

**Please get back to me today if possible.  Best regards, D.A.K.**

**Deborah A. Klar**
**LINER YANKELEVITZ SUNSHINE & REGENSTREIF LLP**
1100 Glendon Avenue | 14th Floor
Los Angeles, CA 90024.3503
main: 310.500.3500
dir: 310.500.3614
fax: 310.500.3501
dklar@linerlaw.com
www.linerlaw.com

Notice of Privilege/Confidentiality Privileged and Confidential information may be contained in this message. If you are not the addressee indicated in this message (or Responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email. Please advise immediately if you or your employer does not consent to Internet email for messages of this kind. Opinions, conclusions and other information in this message that do not relate to the official business of my firm shall be understood as neither given nor endorsed by it.

IRS Circular 230 Disclosure: To ensure compliance with Treasury Department Regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication was not intended or written to be used, and cannot be

used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matter addressed herein.

# EXHIBIT "10"

1  Mark H. Gunderson, Esq. (SBN: 2134)
   Catherine A. Reichenberg, Esq. (SBN: 10362)
2  GUNDERSON LAW FIRM
   5345 Kietzke Lane, Suite 200
3  Reno, Nevada 89511
   Telephone: (775) 829-1222
4  Facsimile: (775) 829-1226

5  Randall J. Sunshine, Esq. (SBN: 137363)
   Ellyn S. Garofalo, Esq. (SBN: 158795)
6  LINER YANKELEVITZ
   SUNSHINE & REGENSTREIF LLP
7  1100 Glendon Avenue, 14th Floor
   Los Angeles, California 90024-3503
8  Telephone: (310) 500-3500
   Facsimile: (310) 500-3501
9  ADMITTED PRO HAC VICE

10 Attorneys for Plaintiffs
   DENNIS MONTGOMERY, and the MONTGOMERY
11 FAMILY TRUST

12                    **UNITED STATES DISTRICT COURT**

13                         **DISTRICT OF NEVADA**

14

15 DENNIS MONTGOMERY and the          )  Case No. 3:06-CV-00056-PMP-VPC
   MONTGOMERY FAMILY TRUST,           )  BASE FILE
16                                    )
          Plaintiffs,                 )  (Consolidated with Case No. 3:06-CV-
17                                    )  00145-PMP-VPC)
       vs.                            )
18                                    )  **[PROPOSED] STIPULATION AND**
   ETREPPID TECHNOLOGIES, LLC, WARREN )  **DISMISSAL WITH PREJUDICE**
19 TREPP, and the UNITED STATES       )
   DEPARTMENT OF DEFENSE,             )
20                                    )
          Defendants.                 )
21                                    )
                                      )
22 ─────────────────────────────     )
                                      )
   AND RELATED CASES.                 )
23 ─────────────────────────────     )

24

25

26

27

28

   0039641/001/407693v01

WHEREAS Dennis Montgomery, the Montgomery Family Trust, eTreppid Technologies, LLC, Warren Trepp, Edra Blixseth and Opspring LLC (collectively, the "Parties") are parties to a dispute arising from the ownership of certain technology described in the Complaints and Counterclaims;

WHEREAS Plaintiffs Dennis Montgomery and the Montgomery Family Trust (collectively, the "Montgomery Parties") have asserted claims against Defendants eTreppid Technologies, LLC and Warren Trepp (collectively, the "eTreppid Parties") in <u>Montgomery, et al. v. eTreppid Technologies, LLC, et al.</u>, Case No. 3:06 CV-00056-BES-VPC (Base File) and Case No. 3:06-CV-00145-PMP-VPC (the "Lawsuit");

WHEREAS Defendant and Counter-counterclaimant eTreppid Technologies, LLC ("eTreppid") has asserted counter-claims against the Montgomery Parties, Edra Blixseth and Opspring, LLC;

WHEREAS the Parties desire to fully resolve and settle all claims and counter-claims asserted by and against the Parties to the Lawsuit;

WHEREAS the Parties have agreed to a settlement of the claims and counter-claims asserted by and against the Parties in the Lawsuit (the "Settlement Agreement");

NOW, THEREFORE, the Parties hereby agree and stipulate as follows:

1. The Montgomery Parties shall dismiss with prejudice all claims asserted in their First Amended Complaint and Counterclaim against the eTreppid Parties in the Lawsuit.

2. eTreppid Technologies, LLC shall dismiss with prejudice all Complaints and Counter-claims asserted against the Montgomery Parties, Edra Blixseth and Opspring, LLC in the Lawsuit.

3. Notwithstanding the above-referenced dismissals with prejudice, the Court shall retain jurisdiction over the following: (1) the eTreppid Parties' claims against Atigeo LLC and Michael Sandoval as third party defendants; (2) issues relating to Michael Flynn's ("Mr. Flynn") attorney's fees (Docket Nos. 502 and 584); (3) Mr. Flynn's motion to establish Rule 3.3 procedures pursuant to the Nevada Rules of Professional Conduct (Docket No. 540); (4) Mr. Flynn's motion for sanctions (Docket No. 545); (5) compliance with the United States Protective Orders (Docket

0039641/001/407693v01

1    Nos. 252 and 253); and (6) enforcement of the confidentiality and mutual non-disparagement

2    provision of the Parties' Settlement Agreement.

3          4.       The terms of the Parties' Settlement Agreement shall remain confidential.

4

5    Dated:  September 26, 2008          LINER YANKELEVITZ
                                         SUNSHINE & REGENSTREIF LLP
6

7                                        By:   /s/ Ellyn S. Garofalo
8                                              Ellyn S. Garofalo
                                               Attorneys for DENNIS MONTGOMERY,
9                                              the MONTGOMERY FAMILY TRUST,
                                               EDRA BLIXETH, AND OPSPRING LLC
10

11   Dated:  September 26, 2008          HOLLAND & HART LLP

12

13                                       By:   /s/ J. Stephen Peek
14                                             J. Stephen Peek
                                               Attorneys for ETREPPID TECHNOLOGIES,
15                                             LLC and WARREN TREPP

16

17

18

19

20

21

22

23

24

25

26

27

28

                            3       Case No.  3:06-CV-00056-PMP-VPC     BASE FILE

1

## CERTIFICATE OF SERVICE

2

Pursuant to NRCP 5(b), I certify that I am an employee of the Law Offices Of Liner Yankelevitz
Sunshine & Regenstreif LLP, and that on September 26, 2008, I caused to be served the within
document described as **[PROPOSED] STIPULATION AND DISMISSAL WITH PREJUDICE**
on the interested parties in this action as stated below:

3

4

| | |
|---|---|
| J. Stephen Peek, Esq.<br>Jerry M. Snyder, Esq.<br>Adam G. Lang, Esq.<br>Shane M. Biornstad, Esq.<br>Holland & Hart LLP<br>5441 Kietzke Lane, Second Floor<br>Reno, Nevada 89511<br>(775) 327-3000; 786-6179 - FAX<br>speek@hollandhard.com,<br>jsnyder@hollandhartcom,<br>alang@hollandhart.com,<br>sbiornstad@hollandhart.com<br>Attorneys for eTreppid and Warren Trepp | Carlotta P. Wells, Sr. Trial Counsel<br>U.S. Dept. of Justice<br>Fed.Programs Branch<br>Civil Division, Room 7150<br>20 Massachusetts Avenue, NW<br>Post Office Box 883<br>Washington, D.C. 20044<br>(202) 514-4522; 616-8470 - FAX<br>E-mail: Carlotta.wells@usdoj.gov<br>Attorneys for Department of Defense |
| Reid H. Weingarten, Esq.<br>Brian M. Heberlig, Esq.<br>Robert A. Ayers, Esq,<br>Steptoe & Johnson, LLP<br>1330 Connecticut Avenue, N.W.<br>Washington, D.C. 20036-1795<br>(202) 429-3000; (202) 429-3902 - FAX<br>rweingarten@steptoe.com;<br>bheberlig@steptoe.com; rayers@steptoe.com<br>Attorneys for eTreppid and Warren Trepp | Raphael O. Gomez, Esq., Sr. Trial Counsel<br>U.S. Dept. of Justice, Fed. Programs Branch<br>Civil Division, Room 6144<br>20 Massachusetts Avenue, NW<br>Post Office Box 883<br>Washington, D.C. 20044<br>(202) 514-1318; 616-8470 - FAX<br>E-mail: raphael.gomez@usdoj.gov<br>Attorneys for Department of Defense |
| Greg Addington, AUSA<br>U.S. DEPARTMENT OF JUSTICE<br>100 W. Liberty Street. Suite 600<br>Reno, Nevada 89501<br>E-mail: Greg.addington@usdoj.gov<br>(775) 784-5181 - FAX<br>Attorneys for Department of Defense | Bridget Robb Peck, Esq.<br>Lewis and Roca LLP<br>50 West Liberty Street, Suite 410<br>Reno, Nevada 89501<br>Tel: (775) 823-2900; Fax: (775) 823-2929<br>bpeck@lrlaw.com<br>Attorneys for Atigeo LLC & Michael Sandoval |
| Roland Tellis, Esq.<br>Marshall B. Grossman, Esq.<br>Heather L. Ristau, Esq.<br>Bingham McCutchen LLP<br>The Water Garden<br>1620 26th Street, Fourth Floor, North Tower<br>Santa Monica, CA 90404-4060<br>Fax: (310) 907-2143<br>E-mail: roland.tellis@bingham.com;<br>marshall.grossman@bingham.com;<br>heather.ristau@bingham.com<br>Attorneys for Michael Sandoval | Robert E. Rohde, Esq.<br>Gregory Schwartz, Esq.<br>Rohde & Van Kampen<br>1001 Fourth Avenue, Suite 4050<br>Seattle, Washington 98154<br>Fax: (206) 405-2825<br>E-mail: brohde@rohdelaw.com,<br>gschwartz@rohdelaw.com<br>Attorneys for Atigeo LLC |

27

28

☒ **[ELECTRONIC]** By filing the document(s) electronically with the U.S. District Court and
therefore the court's computer system has electronically delivered a copy of the foregoing
document(s) to the persons listed above at their respective email address.

0039641/001/ 407693v01

1    I declare under penalty of perjury under the laws of the State of California and the United

2    States of America that the foregoing is true and correct.

3    Executed on September 26, 2008, at Los Angeles, California.

4    _____          _____
     Ellyn S. Garofalo                           /s/ Ellyn S. Garofalo

5          (Type or print name)                              (Signature)

# EXHIBIT "11"

**From:** Addington, Greg (USANV) <Greg.Addington@usdoj.gov>
**Sent:** Tuesday, December 1, 2020 3:58 PM
**To:** John <john@lawyerinmontana.com>
**Subject:** RE: Letter dated October 9 re Dennis Montgomery

I will enquire regarding the status of the review initiated last month.

**GREG ADDINGTON**
Assistant United States Attorney

---

**From:** John <john@lawyerinmontana.com>
**Sent:** Tuesday, December 1, 2020 2:48 PM
**To:** Addington, Greg (USANV) <GAddington@usa.doj.gov>
**Subject:** RE: Letter dated October 9 re Dennis Montgomery

Mr. Addington, my client has been patient for many years now. If the government wants to resolve things with my client, it best do so asap. John Doubek

---

**From:** Addington, Greg (USANV) <Greg.Addington@usdoj.gov>
**Sent:** Monday, October 26, 2020 11:12 AM
**To:** John <john@lawyerinmontana.com>
**Subject:** RE: Letter dated October 9 re Dennis Montgomery

Mr. Doubek:

Thank you for your patience in this matter. Your October 9 letter has been referred to me for response. Your letter references a proposed "Bivens" complaint you intend to file on behalf of Mr. Montgomery. You also reference and provide a copy of the protective order entered by the U.S. District Court in 2007 in litigation involving Mr. Montgomery. As you know, the protective order describes categories of information and materials which cannot be disclosed and which cannot be the subject of discovery or evidentiary presentation, based on the US invocation of its state secrets privilege.

In your letter, you state your view that the protective order "clearly prevents Dennis Montgomery from filing a Bivens complaint and possibly other complaints against the Government." You request this office's views as to "how you want us to proceed."

It is our view the protective order remains in place to preclude disclosure of the categories of information and related materials described in the order, based on the circumstances giving rise to the protective order – including the state secrets privilege invoked by the United States. As you know, the protective order includes a mechanism for US review of materials if there is a concern about specific information or materials which might arguably be encompassed by the order.

We cannot assess what, if anything, in the proposed Bivens complaint might be implicated by the terms of the protective order because we do not have a copy of the proposed complaint. If you will provide me with a draft copy of the Bivens complaint (and any corresponding materials you would anticipate disclosing as part of the filing of the complaint), as contemplated by the terms of the protective order, I will obtain the review of the complaint/materials consistent with the protective order and advise you accordingly. I am supposing that review would be completed within 30 days – though that expectation is tempered by the fact that I do not know if your proposed complaint is 5 pages long or 500 pages long so I cannot now commit to a firm time period for the review.

If you have any questions, do not hesitate to contact me.

**GREG ADDINGTON**
Assistant United States Attorney
Bruce R. Thompson U.S. Courthouse & Fed. Bldg.
400 South Virginia Street, Suite 900
Reno, NV 89501
(775) 334-3347 - direct
(775) 784-5438 - office
(775) 784-5181 - facsimile
Greg.Addington@usdoj.gov

---

**From:** John <john@lawyerinmontana.com>
**Sent:** Tuesday, October 20, 2020 3:16 PM
**To:** Addington, Greg (USANV) <GAddington@usa.doj.gov>
**Subject:** RE: Letter dated October 9 re Dennis Montgomery

Mr. Addington: My client would like to get this matter resolved sooner than later. Because Of Mr. Negroponte's SS directive, my client has been stripped of his rights to do a lot of things for too many years now. Please get back to me asap. John D

---

**From:** Addington, Greg (USANV) <Greg.Addington@usdoj.gov>
**Sent:** Tuesday, October 20, 2020 4:12 PM
**To:** John <john@lawyerinmontana.com>
**Subject:** Letter dated October 9 re Dennis Montgomery

Mr. Doubek:

Your above-referenced October 9 letter was received. The matters described therein are being reviewed for appropriate response.

**GREG ADDINGTON**
Assistant United States Attorney
Bruce R. Thompson U.S. Courthouse & Fed. Bldg.
400 South Virginia Street, Suite 900
Reno, NV 89501
(775) 334-3347 - direct
(775) 784-5438 - office
(775) 784-5181 - facsimile
Greg.Addington@usdoj.gov

# EXHIBIT "12"

**From:** Eisenberg, Joseph
**To:** Terry, Billie
**Cc:** Dennis
**Subject:** FW: Review of former counsel files at Liner firm by United States
**Date:** Monday, May 24, 2010 1:08:10 PM
**Attachments:** Liner Document Inventory.pdf
Liner Hard Drive Inventory.pdf
Liner CD Inventory.pdf

-----Original Message-----
From: Gomez, Raphael (CIV) [mailto:Raphael.Gomez@usdoj.gov]
Sent: Monday, May 24, 2010 12:57 PM
To: Ellyn S. Garofalo; Kathleen Goldberg; Eisenberg, Joseph; Michael
Flynn
Cc: Wells, Carlotta (CIV); Raya, Sharon M. (CIV)
Subject: Review of former counsel files at Liner firm by United States

Counsel,

As we orally have informed you, the United States has conducted an
initial review of the 210 boxes of former counsel files at the Liner
firm.  All 210 boxes of materials, minus the documents and media pulled
for further security review, require no further review by the United
States.

Please find attached an inventory of the hard copies, hard drives, and
CD's/DVD's that have been pulled from boxes 101 through 210 (please note
that the first 100 boxes were discovery produced by eTreppid to
Montgomery in the eTreppid case and were released by the United States
in late January 2010).

We will forward a projected date for completion of the review of the
pulled hard copies, hard drives and CD's/DVD's.

If you have any questions, please email or call.

Raphael Gomez
Carlotta Wells

202 514-1318
202 514-4522

**LINER FILES: CD INVENTORY**

| CD No. | ADDITIONAL INFO |
|---|---|
| **BOX 101** | |
| CD - 000001 | |
| CD - 000002 | |
| CD - 000003 | |
| CD - 000004 | DVD |
| CD - 000005 | |
| CD - 000006 | |
| CD - 000007 | |
| CD - 000008 | |
| CD - 000009 | |
| CD - 000010 | |
| CD - 000011 | DVD |
| CD - 000012 | DVD |
| CD - 000013 | |
| CD - 000014 | |
| CD - 000015 | DVD |
| CD - 000016 | DVD |
| CD - 000017 | DVD |
| CD - 000018 *Microsoft XP | |
| CD - 000019 *Dancing w/ the stars | DVD |
| CD - 000020 *Dancing w/ the stars | DVD |
| CD - 000021 | |
| CD - 000022 | |
| CD - 000023 | DVD |
| CD - 000024 | DVD |
| CD - 000025 | DVD |
| CD - 000026 | DVD |
| CD - 000027 | DVD |
| CD - 000028 | DVD |
| CD - 000029 | DVD |
| CD - 000030 | DVD |
| CD - 000031 | DVD |
| CD - 000032 | |
| CD - 000033 | |
| CD - 000034 | DVD |
| CD - 000035 | |
| CD - 000036 | |
| CD - 000037 | |
| CD - 000038 | DVD |
| CD - 000039 | DVD |
| CD - 000040 | |
| CD - 000041 | |
| CD - 000042 | DVD |
| CD - 000043 | DVD |
| CD - 000044 | DVD |
| CD - 000045 | |

**LINER FILES: CD INVENTORY**

| | |
|---|---|
| CD - 000046 | |
| CD - 000047 | |
| CD - 000048 | |
| CD - 000049 | |
| CD - 000050 | |
| CD - 000051 | |
| CD - 000052 | |
| CD - 000053 | DVD |
| CD - 000054 | |
| CD - 000055 | DVD |
| CD - 000056 | DVD |
| CD - 000057 | |
| CD - 000058 | |
| CD - 000059 | DVD |
| CD - 000060 | DVD |
| CD - 000061 | DVD |
| CD - 000062 | |
| CD - 000063 | DVD |
| CD - 000064 | DVD |
| CD - 000065 | DVD |
| CD - 000066 | DVD |
| CD - 000067 | DVD |
| CD - 000068 | |
| CD - 000069 | |
| CD - 000070 | DVD |
| CD - 000071 | DVD |
| CD - 000072 | DVD |
| CD - 000073 | DVD |
| CD - 000074 | |
| CD - 000075 | |
| CD - 000076 | DVD |
| CD - 000077 | DVD |
| CD - 000078 | DVD |
| CD - 000079 | DVD |
| CD - 000080 | |
| CD - 000081 | |
| CD - 000082 | |
| CD - 000083 | |
| CD - 000084 | |
| CD - 000085 | DVD |
| CD - 000086 | DVD |
| CD - 000087 | DVD |
| CD - 000088 | DVD |
| CD - 000089 | |
| CD - 000090 | |
| CD - 000091 | DVD |
| CD - 000092 | |

**LINER FILES: CD INVENTORY**

| | |
|---|---|
| CD - 000093 | DVD |
| CD - 000094 | DVD |
| CD - 000095 | DVD |
| CD - 000096 | DVD |
| CD - 000097 | DVD |
| CD - 000098 | |
| CD - 000099 | |
| CD - 000100 | DVD |
| CD - 000101 | DVD |
| CD - 000102 | |
| CD - 000103 | DVD |
| CD - 000104 | DVD |
| CD - 000105 | DVD |
| CD - 000106 | DVD |
| CD - 000107 | DVD |
| CD - 000108 | DVD |
| CD - 000109 | DVD |
| CD - 000110 | DVD |
| CD - 000111 | DVD |
| CD - 000112 | DVD |
| CD - 000113 | DVD |
| CD - 000114 | DVD |
| CD - 000115 | |
| CD - 000116 | DVD |
| CD - 000117 | DVD |
| CD - 000118 | |
| CD - 000119 | |
| CD - 000120 | DVD |
| CD - 000121 | DVD |
| CD - 000122 | |
| CD - 000123 | |
| CD - 000124 | |
| CD - 000125 | |
| CD - 000126 | |
| CD - 000127 | |
| CD - 000128 | |
| CD - 000129 | |
| CD - 000130 | |
| CD - 000131 | |
| CD - 000132 | |
| CD - 000133 | DVD |
| CD - 000134 | |
| CD - 000135 | |
| CD - 000136 | |
| CD - 000137 | |
| CD - 000138 | |
| CD - 000139 | |

**LINER FILES: CD INVENTORY**

| | |
|---|---|
| CD - 000140 | |
| CD - 000141 | |
| CD - 000142 | |
| CD - 000143 | |
| CD - 000144 | |
| CD - 000145 | |
| CD - 000146 | |
| CD - 000147 | |
| CD - 000148 | |
| CD - 000149 | |
| CD - 000150 | |
| CD - 000151 | |
| CD - 000152 | |
| CD - 000153 | |
| CD - 000154 | |
| CD - 000155 | |
| CD - 000156 | |
| CD - 000157 | |
| CD - 000158 | |
| CD - 000159 | |
| CD - 000160 | |
| CD - 000161 | |
| CD - 000162 | |
| CD - 000163 | |
| CD - 000164 | |
| CD - 000165 | |
| CD - 000166 | |
| CD - 000167 | |
| CD - 000168 | |
| CD - 000169 | |
| CD - 000170 | |
| CD - 000171 | |
| CD - 000172 | |
| CD - 000173 | |
| CD - 000174 | |
| CD - 000175 | |
| CD - 000176 | |
| CD - 000177 | |
| CD - 000178 | |
| CD - 000179 | |
| CD - 000180 | |
| CD - 000181 | |
| CD - 000182 | |
| CD - 000183 | |
| CD - 000184 | |
| CD - 000185 | |
| CD - 000186 | |

LINER FILES: CD INVENTORY

| | |
|---|---|
| CD - 000187 | |
| CD - 000188 | |
| CD - 000189 | |
| CD - 000190 | |
| CD - 000191 | |
| CD - 000192 | |
| CD - 000193 | |
| CD - 000194 | |
| CD - 000195 | |
| CD - 000196 | |
| CD - 000197 | |
| CD - 000198 | |
| CD - 000199 | DVD |
| CD - 000200 | DVD |
| CD - 000201 | DVD |
| **BOX - 105** | |
| CD - 000223 *Fire Connect | |
| CD - 000224 | |
| CD - 000225 | |
| CD - 000226 | |
| CD - 000227 *Dark City (Movie) | DVD |
| CD - 000228 *School of Rock (Movie) | DVD |
| CD - 000229  *Lost in Trans (Movie) | DVD |
| CD - 000230 *After the Sunset (Movie) | DVD |
| CD - 000231 | DVD |
| CD - 000232 | DVD |
| CD - 000233 | DVD |
| CD - 000234 | DVD |
| CD - 000235 | DVD |
| CD - 000236 *Windows XP | |
| CD - 000237 | DVD |
| CD - 000238 | DVD |
| CD - 000239 *Sync master | |
| CD - 000240 * Windows XP | |
| CD - 000241 | DVD |
| CD - 000242 *Video Capture Software | |
| CD - 000243 *Windows XP | |
| CD - 000244 | DVD |
| CD - 000245 *Video Capture Software | |
| CD - 000246 *Windows XP | |
| CD - 000247 | DVD |
| CD - 000248 | DVD |
| CD - 000249 | DVD |
| CD - 000250 | DVD |
| CD - 000251 | |
| CD - 000252 | DVD |
| CD - 000253 | DVD |

| | |
|---|---|
| CD - 000254 | |
| CD - 000255 | |
| CD - 000256 | DVD |
| CD - 000257 | DVD |
| CD - 000258 | DVD |
| CD - 000259 | |
| CD - 000260 | DVD |
| CD - 000261 | DVD |
| CD - 000262 | DVD |
| CD - 000263 | DVD |
| CD - 000264 | DVD |
| CD - 000265 | |
| CD - 000266 | DVD |
| CD - 000267 | |
| CD - 000268 | DVD |
| CD - 000269 | DVD |
| CD - 000270 | DVD |
| CD - 000271 | DVD |
| CD - 000272 | |
| CD - 000273 | |
| CD - 000274 | DVD |
| CD - 000275 | DVD |
| CD - 000276 | |
| CD - 000277 | |
| **BOX 106** | |
| CD - 000219 | |
| **BOX 114** | |
| CD - 000278 | |
| CD - 000279 | DVD |
| CD - 000280 | |
| CD - 000281 | DVD |
| CD - 000282 | |
| CD - 000283* (IBM Commercial) | |
| CD - 000284 | |
| CD - 000285 | |
| CD - 000286 | |
| CD - 000287 | |
| CD - 000288 | DVD |
| CD - 000289 | |
| CD - 000290 | |
| CD - 000291 | |
| CD - 000292 | |
| CD - 000293 | |
| CD - 000294 | |
| CD - 000295 | |
| CD - 000296 | |
| CD - 000297* (Adobe) | |

| | |
|---|---|
| CD - 000298 | |
| CD - 000299 | |
| CD - 000300 | |
| CD - 000301 | |
| CD - 000302 | |
| CD - 000303 | |
| CD - 000304 | |
| CD - 000305 | DVD |
| CD - 000306 | |
| CD - 000307 | |
| CD - 000308 | |
| CD - 000309* (Music) | |
| CD - 000310* (Win 95) | |
| CD - 000311 | |
| CD - 000312 | |
| CD - 000313 | |
| CD - 000314 | |
| CD - 000315 | DVD |
| CD - 000316 | |
| CD - 000317* (WIN 95) | |
| CD - 000318 | DVD |
| CD - 000319 | |
| CD - 000320 | |
| CD - 000321 | |
| CD - 000322 | |
| CD - 000323 | |
| CD - 000324* (Old Windows Upd.) | |
| CD - 000325 | |
| CD - 000326 | |
| CD - 000327 | |
| CD - 000328 | |
| CD - 000329* (Elvis pt. 2) | |
| CD - 000330 | |
| CD - 000331 | |
| CD - 000332 | |
| CD - 000333 | |
| CD - 000334 | |
| CD - 000335 | |
| CD - 000336 | |
| CD - 000337 | |
| CD - 000338 | |
| CD - 000339 | |
| CD - 000340 | |
| CD - 000341 | |
| CD - 000342 | |
| CD - 000343 | |
| CD - 000344 | |

**LINER FILES: CD INVENTORY**

| | |
|---|---|
| CD - 000345 | |
| CD - 000346 | |
| CD - 000347 | |
| CD - 000348 | |
| CD - 000349 | |
| CD - 000350 | |
| CD - 000351 | |
| CD - 000352 | |
| CD - 000353 | |
| CD - 000354 | |
| CD - 000355 | |
| CD - 000356 | |
| CD - 000357 | |
| CD - 000358 | DVD |
| CD - 000359 | |
| CD - 000360** (Unreadable 360-370) | DVD |
| CD - 000361 | |
| CD - 000362 | |
| CD - 000363 | |
| CD - 000364 | |
| CD - 000365 | |
| CD - 000366 | |
| CD - 000367 | DVD |
| CD - 000368 | |
| CD - 000369 | |
| CD - 000370** | |
| CD - 000371* (Dolby Test Files) | |
| CD - 000372 | |
| CD - 000373* (Kodak Frames) | |
| CD - 000374* (Partition Magic 8.02) | |
| CD - 000375 | |
| CD - 000376* (HP) | DVD |
| CD - 000377* (ADP) | |
| CD - 000378 | |
| CD - 000379 | DVD |
| CD - 000380 | |
| CD - 000381* (Win XP) | |
| CD - 000382 | |
| CD - 000383 | DVD |
| CD - 000384* (Mic Office 2003) | |
| CD - 000385* (Mic XP) | |
| CD - 000386* (Dancing w/ Stars) | DVD |
| CD - 000387* (Dancing w/ Stars) | DVD |
| CD - 000388 | DVD |
| CD - 000389 | |
| CD - 000390 | |
| CD - 000391 | DVD |

**LINER FILES: CD INVENTORY**

| | |
|---|---|
| CD - 000392 | DVD |
| CD - 000393 | DVD |
| CD - 000394 | |
| CD - 000395 | |
| CD - 000396* (Symantec) | |
| CD - 000397* (Mic XP) | |
| CD - 000398 | DVD |
| CD - 000399* (Mic Office 2003) | |
| CD - 000400* (Mic XP) | |
| CD - 000401* (Dancing w/ Stars) | DVD |
| CD - 000402* (Dancing w/ Stars) | DVD |
| CD - 000403 | DVD |
| CD - 000404 | |
| CD - 000405 | |
| CD - 000406 | DVD |
| CD - 000407 | DVD |
| CD - 000408 | DVD |
| CD - 000409 | |
| CD - 000410 | |
| CD - 000411* (Symantec) | |
| CD - 000412* (Microsoft XP) | |
| CD - 000413 | DVD |
| CD - 000414* (Mic Office 2003) | |
| CD - 000415* (Mic XP) | |
| CD - 000416* (Dancing w/ Stars) | DVD |
| CD - 000417* (Dancing w/ Stars) | DVD |
| CD - 000418 | DVD |
| CD - 000419 | |
| CD - 000420 | |
| CD - 000421 | DVD |
| CD - 000422 | DVD |
| CD - 000423 | DVD |
| CD - 000424 | |
| CD - 000425 | |
| CD - 000426*(Symantec) | |
| CD - 000427* (Mic XP) | |
| **BOX 117** | |
| CD - 000220 | |
| **BOX 131** | |
| CD - 000217 | |
| **BOX 145** | |
| CD - 000218 | |
| **BOX 165** | |
| CD - 000431 | |
| CD - 000432 | |
| **BOX 180** | |
| CD - 000221 | |

LINER FILES: CD INVENTORY

| BOX 181 | |
|---|---|
| CD - 000202 | |
| CD - 000203 | |
| CD - 000204 | |
| CD - 000205 | DVD |
| CD - 000206 | DVD |
| CD - 000207 | |
| CD - 000208 | DVD |
| CD - 000209 | |
| CD - 000210 | |
| CD - 000211 | |
| CD - 000212 | DVD |
| CD - 000213 | DVD |
| CD - 000214 | |
| CD - 000215 | |
| CD - 000216 | |
| CD - 000430 | DVD |
| BOX 188-1 | |
| CD - 000222 | |
| BOX 189 | |
| CD - 000428 | |
| BOX 190 | |
| CD - 000429 | |
| BOX 207 | |
| CD - 000433 | |
| CD - 000434 | |
| CD - 000435 | |

## LINER FILES: DOCUMENT INVENTORY

| Present | BOX | CONTENTS | DESCRIPTION | | RELEASED | PULL DETAILS |
|---|---|---|---|---|---|---|
| N/A | 1 | DISCOVERY | N/A | | Y | |
| N/A | 2 | DISCOVERY | N/A | | Y | |
| N/A | 3 | DISCOVERY | N/A | | Y | |
| N/A | 4 | DISCOVERY | N/A | | Y | |
| N/A | 5 | DISCOVERY | N/A | | Y | |
| N/A | 6 | DISCOVERY | N/A | | Y | |
| N/A | 7 | DISCOVERY | N/A | | Y | |
| N/A | 8 | DISCOVERY | N/A | | Y | |
| N/A | 9 | DISCOVERY | N/A | | Y | |
| N/A | 10 | DISCOVERY | N/A | | Y | |
| N/A | 11 | DISCOVERY | N/A | | Y | |
| N/A | 12 | DISCOVERY | N/A | | Y | |
| N/A | 13 | DISCOVERY | N/A | | Y | |
| N/A | 14 | DISCOVERY | N/A | | Y | |
| N/A | 15 | DISCOVERY | N/A | | Y | |
| N/A | 16 | DISCOVERY | N/A | | Y | |
| N/A | 17 | DISCOVERY | N/A | | Y | |
| N/A | 18 | DISCOVERY | N/A | | Y | |
| N/A | 19 | DISCOVERY | N/A | | Y | |
| N/A | 20 | DISCOVERY | N/A | | Y | |
| N/A | 21 | DISCOVERY | N/A | | Y | |
| N/A | 22 | DISCOVERY | N/A | | Y | |
| N/A | 23 | DISCOVERY | N/A | | Y | |
| N/A | 24 | DISCOVERY | N/A | | Y | |
| N/A | 25 | DISCOVERY | N/A | | Y | |
| N/A | 26 | DISCOVERY | N/A | | Y | |
| N/A | 27 | DISCOVERY | N/A | | Y | |
| N/A | 28 | DISCOVERY | N/A | | Y | |
| N/A | 29 | DISCOVERY | N/A | | Y | |
| N/A | 30 | DISCOVERY | N/A | | Y | |
| N/A | 31 | DISCOVERY | N/A | | Y | |
| N/A | 32 | DISCOVERY | N/A | | Y | |
| N/A | 33 | DISCOVERY | N/A | | Y | |

DOJ Security Office Boxes 1-3

DOCUMENT INVENTORY PAGE 1

**LINER FILES: DOCUMENT INVENTORY**

| N/A | | N/A | | Y | | |
|---|---|---|---|---|---|---|
| N/A | 34 DISCOVERY | N/A | | Y | | |
| N/A | 35 DISCOVERY | N/A | | Y | | |
| N/A | 36 DISCOVERY | N/A | | Y | | |
| N/A | 37 DISCOVERY | N/A | | Y | | |
| N/A | 38 DISCOVERY | N/A | | Y | | |
| N/A | 39 DISCOVERY | N/A | | Y | | |
| N/A | 40 DISCOVERY | N/A | | Y | | |
| N/A | 41 DISCOVERY | N/A | | Y | | |
| N/A | 42 DISCOVERY | N/A | | Y | | |
| N/A | 43 DISCOVERY | N/A | | Y | | |
| N/A | 44 DISCOVERY | N/A | | Y | | |
| N/A | 45 DISCOVERY | N/A | | Y | | |
| N/A | 46 DISCOVERY | N/A | | Y | | |
| N/A | 47 DISCOVERY | N/A | | Y | | |
| N/A | 48 DISCOVERY | N/A | | Y | | |
| N/A | 49 DISCOVERY | N/A | | Y | | |
| N/A | 50 DISCOVERY | N/A | | Y | | |
| N/A | 51 DISCOVERY | N/A | | Y | | |
| N/A | 52 DISCOVERY | N/A | | Y | | |
| N/A | 53 DISCOVERY | N/A | | Y | | |
| N/A | 54 DISCOVERY | N/A | | Y | | |
| N/A | 55 DISCOVERY | N/A | | Y | | |
| N/A | 56 DISCOVERY | N/A | | Y | | |
| N/A | 57 DISCOVERY | N/A | | Y | | |
| N/A | 58 DISCOVERY | N/A | | Y | | |
| N/A | 59 DISCOVERY | N/A | | Y | | |
| N/A | 60 DISCOVERY | N/A | | Y | | |
| N/A | 61 DISCOVERY | N/A | | Y | | |
| N/A | 62 DISCOVERY | N/A | | Y | | |
| N/A | 63 DISCOVERY | N/A | | Y | | |
| N/A | 64 DISCOVERY | N/A | | Y | | |
| N/A | 65 DISCOVERY | N/A | | Y | | |
| N/A | 66 DISCOVERY | N/A | | Y | | |
| N/A | 67 DISCOVERY | N/A | | Y | | |

# LINER FILES: DOCUMENT INVENTORY

| | | | | |
|---|---|---|---|---|
| N/A | 68 DISCOVERY | N/A | | Y |
| N/A | 69 DISCOVERY | N/A | | Y |
| N/A | 70 DISCOVERY | N/A | | Y |
| N/A | 71 DISCOVERY | N/A | | Y |
| N/A | 72 DISCOVERY | N/A | | Y |
| N/A | 73 DISCOVERY | N/A | | Y |
| N/A | 74 DISCOVERY | N/A | | Y |
| N/A | 75 DISCOVERY | N/A | | Y |
| N/A | 76 DISCOVERY | N/A | | Y |
| N/A | 77 DISCOVERY | N/A | | Y |
| N/A | 78 DISCOVERY | N/A | | Y |
| N/A | 79 DISCOVERY | N/A | | Y |
| N/A | 80 DISCOVERY | N/A | | Y |
| N/A | 81 DISCOVERY | N/A | | Y |
| N/A | 82 DISCOVERY | N/A | | Y |
| N/A | 83 DISCOVERY | N/A | | Y |
| N/A | 84 DISCOVERY | N/A | | Y |
| N/A | 85 DISCOVERY | N/A | | Y |
| N/A | 86 DISCOVERY | N/A | | Y |
| N/A | 87 DISCOVERY | N/A | | Y |
| N/A | 88 DISCOVERY | N/A | | Y |
| N/A | 89 DISCOVERY | N/A | | Y |
| N/A | 90 DISCOVERY | N/A | | Y |
| N/A | 91 DISCOVERY | N/A | | Y |
| N/A | 92 DISCOVERY | N/A | | Y |
| N/A | 93 DISCOVERY | N/A | | Y |
| N/A | 94 DISCOVERY | N/A | | Y |
| N/A | 95 DISCOVERY | N/A | | Y |
| N/A | 96 DISCOVERY | N/A | | Y |
| N/A | 97 DISCOVERY | N/A | | Y |
| N/A | 98 DISCOVERY | N/A | | Y |
| N/A | 99 DISCOVERY | N/A | | Y |
| N/A | 100 DISCOVERY | N/A | | |
| N/A | 101 OTHER | **1 Pull:**<br>**Pull 1:** CDs that appear to be discovery materials | | Y |

## LINER FILES: DOCUMENT INVENTORY

| | | | | |
|---|---|---|---|---|
| N/A | 102 | OTHER | N/A | Y |
| YES | 103 | OTHER | **4 Pulls:**<br>**Pull 1:** 6/19/06 Flynn Email **(001-005)**<br>**Pull 2:** 7/19/06 Flynn Email **(001-004)**<br>**Pull 3:** 8/14/06 Flynn Email **(001-014)**<br>**Pull 4:** 9/26/06 Mongtomery Email **(001-016)** | N |
| YES | 104 | OTHER | **1 Pull:**<br>**Pull 1:** 3/1/06 Flynn Ltr **(001-008)** | N |
| N/A | 105 | OTHER | Hard drives and CDs | N |
| N/A | 106 | OTHER | **1 Pull:**<br>**Pull 1:** CD | Y |
| YES | 107 | PLEADINGS | **6 Pulls:**<br>**Pull 1:** 3/11/06 Dec of Flynn **(001-004)**;<br>**Pull 2:** 3/11/06 Dec of Flynn **(001-004)**;<br>**Pull 3:** 4/3/06 Reply Memo **(001-029)**;<br>**Pull 4:** 4/21/08 Reply Memo **(001-035)**;<br>**Pull 5:** 3/11/06 Dec of Flynn **(001-006)**;<br>**Pull 6:** 4/3/06 Reply Memo **(001-029)** | Y |
| YES | 108 | PLEADINGS | **2 Pulls:**<br>**Pull 1:** Flynn Declaration **(001-007)**<br>**Pull 2:** 3/17/07 Email **(001-002)** | Y |
| YES | 109 | OTHER | **2 Pulls:**<br>**Pull 1:** 2/26/07 Email **(001)**;<br>**Pull 2:** 2/13/07 Email **(001)** | Y |
| N/A | 110 | OTHER | N/A | Y |
| N/A | 111 | OTHER | N/A | Y |
| N/A | 112 | OTHER | N/A | Y |
| YES | 113 | OTHER | **5 Pulls:**<br>**Pull 1:** 2/13/07 Email **(001-009)**;<br>**Pull 2:** 2/26/07 Email **(001-004)**;<br>**Pull 3:** 3/16/07 Email **(001-012)**;<br>**Pull 4:** 3/16/07 Email **(001-008)**;<br>**Pull 5:** 3/24/07 Email **(001-003)** | N |
| N/A | 114 | OTHER | CDs for review | N |
| N/A | 115 | PLEADINGS | N/A | Y |
| N/A | 116 | OTHER | Hard drives | N |

DOJ Security Office Boxes 1-3

DOCUMENT INVENTORY PAGE 4

# LINER FILES: DOCUMENT INVENTORY

| | | | |
|---|---|---|---|
| YES | 117 PLEADINGS | **4 Pulls:**<br>**Pull 1:** 3/11/06 Dec of Flynn; **(001-004)**<br>**Pull 2:** 4/3/06 Reply Mem **(001-029);**<br>**Pull 3:** CD pulled;<br>**Pull 4:** List of T. Pham file pulled **(001-014)** | Y |
| YES | 118 PLEADINGS | **1 Pull:**<br>**Pull 1:** 3/11/06 Dec of Flynn **(001-004)** | Y |
| YES | 119 PLEADINGS | **4 Pulls:**<br>**Pull 1:** 5/21/08Reply Memo **(001-035);**<br>**Pull 2:** 3/11/06 Dec of Flynn **(001-010);**<br>**Pull 3:** 4/3/06 Reply Memo **(001-029);** *<br>**Pull 4:** (001-004) 3/11/06 Dec of Flynn **(001-004)** | Y |
| YES | 120 OTHER | **3 Pulls:**<br>**Pull 1:** 9/26/06 Montgomery Email **(001)**<br>**Pull 2:** 9/26/06 Montgomery Email **(001)**<br>**Pull 3:** 9/26/06 Montgomery Email **(001)** | <u>Y</u> |
| N/A | 121 OTHER | N/A | Y |
| N/A | 122 OTHER | N/A | Y |
| N/A | 123 OTHER | N/A | Y |
| YES | 124 OTHER | **1 Pull:**<br>**Pull 1:** Montgomery Discovery (not Bates labeled by parties) **(001-120)** | |
| YES | 125 OTHER | **20 Pulls:**<br>**Pull 1:** 5/4/07 Flynn Ltr **(001-013);**<br>**Pull 2:** 5/5/07 Flynn Ltr **(001-013);**<br>**Pull 3:** 9/23/06 SF-95.doc **(001-013);**<br>**Pull 4:** 8/24/06 Interrogatories **(001-018);**<br>**Pull 5:** 3/1/06 Draft Rumsfield, et al. Ltr **(001-046);**<br>**Pull 6:** 6/3/07 Flynn Email **(001)**<br>**Pull 7:** 6/3/07 Flynn Email **(001-008)**<br>**Pull 8:** 6/6/07 Flynn Email **(001)**<br>**Pull 9:** 6/10/07 Flynn Email **(001)**<br>**Pull 10:** Exhibit Listing and Description **(001-002)**<br>**Pull 11:** 6/23/07 Flynn Email **(001-004)**<br>**Pull 12:** 6/23/07 Flynn Email **(001-003)**<br>**Pull 13:** 6/23/07 Flynn Email **(001-004)**<br>**Pull 14:** 6/23/07 Flynn Email **(001-002)**<br>**Pull 15:** 4/13/07 Flynn Ltr **(001-010)**<br>**Pull 16:** Draft Flynn Ltr **(001-015)**<br>Pull 17: 5/9/07 Flynn Email **(001-003)** | Pull 18: 5/9/07 Flynn Email **(001-003)**<br><mark>Pull 19: Rumsfeld Ltr **(001-008)**</mark><br><mark>Pull 20: 4/9/07 Flynn Email **(001-002)**</mark><br><br>N |

DOCUMENT INVENTORY PAGE 5

## LINER FILES: DOCUMENT INVENTORY

| | | | | |
|---|---|---|---|---|
| YES | 126 OTHER | **12 Pulls:**<br>**Pull 1:** 5/8/07 Mont Email **(001-002)**;<br>**Pull 2:** 3/1/06 Rumsfield Ltr **(001-007)**;<br>**Pull 3:** Etreppid legal spreadsheet **(001-033)**;<br>**Pull 4:** 6/10/07 Email **(001-003)**;<br>**Pull 5:** 6/10/07 Email **(001-002)**;<br>**Pull 6:** 6/10/07 Email **(001-002)**;<br>**Pull 7:** 6/10/07 Email **(001-002)**;<br>**Pull 8:** 6/10/07 Email **(001-003)**;<br>**Pull 9:** 6/6/07 Email **(001-002)**;<br>**Pull 10:** 6/4/07 Email **(001-003)**;<br>**Pull 11:** 6/3/07 Email **(001-017)**;<br>**Pull 12:** 6/11/07 Montgomery Declaration **(001-004)**;<br>**Pull 13:** 6/10/07 Email **(001-021)**;<br>**Pull 14:** 3/11/06 Declaration **(001-009)**;<br>**Pull 15:** Reply Memo Buckthorne **(001-037)**;<br>**Pull 16:** 4/18/06 Email **(001-004)**;<br>**Pull 17:** Montgomery Objection to DOD (06-cv-056 Dkt# 125) **(001-...)** | N | |
| N/A | 127 OTHER | Hard drives | N | |
| N/A | 128 OTHER | N/A | Y | |
| N/A | 129 OTHER | N/A | Y | |
| N/A | 130 OTHER | N/A | Y | |
| N/A | 131 OTHER | **1 Pull:**<br>**Pull 1:** CD | Y | |
| N/A | 132 OTHER | N/A | Y | |
| N/A | 133 OTHER | N/A | Y | |
| YES | 134 OTHER | **4 Pulls:**<br>**Pull 1:** 7/5/06 Email **(001-014)**;<br>**Pull 2:** 5/30/06 Email **(001-002)**;<br>**Pull 3:** Notes **(001-007)**;<br>**Pull 4:** 9/26/06 Flynn Email **(001-008)** | N | |
| YES | 135 PLEADINGS | **4 Pulls:**<br>**Pull 1:** Montgomery Declaration **(001-004)**<br>**Pull 2:** Response to DOD Motion **(001-202)**<br>**Pull 3:** Montgomery Declaration **(001-023)**<br>**Pull 4:** 10/30/06 Sealed Montgomery Decl. in Response to DOD Motion for Protective Order -Signed-**(001-023)** | | Pull 1:001-004<br>Pull 2: 001-202 |

# LINER FILES: DOCUMENT INVENTORY

| | | | | |
|---|---|---|---|---|
| YES | 136 OTHER | **4 Pulls:**<br>**Pull 1:** 7/5/06 Email **(001)**;<br>**Pull 2:** Contract Documents **(001-010)**;<br>**Pull 3:** Negroponte Questions **(001-005)**;<br>**Pull 4:** Montgomery Declaration **(001-022)** | Y | Pull 1: 001-022<br>Pull 2: |
| YES | 137 OTHER | **3 Pulls:**<br>**Pull 1:** 4/10/06 Park Email **(001-004)**;<br>**Pull 2:** 3/11/06 Flynn Declaration -Unsigned- **(001-004)**;<br>**Pull 3:** Reply Memo for Return of Property **(001-029)** | Y | Pull 2: 001-004<br>Pull 3: 001-029 |
| YES | 138 PLEADINGS | N/A | Y | |
| YES | 139 OTHER | **30 Pulls:**<br>**Pull 1:** 2/2007 Flynn Declaration **(001-016)**;<br>**Pull 2:** 2/2007 Montgomery Declaration **(001-009)**;<br>**Pull 3:** 2/26/2007 Email **(001)**;<br>**Pull 4:** 2/13/2007 Email **(001-003)**;<br>**Pull 5:** 2/2007 Montgomery Declaration **(001-005)**;<br>**Pull 6:** 2/2007 Montgomery Declaration **(001-006)**;<br>**Pull 7:** 2/2007 Flynn Declaration in Supp of Montgomery Opp. to Govt Motion to Strike **(001-018)**;<br>**Pull 8:** 2/2007 Montgomery Declaration 2 copies -Unsigned-**(001-019)**;<br>**Pull 9:** 3/2007 Email Chain **(001-011)**;<br>**Pull 10:** 3/16/07 Email **(001-004)**;<br>**Pull 11:** Complaint for violation of false claims act **Draft-1 (001-046)**;<br>**Pull 12:** Complaint for violation of false claims act **Draft-2 (001-047)**;<br>**Pull 13:** Complaint for violation of false claims act **Draft-3 (001-044)**;<br>**Pull 14:** Complaint for violation of false claims act **Draft-4 (001-040)**; | **Pull 15:** Complaint for violation of false claims act Draft-5 **(001-046)**;<br>**Pull 16:** Complaint for violation of false claims act Draft-6 **(001-046)**;<br>**Pull 17:** Flynn Declaration **(001-004)**;<br>**Pull 18:** Flynn Declaration **(001-006)**;<br>**Pull 19:** Motion to Unseal **(001-017)**;<br>**Pull 20:** Flynn Declaration **(001-012)**;<br>**Pull 21:** Flynn Declaration **(001-011)**;<br>**Pull 22:** Negroponte Questions **(001-009)**;<br>**Pull 23:** Negroponte Questions **(001-006)**;<br>**Pull 24:** Negroponte Questions **(001-004)**;<br>**Pull 25:** Negroponte Questions **(001-004)**;<br>**Pull 26:** 2/9/07 Flynn Ltr **(001-005)**;<br>**Pull 27:** 2/9/07 Flynn Ltr **(001-005)**;<br>**Pull 28:** 2/9/07 Flynn Ltr **(001-003)**;<br>**Pull 29:** 3/24/07 Email **(001-002)**;<br>**Pull 30:** 1/2007 Montgomery Declaration **(001-007)** | N |

## LINER FILES: DOCUMENT INVENTORY

| | | | Pulls / Description | | Additional |
|---|---|---|---|---|---|
| YES | 140 | OTHER | **7 Pulls:** **Pull 1:** Transcript Excerpt **(001-005); Pull 2:** Transcript Excerpt **(001-005); Pull 3:** 8/16/06 Sealed Declaration of Montgomery - Unsigned- **(001-009); Pull 4:** 8/16/06 Sealed Declaration of Montgomery - Unsigned-**(001-019); Pull 5:** 8/16/06 Sealed Declaration of Montgomery - Unsigned- **(001-020);** | N | **Pull 6:** 10/06 2 Copies Sealed Declaration of Montgomery - Unsigned **(001-045); Pull 7:** 11/30/06 Sealed Declaration of Montgomery - Unsigned- **(001-022);** |
| N/A | 141 | PLEADINGS | N/A | Y | |
| N/A | 142 | OTHER | N/A | Y | |
| N/A | 143 | OTHER | N/A | Y | |
| N/A | 144 | OTHER | N/A | Y | |
| N/A | 145 | OTHER | **1 Pull: Pull 1:** CD | Y | |
| N/A | 146 | PLEADINGS | N/A | Y | |
| YES | 147 | OTHER | **10 Pulls:** **Pull 1:** MONT40-43 **(001-004); Pull 2:** MONT 288-296 **(001-008); Pull 3:** MONT318-337 **(001-020); Pull 4:** 4/13/07 Flynn Ltr **(001-018); Pull 5:** 2/9/07 Flynn Ltr (2 copies) **(001-010); Pull 6:** 6/22/06 Email **(001-002); Pull 7:** 6/22/06 Email **(001-005); Pull 8:** 3/1/06 Flynn Ltr **(001-013); Pull 9:** 6/23/07 Flynn Email **(001-007); Pull 10:** 6/23/07 Flynn Email **(001** | Y | |
| N/A | 148 | OTHER | N/A | Y | |
| N/A | 149 | PLEADINGS | N/A | Y | |
| YES | 150 | PLEADINGS | **2 Pulls:** **Pull 1:** 10/06 Draft Montgomery Response to DOD Motion for Protective Order **(001-044); Pull 2:** 03/22/07 Montgomery Response to DOD Motion for Reconsideration **(001-009)** | Y | **Pull 1:** 001-044 **Pull 2:** 001-009 |
| YES | 151 | OTHER | **1 Pull: Pull 1:** 6/11/07 Montgomery Declaration **(001-004)** | Y | |
| N/A | 152 | PLEADINGS | N/A | Y | |
| N/A | 153 | OTHER | N/A | Y | |
| N/A | 154 | OTHER | N/A | Y | |
| N/A | 155 | OTHER | N/A | Y | |

DOCUMENT INVENTORY PAGE 8

# LINER FILES: DOCUMENT INVENTORY

| | | | | | |
|---|---|---|---|---|---|
| N/A | 156 | PLEADINGS | N/A | | Y |
| N/A | 157 | PLEADINGS | N/A | | Y |
| YES | 158 | OTHER | **6 Pulls:** **Pull 1:** 4/13/07 Flynn Ltr **(001-018)**; **Pull 2:** 2/9/07 Flynn Ltr **(001-010)**; **Pull 3:** 6/22/06 Flynn Email **(001-002)**; **Pull 4:** 6/22/06 Flynn Email **(001-002)**; **Pull 5:** 3/1/06 Flynn Ltr **(001-013)**; **Pull 6:** 7/26/06 Flynn Ltr **(001-007)** | | Y |
| N/A | 159 | PLEADINGS | N/A | | Y |
| N/A | 160 | OTHER | N/A | | Y |
| N/A | 161 | PLEADINGS | N/A | | Y |
| N/A | 162 | DISCOVERY | N/A | | Y |
| N/A | 163 | PLEADINGS | N/A | | Y |
| YES | 164 | OTHER | **1 Pull:** **Pull 1:** 4/13/07 Flynn Ltr. **(001-009)** | | Y |
| YES | 165 | OTHER | **2 Pulls:** **Pull 1:** CD With Document Attached **(001)** **Pull 2:** CD With Document Attached **(001-030)** | | Y |
| YES | 166 | OTHER | **3 Pulls:** **Pull 1:** DM2845-2886 **(001-042)**; **Pull 2:** DM2987-2998 **(001-012)**; **Pull 3:** DM3145-3151 **(001-007)** | | Y |
| N/A | 167 | OTHER | N/A | | Y |
| N/A | 168 | PLEADINGS | N/A | | Y |
| N/A | 169 | OTHER | N/A | | Y |
| N/A | 170 | OTHER | N/A | | Y |
| YES | 171 | OTHER | **1 Pull:** **Pull 1:** Draft Flynn Ltr **(001-008)** | | Y |
| YES | 172 | OTHER | **1 Pull:** **Pull 1:** Potential witness list with handwritten notations **(001-002)** | | Y |
| N/A | 173 | PLEADINGS | N/A | | Y |
| YES | 174 | PLEADINGS | **4 Pulls:** **Pull 1:** 2/27/07 Dec of Flynn **(001-037)**; **Pull 2:** 6/2/06 Dec of Michael West **(001-008)**; **Pull 3:** 06-cv-0263 Dkt# 125 Transcript **(001-085)**; **Pull 4:** 3/3/06 Dec of Michael West **(001-014)** | | Y |
| N/A | 175 | PLEADINGS | N/A | | Y |

# LINER FILES: DOCUMENT INVENTORY

| | | | |
|---|---|---|---|
| YES | 176 OTHER | **2 Pulls:** **Pull 1:** 4/13/07 Flynn Ltr to Cheney **(001-009)**; **Pull 2:** Dec of Flynn **(001-020)** | Y |
| N/A | 177 PLEADINGS | N/A | Y |
| N/A | 178 OTHER | N/A | Y |
| YES | 179 OTHER | **2 Pulls:** **Pull 1:** 6/3/07 Email **(001-012)**; **Pull 2:** 5/8/07 Email **(001)** | Y |
| N/A | 180 OTHER | **1 Pull:** CD | Y |
| N/A | 181 OTHER | **5 Pulls:** 5 CDs pulled | Y |
| N/A | 182 PLEADINGS | N/A | Y |
| N/A | 183 OTHER | N/A | Y |
| N/A | 184 OTHER | N/A | Y |
| N/A | 185 OTHER | N/A | Y |
| N/A | 186 OTHER | N/A | Y |
| N/A | 187 OTHER | N/A | Y |
| N/A | 188 PLEADINGS | **1 Pull:** CD pulled | Y |
| N/A | 189 OTHER | **1 Pull:** CD pulled | Y |
| N/A | 190 OTHER | **1 Pull:** CD pulled | Y |
| N/A | 191 OTHER | **2 Pulls:** 2 Hard drives removed | Y |
| N/A | 192 OTHER | N/A | Y |
| YES | 193 PLEADINGS | **2 Pulls:** **Pull 1:** 06-cv-0263 Dkt# 103, MONT318-337 **(001-020)**; **Pull 2:** MONT288-296 **(001-009)**; | Y |
| N/A | 194 OTHER | N/A | Y |
| YES | 195 PLEADINGS | **1 Pull:** 3/22/07 Montgomery's Response to DoD's Request for Protection Order **(001-009)** | Y |
| YES | 196 OTHER | **1 Pull:** **Pull 1:** Prayer for Relief **(001-042)** | Y |
| YES | 197 PLEADINGS | **1 Pull:** **Pull 1:** 3/11/06 Dec of Flynn **(001-006)** | Y |
| N/A | 198 DISCOVERY | N/A | Y |
| N/A | 199 PLEADINGS | N/A | Y |
| N/A | 200 PLEADINGS | N/A | Y |
| N/A | 201 OTHER | Hard drives | N |
| N/A | 202 OTHER | Hard drives | N |

# LINER FILES: DOCUMENT INVENTORY

| | | | | |
|---|---|---|---|---|
| N/A | 203 OTHER | Hard drives | N | |
| N/A | 204 OTHER | N/A | Y | |
| YES | 205 OTHER | **8 Pulls:**<br>**Pull 1:** 4/10/06 Email **(001-004)**;<br>**Pull 2:** 10/31/07 Email **(001-002)**;<br>**Pull 3:** 3/16-18/07 Email chain **(001-004)**;<br>**Pull 4:** 3/16-18/07 Email chain **(001-007)**;<br>**Pull 5:** 3/16-18/07 Email chain **(001-007)**;<br>**Pull 6:** 6/23/07 Email **(001)**;<br>**Pull 7:** 3/11/06 Dec of Montgomery for Return of Property -Unsigned- & 4/3/06 Reply Memo un Support of Motion for Return of Property **(001-033)**;<br>**Pull 8:** 3/11/06 Dec of Flynn **(001-004)** | Y | |
| N/A | 206 OTHER | N/A | Y | |
| YES | 207 PLEADINGS | **6 Pulls:**<br>**Pull 1:** 2 CDs<br>**Pull 2:** Cover sheet and Index of Emails in "Inbox" **(001-0038)**<br>**Pull 3:** Index of Emails in "Sent" **(001-015)**<br>**Pull 4:** 1 CD<br>**Pull 5:** Index of Emails in "Inbox" **(001-037)**<br>**Pull 6:** Index of Emails in "Sent" **(001-016)** | Y | |
| N/A | 208 OTHER | N/A | Y | |
| YES | 209 PLEADINGS | **3 Pulls:**<br>**Pull 1:** Sealed Montgomery Declaration **(001-036)**<br>**Pull 2:** Working Chronology **(001-014)**<br>**Pull 3:** Sealed Montgomery Declaration **(001-022)** | Y | Pull 3: 001-022 |
| N/A | 210 OTHER | Hard drives | N | |

**LINER FILES: HARD DRIVE INVENTORY**

| HARD DRIVE No. | SERIAL No. | ADDITIONAL INFO | DOJ COPY SERIAL No. | CLIENT COPY SERIAL No. |
|---|---|---|---|---|
| | | **BOX 105** | | |
| HD - 40 | WMAEH1731597 | Security Bag No. 075287 | | |
| HD - 41 | WCAEP1015275 | Security Bag No.075277 | | |
| HD - 42 | WMAMR1202131 | Security Bag No. 075269 | | |
| HD - 43 | ZFUG712N | Security Bag No.075256; Copy of WMA8C2315047 | | |
| HD - 44 | WMAEH1732002 | Security Bag No. 075292 | | |
| HD - 45 | 9QG8HSDQ | Security Bag No. 075273 | | |
| HD - 46 | WMA9P1151187 | Security Bag No.075284 | | |
| HD - 47 | 9QG8N147 | Security Bag No. 075245; Copy of WMAMR1203238 | | |
| HD - 48 | 6QF462VG | Security Bag No.075279; Copy of WCAEP1015275 | | |
| HD - 49 | WMAEP1123872 | Security Bag No. 075263 | | |
| HD - 50 | 3PM08V7Q | | | |
| HD - 51 | 5QD337JK | | | |
| HD - 52 | WMACK1617687 | Security Bag No. 75261 | | |
| HD - 53 | WMAEP1142476 | Security Bag No. 075286 | | |
| HD - 54 | RG0VEH9A | Security Bag No. 075290: Copy of WMAEH1732002 | | |
| HD - 55 | WMAMR1202248 | Security Bag No. 075260 | | |
| HD - 56 | WMAEH1283328 | Security Bag No.075289 | | |
| HD - 57 | WMAMR1277950 | Security Bag No.075281 | | |
| HD - 58 | WMAEH1202303 | Security Bag No. 075265 | | |
| HD - 59 | 6QF46574 | Security Bag No. 075271; Copy of WMAEH1202303 | | |
| HD - 60 | WCAL75136659 | Security Bag No. 075285 | | |

LINER FILES: HARD DRIVE INVENTORY

| | | | | |
|---|---|---|---|---|
| HD - 61 | 7BA08HPG | Security Bag No. 075288 | | |
| HD - 62 | WMA8C2315047 | Security Bag No. 075257 | | |
| HD - 63 | WMAMR1068824 | Security Bag No. 075267 | | |
| HD - 64 | WMAMR1203238 | Security Bag No. 075246 | | |
| HD - 65 | | | | |
| HD - 66 | | | | |
| HD - 67 | | | | |
| HD - 68 | | | | |
| HD - 69 | | | | |
| HD - 70 | | | | |
| HD - 71 | | | | |
| HD - 72 | | | | |
| HD - 73 | | | | |
| HD - 74 | | | | |
| HD - 75 | | | | |
| HD - 76 | | | | |
| HD - 77 | | | | |
| HD - 78 | | | | |
| HD - 79 | | | | |
| HD - 80 | | | | |
| HD - 81 | | | | |
| HD - 82 | | | | |
| HD - 83 | | | | |
| HD - 84 | | | | |
| HD - 85 | | | | |
| HD - 86 | | | | |
| HD - 87 | | | | |
| HD - 88 | | | | |
| HD - 89 | | | | |
| HD - 90 | | | | |
| | | **BOX 116** | | |
| HD - 1 | WMA8C4544113 | Security Bag No. 033654517 | | |
| HD - 2 | WCARW0431467 | Security Bag No. 075298; Copy of WMAEH2602257 | | |
| HD - 3 | WCARW0415948 | Security Bag No. 033654510; Copy of WMAEH2694097 | | |
| HD - 4 | WCA8C3998460 | Security Bag No. 033654515 | | |
| HD - 5 | WMAEH2694097 | Security Bag No. 033654518 | | |
| HD - 6 | WCAEP1014382 | Security Bag No. 033654520 | | |

## LINER FILES: HARD DRIVE INVENTORY

| | | | | |
|---|---|---|---|---|
| HD - 7 | WMAEH2602257 | Security Bag No. 033654516 | | |
| HD - 8 | WCAEP1003948 | Security Bag No. 033654519 | | |
| HD - 9 | 9QG812MG | | | |
| HD - 10 | 9QJ0RXGJ | | | |
| | | BOX 127 | | |
| HD - 13 | WMAMR1538581 | | | |
| HD - 14 | WMAMR1612253 | | | |
| HD - 15 | WMAMR1624507 | | | |
| HD - 16 | WMA8C3243070 | | | |
| HD - 17 | WMAD15194737 | | | |
| HD - 18 | WMAD15335294 | | | |
| HD - 19 | 3CK00XXY | | | |
| HD - 20 | WMA8C1223396 | | | |
| HD - 21 | WCAD13691228 | | | |
| HD - 22 | WMAMR1673681 | | | |
| HD - 23 | WMAD16644525 | | | |
| HD - 24 | WMAMR1538197 | | | |
| HD - 25 | 3CK028W3 | | | |
| HD - 26 | WMAMR1538570 | | | |
| HD - 27 | WMAMR1509932 | | | |
| HD - 28 | WMAMR1580671 | | | |
| HD - 29 | WMAA61102098 | | | |
| HD - 30 | 2544801F3NQ0C6 | | | |
| HD - 31 | WMAMR1523649 | | | |
| HD - 32 | WMAMR1580666 | | | |
| HD - 33 | WMAMR1066012 | | | |
| HD - 34 | WMAMR1537929 | | | |
| HD - 35 | WMAMR1539942 | | | |
| HD - 36 | WMAMR1539825 | | | |
| HD - 37 | WCAD16502878 | | | |
| HD - 38 | WMAD15256807 | | | |
| HD - 39 | WMAMR1543003 | | | |
| | | BOX 191 | | |
| HD - 11 | 9QG7CDDE | Security Bag No. 072755 | | |
| HD - 12 | 6QG31F7K | Security Bag No.072754 | | |
| | | BOX 201 | | |
| HD - 65 | 3PM0686P | | | |
| HD - 66 | 9QM26YN3 | | | |
| HD - 67 | 9QM3FKKW | | | |
| HD - 68 | 3QD03188 | | | |
| | | BOX 202 | | |
| HD - 69 | 3QD08W2N | | | |
| HD - 70 | 3QD0L7T0 | | | |
| HD - 71 | 9QJ0WW9R | | | |
| | | BOX 203 | | |
| HD - 72 | 9QJ16874 | | | |
| HD - 73 | PAG2NLRC | | | |
| HD - 74 | 3QJ01RQ1 | | | |

LINER FILES: HARD DRIVE INVENTORY

| HD - 75 | 3PM0LVN8 | | | |
|---------|----------|--|--|--|
| HD - 76 | 5QG06MMH | | | |
| | BOX 210 *Labeled as defective | | | |
| HD - 77 | RBRAPJNA | Security Bag No. 075274; Copy of WMA8C4544113 | | |
| HD - 78 | WCARW0431405 | Security Bag No. 075255; Copy of WCAEP1003948 | | |
| HD - 79 | RG0VEMRA | Security Bag No. 075254; Copy of WMAEP1142476 | | |
| HD - 80 | WCARW0431298 | Security Bag No. 033654504; Copy of WCAEP1014382 | | |
| HD - 81 | R7CRDRKK | Security Bag No. 075293; Copy of WMACK1617687 | | |
| HD - 82 | RG0VAUYA | Security Bag No. 075278; Copy of WMAEH1731597 | | |
| HD - 83 | RG0VEMKA | Security Bag No. 075283; Copy of WCAL75136659 | | |
| HD - 84 | 9QG8LXX5 | Security Bag No. 075295; Copy of WMAMR1277950 | | |
| HD - 85 | 9Q8N28G | Security Bag No. 075248; Copy of WMAMR1202131 | | |
| HD - 86 | N/A | N/A | | |
| HD - 87 | R7CRD72K | Security Bag No. 033654508; Copy of WMAEH1283328 | | |
| HD - 88 | RBRAA9VA | Security Bag No. 033654501; Copy of WCA8C3998460 | | |
| HD - 89 | 9QG8LSVQ | Security Bag No. 075252; Copy of WMAMR1202248 | | |

**LINER FILES: HARD DRIVE INVENTORY**

| | | | | |
|---|---|---|---|---|
| HD - 90 | RG0ZLL8A | Security Bag No. 075262; Copy of WMAEP1123872 | | |

EXHIBIT "13"

Dennis Lee Montgomery  -  November 18, 2010

---

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA

In re: Dennis and Kathleen )
Montgomery )
)
Michael J. Flynn, )
)
        Plaintiff, )
)
        vs. ) Case No.: 2:10-bk-18510-bb
)
Dennis Lee Montgomery and )
Brenda Kathleen Montgomery, )
)
        Defendants. )
_____)

Videotaped Deposition of: DENNIS LEE MONTGOMERY
Date:                     November 18, 2010
Reported by:              Stephanie P. Borthwick
                          C.S.R. No. 12088

Page 3

```
 1   For the United States of America:
 2     U.S. DEPARTMENT OF JUSTICE
 3     CIVIL DIVISION
 4     BY:  CARLOTTA P. WELLS, Senior Counsel
 5     Federal Programs Branch
 6     20 Massachusetts Avenue, NW
 7     Room 7150
 8     Washington, DC  20530
 9     (202) 514-4522
10   Also Present:
11     Michael J. Flynn, Esq.
12     Sharon Raya, Paralegal to Ms. Wells
13     Tom (last name withheld), U.S. Government
14     Morgan (last name withheld), U.S.
15     Government
16   Videographer:
17     Jesse Navarro, Orravan Video Litigation
18     Services
19
20
21
22
23
24
25
```

Page 3

---

```
 1        Deposition of DENNIS LEE MONTGOMERY, taken on
 2   behalf of the Plaintiff, before Stephanie P.
 3   Borthwick, a Certified Shorthand Reporter,
 4   commencing at the hour of 9:20 a.m., Thursday,
 5   November 18, 2010, at the offices of Yates Court
 6   Reporters, 74967 Sheryl Avenue, Palm Desert,
 7   California.
 8   APPEARANCES:
 9        For the Plaintiff:
10          CONANT LAW, LLC
11          Attorneys at Law
12          BY:  CHRISTOPHER J. CONANT, ESQ.
13          730 17th Street
14          Suite 200
15          Denver, Colorado  80202
16          (303) 298-1800
17        For the Defendants:
18          DION-KINDEM & CROCKETT
19          Attorneys at Law
20          BY:  WILLIAM E. CROCKETT, ESQ.
21          LNR Warner Center
22          21271 Burbank Boulevard
23          Suite 100
24          Woodland Hills, California  91367-6667
25          (818) 883-4400
```

Page 2

```
 1                      INDEX
 2
 3   Deposition of DENNIS LEE MONTGOMERY
 4      Taken on November 18, 2010
 5
 6   Examination By:                          Page
 7   MR. CONANT                                 24
 8
 9   Information Requested:
10      (None)
11
12   Questions Instructed Not to Answer:   Page Line
13   Q.  Has your attorney, to your          45    3
14       knowledge, been in contact with any
15       agency of the United States
16       government concerning your personal
17       property that's listed on these
18       schedules?
19   Q.  Is it your testimony,               46    9
20       Mr. Montgomery, that you have no
21       personal property that falls within
22       the description of this paragraph
23       here on page 22-9?
24   ///
25   ///
```

Page 4

Dennis Lee Montgomery  -  November 18, 2010

| | | | |
|---|---|---|---|
| 1 | 21 | 19-page Wells Fargo PMA | 306 |
| 2 | | Package of Istvan Burgyan, | |
| 3 | | Bates Nos. 00552-70 | |
| 4 | 22 | Five pages of Istvan Burgyan's | 309 |
| 5 | | bank records, Bates | |
| 6 | | Nos. 00943-47 | |
| 7 | 23 | Two-page Bank of America | 312 |
| 8 | | statement of Istvan Burgyan, | |
| 9 | | Bates Nos. 00933-34 | |
| 10 | 24 | One page of photocopied | 313 |
| 11 | | documents including a | |
| 12 | | cashier's check paid to | |
| 13 | | Caesar's Casino and Wells | |
| 14 | | Fargo Bank records. | |
| 15 | 25 | 18 pages of MontBleu Resort | 315 |
| 16 | | Memo Reports | |
| 17 | 26 | Three-pages of win/loss | 324 |
| 18 | | documents | |
| 19 | 27 | 37 pages of Customer | 328 |
| 20 | | Transaction Inquiries | |
| 21 | 28 | 11 pages of miscellaneous | 330 |
| 22 | | casino documents | |
| 23 | /// | | |
| 24 | /// | | |
| 25 | /// | | |

Page 13

---

1 because to do so would violate the terms of the
2 United States protective order, which all the
3 parties to the bankruptcy proceeding have agreed to.
4       MR. CROCKETT:  Bill Crockett on behalf of
5 Dennis Montgomery.
6       THE WITNESS:  Dennis Montgomery.
7       THE VIDEOGRAPHER:  Would the court reporter
8 please swear in the witness.
9       THE REPORTER:  Please raise your right
10 hand.
11       Do you solemnly state under penalty of
12 perjury that the testimony you will give in this
13 matter will be the truth, the whole truth, and
14 nothing but the truth?
15       THE WITNESS:  Yes.
16       THE REPORTER:  Thank you.
17       MR. CONANT:  Okay.  Thank you.
18       Before we start examining the witness, I
19 want to state for the record that there are present
20 in the room four representatives from the U.S.
21 Government, two of which apparently have no last
22 name.
23       We'll ask on the record of Ms. Wells to
24 provide their last names and the government agency
25 that they purportedly work for.

Page 15

---

1       THE VIDEOGRAPHER:  Good morning.  Here
2 begins Media No. 1 in the video deposition of Dennis
3 Lee Montgomery in the matter of Michael J. Flynn
4 versus Dennis Lee Montgomery, et al., in the
5 United States Bankruptcy Court of California, Case
6 No. 2:10-bk-18510-bb.
7       Today's date is November 18th, 2010.  The
8 time is 9:20 a.m.  This deposition is being taken at
9 74967 Sheryl Avenue, Palm Desert, California, and
10 was made at the request of Mr. Christopher Conant of
11 the law offices of Conant Law, LLC.
12       The videographer is Jesse Navarro here on
13 behalf of Orravan Video Litigation Services,
14 Indian Wells, California.
15       Would counsel and all present please
16 identify yourselves and state whom you represent.
17       MR. CONANT:  Christopher Conant for the
18 plaintiff, Michael J. Flynn.
19       MR. FLYNN:  And Michael J. Flynn in
20 persona.
21       MS. WELLS:  Carlotta Wells on behalf of the
22 United States and with the United States Department
23 of Justice.  Sharon Raya is with me from my office.
24 With me, also, are Morgan and Tom, who are with the
25 government and I can't disclose anything further

Page 14

---

1       MS. WELLS:  And I cannot, because to do so
2 would violate the terms of the United States
3 protective order.
4       MR. CONANT:  Ms. Wells, do you have a copy
5 of the protective order in front of you?
6       MS. WELLS:  I do.  Do you have one?
7       MR. CONANT:  I have a copy in front of me.
8 I'd like to actually get it admitted as an exhibit
9 in this deposition.
10       Let me -- while I work on getting extra
11 copies to admit as an exhibit, Ms. Wells, can you
12 review the protective order and identify which
13 specific portion of the protective order you're --
14       MS. WELLS:  Am I a witness now?  All I can
15 tell you is it's pretty self-evident from the face
16 of the United States protective order what's
17 protected, what isn't.
18       The information that's protected is set
19 forth in paragraphs 2 and paragraphs 3.
20       MR. CONANT:  How does those pertain
21 specifically to the identities of these gentlemen
22 and why they're here today?
23       MS. WELLS:  I think it's self-evident and
24 if you want to read those paragraphs into the
25 record, feel free to.

Page 16

4 (Pages 13 to 16)

Dennis Lee Montgomery  -  November 18, 2010

**Page 17**

```
 1          MR. CONANT:  I don't -- well --
 2          MS. WELLS:  Paragraphs 2 and 3 of the
 3   United States protective order, which is
 4   Document 253, District of Nevada Case File 30656.
 5          MR. CONANT:  Ms. Wells, who is making the
 6   decision regarding what is -- why these gentleman
 7   are here?
 8          Who in the government made a decision why
 9   these gentlemen are here?  Who in the government
10   made a decision for these two gentlemen to be here
11   today?
12          MS. WELLS:  This particular deposition is
13   being handled in the manner that all information
14   related to this case has been handled.  It's been a
15   joint decision between those attorneys representing
16   the United States' interests and the agencies whose
17   information we're protecting.
18          That's all I'm going to say.
19          MR. CONANT:  Were these gentleman at all
20   involved in any way in the litigation in Nevada?
21          MS. WELLS:  I'm not going to go any further
22   than what I've already said.
23          MR. CONANT:  Were you meeting with Judge
24   Pro in the U.S. District Court for the district of
25   Nevada yesterday?
```

**Page 18**

```
 1          MS. WELLS:  At Judge Pro's insistence, yes.
 2   We met with him in his chambers yesterday.
 3          MR. CONANT:  Who is "we"?
 4          MS. WELLS:  The people representing the
 5   United States Department of Justice and the United
 6   States in this case.
 7          MR. CONANT:  Who were those?  I'm asking
 8   for the identities, Ms. Wells.
 9          MS. WELLS:  All I'm saying is that people
10   from the government met with him and I mean it
11   actually -- if you really need to know, it was the
12   four of us here.
13          MR. CONANT:  Did Judge Pro -- when did
14   Judge Pro contact you to meet with him?
15          MS. WELLS:  I'm not going to say anything
16   more other than we're complying with the terms of
17   the order that Judge Pro entered, I believe it was
18   October 30th, and we were there because of that
19   order.
20          MR. CONANT:  What order?
21          MS. WELLS:  Let's see.
22          It was the order dated October 28th, 2010,
23   Docket No. 1172, same case, Montgomery versus
24   eTreppid Technology.
25          MR. CONANT:  Were there any documents
```

**Page 19**

```
 1   reviewed in connection with your meeting with Judge
 2   Pro that were -- that originated from my client
 3   Michael Flynn?
 4          MS. WELLS:  This is not the subject of this
 5   deposition.  We're not here to talk about this.  If
 6   Mr. Flynn wants to have a conversation with me about
 7   this we can have it, but it's not appropriate for
 8   the record.
 9          MR. CONANT:  It is appropriate for the
10   record.  You are --
11          MS. WELLS:  It does -- what does that have
12   to do with the information we're here to protect
13   now?  The long and the short of it is that there
14   were documents, as you know, from the Order that the
15   court in Montana sent to Judge Pro.
16          He asked the United States to take a look
17   at them to determine the extent to which there's
18   information that may or may not be protected under
19   the United States protective order.
20          Upon the limited review that we did in his
21   chambers yesterday, we determined that there was
22   enough of a question there that we need to take the
23   documents back with us to Washington to do a more
24   thorough review.  That's it.
25          MR. CONANT:  What documents did you review?
```

**Page 20**

```
 1          MS. WELLS:  The documents that the court in
 2   Montana sent.
 3          MR. CONANT:  What documents were those?
 4          MS. WELLS:  I didn't take a list.  It's not
 5   a very big -- it's a small pile, not even an inch
 6   thick.
 7          MR. FLYNN:  This is Michael Flynn.  I'm
 8   going to put a statement on the record.
 9          The documents that were given to David
10   Cotner, counsel for the trustee in the Montana
11   bankruptcy proceeding, were very limited and I
12   specifically reviewed them before giving them to
13   Cotner.
14          They were apparently subsequently given to
15   Judge Kirscher and they had all been previously
16   reviewed by the federal government, Department of
17   Justice, and approved.  And except for the Sandoval
18   complaint, they are publicly on file in the Nevada
19   District Court and can be picked up online.
20          So unless documents were added that I don't
21   know about -- and I don't know about any of the
22   documents, I don't have the identity of the
23   documents that were given to Judge Kirscher or
24   subsequently conveyed to Judge Pro -- there are no
25   documents that do not comply with the US protective
```

Dennis Lee Montgomery  -  November 18, 2010

1  order in any way.
2          So if either documents were added by
3  someone or there has been a change in the position
4  of the Department of Justice with regard to the
5  scope of the protective order, then there is nothing
6  in any of the documents given to Cotner, apparently
7  passed on to Judge Kirscher, which would violate the
8  terms of the U.S. protective order.
9          MR. CONANT:  Do you have a copy, Ms. Wells,
10  of the letter or whatever communication there was
11  between Judge Kirscher and Judge Pro?
12          MS. WELLS:  No.
13          MR. CONANT:  Who at the government have you
14  been talking to regarding the matter involving the
15  letter from Judge Kirscher to Judge Pro?
16          MS. WELLS:  I'm not here to answer these
17  questions.  I'm here to enforce the terms of the
18  United States protective order and only people with
19  the United States have that authority and the
20  ability to determine what's protected and what isn't
21  and that's all we're here for.
22          It's a very limited role that we're
23  playing, it's a very limited role, and I can tell
24  you on the record that what we're doing here today
25  is entirely consistent with what we've done ever

Page 21

1  since we first got involved in this case and ever
2  since Judge Pro acknowledged there was information
3  to be protected.
4          That's all I'm going to say and I'll keep
5  saying the same thing over and over again.
6          MR. FLYNN:  It's completely inaccurate.
7  For the record, these gentlemen, however nice
8  gentleman they may be, never participated and never
9  appeared in courtrooms in any of the Nevada
10  proceedings, Ms. Wells, and you know it and I know
11  it.
12          So this four-person deluge from the
13  Department of Justice in Dennis Montgomery's
14  deposition is apparently being done for some reasons
15  completely extraneous to the materials in the
16  protective order, but why don't we get started.
17          MR. CONANT:  I just want to state one last
18  thing for the record.  When I deposed Istvan Burgani
19  in this very case on September 22nd, the U.S.
20  Government showed no interest in this matter.
21          I had to call Mr. Gomez at his office in
22  D.C. halfway through the deposition, because there
23  became an issue regarding the protective order.
24  Mr. Gomez was completely indifferent regarding this
25  case and now, for some reason, we have four people

Page 22

1  here from the US government, two of who, apparently,
2  have no last names and are from some unidentified
3  agency with the government.
4          And for the record, Ms. Wells is not
5  indicating how their involvement is at all
6  implicated in the protective order.  The protective
7  order only governs issues concerning intelligence
8  agencies as defined in the National Security Act and
9  we have no indication of what agencies these
10  gentlemen are with and whether they're with an
11  intelligence agency or whether it's an
12  administrative branch of the government that's not
13  included within the National Security Act as an
14  intelligence agency.
15          So we simply don't know what is -- what is
16  purportedly being protected by the protective order
17  or not.
18          MR. FLYNN:  We think -- at this juncture
19  I'll put on the record that I believe -- I didn't
20  believe it during the Nevada proceedings, I thought
21  there were legitimate interests to be protected in
22  terms of identities of intelligence agency
23  individuals, but at this point I believe that the
24  Department of Justice has gone far beyond that and
25  is now using, under the guise of national security

Page 23

1  for reasons related to the facts that I put in the
2  emails to you, Carlotta, has gone far beyond the
3  scope of national security in an effort to cover up
4  or conceal the fraudulent activities of
5  Mr. Montgomery as I've repeatedly said in emails.
6          So why don't we just start.
7                  EXAMINATION
8  BY MR. CONANT:
9      Q.  Okay.  All right.  Turning to
10  Mr. Montgomery.  Mr. Montgomery, let's start
11  something.
12          Can you state your name for the record.
13      A.  Dennis Montgomery.
14      Q.  What's your -- do you have a middle name?
15      A.  Lee.
16      Q.  Do you understand what it means to take a
17  deposition, Mr. Montgomery?
18      A.  Yes.
19      Q.  What do you understand that to mean?
20      A.  You're going to ask me questions; I'm going
21  to answer them.
22      Q.  Do you know -- do you understand that your
23  testimony today is under the penalty of perjury?
24      A.  Yes.
25      Q.  Do you understand what that means?

Page 24

6 (Pages 21 to 24)

# EXHIBIT "14"

**dennismontgomery45@gmail.com**

| | |
|---|---|
| **From:** | Dennis <dennis@ncoder.net> |
| **Sent:** | Thursday, August 29, 2013 3:43 PM |
| **To:** | 'Cameron, Carl' |
| **Subject:** | RE: CIA |

I know a lot going in DC today, just call me tomorrow.

**From:** Cameron, Carl [mailto:CARL.CAMERON@FOXNEWS.COM]
**Sent:** Thursday, August 29, 2013 11:57 AM
**To:** Dennis
**Subject:** Re: CIA

Understood. As I say I happen to be out there next week so we'll get together.

Carl Cameron, Chief Political Correspondent, Fox News, From Mobile, please excuse autocorrect errors.

**From:** Dennis
**Sent:** Thursday, August 29, 2013 1:23 PM
**To:** Cameron, Carl
**Subject:** CIA

I will go on the record.  I am not turning back now...

**From:** Dennis [mailto:dennis@ncoder.net]
**Sent:** Thursday, August 29, 2013 10:21 AM
**To:** carl.cameron@foxnews.com
**Subject:** CIA

This is what the information is running on in my house.  I would bring a film crew you may to film some of this...

**From:** Cameron, Carl [mailto:CARL.CAMERON@FOXNEWS.COM]
**Sent:** Thursday, August 29, 2013 10:15 AM
**To:** Dennis
**Subject:** Re: CIA

Will do. I arrive late Sunday and hope to see you Mon or Tues. I'll call tomorrow.

Carl Cameron, Chief Political Correspondent, Fox News, From Mobile, please excuse autocorrect errors.

**From:** Dennis
**Sent:** Thursday, August 29, 2013 12:49 PM
**To:** Cameron, Carl
**Subject:** CIA

Just email me when you know your plans.

Dennis Montgomery
dennis@ncoder.net
619.508.1964

1

**dennismontgomery45@gmail.com**

| | |
|---|---|
| **From:** | Dennis <dennis@ncoder.net> |
| **Sent:** | Thursday, August 29, 2013 1:51 PM |
| **To:** | carl.cameron@foxnews.com |
| **Subject:** | CIA |

The best place to stay near me is the Hyatt, Bellevue, a few miles from my house.
http://www.bellevue.hyatt.com/en/hotel/home.html

**From:** Cameron, Carl [mailto:CARL.CAMERON@FOXNEWS.COM]
**Sent:** Thursday, August 29, 2013 10:15 AM
**To:** Dennis
**Subject:** Re: CIA

Will do. I arrive late Sunday and hope to see you Mon or Tues. I'll call tomorrow.

Carl Cameron, Chief Political Correspondent, Fox News, From Mobile, please excuse autocorrect errors.

**From:** Dennis
**Sent:** Thursday, August 29, 2013 12:49 PM
**To:** Cameron, Carl
**Subject:** CIA

Just email me when you know your plans.

Dennis Montgomery
dennis@ncoder.net
619.508.1964

**dennismontgomery45@gmail.com**

| | |
|---|---|
| **From:** | Cameron, Carl <CARL.CAMERON@FOXNEWS.COM> |
| **Sent:** | Monday, October 7, 2013 1:09 PM |
| **To:** | 'Dennis' |
| **Subject:** | RE: Morning |

We have a bureau in Seattle and could arrange to send a crew out to shoot more material - - whaddya think?

**dennismontgomery45@gmail.com**

| | |
|---|---|
| **From:** | Cameron, Carl <CARL.CAMERON@FOXNEWS.COM> |
| **Sent:** | Thursday, October 31, 2013 1:56 PM |
| **To:** | Dennis |
| **Subject:** | Re: CIA |

I'd like to have a camera to you tomorrow after 3 your time. Can you do it? I think you should meet him before Tuesday. And shooting your updated demonstration and narrative is crucial now

Carl Cameron, Chief Political Correspondent, Fox News, From Mobile, please excuse autocorrect errors.

**From:** Dennis
**Sent:** Thursday, October 31, 2013 12:55 AM
**To:** Cameron, Carl
**Subject:** CIA

Look at new videos on www.blxware.net #5, #6

**dennismontgomery45@gmail.com**

| | |
|---|---|
| **From:** | Dennis <dennis@ncoder.net> |
| **Sent:** | Thursday, October 31, 2013 2:09 PM |
| **To:** | 'Cameron, Carl' |
| **Subject:** | RE: CIA |

I will be ready.  I just want to make sure they will in Federal Court Tues also.

**From:** Cameron, Carl [mailto:CARL.CAMERON@FOXNEWS.COM]
**Sent:** Thursday, October 31, 2013 10:56 AM
**To:** Dennis
**Subject:** Re: CIA

I'd like to have a camera to you tomorrow after 3 your time. Can you do it? I think you should meet him before Tuesday. And shooting your updated demonstration and narrative is crucial now

Carl Cameron, Chief Political Correspondent, Fox News, From Mobile, please excuse autocorrect errors.

**From:** Dennis
**Sent:** Thursday, October 31, 2013 12:55 AM
**To:** Cameron, Carl
**Subject:** CIA

Look at new videos on www.blxware.net #5, #6

**dennismontgomery45@gmail.com**

| | |
|---|---|
| **From:** | Cameron, Carl <CARL.CAMERON@FOXNEWS.COM> |
| **Sent:** | Thursday, September 26, 2013 1:52 AM |
| **To:** | Dennis |
| **Subject:** | Re: CIA |

I can get the whole story out but need examples of the harvested data. You mention on tape the florida voter registration data, creditcard and bank records and personal passwords and log in data For tens of millions ..all I need is a relatively small sample of each and I can do the whistle blower story and back it up without disclosing anyone's private info.

Carl Cameron, Chief Political Correspondent, Fox News, From Mobile, please excuse autocorrect errors.

**From:** Dennis
**Sent:** Wednesday, September 25, 2013 6:32 PM
**To:** Cameron, Carl
**Subject:** CIA

I am ok, thanks for your support.  I am just amazed I can't get legal help in this matter.  Everyone wants whistleblower to come forward, but few are willing to help. The bad press about me is making it hard to get legal representation to expose the crimes US Government officials have committed against American citizens.  I guess the government's strategy of leaking false information to the press, to discredit me, really has worked.

When James Clapper lied under oath to Congress this year and gave the  "the least untruthful answer possible" about document harvesting, he apologized and that was the end of it.  James Clapper and John Brennan ran these "illegal" document harvesting programs that I was involved with from 2003 - 2010,  and I will find a way to get the information out.

The value of this harvested data is worth tens of millions of dollars.  I have never attempted to sell the data or exploit the data to benefit me or my family.  I could have sold the data years ago for millions.  No one would have known I had sold the data, and that would have been the end of the story.

I am fighting insurmountable odds and creating immense risk by going down the whistleblower complaint road. I am not only creating this risk for myself, but for my family also. I am trying to do this without violating the documents I have signed with the US Government or existing court orders preventing the release of certain information.

It is obvious to me that I need to get this whistleblower complaint process story out first to help repair some of the malice that has taken place by the US Government officials when they leaked this false information to the press about me.

I get I just need an attorney to protect me, and there must be one out there for me.  I just hope that interview I did with you gets released while I am still alive.  I suspect the US Government is deciding what to do with me, and my desire to expose James Clapper and John Brennan's involvement in these "harvesting" programs as we speak.  They can't hide the HAMMER forever.

Dennis Montgomery
619.508.1964
dennis@ncoder.net

**Frm:** Cameron, Carl [mailto:CARL.CAMERON@FOXNEWS.COM]
**Sent:** Wednesday, September 25, 2013 12:20 PM
**To:** 'Dennis'
**Subject:** Hi Dennis

How did it go Monday at the hospital?  Please let me know how you are doing when you are able, I'm rooting for you.

Carl Cameron
Chief Political Correspondent
FOX NEWS CHANNEL
202-320-2105

EXHIBIT "15"



# PHOENIX
# New Times

| ARPAIO |

# Arpaio Pal Klayman Shot Down, DOJ Okayed, and More in Latest Sheriff Joe Contempt Hearing

**STEPHEN LEMONS** | **AUGUST 12, 2015** | **9:15AM**

f 🐦 ▷ 🗗 T̤T

A status conference in downtown Phoenix before federal Judge G. Murray Snow continued his court's inexorable march toward a second round of contempt hearings in the ACLU's big racial-profiling

## LATEST STORIES



**Joe Arpaio is Four Times a Loser**



**Where Does This Phoenix City Council Candidate Really Live?**

Joe Arpaio's Birther Pal Larry Klayman Denied in the Latest Contempt Hearing Before Judge...      https://www.phoenixnewtimes.com/news/arpaio-pal-klayman-shot-down-doj-okayed-and-more...

And when Snow refused Arpaio's attorneys attempt to disqualify him from the case, what did Arpaio's legal team do? Play copycat to Klayman, **seeking a writ of mandamus from the Ninth**, which is currently pending.

In another development Tuesday, Snow allowed the DOJ to intervene in *Melendres*.

This means, essentially, that DOJ attorneys will work alongside lawyers from the ACLU and Covington & Burling on the case.

==DOJ attorney Rafael Gomez was present to address **the 50 hard drives recently seized by the U.S. Marshals on order of the court.**==

==Gomez said that his "client entities" – presumably U.S. intelligence agencies such as the CIA – only wanted to review the one hard drive and two bankers boxes of material that had been made available to them previously; they then will decide what to do about the==

Joe Arpaio's Birther Pal Larry Klayman Denied in the Latest Contempt Hearing Before Judge...    https://www.phoenixnewtimes.com/news/arpaio-pal-klayman-shot-down-doj-okayed-and-more...

additional 50 hard drives.

Gomez said he could not reveal who these "client entities" are, as that information may be classified pending a review of the material. He said his clients were concerned that by opening the 50 hard drives they could compromise the metadata on the files. He could not say how long it would take for a decision to be reached.

Snow seemed annoyed by this and advised Gomez that he was not going to wait for the U.S. government to make a decision before allowing the parties to examine the files.

Both Iafrate and ACLU attorney Cecillia Wang indicated that they wanted access to the 50 hard drives.

Snow ordered the parties to consult and hopefully agree to protocols in handling the material.

During the hearing, the judge tangled more than once

# EXHIBIT "16"

COMMITTEE SENSITIVE

EXECUTIVE SESSION

COMMITTEE ON THE JUDICIARY,

JOINT WITH THE

COMMITTEE ON GOVERNMENT REFORM AND OVERSIGHT,

U.S. HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.

INTERVIEW OF:  JAMES A. BAKER (DAY 2)

Thursday, October 18, 2018

Washington, D.C.

The interview in the above matter was held in Room 2141, Rayburn House Office Building, commencing at 10:01 a.m.

Present:  Representatives Meadows, Jordan, Ratcliffe, and Gaetz.

COMMITTEE SENSITIVE

here.

Mr. Breitenbach.  Unlawful surveillance of whom?

Mr. Baker.  Of Americans, including government officials.
Yeah.  I can go -- I mean --

Mr. Jordan.  Who was his client?

Mr. Baker.  Can I just -- I'm turning to the Bureau to describe
this.  So his client was an individual named Dennis Montgomery, who
I believe, to the best of my recollection, he said that he had been
a U.S. Government contractor and, in the course of that work, had come
across evidence of unlawful surveillance by the government of
Americans -- and including government officials -- and wanted to give
that information to the Bureau, which eventually did take place.

Mr. Jordan.  And was this -- I'm sorry.  Go ahead.

Mr. Sommers.  During what time period?

Mr. Jordan.  Yeah.  That's what I was going to ask.

Mr. Baker.  To the best of my recollection, it's in the late
summer, early fall 2016.

Mr. Sommers.  And the surveillance, what time period was that?

Mr. Baker.  I'm not entirely sure what the timeframe was.  It was
a significant -- it was -- one of the issues in the case was it was
a large amount of data that he had that he wanted to provide, that
these -- these disks or other media had a lot of data on them about
this, allegedly.

Mr. Sommers.  Surveillance by whom?

Mr. Baker.  By the U.S. Government itself of Americans,

COMMITTEE SENSITIVE

# EXHIBIT "17"

| | |
|---|---|
| **From:** | Dickas, J (Intelligence) |
| **To:** | Dennis (dennis@ncoder.net) |
| **Subject:** | RE: CIA |
| **Date:** | Thursday, September 18, 2014 5:18:50 PM |

Hi Mr. Montgomery,

Apologies for the slow response, I was out of the office for a couple weeks.  Based on my examination of your case, it looks to me like the Department of Defense Inspector General is actually best positioned to review your complaint that the work you performed for the government was illegal or improper.  If you are having a hard time bringing this issue to the DoD IG's attention, I believe Sen. Cantwell's casework staff is in a good position to help you get in touch with them. Hope that is helpful.

John

**From:** Dennis [mailto:dennis@ncoder.net]
**Sent:** Thursday, September 18, 2014 3:49 PM
**To:** Dickas, J (Intelligence)
**Cc:** Wolfe, J (Intelligence)
**Subject:** CIA

Would you at least give me the courtesy of acknowledging my email. I have limited ways to communicate with you and your committee.

It has been over a year since you sent me this email below.

I have followed the proper channels to file my whistle blower complaints with the intelligence community.  I have been told to be patient.  You made it clear in you August 16, 2013 email that you would like to help me but cautioned me about releasing sensitive documents, which I have not done.

I am a American who has information regarding US government intelligence agencies mass surveillance of Americans, that you may not have been aware of.  At this point, I will assume you have verified that I was working for companies that had contracts with the CIA, DOD, DNI, HOMELAND SECURITY, as well as others.

I thought at one point you and your committee would help me move my whistleblower complaints forward?

I have followed the rules you ask me to follow. I will cooperate fully with you other members of your committee regarding information that is contained in the various whistleblower complaints that I have filed with the Inspector General's within the intelligence community.

I am disabled, and have limited ways to communicate with you.  I am trying to do the right thing.

Please help me.

Dennis Montgomery
dennis@ncoder.net
619.508.1964

**From:** Dickas, J (Intelligence) [j
**Sent:** Friday, August 16, 2013 12:51 PM
**To:** Dennis
**Subject:** RE: CIA

Hi Mr. Montgomery -

I would still recommend that you work with Senator Cantwell's casework staff to try to get a response from the CIA Inspector General regarding your complaint.  Have you tried to contact Senator Cantwell's staff about this?

Also, you mentioned protections for whistleblower complaints - it is important to emphasize that such protections have generally not been interpreted to cover disclosures of classified information through improper channels.  So I would strongly recommend that you not convey any classified information via any unclassified modes of communication, or to any staff that do not have the necessary security clearances.  You seem to have been pretty careful not to do this so far, but some of your comments make me concerned that you may be considering violating classification rules in the course of your interactions with congressional staff, and many congressional staff (myself included) would feel compelled to report the violation if you did so.  I would definitely like to be helpful in getting your concern addressed, but if you violate any laws regarding the protection of classified information I don't think anyone in the legislative branch will be able to help or protect you.

Let me know if you need any help getting back in touch with Senator Cantwell's office, and have a great weekend.

John

**From:** Dennis [dennis@ncoder.net]
**Sent:** 15 August 2013 00:29
**To:** Dickas, J (Intelligence)
**Subject:** CIA

This is not a complete list of individuals in Congress that had their personal data harvested.  I just wanted to give you some idea how wide spread it was.  I would hope the information I have provided to you and whoever you provide it to; is treated as information that being submitted as a whistleblower complaint, and protected accordingly.  I continue to try to look for "Proper Channels" to go through in blowing the whistle on these illegal "document harvesting programs", and the US Government officials that were involved in these programs.  This work was nothing more than the US Government spying on US citizens, without their knowledge, consent or any court order.

I along with my family have been threatened, harassed, and when I wouldn't agree to stop my effort to whistle blow on the US Intelligence community, discredited. It is not fair for the US Government to leak false information to the press in hopes of getting me to stop my whistle blowing campaign, and when I attempt to defend myself,  hold me to the State Secrets Privilege.

It is important to remember it was the government who came to me to do the work, not me going to the government looking for work...

I am just one US citizen that is trying to get the truth out if the face of insurmountable obstacles.

I appreciate all of your help.
Dennis Montgomery
dennis@ncoder.net
619.508.1964

---

**From:** Dennis [mailto:dennis@ncoder.net]
**Sent:** Wednesday, August 14, 2013 8:48 PM
**To:** 'Dickas, J (Intelligence)'
**Subject:** CIA

John, In the years I was involved with these programs the following individuals had data harvested by the US Government, at least once.  Over half this individuals have had their personal data harvested more than twice.  As you can see, the program did not discriminate based on political party; 48 Democrats and 35 Republicans.   Would you like me to provide more information? There are tens of millions of records that were harvested.

I am sure I have already violated this State Secrets Privilege by disclosing this information, even without disclosing what was actually harvested.  Why wouldn't the **Inspector General of the DNI**, **Inspector General of the DOJ**, **Inspector General of the Air Force**, or the **Inspector General of the CIA** want to get to the bottom of these disclosures and let me file a whistleblower complaint?  I suspect it has something to do with politics, James Clapper, John Brennan, and the other US Government officials that were involved in this "illegal" data gathering effort and what they actually used the data for.

How can the US Government classify this information as classified, secret, or top secret when these individuals obviously had nothing to do with terrorism, like the other 10 million US Citizens that had their personal information harvested, without their knowledge, consent, or court order under the disguise of "national security."

ADAM SMITH,CONGRESSMAN,D
ALCEE HASTINGS,CONGRESSMAN,D
BARBARA BOXER,SENATOR,D
BILL NELSON,SENATOR,D
BOB GOODLATTE,CONGRESSMAN,R
CARL LEVIN,SENATOR,D
CHARLES GRASSLEY,SENATOR,R
CHARLES SCHUMER,SENATOR,D
COLLIN PETERSON,CONGRESSMAN,D
DANNY DAVIS,CONGRESSMAN,D
DAVE CAMP,CONGRESSMAN,R
DAVID PRICE,CONGRESSMAN,D
DEREK KILMER,CONGRESSMAN,D
DIANNE FEINSTEIN,SENATOR,D
DONALD PAYNE,CONGRESSMAN,D

ED PASTOR,CONGRESSMAN,D
EDDIE JOHNSON,CONGRESSMAN,D
EDWARD MARKEY,CONGRESSMAN,D
ELIJAH CUMMINGS,CONGRESSMAN,D
FRANK LUCAS,CONGRESSMAN,R
FRANK PALLONE,CONGRESSMAN,D
FRED UPTON,CONGRESSMAN,R
GENE GREEN,CONGRESSMAN,D
HARRY REID,SENATOR,D
HENRY CUELLAR,CONGRESSMAN,D
HOWARD COBLE,CONGRESSMAN,R
JACK KINGSTON,CONGRESSMAN,R
JAMES CLYBURN,CONGRESSMAN,D
JAMES INHOFE,SENATOR,R
JEB HENSARLING,CONGRESSMAN,R
JEFF MILLER,CONGRESSMAN,R
JEFF SESSIONS,SENATOR,R
JIM COOPER,CONGRESSMAN,D
JOE BARTON,CONGRESSMAN,R
JOHN BOEHNER,CONGRESSMAN,R
JOHN BOOZMAN,SENATOR,R
JOHN CONYERS,CONGRESSMAN,D
JOHN DELANEY,CONGRESSMAN,D
JOHN DUNCAN,CONGRESSMAN,R
JOHN LEWIS,CONGRESSMAN,D
JOHN MCCAIN,SENATOR,R
JOSE SERRANO,CONGRESSMAN,D
KAY GRANGER,CONGRESSMAN,R
LAMAR ALEXANDER,SENATOR,R
LAMAR SMITH,CONGRESSMAN,R
LEE TERRY,CONGRESSMAN,R
LEONARD LANCE,CONGRESSMAN,R
LORETTA SANCHEZ,CONGRESSMAN,D
MARCO RUBIO,SENATOR,R
MARK KIRK,SENATOR,R
MARK SANFORD,CONGRESSMAN,R
MARSHA BLACKBURN,CONGRESSMAN,R
MAX BAUCUS,SENATOR,D
MELVIN WATT,CONGRESSMAN,D
MICHAEL MICHAUD,CONGRESSMAN,D
MICHAEL TURNER,CONGRESSMAN,R
MIKE THOMPSON,CONGRESSMAN,D
MITCH MCCONNELL,SENATOR,R
PAT ROBERTS,SENATOR,R
PATRICK LEAHY,SENATOR,D

PATTY MURRAY,SENATOR,D
PAUL RYAN,SENATOR,D
PETER DEFAZIO,CONGRESSMAN,D
RALPH HALL,CONGRESSMAN,R
RICHARD BURR,CONGRESSMAN,R
RICHARD DURBIN,SENATOR,D
RICK LARSEN,CONGRESSMAN,D
ROBERT ANDREWS,CONGRESSMAN,D
ROBERT MENENDEZ,SENATOR,D
RON WYDEN,SENATOR,D
ROSCOE BARTLETT,CONGRESSMAN,R
RUBEN HINOJOSA,CONGRESSMAN,D
SANDER LEVIN,CONGRESSMAN,D
SANFORD BISHOP,CONGRESSMAN,D
SAXBY CHAMBLISS,SENATOR,R
SHERROD BROWN,CONGRESSMAN,D
STEPHEN LYNCH,CONGRESSMAN,D
STEVE COHEN,CONGRESSMAN,D
SUSAN COLLINS,SENATOR,R
TIM RYAN,CONGRESSMAN,D
TOM COBURN,CONGRESSMAN,R
TOM HARKIN,SENATOR,D
TOM LATHAM,CONGRESSMAN,R

I appreciate all of your help.
Dennis Montgomery
dennis@ncoder.net
619.508.1964

**From:** Dickas, J (Intelligence) [mailto:J_Dickas@ssci.senate.gov]
**Sent:** Wednesday, August 14, 2013 10:57 AM
**To:** Dennis
**Subject:** RE: CIA

Hi Mr. Montgomery -

I would definitely not recommend simply disclosing classified information publicly.  If you believe that the work that the CIA contracted you to do was illegal or improper, I would encourage you to keep trying to bring it to the attention of the CIA Inspector General.  The CIA IG actually has a fairly good track record of investigating issues like this, and unlike the other Inspectors General that you have previously contacted, the the CIA IG is well positioned to look into the matter.

If you have not yet received a response from the CIA IG, I would recommend contacting Senator Cantwell's caseworker and asking for assistance.  Congressional caseworkers are generally quite good at getting government agencies to respond to constituent inquiries and concerns.  And if you need any help getting in touch with a caseworker, let me know and I'd be happy to help facilitate with Sen. Cantwell's office.

John Dickas

**From:** Dennis [dennis@ncoder.net]
**Sent:** 14 August 2013 11:00
**To:** Dickas, J (Intelligence)
**Subject:** CIA

I have to been unsuccessful with moving my whistleblower case forward within the US government. I have been rejected by the Office of Special Counsel, the Inspector General of the DNI, and the Inspector General of the DOJ.  I provided my whistleblower complaint to the Inspector General of the CIA, but have not heard back from them.  I have sent faxes to them, asking them to just confirm they have received my information.  Still no response from Inspector General of the CIA.

I appreciate you dialog regarding the whistleblowers laws "currently in place as being inadequate." It seems like my only option now, is to release the information to the public, and let the public investigate for themselves what has really gone on.  This would expose both the inadequate whistleblower laws regarding the intelligence community, the vast amount of data that was actually harvested, and  the US government officials that created, supervised, and abused the programs under "the disguise" of national security or the "patriot act."

The State Secrets Privilege was issued against me to "hide crimes" committed by former US Government officials that worked on these information gathering programs.  These programs are now controlled by individuals that are currently in the highest government offices in our country today.  These programs gathered tens of millions of records of personal information that had absolutely nothing to do with "national security", without any court oversight.  No one was exempt from these "covert programs" including  some of the members of the current congress;  Ron Wyden, John Boehner, Harry Reid, and many others.

According to current administration officials, Snowden did follow the correct protocol for whistleblowing on US Government officials or "illegal data harvesting programs" within the intelligence community.  Given what I have gone through for the last 6 years, I doubt it would have made much difference.  There are no whistleblowing laws within the US Government intelligence community, and the journey I have gone through only proves that.

I appreciate all of your help.
Dennis Montgomery
dennis@ncoder.net
619.508.1964

**From:** Dennis [mailto:dennis@ncoder.net]
**Sent:** Tuesday, August 13, 2013 3:20 PM
**To:** 'Dickas, J (Intelligence)'
**Subject:** CIA

The rejection of the whistleblower complaint rejection by the Inspector General Director of the DNI doesn't make since to me.

All of the work that was done from 2008-2010 was done under secrecy at Fort Washington, MD, and James Clapper. The program there was "document harvesting" information from millions of US Citizens personal information. As I reported to you before, when I was working there, I saw employees from CIA that I had worked with years earlier.

The work that was done at Fort Washington was under an Air Force and DNI contract. Given the fact that James Clapper is the head of the DNI, and the work that was done at Fort Washington was under his direct control, how could the Inspector General of the DNI, claim it is not under his purview to investigate?

I have also included the rejection letter by the Office of Special Counsel. That office suggested I contact my senators or congressman for help. Which I have done.

I have tried to go through the necessary steps to file my whistleblower complaint against US government programs and officials with the correct US government agency. It has become obvious to me, that US government individuals involved in these programs, don't want these investigations to move.

Dennis Montgomery
dennis@ncoder.net
619.508.1964

**From:** Dickas, J (Intelligence) [mailto:J_Dickas@ssci.senate.gov]
**Sent:** Tuesday, August 13, 2013 2:35 PM
**To:** Dennis
**Subject:** RE: CIA

Mr. Montgomery -

I definitely agree that the intelligence whistleblower laws currently in place are inadequate. I do think that the IG that is best positioned to address your concern that your work for the CIA was illegal and/or improper is the CIA IG. If the CIA IG has not responded to your attempts to communicate with them, Senator Cantwell's casework staff might be able to help you get in touch with them.

John

**From:** Dennis [dennis@ncoder.net]
**Sent:** 13 August 2013 16:52
**To:** Dickas, J (Intelligence)
**Subject:** CIA

I filed a whistleblower complaint with the Inspector General of the DOJ, and sent a copy of it to the Attorney General Eric Holder and the Deputy Attorney General, James Cole. The whistleblower complaint was against the two DOJ attorneys and the FBI Special Agent that were involved in the illegal raid on my home and property. I just received a rejection letter by the Inspector General of the DOJ, who referred it to the FBI. This is the same FBI that the judge has already ruled had

already violated my 4th Amendment rights in the first place.

The DOJ doesn't want me to provide them information regarding the illegal document harvesting programs that were run by the intelligence community, against American citizens in this country. They are hiding behind the State Secrets Privilege to "conceal the crimes" and the government officials that were involved in these programs.

The Inspector General of the DNI has also refused to investigate my whistleblower against James Clapper and the DNI.  They had determined it was not under their purview.

It doesn't seem like a whistleblower process really exists in this country when it comes to the intelligence community.

Dennis Montgomery
619.508.1964

---

**From:** Dickas, J (Intelligence) [mailto:J_Dickas@ssci.senate.gov]
**Sent:** Tuesday, August 13, 2013 10:35 AM
**To:** Dennis
**Subject:** RE: CIA

Hi Mr. Montgomery,

If the CIA IG has not confirmed receipt of the information that you sent, the easiest thing to do might be to have the caseworker from Sen. Cantwell's office contact them and ask them to confirm receipt of the materials.  If you need help getting in touch with them, just let me know.

John

---

**From:** Dennis [dennis@ncoder.net]
**Sent:** 12 August 2013 11:51
**To:** Dickas, J (Intelligence)
**Subject:** CIA

John,

I have no way know if the information I sent to the Inspector General of the CIA on 8/6/13 was received.  I have asked for some kind of confirmation from the Inspector General of the CIA that my information was received by his office.

Dennis Montgomery
dennis@ncoder.net
619.508.1964

# EXHIBIT "18"

Capital Reporting Company

IN THE UNITED STATES TAX COURT

_____
In the Matter of:                )
                                 )
DENNIS L. MONTGOMERY & BRENDA K. )
MONTGOMERY,                      )
                                 )
      Petitioner,                )
                                 )
v.                               ) Docket No: 9008-09
                                 )
COMMISSIONER OF INTERNAL REVENUE,)
                                 )
      Respondent.                )

Pages:    1 through 47

Place:    Los Angeles, California

Date:     February 23, 2015

Capital Reporting Company

37

1  resolved?  My legal bill in 2007, Your Honor, was
2  over a million five.
3       So I just want to resolve 2006, and I think
4  the easiest resolution, Your Honor, is simply give me
5  my deduction.
6       THE COURT:  You may be right, and who
7  knows, maybe Mr. Corry in the next two months will
8  look at it and conclude that you're right -- maybe.
9       MR. CORRY:  Your Honor, if I may?
10      THE COURT:  Yes.
11      MR. CORRY:  He is living in Washington now.
12  I don't know if you want to ask Petitioner if he
13  would --
14      MR. MONTGOMERY:  I don't want to change
15  people now, Your Honor.
16      MR. CORRY:  I just wanted to give him the
17  opportunity.
18      MR. MONTGOMERY:  I'd rather him stay on
19  this attempt to resolve things.
20      THE COURT:  Okay.  It is a very old case,
21  but you're right, a trial might have to have a change
22  in place of trial, were that to become necessary.
23      MR. CORRY:  And, Your Honor, maybe to move
24  forward, if Petitioner would like to go on the record
25  and describe his gambling losses, because gambling

38

1  income is one of the issues.  If he would like to go
2  on the record and say how many --
3       THE COURT:  Oh, for '05 and '06?
4       MR. CORRY:  For '05 and '06.  If he would
5  like to go on the record and say an estimate of how
6  much he believes that he lost because of gambling
7  activities in 2005 and 2006.
8       THE COURT:  That's completely unrelated to
9  national security, so if you have records of your
10  gambling losses for those years -- do you have
11  records of gambling losses?
12      MR. MONTGOMERY:  No, but I can get them.
13  But how much was the gambling loss?
14      MR. CORRY:  The gambling income for 2005 --
15  the adjustment on those in the deficiency was $1,400.
16      THE COURT:  You see, that's the kind of
17  thing you almost surely have gambling losses in
18  excess of that.
19      MR. CORRY:  Yes, Your Honor.
20      MR. MONTGOMERY:  How much was it, Your
21  Honor?
22      THE COURT:  It was less than 2,000.
23      MR. CORRY:  $1,400 in 2005, and in 2006 it
24  was $43,000.
25      THE COURT:  So you probably have losses

39

1  that exceed that.  Right?
2       MR. MONTGOMERY:  Do you see the irony,
Your
3  Honor?  He's fighting me over whatever the amount is,
4  let's say $40,000, and I spent a million dollars
5  defending myself.
6       THE COURT:  No.  I understand.  He's quite
7  logically making the point, let's try to resolve
8  these minor issues at least, and that sounds like the
9  minor issue that the men in black would not have come
10  after you to seize records about.
11      MR. MONTGOMERY:  Well, I took a gamble on
12  my life.  The biggest gamble I ever took was working
13  for the United States intelligence agencies.
14      And I want to go on the record one last
15  time -- and yes, Your Honor, I will provide you what
16  you've asked me to provide you in a letter -- but I
17  want to go on the record one last time stating I did
18  work for projects under the direction of John Brannen
19  and James Clapper.
20      John Brannen at the time was not the head
21  of the CAI which he is the head of the CIA now, and
22  James Clapper was the head of the DNI, and  at the
23  time I worked for him was in charge of work being
24  done at Fort Washington, Maryland.
25      These projects that I worked for the

40

1  government on illegally data mined U.S. Americans and
2  their businesses without any FISA court order, search
3  warrant or the knowledge or consent of the people
4  that were doing the work.
5       THE COURT:  Depending on the data mining
6  involved, maybe they did need it and maybe they
7  didn't.  But I'm just here to figure out how much in
8  tax, if anything, you owe for '05 and '06.
9       MR. MONTGOMERY:  Your Honor, I'm sorry; I
10  didn't mean to interrupt you.
11      THE COURT:  Go ahead.
12      MR. MONTGOMERY:  I filed a whistleblower
13  complaint with the inspector general of the IRS
14  outlining these things too where I was trying to be a
15  whistleblower and provide the inspector general of
16  exactly what happened to me as an American has
17  happened to a lot of other people as an American, and
18  I submitted that whistleblower complaint.
19      I also filed a whistleblower complaint with
20  the inspector general of the CIA, the inspector
21  general of the Department of Defense, the inspector
22  general of the DOJ.
23      THE COURT:  If you get income from any of
24  that, it's probably taxable.
25      MR. MONTGOMERY:  Yes.  I got a reply saying

EXHIBIT "19"



U.S. Department of Justice

Vincent H. Cohen, Jr.
Acting United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

July 28, 2015

Re:   In re Investigation of Possible Violations of 50 U.S.C. § 1809

Dear Counsel:

As you are aware, your client, Dennis Montgomery, has indicated that he possesses physical evidence of possible violations of 50 U.S.C. § 1809 in the form of documents, written material, electronic media and/or other physical items, to include any codes necessary to access such items (collectively referred to hereinafter as the "Physical Evidence"), which your client acquired in connection with his previous employment with the United States government. I understand that your client is interested in voluntarily producing the Physical Evidence to members of law enforcement and representatives of this Office for evaluation.

In order to assure that there are no misunderstandings concerning the terms under which your client's production of the Physical Evidence would occur:

(1)    First, except as provided for in paragraphs two and three below, the act of production by your client would not be used against your client to establish either that (a) the Physical Evidence was in his possession or control or (b) the Physical Evidence is authentic.

(2)    Second, the Government may make any use whatsoever of the Physical Evidence produced by your client pursuant to this agreement, provided that an evidentiary foundation other than your client's production of such items can be established.

(3)    Third, in the event your client is ever a witness or presents evidence through other witnesses, at trial or any other proceeding, and your client's statements or that evidence contradicts that the Physical Evidence (a) existed, (b) was in his possession, custody, or control, or (c) was authentic, the attorney or agent for the Government may cross-examine your client and other witnesses concerning the act of production by your client. Evidence regarding the act of production may also be introduced in rebuttal at any trial. (This provision is intended to assure that your client does not abuse the opportunity for a voluntary production, does not make materially false statements to a government agency or fact finder, and does not commit perjury or otherwise provide materially false information at a trial or any other proceeding.)

(4)    Fourth, it is understood and agreed to by your client and the United States that this agreement does not constitute a plea bargaining session. However, if this agreement is subsequently construed to be a plea bargaining session, your client knowingly and voluntarily

waives or gives up any rights he has pursuant to Rule 410 of the Federal Rules of Evidence and Rule 11(f) of the Federal Rules of Criminal Procedure.

(5)   Finally, this agreement does not obligate the United States Attorney's Office for the District of Columbia to take any action or refrain from taking any action not described in this letter. In addition, your client understands that this Office has made no additional promises to your client not contained in writing herein.

I trust that you will find this offer fair and reasonable. If your client wishes to engage in a voluntary act of production under these ground rules, you and your client should both sign this letter where indicated below.

Sincerely yours,

VINCENT H. COHEN, JR.
UNITED STATES ATTORNEY

By: _____

DEBORAH A. CURTIS
Assistant United States Attorney

### ACKNOWLEDGMENT

I have read every word of this agreement, and its meaning has been fully explained to me by my attorney. After consultation with my attorney, I understand and agree to the contents of this letter.

_____7/28/15_____      _____Dennis Montgomery_____
Date

### ATTORNEY'S ACKNOWLEDGMENT

I acknowledge that I have read each page of this agreement, reviewed it in its entirety with my client, and discussed fully with my client each of the provisions of the agreement.

_____7/28/15_____      _____
Date                                    Attorney for _____Dennis Montgomery_____

FD-597 (Rev 8-11-94)

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property Received/Returned/Released/Seized

File # _____

On (date) _____8/19/2015_____

item(s) listed below were:
- [X] Received From
- [ ] Returned To
- [ ] Released To
- [ ] Seized

(Name) _____DENNIS  MONTGOMERY_____

(Street Address) _____

(City) _____MIRAMAR  FL_____

Description of Item(s): HD LABELLED DRIVE 49 2005 ALL

(2) HD LABELLED DRIVE 49 2005 ALL
(1) HD LABELLED DRIVE 41 2008 BLX. OPS
(1)   "          "     43 2010 ETN VAULT
(1)   "          "     47 2008 DMT. SRC
(1)   "          "     39 2008 BLX. BIOMETRICS
(1)   "          "     32 BLX.CIR 2012
(1)   "          "     35 ETN.CIR OUTPUT
(1)   "          " DISK 31 BLX. RECORDER
(1)   "          "     40 2008 BLX. OPS
(1)   "          " DISK 24 ETN.SRC
(1)   "          " DISK 25 ETN.ALL
(1)   "          " DRIVE 48 2005 ETN.ADMIN
(1)   "     " DISK 33 BLX. BLX SRC     (1) "  " DRIVE 36 2008 BLX. ADMIN
(1)   "     " DRIVE 37 2008 BLX. EMPX  (1) "  " DISK 23 2004 ETN.COVA
(1)   "     " DISK 22 2004 ETN.COVA    (1) "  " DRIVE 43 2008 ETN.WIP
(1)   "     " DRIVE 34 2008 BLX.SRC    (1) "  " DRIVE 44 2010 DMT VAULT
(1)   "     " DRIVE 42 2010 DMT        (1) "  " DISK 05 VIDEO
(1)   "     " DISK 07 VIDEO
(1) SHEET OF PAPER "MONTGOMERY DISK DRIVES"

Received By: _____    Received From: _____
            (Signature)                               (Signature)

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
Receipt for Property Received/Returned/Released/Seized

File # _____

On (date)  _August 19, 2015_____

item(s) listed below were:
☒ Received From
☐ Returned To
☐ Released To
☐ Seized

(Name)  _Dennis Montgomery_____

(Street Address) _____

(City)  _Miramar, FL._____

Description of Item(s): (1) HD labeled Disk 04 Video - 2TB green
(1) HD labeled Disk 11 2009 Jory                (1) 8HD Disk 29 BLX.LIVE
  (1) HD labeled Disk 8 Video - green label     (1) 8HD Disk 15 2005 ETR.WIP
  (1) HD labeled Disk 19 2004 ETR.RND           (1) HD Disk 14 2006 ETREAPD WIP
  (1) HD labeled Disk 30 BLX.LIVE
  (1) HD labeled Disk 02.. VIDEO green label
  (1) HD labeled Disk 03 VIDEO green label
  (1) HD labeled Disk 09 VIDEO green label
  (1) HD labeled Disk 18 2005 ETR.RND
  (1) HD labeled Disk 26 ETR.DRONE
  (1) HD labeled Disk 28 BLX.SRC
  (1) HD labeled Disk 13 2007 Sandoval
  (1) HD labeled Disk 01.. Video green label
  (1) HD labeled Disk 16 2005 ETR.WIP green label
  (1) HD labeled Disk 06 Video - green label
  (1) HD labeled Disk 12 2009 Jory
  (1) HD labeled Disk 27 BLX.TB
  (1) HD labeled Disk 17 2004 ETR.WIP
  (1) HD labeled Disk 10 Video green label
  (1) HD labeled Disk 20 2005 ETR.FACE

Received By: _____     Received From: _____
                    (Signature)                                      (Signature)



U.S. Department of Justice

Ronald C. Machen Jr.
United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

November 24, 2015

Larry Klayman, Esq.

Re:   <u>In re Investigation of Possible Violations of 50 U.S.C. § 1809</u>

Dear Counsel:

As you are aware, your client, Dennis Montgomery, has indicated that he possesses evidence of possible violations of 50 U.S.C. § 1809, the Foreign Intelligence Surveillance Act. I understand that in support of these allegations, in addition to providing physical evidence, your client is interested in meeting with members of law enforcement for a voluntary, "off-the-record" debriefing.

In order to assure that there are no misunderstandings concerning the meaning of "off-the-record," I am writing to clarify the ground rules of this and any subsequent voluntary "off-the-record" debriefing(s) with your client.

(1)     First, except as provided for in paragraphs two and three below, no statements made by or other information provided by you during the voluntary "off-the-record" debriefing(s) will be used directly against your client in any criminal proceeding, other than a prosecution for perjury, giving a false statement, or obstruction of justice.

(2)     Second, the Government may make derivative use of and may pursue any investigative leads suggested by any statements made by, or other information provided by, your client. (Because any statements made during this "off-the-record" debriefing are voluntarily made on the part of your client, rather than compelled, it is the government's position that <u>Kastigar</u> protections do not apply. Nevertheless, your client understands that based on the terms of this agreement there will be no <u>Kastigar</u> hearing at which the government would have to prove that the evidence it would introduce at trial is not tainted by any statements made by or other information provided by your client.)

(3)     Third, in the event your client is ever a witness or presents evidence through other witnesses, at a trial or any other proceeding, and your client's statements or that evidence contradicts statements made in your debriefing, the attorney or agent for the Government may

cross-examine your client and other witnesses concerning any statements made or other information provided by your client during the "off-the-record" debriefing(s). Evidence regarding such statements may also be introduced in rebuttal. (This provision is to assure that your client does not abuse the opportunity for a voluntary "off-the-record" debriefing(s), does not make material false statements to a government agency or fact finder, and does not commit perjury or otherwise provide materially false information at a trial or other proceeding, examples of which include, but are not limited to, sentencing hearings, parole hearings, and hearings on revocation of probation or supervised release).

(4)     Finally, this debriefing agreement does not obligate the United States Attorney's Office for the District of Columbia to file any motion regarding cooperation provided by your client. In addition, your client understands that this office has made no additional promises to your client not contained in writing herein.

I trust that you will find these ground rules fair and reasonable. If your client wishes to engage in a voluntary "off-the-record" debriefing under these ground rules, would you and your client both sign this letter where indicated below. Once signed, please return the original to me and retain a copy for your files.

Sincerely yours,

CHANNING D. PHILLIPS
UNITED STATES ATTORNEY

BY: _____   12/3/15

Deborah A. Curtis
Assistant United States Attorney

2

I have read every word of this debriefing agreement, and its meaning has been fully explained to me by my attorney.  After consultation with my attorney, I understand and agree to the contents of this letter.

_____11-70-15_____                          _____Dennis Montgomery_____
Date                                                              Dennis Montgomery

### *ATTORNEY'S ACKNOWLEDGMENT*

I acknowledge that I have read each page of this debriefing agreement, reviewed it in its entirety with my client, and discussed fully with my client each of the provisions of the agreement.

_____12/3/15_____                          _____
Date                                                              Larry Klayman
                                                                     Attorney for Dennis Montgomery

3

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION
### Receipt for Property Received/Returned/Released/Seized

File # _____

On (date) ___12/3/2015___

item(s) listed below were:
- ☒ Received From
- ☐ Returned To
- ☐ Released To
- ☐ Seized

(Name) DENNIS MONTGOMERY

(Street Address) 3812 94th AVE NE

(City) BELLVUE WA 98004

Description of Item(s): (1) ATIVA 4 GB THUMB DRIVE

Received By: _____
(Signature)

Received From: _____
(Signature)



U.S. Department of Justice

Vincent H. Cohen, Jr.
Acting United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

July 28, 2015

Re:   In re Investigation of Possible Violations of 50 U.S.C. § 1809

Dear Counsel:

As you are aware, your client, Dennis Montgomery, has indicated that he possesses physical evidence of possible violations of 50 U.S.C. § 1809 in the form of documents, written material, electronic media and/or other physical items, to include any codes necessary to access such items (collectively referred to hereinafter as the "Physical Evidence"), which your client acquired in connection with his previous employment with the United States government. I understand that your client is interested in voluntarily producing the Physical Evidence to members of law enforcement and representatives of this Office for evaluation.

In order to assure that there are no misunderstandings concerning the terms under which your client's production of the Physical Evidence would occur:

(1)    First, except as provided for in paragraphs two and three below, the act of production by your client would not be used against your client to establish either that (a) the Physical Evidence was in his possession or control or (b) the Physical Evidence is authentic.

(2)    Second, the Government may make any use whatsoever of the Physical Evidence produced by your client pursuant to this agreement, provided that an evidentiary foundation other than your client's production of such items can be established.

(3)    Third, in the event your client is ever a witness or presents evidence through other witnesses, at trial or any other proceeding, and your client's statements or that evidence contradicts that the Physical Evidence (a) existed, (b) was in his possession, custody, or control, or (c) was authentic, the attorney or agent for the Government may cross-examine your client and other witnesses concerning the act of production by your client. Evidence regarding the act of production may also be introduced in rebuttal at any trial. (This provision is intended to assure that your client does not abuse the opportunity for a voluntary production, does not make materially false statements to a government agency or fact finder, and does not commit perjury or otherwise provide materially false information at a trial or any other proceeding.)

(4)    Fourth, it is understood and agreed to by your client and the United States that this agreement does not constitute a plea bargaining session. However, if this agreement is subsequently construed to be a plea bargaining session, your client knowingly and voluntarily

waives or gives up any rights he has pursuant to Rule 410 of the Federal Rules of Evidence and Rule 11(f) of the Federal Rules of Criminal Procedure.

(5)     Finally, this agreement does not obligate the United States Attorney's Office for the District of Columbia to take any action or refrain from taking any action not described in this letter. In addition, your client understands that this Office has made no additional promises to your client not contained in writing herein.

I trust that you will find this offer fair and reasonable. If your client wishes to engage in a voluntary act of production under these ground rules, you and your client should both sign this letter where indicated below.

Sincerely yours,

VINCENT H. COHEN, JR.
UNITED STATES ATTORNEY

By: _____

DEBORAH A. CURTIS
Assistant United States Attorney

### ACKNOWLEDGMENT

I have read every word of this agreement, and its meaning has been fully explained to me by my attorney. After consultation with my attorney, I understand and agree to the contents of this letter.

_____7/28/15_____          _____Dennis Montgomery_____
Date

### ATTORNEY'S ACKNOWLEDGMENT

I acknowledge that I have read each page of this agreement, reviewed it in its entirety with my client, and discussed fully with my client each of the provisions of the agreement.

_____7/28/15_____          _____
Date

Attorney for _____Dennis Montgomery_____

# EXHIBIT "20"

---------- Forwarded message ----------
From: "Curtis, Deborah (USADC)" <Deborah.Curtis@usdoj.gov>
Date: Nov 24, 2015 7:24 AM
Subject: Meeting
To: "Larry Klayman" <leklayman@gmail.com>, "Dina James" <daj142182@gmail.com>
Cc: "Giardina, Walter B. (WF) (FBI)" <Walter.Giardina@ic.fbi.gov>, "Barnett, William J. (WF)
(FBI)" <William.Barnett@ic.fbi.gov>

Dear Mr. Klayman,

The FBI looks forward to meeting with you and Mr. Montgomery on December 3, 2015 at 1030
am<x-apple-data-detectors://6> at the Washington Field Office.

As I indicated in our recent telephonic discussion, in furtherance of this investigation, the FBI
requests the following information from your client:

-tax returns for the past ten years showing reported income and source of income

-bank statements for the past 10 years to the present showing deposits or reimbursements from
Other Government Agency of the Intelligence Community ("OGA") or OGA associated entities

-any contracts between Dennis Montgomery ("DM") or DM related companies and OGA or
OGA associated entities

-any orders, memoranda, taskings, or communications in any form from OGA, OGA associated
entities, or government officials for the past 10 years to the present (this can exclude the many
letters DM has submitted to Inspector Generals and members of Congress)

-email records between DM and OGA or government officials from 2005 to the present

-phone numbers for OGA individuals or government officials DM worked with from 2005 to the
present (phone records as well if he possesses)

-address and supporting records (bills, leases, voter registration, etc) where DM lived while
working at Ft. Washington, Maryland
-------
These materials will be treated as falling within the scope of our existing production immunity
agreement.

Further, in order allow for more direct discussions between FBI and your client, my office may
be in a position to now offer a standard letter immunity agreement for purposes of this meeting. I
will follow up with you later today or tomorrow on that issue.

Please let me know if you have any questions.

194 of 194

Deborah
DEBORAH A. CURTIS
Assistant U.S. Attorney